UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD S. PATOSKI,<br><br>        Plaintiff,<br><br>v.<br><br>ALPHONSO JACKSON, SECRETARY,<br>DEPARTMENT OF HOUSING AND<br>URBAN DEVELOPMENT,<br><br>        Defendant. | C.A. No. 05-11086 RCL |

## FIRST AMENDED COMPLAINT AND JURY TRIAL DEMAND

A.    Nature of the Action

This is an action for equitable and legal relief, attorney's fees, costs and other relief against Defendant, based on its discrimination against Plaintiff on account of his age, race and or gender, and HUD's use of unlawful formal and informal affirmative action programs and practices that have damaged Plaintiff and prevented him, and continue to prevent him, from competing for training and positions at HUD on an equal footing with members of targeted groups. This suit is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, the ADEA, and the Fifth Amendment of the United States Constitution.

B.    Jurisdiction

Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343. Venue in this district is proper pursuant to 28 U.S.C. § 1391, in that each cause of action arose in this district. All conditions precedent to suit have been complied with, to wit:

Plaintiff timely initiated EEO activity, and the Equal Employment Opportunity Commission ("EEOC") issued its Decision on February 25, 2005. The Plaintiff's present Complaint is brought within the requisite 90 days of his receipt of the EEOC decision.

C.    Parties to the Action

1.    Plaintiff Richard S. Patoski is an individual with a place of residence at 28 Brookhouse Drive, Marblehead, MA 01945.

2.    Defendant Alphonso Jackson is the Secretary of the United States Department of Housing and Urban Development and is sued in his official capacity only [hereinafter this defendant is referred to as "HUD"].

D.    FACTUAL ALLEGATIONS

3.    Plaintiff is a Caucasian male with a date of birth of January 2, 1949.

4.    Plaintiff began to work for HUD in 1972.

5.    Since 1980, Plaintiff worked as a Community Planning and Development ("CPD") Representative in the CPD Division in HUD's Boston Field Office. Plaintiff performed his job in a competent and professional manner. Plaintiff received outstanding performance evaluations and special awards.

COUNT I – NON-SELECTION FOR COMMUNITY BUILDER POSITION --
ADEA – AGE DISCRIMINATION

6.    In or about October 1997, Plaintiff applied for one of four Community Builder/Community Resource Representative positions in HUD's Boston office at the GS-14 level. These Community Builder positions were new positions, created to solely carry out a function that was one of Plaintiff's duties at the GS-12 level that he was in at the time.

7.  It was determined that Plaintiff met the minimum qualifications for the position at the GS-14 level. Plaintiff's application received the highest rating score possible and his name was placed on the "Best Qualified List" for the GS-14 level Community Builder position.

8.  Jose Cintron, then Acting Deputy Assistant Secretary for Public and Indian Housing in Washington, D.C., (then 44 years old), was the Selecting Officer for the Boston CB vacancies. In making the selections, Mr. Cintron relied on and/or deferred the selection decisions to the Secretary's Representative for the region where the vacancy was located.

9.  For the Boston Office, the Secretary's Representative was Mary Lou Crane.

10. Ms. Crane made the selections for the Boston Community Builder positions based in part on her interest in workforce "diversity." On information and belief, Ms. Crane, who was not in the Plaintiff's chain of command, and who should not have been consulted, informed Mr. Cintron that Plaintiff did not have the interpersonal skills to successfully perform the Community Builder position. Mr. Cintron adopted Ms. Crane's selections, as he believed that it is more difficult for older persons to change their behavior.

11. On or about April 3, 1998, Plaintiff received a letter dated March 20, 1998, in which he was informed that he was not selected for one of the Community Builder/Community Resource Representative positions.

12. On or about July 1, 1998, Plaintiff filed an EEO complaint alleging discrimination based on age and gender, when he was not selected for one of four Community Builder/Community Resource Representative positions.

13.    On or about September 30, 1999, the District Inspector General for Audit Southwest District released an Audit, addressing the Community Builder selection process. HUD's own Inspector General Report documented the fact that after the Secretary of HUD was advised that he could not use race as a factor in hiring decision, the Secretary stated that he wanted to use diversity as a selection criteria, and another employee pointed out during that same meeting that "diversity was easy to tell from the volunteer activities in the resume, or that one could also determine it during the interview."

14.    At the time of the Plaintiff's rejection, HUD had promulgated, and implemented a formal affirmative action plan that unlawfully discriminated against white males, and gave preferences in numerous aspects of employment to applicants of certain racial and ethnic groups and women. The affirmative action plan implemented by HUD was not designed to cure past acts of discrimination and was not narrowly tailored to achieve legitimate goals. The existence of HUD's formal and/or informal affirmative action programs at the time of Plaintiff's rejections, and the fact that managers and supervisors were held accountable for meeting the goals of these programs, constitute circumstantial and/or direct evidence that Plaintiff was subjected to discrimination because of his race and/or gender.

15.    HUD collected and compiled minority data from the applications for each city which had a CB vacancy, and other documents show that diversity was a factor in the CB selection process.

16.    All the people chosen for the Community Builder position in Boston were endorsed by Ms. Crane. Ms. Teninga (female) and Mr. Reeves (black male) were

initially chosen because Ms. Crane favored their selection, but they declined the offers. Ultimately, three younger individuals, two of which were female, were selected for the Boston CB vacancies.

17. Plaintiff's qualifications for the Community Builder were objectively better than the selectees (i.e., Ms. Griswold, Mr. Polito and Ms. Pellegrino). Ms. Pellegrino had much less experience than Plaintiff, and her experience was confined to one Agency program (Housing). Although Ms. Pellegrino was found eligible, other candidates were found ineligible because their applications showed that they lacked knowledge of Agency programs and or only had experience in one program area. Ms. Griswold's Supervisor felt that she lacked people skills.

18. If the rating panel had averaged the rating scores of each panel member, as they had been required to do, Plaintiff would have received a higher rating than selectees Ms. Pellegrino and Mr. Polito.

19. HUD offered pretextual reasons for Plaintiff's non-selection, relating to his purported lack of "people skills."

20. When filling the Community Builder positions, HUD violated various policies and procedures, including, without limitation, the requirement to preserve all the selection records, and failing to use consistent rating and ranking procedures in the nationwide selection process.

21. A departmental atmosphere of discrimination is also demonstrated by the fact that so many women and minorities were selected for the positions, even though they were already over-represented in the Agency's work force at the upper grade levels.

22.    HUD discriminated against Plaintiff on the basis of his age (49), in violation of

the ADEA, when it failed to select Plaintiff for one of the Community Builder

positions.

23.    As a result of the unlawful rejection of Plaintiff's application, Plaintiff has

suffered lost wages, lost benefits, inconvenience and emotional suffering for

which he seeks compensation.

COUNT II – NON-SELECTION FOR COMMUNITY BUILDER POSITION
TITLE VII – GENDER DISCRIMINATION

24.    Plaintiff reasserts and realleges the above allegations.

25.    HUD discriminated against Plaintiff on the basis of his gender (male), in violation

of Title VII, when it failed to select Plaintiff for one of the Community Builder

positions.

COUNT III – NON-SELECTION FOR COMMUNITY BUILDER POSITION
TITLE VII AND ADEA – COMBINATION OF AGE AND GENDER
DISCRIMINATION

26.    Plaintiff reasserts and realleges the above allegations.

27.    HUD discriminated against Plaintiff on the based of his gender (male), his age

(49), or a combination of both, in violation of Title VII and the ADEA, when it

failed to select Plaintiff for one of the Community Builder positions.

COUNT IV – NON-SELECTION FOR COMMUNITY BUILDER POSITION
TITLE VII – GENDER DISCRIMINATION WAS A MOTIVATING FACTOR
42 U.S.C. § 2000e-2(m)

28.    Plaintiff reasserts and realleges the above allegations.

29.    Whether or not Plaintiff would have been selected for a Community Builder

position but for his gender, he is nevertheless entitled to relief 42 U.S.C. § 2000e-

2(m), because his gender was improperly considered in the decision not to select Plaintiff for a Community Builder position.

COUNT V – NON-SELECTION FOR PHRS POSITION
TITLE VII – COMBINATION OF RACE AND GENDER DISCRIMINATION

30.  Plaintiff reasserts and realleges the above allegations.

31.  HUD put out two different vacancy announcements for a single Public Housing Revitalization Specialist (PHRS) position in Boston.  One vacancy was for only internal, career status candidates (MSR) and the other vacancy announcement was for both internal and external candidates (DEU).

32.  When an agency fills a vacancy using a Delegated Examining Unit (DEU) process, the Agency must follow OPM's regulations for that process.  OPM's DEU regulations are designed to achieve merit system objectives.

33.  On or about January 21, 2000, Plaintiff timely submitted his applications for both the MSR and DEU vacancy announcements for the PHRS position in Boston.

34.  On May 16, 2000, Plaintiff was notified that he was eligible and qualified under the PHRS DEU vacancy announcement at the GS-13, GS-14 and GS-15 level.

35.  On June 25, 2000, Plaintiff was informed, incorrectly, that he was unqualified under the MSR PHRS vacancy at the GS-14 level.  After Plaintiff complained about the inconsistency between the eligibility determinations for his MSR application and for his DEU application, HUD claimed there had been a procedural error and placed him in a "priority consideration," program for future job applications, to make up for the error, claiming that it was a benefit when in fact, there was no benefit.

36. Mr. Knighton, a black male and an unlawfully hired temporary HUD employee, inappropriately applied for a PHRS position under the MSR vacancy announcement, for which he was properly found ineligible. He did not submit an application under the DEU vacancy announcement. HUD, *sua sponte*, forwarded Mr. Knighton's application to the separate DEU selection process for only those applicants who applied under the DEU vacancy announcement. However, other white applicants who had applied under the MSR vacancy announcement did not have their applications forwarded to the DEU process. As a result of the advantage gained by Mr. Knighton, he was placed on the PHRS DEU "Certificate of Eligibles" from which the selection for the position was made.

37. Mr. Gallagher, a white male who had applied under the DEU vacancy announcement was determined ineligible for the PHRS position at the GS-15 level but was improperly placed on the DEU GS-15 rating roster, was rated for the GS-15 position in Boston, and received the highest rating. Mr. Gallagher also applied for the PHRS positions in Washington, D.C. where he was not placed in the rating pool for the positions at the GS-15 level and where he was ultimately selected for a GS-13 PHRS job in Washington, D.C. If Mr. Gallagher had not been placed in the rating pool for the position at the GS-15 level, the DEU GS-15 "Certificate of Eligibles" from which the selection was made would have contained the names of the only three African-Americans to have applied for the job and no others.

38.   But for the inappropriate processing of Mr. Knighton and Mr. Gallagher's applications, Plaintiff would have been on the DEU GS-15 "Certificate of Eligible" for the PHRS DEU job from which the selection was made.

39.   When filling the PHRS positions, HUD violated various policies and procedures, including, without limitation, the requirement to preserve all the selection records.

40.   The Agency's applicable Collective Bargaining Agreement (CBA) provisions require the Agency to use a crediting plan to rate and rank candidates. The Agency's CBA also requires that the "[r]atings shall be sufficiently documented in order to reconstruct the action." However, HUD is unable to confirm whether there was a crediting plan developed or used by the staffing panels who rated the DEU applicants for the PHRS jobs. Indeed, there was no crediting plan developed for the staffing panels who rated the DEU applicants for the PHRS positions.

41.   Eventually, Mr. Abbey Ogunbola, a younger black male, was chosen for the PHRS position. HUD improperly "groomed" Mr. Ogunbola for the position, by illegally using OPM Schedule A hiring authority to place him in the PHRS position as a temporary employee.

42.   Plaintiff was discriminated against on the basis of his sex (male), his race (Caucasian), or a combination of both, when he was not selected for the PHRS position, in violation of Title VII.

43.   As a result of the unlawful rejection of Plaintiff's application, Plaintiff has suffered lost wages, lost benefits, inconvenience, damage to his professional reputation and emotional suffering for which he seeks compensation.

COUNT VI – NON-SELECTION FOR PHRS POSITION
TITLE VII – GENDER AND/OR RACE DISCRIMINATION WAS A MOTIVATING
FACTOR

44.    Plaintiff reasserts and realleges the above allegations.

45.    Whether or not Plaintiff would have been selected for a PHRS position but for his

gender or race, he is nevertheless entitled to relief pursuant to 42 U.S.C. § 2000e-

2(m), because his gender and/or race was improperly considered in the decision

not to select Plaintiff for the PHRS position.

COUNT VII – AFFIRMATIVE ACTION PROGRAMS WITHOUT JUSTIFICATION
DURING THE PERIOD OF PLAINTIFF'S REJECTIONS – TITLE VII – RACE
AND/OR GENDER

46.    Plaintiff reasserts and realleges the above allegations.

47.    In 1998 and 2000, the period of time in which Plaintiff was rejected for the PHRS

and CB positions, HUD engaged in formal and/or informal affirmative action

programs, including without limitation, an Affirmative Employment Plan (AEP).

The AEP, and other affirmative action programs were designed to benefit the

careers of women and members of certain ethnic and racial groups, but not White

males.

48.    HUD's AEP was based on HUD's claim that women and various racial and/or

ethnic groups were under-represented in its workforce.  The internal analysis that

was the basis for the claim of under-representation did not meet Title VII and/or

Fifth Amendment standards for such analysis, and did not meet the standard as

articulated in a memorandum from the Department of Justice, dated February 29,

1996.  The AEP and other affirmative action programs were applied, even for job

that lacked conspicuous imbalance in traditionally segregated job categories.

49.    Such efforts at affirmative action resulted in the steady increase of employment of women and those in certain ethnic and racial groups, especially at the grade levels of the positions that the Plaintiff applied for.

50.    There was no sufficient compelling state interest to justify the establishment of such formal and/or informal affirmative action programs.

51.    The formal and informal affirmative action programs were a factor which directly, or indirectly, led to the decisions to reject Plaintiff for the CB positions in 1998 and the PHRS position in 2000.

52.    As a result of the affirmative action programs, which were unlawful under Title VII, Plaintiff suffered lost wages and benefits, damage to his professional reputation, and emotional distress, for which he seeks compensation.

### COUNT VIII – DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF – ONGOING USE OF UNLAWFUL, DISCRIMINATORY EMPLOYMENT PATTERNS AND PRACTICES THAT PREVENT PLAINTIFF FROM COMPETING ON EQUAL FOOTING – TITLE VII – RACE AND/OR GENDER

53.    Plaintiff reasserts and realleges the above allegations.

54.    HUD has, and continues to engage in a pattern and practice of unlawfully favoring women and certain races and ethnicities with regard to trainings and promotions, whereby HUD has deprived, and continues to deprive Plaintiff of his right to Equal Protection under the law.

55.    Plaintiff is a current Federal Civil Service Career employee at HUD and he intends to continue to apply at HUD for trainings and promotions in the future. Plaintiff continues to be affected by ongoing, institutionalized discrimination, as he continues to apply for positions at HUD, and he continues to be rejected, in favor of applicants from certain racial or ethnic groups. Plaintiff is forced to

compete on an unequal footing with other "targeted" applicants on account of his race and/or gender for promotions and training.

56.    Statistical and other evidence demonstrates that HUD favors women and certain minorities, and disfavors White males in selections for promotions and training. Plaintiff was not selected for positions because of actions emanating from a formal and informal affirmative action programs pursued by HUD.

57.    There was no sufficient under-representation in traditionally segregated job categories as to justify preferential treatment for women and certain minorities. The formal and/or informal affirmative action programs which HUD has implemented and/or continued were/are not designed to cure past acts of discrimination, and were not narrowly tailored to achieve legitimate goals, and are in violation of Title VII.

COUNT IX – DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF –
ONGOING USE OF UNLAWFUL, DISCRIMINATORY EMPLOYMENT PATTERNS
AND PRACTICES THAT PREVENT PLAINTIFF FROM COMPETING ON AN
EQUAL FOOTING – THE FIFTH AMENDMENT OF
THE UNITED STATES CONSTITUTION – RACE AND/OR GENDER

58.    Plaintiff reasserts and realleges the above allegations.

59.    HUD has, and continues to engage in a pattern and practice of unlawfully favoring women and certain races and ethnicities with regard to promotions and training, including without limitation its current five year strategy for diversity hiring to address purported under-representations in the HUD workforce.

60.    Plaintiff is a current Federal Civil Service Career employee at HUD and he intends to continue to apply at HUD for trainings and promotions in the future. Plaintiff continues to be affected by ongoing, institutionalized discrimination, as

he continues to apply for positions at HUD, and he continues to be rejected, in

favor of applicants from certain racial or ethnic groups. Plaintiff is forced to

compete on an unequal footing with other "targeted" applicants on account of his

race and/or gender for promotions and training.

61.     HUD's formal and/or informal affirmative action programs violate the Fifth

Amendment of the United States Constitution and deprive Plaintiff of his right to

Equal Protection under the law. The past and/or continuing programs do not

satisfy strict scrutiny analysis, or any other standard required under the Fifth

Amendment.

62.     Plaintiff is entitled to a declaratory judgment and other equitable relief to ensure

that going forward, Plaintiff will be accorded equal footing for training and

promotions at HUD.

Wherefore, the Plaintiff requests that this Court order:

a)      That the Plaintiff be compensated for any loss of wages and/or benefits
        incurred as a result of discriminatory rejection, incurred either before or
        after judgment (back pay and front pay);

b)      that the Plaintiff be awarded an amount of money which will fairly
        compensate him for his emotional and physical pain, suffering,
        inconvenience, mental anguish, and loss of enjoyment of life.

c)      that the Plaintiff be awarded an amount of money which will fairly
        compensate him for the damage to his reputation and/or the diminution of
        his earning capacity;

d)      that the Defendant pay the Plaintiff costs and attorney's fees resulting
        from this action and the prior proceedings at the EEOC;

e)      that the Defendant pay the Plaintiff prejudgment interest;

f)      that the Defendant be ordered to pay the Plaintiff punitive damages;

g)    that the Defendant immediately promote Plaintiff to a GS-15 position in Boston;

h)    a declaratory judgment stating that HUD's past and/or continuing practices and policies favoring women and certain racial or ethnic groups be declared unlawful;

i)    an injunction preventing HUD from continuing to implement its ongoing practices and policies favoring applicants based on gender, race and/or ethnicity;

j)    equitable relief requiring that Plaintiff be given training, promotions or other preferences to assist Plaintiff's career

k)    such relief as may be just and proper and/or which will make the Plaintiff whole.

THE PLAINTIFF DEMANDS A TRIAL BY JURY ON EACH ISSUE SO TRIABLE

Respectfully submitted,

The Plaintiff
By his attorneys,


_____/s/ Robert S. Mantell_____
Kevin G. Powers
BBO# 405020
Robert S. Mantell
BBO# 559715
Rodgers, Powers & Schwartz LLP
18 Tremont Street, Suite 500
Boston, MA 02108
(617) 742-7010, ext. 305
fax (617) 742-7225
RMantell@TheEmploymentLawyers.com

Patoski first amended complaint



U. S. Department of Justice

Office of the Associate Attorney General

---

The Associate Attorney General

*Washington, D.C. 20530*

February 29, 1996

*Note page 8 and 9.*

MEMORANDUM TO GENERAL COUNSELS

From:     John R. Schmidt

Re:       Post-*Adarand* Guidance on Affirmative Action in Federal Employment

I.  Introduction.

In Adarand Constructors, Inc. v. Peña, 115 S. Ct. 2097 (1995), the Supreme Court
held that federal affirmative action programs that use racial and ethnic criteria as a basis for
decisionmaking are subject to strict judicial scrutiny.  Under strict scrutiny, such programs
must serve a compelling governmental interest and must be narrowly tailored to serve that
interest.

On June 28, the Justice Department's Office of Legal Counsel (OLC) issued
preliminary legal guidance on the implementation of Adarand.  As indicated in the OLC
memorandum, although Adarand was a challenge to a Department of Transportation
contracting program, its holding applies to race-based decisionmaking in all areas of federal
activity, including employment.

The purpose of this memorandum is to provide guidance on the use of affirmative
action in federal employment.  In order to assure that race is used in a manner consistent
with Adarand principles, each agency will be expected to utilize this guidance, and
communicate it as necessary throughout the agency.

A number of overarching points merit attention at the outset.  First, the federal
government is firmly committed to fair employment practices that open opportunities to all
Americans.  It is also committed to ensuring that its workforce draws on the full range of the
nation's talent.  Affirmative action efforts can advance those vital objectives.  Thus, to the
extent that they comport with Adarand, such efforts should be continued.

Second, the Supreme Court in Adarand did not establish a constitutional bar on the
use of race-based affirmative action measures by the federal government, but rather held that
such action requires strict scrutiny.  Moreover, a majority of the Court rejected the
proposition that "strict scrutiny" of affirmative action measures means "strict in theory, fatal
in fact," and agreed that such measures may be permissible even under strict scrutiny.  The
Court in Adarand did not decide the constitutionality of the program at issue in the case, but

2

rather remanded the case to the lower courts so they could determine, in the first instance, whether the program satisfied strict scrutiny. No program was held unconstitutional in Adarand.

Third, Adarand itself does not provide specific guidance on application of the strict scrutiny standard. Some principles can be gleaned from the Supreme Court's decision in City of Richmond v. J.A. Croson Co., 488 U.S. 469 (1989), in which a majority of the Court held for the first time that race-based affirmative action by state and local governments is subject to strict scrutiny. In large measure, the standards by which federal affirmative action in employment will be judged generally will track the standards used in Croson. Post-Croson lower court cases, including some in the employment setting, also help to flesh out what strict scrutiny means in practice.

Fourth, Adarand left open the question whether, even under strict scrutiny, Congressionally authorized affirmative action measures undertaken by federal agencies are entitled to particular deference from the courts, given Congress' broad powers to remedy discrimination. In our view, that deference should remain, and so affirmative action programs directed by Congress may have more force than those created solely by agencies.

Fifth, at this time, strict scrutiny does not apply to gender-based affirmative action measures of the federal government. Under current Supreme Court authority, such action is subject to intermediate scrutiny. Therefore, the guidance set forth in this memorandum does not apply in all respects to gender-based affirmative action programs in federal employment. However, applying this guidance to gender-based programs should ensure that those programs meet applicable legal standards.

Sixth, Adarand's application of strict scrutiny is premised on the limitations equal protection principles place on governmental action. Adarand, therefore, does not apply directly to employment actions of private employers. Both public and private employers are subject to Title VII of the 1964 Civil Rights Act. The Supreme Court has held that the Title VII standards governing affirmative action in the workplace are less stringent than the constitutional standards, and so in some circumstances, measures taken by governmental entities that would satisfy Title VII might not meet the Adarand requirements. See Johnson v. Transportation Agency, 480 U.S. 616, 627 (1987).

Finally, agencies should be aware that when legal challenges to the use of affirmative action plans are made, they will arise in cases filed under Title VII. Although Adarand is premised on constitutional standards, under Brown v. GSA, 425 U.S. 820 (1976), most lawsuits alleging race discrimination in federal employment must be brought pursuant to Section 717 of Title VII, 42 U.S.C. § 2000e-16.[1] The federal government, nevertheless, is

---

[1]   One notable exception to this rule is for claims of discrimination asserted by

(continued...)

3

obligated to act in accordance with the Constitution, and, therefore, use of race-based decisionmaking in federal employment must comport with the Adarand standards.

II.     Scope of Adarand.

Adarand established that any governmental action that uses race or ethnicity as a basis for decisionmaking will be subject to strict scrutiny. In the employment setting, such action encompasses race-based measures that the federal government adopts on its own initiative, through legislation, regulations, internal agency procedures, or even individual employment decisions. This is to be contrasted with race-based employment decisions that agencies undertake pursuant to court-ordered remedial directives in race discrimination lawsuits against the government, or pursuant to court-approved consent decrees settling such suits. The Supreme Court has not definitively resolved the standard of review for court-ordered or court-approved affirmative action. See United States v. Paradise, 480 U.S. 149 (1987) (court order); Local 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501 (1986) (consent decree). It is unclear to what extent Adarand applies to such actions. Accordingly, this memorandum does not address race-based employment decisions that agencies make under court orders or consent decrees.[2]

The scope of race-based employment decisions that are subject to Adarand is quite broad. Adarand applies to both the final judgment as to a particular decision, as well as to the various steps leading to that judgment. Race-based decision-making includes situations where race is one of several factors as well as those in which race is the only factor.

The kinds of employment decisions covered by Adarand also are very broad. Adarand applies both to the agency's decisions creating and implementing formal and informal affirmative action programs, as well as to the decisions of individual supervisors. It applies to the use of race in decisions regarding hiring, promotion, training, and scholarships, just as it applies to race-based decisions regarding reductions in force and reassignments.

Adarand does not apply, however, to actions in which race is not used as a basis for making employment decisions about individuals. For example, action to increase minority applications for employment is not subject to Adarand. Outreach and recruitment efforts — such as attending job fairs and minority professional association meetings, and making vacancies known at schools with substantial minority enrollment — which merely seek to

---

[1](...continued)
uniformed members of the armed forces, who are excluded from the coverage of Title VII. See, e.g., Doe v. Garrett, 903 F.2d 1455, 1461 (11th Cir. 1990), cert. denied, 499 U.S. 904 (1991). Such claims may be brought directly under the Constitution.

[2] We are available to provide specific guidance to any agency in that situation.

4

expand the pool of qualified applicants generally would not be subject to strict scrutiny under Adarand. As long as non-minorities are well represented in the applicant pool, the courts of appeals have held that efforts to expand the number of qualified minorities in the applicant pool do not involve race-based decisionmaking and hence do not raise constitutional issues. See, e.g., Peightal v. Metropolitan Dade County, 26 F.3d 1545, 1557-1558 (11th Cir. 1994) (presentations at job fairs and career days designed specifically to apprise minorities of career opportunities deemed to be race-neutral); Billish v. City of Chicago, 962 F.2d 1269, 1290 (7th Cir. 1992), vacated on other grounds, 989 F.2d 890 (7th Cir.) (en banc), cert. denied, 114 S. Ct. 290 (1993); Coral Constr. Co. v. King County, 941 F.2d 910, 923 (9th Cir. 1991), cert. denied, 502 U.S. 1033 (1992). To the extent that efforts designated as "outreach and recruitment" might also involve providing temporary or summer employment to interns, however, the use of race in deciding who will receive these internship positions is subject to Adarand.

Other race-neutral action not subject to Adarand would include reviewing qualification standards to ensure that unnecessary criteria that have a disproportionate impact on minorities are eliminated. Agencies should review their current practices to determine whether any are unnecessarily excluding minorities. Agencies may also define selection criteria in ways that give an applicant credit for overcoming social and economic disadvantage, which may include barriers posed by discrimination based on race or ethnicity. As long as race or ethnicity is not used to define social and economic disadvantage, Adarand will not apply. Indeed, agencies should regularly examine their recruitment practices to ensure that they are effective and productive. Agencies should also determine whether minority applicants have been deterred as a result of past discriminatory practices or the agency's reputation for discrimination, whether deserved or not. Adarand also does not preclude tracking minority participation in the agency's workforce through the collection and maintenance of statistics or the filing of reports with the Equal Employment Opportunity Commission.

At this time, strict scrutiny does not apply to gender-based affirmative action measures in employment. Under current Supreme Court authority, such action is subject to intermediate scrutiny.[3] Nevertheless, the same sort of analysis described below, when applied to gender-based programs, should ensure that those programs meet applicable legal standards. In addition, Adarand's strict scrutiny neither applies to employment programs based on age or disability, nor to measures that use membership in a Native American tribe or residence in an Alaskan Native village as a basis for decisionmaking. Such action is subject to the more lenient "rational basis" standard of scrutiny. See Morton v. Mancari, 417 U.S. 535 (1974), in which the Supreme Court held that strict scrutiny did not apply to hiring preferences for tribal members at the federal Bureau of Indian Affairs.

---

[3] The appropriate standard of scrutiny for gender-based programs may be considered by the Supreme Court in United States v. Commonwealth of Virginia, No. 94-1941, which addresses the male-only admission policies of the Virginia Military Institute.

5

Finally, the establishment of numerical goals for minority participation should not raise concerns under <u>Adarand</u> where race-based decisionmaking is not used to achieve the goal and the goal is commensurate with availability of minorities in the qualified and appropriate labor pool. This use of goals is consistent with Executive Order 11246, 30 Fed. Reg. 12319, (Sept. 24, 1965), as amended, under which the federal government requires federal contractors in the private sector to set goals where minorities are underutilized in the contractor's workforce. Regulations that the Department of Labor has promulgated to enforce the Executive Order, which are published at 41 C.F.R. Part 60, provide guidance as to the manner in which federal contractors may properly use such goals. See further discussion at pp. 16-17.

III.    Elements of Strict Scrutiny.

Under <u>Adarand</u>, federal programs that use race or ethnicity as a basis for decisionmaking must be strictly scrutinized to ensure that they promote "compelling" governmental interests, and that they are "narrowly tailored" to serve those interests. The "compelling interest" prong of the strict scrutiny standard focuses on the purpose of the classification; the "narrow tailoring" prong focuses on the method by which the government seeks to meet the objective of the racial or ethnic classification.

A.    Compelling Governmental Interests.

1.    Remedial Predicate.

a.    Historical evidence.  Standing alone, the fact and history of racial discrimination in society at large is not a sufficient predicate for race-based affirmative action. Under <u>Adarand</u>, however, the government does have a compelling interest in acting to remedy the identified effects of its own discrimination, or of its own practices that unintentionally extend the effects of discrimination by others. See <u>Croson</u>, 488 U.S. at 486 (plurality opinion); <u>Wygant v. Jackson Bd. of Educ.</u>, 476 U.S. 267, 274 (1986) (plurality opinion).[4]  Race-based remedial action may be aimed at ongoing patterns and practices of exclusion, or at the lingering effects of prior discriminatory conduct that has ceased. See <u>Adarand</u>, 115 S. Ct. at 2133 (Souter, J., dissenting) ("The Court has long accepted the view that constitutional authority to remedy past discrimination is not limited to the power to

---

[4]  In <u>Croson</u>, which involved affirmative action in public contracting, the Court said that the government may act on the basis of race or ethnicity to remedy the effects of discrimination committed by private contractors, where the government becomes a "passive participant" in that conduct, and thus helps to perpetuate a system of exclusion. <u>Croson</u>, 488 U.S. at 492 (plurality opinion); <u>id.</u> at 519 (Kennedy, J., concurring in part and concurring in the judgment).

6

forbid its continuation, but extends to eliminating those effects that would otherwise persist and skew the operation of public systems even in the absence of current intent to practice any discrimination.").

The federal government today is quite proud of its record of fair employment for persons of all races. However, its record has not always been one of fair practices. Beginning in the 1940s, a series of Executive Orders and statutes was adopted to address a long history of employment discrimination by the federal government. Although progress was made after those actions, it was insufficient; Congress in 1972 determined that discrimination against federal employees continued, and that it was necessary to provide federal employees the protection against employment discrimination that Congress previously afforded to other employees. Congress stated that extending Title VII to federal employees was necessary to "correct this entrenched discrimination in the Federal Service." H.R. Rep. No. 238, 92d Cong., 1st Sess. 84 (1971).

While discrimination in federal employment may not now be the pervasive problem it once was, instances of discrimination still persist in federal employment, as elsewhere. The President's July, 1995 Affirmative Action Review noted that one of the lingering effects of historical practices has been that minorities and women are still underrepresented at higher grade levels. Eliminating this disparity is made more difficult by the time lag necessary for new hires to reach senior ranks. In addition, according to the Equal Employment Opportunity Commission (EEOC) and the Merit Systems Protection Board, the federal sector equal employment process still produces a significant number of decisions in which agencies are found to have discriminated against minorities and women. Where agencies identify current discriminatory practices, or the lingering effects of past practices, affirmative action is an effective remedial measure.

A prior judicial, administrative, or legislative determination of discrimination by the government is not required before the government may voluntarily choose to use affirmative action efforts. Croson, 488 U.S. at 500. An agency must have a "strong basis in evidence," however, for its determination that its practices have resulted in a significant exclusion or underutilization of minorities or have perpetuated exclusion perpetrated by others and that a race-based remedial effort is appropriate. Id. (quoting Wygant, 476 U.S. at 277). See also Peightal v. Metropolitan Dade County, 26 F.3d 1545, 1553 (11th Cir. 1994); Concrete Works v. City and County of Denver, 36 F.3d 1513, 1521 (10th Cir. 1994), cert. denied, 115 S. Ct. 1315 (1995); Donaghy v. City of Omaha, 933 F.2d 1448, 1458 (8th Cir.), cert. denied, 502 U.S. 1059 (1991), O'Donnell Constr. Co. v. District of Columbia, 963 F.2d 420, 424 (D.C. Cir. 1992); Stuart v. Roache, 951 F.2d 446, 450 (1st Cir. 1991) (Breyer, J.); Cone Corp. v. Hillsborough County, 908 F.2d 908, 915 (11th Cir.), cert. denied, 498 U.S. 983 (1990).

This does not mean that an agency must admit that it has discriminated, either intentionally or inadvertently, before adopting affirmative action measures. See Johnson v. Transportation Agency, 480 U.S. at 652-653 (O'Connor, J., concurring); Wygant, 476 U.S.

7

at 290 (O'Connor, J., concurring). Furthermore, the fact that an agency has adopted some affirmative action measures does not imply that the agency has discriminated against minorities. In certain circumstances, agencies may voluntarily use race in employment actions if there is a "gross statistical disparit[y]" between the level of minority participation in a particular job category and the percentage of qualified minorities in the applicable labor pool for the relevant geographic market. Croson, 488 U.S. at 501, 509. While the Supreme Court has never established a bright line test by which to judge the significance of a statistical disparity, the Court has stressed that statistical disparities must be substantial enough to suggest that minorities are being excluded from consideration because of factors related to race. Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 995 (1988).

                b. Statistical evidence. Establishing the prerequisite for affirmative action does not have to be complicated. Statistics alone may form a sufficient predicate for race-conscious measures. Cf. International Bhd. of Teamsters v. United States, 431 U.S. 324 (1977). In Hazelwood v. United States, 433 U.S. 299 (1977), the Supreme Court stated that the "standard deviation analysis" can be used to demonstrate that a significant underrepresentation of minorities in a particular job category could be the result of a factor in the selection process that was eliminating minority candidates. The Court stated that "a fluctuation of more than two or three standard deviations would undercut the presumption that decisions were being made randomly with regard to race." Hazelwood, 433 U.S. at 311 n.17. See also Casteneda v. Partida, 430 U.S. 482, 496-497 n.17 (1977), for a further discussion of "standard statistical deviations" and an explanation of how they are calculated.

        Standard deviation analysis is less probative with respect to smaller sample sizes. In those situations, other means of statistical analysis may be necessary to determine whether the disparity between the percentage of qualified minorities in the available labor pool and the jobs at issue is sufficiently large to permit the adoption of race-conscious efforts. There are statistical analyses available for small sample sizes,[5] but it is preferable to use the largest justifiable sample size.

        Anecdotal and documentary evidence is always relevant. In determining whether race-based remedial measures are warranted, an agency may use other types of evidence to supplement the statistical comparisons between current minority availability and current minority representation. For example, anecdotal or documentary evidence showing historical underrepresentation (or the virtual absence) of minorities at an agency over a long period of time may put a gloss on an existing statistical disparity, and thus provide further support for race-based remedial action.

---

    [5] See, e.g., Fisher's Exact Test, discussed at Jurgens v. Thomas, 29 FEP Cases 1561, 1568 n.15 (N.D. Tex. 1982); Sims v. Montgomery County Comm'rs, 766 F. Supp. 1052, 1100-1101 & n.136 (M.D. Ala. 1990).

8

Indeed, there may be some occasions where the number of jobs at issue is so small that no reliable statistical analysis is possible. In those circumstances, agencies may rely on anecdotal evidence that there has been discrimination, or that there has simply been no, or exceedingly few, minority personnel despite the fact that hiring has occurred over a sustained period. This sort of evidence could indicate that the absence of minority hiring is unlikely to be due solely to lack of qualified candidates, justifying race-conscious remedial action.

Whenever an agency establishes an affirmative action plan, based on statistical comparisons or anecdotal information, it is important that agencies carefully match the job qualifications in the jobs at issue with those in the relevant applicant pool as closely as possible. It would not be sufficient for an agency to have only a general sense that its EEO profile indicated minority underrepresentation. The agency must go through the process of comparing minority representation in the job category at issue to the relevant pool in the civilian labor force to determine whether there is a sufficiently substantial disparity and, therefore, a predicate for affirmative action.

Depending on the circumstances, the relevant labor pool is measured either by applicant flow data or the civilian labor force. An underrepresentation of minorities when compared to the general population or the general civilian labor force, however, would not be a sufficient predicate for the use of racial criteria in employment decisions when special skills or qualifications are required to perform the job. Croson, 488 U.S. at 501 (internal quotations omitted). See also Johnson v. Transportation Agency, 480 U.S. at 632; Hazelwood Sch. Dist. v. United States, 433 U.S. at 308. There are many entry-level jobs, however, for which comparisons to the general labor market are appropriate.

For example, if an agency or office sought to determine whether it had an underrepresentation of African-American engineers, it would not compare the percentage of African-American engineers that it employed with the percentage of African-Americans in the civilian labor force generally, or with the percentage of African-Americans in a "professionals" category of which engineers may be only a part. Since engineers possess unique qualifications not shared by the population or professionals at large, the comparison should be between the percentage of African-American engineers employed by the agency or office and the percentage of African-American engineers in the civilian labor force. Where the fit cannot be so precise, the agency should use the qualified labor force that most closely matches the agency's qualifications for the jobs at issue.[6] If an agency were going to fill

---

[6] The 1990 Civilian Labor Force (CLF) census data would provide a source for these comparisons. It reflects the racial and ethnic distribution of the civilian labor force by major occupations. The Office of Personnel Management also maintains a Central Personnel Data File that provides work force information by occupational code. EEOC uses a Cross Classification Table that can assist agencies in matching OPM and CLF classifications. EEOC can make this table available to agencies. Finally, OPM and the Census Bureau have

(continued...)

9

SES positions and wanted to know if it had an underrepresentation of Hispanics in its SES ranks, the agency would compare the number of its Hispanic GS-15s, and others of similar qualifications eligible for placement into an SES positions, to the number of Hispanic SESers it employs.

This analysis should be performed at whatever level within the agency that the employment decisions are made. The fact that there are sufficient disparities to justify race-based action by one component of an agency does not mean that other components may take such action, when employment decision are made by individual components.

Similarly, evidence that particular employment practices at the agency have dissuaded minorities from applying for jobs or accepting offers can serve to buttress statistical disparities on which the use of racial criteria in employment decisions is predicated. By contrast, if it is clear that minority underrepresentation stems from the agency's inability to compete for minority candidates with other agencies and private corporations that simply can make more attractive job offers, the statistical disparity alone may not justify the use of race-based remedial measures (although, in such circumstances, the agency still may be able to show that it has a non-remedial operational need to increase minority representation, a concept that is discussed below).

It is important that the statistical evidence on which the decision to use racial and ethnic criteria is made be thorough and accurate. The use of sound statistics will enable an agency to establish a justification for the use of race if challenged. The use of race in the affirmative action context will be upheld where there is a sound basis for its use; absent such sound support, a non-minority disadvantaged by the use of race could successfully challenge the use of an affirmative action plan.

## 2. Operational Needs Of The Agency.

While both Adarand and Croson make clear that remedial interests can be sufficiently compelling to justify race-based measures, they did not explore the full range of interests that might be found compelling. Efforts to advance an agency's operational objectives may also supply a predicate sufficient to permit race-conscious employment actions, apart from any remedial objective the agency may have. There has never been a majority opinion for the Supreme Court that addresses the question whether and in what circumstances such objectives can constitute a compelling interest. Some members of the Court and several lower courts, however, have suggested that, under appropriate circumstances, an agency's operational need for a diverse workforce could justify the use of racial considerations. This operational need

---

[6](...continued)
agreed to conduct preliminary statistical studies to help agencies match job requirements and appropriate applicant pools.

10

may reflect an agency's interest in seeking internal diversity in order to bring a wider variety of perspectives to bear on the range of issues with which the agency deals. It also may reflect an interest in promoting community trust and confidence in the agency.

The courts will require a convincing basis for the conclusion that the use of race and ethnicity are necessary to promote an operational need. The Supreme Court requires that the articulated need be based on a "legitimate factual predicate." Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 278 n.5 (1986). Thus, even prior to Adarand, public employers could not rely solely on broad assertions of operational need to justify the use of race and ethnicity as criteria in decisionmaking. See, e.g., Hayes v. North State Law Enforcement Officers Ass'n, 10 F.3d 207 (4th Cir. 1993) (opinion of police chief that effective law enforcement required racial diversity was insufficient alone to create a compelling state interest; city was required to support its contention with objective evidence as well). Thus, any agency relying upon non-remedial justifications for race-based action should have a well-reasoned basis -- be it statistical, anecdotal, expert opinion, or other -- for concluding that there is a compelling operational need for increased minority representation in its workforce.

In the controlling opinion in Regents of the Univ. of California v. Bakke, 438 U.S. 265 (1978), Justice Powell stated that a university could take the race of applicants into account in its admission process to foster the diversity of its student body. This greater diversity, he reasoned, would bring a wider range of perspectives to the university and would contribute to a more robust exchange of ideas, which is the central mission of higher education. In short, Justice Powell recognized that diversity among the student body serves the operational needs of a university. Along the same lines, in a concurring opinion in Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 286, 288 (1986), Justice O'Connor also suggested that fostering racial and ethnic diversity among faculty in public schools may be a compelling interest. See also discussion in O'Donnell Constr. Co. v. District of Columbia, 963 F.2d 420, 429 (D.C. Cir. 1992), in which now-Justice Ginsburg, in a concurring opinion, stated her agreement with Justice Stevens' position "that remedy for past wrong is not the exclusive basis upon which racial classifications may be justified."

Individual federal agencies may have operational objectives that can be served by a diverse workforce that brings an array of backgrounds and perspectives to the issues that these agencies confront and the choices that they must make. The same robust exchange of ideas that was deemed essential by Justice Powell in Bakke to further the educational objectives of a university may also be vital to sound decisionmaking at certain agencies. For example, under Justice Powell's reasoning regarding the value of diversity at college campuses, federal agencies that have educational missions may themselves have a legitimate interest in fostering diversity in their own workforces. Similarly, a racially diverse range of views and perspectives among its workers may substantially enhance the performance of an agency that is charged with handling matters that particularly affect minorities and minority communities (e.g., public housing and urban policy; economic dislocation in minority communities; immigration; health care in underserved, predominantly minority communities; conditions in tribal reservations or villages).

11

It would, therefore, not necessarily be inconsistent with Adarand for race and ethnicity to be taken into account in employment decisions in order to assure that decisionmakers will be exposed to the greatest possible diversity of perspectives. However, the goal of affirmative action in the federal workplace cannot be diversity for diversity's sake. It must be rooted in an identifiable and articulated operational need for diversity of opinion in the agency's workforce. The agency, moreover, cannot rely on racial or ethnic stereotypes to obtain a diversity of opinion. Rather, the agency must have some basis to believe that, in the aggregate, diversification of its workforce will make a difference in the array of perspectives communicated at the agency, and that this greater diversity will significantly enhance the performance of the agency's functions. Furthermore, if an agency's articulated reason for the use of affirmative action is the need for diversity of opinion, the use of racial and ethnic criteria should not be the only means by which the agency obtains a diversity of opinion. In addition, other factors that bear on diversity — such as geography, education, work and life experience — should also be considered.

There are also areas of governmental activity where, in order to be effective and have the cooperation and confidence of the community, an agency must be representative of the community. This form of operational need has been recognized in the law enforcement context by members of the Supreme Court, and by lower courts, and focuses on an agency's ability effectively to address the needs of the communities it serves. See Wygant, 476 U.S. at 314 (Stevens, J. dissenting) ("[I]n law enforcement * * * in a city with a recent history of racial unrest, the superintendent of police might reasonably conclude that an integrated police force could develop a better relationship with the community and thereby do a more effective job of maintaining law and order than a force composed only of whites."); United States v. Paradise, 480 U.S. 149, 167 n.18 (1987) (plurality opinion) (noting, but not reaching, argument that race-conscious hiring can "restore[] community trust in fairness of law enforcement and facilitate[] effective police service by encouraging citizen cooperation"); Detroit Police Officers' Assoc. v. Young, 608 F.2d 671, 696 (4th Cir. 1979) (argument "is not simply that blacks communicate better with blacks or that a police department should cater to the public's desires. Rather it is that effective crime prevention and solution depend heavily on the public support and cooperation which result only from public respect and confidence in the police"); Talbert v. City of Richmond, 648 F.2d 925 (4th Cir. 1981).

In the federal employment context, the Federal Bureau of Investigation, the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco, and Firearms and other federal law enforcement organizations are dependent on this kind of community support to function effectively. Law enforcement organizations also may have particular diversity needs quite apart from their need for community support. For example, undercover operations are likely to require the availability of agents of diverse racial and ethnic backgrounds.

The military is another segment of the government that clearly has a compelling and widely-recognized need for diversity. In order to maintain combat readiness, the armed forces have an unusually strong need to maintain morale and cohesiveness. Its cohesiveness could be threatened if personnel did not have visible evidence that advancement within the

12

military is possible for members of all racial and ethnic groups. Federal policies with regard to military affairs have traditionally received significant deference from the judiciary, see, e.g., Weiss v. United States, 114 S. Ct. 752, 769 (1994), and we do not anticipate Adarand affecting that deference.

Other examples of organizations that might have a compelling interest in using race-based employment measures to help ensure trust would include EEO offices that must gain the confidence of current or former employees who already feel that they have been subject to discrimination, and community relations offices that are called upon to quiet racial tensions in troubled neighborhoods. This list is by no means exhaustive. Depending on its mission, an agency may have a compelling interest in fostering community trust, unique to the agency, or to an office within the agency, that would justify the consideration of racial and ethnic factors.

B.    Narrow Tailoring Inquiry.

Once an agency identifies a compelling interest for using race or ethnicity in its decisionmaking, the inquiry shifts to whether the manner in which these criteria are used is narrowly tailored to achieve that interest. The narrow tailoring analysis ensures that the use of the racial or ethnic criteria is the result of careful deliberation and is the least intrusive means to obtain the desired result.

In determining whether race-based employment action is narrowly tailored to serve a compelling interest, the courts have usually considered the following factors: 1) whether the government considered race-neutral alternatives before using the racial or ethnic criteria, 2) the manner in which race or ethnicity is used in making decisions – e.g., is it one of many factors to be considered, or is it the sole or dominant factor, 3) the comparison of any numerical target to the number of qualified minorities in the labor pool, 4) the scope of the program, 5) the duration of the program, and 6) the impact of the program on nonminorities. United States v. Paradise, 480 U.S. 149, 171 (1987); Hayes, 10 F.3d at 216.[7]

All of these factors will not be relevant in every case. However, examining an agency's use of race and ethnicity in light of these factors will ensure that any race-based employment activity is narrowly tailored to meet the agency's legitimate objective.

---

[7] Some of the factors that make up the narrow tailoring requirement have essentially been applied in challenges to affirmative action plans filed under Title VII. See Johnson, 480 U.S. at 637-638 and Steelworkers v. Weber, 443 U.S. 191, 197, 208 (1979), in which the Court stated that affirmative action measures must not "unnecessarily trammel" the interests of nonminorities.

13

## 1. Race-Neutral Alternatives.

In Croson, the Supreme Court held that a Richmond, Virginia ordinance that required prime contractors who received city contracts to subcontract at least 30 percent of the dollar amount of those contracts to minority businesses was not "narrowly tailored," in part, because the city had not considered race-neutral means to increase minority participation in municipal contracting. While the Court made clear that race-neutral measures had to be considered, it did not specify the extent to which such measures had to be considered — or actually used — before the government may resort to race-conscious action.

The most common race-neutral method of increasing minority participation in federal employment is recruiting and outreach.[8] Other race-neutral methods would include training programs open to all employees, diversity seminars, and eliminating unnecessary selection criteria that have a disproportionate impact on minorities. In some instances, race-neutral measures might be sufficient to serve the agency's objectives. In other cases, they may not. If an agency documents a compelling interest in remedying discrimination, it will not have to rely solely on race-neutral action to meet its objective. Cases suggest that although an agency will be required to give the race-neutral options serious consideration and use them to the extent feasible, use of race-neutral action need not be exhausted before race may be used more directly in decisionmaking. As the Ninth Circuit said in Coral Constr. Co. v. King County, 941 F.2d at 923, "while strict scrutiny requires serious, good faith consideration of race-neutral alternatives, strict scrutiny does not require exhaustion of every such possible alternative." See also Peightal, 26 F.3d at 1557. This approach gives the agency a measure of discretion in responding to its articulated need and allows the agency to draw on its prior experience as to the efficacy of race-neutral options.

It is also essential that agencies review both existing and contemplated selection practices and devices to ensure that they are job-related and minimize disparate impact to the extent practicable.[9] Traditional standardized tests can result in severe disparate impact, and often can be shown to be only marginally job related at best. These examinations are very

---

[8] As indicated above, (at pages 3-4), such action is considered race-neutral because it does not involve the use of racial criteria in employment decisionmaking.

[9] Title VII prohibits the use of an employment practice or devices, such as a written examination, physical agility test or minimum height/weight requirement, that is neutral on its face but causes a disparate impact on the basis of race, color, religion, sex or national origin, unless the employer can demonstrate that such practice or device is job related for the position for which it is used and is consistent with business necessity. Title VII also prohibits the use of an employment practice or device that causes a disparate impact but is job related, if there exists an alternative selection practice or device that will cause less of a disparate impact and will equally serve the employer's legitimate business needs.

14

susceptible to challenge under Title VII and should be carefully scrutinized and reformed as part of any serious effort in affirmative action.[10]

### 2. The Manner In Which Race And Ethnicity Is Used.

Of critical importance in the narrow tailoring analysis is the manner in which race and ethnicity are used in decisionmaking. Once a compelling interest has been identified and documented, and race-neutral options considered, race can be used along with other factors when evaluating the qualifications and breadth of experience that an applicant brings to a job. However, race should not become the sole or dominant factor.

In Bakke, Justice Powell rejected a system in which the university reserved a set number of places for minority applicants. He contrasted that program, which based decisions solely on race and ethnicity, with other programs in which race or ethnic background is simply one factor among many in the admissions decision. Justice Powell noted that in the latter type of program "race or ethnic background may be deemed a 'plus'" but does not "insulate the individual from comparison with all other candidates * * *." 438 U.S. at 317. Such programs, he suggested, would be deemed sufficiently flexible to meet the narrow tailoring requirement.

Similarly, in Johnson, the Supreme Court upheld an affirmative action plan under which a state agency considered the gender of applicants in making promotion decisions. The Court noted that the plan did not set aside positions for women but only established goals for their representation "which were not 'construed' by the agency as 'quotas.'" The Court stressed that in the promotion decisions at issue "sex * * * was but one of numerous factors [that were] taken into account." 480 U.S. at 638.

As these cases suggest, there are two kinds of race-based employment actions that, because of their rigidity, would be particularly vulnerable to constitutional challenge under strict scrutiny. The first is the use of quotas. Unlike goals, which establish only a numerical objective to be attained through an agency's best efforts, quotas require the selection of specified numbers of minorities without regard to relative qualifications, availability, or application rates. The second is a program in which race or ethnicity is the sole or dominant requirement for eligibility for a particular employment opportunity. Under the standard established by the Court, race can be an appropriate consideration in employment decisions only as long as it is not the exclusive or dominant factor. Flexibility is the key.

---

[10] In fact, over the past several years, an increasing number of employers have begun to use testing mechanisms that have less of a disparate impact than traditional cognitive-only examinations. Agencies that need information about such tests should contact the Employment Litigation Section of the Civil Rights Division of the Department of Justice.

15

In his July 19, 1995, Directive to the Executive Departments and Agencies, the President stated that any program that creates a quota must be reformed or eliminated. Consistent with this guidance, agencies should ensure that the use of numerical goals are not converted into rigid requirements.

In sum, where an agency uses race in employment decisions, race should be only one factor of the many that go into both the assessment of a candidate's accomplishments and potential as well as the assessment of what the candidate may bring to the agency. Under Adarand, such measures must be flexible and fair -- race can be used as one of a number of factors in evaluating an applicant's credentials, but it cannot be the sole factor, or so outweigh all other considerations that it effectively defines who will receive consideration.

### 3. Comparison Of Numerical Target To Relevant Labor Market.

Any numerical objectives for minority representation must be reasonable. In those cases where an affirmative action program is justified on remedial grounds, any numerical goal must have a reasonable relation to the extent of the demonstrated disparity, the number of vacancies, and the availability of candidates. Both the disparity and the availability of candidates will be judged in relation to the relevant labor market. Where a targeted position requires special skills or training, the comparison must be to the qualified labor market; that is, the real market of persons with qualifications that match those of the agency. Broad comparisons to general population statistics will not suffice where agency qualifications require specific educational qualifications or levels of specific experience. See Croson, 488 U.S. at 507 (30% minority subcontracting requirement not narrowly tailored because it was tied to the minority population of Richmond and not the pool of qualified subcontractors); Edwards v. City of Houston, 37 F.3d 1097, 1114 (5th Cir. 1994) (race-based promotion goals narrowly tailored because tied to number of minorities with required skills).

As stated before (see, infra page 5), when taking race-based remedial action, an agency may establish as its ultimate goal the achievement of minority representation in a particular type of job similar to the percentage of minorities in the available, qualified applicant pool. The selection of that goal is based on the legitimate assumption that fair employment practices, over time, would result in a selection rate for minorities that essentially tracks the availability of minorities in the qualified labor market. It also establishes a benchmark by which the employer can measure whether its practices are somehow foreclosing opportunities for minorities. The use of this goal also helps to demonstrate that opportunities for non-minorities will not be unfairly diminished.

An agency may, under certain circumstances, use short-term goals that are somewhat higher than that percentage in order to eliminate significant underrepresentation of minorities. However, the use of such higher short-term goals should probably be limited to circumstances of extraordinarily severe underrepresentation that may justify a more concerted effort to remedy that level of underutilization. See, e.g., United States v. Paradise, 480 U.S. 149 (1987). Use of higher short-term goals may be appropriate, for example, where an

16

agency has engaged in actions that have discouraged minorities from seeking employment with the agency. Agencies contemplating the use of such goals should consult with the Justice Department.

While the use of goals for minority participation that match the level of minority representation in the relevant labor pool is required when an agency is pursuing a remedial effort, that is not necessarily the case when an agency sets a goal for non-remedial operational interests. In those circumstances, the goal may be tied to a level of minority representation that the agency considers necessary to achieve those interests.

### 4. Burden On Nonminorities.

Affirmative action efforts will necessarily affect nonminority employees and applicants who were not themselves responsible for the problem that those efforts seek to address. The Supreme Court has indicated that while some degree of impact on these individuals is constitutionally permissible, that burden cannot be too onerous. See Wygant, 476 U.S. at 280-81. The nature and extent of the burden is an integral part of the narrow tailoring analysis.

Racial or ethnic classifications that "unsettle * * * legitimate, firmly rooted expectation[s]," Johnson, 480 U.S. at 638, are likely to be viewed as more burdensome than those that do not. For example, in Wygant, the Court recognized that race-based layoffs may impose a more substantial burden than race-based hiring, because "denial of a future employment opportunity is not as intrusive as loss of an existing job," and because where affirmative action is achieved through hiring, "the burden to be borne by innocent individuals is diffused to a considerable extent among society generally." 476 U.S. at 282-283.[11]

Agencies therefore should give careful consideration to the way in which non-minorities are affected by employment practices when determining whether specific practices are constitutional. As affirmative action advances beyond hiring, the effect on third parties may shift onto those specific individuals competing for a limited promotion. The same kind of consideration of race might satisfy constitutional standards when used in the hiring context but be somewhat more vulnerable when used for promotions.

---

[11] Wygant addressed race-based layoffs by a local public school system that resulted in the displacement of more senior and more qualified nonminority teachers in favor of junior, less qualified minorities. It is our understanding that federal agencies historically have not used race in making layoff decisions. Any agency contemplating a change from the current practice should discuss the circumstances specifically with the Justice Department.

17

The time within which an agency will be able to eliminate a significant underrepresentation of minorities in its workforce will depend not only on the rate at which minorities are selected, but also on the overall number of hires or promotions an agency makes each year. As the number of hires decreases, as is likely during this era of government downsizing, the speed at which underutilization can be eliminated may be reduced. When using race-based affirmative action to remedy underrepresentation of minorities, agencies must be careful to do so at a rate that does not unfairly trammel the interests of non-minority applicants.

5. The Scope Of The Program.

In Croson, the Supreme Court criticized the Richmond minority subcontracting program on the ground that it extended the benefit of a racial classification to minority groups as to whom there was no evidence of discrimination. The Court concluded that the plan was not narrowly tailored because although the program was intended to remedy discrimination against African-American contractors, it included among its beneficiaries Hispanics, Asian-Americans, Native-Americans, Eskimos and Aleuts — groups for which Richmond had proffered "absolutely no evidence of discrimination." 488 U.S. at 506. Apart from operational needs, if an agency's statistics were to reveal underutilization only in its hiring and promotion of African-Americans, the agency would be justified in focusing remedial action on African-Americans, but not on Hispanic-Americans, Native-Americans, or Asian-Americans. Treating "minorities" as a single group raises concerns; remedial action in federal employment usually can be targeted only at specific groups determined to have a need for a special focus. Similarly, where an agency can only demonstrate an operational need for diversity in some offices, racial and ethnic criteria cannot be considered in employment decisions throughout the agency; narrow tailoring will require limiting the use of such criteria to the offices and positions determined to have an operational need for diversity.

Croson also imposed a geographic limitation on the scope of remedial action. Although the program at issue in that case was intended to remedy discrimination against African-American subcontractors in Richmond, it was also open to minorities elsewhere in the country. The Court held that it was not narrowly tailored because it conferred the benefit on persons from outside the relevant geographic market. This geographic limitation does not apply to affirmative action in employment by the federal government with respect to jobs for which agencies advertise or hire nationally.

6. Duration Of The Program.

A race-based measure should last only as long as it is needed. See Fullilove, 448 U.S. 448, 513 (1980) (Powell, J. concurring). The use of race should either be of limited duration or subject to periodic review. See Haves, 10 F.3d at 11. In employment, this periodic review would normally be performed when the agency submits its yearly affirmative action reports to the Equal Employment Opportunity Commission. At that time, it can be

18

determined whether the objectives of race-based actions have been met. If race-based measures that were justified when adopted are no longer needed, they should be discontinued.

In addition, there may be instances in which agencies are continuing to use non-job-related selection criteria, such as a test, that have a disparate impact on minorities while developing new selection criteria that do not have such a disparate impact. In those situations, an agency can continue to use race-conscious selection methods to overcome the effects of the exclusionary criteria until new selection procedures are in place that no longer exclude disparate numbers of minorities or that are job-related.

Racial and ethnic criteria cannot be used after remedial objectives have been satisfied merely to maintain a statistical balance. See Johnson v. Transportation Agency, 480 U.S. at 640; Sheet Metal Workers v. EEOC, 478 U.S. at 477-478; Haves v. North State Law Enforcement Officers Ass'n, 10 F.3d 207 (4th Cir. 1993). But that does not necessarily mean that the use of such criteria must be abandoned the moment that minority representation in a particular job category at an agency equals minority representation in the qualified labor market. The agency may be able to use the criteria for a reasonable period thereafter to ensure that its remedial objectives have been fully satisfied. And if the use of the criteria is suspended for some period of time because disparities appear to have been corrected, an agency may re-institute them if it subsequently finds that its policies, or its unrepaired selection devices, are again leading to a significant disparity.

IV. Conclusion.

As the President emphasized in his July 19, 1995, statement, the Administration is committed to the vigorous enforcement of the laws prohibiting discrimination as well as to the elimination of barriers to opportunity. The Administration thus supports affirmative action measures that promote employment opportunities for Americans subject to discrimination or its continuing effects. Nothing in Adarand requires a retreat from this effort. Moreover, because federal agencies have long been subject to Title VII standards in their employment practices, the application of strict scrutiny should not require major modifications in the way federal agencies have been properly implementing affirmative action policies.

In sum, what Adarand requires is that in order for race or ethnicity to be used as a basis for decisionmaking, an agency must have a demonstrable factual predicate for its actions. That predicate could be the agency's interest in remedying the effects of its past discriminatory practices or the effects of employment practices that unintentionally have excluded minorities, or it could be based on the agency's operational needs. Once this predicate is identified, the agency should consider all reasonable means of increasing minority participation in its workforce without specific reliance on racial criteria. However, if such methods are inadequate to meet the agency's legitimate objectives, consideration can be given to racial and ethnic factors. Under Adarand, such measures must be flexible and

19

fair — race can be used as one of a number of factors in evaluating an applicant's credentials, but it cannot be the sole factor, or so outweigh all other considerations that it effectively defines who will receive consideration. The use of race-conscious measures also must be limited in duration, lasting no longer than necessary to accomplish the agency's objectives. If the use of the classification is intended to be remedial, it can be targeted only at those groups against whom discrimination has been shown. Finally, consideration must be given to the kind of employment decision that is at issue and the impact the use of the criteria will have on nonminorities to assure that the burden will not fall too heavily on innocent parties.