UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| RICHARD S. PATOSKI, )  <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ALPHONSO JACKSON, SECRETARY, ) <br> DEPARTMENT OF HOUSING AND ) <br> URBAN DEVELOPMENT, ) <br> ) <br> Defendant. ) | C.A. No. 05-11086 RCL |

## PLAINTIFF RICHARD S. PATOSKI'S MOTION TO COMPEL RESPONSES TO HIS FIRST SET OF DOCUMENT REQUESTS

Plaintiff Richard S. Patoski hereby moves to compel full responses to his first set of document requests. These timely filed discovery requests are attached as Exhibit 1, and Defendant HUD's responses are contained in Exhibit 2. HUD supplemented its responses on or about October 3, 2006 (Exhibit 3), on October 4, 2006 (Exhibit 4), and again on October 12, 2006. HUD provided a privilege log. Exhibit 5.

Mr. Patoski is a White male, and current employee of Defendant HUD. This is a reverse discrimination case, in which Mr. Patoski alleges that he was rejected for two promotions, because of his race, sex and/or age. Mr. Patoski further alleges that HUD has implemented, and continues to adhere to, formal and/or informal policies that discriminate against the hiring and promotion of White males, in violation of Title VII and the Fifth Amendment to the United States Constitution.

DOCUMENT REQUESTS NOS. 1, 2, 3, 4, 5, 7, 8, RELATING TO HUD'S
JUSTIFICATIONS FOR ENGAGING IN AFFIRMATIVE ACTION

As part of his claims, Patoski alleges that HUD improperly engaged in affirmative action, without proper constitutional justification. During the period in which Patoski was twice rejected for the promotions at issue in this case, HUD's "AEP" program (Affirmative Employment Program) was implemented to achieve a proportionate representation within HUD that was at least equal to the gross population as a whole, with respect to PATCO categories. Cockrell Dep., at 36, Exhibit 6. HUD would use its quota based system to encourage hiring and promotion of women, and those of various racial and ethnic backgrounds, even if such population was underrepresented by only a single person within the HUD workforce. Cockrell Dep., at 24-25, Exhibit 6. However, there were no goals or objectives to seek adequate representation for White males. Cockrell Dep., at 27, 31-32, Exhibit 6.

Such policies resulted in disproportionate staffing patterns, at the expense of White males. For example, the HUD AEP Fiscal Year 2001 Update Report shows that White males were underrepresented in all six categories of HUD workers, and that, overall, they constituted only 27.8% of the workforce as compared to 42.6% of the civilian labor force. Meanwhile, Black females were overrepresented, constituting 25% of the HUD workforce, despite consisting of only 5.4% of the civilian labor force. Exhibit 7, at DII-20. Nevertheless, HUD set numerical goals for hiring 50 additional Black females, but did not set any goal for hiring underrepresented White males. Exhibit 7, at DII-32.

While Black males were represented in the HUD workplace at almost twice the rate they appear in the civilian work force, HUD nevertheless set itself the goal of hiring 20 additional Black males. Exhibit 7. Attainment of these goals would have the likely

effect of increasing the White males' already marked underrepresentation in the HUD workplace.

In 1995, the United States Supreme Court decided Adarand Constructors, Inc. v. Pena, 115 S. Ct. 2097, 2105-2107 (1995), which held that the Fifth Amendment of the United States Constitution prohibits Federal race-based affirmative action programs, which are unjustified and/or exceed narrow Constitutional limits. Id. Under the approach required by the Constitution, any preference based on racial or ethnic criteria is subject to strict scrutiny, and is subject to the most searching examination. Adarand, 115 S. Ct. at 2111, 2112.

Under strict scrutiny analysis, numerical hiring goals based on race must be narrowly tailored to remedy ongoing patterns and practices of exclusion, or at the lingering effects of prior discriminatory conduct that has ceased. See Adarand, 115 S. Ct. at 2133 (Souter, J. dissenting). It must be shown that such exclusion has resulted in a significant underutilization of racial or ethnic groups. Richmond v. J.A. Croson Co., 488 U.S. 469, 500 (1989). The agency must demonstrate the existence of racial exclusion with a "strong basis in evidence." Croson, 488 U.S. at 500. In other words, the burden rests on the agency to justify its race-based remedial programs, to establish that they pass muster under strict scrutiny.

For example, if the Federal Government seeks to justify its affirmative action program, it is not enough to show that there are fewer group members within the job category than in the general population. Rather, it must be shown that there are fewer group members in the job category than exist in the qualified labor pool, and that the disparity be "significant." Croson, 488 U.S. at 500, 501.

3

In light of the <u>Adarand</u> decision, President Clinton, in a memorandum dated July 19, 1995, directed department heads to evaluate the race based programs they were administering. Likewise, in a February 29, 1996 Memorandum from the United States Department of Justice, entitled "Post-*Adarand* Guidance on Affirmative Action in Federal Employment," the agencies were directed to evaluate their affirmative action programs to make sure they complied with strict scrutiny. <u>Exhibit 8</u>.

Patoski propounded document request nos. 1-5, 7-8 to determine what, if any, analysis was conducted by HUD to determine that its numerical race-based hiring program was constitutional. HUD only responded by objecting:

1.    All documents, studies, recommendations, reports and analyses relating to or undertaken in response to, a memorandum from President Clinton, dated July 19, 1995, requiring that Heads of Executive Departments and Agencies undertake "an evaluation of programs you administer that use race or ethnicity in decision making."

   Objection: the defendant objects to this request on the ground that the request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. The defendant further objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege.

2.    All documents relating to any program changes or eliminations made as a result of any evaluations as described in document request 1.

   Objection: the defendant objects to this request on the ground that the request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. The defendant further objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege.

3.    A Memorandum to general counsels, dated February 29, 1996, from John R. Schmidt, of the United States Department of Justice, relating to "Post Adarand Guidance on Affirmative Action in Federal Employment."

   The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege.

4

4.    All documents reflecting or evidencing the distribution of the document described in document request 3, and or responding to that document.

The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege.

5.    All documents, studies, recommendations, reports and analyses relating to whether HUD recruitment, hiring, training and/or promotion practices complied with the strict scrutiny standard enunciated as described in the document identified in document request 3.

The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege.

7.    All correspondence between EEOC and HUD on how to determine if HUD's affirmative employment programs, and diversity programs, met the strict scrutiny standard of Adarand Constructors, Inc. v. Pena, 115 S. Ct. 2097 (1995).

The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege.

8.    All documents, studies, recommendations, reports and analyses relating to whether HUD recruitment, hiring, training and/or promotion practices complied with the strict scrutiny standard enunciated in the decision of Adarand Constructors, Inc. v. Pena, 115 S. Ct. 2097 (1995).

The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege.

One of HUD's supplemental responses to these requests further stated, "Materials withheld subject to a claim of privilege are listed in the attached privilege log." Exhibit 4, at 1-3. While HUD's affirmative action program has been placed squarely at issue, HUD is refusing to provide any documents indicating whether or not it undertook an analysis to determine whether the program met the requirements of strict scrutiny, and the results of such analysis. Such a position is completely untenable, where HUD's AEP has been placed directly at issue, and HUD, as a Federal agency, is under the Constitutional

obligation to justify its programs involving racial and gender preference. The work product doctrine does not bar disclosure where there is no other way to acquire the information.

Tellingly, HUD is objecting even to the production of the February 29, 1996 DoJ memorandum requiring agencies to evaluate their affirmative action programs in view of the strict scrutiny analysis, on grounds of attorney-client privilege and the work product doctrine. See Exhibit 2, Response to Request No. 3, at 1-2. That DoJ memorandum, attached hereto as Exhibit 8, is available on the internet at the following address: http://eeoa.army.pentagon.mil/web/doc_library/ACF8B0B.TXT. The document is also referred to and **quoted** in various documents available on the internet. Frequently Asked Questions About Management Directive 715, §§ 7, 10, 11, 12 (available on the EEOC website), Exhibit 9. Indeed, the publicly available GAO document, March 2001 report number GAO-01-377, at 6 identifies and describes the relevant portion of the DoJ Memorandum. (available on the GAO website), Exhibit 10; see also http://www.usdoj.gov/usao/eousa/foia_reading_room/usab5203.pdf, at 10-11 Thus, HUD is taking an overwhelmingly broad view of the scope of privilege, for this publicly available, described and oft-quoted document.

Patoski is entitled to HUD's analysis related to whether its AEP program satisfied Constitutional requirements. The burden rests on the government, in implementing an affirmative action program, to justify its existence, and show it to be appropriate under Constitutional principles. Adarand, 115 S. Ct. at 2111, 2112. Moreover, Patoski is entitled to HUD's analysis undertaken at the time that the AEP was in effect. HUD should not be permitted to provide to the Court a post hoc analysis, which ignores or

glosses over what it knew or understood at the time.  Thus, it should be required to

respond fully to document requests 1-5, 7-8.

DOCUMENT REQUEST 9

9.      All of HUD's Affirmative Employment Program Plans (AEP), Affirmative
Employment Program Accomplishment Reports and Affirmative Employment Program
Plan Updates from Fiscal year 1997 through the present.

This response will be supplemented tomorrow.

While it has provided other documents, HUD has failed to provide any of its

department-wide AEP **Accomplishment Reports**.  It has failed to object to this request

and it should provide full responses.

DOCUMENT REQUEST 10

One of the positions to which Patoski applied, the Community Builder position,

was in the Office of Field Policy and Management.  Patoski sought the affirmative action

reports generated for HUD, including sub-elements such as the Office of Field Policy and

Management.  Such reports describe affirmative action strategies and numerical goals

within these relevant divisions.  Furthermore, such reports contain workforce

composition data that Patoski could utilize to show the continuing marginalization of

White male employees.  Document request 10 and HUD's response is as follows:

10.     All Affirmative Employment program plans (AEP), Affirmative Employment
Program Accomplishment Reports and Affirmative Employment Program Plan Updates
from Fiscal year 1997 through the present prepared by sub-elements of HUD.

This response will be supplemented tomorrow.

HUD's Supplemental response simply identifies what it has produced, and states

that the search for missing AEP materials is ongoing.  Exhibit 3, at 1-2.  HUD has failed

to produce the AEP materials for the Office of Field Policy and Management, for years

7

1997 and 1998, 2001-2003. 1997 and 1998 materials are directly relevant to Mr.

Patoski's October 1997 application for the Community Builder position. HUD should be

required to produce these documents immediately.

DOCUMENT REQUEST 12

Despite stating that it would respond, HUD has not responded to document

request no. 12.

12.    Any and all drafts of the "FY 2005 Management Directive 715 Affirmative
Programs of EEO Report."

The defendant objects to this request on the ground that it seeks materials protected by
the deliberative process privilege. Notwithstanding nor waiving the foregoing, this
response will be seasonably supplemented.

HUD states that the requested document is in draft form, and will be released

when it is completed. Exhibit 4, at 3. HUD should be compelled to do so.

DOCUMENT REQUEST 13

Despite stating that it would respond, Defendant has failed to respond to

Document Request 13, which seeks information concerning the AEP's Managers' role in

the selection processes for the two positions at issue in this case.

13.    All documents and policy memorandums regarding the role of an AEP Manager
in the selection process for training, promotion and hiring, from January 1, 1995 to the
present, including, but not limited to the AEP Manager's role in the selection process for
the Community Builders positions in Boston, MA under vacancy announcement #OS-
MST-98-0002A and for the Public Housing Revitalization Specialist Position in Boston,
MA under the vacancy announcement #06-DEU-2000-OOS1A and # 06-MSR-2000-
0099AZ.

The defendant objects to this request on the ground that it seeks materials protected by
the attorney client privilege, work product doctrine and/or the deliberative process
privilege. Notwithstanding nor waiving the foregoing, this response will be seasonably
supplemented.

8

HUD later supplemented its response, and provided what it listed was one document (it is actually two).  See Exhibit 3, at 2.  Nevertheless, it is unclear whether it has withdrawn its objection, and whether it is withholding documents based on its attorney client objection.  There is no proper basis for asserting attorney/client privilege or the work product doctrine.  At issue are training, hiring and promotion strategies, involving the application and implementation of HUD's diversity strategies, especially as relates to the two specific jobs at issue.  As a governmental entity, such information should be freely available.  HUD should be required to respond fully to the request.

DOCUMENT REQUESTS 15, 16, 34, 36, 38, 39, 40<br>COMPARATIVE DATA

To determine whether its workforce is sufficiently diverse, HUD compared its workforce composition and its applicant pool, to what it regarded as the civilian labor force.  Patoski requested data so that he could determine whether HUD was continuing affirmative action efforts, for the benefit of women and minorities, despite the fact that such groups were already over-represented in HUD's workforce.  Patoski also sought statistical information to determine whether specific HUD programs and policies (some of which Patoski contends are illegal) impacted HUD's workforce composition.  HUD has asserted that it is in the process of determining how best to turn over the information. See Parties Joint Motion for an Extention of the Discovery Deadline to December 16, 2006, at 2.

Plaintiff requests the opportunity for himself, his lawyer and his expert(s) to come to the HUD workplace, and directly access the HUD computer databases containing the statistical information himself.  Patoski remains an employee of HUD.  Patoski would be agreeable to not accessing any social security numbers, addresses, or other private date in

9

the HUD database.  (Plaintiff is already subject to a confidentiality order in this case).

However, Patoski needs the opportunity to make inquiries of both the HUD workforce,

HUD applicants, and the civil labor force statistics that HUD either uses, or has available

to use.  Patoski must be given the opportunity to develop statistical evidence that women

and applicants of certain ethnic groups were favored.

In the alternative, HUD should be compelled to provide both the workforce and

applicant data, and the data of the civilian labor pool(s).  HUD should also be compelled

to provide this information in an easily usable electronic form.  The document requests,

and HUD's responses follow:

15.    All data used for any comparison of any part of, or all of, HUD's work force as of
January 1, 1997 and in each subsequent year to the 1990 Census Availabilty Data (CAD),
formerly the Civilian Labor Force Factors (CLF), including all instructions, data and
calculations provided by the EEOC.

The defendant objects to this request on the ground that it seeks materials
protected by the attorney client privilege, work product doctrine and/or the deliberative
process privilege. Notwithstanding nor waiving the foregoing, this response will be
supplemented tomorrow.

16.    All data used for any comparison of any part of, or all of, HUD's work force to
the 2000 Census Availability Data (CAD).

The defendant objects to this request on the ground that it seeks materials
protected by the attorney client privilege, work product doctrine and/or the deliberative
process privilege. Notwithstanding nor waiving the foregoing, this response will
supplemented tomorrow.

34.    All applicant flow data collected by HUD by position and grade, including that
collected by the separate systems used by the Office of Departmental Equal Employment
Opportunity and the Office of Human Resources, from January 1, 1997 to the present.

The defendant shall supplement this response.

36.    All quarterly data submissions regarding HUD's staffing submitted to OPM,
from. January 1997 to the present.

The defendant shall supplement this response.

10

38.    All data in the Merits Staffing Control System, entered or present on the System from January 1, 1997, to the present.

The defendant shall supplement this response.

39.    All data in the personnel payroll database, enter or present on the database from January 1997 to the present.

The defendant Objects to this request on the ground that the request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. See Response No. 27.

40.    All data in the EEOMAS database, which was in the system from January 1, 1997 to the present.

The defendant objects to this request on the ground that the request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. See also, Response No. 27. The defendant shall supplement this response.

HUD later supplemented its responses, and listed all the materials in its document production that contain some data tables relating to its workforce composition. See Exhibit 3, at 2-4; Exhibit 4, at 3, 4-6. However, the data tables supplied by HUD are insufficient to comply with Plaintiff's requests, as they are generic tables that do not focus on the positions at issue in this case. For example, how many white males applied for the Community Builder position, and how many were hired? We do not know from HUD's produced materials. Moreover, HUD data could be mined to determine the hiring patterns of individual decision-makers, to determine whether they exhibit some bias. HUD's produced reports do not begin to provide this level of data.

The data sought by Mr. Patoski was accumulated and maintained by HUD. Examples appear in the record of investigation assembled by investigators at HUD. See Exhibit F11 in the BN-01-01 Record of Investigation. Mr. Patoski should be given access to this critical information.

HUD's objection relating to attorney/client privilege and the work product

doctrine are completely inapplicable to the provision of workforce and applicant data.

HUD should be compelled to produce this data immediately. This is the data used by

HUD, from which, in public documents, it compares its workforce to.

DOCUMENT REQUEST 19, 22

19.    All documents relating to the HUD Special Emphasis Program, including without
limitation, its goals, the content of the program, date of inception, any changes in the
program, any and all strategies used to assist minorities and/or women under the
program, and benefits conferred by the program to women and/or minorities, and any and
all justifications for the program.

The defendant objects to this request on the ground that it seeks materials
protected by the attorney client privilege, work product doctrine and/or the deliberative
process privilege. The defendant further objects in that it cannot fairly respond to the
question because it mis-characterizes the nature of the program. Notwithstanding nor
waiving the foregoing, this response will be supplemented tomorrow.

22.    All documents, studies, recommendations, reports and analyses relating to
whether HUD Special Emphasis Program complied with the Constitution based Equal
Protection scrutiny.

The defendant objects to this request on the ground that it seeks materials
protected by the attorney client privilege, work product doctrine and/or the deliberative
process privilege.

On October 3, 2006, HUD supplemented its response with a single document, but

does so in a manner which is ambiguous as to whether it is withholding documents based

on its objections. Exhibit 3, at 5. However, it appears that HUD continues to improperly

withhold responsive documents. One document in Mr. Patoski's possession is a printout

from the HUD website, which describes HUD's Special Emphasis Program's goal as to

"bring about a more diverse . . . workforce. . . . Promoting the equitable distribution of

employees . . . throughout professional, administrative . . . and other occupations, as well

as advancement into managerial and supervisory positions." Exhibit 11. However, HUD

12

fails to provide any justification for failure to produce this document in discovery, and Mr. Patoski suspects that HUD has withheld other documents relating to the Special Emphasis Program.

As discussed with regard to document requests 1-5, 7-8, Mr. Patoski seeks all information relating to any justification HUD has for implementing a program which targets and benefits women and members of certain ethnic groups. HUD should be required to produce such justifications for the programs, as the Constitution requires that race based governmental programs must be reviewed with strict scrutiny. Adarand, 115 S. Ct. at 2111, 2112.

### DOCUMENT REQUEST 23, 24

FEORP reports, like the AEP reports discussed above, analyze the HUD workforce to determine whether there are underrepresentations of employees based on gender or certain ethnic groups, and establish numerical goals for eliminating such underrepresentation and maintain gender and ethnic diversity (for everyone except White males). The FEORP urged special recruitment strategies to alleviate under-representation in those targeted groups. When areas of purported under-representation were eliminated, it would be considered an "accomplishment." The FEORP program has remained in existence, even after the AEP program was eliminated effective September 30, 2003. Therefore, Plaintiff has sought the FEORP reports, and the justifications for the FEORP program:

23.    All of HUD's FEORP recruitment plans and reports from January 1997 to the present

This response shall be supplemented tomorrow.

24.    All documents, studies, recommendations, reports and analyses relating to

13

whether HUD's FEORP recruitment plans complied with Constitution-based equal protection scrutiny.

The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege.

HUD supplemented its document production by stating, "There are no FEORP Reports after 2003," and then listing the FEORP reports that it had previously produced. Exhibit 3, at 6. HUD further supplemented by referring to its produced privilege log. Exhibit 4, at 3. Despite HUD's promise to supplement, it has failed to provide the 1997 FEORP Program Plan; FEORP FY 2000 Accomplishment Report, FY 2001 Plan Certification and FEORP Plan, and the FY 1997 FEORP Accomplishment Report and FEORP FY 1998 Plan Certification, or reports issued for FY 2003 or later. HUD should be compelled to provide these other documents.

Plaintiff's arguments with regard to document request 1-5, 7-8 are equally applicable here. To the extent that HUD is establishing numerical goals for hiring, the Adarand case, and the Fifth Amendment's strict scrutiny standard, requires that HUD justify its approach. Plaintiff merely seeks to see this constitutionally required analysis. HUD should not be permitted to hide behind attorney/client privilege and fail to provide information concerning its justifications for participating in the FEORP program.

DOCUMENT REQUESTS 26 and 33

Plaintiff has sought other data on HUD's efforts and strategies to increase diversity.

26.    Any and all documentation provided to HUD personnel officers, managers or supervisors, indicating HUD's desire for a diverse workforce, and/or indicating strategies for increasing the numbers of under represented populations in the workforce, circulated from January 1, 1997, to the present.

14

The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege. Notwithstanding nor waiving the foregoing, the defendant shall supplement this response tomorrow.

33.    All documents relating to whether HUD takes steps to maintain or increase minority or gender representation, even after under representation has been cured in an applicable job category, from January 1, 1997, to the present.

The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege. Notwithstanding nor waiving the foregoing, the defendant shall supplement this response.

HUD supplemented its response request 26 with a single, four page document (Exhibit 4, at 4), but did so in a way which is ambiguous as to whether it continues to withhold documents based on privilege. These requests are obviously relevant to Plaintiff's claims and full responses should be compelled, or at the very least, a privilege log for Request 26 should be produced.

DOCUMENT REQUEST NOS. 27-31, 37
EVALUATIONS AND AWARDS

Plaintiff seeks evaluations and awards of the individuals who affected Plaintiff's career opportunities, to determine whether the evaluation process created incentives, or noted the recipients' penchant to disfavor White males. For example, Plaintiff's discovery requests included document request 29, which requested performance evaluations from various individuals involved in the selection process for the two positions directly at issue in Mr. Patoski's case. HUD policy required that supervisors and managers be evaluated with regard to their compliance with the affirmative action policies. It was Mr. Patoski's goal to determine whether any of the relevant individuals were commended for hiring or favoring females or those of various racial or ethnic backgrounds, and to determine in what ways HUD encourages its managers and

supervisors to make decisions based on race and/or sex.  See Johnson v. Transportation

Agency, Santa Clara County, , 107 S. Ct. 1442, 1467 (1987) (Scalia, dissenting)

(evaluations of supervisory personnel based on their ability to attain an affirmative action

plan's objective for a diverse workforce "unmistakably communicated" that concrete

numerical results in hiring were expected).

27.    The performance evaluations for FY 98 and any narratives regarding the
EEOC/AE/Diversity Performance Element rating for the supervisors and managers
involved in the selection process for the Community Builder Positions in the Boston, MA
HUD Field Office under vacancy announcement #OS-MST-98-0002A, including,
without limitation, the FY98 performance evaluations for Jose Citron, Mary Lou Crane,
Anthony Brito, Cal Kolaski, Macella Brown, Jacqueline Campbell, Robert Paquin, and
the Human resources Manager responsible for overseeing the selection process.

    Government records retrievable by individual name are subject to the Privacy Act
and may not be disclosed without a court order. In this regard, defendant has forwarded
to Plaintiff a proposed order for the Court to enter, authorizing disclosure of materials
under that Act. Absent court authorization, the defendant and undersigned counsel could
be subject to civil and/or criminal penalties for disclosure of records covered by the
Privacy Act. The defendant shall supplement this response.

28.    Any awards received by any of the persons named in request 27 above for their
performance during 1998.

    See Response No. 27.

29.    The performance evaluations for FY 2000 and any narratives regarding the
EEOC/AE/Diversity Performance Element Rating for the supervisors and managers
involved in the selection process for the Public Housing Revitalization Specialist
positions in the Boston, MA HUD field Office under Vacancy Announcement #  06-
DEU-2000-0081A and #06-MSR-2000-0099AZ, including, without limitation, the FY
2000 performance evaluations of Cheryl Ann Tenninga, Mirza Del Rosario, Carmen
Valenti, Maxine Saunders, the Human Resources Supervisor for Debora Medvic, a
Human Resources Specialist and the Human Resources Supervisor for Jeffrey Lahmers.

    See Response No. 27.

30.    Any awards received by any of the persons named or identified in request 29
above and Jeffrey Lahmers and Emmanuel Yeow, for their performance during 2000.

    See Response No 27.

31.     The annual performance appraisal for Deborah Medvic for 2000 and any document relating to any action taken against Ms. Medvic for the error she made in finding plaintiff ineligible for the Public Housing Revitalization Specialist position in vacancy announcement #06-MSR-20000-0099AZ.

See Response No. 27.

37.     The annual performance reviews, if any, of the HUD EEO Director, from January 1, 1997, to the present.

Objection: the defendant objects to this request on the ground that the request is not reasonably calculated to lead to the discovery of admissible evidence in this matter, See Response No. 27. Notwithstanding, the defendant shall supplement this response.

HUD supplemented its response by providing many evaluations and awards, but unfortunately, they are not the ones that Mr. Patoski sought. See Exhibit 3, at 7-9. It further stated that it provided performance appraisals of the persons specifically named in request 27, however, it failed to provide evaluations for Mary Lou Crane. Id. Mr. Patoski sought the evaluations which gave participants and decisionmakers ratings, and awards, during the period(s) in which the subjects of the evaluations took actions which contributed to the rejection(s) of Mr. Patoski. Instead, HUD provided evaluations for these actors for periods that were either before or after they took action that was relevant to Mr. Patoski.

Thus, Mr. Patoski seeks the evaluations of Mary Lou Crane, Jose Cintron, Anthony Brito, Marcella Brown and Robert Paquin, covering their work during the period of October 1997 through April 1998.

Mr. Patoski seeks the evaluation of Cheryl Ann Teninga which covers the period of May 10 though June 30, 2000.

17

Mr. Patoski seeks the evaluations of Carmen Valenti, Debora Medvic, Jeffrey Lahmers Emmanuel Yeow, and Maxine Saunders, for the period covering February 1, 2000 through June 30, 2000.

While HUD has provided an evaluation for Mirza Del Rosario coving the period of February 1, 2000 through September 30, 2000, it has not provided the EPPES evaluation for the period, and it should do so.

HUD has stated that it will provide the responsive documents if it can find them (See Exhibit 13), but it has not yet provided the documents.

### INTERROGATORY 32

32.    The business operation plan for HUD's office of departmental equal employment opportunity for FY 1998 and 2000.

Reasonable investigation by the Office of Diversity and Equal Employment has uncovered no such document. The defendant shall supplement.

HUD's supplemental response states that there is no such document. Exhibit 3, at 8. A copy of two pages from the Business and Operating Plan is attached as Exhibit 12. While HUD states that it has uncovered no such document, it certainly exists, and discusses HUD's goals for workplace diversity. Id. Contrary to the original interrogatory, the requested document is called the FY 2000 ODEEO Business and Operating Plan. It should be produced immediately.

### INTERROGATORY 35 and 42

Mr. Patoski believes that certain vacancy announcements were cancelled upon review of applicant flow date, which revealed an "insufficient" pool of women and "minority" applicants. Sometimes, deadlines for applying to vacancies were extended, and sometimes standards were lowered, or the vacancy would be cancelled and reissued

soon after. Therefore, Mr. Patoski seeks information concerning when and how the

applicant flow data was accessed:

35.    All records of those who had access to or were given copies of the applicant flow
data prior to selection for the individual positions that the flow data was collected for.

    Objection: the defendant objects to this request on the ground that the request is
overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of
admissible evidence in this matter. Notwithstanding nor waiving, the defendant shall
supplement this response.

42.    All data from the EEOMAS database regarding all vacancy announcements from
January 1997 to the present that were cancelled, and a new vacancy announcement for
the same position(s) subsequently reissued, and the race, sex and age of all new hires or
HUD employees promoted under each new vacancy announcement.

    The defendant objects to this request on the ground that the request is overbroad,
unduly burdensome and not reasonably calculated to lead to the discovery of admissible
evidence. See Response No. 27. The defendant shall supplement this response

    After objecting to Document Request 35 on the grounds that it is

overburdensome, HUD supplemented its response by stating that it had no documents

responsive to this request. Exhibit 4, at 6-7. HUD's newfound position is less than

credible, given its explanation that applicant flow data is contained in the

personnel/payroll database, and the Merit Staffing Tracking system. Id. As argued

above, Plaintiff should be given access to those databases. To the extent that responsive

documents are privileged, Plaintiff seeks a privilege log. Otherwise, a full response

should be compelled.

DOCUMENT REQUEST 44 AND 45

    Mr. Patoski made inquiries concerning the Emerging Leaders Program, which

trains participants, and then gives them advantages for the purposes of promotion. Mr.

Patoski sought information as to whether the program was being used to assist women

and those of certain ethnic groups.

44.    All documents relating to the Emerging Leaders Program, including without Limitation its goals, the content of the program, date of inception, any changes in the program, the selection process for participants, and all strategies used to assist minorities and women under the program, and all justification for the program.

The defendant shall provide a response tomorrow.

45.    Documents or data reflecting the participants from the Community Planning and Development Division that were in the emerging leaders Program, and the race, gender, and age, and date of participation for each of the participants.

The defendant shall provide a response tomorrow.

HUD supplemented its responses, provided some documents, but now belatedly

asserts attorney client privilege and the work product doctrine, in response to document

request 44. Exhibit 4. HUD has the burden of justifying its programs of racial and

gender preferences, and should provide documents on this issue.

DOCUMENT REQUEST 50

50.    For each time in which HUD has concluded that there exists a Manifest Imbalance and/or Conspicuous Absence, from January 1, 1997 to the present, for any racial or ethnic group, or any gender, provide all data, reports, studies, calculations and other documents relied upon in reaching the Manifest Imbalance and Conspicuous Absence conclusions.

HUD, in response, refers to some AEP reports, and conditions its response "as

defined by MD 714." However, Mr. Patoski's request is not limited to manifest

imbalances or conspicuous absences, or any other term "as defined by MD 714." If there

are any other calculations that use the same terms, but with dissimilar definitions as MD

714, those documents should be produced.

REQUEST 54

HUD has stated that it would attempt to locate documents responsive to request

54, but at this point, it has failed to produce responsive documents. Exhibit 4. HUD

should be required to produce the documents in a timely fashion.

WHEREFORE, Plaintiff Patoski requests that his motion to compel responses to document requests 1-5, 7-10, 12, 13, 15, 16, 19, 22-24, 26-40, 42, 44-45, 50 and 54, and that Plaintiff, his lawyers and his experts be permitted to make inquiries on HUD's computer databases containing personnel and applicant information.

The Plaintiff
By his attorneys,


_____/s/ Robert S. Mantell_____
Kevin G. Powers
BBO# 405020
Robert S. Mantell
BBO# 559715
Rodgers, Powers & Schwartz LLP
18 Tremont Street, Suite 500
Boston, MA  02108
(617) 742-7010, ext. 305
fax (617) 742-7225

## LR 7.1 AND 37 CERTIFICATION

I, Robert S. Mantell, hereby state that I have initiated numerous attempts, over the past months, to resolve or narrow the issues contained in this motion, some of which have been described above.  The last comprehensive attempt to do so was on September 26, 2006.


_____/s/ Robert S. Mantell_____

Patoski motion to compel

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| RICHARD S. PATOSKI,<br><br>Plaintiff,<br><br>v.<br><br>ALPHONSO JACKSON, SECRETARY,<br>DEPARTMENT OF HOUSING AND<br>URBAN DEVELOPMENT,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)    C.A. No. 05-11086 RCL<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS, AND FIRST SET OF INTERROGATORIES**

Pursuant to the Federal Rules of Civil Procedure, Plaintiff Richard Patoski hereby serves his first set of interrogatories and document requests on Defendant. Plaintiff hereby requests that the Defendant respond to the discovery requests in a timely fashion. Produced documents are to be delivered to Robert S. Mantell, Rodgers, Powers & Schwartz LLP, 18 Tremont Street, Suite 500, Boston, MA ·02108.

## DEFINITIONS AND INSTRUCTIONS

1. As used herein, the term "HUD" means the Department of Housing and Urban Development, its agents, employees, directors, representatives, servants and/or any other person(s) acting or purporting to act on its behalf including without limitation any attorney employed or retained by it.

2. As used herein, the terms "you," "your," and "yours" mean Defendant.

3. As used herein, all words in the singular shall be construed also to include the plural and vice versa, and all words in either the masculine, feminine or neuter shall be construed to include the other genders.

4. As used herein, the words "and" and "or" shall be construed conjunctively, disjunctively or both as necessary to give the particular request, interrogatory, or answer the broadest and most inclusive scope.

5. Unless otherwise specified each request and interrogatory shall cover the time period from January 1, 1997, to the present.

6.     As used herein, the term "person" or "individual" means any natural person, corporation, partnership, unincorporated association, government, government agency, firm, trust, group, or any other entity.

7.     As used herein, the term "employee" means any employee of HUD, including but not limited to employees who are members of a bargaining unit, non-management employees, supervisory employees, professional employees, or any other person employed by HUD.

8.     As used herein, the term "concern" or "concerning" or the phrase "relating to" shall mean and include pertaining to, referring to, alluding to, connected with, commenting on, regarding, comprising, discussing, showing, describing, mentioning, memorializing, reflecting, analyzing, constituting, evidencing, illustrating, depicting, summarizing, reporting, supporting, contradicting or rebutting, directly or indirectly.

9.     The word "document" as used herein means the original or any copy of any notes, correspondence, memoranda (including written memoranda of telephone conversations, other communications, discussions, agreements and any other acts, transactions or activities), invoices, time sheets, expense vouchers, contracts, agreements, drafts, pamphlets, audits, bill or sale, purchase order, ledgers, canceled checks, deposit sips, budgets, receipts, books of account, order forms, records, requisitions, drawings, specifications, sound recordings, video recordings, transcripts, computer-stored data or data bases and computer drawings, printouts, or any document such as a code for a computer run or printout and any other retrievable computer data in your possession, any other written matter of any kind, including but not limited to any marginal comments appearing on any documents or any other writing.

10.     The word "communication" as used herein means any oral or written transmittal of information, or request for information, made from one person to another person, whether made in person, by telephone or by any other means and includes any documents made only for the purpose of recording a communication, an idea, statement, opinion or belief.

11.     As used herein, the term "oral communication" means any conversation, telephone conversation, statement, discussion, debate, interview, argument, disclosure, consultation, meeting, and any other manner of oral utterance.

12.     As used herein, the term "correspondence" means any document sent or delivered by one of more persons to one or more persons.

13.     As used herein, the term "identify" means, with respect to a natural person, set forth (a) his/her full name; (b) his/her present or last known business and residence addresses; (c) his/her employer; and (d) the relationship or position (or positions) held with that employer.

14.    As used herein, the term "identify" means, with respect to a corporation, partnership, business trust, or other association or business entity, set forth (a) its full name; (b) its address; and (c) its state of incorporation, if any.

15.    As used herein, the term "identify" means, with respect to correspondence or communication, set forth (a) the customary business description of the document or communication; (b) its number, if any; (c) its date; (d) the identity of the addressor(s) or author(s) of the document or communication; (e) the identity of the addressee(s) or recipient(s) of the document or communication; (f) the identity of all persons other than Defendant who possess, control, or have custody of each document; and (g) a brief description of the substance of each document or communication.

16.    To "identify" an act, occurrence, happening or event is to provide a complete description of the act, occurrence, happening or event sufficient to distinguish it from all other acts, occurrences, happenings or events and further is to state (a) the person or persons performing the act or involved in the occurrence, happening or event; (b) the date on which the act, occurrence, happening or event took place; (c) the duration of the act, occurrence, happening or event; and (d) the place at which the act, occurrence, happening or event took place.

17.    If any of these interrogatories or requests for documents cannot be answered or responded to in part or in full, then you should (a) answer or respond to the extent possible; (b) specify each reason for your inability to answer or respond to the interrogatory or request or portion thereof; and (c) state whatever information or knowledge you have concerning the unanswered portion. If and only if a specific response is not possible, then provide a general response which is as specific as possible.

18.    In the event that it is claimed that any document responsive to any request is privileged, each privileged document should be fully identified in writing, except that the substance thereof need not be described to the extent it is claimed to be privileged. To "identify" a document means to provide a description sufficient to identify that document for purposes of a subpoena duces tecum and is further to state:

   a. the date on which the document was prepared;
   b. the author or authors of the document;
   c. the addresses of the document, if any;
   d. the title of the document, if any; and
   e. the substance thereof to the extent not privileged.

19.    In answering each interrogatory, furnish all information available to you, regardless of whether it is based on personal knowledge, business records, oral communications, hearsay, or any other source.

20.    These interrogatories and document requests are continuing and require supplemental response and production. If any answer is not presently known or

available, include a statement to that effect and furnish the answer when known or available, unless otherwise agreed to by counsel.

21.    With regard to requests for data, responsive information shall be provided on computer disks or zip disks.

## DOCUMENT REQUESTS

1.    All documents, studies, recommendations, reports and analyses relating to, or undertaken in response to, a memorandum from President Clinton, dated July 19, 1995, requiring that Heads of Executive Departments and Agencies undertake "an evaluation of programs you administer that use race or ethnicity in decision-making."

2.    All documents relating to any program changes or eliminations made as a result of any evaluations as described in document request 1.

3.    A Memorandum to General Counsels, dated February 29, 1996, from John R. Schmidt, of the United States Department of Justice, relating to "Post-*Adarand* Guidance on Affirmative Action in Federal Employment."

4.    All documents reflecting or evidencing the distribution of the document described in document request 3, and or responding to that document.

5.    All documents, studies, recommendations, reports and analyses relating to whether HUD recruitment, hiring, training and/or promotion practices complied with the strict scrutiny standard enunciated as described in the document identified in document request 3.

6.    All correspondence, including e-mails, between the EEOC and HUD regarding how to determine whether women and racial/ethnic groups were under-represented in HUD's workforce.

7.    All correspondence between EEOC and HUD on how to determine if HUD's affirmative employment programs, and diversity programs, met the strict scrutiny review standard of Adarand Constructors, Inc. v. Pena, 115 S. Ct. 2097 (1995).

8.    All documents, studies, recommendations, reports and analyses relating to whether HUD recruitment, hiring, training and/or promotion practices complied with the strict scrutiny standard enunciated in the decision of Adarand Constructors, Inc. v. Pena, 115 S. Ct. 2097 (1995).

9.    All of HUD's Affirmative Employment Program Plans (AEP), Affirmative Employment Program Accomplishment Reports and Affirmative Employment Program Plan Updates from Fiscal Year 1997 through the present.

4

10.    All Affirmative Employment Program Plans (AEP), Affirmative Employment Program Accomplishment Reports and Affirmative Employment Program Plan Updates from Fiscal Year 1997 through the present prepared by sub-elements of HUD.

11.    The "FY 2004 Management Directive 715 Affirmative Programs of EEO Report" sent to the EEOC.

12.    Any and all drafts of the "FY 2005 Management Directive 715 Affirmative Programs of EEO Report."

13.    All documents and policy memorandums regarding the role of an AEP Manager in the selection process for training, promotion and hiring, from January 1, 1995 to the present, including, but not limited to the AEP Manager's role in the selection process for the Community Builders position in Boston, MA under vacancy announcement # 0S-MST-98-0002A and for the Public Housing Revitalization Specialist Position in Boston, MA under vacancy announcement # 06-DEU-2000-0081A and # 06-MSR-2000-0099AZ.

14.    All training material for the AEP Managers, from January 1, 1995 to the present

15.    All data used for the comparison of any part of, or all of, HUD's work force as of January 1, 1997 and in each subsequent year to the 1990 Census Availability Data (CAD), formerly the Civilian Labor Force Factors (CLF), including all instructions, data and calculations provided by the EEOC.

16.    All data used for any comparison of any part of, or all of, HUD's work force to the 2000 Census Availability Data (CAD).

17.    All documentation, directives, instructions, correspondence relating to the exclusion of White males from the identification of Manifest Imbalance and Conspicuous Absence in occupational categories, grade groupings and major occupations for any HUD plan or program, including, but not limited to a memorandum from James Troy, Office of Program Operations, EEOC, from 1989.

18.    The detailed implementation plan developed to insure that "diversity hiring strategies are in place to address under-representation," which is referred to on page 292 of the HUD FY 2005 Performance and Accountability Report

19.    All documents relating to the HUD Special Emphasis Program, including without limitation, its goals, the content of the program, date of inception, any changes in the program, any and all strategies used to assist minorities and/or women under the program, any benefits conferred by the program to women and/or minorities, and any and all justifications for the program.

20.    All documents indicating the nature of, or identification of, "special emphasis groups" the members of which the Special Emphasis Program seeks to advance.

5

21.    All documents relating to the conduct of the Special Emphasis Program, including without limitation,

      1.    Any and all information and strategies it has provided to management for enhancing the advancement of special emphasis groups;

      2.    Any assistance it has afforded to achieve equal opportunity in any aspect of personnel management policy and practice; and

      3.    Promotion of the equitable distribution of all employees.

      4.    The role of the Special Emphasis Program Manager.

22.    All documents, studies, recommendations, reports and analyses relating to whether the HUD Special Emphasis Program complied with Constitution-based Equal Protection scrutiny.

23.    All of HUD's FEORP recruitment plans and reports from January 1, 1997 to the present.

24.    All documents, studies, recommendations, reports and analyses relating to whether HUD's FEORP recruitment plans complied with Constitution-based Equal Protection scrutiny.

25.    All documents relating to the HUD Upward Mobility Program, including without limitation, its goals, the content of the program, date of inception, any changes in the program, any and all strategies used to assist minorities and women under the program, any benefits conferred by the program to women and/or minorities, and any and all justifications for the program.

26.    Any and all documents provided to HUD personnel officers, managers or supervisors, indicating HUD's desire for a diverse workforce, and/or indicating strategies for increasing the numbers of underrepresented populations in the workforce, circulated from January 1, 1997 to the present.

27.    The performance evaluations for FY 98 and any narratives regarding the EEOC/AE/Diversity Performance Element Rating for the supervisors and managers involved in the selection process for the Community Builder positions in the Boston, MA HUD Field Office under Vacancy Announcement #OS-MST-98-0002A, including, without limitation, the FY 98 performance evaluations for Jose Citron, Mary Lou Crane, Anthony Brito, Cal Kolaski, Marcella Brown, Jacqueline Campbell, Robert Paquin, and the Human Resources Manager responsible for overseeing the selection process.

28.    Any awards received by any of the persons named in request 27 above for their performance during 1998.

29.    The performance evaluations for FY 2000 and any narratives regarding the EEOC/AE/Diversity Performance Element Rating for the supervisors and managers involved in the selection process for the Public Housing Revitalization Specialist positions in the Boston, MA HUD field Office under Vacancy Announcement # 06-DEU-2000-0081A and #06-MSR-2000-0099AZ, including, without limitation, thee FY 2000 performance evaluations of Cheryl Ann Tenninga, Mirza Del Rosario, Carmen Valenti, Maxine Saunders, the Human Resources Supervisor for Debora Medvic, a Human Resources Specialist and the Human Resources Supervisor for Jeffrey Lahmers.

30.    Any awards received by any of the persons named or identified in request 29 above and Jeffry Lahmers and Emmanuel Yeow, for their performance during 2000.

31.    The annual performance appraisal for Deborah Medvic for 2000 and any document relating to any action taken against Ms. Medvic for the error she made in finding Plaintiff ineligible for the Public Housing Revitalization Specialists position in Boston vacancy announcement #06-MSR-2000-0099AZ.

32.    The business operation plan for HUD's office of departmental equal employment opportunity for FY 98 and 2000.

33.    All documents relating to whether HUD takes steps to maintain or increase minority or gender representation, even after under-representation has been cured in an applicable job category, from January 1, 1997 to the present.

34.    All applicant flow data collected by HUD by position and grade, including that collected by the separate systems used by the Office of Departmental Equal Employment Opportunity and the Office of Human Resources, from January 1, 1997 to the present.

35.    All records of those who had access to or were given copies of the applicant flow data prior to the selections for the individual positions that the applicant flow data was collected for.

36.    All quarterly data submissions regarding HUD's staffing submitted to OPM, from January 1, 1997 to the present.

37.    The annual performance reviews, if any, of the HUD EEO Director, from January 1, 1997 to the present.

38.    All data in the Merit Staffing Control System, entered or present on the System from January 1, 1997 to the present.

39.    All data in the personnel payroll database, entered or present on the database from January 1, 1997 to the present.

40.    All data in the EEOMAS database, which was on the system at any time from January 1, 1997 to the present.

41.    All documents relating to the "Diversity Recruitment Plan," including without limitation, its goals, the content of the program, date of inception, any changes in the program, any and all strategies used to assist minorities and women under the program, any and all justifications for the program.

42.    All data from the EEOMAS data Base regarding all vacancy announcements from January 1997 to the present that were cancelled, and a new vacancy announcement for the same position(s) subsequently reissued, and the race, sex and age of all new hires or HUD employees promoted under each new vacancy announcement.

43.    HUD's Office of Inspector General's Audit report for audit job #FW010032 titled "Follow UP Community Builder Nationwide Audit.

44.    All documents relating to the Emerging Leaders Program, including without limitation, its goals, the content of the program, date of inception, any changes in the program, the selection process for participants, any and all strategies used to assist minorities and women under the program, any and all justifications for the program.

45.    Documents or data reflecting the participants from the Community Planning and Development Division that were in the Emerging Leaders Program, and the race, gender and age, and date of participation for each of the participants.

46.    All documents relating to the HUD Intern Program and the Presidential Management Fellow Program, including without limitation, their goals, the content of the programs, date of inception, any changes in the programs, any and all strategies used to assist minorities and women under the programs, and any and all justifications for the programs.

47.    All documents relating to the Hispanic Employment Plan discussed in Thelma Cockrell's deposition in the case of Worth v. HUD, at 75-76, including without limitation, the program's goals, the content of the program, date of inception, any changes in the programs, any and all strategies used to assist minorities and women under the program, and any and all justifications for the program.

48.    All documents relating to the Corrective Action Plan discussed in Thelma Cockrell's deposition in the case of Worth v. HUD, including without limitation, the program's goals, the content of the program, date of inception, any changes in the programs, any and all strategies used to assist minorities and women under the program, and any and all justifications for the program.

49.    All studies, analyses, reports and other documentation of efforts undertaken by HUD to analyze and resolve any indicated adverse impact on White males in hiring, promotions or training.

50.    For each time in which HUD has concluded that there exists a Manifest Imbalance and/or Conspicuous Absence, from January 1, 1997 to the present, for any racial or ethnic group, or any gender, provide all data, reports, studies, calculations and other documents relied upon in reaching the Manifest Imbalance and Conspicuous Absence conclusions.

51.    All documents, not responsive to any of the above requests, relating to strategies for increasing diversity in the HUD workforce.

52.    All documents, not responsive to any of the above requests, relating to any benefits conferred to women and/or minorities by any HUD program with the goal of encouraging diversity in the HUD workforce.

53.    All documents relating to the Proud To Be Goal, any strategies for increasing diversity in the HUD workforce using the goal, and any benefits conferred to women and/or minorities by the Proud To Be Goal.

54.    All documents relating to the "Accelerated Promotion Policy," including without limitation, its goals, the content of the program, date of inception, any changes in the program, any and all strategies used to assist minorities and women under the program, any and all justifications for the program.

55.    All documents relating to any studies, reports or conclusions that any positions at HUD, which existed from January 1, 1997 to January 1, 2004, were traditionally segregated.

56.    All documents indicating whether the 1998 Community Builder position, vacancy announcement OS-MST-98-0002A was a traditionally segregated position.

57.    All documents indicating or relating to whether an under-representation existed such that the AEP's numerical goals to promote diversity applied to vacancy announcement OS-MST-98-0002A.

58.    All documents indicating whether one or both positions identified in vacancy announcements 06-DEU-2000-0081A and 06-MSR-2000-0099AZ was a traditionally segregated position.

59.    All documents indicating or relating to whether an under-representation existed such that the AEP's numerical goals to promote diversity applied to one or both vacancy announcements 06-DEU-2000-0081A and 06-MSR-2000-0099AZ.

INERROGATORY

1.    Identify the full names, work and residential addresses, and work and residential telephone numbers of the following individuals and further identify the attorney, if any, that represents each individual for the purposes of this litigation:

The Plaintiff
By his attorneys,

Kevin G. Powers
BBO# 405020
Robert S. Mantell
BBO# 559715
Rodgers, Powers & Schwartz LLP
18 Tremont Street, Suite 500
Boston, MA  02108
(617) 742-7010, ext. 305
fax (617) 742-7225

Patoski first document request

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was
served upon the attorney of record for each other party
by mail (by hand) on 3/6/06

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD PATOSKI,<br><br>   Plaintiff,<br><br>  v.<br><br>ALPHONSO JACKSON, Secretary,<br>Department of Housing and Urban<br>Development,<br><br>   Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

       Civil Action No. 05-11086-RCL

## DEFENDANT'S FIRST RESPONSE TO THE PLAINTIFF'S DOCUMENT REQUESTS

1. All documents, studies, recommendations, reports and analyses relating to or undertaken in response to, a memorandum from President Clinton, dated July 19, 1995, requiring that Heads of Executive Departments and Agencies undertake "an evaluation of programs you administer that use race or ethnicity in decision making."

  Objection: the defendant objects to this request on the ground that the request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. The defendant further objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege.

2. All documents relating to any program changes or eliminations made as a result of any evaluations as described in document request 1.

  Objection: the defendant objects to this request on the ground that the request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. The defendant further objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege.

3. A Memorandum to general counsels, dated February 29, 1996, from John R. Schmidt, of the United States Department of Justice, relating to "Post Adarand Guidance on Affirmative Action in Federal Employment."

The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege.

4.    All documents reflecting or evidencing the distribution of the document described in document request 3, and or responding to that document.

The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege.

5.    All documents, studies, recommendations, reports and analyses relating to whether HUD recruitment, hiring, training and/or promotion practices complied with the strict scrutiny standard enunciated as described in the document identified in document request 3.

The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege.

6.    All correspondence, including e-mails, between the EEOC and HUD regarding how to determine whether women and racial/ethnic groups were under represented in HUD's workforce.
The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege.

7.    All correspondence between EEOC and HUD on how to determine if HUD's affirmative employment programs, and diversity programs, met the strict scrutiny standard of Adarand Constructors, Inc. V. Pena, 115 S.Ct. 2097 (1995).

The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege.

8.    All documents, studies, recommendations, reports and analyses relating to whether HUD recruitment, hiring, training and/or promotion practices complied with the strict scrutiny standard enunciated in the decision of Adarand Contructors, Inc. V. Pena, 115 S.Ct. 2097 (1995).

The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege.

9.    All of HUD's Affirmative Employment Program Plans (AEP), Affirmative Employment Program Accomplishment Reports and Affirmative Employment Program Plan Updates from Fiscal year 1997 through the present.

This response will be supplemented tomorrow.

10.    All Affirmative Employment program plans (AEP), Affirmative Employment Program Accomplishment Reports and Affirmative Employment Program Plan Updates from Fiscal year 1997 through the present prepared by sub-elements of HUD.

This response will be supplemented tomorrow.

11.    The "FY 2004" Management Directive 715 Affirmative Programs of EEO Report" sent to the EEOC.

This response will be supplemented tomorrow

12.    Any and all drafts of the "FY 2005 Management Directive 715 Affirmative Programs of EEO Report."

The defendant objects to this request on the ground that it seeks materials protected by the deliberative process privilege.  Notwithstanding nor waiving the foregoing, this response will be seasonably supplemented

13.    All documents and policy memorandums regarding the role of an AEP Manager in the selection process for training, promotion and hiring, from January 1, 1995 to the present, including, but not limited to the AEP Manager's role in the selection process for the Community Builders position in Boston, MA under vacancy announcement #OS-MST-98-0002A and for the Public Housing Revitalization Specialist Position in Boston, MA under the vacancy announcement #06-DEU-2000-0081A and # 06-MSR-2000-0099AZ.

The defendant objects to this request on the ground that it seeks materials protected by the attorney client  privilege, work product doctrine and/or the deliberative process privilege. Notwithstanding nor waiving the foregoing, this response will be seasonably supplemented

14.    All training materials for the AEP managers from January 1, 1995 to the present.

This response will be supplemented tomorrow.

15.    All data used for any comparison of any part of, or all of, HUD's work force as of January 1, 1997 and in each subsequent year to the 1990 Census Availabilty Data (CAD), formerly the Civilian Labor Force Factors (CLF), including all instructions, data and calculations provided by the EEOC.

The defendant objects to this request on the ground that it seeks materials protected by the attorney client  privilege, work product doctrine and/or the deliberative process privilege. Notwithstanding nor waiving the foregoing, this response will be supplemented tomorrow.

16.    All data used for any comparison of any part of, or all of, HUD's work force to the 2000 Census Availability Data (CAD).

The defendant objects to this request on the ground that it seeks materials protected by the attorney client  privilege, work product doctrine and/or the deliberative process privilege. Notwithstanding nor waiving the foregoing, this response will supplemented tomorrow.

17.    All documentation, directives, instructions, correspondence relating to the exclusion of White males from the identification of Manifest Imbalance and Conspicuous Absence in occupational categories, grade groupings and major occupations fro any HUD plan or program, including, but not limited to a memorandum from James Troy, Office of Program operations, EEOC, from 1989.

The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege. Notwithstanding nor waiving the foregoing, this response will be seasonably supplemented.

18.    The detailed implementation plan developed to insure that "diversity hiring strategies are in place to address under-representation" which is referred to on page 292 of the HUD FY 2005 Performance and Accountability Report.

The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege. Notwithstanding, nor waving the foregoing, there are no documents responsive to this request.

19.    All documents relating to the HUD Special Emphasis Program, including without limitation, its goals, the content of the program, date of inception, any changes tin the program, any and all strategies used to assist minorities and/or women under the program, and benefits conferred by the program to women and/or minorities, and any and all justifications for the program.

The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege. The defendant further objects in that it cannot fairly respond to the question because it mis-characterizes the nature of the program. Notwithstanding nor waiving the foregoing, this response will be supplemented tomorrow.

20.    All documents indicating the nature of, or identification of, "special emphasis groups" the members of which the Special Emphasis Program seeks to advance.

There are no documents responsive to this request. The special emphasis group is not an advancement program.

21.    All documents relating to the conduct of the Special Emphasis Program, including without limitation,
        1.    Any and all information and strategies it has provided to management for enhancing the advancement of special emphasis groups;

        2.    Any assistance it has afforded to achieve equal opportunity in any aspect of personnel management policy and practice; and
        3.    Promotion of the equitable distribution of employees.
        4.    The ole of the special emphasis manager.

The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege. The defendant further objects in that it cannot fairly respond to the question because it mis-characterizes the nature of the program. Notwithstanding nor waiving the foregoing, the defendant shall seasonably supplement this response.

22.    All documents, studies, recommendations, reports and analyses relating to whether HUD Special Emphasis Program complied with the Constitution based Equal Protection scrutiny.

The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege.

23.    All of HUD's FEORP recruitment plans and reports from January 1997 to the present

This response shall be supplemented tomorrow.

24.    All documents, studies, recommendations, reports and analyses relating to whether HUD's FEORP recruitment plans complied with Constitution-based equal protection scrutiny.

The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege.

25.    All documents relating to the HUD Upward Mobility Program, including without limitation, its goals, the content of the program, date of inception, any changes in the program, any and all strategies used to assist minorities and women under the program, any benefits conferred by the program to women and/or minorities, and any and all justification for the program.

The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege. Notwithstanding nor waiving the foregoing, the defendant shall seasonably supplement this request.

26.    Any and all documentation provided to HUD personnel officers, managers or supervisors, indicating HUD's desire for a diverse workforce, and/or indicating strategies for increasing the numbers of under represented populations in the workforce, circulated from January 1, 1997, to the present.

The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege. Notwithstanding nor waiving the foregoing, the defendant shall supplement this response tomorrow.

27.    The performance evaluations for FY 98 and any narratives regarding the EEOC/AE/Diversity Performance Element rating for the supervisors and managers involved in

the selection process for the Community Builder Positions in the Boston, MA HUD Field Office under vacancy announcement #OS-MST-98-0002A, including, without limitation, the FY98 performance evaluations for Jose Citron, Mary Lou Crane, Anthony Brito, Cal Kolaski, Macella Brown, Jacqueline Campbell, Robert Paquin, and the Human resources Manager responsible for overseeing the selection process.

Government records retrievable by individual name are subject to the Privacy Act and may not be disclosed without a court order. In this regard, defendant has forwarded to Plaintiff a proposed order for the Court to enter, authorizing disclosure of materials under that Act. Absent court authorization, the defendant and undersigned counsel could be subject to civil and/or criminal penalties for disclosure of records covered by the Privacy Act. The defendant shall supplement this response.

28.    Any awards received by any of the persons named in request 27 above for their performance during 1998.

    See Response No. 27.

29.    The performance evaluations for FY 2000 and any narratives regarding the EEOC/AE/Diversity Performance Element Rating for the supervisors and managers involved in the selection process for the Public Housing Revitalization Specialist positions in the Boston, MA HUD Field Office under vacancy Announcement # 06-DEU-2000-0081A and #06-MSR-2000-0099AZ, including, without limitation, the FY 2000 performance evaluations of Cheryl Ann Tenninga, Mirza Del Rosario, Carmen Valenti, Maxine Sounders, the Human Resources Specialst and the Human Resources Supervisor for Jeffrey Lahmers.

    See Response No. 27.

30.    Any awards received by any of the persons named or identified in request 29 above and Jeffrey Lahmers and Emmanuel Yeow, for their performance during 2000.

    See Response No. 27.

31.    The annual performance appraisal for Deborah Medvic for 2000 and any document relating to any action taken against Ms. Medvic for the error she made in finding plaintiff ineligible for the Public Housing Revitalization Specialist position in vacancy announcement #06-MSR-20000-0099AZ.

    See Response No. 27.

32.    The business operation plan for HUD's office of departmental equal employment opportunity for FY 1998 and 2000.

Reasonable investigation by the Office of Diversity and Equal Employment has uncovered no such document. The defendant shall supplement.

33.    All documents relating to whether HUD takes steps to maintain or increase minority or gender representation, even after under representation has been cured in an applicable job category, from January 1, 1997, to the present.

The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege. Notwithstanding nor waiving the foregoing, the defendant shall supplement this response.

34.    All applicant flow data collected by HUD by position and grade, including that collected by the separate systems used by the Office of Departmental Equal Employment Opportunity and the Office of Human Resources, from January 1, 1997 to the present.

The defendant shall supplement this response.

35.    All records of those who had access to or were given copies of the applicant flow data prior to selection for the individual positions that the flow data was collected for.

Objection: the defendant objects to this request on the ground that the request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence in this matter. Notwithstanding nor waiving, the defendant shall supplement this response.

36.    All quarterly data submissions regarding HUD's staffing submitted to OPM, from January 1997 to the present.

The defendant shall supplement this response.

37.    The annual performance reviews, if any, of the HUD EEO Director, from January 1, 1997, to the present.

Objection: the defendant objects to this request on the ground that the request is not reasonably calculated to lead to the discovery of admissible evidence in this matter. See also, Response No. 27. Notwithstanding, the defendant shall supplement this response.

38.    All data in the Merits Staffing Control System, entered or present on the System from January 1, 1997, to the present.

The defendant shall supplement this response.

39.    All data in the personnel payroll database, enter or present on the database from January 1997 to the present.

The defendant objects to this request on the ground that the request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. See also, Response No. 27.

40.    All data in the EEOMAS database, which was in the system from January 1, 1997 to the present.

The defendant objects to this request on the ground that the request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. See also, Response No. 27. The defendant shall supplement this response.

41.    All documents relating to the "Diversity Recruitment Plan," including without limitation, its goals, the content of the Program, date of inception, any change in the program, and any and all strategies used to assist minorities and women under the program, and any all justification for the program.

Please see attached documents 1-84, 86-253, 261-274, 322-384, 401-491, 558-560, 583-664, 727-737, 740-741, 865-921, 973-1558, 1562-1795. The defendant shall supplement this response.

42.    All data from the EEOMAS database regarding all vacancy announcements from January 1997 to the present that were cancelled, and a new vacancy announcement for the same position(s) subsequently reissued, and the race, sex and age of all new hires or HUD employees promoted under each new vacancy announcement.

The defendant objects to this request on the ground that the request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. See also, Response No. 27. The defendant shall supplement this response

43.    HUD's Office of Inspector General's Audit report for audit job #FW010032 titled "Follow UP Community Builder nationwide Audit."

The defendant objects to this request on the ground that it seeks materials protected by the deliberative process privilege. The defendant shall supplement this response.

44.    All documents relating to the Emerging Leaders Program, including without Limitation its goals, the content of the program, date of inception, any changes in the program, the selection process for participants, and all strategies used to assist minorities and women under the program, and all justification for the program.

The defendant shall provide a response tomorrow.

45.    Documents or data reflecting the participants from the Community Planning and Development Division that were in the emerging leaders Program, and the race, gender, and age, and date of participation for each of the participants.

The defendant shall provide a response tomorrow.

46.    All documents relating to the HUD Intern Program and the Presidential management Fellow Program, including without limitation, their goals, the content of the programs, date of

inception, any change in the programs, and any and all strategies used to assist minorities and women under the program, and any and all justifications for the programs.

See 1-84, 86-253, 261-274, 322-384, 401-491, 558-560, 583-664, 727-737, 740-741, 865-921, 973-1558, 1562-1795; 751-864.

47.    All documents relating to the Hispanic Employment plan discussed in Thelma Cockrell's deposition in the case of Worth v. HUD, including without limitation, the program's goals, the content of the program, date of inception, any changes in the program, any and all strategies used to assist minorities and women under th program , and any and all justifications for the program.

Please see attached documents 1-84, 86-253, 261-274, 322-384, 401-491, 558-560, 583-664, 727-737, 740-741, 865-921, 973-1558, 1562-1795.  The defendant shall supplement this response.  See also Executive Order 13171 located at http://www.opm.gov/eo/13171.asp

48. All studies, analyses, reports and other documentation of efforts undertaken by HUD to analyze and resolve any indicated adverse impact on White males in hiring promotions and training.

No such documents.

Respectfully submitted,
MICHAEL J. SULLIVAN,
United States Attorney

By:    /s/ Mark J. Grady
Mark J. Grady, Assistant U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA  02210
617-748-3136

Certificate of Service

I hereby certify that I hand delivered a copy of the foregoing to plaintiff's counsel on July 11, 2006.

By:    /s/ Mark J. Grady
Mark J. Grady, Assistant U.S. Attorney

# EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD PATOSKI, ) | Civil Action No. 05-11086-RCL |
| Plaintiff, ) | |
| v. ) | |
| ALPHONSO JACKSON, Secretary, ) Department of Housing and Urban ) Development, ) | |
| Defendant. ) | |

## DEFENDANT'S SUPPLEMENTAL RESPONSE TO THE PLAINTIFF'S DOCUMENT REQUESTS

6.    All correspondence, including e-mails, between the EEOC and HUD regarding how to determine whether women and racial/ethnic groups were under represented in HUD's workforce.

Supplemental Response

The following materials are responsive to this request:
1. Management Directive 713 Affirmative Action for Hiring, Placement and Advancement of Individuals with Handicaps, HUD 5660-5700;
2. Management Directive 714 Equal Employment Opportunity Management Directive, HUD 5701-5758;
3. Management Directive 715 Equal Employment Opportunity, HUD 5759-5781.

10.    All Affirmative Employment program plans (AEP), Affirmative Employment Program Accomplishment Reports and Affirmative Employment Program Plan Updates from Fiscal year 1997 through the present prepared by sub-elements of HUD.

Second Response

Please see attached p., 1796- 1826, 2037-2062 (Office of Chief Procurement, years 1999, 2000 and 2001); 1827-1921 (Office of Field Policy and Management, years 1999 and 2000); 1922-1964 (Office of Real Estate Assessment, years 1999, 2000, and 2001); 1965-2033 (Office of Congressional and Intergovernmental Relations, years 1997, 1998 and 1999); 2063-2109 (Office of Community Planning and Development, year 2001); 2110-2470 (Office of the Chief Financial Advisor, years 1997, 1998, 2000, 2001, 2002 and 2003); 2471-2694 (Office of Public and Indian Housing, years 1997, 1998, 1999, 2000, 2001 and 2002); 2695-2798 (Enforcement

Center, years 1999 and 2001); 2799 (Office of Lead Housing Control, year 1997); 2811-2900 (Office of General Counsel, years 1999 and 2000); 2901-3108 (Office of Inspector General, years 1997, 1998, 1999, 2000 and 2003); 3109-3327 (Office of Administration, years 1997, 1999, 2000, 2001 and 2002); 3328-3653 (Government National Mortgage Association, years 1997, 1998, 2000, 2001, 2002); 3654-3858 (Office of Fair Housing, years 1997, 1998 and 1999. (To the extent that reports for individual years may be missing, a reasonable search has been conducted that did not uncover those reports. Said search is ongoing and should such materials be discovered, this response will be supplemented)

    Supplemental Response

       Please also see HUD 5605-5659 (Office of Community Planning and Development, 2000). To the extent that reports for individual years may be missing, a reasonable search has been conducted that did not uncover those reports.

13.    All documents and policy memorandums regarding the role of an AEP Manager in the selection process for training, promotion and hiring, from January 1, 1995 to the present, including, but not limited to the AEP Manager's role in the selection process for the Community Builders position in Boston, MA under vacancy announcement #OS-MST-98-0002A and for the Public Housing Revitalization Specialist Position in Boston, MA under the vacancy announcement #06-DEU-2000-0081A and # 06-MSR-2000-0099AZ.

    Supplemental Response

    The following materials are responsive to this request
    1. ODEEO, Affirmative Employment Division, Affirmative Employment Program Managers and Discrimination Complaint Managers Briefing February 3, 2005, p. 5021-5120.

15.    All data used for any comparison of any part of, or all of, HUD's work force as of January 1, 1997 and in each subsequent year to the 1990 Census Availability Data (CAD), formerly the Civilian Labor Force Factors (CLF), including all instructions, data and calculations provided by the EEOC.

    Supplemental Response

    The following materials are responsive to this request
    1. HUD Office of Field Policy and Management FY 1999 AEP Plan Update Report, p. 1827-1880
    2. HUD Office of Field Policy and Management FY 2000 AEP Plan Update Report, p.1881-1921
    3. HUD Real Estate Assessment Center FY 1999 AEP Plan Update Report, p. 1922-1938
    4. HUD Real Estate Assessment Center FY 2000 AEP Plan Update Report, p. 1939-1951
    5. HUD Real Estate Assessment Center FY 2001 AEP Plan Update Report, p. 1952-1964
    6. HUD Office of Congressional and Intergovernmental Relations FY 1997 AEP Plan Update Report, p. 1965-1988

7. HUD Office of Congressional and Intergovernmental Relations FY 1998 AEP Plan Update Report, p. 1989-2012

8. HUD Office of Congressional and Intergovernmental Relations FY 1999 AEP Plan Update Report, p. 2013-2036

9. HUD Office of the Chief Procurement Officer FY 1999 Accomplishment Report, p. 2037-2050

10. HUD Office of the Chief Procurement Officer FY 2000 AEP Plan Update Report, p. 2051-2062

11. HUD Office of Community Planning and Development FY 2001 AEP Program Update Report, p. 2063-2109

12. HUD Office of the Chief Financial Officer FY 1997 AEP Accomplishment Report, p. 2110-2199

13. HUD Office of the Chief Financial Officer FY 1998 AEP Accomplishment Report, p. 2200-2313

14. HUD Office of the Chief Financial Officer FY 2000 AEP Accomplishment Report, p. 2314-2357

15. HUD Office of the Chief Financial Officer FY 2001 AEP Plan Update Report, p. 2358-2399

16. HUD Office of the Chief Financial Officer FY 2002 AEP Plan Update Report, p. 2400-2435

17. HUD Office of the Chief Financial Officer FY 2003 AEP Plan Update Report, p. 2436-2470

18. HUD Office of the Assistant Secretary for Public and Indian Housing FY 1997 AEP Accomplishment Report, p. 2471-2501

19. HUD Office of the Assistant Secretary for Public and Indian Housing FY 1998 AEP Plan Update Report, p. 2502-2530

20. HUD Office of the Assistant Secretary for Public and Indian Housing FY 1999 AEP Plan Update Report, p. 2531-2561

21. HUD Office of the Assistant Secretary for Public and Indian Housing FY 2000 AEP Accomplishment Report, p. 2562-2594

22. HUD Office of the Assistant Secretary for Public and Indian Housing FY 2001 AEP Plan Update Report, p. 2595-2660

23. HUD Office of the Assistant Secretary for Public and Indian Housing FY 2002 AEP Plan Update Report, p. 2661-2694

24. HUD Departmental Enforcement Center FY 1999 AEP Plan Update Report, p. 2695-2731

25. HUD Departmental Enforcement Center FY 2001 AEP Plan Update Report, p. 2732-2798

26. HUD Office of Lead Hazard Control FY 1997 AEP Plan Update Report, p. 2799-2810

27. HUD Office of General Counsel FY 1999 AEP Plan Update Report, p. 2811-2857

28. HUD Office of General Counsel FY 2000 AEP Plan Update Report, p. 2858-2900

29. HUD Office of Inspector General FY 1997 AEP Plan Update Report, p. 2901-2930

30. HUD Office of Inspector General FY 1998 Affirmative Employment Report, p. 2931-2976

31. HUD Office of Inspector General FY 1999 Affirmative Employment Report, p. 2977-

3024
32. HUD Office of Inspector General FY 2000 Affirmative Employment Report, p. 3025-3070
33. HUD Office of Inspector General FY 2003 AEP Update Report, p. 3071-3108
34. HUD Office of Administration FY 1997 AEP Plan Update Report, p. 3109-3151
35. HUD Office of Administration FY 1999 AEP Update Report, p. 3152-3191
36. HUD Office of Administration FY 2000 AEP Plan Update Report, p. 3192-3229
37. HUD Office of the Assistant Secretary for Administration FY 2001 AEP Plan Update Report, p. 3230-3276
38. HUD Office of the Assistant Secretary for Administration FY 2002 AEP Plan Update Report, p. 3277-3327
39. HUD Government National Mortgage Association FY 1997 AEP Accomplishment Report, p. 3328-3397
40. HUD Government National Mortgage Association FY 1998 AEP Plan Update Report, p. 3398-3456
41. HUD Government National Mortgage Association FY 2000 AEP Plan Update Report, p. 3457-3518
42. HUD Government National Mortgage Association FY 2001 AEP Plan Update Report, p. 3519-3580
43. HUD Government National Mortgage Association FY 2002 AEP Accomplishment Report, p. 3581-3653
44. HUD Office of Fair Housing and Equal Opportunity FY 1997 AEP Accomplishment Report, p. 3654-3734
45. HUD Office of Fair Housing and Equal Opportunity FY 1998 AEP Plan Update Report, p. 3735-3783
46. HUD Office of Fair Housing and Equal Opportunity FY 1999 AEP Accomplishment Report (Summary Analysis of Work Force), p. 3784-3858
47. HUD Departmentwide FY 1997 AEP Update Report, p. 3859-3961
48. HUD Departmentwide FY 1998 AEP Update Report, p. 3962-4070
49. HUD Departmentwide FY 1999 AEP Plan Update Report, p. 4071-4180
50. HUD Departmentwide FY 2000 AEP Plan Update Report, p. 4181-4286
51. HUD Departmentwide FY 2001 AEP Update Report, p. 4287-4389
52. HUD Departmentwide FY 2002 AEP Update Report, p. 4390-4497
53. HUD Departmentwide FY 2003 AEP Plan Update Report, p. 4498-4600
54. HUD EEOTRAC materials, HUD 5567-5604.

16.    All data used for any comparison of any part of, or all of, HUD's work force to the 2000 Census Availability Data (CAD).

Supplemental Response

The following materials are responsive to this Request:
1. HUD Office of Departmental Equal Employment Opportunity, Affirmative Employment Division, FY 2004 Management Directive Form 715, Affirmative Programs of EEO Report, p. 4601-4708
2. HUD EEOTRAC materials, HUD 5567-5604.

18.    The detailed implementation plan developed to insure that "diversity hiring strategies are in place to address under-representation" which is referred to on page 292 of the HUD FY 2005 Performance and Accountability Report.

Supplemental Response

On August 25, 2003, EEOC issued Management Directive 715 ("MD-715"), which became effective on October 1, 2003. MD 715 explicitly overrides MD-714, its predecessor, and all related interpretive memoranda. Unlike MD-714, MD-715 does not provide for any numerical goal-setting objectives, and states as its goal the achievement of equal opportunity for all federal employees and applicants, regardless of race, sex, national origin, color, religion, disability or reprisal for engaging in prior protected activity. Since that time HUD has had no Affirmative Employment Plan and has had no EEO/AEP Program. In reference to the FY 2005 HUD Performance and Accountability Report, page 292, removal of the referenced statement "diversity hiring strategies are in place to address under-representation" was an oversight and should have been deleted. There are no documents responsive to this request.

19.    All documents relating to the HUD Special Emphasis Program, including without limitation, its goals, the content of the program, date of inception, any changes tin the program, any and all strategies used to assist minorities and/or women under the program, and benefits conferred by the program to women and/or minorities, and any and all justifications for the program.

Supplemental Response

The following materials are responsive to this request:
1. Logistical Procedures and Resource Information Guide, HUD 5813-5835.

20.    All documents indicating the nature of, or identification of, "special emphasis groups" the members of which the Special Emphasis Program seeks to advance.

Supplemental Response
See Response No. 19.

21.    All documents relating to the conduct of the Special Emphasis Program, including without limitation,
   1.    Any and all information and strategies it has provided to management for enhancing the advancement of special emphasis groups;
   2.    Any assistance it has afforded to achieve equal opportunity in any aspect of personnel management policy and practice; and
   3.    Promotion of the equitable distribution of employees.
   4.    The role of the special emphasis manager.

Supplemental Response
See response No. 19.

22.     All documents, studies, recommendations, reports and analyses relating to whether HUD Special Emphasis Program complied with the Constitution based Equal Protection scrutiny.

There are no such documents.

23.     All of HUD's FEORP recruitment plans and reports from January 1997 to the present

Supplemental Response
There are no FEORP Reports after 2003.  The following materials are responsive to this request:
1. FEORP Program Recruitment Plan 2003, p. 219-221;
2. FEORP Accomplishment Report, p. 222-241
3. FEORP Accomplishment Report 2002, p. 360-378;
4. FEORP Plan Certification 2003, p. 379-384;
5. Cover Sheets, HUD Office of Departmental Equal Employment Opportunity (ODEEO), Affirmative Employment Division, Federal Equal Opportunity Recruitment Program (FEORP) Departmentwide FY 1997 Plan Certification, p. 4828-4829;
6. HUD ODEEO, Affirmative Employment Division, FEORP Departmentwide FY 1996 Accomplishment Report, p. 4830-4857
7. HUD ODEEO, Affirmative Employment Division, FEORP Departmentwide FY 1998 Accomplishment Report, FY 1999 Plan Certification and Program Plan, p. 4858-4891
8. HUD ODEEO, Affirmative Employment Division, FEORP Departmentwide FY 1999 Accomplishment Report, FY 2000 Plan Certification and Recruitment Plan Update, p. 4892-4921
9. HUD ODEEO, Affirmative Employment Division, FEORP Departmentwide FY 2001 Accomplishment Report, p. 4922-4953;
10. HUD ODEEO, Affirmative Employment Division, FEORP Departmentwide FY 2002 Accomplishment Report, FY 2002 Hispanic Employment Analysis and Initiatives, FY 2003 Plan Certification and Recruitment Plan, p. 4986-5020

25.     All documents relating to the HUD Upward Mobility Program, including without limitation, its goals, the content of the program, date of inception, any changes in the program, any and all strategies used to assist minorities and women under the program, any benefits conferred by the program to women and/or minorities, and any and all justification for the program.

Supplemental response
The following materials are responsive to this Request:
1. Handbook : Upward Mobility Program, HUD 5836-5862.

27.     The performance evaluations for FY 98 and any narratives regarding the EEOC/AE/Diversity Performance Element rating for the supervisors and managers involved in the selection process for the Community Builder Positions in the Boston, MA HUD Field Office under vacancy announcement #OS-MST-98-0002A, including, without limitation, the FY98 performance evaluations for Jose Citron, Mary Lou Crane, Anthony Brito, Cal Kolaski, Macella

Brown, Jacqueline Campbell, Robert Paquin, and the Human resources Manager responsible for overseeing the selection process.

<u>Supplemental Response</u>

The recruiting of the Community Builder positions was conducted on a nationwide basis from the Headquarters Office in Washington, DC.  Many managers both within and outside of headquarters were involved in interviewing and selecting.  The vacancies for these positions were not location specific, so it could not determined who was specifically involved for any particular location.  Additionally, HUD maintains the case files for 2 years, thus there are no longer any documents from which HUD could identify or provide any names requested.  Attached are performance appraisals of those persons specifically requested in number 27.  The Human Resources managers responsible for overseeing the selection process were Hal Morrison and Daniel Gluck.  Both left the Department several years ago and HUD Office of Personnel does not have any records on either employee.

These following materials are provided in response to this request, the materials should be considered CONFIDENTIAL and subject to the Court's Privacy Act Order:
   1. Jose Citron, evaluation period 2/1/99- 1/31/00, HUD 5482-5494;
   2. Anthony Brito, evaluation period, evaluation period 2/1/99-1/31/00, HUD 5500-5508;
   3. Marcella Brown, evaluation period1/31/99- 2/1/00, HUD 5509-5530;
   4. Robert Paquin, evaluation period, 2/1/00-1/31/01, HUD 5531-5537.

28.    Any awards received by any of the persons named in request 27 above for their performance during 1998.

All Responsive records have been provided  in Response No. 27.

29.    The performance evaluations for FY 2000 and any narratives regarding the EEOC/AE/Diversity Performance Element Rating for the supervisors and managers involved in the selection process for the Public Housing Revitalization Specialist positions in the Boston, MA HUD Field Office under vacancy Announcement # 06-DEU-2000-0081A and #06-MSR-2000-0099AZ, including, without limitation, the FY 2000 performance evaluations of Cheryl Ann Tenninga, Mirza Del Rosario, Carmen Valenti, Maxine Sounders, the Human Resources Specialst and the Human Resources Supervisor for Jeffrey Lahmers.

<u>Supplemental Response</u>

These following materials are provided in response to this request, the materials should be considered CONFIDENTIAL and subject to the Court's Privacy Act Order:

   1. Cheryl Ann Teninga, evaluation dated 5/9/00, HUD 5351-5367;
        Evaulation period 2/1/99-1/31/00, HUD 5538-05555;
   2. Mirza Del Rosario, evaluation period 2/1/00-9/30/00, HUD 5375-5388;
   3. Carmen Valenti, evaluation period 2/1/99-/1/31/00; HUD 5389-5424;
   4. Maxine Sounders, evaluation period 2/1/99-9/30/99; HUD 5425-5450;
        Evaluation period, 10/1/00-9/30/01, HUD 5495-5499;

5. Emmanuel Yeow, evaluation period, 2/1/99-1/31/00, HUD 5463-5481.

30.     Any awards received by any of the persons named or identified in request 29 above and Jeffrey Lahmers and Emmanuel Yeow, for their performance during 2000.

    Supplemental Response

    These following materials are provided in response to this request, the materials should be considered CONFIDENTIÅL and subject to the Court's Privacy Act Order:

    1. Cheryl Ann Teninga, HUD 5368-5374.

31.     The annual performance appraisal for Deborah Medvic for 2000 and any document relating to any action taken against Ms. Medvic for the error she made in finding plaintiff ineligible for the Public Housing Revitalization Specialist position in vacancy announcement #06-MSR-20000-0099AZ.

    Supplemental Response

    These following materials are provide din response to this request, the materials should be considered CONFIDENTIAL and subject to the Court's Privacy Act Order:

    1. Evaluation period, 2/1/99-1/31/00, HUD 5451.  There are no documents reflecting any action against Ms. Medvic.

32.     The business operation plan for HUD's office of departmental equal employment opportunity for FY 1998 and 2000.

    Supplemental Response

    The ODEEO was not established as a separate office in 1998 and 2000.  Thus, there are no documents responsive to this request.

40.     All data in the EEOMAS database, which was in the system from January 1, 1997 to the present.

Supplemental Response

    The HUD EEOMAS database is no longer used by HUD.  The Equal Opportunity Tracking System contains some historical data from 1997 to 2006 from the EEOMAS database. The following materials are provided in Response to this Request
    1. HUD 5567-5604;
    2. Facsimile to Rick Patoski from Teresa Royal-Furth, dated July 25, 2001, HUD 5782-5800.

44.     All documents relating to the Emerging Leaders Program, including without Limitation its goals, the content of the program, date of inception, any changes in the program, the selection process for participants, and all strategies used to assist minorities and women under the program, and all justification for the program.

> Supplemental Response
> The following materials are responsive to this request.
> 1. ELP announcement HUD 5801-5804;
> 2. Application, HUD 05805-5808;
> 3. ELP Frequently Asked Questions, HUD 5809-5812.

48.     All documents relating to the Corrective Action plan discussed in Thelma Cockrell's deposition in the case of Worth v. HUD, including without limitation, the program's goals, the content of the program, date of inception, any changes in the programs, any and all strategies used to assist minorities and women under the program, and any and all justifications for the program.

> Supplemental Response
> 1. Corrective Action Plan Implementation Memo, HUD 5556-5557;
> 2. Corrective Action Plan FY '04, HUD 5558-5562;
> 3. Corrective Action Plan Matrix for Office of Human Resources, HUD 5563-5566.

>                     Respectfully submitted,
>                     MICHAEL J. SULLIVAN,
>                     United States Attorney
>
>             By:     /s/ Mark J. Grady
>                     Mark J. Grady, Assistant U.S. Attorney
>                     1 Courthouse Way, Suite 9200
>                     Boston, MA  02210
>                     617-748-3136

Dated : October 3, 2006

# EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD PATOSKI, ) | |
| ) | Civil Action No. 05-11086-RCL |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| ALPHONSO JACKSON, Secretary, ) | |
| Department of Housing and Urban ) | |
| Development, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**DEFENDANT'S OCTOBER 4, 2006, SUPPLEMENTAL RESPONSE TO THE
PLAINTIFF'S DOCUMENT REQUESTS**

1.      All documents, studies, recommendations, reports and analyses relating to or undertaken in response to, a memorandum from President Clinton, dated July 19, 1995, requiring that Heads of Executive Departments and Agencies undertake "an evaluation of programs you administer that use race or ethnicity in decision making."

Supplemental Response 10-4-06

Objection: the defendant objects to this request on the ground that the request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. The defendant further objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege. Materials withheld subject to a claim of privilege are listed in the attached privilege log.

2.      All documents relating to any program changes or eliminations made as a result of any evaluations as described in document request 1.

Supplemental Response 10-4-06

Objection: the defendant objects to this request on the ground that the request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. The defendant further objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege. Materials withheld subject to a claim of privilege are listed in the attached privilege log. Notwithstanding nor waiving the foregoing, EEOC MD-714 (p. 5701-5758) was

superceded by EEOC MD-715 (p. 5759-5781).

3.      A Memorandum to general counsels, dated February 29, 1996, from John R. Schmidt, of the United States Department of Justice, relating to "Post Adarand Guidance on Affirmative Action in Federal Employment."

    Supplemental Response 10-4-06
    The defendant objects to this request on the ground that it seeks materials protected by the attorney client  privilege, work product doctrine and/or the deliberative process privilege. Materials withheld subject to a claim of privilege are listed in the attached privilege log.

4.      All documents reflecting or evidencing the distribution of the document described in document request 3, and or responding to that document.

    Supplemental Response 10-4-06
    The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege. Materials withheld subject to a claim of privilege are listed in the attached privilege log. Notwithstanding nor waiving the foregoing, there are no documents responsive to this request.

5.      All documents, studies, recommendations, reports and analyses relating to whether HUD recruitment, hiring, training and/or promotion practices complied with the strict scrutiny standard enunciated as described in the document identified in document request 3.

    Supplemental Response 10-4-06
    The defendant objects to this request on the ground that it seeks materials protected by the attorney client  privilege, work product doctrine and/or the deliberative process privilege. Materials withheld subject to a claim of privilege are listed in the attached privilege log.

6.      All correspondence, including e-mails, between the EEOC and HUD regarding how to determine whether women and racial/ethnic groups were under represented in HUD's workforce.

    Supplemental Response 10-4-06

    The following materials are responsive to this request:
    1. Instructions for Federal Agencies for EEOC MD-715, p. 5869-6033; and
    2. Correspondence between HUD and St Louis District Office of EEOC, p. 6034-6044.

7.      All correspondence between EEOC and HUD on how to determine if HUD's affirmative employment programs, and diversity programs, met the strict scrutiny standard of Adarand Constructors, Inc. v. Pena, 115 S. Ct. 2097 (1995).

    Supplemental Response 10-4-06
    The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege. Notwithstanding nor waiving the foregoing, there are no such documents.

8.    All documents, studies, recommendations, reports and analyses relating to whether HUD recruitment, hiring, training and/or promotion practices complied with the strict scrutiny standard enunciated in the decision of Adarand Constructors, Inc. v. Pena, 115 S. Ct. 2097 (1995).

Supplemental Response 10-4-06
The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege. Materials withheld subject to a claim of privilege are listed in the attached privilege log.

12.    Any and all drafts of the "FY 2005 Management Directive 715 Affirmative Programs of EEO Report."

Supplemental Response 10-4-06
The defendant objects to this request on the ground that it seeks materials protected by the deliberative process privilege because the report remains in draft form.  HUD has no objection to the release of the final document.  Notwithstanding nor waiving the foregoing, the agency has determined that data within the documents responsive to this request may be separately disclosed without impugning the goals of the privilege.  Please see Data Tables from the 2005 Draft MD 715 Report, p. 6045-6075.

16.    All data used for any comparison of any part of, or all of, HUD's work force to the 2000 Census Availability Data (CAD).

Supplemental Response 10-4-06

Data contained in the Draft of the 2005 MD 715 Report is responsive to this request.  See p. 6045-6075.

24.    All documents, studies, recommendations, reports and analyses relating to whether HUD's FEORP recruitment plans complied with Constitution-based equal protection scrutiny.

Supplemental Response 10-4-06
The defendant objects to this request on the ground that it seeks materials protected by the attorney client  privilege, work product doctrine and/or the deliberative process privilege. Materials withheld subject to a claim of privilege are identified in the attached privilege log.

26.    Any and all documentation provided to HUD personnel officers, managers or supervisors, indicating HUD's desire for a diverse workforce, and/or indicating strategies for increasing the numbers of under represented populations in the workforce, circulated from January 1, 1997, to the present.

Supplemental Response 10-4-06

The following materials are Responsive to this Request
1. Policy Statement by Mel Martinez, dated April 2, 2001. Pages 5963-5867.

33.    All documents relating to whether HUD takes steps to maintain or increase minority or gender representation, even after under representation has been cured in an applicable job category, from January 1, 1997, to the present.

Supplemental Response 10-4-06

The defendant objects to this request on the ground that it seeks materials protected by the attorney client privilege, work product doctrine and/or the deliberative process privilege. Materials withheld subject to a claim of privilege are identified in the attached privilege log. Notwithstanding nor waiving the foregoing, the following documents are responsive to this request:
        1. Management Directive 715 Equal Employment Opportunity, HUD 5759-5781;
        2. HUD Office of Departmental Equal Employment Opportunity, Affirmative Employment Division, FY 2004 Management Directive Form 715, Affirmative Programs of EEO Report, p. 4601-4708; and
        3. Instructions for Federal Agencies for EEOC MD-715, p. 5869-6033.
        The Draft of the 2005 MD 715 Report is responsive to this request. Data used in the preparation of that report has been deemed to be segregable and has been released. See pages, 6045-6075. The defendant objects to the (present) production of the balance of the Report on the basis of the deliberative process privilege. The Report will be released when final.

34.    All applicant flow data collected by HUD by position and grade, including that collected by the separate systems used by the Office of Departmental Equal Employment Opportunity and the Office of Human Resources, from January 1, 1997 to the present

Supplemental Response 10-4-06
The following materials are responsive to this request:
1. HUD Office of Field Policy and Management FY 1999 AEP Plan Update Report, p. 1827-1880;
2. HUD Office of Field Policy and Management FY 2000 AEP Plan Update Report, p.1881-1921;
3. HUD Real Estate Assessment Center FY 1999 AEP Plan Update Report, p. 1922-1938;
4. HUD Real Estate Assessment Center FY 2000 AEP Plan Update Report, p. 1939-1951;
5. HUD Real Estate Assessment Center FY 2001 AEP Plan Update Report, p. 1952-1964;
6. HUD Office of Congressional and Intergovernmental Relations FY 1997 AEP Plan Update Report, p. 1965-1988;
7. HUD Office of Congressional and Intergovernmental Relations FY 1998 AEP Plan Update Report, p. 1989-2012;

8. HUD Office of Congressional and Intergovernmental Relations FY 1999 AEP Plan Update Report, p. 2013-2036;

9. HUD Office of the Chief Procurement Officer FY 1999 Accomplishment Report, p. 2037-2050;

10. HUD Office of the Chief Procurement Officer FY 2000 AEP Plan Update Report, p. 2051-2062;

11. HUD Office of Community Planning and Development FY 2001 AEP Program Update Report, p. 2063-2109;

12. HUD Office of the Chief Financial Officer FY 1997 AEP Accomplishment Report, p. 2110-2199;

13. HUD Office of the Chief Financial Officer FY 1998 AEP Accomplishment Report, p. 2200-2313;

14. HUD Office of the Chief Financial Officer FY 2000 AEP Accomplishment Report, p. 2314-2357;

15. HUD Office of the Chief Financial Officer FY 2001 AEP Plan Update Report, p. 2358-2399;

16. HUD Office of the Chief Financial Officer FY 2002 AEP Plan Update Report, p. 2400-2435;

17. HUD Office of the Chief Financial Officer FY 2003 AEP Plan Update Report, p. 2436-2470;

18. HUD Office of the Assistant Secretary for Public and Indian Housing FY 1997 AEP Accomplishment Report, p. 2471-2501;

19. HUD Office of the Assistant Secretary for Public and Indian Housing FY 1998 AEP Plan Update Report, p. 2502-2530;

20. HUD Office of the Assistant Secretary for Public and Indian Housing FY 1999 AEP Plan Update Report, p. 2531-2561;

21. HUD Office of the Assistant Secretary for Public and Indian Housing FY 2000 AEP Accomplishment Report, p. 2562-2594;

22. HUD Office of the Assistant Secretary for Public and Indian Housing FY 2001 AEP Plan Update Report, p. 2595-2660;

23. HUD Office of the Assistant Secretary for Public and Indian Housing FY 2002 AEP Plan Update Report, p. 2661-2694;

24. HUD Departmental Enforcement Center FY 1999 AEP Plan Update Report, p. 2695-2731;

25. HUD Departmental Enforcement Center FY 2001 AEP Plan Update Report, p. 2732-2798;

26. HUD Office of Lead Hazard Control FY 1997 AEP Plan Update Report, p. 2799-2810;

27. HUD Office of General Counsel FY 1999 AEP Plan Update Report, p. 2811-2857;

28. HUD Office of General Counsel FY 2000 AEP Plan Update Report, p. 2858-2900;

29. HUD Office of Inspector General FY 1997 AEP Plan Update Report, p. 2901-2930;

30. HUD Office of Inspector General FY 1998 Affirmative Employment Report, p. 2931-2976;

31. HUD Office of Inspector General FY 1999 Affirmative Employment Report, p. 2977-3024;

32. HUD Office of Inspector General FY 2000 Affirmative Employment Report, p. 3025-

3070;

33. HUD Office of Inspector General FY 2003 AEP Update Report, p. 3071-3108;

34. HUD Office of Administration FY 1997 AEP Plan Update Report, p. 3109-3151;

35. HUD Office of Administration FY 1999 AEP Update Report, p. 3152-3191;

36. HUD Office of Administration FY 2000 AEP Plan Update Report, p. 3192-3229;

37. HUD Office of the Assistant Secretary for Administration FY 2001 AEP Plan Update Report, p. 3230-3276;

38. HUD Office of the Assistant Secretary for Administration FY 2002 AEP Plan Update Report, p. 3277-3327;

39. HUD Government National Mortgage Association FY 1997 AEP Accomplishment Report, p. 3328-3397;

40. HUD Government National Mortgage Association FY 1998 AEP Plan Update Report, p. 3398-3456;

41. HUD Government National Mortgage Association FY 2000 AEP Plan Update Report, p. 3457-3518;

42. HUD Government National Mortgage Association FY 2001 AEP Plan Update Report, p. 3519-3580;

43. HUD Government National Mortgage Association FY 2002 AEP Accomplishment Report, p. 3581-3653;

44. HUD Office of Fair Housing and Equal Opportunity FY 1997 AEP Accomplishment Report, p. 3654-3734;

45. HUD Office of Fair Housing and Equal Opportunity FY 1998 AEP Plan Update Report, p. 3735-3783;

46. HUD Office of Fair Housing and Equal Opportunity FY 1999 AEP Accomplishment Report (Summary Analysis of Work Force), p. 3784-3858;

47. HUD Departmentwide FY 1997 AEP Update Report, p. 3859-3961;

48. HUD Departmentwide FY 1998 AEP Update Report, p. 3962-4070;

49. HUD Departmentwide FY 1999 AEP Plan Update Report, p. 4071-4180;

50. HUD Departmentwide FY 2000 AEP Plan Update Report, p. 4181-4286;

51. HUD Departmentwide FY 2001 AEP Update Report, p. 4287-4389;

52. HUD Departmentwide FY 2002 AEP Update Report, p. 4390-4497;

53. HUD Departmentwide FY 2003 AEP Plan Update Report, p. 4498-4600;

54. HUD Office of Departmental Equal Employment Opportunity, Affirmative Employment Division, FY 2004 Management Directive Form 715, Affirmative Programs of EEO Report, p. 4601-4708; and

55. Data Tables from the 2005 Draft MD 715 Report, p. 6045-6075. The defendant objects to the (present) production of the balance of the Report on the basis of the deliberative process privilege. The Report will be released when final.

35.    All records of those who had access to or were given copies of the applicant flow data prior to selection for the individual positions that the flow data was collected for.

Supplemental Response 10-4-06

There are no documents responsive to this request. HUD's Applicant Flow System is not an automated system. In 1981, the EEOC directed Federal agencies to begin to collect and maintain applicant flow data. The Office of Human Resources is responsible for collecting

applicant flow data. HUD employees do not have to complete the survey forms because their background data is already in the personnel/payroll database. Non-HUD applicants are asked to complete the survey on a voluntary basis and return it with their application package. The submission of the survey is completely voluntary. The background survey form is removed from the application, entered into the Merit Staffing Tracking system and then destroyed. Selected information (announcement number and related position vacancy information, applicants' name and background, if available and their placement in the merit staff process) was forwarded to the Affirmative Employment Division for assessment and reporting under MD-714. In an effort to comply with EEOC's regulations, and in lieu of an automated system, all applicant flow data has been manually calculated and was included in the Department's Annual AEP Reports. There were no other reports produced on applicant flow.

44.    All documents relating to the Emerging Leaders Program, including without Limitation its goals, the content of the program, date of inception, any changes in the program, the selection process for participants, and all strategies used to assist minorities and women under the program, and all justification for the program.

   Supplemental Response 10-4-06
   In addition to the materials provided 10-3-06, the request seeks materials protected by the attorney client privilege and work product doctrine. Materials withheld subject to the privilege are identified in the attached privilege log. The following additional materials are responsive to this request:
       1. Emerging Leaders Brochure, February 2004, p. 6076-6081;
       2. Emerging Leaders Program Announcement, February 2004, p. 6082-6088;
       3. Emerging Leaders Program Rating Criteria, p. 6089-6094;
       4. Emerging Leaders Program Guidelines for Reviewing Applications, p. 6095-6096;
       5. Emerging Leaders Program Application Evaluation Plan, p. 6097-6099;
       6. Emerging Leaders Program FY 2005, p. 6100-6105;
       7. Emerging Leaders Program Guidelines for Reviewing Applications 2005-2006, p. 6106-6108;
       8. Emerging Leaders Program Application Evaluation and Final Selection Plan 2005-2006, p. 6109-6110;
       9. Emerging Leaders Program Participants 2005-2006, p. 6111; and
       10. Emerging Leaders Program FAQ, p. 6112-6113.

45.    Documents or data reflecting the participants from the Community Planning and Development Division that were in the emerging leaders Program, and the race, gender, and age, and date of participation for each of the participants.

   Supplemental Response 10-4-06
   The following materials are responsive to this request:
       1. Emerging Leaders Program Participants 2005-2006, p. 6111.

49.    All studies, analyses, reports and other documentation of efforts undertaken by HUD to analyze and resolve any indicated adverse impact on White males in hiring promotions and training.

Supplemental Response

There are no documents responsive to this request.

50.     For each time in which HUD has concluded that there exists a Manifest Imbalance and/or
Conspicuous Absence, from January 1, 1997 to the present, for any racial or ethnic group, or any
gender, provide all data, reports, studies, calculations and other documents relied upon in
reaching the Manifest Imbalance and Conspicuous Absence conclusions.

Supplemental Response 10-4-06

As defined by MD 714, the following materials are responsive to this request.

1. HUD Departmentwide FY 1997 AEP Update Report, p. 3859-3961;
2. HUD Departmentwide FY 1998 AEP Update Report, p. 3962-4070;
3. HUD Departmentwide FY 1999 AEP Plan Update Report, p. 4071-4180;
4. HUD Departmentwide FY 2000 AEP Plan Update Report, p. 4181-4286;
5. HUD Departmentwide FY 2001 AEP Update Report, p. 4287-4389;
6. HUD Departmentwide FY 2002 AEP Update Report, p. 4390-4497; and
7. HUD Departmentwide FY 2003 AEP Plan Update Report, p. 4498-4600.

51.     All documents, not responsive to any of the above requests, relating to strategies for
increasing diversity in the HUD workforce.

Supplemental response 10-4-06

There are no documents responsive to this request.

52.     All documents, not responsive to any of the above requests, relating to any benefits
conferred to women and/or minorities by any HUD program with the goal of encouraging
diversity in the HUD workforce.

Supplemental response 10-4-06

There are no documents responsive to this request.

53      All documents relating to the Proud To Be Goal, any strategies for increasing diversity
in the HLTD workforce using the goal, and any benefits conferred to women and/or minorities
by the Proud To Be Goal.

Supplemental response 10-4-06

The defendant is attempting to locate responsive documents, if any.

54.     All documents relating to the "Accelerated Promotion Policy," including without
limitation, its goals, the content of the program, date of inception, any changes in the program,
any and all strategies used to assist minorities and women under the program, any and all
justifications for the program.

Supplemental response 10-4-06

The defendant is attempting to locate responsive documents, if any.

55.    All documents relating to any studies, reports or conclusions that any positions at HUD, which existed from January 1, 1997 to January 1,2004, were traditionally segregated.

Supplemental response 10-4-06

There are no documents responsive to this request.

56.    All documents indicating whether the 1998 Community Builder position, vacancy announcement OS-MST-98-0002A was a traditionally segregated position.

Supplemental response 10-4-06

There are no documents responsive to this request.

57.    All documents indicating or relating to whether an under-representation existed such that the AEP's numerical goals to promote diversity applied to vacancy announcement OS-MST-98-0002A.

Supplemental response 10-4-06

There are no documents responsive to this request.

58.    All documents indicating whether one or both positions identified in vacancy announcements 06-DEU-2000-008 1A and 06-MSR-2000-0099AZ was a traditionally segregated position.

Supplemental Response 10-4-06

There are no documents responsive to this request.

59.    All documents indicating or relating to whether an under-representation existed such that the AEP's numerical goals to promote diversity applied to one or both vacancy announcements 06-DEU-2000-008 1 A and 06-MSR-2000-0099AZ.

Supplemental Response 10-4-06

There are no documents responsive to this request.

Respectfully submitted,
MICHAEL J. SULLIVAN,
United States Attorney

By:    /s/ Mark J. Grady
Mark J. Grady, Assistant U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA  02210
617-748-3136

# EXHIBIT 5

| PRIVILEGE LOG | | | | | |
|---|---|---|---|---|---|
| Source | Date | Subject | From | To | Privilege |
| DOJ | 10/2002 | Legal opinion and Analysis of HUD AEP | DOJ | Domestic Policy Council in the Executive Office of the President | Attorney Client/ Deliberative Process |
| HUD OGC | 11/2002 | Legal Opinion and Analysis of HUD AEP | Associate General Counsel, HUD | General Counsel, HUD | Attorney client, Work Product, Prepared in Anticipation of litigation |
| HUD OGC | 12/2002 | Legal Opinion and Analysis of HUD AEP | General Counsel HUD | General Counsel OMB | Attorney client, Deliberative Process |
| USDOJ | 2/1996 | Legal Opinion and Analysis of Executive hiring practices | John Schmidt, USDOJ | General Counsels for Executive Agencies | Attorney client, Deliberative Process |
| USDOJ | 2002-present | Legal opinion and Analysis/ Mental Impressions of Counsel handling the matter of Worth v. Martinez with respect to HUD AEP, Emerging Leaders Program, FEORP, *Adarand* | USDOJ/HUD OGC | HUD, File | Attorney client, Work Product, Matarials prepared in anticipation of litigation or for trial |

# EXHIBIT 6

Thelma Rhea Cockrell - 1/24/02

---

**Page 1**

```
              UNITED STATES OF AMERICA
       EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
                ST. LOUIS DISTRICT OFFICE

LARRY L. PRICE,              Agency Case Nos.
                             HUD, KC-00-01
       Complainant,         HUD, KC-00-03 and 05
  vs.                        EEOC Case Nos.
                             280-A0-4009X
MEL M. MARTINEZ, Secretary, 280-A0-4069X
DEPARTMENT OF HOUSING AND   280-A1-4111X
URBAN DEVELOPMENT,          280-A1-4112X
                             280-A1-4113X
       Agency.              280-A1-4317X

         DEPOSITION OF THELMA RHEA COCKRELL, a
    witness, taken on behalf of the Complainant,
    pursuant to Agreement, on the 24th day of January,
    2002, at the offices of the Department of Housing
    and Urban Development, 400 State Avenue, Kansas
    City, Kansas, before:

                 GAYL L. RYDER,
    of AAA Reporting Company, a Notary Public of the
    State of Kansas.

                 APPEARANCES

       For the Complainant:
          MR. CHARLES L. WIEST, JR.
          ATTORNEY AT LAW
          300 South Hanley Road, Suite 3100
          St. Louis, Missouri  63105-3415

       For the Agency:
          MS. LORI M. HOOVER
          ASSOCIATE FIELD COUNSEL FOR
          ADMINISTRATIVE LAW
          US DEPARTMENT OF HOUSING AND
          URBAN DEVELOPMENT
          400 State Avenue
          Kansas City, Kansas  66101-2406
       Also Present:
          MR. LARRY L. PRICE
```

---

**Page 2**

```
                  STIPULATIONS
         It was stipulated by and between counsel
    and the witness that the presentation of this
    deposition to the witness by the officer is
    expressly waived.



                   INDEX

WITNESS: MS. THELMA RHEA COCKRELL      PAGE:

Examination by Mr. Wiest                 3

EXHIBITS:                           IDENTIFIED:

    (NONE)


CERTIFIED QUESTION:
Page 20, Line 3
```

---

**Page 3**

1      (The deposition commenced at 9:00
2   a.m.)
3           THELMA RHEA COCKRELL,
4   a witness, being first duly sworn, testified
5   under oath as follows:
6   EXAMINATION BY MR. WIEST:
7   Q. Ms. Cockrell, my name is Charles Wiest. I've
8      already introduced myself to you. We're here to
9      take your deposition today.
10          Have you had your deposition taken in
11   the past?
12   A. No.
13   Q. This is the first time you have had the
14      privilege of being deposed, then?
15   A. Yes, it is.
16   Q. Well, then, I'll take a moment to explain to you
17      a little bit about what we do in this.
18          I'll be asking you a series of
19      questions. The court reporter will take the
20      questions down verbatim. Then I'll ask you to
21      respond to the questions that I ask and she'll
22      take your answers down verbatim.
23          If I ask you a question and you don't
24      understand what I'm asking -- and that's not an
25      infrequent situation -- you are certainly
        privileged to ask me to rephrase it so that it

---

**Page 4**

1   would be stated to you in a way that you
2   understand it and be comfort in answering it.
3       If you do answer the question, then I
4   will assume that you have both understood the
5   question and that there's no question as to what
6   I'm asking you, and that your answer is going to
7   be honest, full, complete and a response to the
8   question that I've asked you. All right, do you
9   agree to that and you understand what I'm
10  saying?
11  A. Yes.
12  Q. Okay, good. Then we'll just get started.
13      Would you state for the record what
14  your position is with the Department of Housing
15  and Urban Development.
16  A. I'm the director, affirmative employment
17  division.
18  Q. How long have you worked for HUD?
19  A. For HUD, 33 years.
20  Q. What positions have you held prior to taking on
21  this one? All you have to do is sort of give me
22  the names and the --
23  A. For 33 years?
24  Q. Yeah.
25  A. My first 17 years was in the office of human

---

Thelma Rhea Cockrell - 1/24/02

Page 21

1    would like to have the judge review whether she
2    should be required to answer that question
3    directly.
4       I'll move on.
5  Q.  (By Mr. Wiest) Is it fair to say that based on
6    the information that you use to prepare the plan
7    within HUD, you don't care whether the person is
8    qualified or not for the particular category for
9    which the figure --
10      MS. HOOVER:  I'm going to object to
11   you asking her whether she cares about the way
12   she does her job. She told you she doesn't --
13      MR. WIEST:  It's not her personally,
14   it's HUD. And I'm simply saying that if HUD
15   doesn't know whether the people in the P
16   category, reported in the P category, are
17   qualified to be professional people, and they
18   use the figure, then it would appear to me that
19   it's irrelevant whether they're qualified or
20   not, as long as the figure is reported to the
21   EEOC.
22      MS. HOOVER;  Well, could you use
23   another word other than care?
24  Q.  (By Mr. Wiest)  Is it relevant or irrelevant to
25   HUD whether the people comprising the P category

Page 22

1    as reported to HUD from the EEOC are qualified
2    or not qualified to be professional employees?
3  A.  It's irrelevant. That's the pool to use from.
4    It's irrelevant.
5  Q.  I would assume that the same is also true for
6    administrative, technical and all of that, that
7    whether or not the people comprising that
8    category are qualified or not qualified is
9    irrelevant, it's just the figure that you care
10   about?
11 A.  Yes.
12 Q.  What does a conspicuous absence mean in the
13   jargon of Affirmative Action plan formulation?
14 A.  Conspicuous absence means that there is nearly
15   or no employees within the -- whether it be in
16   the category that you're looking at, in the
17   analysis that you're conducting.
18 Q.  Does that go for the PATCO group or does that go
19   for each of the occupational series?
20 A.  Both.
21 Q.  What does manifest imbalance mean?
22 A.  That means that the group is significant --
23   is -- there is some underrepresentation.
24 Q.  How much, is there a number associated with
25   that?

Page 23

1  A.  Not a specific number per se. It means that
2    they are significantly below.
3  Q.  What does severe underrepresentation mean?
4  A.  Severe underrepresentation used to be what is
5    now considered conspicuous absence.
6  Q.  So severe underrepresentation now equates to the
7    terminology conspicuous absence?
8  A.  (Witness nods head.)
9  Q.  Okay, and in the GAO report it says severe
10   underrepresentation has been defined by the EEOC
11   as representation indexes below 50 percent. So
12   basically, what you're saying is that
13   conspicuous absence means any absence of
14   employees -- strike that. The number of
15   employees in that group is 50 percent less than
16   what you would find in the civilian labor force?
17 A.  Uh-huh.
18 Q.  Is that right?
19 A.  Yes.
20 Q.  Again, I'm just not exactly sure, but
21   conspicuous absence, that was nearly nobody.
22   Isn't that what you were saying?
23 A.  Nearly or none.
24 Q.  Okay, nearly or none. And that means less than
25   50 percent; is that right?

Page 24

1  A.  Yes.
2  Q.  Where is the line drawn between conspicuous
3    absence at, say, 49 percent, and manifest
4    imbalance begin; what is the range between those
5    two?
6  A.  Actually, I don't use a percentage to determine
7    the areas of underrepresentation. I use the
8    underrepresentation index. The index is the
9    total number.
10 Q.  Well, the index, as you can see from this
11   report, is another way of stating the
12   percentage. So when you say you have an index
13   of 50, you're basically saying 50 percent.
14 A.  So my --
15 Q.  Isn't that right?
16 A.  I would say yes. I'll say yes.
17 Q.  All right. So we have conspicuous absence being
18   anything less than about 50 percent or 50 on
19   your index scale?
20 A.  Uh-huh.
21 Q.  And we have manifest imbalance, which is more
22   than conspicuous absence but less than something
23   else. And I'll get to whatever that is in a
24   minute.
25      Where does manifest imbalance end? We

AAA COURT REPORTING COMPANY        (913) 385-2699

**Page 25**

1  know it will start after 50 percent somewhere or
2  after 50, but where does manifest imbalance end?
3  A.  An index score for manifest imbalance is from 50
4  to 99.
5  Q.  So if you have an index number of 99, you have a
6  manifest imbalance in your workforce; is that
7  it?
8  A.  Yes.
9  Q.  Is it fair to say that if you have 100 -- only
10  where you have 100 do you achieve, what, what is
11  it called?
12  A.  Full representation.
13  Q.  Full representation.
14      And where you have 100 plus, what do
15  you call that?
16  A.  That's still full representation.
17  Q.  So is it HUD's objective to be sure to have full
18  representation within each occupation?
19  A.  Ideally.
20  Q.  Is that what its objective is?
21  A.  It's not an objective per se; I mean, it's not
22  written in stone.  But ideally HUD's objective
23  is to have a workforce that's representative of
24  the nation's diversity, which would mean yes.
25  Q.  We're talking about actual numbers, now.  I want

**Page 26**

1  to keep it on a completely analytical basis
2  here.
3      So what we're saying is that HUD's
4  objective is to not have manifest imbalance, and
5  not to have manifest imbalance means that you
6  have to have 100 percent representation on the
7  index that you would use with respect to a
8  category?
9  A.  HUD's objective is to have full representation
10  of all groups.
11  Q.  Compared to what the figures are in the civilian
12  labor force; is that right?
13  A.  Yes.
14  Q.  But that doesn't apply to Whites in any way,
15  does it?
16  A.  We want a workforce that represents the nation's
17  diversity.
18  Q.  But under the EEO and AEP plans, that does not
19  consider White males in the categories, does it?
20  A.  You mean if White males are covered under the
21  AEP plan itself, yes, they are.  Is that what
22  you're saying?
23  Q.  You don't set any goals and objectives if you
24  find a manifest imbalance in White males in a
25  category, do you?

**Page 27**

1  A.  No, you don't set goals and objectives.
2  Q.  So it's fair to say that what you're trying to
3  do is cure manifest imbalances in every category
4  except those of White males?
5  A.  I'm not sure I understand what you just said.
6  Could you say that one more time for me?
7  Q.  I will say that another time.
8      That under the HUD AEP you are
9  attempting to achieve full representation to
10  avoid manifest imbalances with respect to every
11  category of worker by classification except for
12  White males.
13  A.  To answer that, I would have to say that when we
14  do the AEP report, there are no goals,
15  objectives, for White males.
16  Q.  Even if there is a manifest imbalance?
17  A.  There's no analysis for manifest imbalance.
18  It --
19  Q.  Well, you told me that it was a score of less
20  than 99, right?
21  A.  You didn't let me finish my --
22  Q.  Okay, go on.  If there's something else you want
23  to tell me there, I'll listen to it.  Go on.
24  A.  What I was saying is that there's no analysis
25  for manifest imbalance of White males.

**Page 28**

1  Q.  Why is that?
2  A.  Actually, I don't think I can answer that.  It's
3  based on the rules and regulations and policies
4  and procedures that's provided for us, for us
5  being federal agencies, to use in developing AEP
6  reports.
7  Q.  Rules and regulations.  Are you referring to
8  some EEOC policy, perhaps?
9  A.  Yes.
10  Q.  What does the EEOC policy tell you?
11  A.  MD -- Management Directive 714 is quite
12  extensive, it says quite a bit.
13  Q.  Are you saying that 714 says you don't do any
14  analysis with respect to White males?
15  A.  I wouldn't maybe say it in those words, I would
16  not.
17  Q.  Look at the response to Interrogatory 28.  It's
18  a document --
19      THE WITNESS:  It's an attachment.
20  Q.  (By Mr. Wiest)  I'll read it.
21      It says in here, on this letter --
22  it's a letter from EEOC to the directors of EEO,
23  dated October the 18th, 1989.  I would like you
24  to look over it to see if this is a letter that
25  you provided to your counsel in response to that

**Page 29**

1    Interrogatory.

2  A.  Yes, it is.

3  Q.  So you're familiar with the content of that

4    letter, right?

5  A.  Uh-huh.

6  Q.  If you want to read it, you can do that, but I

7    need it to be able to ask my questions.

8        It says, "Clearly, the historical

9    intent of Affirmative Action in federal service

10    is to eliminate the effects of past and present

11    employment discrimination against minorities and

12    females," right?

13  A.  Yes.

14  Q.  It is not to eliminate any past or present

15    discrimination against, for example, White

16    males, if you were in an Hispanic neighborhood

17    or something of that sort? Right up the street

18    there's a neighborhood that is predominantly

19    Hispanic, right? Do you know that or not?

20  A.  No, I have no idea.

21  Q.  Well, is there any effort to cure any

22    discrimination against White males?

23        MS. HOOVER:  I'm going to object to

24    the form of the question.

25        Are you talking about on the EEOC's

**Page 30**

1    part?

2        MR. WIEST:  I'm talking about the

3    agency's part. She's saying that the agency's

4    policies are directed by the EEOC. I don't care

5    whether the origin of it is with the EEOC or

6    whether it's --

7        MS. HOOVER:  Well, she can only answer

8    for HUD.

9  Q.  (By Mr. Wiest) Does the agency attempt to

10    eliminate discrimination, through the use of its

11    Affirmative Action program, against White males?

12  A.  Back to your question. You said something about

13    discrimination through the AEP report.

14  Q.  No, I said, "Clearly, the historical intent of

15    Affirmative Action in the federal service is to

16    eliminate the effects of past and present

17    employment discrimination against minorities and

18    females," that's what I said.

19  A.  Okay.

20  Q.  And then I said, then there is no effort within

21    HUD to eliminate discrimination against White

22    males?

23  A.  Well, first of all, I don't know of any

24    discrimination against White males. And if

25    you're talking about the AEP report, I've

**Page 31**

1    already stated that the AEP report does not

2    include goals and objective for White males.

3    But they are included in the analysis of the

4    workforce. If you're looking at HUD's workforce

5    as a whole, they're included in everything.

6  Q.  You say there's no discrimination against White

7    males?

8  A.  I said I don't know of any.

9  Q.  On what basis do you make that statement?

10        MS. HOOVER:  I'm going to object. She

11    said she doesn't know of any.

12        MR. WIEST:  That's what I say.

13  Q.  (By Mr. Wiest) On what basis do you make that

14    statement?

15  A.  Because I don't know of any.

16  Q.  Now, what is the difference between, let's say,

17    a manifest imbalance of a score at 98 with, say,

18    Hispanics, and a manifest imbalance of a score

19    of 98 with a category for White males; what is

20    the difference between the two?

21  A.  There are no manifest analysis -- there's no

22    underrepresentation analysis of White males'

23    representation in the workforce.

24  Q.  No analysis.

25        You get figures, do you not, on White

**Page 32**

1    males?

2  A.  Yes, uh-huh.

3  Q.  And you know what the categories are and you

4    know who occupies --

5  A.  Uh-huh.

6  Q.  And you're able to make the same calculations

7    with respect to White males in a category as you

8    are with Hispanics or Hispanic males or females,

9    are you not?

10  A.  The data is there to do it, yes.

11  Q.  And to have a complete idea of how the workforce

12    is broken out and that sort of thing, you do

13    look at the number of White males in a category,

14    do you not?

15  A.  The numbers, yes.

16  Q.  And it's easy to do that and to get the score

17    from those numbers that you have, right?

18  A.  You mean can it be done? Yes, it can be done.

19    Is it done? No.

20  Q.  So from HUD's standpoint, if there's an Hispanic

21    shortfall of one point, you're going to take an

22    action with that, because that's discrimination,

23    right?

24  A.  Not necessarily. Not necessarily an action.

25  Q.  Well, it says that you want to have full

Thelma Rhea Cockrell - 1/24/02

Page 33

1 representation, 100?
2 A. Uh-huh.
3 Q. And it says in here that the purpose of
4 Affirmative Action is to remedy a past and
5 present discrimination. I'm assuming that HUD
6 is agreeing to the fact or claiming that the
7 justification for achieving 100 percent
8 representation, that is, the score of 100, is to
9 cure past or present discrimination, right?
10 A. Yes, that's the intent.
11 Q. So what you're saying, you're defining
12 discrimination, the existence or nonexistence of
13 discrimination, on how close you come to full
14 representation; isn't that true?
15 A. No.
16 Q. That isn't what that means?
17 A. Not to me, no. It means we don't have full
18 representation in the workforce.
19 Q. So what difference does that make? Why do you
20 have to do that, why do you even care about
21 doing that?
22 A. It's the policy of the federal government.
23 Q. It is the policy to achieve full representation,
24 but not to cure discrimination, right?
25 A. Hopefully, to cure discrimination.

Page 34

1 Q. Okay, well, you were saying that to have the
2 full representation doesn't mean that there has
3 been discrimination. Did you say that?
4 A. Excuse me?
5 Q. That when you are going from, say, 98 to 100,
6 you are achieving full representation?
7 A. Yeah, if the score is 100, it's full
8 representation, yes.
9 Q. And the purpose of achieving full
10 representation, as I read this thing, is to cure
11 past and present discrimination. Is that right?
12 A. That's what EEOC has written, yes.
13 Q. So is the purpose in seeking full
14 representation, 100, a score of 100, the
15 purpose, is that to eliminate past or present
16 discrimination?
17 A. That's the overall intent of affirmative
18 employment.
19 Q. Is that the only way -- the only way you achieve
20 full representation, have you eliminated
21 discrimination?
22 A. Actually, you can have full representation and
23 still have discrimination, if that's what you're
24 talking about.
25 Q. When you were talking about the statistical

Page 35

1 basis for Affirmative Action, the equivalent of
2 full representation is regarded as the
3 elimination of discrimination?
4 A. No.
5 Q. When is discrimination eliminated?
6 A. I would love to know. I don't have an answer
7 for that.
8 Q. So what is the purpose of achieving 100, a score
9 of 100 then? See, I simply don't understand how
10 all this fits together.
11 If this is supposed to be for
12 discrimination purposes, curing discrimination
13 purposes, why would there be an effort to
14 achieve a score of 100?
15 A. The overall intent of the -- or what I keep
16 saying is to have a workforce that is reflective
17 of the nation's diversity. Okay? To have a
18 workforce that is reflective.
19 That doesn't mean, in my opinion,
20 there's not discrimination in the workforce. It
21 means we have bodies of people that is
22 reflective of those that are in the population
23 of the nation.
24 Q. So the objective of the affirmative employment
25 plan is to achieve diversity; is that right?

Page 36

1 A. To achieve a workforce that is reflective of the
2 nation's diversity.
3 Q. And when the workforce is reflective of the
4 nation's diversity, it's simply mirroring the
5 civilian labor force per category?
6 A. Yes.
7 Q. Without regard to qualifications?
8 A. Well, if you are talking about employment,
9 qualifications is always the main issue. If
10 you're talking about what's out there in the
11 workforce, again, as you asked about
12 qualifications before, I can't relate --
13 Q. All right, that's the key, you --
14 A. Oh, okay.
15 Q. So what we're looking for is not the curing of
16 discrimination, but achieving a proportionate
17 representation within HUD that is equal to the
18 gross population as a whole with respect to the
19 PATCO categories?
20 A. Yes.
21 Q. Is that what HUD means by diversity, that you
22 would have this achieving a workforce that has a
23 score of 100 with respect to each of the
24 categories?
25 A. No, I wouldn't say that's HUD's definition of

# EXHIBIT 7

# DEPARTMENTWIDE

# AFFIRMATIVE EMPLOYMENT PROGRAM (AEP)



## Fiscal Year 2001

## UPDATE REPORT

## AFFIRMATIVE EMPLOYMENT PROGRAM (AEP) PLAN UPDATE REPORT

## DISTRIBUTION OF EEO GROUPS AND COMPARATIVE CIVILIAN LABOR FORCE BY PATCOB AND TOTAL WORK FORCE

### FISCAL YEAR 2000 (Year End)/FISCAL YEAR 2001 (Beginning)

| Occupational Category | Total | White males | White females | Black males | Black females | Hispanic males | Hispanic females | Asian males | Asian females | Indian males | Indian females |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **PROFESSIONAL** HUD Work force | 100.0 | 45.3 | 20.4 | 8.4 | 13.5 | 3.2 | 1.9 | 3.4 | 3.4 | 0.3 | 0.2 |
| Civilian Labor Force (CLF) | 100.0 | 54.7 | 30.3 | 2.4 | 3.2 | 2.1 | 1.4 | 3.5 | 1.9 | 0.2 | 0.2 |
| **ADMINISTRATIVE** HUD Work force | 100.0 | 29.7 | 26.8 | 9.7 | 22.7 | 3.2 | 3.9 | 1.5 | 1.5 | 0.5 | 0.5 |
| Civilian Labor Force CLF | 100.0 | 42.1 | 40.4 | 3.6 | 5.3 | 2.6 | 2.6 | 1.4 | 1.4 | 0.3 | 0.3 |
| **TECHNICAL** HUD Work force | 100.0 | 5.1 | 32.9 | 3.8 | 45.1 | 1.2 | 7.4 | 0.7 | 1.7 | 0.2 | 1.9 |
| Civilian Labor Force CLF | 100.0 | 36.1 | 42.9 | 3.6 | 6.6 | 3.2 | 3.4 | 1.9 | 1.6 | 0.4 | 0.4 |
| **CLERICAL** HUD Work force | 100.0 | 5.3 | 34.3 | 5.0 | 45.2 | 0.9 | 5.3 | 0.0 | 3.1 | 0.3 | 0.6 |
| Civilian Labor Force CLF | 100.0 | 14.0 | 63.4 | 2.8 | 9.6 | 1.7 | 5.2 | 0.8 | 1.9 | 0.2 | 0.5 |
| **OTHER** HUD Work force | 100.0 | 29.0 | 22.6 | 6.5 | 22.6 | 3.2 | 12.9 | 0.0 | 3.2 | 0.0 | 0.0 |
| Civilian Labor Force CLF | 100.0 | 67.6 | 11.2 | 9.7 | 3.2 | 4.8 | 1.0 | 1.2 | 0.3 | 0.9 | 0.2 |
| **BLUE COLLAR** HUD Work force | 100.0 | 20.0 | 0.0 | 80.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Civilian Labor Force CLF | 100.0 | 65.4 | 9.8 | 9.1 | 2.2 | 8.7 | 1.5 | 1.7 | 0.5 | 0.8 | 0.2 |
| **TOTAL** HUD Work force | 100.0 | 27.8 | 27.0 | 8.8 | 25.0 | 2.8 | 4.1 | 1.6 | 1.8 | 0.4 | 0.6 |
| Civilian Labor Force CLF | 100.0 | 42.6 | 35.3 | 4.9 | 5.4 | 4.8 | 3.3 | 1.5 | 1.3 | 0.3 | 0.3 |

EEOC FORM 566/569 (8/87)

DII-20

COMBINED HIRING AND INTERNAL MOVEMENT
NUMERICAL OBJECTIVES BY PATCOB

FISCAL YEAR 2001

ORGANIZATION: HUD

| OCCUPATIONAL CATEGORY | PLANNED/ ACTUAL | TOTAL ALL | WHITE | | BLACK | | HISPANIC | | ASIAN AMER./ PAC. ISLANDER | | AMER. INDIAN/ ALASKAN NATIVE | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Male | Female | Male | Female | Male | Female | Male | Female | Male | Female |
| PROFESSIONAL | PLANNED | 70 | **** | 32 | 0 | 0 | 5 | 5 | 13 | 5 | 5 | 5 |
| | ACTUAL | | | | | | | | | | | |
| ADMINISTRATIVE | PLANNED | 312 | **** | 151 | 0 | 50 | 30 | 28 | 17 | 12 | 12 | 12 |
| | ACTUAL | | | | | | | | | | | |
| TECHNICAL | PLANNED | 62 | **** | 32 | 9 | 0 | 7 | 0 | 6 | 4 | 4 | 0 |
| | ACTUAL | | | | | | | | | | | |
| CLERICAL | PLANNED | 52 | **** | 20 | 10 | 0 | 5 | 5 | 5 | 0 | 1 | 4 |
| | ACTUAL | | | | | | | | | | | |
| OTHER | PLANNED | 5 | **** | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 1 |
| | ACTUAL | | | | | | | | | | | |
| BLUE COLLAR | PLANNED | 0 | **** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | ACTUAL | | | | | | | | | | | |
| TOTAL | PLANNED | 501 | **** | 235 | 20 | 50 | 48 | 38 | 42 | 22 | 24 | 22 |
| | ACTUAL | | | | | | | | | | | |

EEOC FORM 566 (8/87)

DII-32

# EXHIBIT 8

U. S. Department of Justice

Office of the Associate Attorney General

---

The Associate Attorney General　　　　　　　　　　*Washington, D.C. 20530*

February 29, 1996

MEMORANDUM TO GENERAL COUNSELS

From:　　　John R. Schmidt

Re:　　　　Post-*Adarand* Guidance on Affirmative Action in Federal Employment

I. Introduction.

In <u>Adarand Constructors, Inc. v. Peña</u>, 115 S. Ct. 2097 (1995), the Supreme Court held that federal affirmative action programs that use racial and ethnic criteria as a basis for decisionmaking are subject to strict judicial scrutiny. Under strict scrutiny, such programs must serve a compelling governmental interest and must be narrowly tailored to serve that interest.

On June 28, the Justice Department's Office of Legal Counsel (OLC) issued preliminary legal guidance on the implementation of Adarand. As indicated in the OLC memorandum, although <u>Adarand</u> was a challenge to a Department of Transportation contracting program, its holding applies to race-based decisionmaking in all areas of federal activity, including employment.

The purpose of this memorandum is to provide guidance on the use of affirmative action in federal employment. In order to assure that race is used in a manner consistent with <u>Adarand</u> principles, each agency will be expected to utilize this guidance, and communicate it as necessary throughout the agency.

A number of overarching points merit attention at the outset. First, the federal government is firmly committed to fair employment practices that open opportunities to all Americans. It is also committed to ensuring that its workforce draws on the full range of the nation's talent. Affirmative action efforts can advance those vital objectives. Thus, to the extent that they comport with <u>Adarand</u>, such efforts should be continued.

Second, the Supreme Court in <u>Adarand</u> did not establish a constitutional bar on the use of race-based affirmative action measures by the federal government, but rather held that such action requires strict scrutiny. Moreover, a majority of the Court rejected the proposition that "strict scrutiny" of affirmative action measures means "strict in theory, fatal in fact," and agreed that such measures may be permissible even under strict scrutiny. The Court in <u>Adarand</u> did not decide the constitutionality of the program at issue in the case, but

2

rather remanded the case to the lower courts so they could determine, in the first instance, whether the program satisfied strict scrutiny. No program was held unconstitutional in Adarand.

Third, Adarand itself does not provide specific guidance on application of the strict scrutiny standard. Some principles can be gleaned from the Supreme Court's decision in City of Richmond v. J.A. Croson Co., 488 U.S. 469 (1989), in which a majority of the Court held for the first time that race-based affirmative action by state and local governments is subject to strict scrutiny. In large measure, the standards by which federal affirmative action in employment will be judged generally will track the standards used in Croson. Post-Croson lower court cases, including some in the employment setting, also help to flesh out what strict scrutiny means in practice.

Fourth, Adarand left open the question whether, even under strict scrutiny, Congressionally authorized affirmative action measures undertaken by federal agencies are entitled to particular deference from the courts, given Congress' broad powers to remedy discrimination. In our view, that deference should remain, and so affirmative action programs directed by Congress may have more force than those created solely by agencies.

Fifth, at this time, strict scrutiny does not apply to gender-based affirmative action measures of the federal government. Under current Supreme Court authority, such action is subject to intermediate scrutiny. Therefore, the guidance set forth in this memorandum does not apply in all respects to gender-based affirmative action programs in federal employment. However, applying this guidance to gender-based programs should ensure that those programs meet applicable legal standards.

Sixth, Adarand's application of strict scrutiny is premised on the limitations equal protection principles place on governmental action. Adarand, therefore, does not apply directly to employment actions of private employers. Both public and private employers are subject to Title VII of the 1964 Civil Rights Act. The Supreme Court has held that the Title VII standards governing affirmative action in the workplace are less stringent than the constitutional standards, and so in some circumstances, measures taken by governmental entities that would satisfy Title VII might not meet the Adarand requirements. See Johnson v. Transportation Agency, 480 U.S. 616, 627 (1987).

Finally, agencies should be aware that when legal challenges to the use of affirmative action plans are made, they will arise in cases filed under Title VII. Although Adarand is premised on constitutional standards, under Brown v. GSA, 425 U.S. 820 (1976), most lawsuits alleging race discrimination in federal employment must be brought pursuant to Section 717 of Title VII, 42 U.S.C. § 2000e-16.[1] The federal government, nevertheless, is

---

[1]    One notable exception to this rule is for claims of discrimination asserted by

(continued...)

3

obligated to act in accordance with the Constitution, and, therefore, use of race-based decisionmaking in federal employment must comport with the Adarand standards.

## II.    Scope of Adarand.

Adarand established that any governmental action that uses race or ethnicity as a basis for decisionmaking will be subject to strict scrutiny. In the employment setting, such action encompasses race-based measures that the federal government adopts on its own initiative, through legislation, regulations, internal agency procedures, or even individual employment decisions. This is to be contrasted with race-based employment decisions that agencies undertake pursuant to court-ordered remedial directives in race discrimination lawsuits against the government, or pursuant to court-approved consent decrees settling such suits. The Supreme Court has not definitively resolved the standard of review for court-ordered or court-approved affirmative action. See United States v. Paradise, 480 U.S. 149 (1987) (court order); Local 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501 (1986) (consent decree). It is unclear to what extent Adarand applies to such actions. Accordingly, this memorandum does not address race-based employment decisions that agencies make under court orders or consent decrees.[2]

The scope of race-based employment decisions that are subject to Adarand is quite broad. Adarand applies to both the final judgment as to a particular decision, as well as to the various steps leading to that judgment. Race-based decision-making includes situations where race is one of several factors as well as those in which race is the only factor.

The kinds of employment decisions covered by Adarand also are very broad. Adarand applies both to the agency's decisions creating and implementing formal and informal affirmative action programs, as well as to the decisions of individual supervisors. It applies to the use of race in decisions regarding hiring, promotion, training, and scholarships, just as it applies to race-based decisions regarding reductions in force and reassignments.

Adarand does not apply, however, to actions in which race is not used as a basis for making employment decisions about individuals. For example, action to increase minority applications for employment is not subject to Adarand. Outreach and recruitment efforts — such as attending job fairs and minority professional association meetings, and making vacancies known at schools with substantial minority enrollment — which merely seek to

---

[1](...continued)
uniformed members of the armed forces, who are excluded from the coverage of Title VII. See, e.g., Doe v. Garrett, 903 F.2d 1455, 1461 (11th Cir. 1990), cert. denied, 499 U.S. 904 (1991). Such claims may be brought directly under the Constitution.

[2]    We are available to provide specific guidance to any agency in that situation.

4

expand the pool of qualified applicants generally would not be subject to strict scrutiny under Adarand. As long as non-minorities are well represented in the applicant pool, the courts of appeals have held that efforts to expand the number of qualified minorities in the applicant pool do not involve race-based decisionmaking and hence do not raise constitutional issues. See, e.g., Peightal v. Metropolitan Dade County, 26 F.3d 1545, 1557-1558 (11th Cir. 1994) (presentations at job fairs and career days designed specifically to apprise minorities of career opportunities deemed to be race-neutral); Billish v. City of Chicago, 962 F.2d 1269, 1290 (7th Cir. 1992), vacated on other grounds, 989 F.2d 890 (7th Cir.) (en banc), cert. denied, 114 S. Ct. 290 (1993); Coral Constr. Co. v. King County, 941 F.2d 910, 923 (9th Cir. 1991), cert. denied, 502 U.S. 1033 (1992). To the extent that efforts designated as "outreach and recruitment" might also involve providing temporary or summer employment to interns, however, the use of race in deciding who will receive these internship positions is subject to Adarand.

Other race-neutral action not subject to Adarand would include reviewing qualification standards to ensure that unnecessary criteria that have a disproportionate impact on minorities are eliminated. Agencies should review their current practices to determine whether any are unnecessarily excluding minorities. Agencies may also define selection criteria in ways that give an applicant credit for overcoming social and economic disadvantage, which may include barriers posed by discrimination based on race or ethnicity. As long as race or ethnicity is not used to define social and economic disadvantage, Adarand will not apply. Indeed, agencies should regularly examine their recruitment practices to ensure that they are effective and productive. Agencies should also determine whether minority applicants have been deterred as a result of past discriminatory practices or the agency's reputation for discrimination, whether deserved or not. Adarand also does not preclude tracking minority participation in the agency's workforce through the collection and maintenance of statistics or the filing of reports with the Equal Employment Opportunity Commission.

At this time, strict scrutiny does not apply to gender-based affirmative action measures in employment. Under current Supreme Court authority, such action is subject to intermediate scrutiny.[3] Nevertheless, the same sort of analysis described below, when applied to gender-based programs, should ensure that those programs meet applicable legal standards. In addition, Adarand's strict scrutiny neither applies to employment programs based on age or disability, nor to measures that use membership in a Native American tribe or residence in an Alaskan Native village as a basis for decisionmaking. Such action is subject to the more lenient "rational basis" standard of scrutiny. See Morton v. Mancari, 417 U.S. 535 (1974), in which the Supreme Court held that strict scrutiny did not apply to hiring preferences for tribal members at the federal Bureau of Indian Affairs.

---

[3] The appropriate standard of scrutiny for gender-based programs may be considered by the Supreme Court in United States v. Commonwealth of Virginia, No. 94-1941, which addresses the male-only admission policies of the Virginia Military Institute.

5

Finally, the establishment of numerical goals for minority participation should not raise concerns under <u>Adarand</u> where race-based decisionmaking is not used to achieve the goal and the goal is commensurate with availability of minorities in the qualified and appropriate labor pool. This use of goals is consistent with Executive Order 11246, 30 Fed. Reg. 12319, (Sept. 24, 1965), as amended, under which the federal government requires federal contractors in the private sector to set goals where minorities are underutilized in the contractor's workforce. Regulations that the Department of Labor has promulgated to enforce the Executive Order, which are published at 41 C.F.R. Part 60, provide guidance as to the manner in which federal contractors may properly use such goals. See further discussion at pp. 16-17.

III.    <u>Elements of Strict Scrutiny</u>.

Under <u>Adarand</u>, federal programs that use race or ethnicity as a basis for decisionmaking must be strictly scrutinized to ensure that they promote "compelling" governmental interests, and that they are "narrowly tailored" to serve those interests. The "compelling interest" prong of the strict scrutiny standard focuses on the purpose of the classification; the "narrow tailoring" prong focuses on the method by which the government seeks to meet the objective of the racial or ethnic classification.

A.    <u>Compelling Governmental Interests</u>.

1.    <u>Remedial Predicate</u>.

a.    <u>Historical evidence</u>.  Standing alone, the fact and history of racial discrimination in society at large is not a sufficient predicate for race-based affirmative action. Under <u>Adarand</u>, however, the government does have a compelling interest in acting to remedy the identified effects of its own discrimination, or of its own practices that unintentionally extend the effects of discrimination by others. See <u>Croson</u>, 488 U.S. at 486 (plurality opinion); <u>Wygant v. Jackson Bd. of Educ.</u>, 476 U.S. 267, 274 (1986) (plurality opinion).[4]  Race-based remedial action may be aimed at ongoing patterns and practices of exclusion, or at the lingering effects of prior discriminatory conduct that has ceased. See <u>Adarand</u>, 115 S. Ct. at 2133 (Souter, J., dissenting) ("The Court has long accepted the view that constitutional authority to remedy past discrimination is not limited to the power to

---

[4]  In <u>Croson</u>, which involved affirmative action in public contracting, the Court said that the government may act on the basis of race or ethnicity to remedy the effects of discrimination committed by private contractors, where the government becomes a "passive participant" in that conduct, and thus helps to perpetuate a system of exclusion. <u>Croson</u>, 488 U.S. at 492 (plurality opinion); <u>id.</u> at 519 (Kennedy, J., concurring in part and concurring in the judgment).

6

forbid its continuation, but extends to eliminating those effects that would otherwise persist and skew the operation of public systems even in the absence of current intent to practice any discrimination.").

The federal government today is quite proud of its record of fair employment for persons of all races. However, its record has not always been one of fair practices. Beginning in the 1940s, a series of Executive Orders and statutes was adopted to address a long history of employment discrimination by the federal government. Although progress was made after those actions, it was insufficient; Congress in 1972 determined that discrimination against federal employees continued, and that it was necessary to provide federal employees the protection against employment discrimination that Congress previously afforded to other employees. Congress stated that extending Title VII to federal employees was necessary to "correct this entrenched discrimination in the Federal Service." H.R. Rep. No. 238, 92d Cong., 1st Sess. 84 (1971).

While discrimination in federal employment may not now be the pervasive problem it once was, instances of discrimination still persist in federal employment, as elsewhere. The President's July, 1995 Affirmative Action Review noted that one of the lingering effects of historical practices has been that minorities and women are still underrepresented at higher grade levels. Eliminating this disparity is made more difficult by the time lag necessary for new hires to reach senior ranks. In addition, according to the Equal Employment Opportunity Commission (EEOC) and the Merit Systems Protection Board, the federal sector equal employment process still produces a significant number of decisions in which agencies are found to have discriminated against minorities and women. Where agencies identify current discriminatory practices, or the lingering effects of past practices, affirmative action is an effective remedial measure.

A prior judicial, administrative, or legislative determination of discrimination by the government is not required before the government may voluntarily choose to use affirmative action efforts. Croson, 488 U.S. at 500. An agency must have a "strong basis in evidence," however, for its determination that its practices have resulted in a significant exclusion or underutilization of minorities or have perpetuated exclusion perpetrated by others and that a race-based remedial effort is appropriate. Id. (quoting Wygant, 476 U.S. at 277). See also Peightal v. Metropolitan Dade County, 26 F.3d 1545, 1553 (11th Cir. 1994); Concrete Works v. City and County of Denver, 36 F.3d 1513, 1521 (10th Cir. 1994), cert. denied, 115 S. Ct. 1315 (1995); Donaghy v. City of Omaha, 933 F.2d 1448, 1458 (8th Cir.), cert. denied, 502 U.S. 1059 (1991), O'Donnell Constr. Co. v. District of Columbia, 963 F.2d 420, 424 (D.C. Cir. 1992); Stuart v. Roache, 951 F.2d 446, 450 (1st Cir. 1991) (Breyer, J.); Cone Corp. v. Hillsborough County, 908 F.2d 908, 915 (11th Cir.), cert. denied, 498 U.S. 983 (1990).

This does not mean that an agency must admit that it has discriminated, either intentionally or inadvertently, before adopting affirmative action measures. See Johnson v. Transportation Agency, 480 U.S. at 652-653 (O'Connor, J., concurring); Wygant, 476 U.S.

7

at 290 (O'Connor, J., concurring). Furthermore, the fact that an agency has adopted some affirmative action measures does not imply that the agency has discriminated against minorities. In certain circumstances, agencies may voluntarily use race in employment actions if there is a "gross statistical disparit[y]" between the level of minority participation in a particular job category and the percentage of qualified minorities in the applicable labor pool for the relevant geographic market. Croson, 488 U.S. at 501, 509. While the Supreme Court has never established a bright line test by which to judge the significance of a statistical disparity, the Court has stressed that statistical disparities must be substantial enough to suggest that minorities are being excluded from consideration because of factors related to race. Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 995 (1988).

b. Statistical evidence. Establishing the prerequisite for affirmative action does not have to be complicated. Statistics alone may form a sufficient predicate for race-conscious measures. Cf. International Bhd. of Teamsters v. United States, 431 U.S. 324 (1977). In Hazelwood v. United States, 433 U.S. 299 (1977), the Supreme Court stated that the "standard deviation analysis" can be used to demonstrate that a significant underrepresentation of minorities in a particular job category could be the result of a factor in the selection process that was eliminating minority candidates. The Court stated that "a fluctuation of more than two or three standard deviations would undercut the presumption that decisions were being made randomly with regard to race." Hazelwood, 433 U.S. at 311 n.17. See also Casteneda v. Partida, 430 U.S. 482, 496-497 n.17 (1977), for a further discussion of "standard statistical deviations" and an explanation of how they are calculated.

Standard deviation analysis is less probative with respect to smaller sample sizes. In those situations, other means of statistical analysis may be necessary to determine whether the disparity between the percentage of qualified minorities in the available labor pool and the jobs at issue is sufficiently large to permit the adoption of race-conscious efforts. There are statistical analyses available for small sample sizes,[5] but it is preferable to use the largest justifiable sample size.

Anecdotal and documentary evidence is always relevant. In determining whether race-based remedial measures are warranted, an agency may use other types of evidence to supplement the statistical comparisons between current minority availability and current minority representation. For example, anecdotal or documentary evidence showing historical underrepresentation (or the virtual absence) of minorities at an agency over a long period of time may put a gloss on an existing statistical disparity, and thus provide further support for race-based remedial action.

---

[5] See, e.g., Fisher's Exact Test, discussed at Jurgens v. Thomas, 29 FEP Cases 1561, 1568 n.15 (N.D. Tex. 1982); Sims v. Montgomery County Comm'rs, 766 F. Supp. 1052, 1100-1101 & n.136 (M.D. Ala. 1990).

8

Indeed, there may be some occasions where the number of jobs at issue is so small that no reliable statistical analysis is possible. In those circumstances, agencies may rely on anecdotal evidence that there has been discrimination, or that there has simply been no, or exceedingly few, minority personnel despite the fact that hiring has occurred over a sustained period. This sort of evidence could indicate that the absence of minority hiring is unlikely to be due solely to lack of qualified candidates, justifying race-conscious remedial action.

Whenever an agency establishes an affirmative action plan, based on statistical comparisons or anecdotal information, it is important that agencies carefully match the job qualifications in the jobs at issue with those in the relevant applicant pool as closely as possible. It would not be sufficient for an agency to have only a general sense that its EEO profile indicated minority underrepresentation. The agency must go through the process of comparing minority representation in the job category at issue to the relevant pool in the civilian labor force to determine whether there is a sufficiently substantial disparity and, therefore, a predicate for affirmative action.

Depending on the circumstances, the relevant labor pool is measured either by applicant flow data or the civilian labor force. An underrepresentation of minorities when compared to the general population or the general civilian labor force, however, would not be a sufficient predicate for the use of racial criteria in employment decisions when special skills or qualifications are required to perform the job. Croson, 488 U.S. at 501 (internal quotations omitted). See also Johnson v. Transportation Agency, 480 U.S. at 632; Hazelwood Sch. Dist. v. United States, 433 U.S. at 308. There are many entry-level jobs, however, for which comparisons to the general labor market are appropriate.

For example, if an agency or office sought to determine whether it had an underrepresentation of African-American engineers, it would not compare the percentage of African-American engineers that it employed with the percentage of African-Americans in the civilian labor force generally, or with the percentage of African-Americans in a "professionals" category of which engineers may be only a part. Since engineers possess unique qualifications not shared by the population or professionals at large, the comparison should be between the percentage of African-American engineers employed by the agency or office and the percentage of African-American engineers in the civilian labor force. Where the fit cannot be so precise, the agency should use the qualified labor force that most closely matches the agency's qualifications for the jobs at issue.[6] If an agency were going to fill

---

[6] The 1990 Civilian Labor Force (CLF) census data would provide a source for these comparisons. It reflects the racial and ethnic distribution of the civilian labor force by major occupations. The Office of Personnel Management also maintains a Central Personnel Data File that provides work force information by occupational code. EEOC uses a Cross Classification Table that can assist agencies in matching OPM and CLF classifications. EEOC can make this table available to agencies. Finally, OPM and the Census Bureau have
(continued...)

9

SES positions and wanted to know if it had an underrepresentation of Hispanics in its SES ranks, the agency would compare the number of its Hispanic GS-15s, and others of similar qualifications eligible for placement into an SES positions, to the number of Hispanic SESers it employs.

This analysis should be performed at whatever level within the agency that the employment decisions are made. The fact that there are sufficient disparities to justify race-based action by one component of an agency does not mean that other components may take such action, when employment decision are made by individual components.

Similarly, evidence that particular employment practices at the agency have dissuaded minorities from applying for jobs or accepting offers can serve to buttress statistical disparities on which the use of racial criteria in employment decisions is predicated. By contrast, if it is clear that minority underrepresentation stems from the agency's inability to compete for minority candidates with other agencies and private corporations that simply can make more attractive job offers, the statistical disparity alone may not justify the use of race-based remedial measures (although, in such circumstances, the agency still may be able to show that it has a non-remedial operational need to increase minority representation, a concept that is discussed below).

It is important that the statistical evidence on which the decision to use racial and ethnic criteria is made be thorough and accurate. The use of sound statistics will enable an agency to establish a justification for the use of race if challenged. The use of race in the affirmative action context will be upheld where there is a sound basis for its use; absent such sound support, a non-minority disadvantaged by the use of race could successfully challenge the use of an affirmative action plan.

## 2. Operational Needs Of The Agency.

While both Adarand and Croson make clear that remedial interests can be sufficiently compelling to justify race-based measures, they did not explore the full range of interests that might be found compelling. Efforts to advance an agency's operational objectives may also supply a predicate sufficient to permit race-conscious employment actions, apart from any remedial objective the agency may have. There has never been a majority opinion for the Supreme Court that addresses the question whether and in what circumstances such objectives can constitute a compelling interest. Some members of the Court and several lower courts, however, have suggested that, under appropriate circumstances, an agency's operational need for a diverse workforce could justify the use of racial considerations. This operational need

---

[6](...continued)
agreed to conduct preliminary statistical studies to help agencies match job requirements and appropriate applicant pools.

10

may reflect an agency's interest in seeking internal diversity in order to bring a wider variety of perspectives to bear on the range of issues with which the agency deals. It also may reflect an interest in promoting community trust and confidence in the agency.

The courts will require a convincing basis for the conclusion that the use of race and ethnicity are necessary to promote an operational need. The Supreme Court requires that the articulated need be based on a "legitimate factual predicate." Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 278 n.5 (1986). Thus, even prior to Adarand, public employers could not rely solely on broad assertions of operational need to justify the use of race and ethnicity as criteria in decisionmaking. See, e.g., Hayes v. North State Law Enforcement Officers Ass'n, 10 F.3d 207 (4th Cir. 1993) (opinion of police chief that effective law enforcement required racial diversity was insufficient alone to create a compelling state interest; city was required to support its contention with objective evidence as well). Thus, any agency relying upon non-remedial justifications for race-based action should have a well-reasoned basis – be it statistical, anecdotal, expert opinion, or other – for concluding that there is a compelling operational need for increased minority representation in its workforce.

In the controlling opinion in Regents of the Univ. of California v. Bakke, 438 U.S. 265 (1978), Justice Powell stated that a university could take the race of applicants into account in its admission process to foster the diversity of its student body. This greater diversity, he reasoned, would bring a wider range of perspectives to the university and would contribute to a more robust exchange of ideas, which is the central mission of higher education. In short, Justice Powell recognized that diversity among the student body serves the operational needs of a university. Along the same lines, in a concurring opinion in Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 286, 288 (1986), Justice O'Connor also suggested that fostering racial and ethnic diversity among faculty in public schools may be a compelling interest. See also discussion in O'Donnell Constr. Co. v. District of Columbia, 963 F.2d 420, 429 (D.C. Cir. 1992), in which now-Justice Ginsburg, in a concurring opinion, stated her agreement with Justice Stevens' position "that remedy for past wrong is not the exclusive basis upon which racial classifications may be justified."

Individual federal agencies may have operational objectives that can be served by a diverse workforce that brings an array of backgrounds and perspectives to the issues that these agencies confront and the choices that they must make. The same robust exchange of ideas that was deemed essential by Justice Powell in Bakke to further the educational objectives of a university may also be vital to sound decisionmaking at certain agencies. For example, under Justice Powell's reasoning regarding the value of diversity at college campuses, federal agencies that have educational missions may themselves have a legitimate interest in fostering diversity in their own workforces. Similarly, a racially diverse range of views and perspectives among its workers may substantially enhance the performance of an agency that is charged with handling matters that particularly affect minorities and minority communities (e.g., public housing and urban policy; economic dislocation in minority communities; immigration; health care in underserved, predominantly minority communities; conditions in tribal reservations or villages).

11

It would, therefore, not necessarily be inconsistent with <u>Adarand</u> for race and ethnicity to be taken into account in employment decisions in order to assure that decisionmakers will be exposed to the greatest possible diversity of perspectives. However, the goal of affirmative action in the federal workplace cannot be diversity for diversity's sake. It must be rooted in an identifiable and articulated operational need for diversity of opinion in the agency's workforce. The agency, moreover, cannot rely on racial or ethnic stereotypes to obtain a diversity of opinion. Rather, the agency must have some basis to believe that, in the aggregate, diversification of its workforce will make a difference in the array of perspectives communicated at the agency, and that this greater diversity will significantly enhance the performance of the agency's functions. Furthermore, if an agency's articulated reason for the use of affirmative action is the need for diversity of opinion, the use of racial and ethnic criteria should not be the only means by which the agency obtains a diversity of opinion. In addition, other factors that bear on diversity — such as geography, education, work and life experience — should also be considered.

There are also areas of governmental activity where, in order to be effective and have the cooperation and confidence of the community, an agency must be representative of the community. This form of operational need has been recognized in the law enforcement context by members of the Supreme Court, and by lower courts, and focuses on an agency's ability effectively to address the needs of the communities it serves. See <u>Wygant</u>, 476 U.S. at 314 (Stevens, J. dissenting) ("[I]n law enforcement * * * in a city with a recent history of racial unrest, the superintendent of police might reasonably conclude that an integrated police force could develop a better relationship with the community and thereby do a more effective job of maintaining law and order than a force composed only of whites."); <u>United States v. Paradise</u>, 480 U.S. 149, 167 n.18 (1987) (plurality opinion) (noting, but not reaching, argument that race-conscious hiring can "restore[] community trust in fairness of law enforcement and facilitate[] effective police service by encouraging citizen cooperation"); <u>Detroit Police Officers' Assoc. v. Young</u>, 608 F.2d 671, 696 (4th Cir. 1979) (argument "is not simply that blacks communicate better with blacks or that a police department should cater to the public's desires. Rather it is that effective crime prevention and solution depend heavily on the public support and cooperation which result only from public respect and confidence in the police"); <u>Talbert v. City of Richmond</u>, 648 F.2d 925 (4th Cir. 1981).

In the federal employment context, the Federal Bureau of Investigation, the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco, and Firearms and other federal law enforcement organizations are dependent on this kind of community support to function effectively. Law enforcement organizations also may have particular diversity needs quite apart from their need for community support. For example, undercover operations are likely to require the availability of agents of diverse racial and ethnic backgrounds.

The military is another segment of the government that clearly has a compelling and widely-recognized need for diversity. In order to maintain combat readiness, the armed forces have an unusually strong need to maintain morale and cohesiveness. Its cohesiveness could be threatened if personnel did not have visible evidence that advancement within the

12

military is possible for members of all racial and ethnic groups. Federal policies with regard to military affairs have traditionally received significant deference from the judiciary, see, e.g., Weiss v. United States, 114 S. Ct. 752, 769 (1994), and we do not anticipate Adarand affecting that deference.

Other examples of organizations that might have a compelling interest in using race-based employment measures to help ensure trust would include EEO offices that must gain the confidence of current or former employees who already feel that they have been subject to discrimination, and community relations offices that are called upon to quiet racial tensions in troubled neighborhoods. This list is by no means exhaustive. Depending on its mission, an agency may have a compelling interest in fostering community trust, unique to the agency, or to an office within the agency, that would justify the consideration of racial and ethnic factors.

B.     Narrow Tailoring Inquiry.

Once an agency identifies a compelling interest for using race or ethnicity in its decisionmaking, the inquiry shifts to whether the manner in which these criteria are used is narrowly tailored to achieve that interest. The narrow tailoring analysis ensures that the use of the racial or ethnic criteria is the result of careful deliberation and is the least intrusive means to obtain the desired result.

In determining whether race-based employment action is narrowly tailored to serve a compelling interest, the courts have usually considered the following factors: 1) whether the government considered race-neutral alternatives before using the racial or ethnic criteria, 2) the manner in which race or ethnicity is used in making decisions – e.g., is it one of many factors to be considered, or is it the sole or dominant factor, 3) the comparison of any numerical target to the number of qualified minorities in the labor pool, 4) the scope of the program, 5) the duration of the program, and 6) the impact of the program on nonminorities. United States v. Paradise, 480 U.S. 149, 171 (1987); Hayes, 10 F.3d at 216.[7]

All of these factors will not be relevant in every case. However, examining an agency's use of race and ethnicity in light of these factors will ensure that any race-based employment activity is narrowly tailored to meet the agency's legitimate objective.

---

[7]  Some of the factors that make up the narrow tailoring requirement have essentially been applied in challenges to affirmative action plans filed under Title VII. See Johnson, 480 U.S. at 637-638 and Steelworkers v. Weber, 443 U.S. 191, 197, 208 (1979), in which the Court stated that affirmative action measures must not "unnecessarily trammel" the interests of nonminorities.

13

### 1. Race-Neutral Alternatives.

In <u>Croson</u>, the Supreme Court held that a Richmond, Virginia ordinance that required prime contractors who received city contracts to subcontract at least 30 percent of the dollar amount of those contracts to minority businesses was not "narrowly tailored," in part, because the city had not considered race-neutral means to increase minority participation in municipal contracting. While the Court made clear that race-neutral measures had to be considered, it did not specify the extent to which such measures had to be considered — or actually used — before the government may resort to race-conscious action.

The most common race-neutral method of increasing minority participation in federal employment is recruiting and outreach.[8] Other race-neutral methods would include training programs open to all employees, diversity seminars, and eliminating unnecessary selection criteria that have a disproportionate impact on minorities. In some instances, race-neutral measures might be sufficient to serve the agency's objectives. In other cases, they may not. If an agency documents a compelling interest in remedying discrimination, it will not have to rely solely on race-neutral action to meet its objective. Cases suggest that although an agency will be required to give the race-neutral options serious consideration and use them to the extent feasible, use of race-neutral action need not be exhausted before race may be used more directly in decisionmaking. As the Ninth Circuit said in <u>Coral Constr. Co. v. King County</u>, 941 F.2d at 923, "while strict scrutiny requires serious, good faith consideration of race-neutral alternatives, strict scrutiny does not require exhaustion of every such possible alternative." <u>See also Peightal</u>, 26 F.3d at 1557. This approach gives the agency a measure of discretion in responding to its articulated need and allows the agency to draw on its prior experience as to the efficacy of race-neutral options.

It is also essential that agencies review both existing and contemplated selection practices and devices to ensure that they are job-related and minimize disparate impact to the extent practicable.[9] Traditional standardized tests can result in severe disparate impact, and often can be shown to be only marginally job related at best. These examinations are very

---

[8] As indicated above, (at pages 3-4), such action is considered race-neutral because it does not involve the use of racial criteria in employment decisionmaking.

[9] Title VII prohibits the use of an employment practice or devices, such as a written examination, physical agility test or minimum height/weight requirement, that is neutral on its face but causes a disparate impact on the basis of race, color, religion, sex or national origin, unless the employer can demonstrate that such practice or device is job related for the position for which it is used and is consistent with business necessity. Title VII also prohibits the use of an employment practice or device that causes a disparate impact but is job related, if there exists an alternative selection practice or device that will cause less of a disparate impact and will equally serve the employer's legitimate business needs.

14

susceptible to challenge under Title VII and should be carefully scrutinized and reformed as part of any serious effort in affirmative action.[10]

## 2. The Manner In Which Race And Ethnicity Is Used.

Of critical importance in the narrow tailoring analysis is the manner in which race and ethnicity are used in decisionmaking. Once a compelling interest has been identified and documented, and race-neutral options considered, race can be used along with other factors when evaluating the qualifications and breadth of experience that an applicant brings to a job. However, race should not become the sole or dominant factor.

In Bakke, Justice Powell rejected a system in which the university reserved a set number of places for minority applicants. He contrasted that program, which based decisions solely on race and ethnicity, with other programs in which race or ethnic background is simply one factor among many in the admissions decision. Justice Powell noted that in the latter type of program "race or ethnic background may be deemed a 'plus'" but does not "insulate the individual from comparison with all other candidates * * *." 438 U.S. at 317. Such programs, he suggested, would be deemed sufficiently flexible to meet the narrow tailoring requirement.

Similarly, in Johnson, the Supreme Court upheld an affirmative action plan under which a state agency considered the gender of applicants in making promotion decisions. The Court noted that the plan did not set aside positions for women but only established goals for their representation "which were not 'construed' by the agency as 'quotas.'" The Court stressed that in the promotion decisions at issue "sex * * * was but one of numerous factors [that were] taken into account." 480 U.S. at 638.

As these cases suggest, there are two kinds of race-based employment actions that, because of their rigidity, would be particularly vulnerable to constitutional challenge under strict scrutiny. The first is the use of quotas. Unlike goals, which establish only a numerical objective to be attained through an agency's best efforts, quotas require the selection of specified numbers of minorities without regard to relative qualifications, availability, or application rates. The second is a program in which race or ethnicity is the sole or dominant requirement for eligibility for a particular employment opportunity. Under the standard established by the Court, race can be an appropriate consideration in employment decisions only as long as it is not the exclusive or dominant factor. Flexibility is the key.

---

[10] In fact, over the past several years, an increasing number of employers have begun to use testing mechanisms that have less of a disparate impact than traditional cognitive-only examinations. Agencies that need information about such tests should contact the Employment Litigation Section of the Civil Rights Division of the Department of Justice.

15

In his July 19, 1995, Directive to the Executive Departments and Agencies, the President stated that any program that creates a quota must be reformed or eliminated. Consistent with this guidance, agencies should ensure that the use of numerical goals are not converted into rigid requirements.

In sum, where an agency uses race in employment decisions, race should be only one factor of the many that go into both the assessment of a candidate's accomplishments and potential as well as the assessment of what the candidate may bring to the agency. Under Adarand, such measures must be flexible and fair — race can be used as one of a number of factors in evaluating an applicant's credentials, but it cannot be the sole factor, or so outweigh all other considerations that it effectively defines who will receive consideration.

### 3. Comparison Of Numerical Target To Relevant Labor Market.

Any numerical objectives for minority representation must be reasonable. In those cases where an affirmative action program is justified on remedial grounds, any numerical goal must have a reasonable relation to the extent of the demonstrated disparity, the number of vacancies, and the availability of candidates. Both the disparity and the availability of candidates will be judged in relation to the relevant labor market. Where a targeted position requires special skills or training, the comparison must be to the qualified labor market; that is, the real market of persons with qualifications that match those of the agency. Broad comparisons to general population statistics will not suffice where agency qualifications require specific educational qualifications or levels of specific experience. See Croson, 488 U.S. at 507 (30% minority subcontracting requirement not narrowly tailored because it was tied to the minority population of Richmond and not the pool of qualified subcontractors); Edwards v. City of Houston, 37 F.3d 1097, 1114 (5th Cir. 1994) (race-based promotion goals narrowly tailored because tied to number of minorities with required skills).

As stated before (see, infra page 5), when taking race-based remedial action, an agency may establish as its ultimate goal the achievement of minority representation in a particular type of job similar to the percentage of minorities in the available, qualified applicant pool. The selection of that goal is based on the legitimate assumption that fair employment practices, over time, would result in a selection rate for minorities that essentially tracks the availability of minorities in the qualified labor market. It also establishes a benchmark by which the employer can measure whether its practices are somehow foreclosing opportunities for minorities. The use of this goal also helps to demonstrate that opportunities for non-minorities will not be unfairly diminished.

An agency may, under certain circumstances, use short-term goals that are somewhat higher than that percentage in order to eliminate significant underrepresentation of minorities. However, the use of such higher short-term goals should probably be limited to circumstances of extraordinarily severe underrepresentation that may justify a more concerted effort to remedy that level of underutilization. See, e.g., United States v. Paradise, 480 U.S. 149 (1987). Use of higher short-term goals may be appropriate, for example, where an

16

agency has engaged in actions that have discouraged minorities from seeking employment with the agency. Agencies contemplating the use of such goals should consult with the Justice Department.

While the use of goals for minority participation that match the level of minority representation in the relevant labor pool is required when an agency is pursuing a remedial effort, that is not necessarily the case when an agency sets a goal for non-remedial operational interests. In those circumstances, the goal may be tied to a level of minority representation that the agency considers necessary to achieve those interests.

### 4. Burden On Nonminorities.

Affirmative action efforts will necessarily affect nonminority employees and applicants who were not themselves responsible for the problem that those efforts seek to address. The Supreme Court has indicated that while some degree of impact on these individuals is constitutionally permissible, that burden cannot be too onerous. See Wygant, 476 U.S. at 280-81. The nature and extent of the burden is an integral part of the narrow tailoring analysis.

Racial or ethnic classifications that "unsettle * * * legitimate, firmly rooted expectation[s]," Johnson, 480 U.S. at 638, are likely to be viewed as more burdensome than those that do not. For example, in Wygant, the Court recognized that race-based layoffs may impose a more substantial burden than race-based hiring, because "denial of a future employment opportunity is not as intrusive as loss of an existing job," and because where affirmative action is achieved through hiring, "the burden to be borne by innocent individuals is diffused to a considerable extent among society generally." 476 U.S. at 282-283.[11]

Agencies therefore should give careful consideration to the way in which non-minorities are affected by employment practices when determining whether specific practices are constitutional. As affirmative action advances beyond hiring, the effect on third parties may shift onto those specific individuals competing for a limited promotion. The same kind of consideration of race might satisfy constitutional standards when used in the hiring context but be somewhat more vulnerable when used for promotions.

---

[11] Wygant addressed race-based layoffs by a local public school system that resulted in the displacement of more senior and more qualified nonminority teachers in favor of junior, less qualified minorities. It is our understanding that federal agencies historically have not used race in making layoff decisions. Any agency contemplating a change from the current practice should discuss the circumstances specifically with the Justice Department.

17

The time within which an agency will be able to eliminate a significant underrepresentation of minorities in its workforce will depend not only on the rate at which minorities are selected, but also on the overall number of hires or promotions an agency makes each year. As the number of hires decreases, as is likely during this era of government downsizing, the speed at which underutilization can be eliminated may be reduced. When using race-based affirmative action to remedy underrepresentation of minorities, agencies must be careful to do so at a rate that does not unfairly trammel the interests of non-minority applicants.

### 5. The Scope Of The Program.

In Croson, the Supreme Court criticized the Richmond minority subcontracting program on the ground that it extended the benefit of a racial classification to minority groups as to whom there was no evidence of discrimination. The Court concluded that the plan was not narrowly tailored because although the program was intended to remedy discrimination against African-American contractors, it included among its beneficiaries Hispanics, Asian-Americans, Native-Americans, Eskimos and Aleuts — groups for which Richmond had proffered "absolutely no evidence of discrimination." 488 U.S. at 506. Apart from operational needs, if an agency's statistics were to reveal underutilization only in its hiring and promotion of African-Americans, the agency would be justified in focusing remedial action on African-Americans, but not on Hispanic-Americans, Native-Americans, or Asian-Americans. Treating "minorities" as a single group raises concerns; remedial action in federal employment usually can be targeted only at specific groups determined to have a need for a special focus. Similarly, where an agency can only demonstrate an operational need for diversity in some offices, racial and ethnic criteria cannot be considered in employment decisions throughout the agency; narrow tailoring will require limiting the use of such criteria to the offices and positions determined to have an operational need for diversity.

Croson also imposed a geographic limitation on the scope of remedial action. Although the program at issue in that case was intended to remedy discrimination against African-American subcontractors in Richmond, it was also open to minorities elsewhere in the country. The Court held that it was not narrowly tailored because it conferred the benefit on persons from outside the relevant geographic market. This geographic limitation does not apply to affirmative action in employment by the federal government with respect to jobs for which agencies advertise or hire nationally.

### 6. Duration Of The Program.

A race-based measure should last only as long as it is needed. See Fullilove, 448 U.S. 448, 513 (1980) (Powell, J. concurring). The use of race should either be of limited duration or subject to periodic review. See Haves, 10 F.3d at 11. In employment, this periodic review would normally be performed when the agency submits its yearly affirmative action reports to the Equal Employment Opportunity Commission. At that time, it can be

18

determined whether the objectives of race-based actions have been met. If race-based measures that were justified when adopted are no longer needed, they should be discontinued.

In addition, there may be instances' in which agencies are continuing to use non-job-related selection criteria, such as a test, that have a disparate impact on minorities while developing new selection criteria that do not have such a disparate impact. In those situations, an agency can continue to use race-conscious selection methods to overcome the effects of the exclusionary criteria until new selection procedures are in place that no longer exclude disparate numbers of minorities or that are job-related.

Racial and ethnic criteria cannot be used after remedial objectives have been satisfied merely to maintain a statistical balance. See Johnson v. Transportation Agency, 480 U.S. at 640; Sheet Metal Workers v. EEOC, 478 U.S. at 477-478; Hayes v. North State Law Enforcement Officers Ass'n, 10 F.3d 207 (4th Cir. 1993). But that does not necessarily mean that the use of such criteria must be abandoned the moment that minority representation in a particular job category at an agency equals minority representation in the qualified labor market. The agency may be able to use the criteria for a reasonable period thereafter to ensure that its remedial objectives have been fully satisfied. And if the use of the criteria is suspended for some period of time because disparities appear to have been corrected, an agency may re-institute them if it subsequently finds that its policies, or its unrepaired selection devices, are again leading to a significant disparity.

IV.  Conclusion.

As the President emphasized in his July 19, 1995, statement, the Administration is committed to the vigorous enforcement of the laws prohibiting discrimination as well as to the elimination of barriers to opportunity. The Administration thus supports affirmative action measures that promote employment opportunities for Americans subject to discrimination or its continuing effects. Nothing in Adarand requires a retreat from this effort. Moreover, because federal agencies have long been subject to Title VII standards in their employment practices, the application of strict scrutiny should not require major modifications in the way federal agencies have been properly implementing affirmative action policies.

In sum, what Adarand requires is that in order for race or ethnicity to be used as a basis for decisionmaking, an agency must have a demonstrable factual predicate for its actions. That predicate could be the agency's interest in remedying the effects of its past discriminatory practices or the effects of employment practices that unintentionally have excluded minorities, or it could be based on the agency's operational needs. Once this predicate is identified, the agency should consider all reasonable means of increasing minority participation in its workforce without specific reliance on racial criteria. However, if such methods are inadequate to meet the agency's legitimate objectives, consideration can be given to racial and ethnic factors. Under Adarand, such measures must be flexible and

19

fair — race can be used as one of a number of factors in evaluating an applicant's credentials, but it cannot be the sole factor. or so outweigh all other considerations that it effectively defines who will receive consideration. The use of race-conscious measures also must be limited in duration, lasting no longer than necessary to accomplish the agency's objectives. If the use of the classification is intended to be remedial, it can be targeted only at those groups against whom discrimination has been shown. Finally, consideration must be given to the kind of employment decision that is at issue and the impact the use of the criteria will have on nonminorities to assure that the burden will not fall too heavily on innocent parties.

# EXHIBIT 9

*The U.S. Equal Employment Opportunity Commission*

# Frequently Asked Questions About Management Directive-715

Management Directive 715 (MD-715) is the policy guidance which the Equal Employment Opportunity Commission (EEOC) provides to federal agencies for their use in establishing and maintaining effective programs of equal employment opportunity under Section 717 of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e *et seq.*, and Section 501 of the Rehabilitation Act of 1973 (Rehabilitation Act), as amended, 29 U.S.C. § 791 *et seq.* MD-715 provides a roadmap for creating effective equal employment opportunity (EEO) programs for all federal employees as required by Title VII and the Rehabilitation Act. MD-715 took effect on October 1, 2003.

The Instructions to Federal Agencies for Equal Employment Opportunity Management Directive 715 (Instructions) set forth general reporting requirements for federal agencies.

A copy of MD-715 and the Instructions are available on the EEOC's web site: http://www.eeoc.gov/federal/md715/index.html. Also available are PARTS A through J of EEOC FORM 715-01 (in HTML, PDF, and MS WORD), the Workforce Data Tables (in HTML, MS WORD and EXCEL), the Department or Agency List with Second Level Reporting Components, Guidance on Completing the EEOC Form 715-01 Workforce Data Tables and links to the OPM/Census Occupation Cross-Classification Table and the Census EEO 2000 Data Tool.

The following questions are those which have been most frequently asked by persons who have read MD-715 and the Instructions.

## GENERAL QUESTIONS

**1. What format may I use to submit the MD-715 report and the applicable Workforce Data Tables? Access? Text?**

At the present time, your MD-715 report (FORM 715-01, all supporting documentation, and all the Workforce Data Tables) must be submitted to the EEOC in hard copy format. All data must be identified and arranged in the same manner as shown in the Workforce Data Tables.

**2. How do I know if I am a 2nd level, 3rd level or 4th level reporting component?**

Most federal agencies have subordinate components, but not every subordinate component is a subordinate **reporting** component for purposes of filing under MD-715. A subordinate **reporting** component, *i.e.*, a second, third or fourth level **reporting** component, is one that enjoys a certain amount of autonomy from its parent agency. In other words, does the subordinate component have its own personnel system, finance department, recruitment structure, culture, etc? Or is the component simply a regional office that operates more as an extension of the parent? If the component is closer to being independent, then it is considered a subordinate **reporting** component.

For example, the Department of Justice (DoJ) is a parent agency with several subordinate components. Some of those subordinate components, like the Federal Bureau of Investigation (FBI), Drug Enforcement Agency, etc., operate independently (albeit under the umbrella of DoJ); they have their own recruitment programs, personnel systems, culture, etc. Thus, the FBI is a 2nd level **reporting** component. Compare the FBI to the Baltimore District Office of the EEOC. The Baltimore District Office is not an independent entity, but rather a spoke on the wheel, with EEOC headquarters at the center.

The majority of federal agencies do not have 2nd level **reporting** components, and even fewer will have a 3rd or 4th level **reporting** component, because very few agencies have independent and autonomous entities under their second level components. One example of a 3rd level **reporting** component would be the National Weather Service (NWS). The parent agency is the Department of Commerce. Under Commerce is the National Oceanic and Atmospheric Administration (NOAA), which

meets the definition of a second level **reporting** component. NWS comes under NOAA and meets the same definition.

Contrast NWS with FBI's New York District Office (NYDO). The Department of Justice is a parent agency with several subordinate components. The Federal Bureau of Investigation is one such component that is greatly autonomous from Justice. Thus, it is a 2nd level **reporting** component. Under FBI, there are several regional offices, including the New York District Office. The FBI-NYDO is not a subordinate **reporting** component. It has no filing requirements under MD-715. Note, however, that this does not mean the FBI-NYDO has no responsibility under MD-715! See FAQ No. 9, below.

The EEOC has developed a Department or Agency List with Second Level Reporting Components, which may be accessed through the following link: http://www.eeoc.gov/federal/715instruct/agencylist.html

Please contact Gail S. Demers at 202-663-4555 or gail.demers@eeoc.gov if you believe that your agency or department has a Second Level Reporting Component which should have been included on this list or if you believe such a component has been included erroneously.

**3. What about very large regional offices that are not considered subordinate *reporting* components? Does the above definition mean that those subordinate components do not have any responsibilities under MD-715?**

Absolutely not. **All entities that make up a federal agency have responsibilities under MD-715.** A federal agency needs to work closely with all of its subordinate entities in order to ensure that the agency itself can perform a Model EEO self-assessment and undertake a comprehensive barrier analysis to identify barriers and execute plans for eliminating them **throughout its workforce**, as well as to maintain an effective, **agency-wide** special recruitment program which establishes specific goals for the employment and advancement of individuals with targeted disabilities.

Continuing the example from above, the Baltimore District Office of the EEOC is required to conduct a self-assessment of its EEO program and a barrier analysis of its workplace. Deficiencies identified in the self-assessment and barriers uncovered must be addressed and corrective plans must be developed and instituted. All this information (the self-assessment, the corrective plans, etc.) will then be rolled up to EEOC headquarters to be used in completing the **overall** EEOC MD-715 report. EEOC headquarters can't possibly report on the entire Commission without the input of all subordinate entities (regional, district and field offices).

Similarly, the FBI-NYDO will have to engage in the Model EEO self-assessment and perform a thorough barrier analysis. Plans to address identified deficiencies and barriers will need to be developed and instituted. These plans will be rolled up to FBI headquarters for inclusion in its Bureau-wide report. Additionally, FBI headquarters will roll up its information to Justice for inclusion in the department-wide report. The important distinction to understand is that, **regardless of whether a subordinate entity has to file a report with the EEOC, all of the activities required by MD 715 have to be done either by or for all of an agency's entities - whether those entities are termed major commands, post offices, small air bases, regional centers, etc.**

**4. I have subordinate components that are reporting components. Who and where do they report to, and what are they reporting?**

Second Level Reporting Components which have 1,000 or more employees in permanent full or part time appointments must submit MD-715 reports (FORM 715-01, PARTS A-F and H-J and all Workforce Data Tables) to their agency headquarters for inclusion in the agency-wide report and for submission by the parent to the EEOC. Second Level Reporting Components with 500 or more (but fewer than 1,000) employees in permanent full or part time appointments must file MD-715 reports with PARTS A-F and H-I and Workforce Data Tables A/B 1-7 with their agency headquarters for inclusion in the agency-wide report and maintain a copy.

See The Quick Guide in Section III of the Instructions, available at the following link: http://www.eeoc.gov/federal/715instruct/section3.html.

**5. My agency has several Second Level Reporting Components. Must the agency's MD-715 report include all of the PART Hs, Is and Js prepared by its Second Level Reporting**

**Components?**

No. The agency's overall MD-715 Report may incorporate these by reference. However, the MD-715 report filed by the parent agency (i.e., the agency-wide report) should include the PART Hs, Is and Js to be addressed at the headquarters level. Please note that ultimately, it is the agency itself which is responsible for ensuring that a Model EEO self-assessment and a comprehensive barrier analysis to identify barriers and execute plans for eliminating them have been conducted **throughout its workforce**, and for ensuring that the agency maintains an effective, **agency-wide** special recruitment program which establishes specific goals for the employment and advancement of individuals with targeted disabilities.

**6. Should a Second Level Reporting Component file its MD-715 report directly with the Commission or should it first submit its MD-715 report to its parent agency?**

As previously noted, a federal agency needs to work closely with all of its subordinate entities in order to ensure that the agency itself can perform a Model EEO self-assessment and undertake a comprehensive barrier analysis to identify barriers and execute plans for eliminating them **throughout its workforce**, as well as to maintain an effective, **agency-wide** special recruitment program which establishes specific goals for the employment and advancement of individuals with targeted disabilities. Thus, an agency's EEO Director ultimately is responsible for ensuring equal opportunity throughout the entire agency.

Accordingly, all Second Level Reporting Components should first submit their MD-715 reports to their parent agency's EEO Director for review and coordination. The parent agency should submit a complete package of MD-715 reports to the EEOC. Therefore, those agencies which have Second Level Reporting Components need to seriously consider the date by which these entities must gather and analyze all necessary data and information and to perform the required MD 715 exercises, in order to complete the review and coordination process well in advance of the January 31 due date. Practically speaking, since subordinate components, whether they are reporting components or not, make up the report of the parent entity, the parent entity will need its subordinate's MD-715 report well in advance of January 31. Parent agencies should keep this in mind when setting internal deadlines for subordinate components, and take care to have in place a procedure which will ensure that the review of a subordinate component's MD-715 report will be concluded in sufficient time to allow required MD-715 reports to be filed by January 31.

# MODEL EEO PROGRAMS AND BARRIER QUESTIONS

**7. What should be done under MD-715 when a particular group has a low participation rate?**

A low participation rate should be taken as a "trigger," a situation which alerts the agency to the possible existence of a barrier to equal opportunity. An agency should identify the likely factor (or combination of factors) which has adversely affected the employment opportunities of the group in question. Depending on the nature of the potential problem, an agency could consider a variety of questions. For example, if a particular group has a low participation rate in a particular occupation, the agency should determine whether recruitment efforts are resulting in a diverse pool of applicants. In this regard, it should be noted that actions designed to increase the number of applications for employment from a particular group are unaffected by *Adarand*. See DoJ Memorandum at pp. 3-4.

If the applicant pool includes a cross-section of qualified applicants, the agency should explore whether there is a significant disparity between a group's proportionate representation in the applicant pool and the pool of selectees. If so, the agency needs to explore why. Are there selection criteria that tend to screen out the group in question?

If there is a situation where the participation rate for a group occupying a higher level position is lower than the corresponding participation rate in the lower level feeder pool for that position, the agency should review its merit promotion processes and may also need to review related processes, such as career development programs, appraisal systems and/or awards programs, for barriers affecting the group's advancement to the next level.

Numerous other examples of questions which should be addressed during a thorough investigation of a

potential barrier in an assortment of employment processes are found in Section II of the Instructions to Federal Agencies for Equal Employment Opportunity Management Directive 715.

**8. My agency has identified many areas where our EEO Programs are deficient and numerous areas which should be explored for barriers. How can we be expected to file so many PART Hs and PART Is?**

We suggest that your agency first determine whether any of the program deficiencies are interrelated and could, therefore, be addressed in a comprehensive manner which can be set forth in a single PART H. In addition, an agency may need to prioritize its needs. If an agency will be unable to address the deficiency during the Fiscal Year in question (whether due to budget, lack of personnel or other reasons), the deficiency should be identified in a PART H together with at least a general indication of the agency's current plans to address the deficiency in an identified, subsequent Fiscal Year.

Similarly, a through and systematic analysis may identify certain barriers which are interrelated and could, therefore, be addressed in a comprehensive manner which can be set forth in a single PART I. In addition, if an agency is unable to explore data, an employment process, or other sources for possible barriers during the Fiscal Year in question (whether due to budget, lack of personnel or other reasons), the barrier should be identified in a PART I together with a general indication of the agency's current plans to perform an analysis to determine the cause of the condition and develop measurable objectives to correct the undesired condition address the barrier in an identified, subsequent Fiscal Year.

**9. Do you have any suggestions as to how the data gathered in my agency's Form 462 Report could be utilized in conducting a barrier analysis under MD-715?**

Yes. An agency is required to examine any policy, principle or practice that limits or tends to limit employment opportunities for members of a particular sex, race or ethnic background, or based on an individual's disability status. An analysis of the Form 462 data relating to the nature and disposition of EEO complaints can provide useful insight into the extent to which an agency is meeting its obligations under Title VII and the Rehabilitation Act and, thus, may help an agency to identify areas where barriers may be operating to limit certain groups.

For example, an analysis may reveal that there are certain trends in the types of complaints being filed or problem areas within the agency. Does the data reveal an increase in complaints about employee development or training? How about promotions? Awards? Disciplinary actions? If the answer to any of these questions is 'yes,' then an agency should study the data further to determine if there is an identifiable trend - is a particular group making a significant percentage of the complaints? Is the increase attributable to a certain facility, office, region, etc.? Do complaints about promotion, for example, tend to involve a particular stage of the promotion process or procedures? Do complaints involving reasonable accommodation issues also involve failures to comply with the agency's reasonable accommodation procedures? Has a union, ombudsman, employee advocacy group, special emphasis group or other group also raised concerns about the area in question?

In addition, note that the 462 data also is invaluable in assessing whether your agency's EEO program is meeting the 6 essential elements of a model EEO program. If the data reveals that complaints are not being processed within the regulatory time frame, the 462 will allow you to determine what stage of the process needs attention: Is counseling completed in a timely manner? Does the problem lie with timely completion of investigations? If your agency does both, is there a significant difference in timeliness between in-house and contract investigations? Is the agency's information collection system accurate and adequate for purposes of completing the Form 462? Any deficiencies in these areas also need to be addressed in the 715 report.

**10. Please discuss the impact of the Supreme Court's decision in *Adarand* and its applicability to agencies' affirmative employment programs.**

In *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995), the U.S. Supreme Court held that all racial classifications imposed by a federal, state, or local government must be analyzed by a reviewing court under "strict scrutiny," meaning that such classifications are constitutional only if they are narrowly tailored measures that further compelling government interests. The *Adarand* case arose under the Equal Protection clause of the U.S. Constitution regarding a federal program that provided

financial incentives for contractors to hire subcontractors controlled by socially and economically disadvantaged groups, which included various racial and ethnic groups.

EEOC is tasked by Congress to enforce laws prohibiting employment discrimination, including Title VII of the Civil Rights Act. *Adarand* does not affect an agency's responsibilities under MD-715. Neither EEOC policy nor MD-715 requires agencies to establish racial or ethnic preferences or quotas. Indeed, federal anti-discrimination laws and EEOC's policies require that agencies prohibit discrimination, including "reverse" discrimination. MD-715 requires agencies to take proactive steps to ensure equal employment opportunity for all their employees and applicants for employment by regularly evaluating their employment practices to identify and eliminate barriers that hamper the advancement of any racial or ethnic group in federal agencies.

In July 1995, the Department of Justice issued a memorandum entitled "Post-*Adarand* Guidance on Affirmative Action in Federal Employment" ("DoJ Memorandum"). The DoJ Memorandum provides guidance to all federal agencies on how to interpret *Adarand* in the context of federal employment and agencies seeking guidance in this area should review the DoJ Memorandum. It should be noted that the DoJ Memorandum re-emphasizes the federal commitment to affirmative employment in the federal government.

**11. But MD-715 requires agencies to collect and analyze data which show the representation of groups by ethnicity and race (as well as by sex and disability status) in numerous profiles, such as grade distribution, major occupations, promotions, career development, etc. Thus, agencies must identify personnel by their membership in protected groups. Aren't such classifications unlawful?**

No, an agency's collection and analysis of data by protected group is not unlawful. Neither *Adarand* nor any other controlling authority prohibits such collection and analysis. As is specifically noted in the DoJ Memorandum, "*Adarand* ... does not preclude tracking participation [by protected class] in the agency's workforce through the collection and maintenance of statistics or the filing of reports with the Equal Employment Opportunity Commission." DoJ Memorandum, p. 4. The purpose of the data collection is to allow the evaluation of policies, practices or procedures which may be impacting the employment opportunities of any protected group. Of course, agencies must ensure that the data collected are used appropriately for the purpose of developing and monitoring affirmative employment programs.

**12. Are federal agencies prohibited from adopting goals based on race or ethnicity?**

If a federal agency desires to develop numerical objectives or goals, the agency's General Counsel should carefully review the DoJ Memorandum before establishing any goals.

**13. Are federal agencies prohibited from adopting preferences based on race or ethnicity?**

Before a federal agency uses ethnicity or race as a basis for an employment decision, the agency must satisfy strict scrutiny to ensure that the decision promotes "compelling" government interests and that it is "narrowly tailored" to serve those interests. Again, the agency's General Counsel should carefully review the DoJ Memorandum before establishing any preferences.

## TABLE QUESTIONS

**14. Why did the EEOC revise the categories under which the agencies are to report the race and ethnicity of employees and applicants?**

The Instructions call for federal agencies to report statistical information on the racial and ethnic categories of employees and applicants as prescribed by the Office of Management and Budget (OMB) in Statistical Policy Directive No. 15, Race and Ethnic Standards for Federal Statistics and Administrative Reporting (OMB Directive 15), which all federal agencies were required to adopt no later than January 1, 2003. OMB Directive 15 is available at:
http://www.whitehouse.gov/omb/fedreg/ombdir15.html.

Under OMB Directive 15:

"The minimum categories for data on race and ethnicity for Federal statistics, program administrative

reporting, and civil rights compliance reporting are defined as follows:

- **American Indian or Alaska Native.** A person having origins in any of the original peoples of North and South America (including Central America), and who maintains tribal affiliation or community attachment.

- **Asian.** A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

- **Black or African American.** A person having origins in any of the black racial groups of Africa. Terms such as "Haitian" or "Negro" can be used in addition to "Black or African American."

- **Hispanic or Latino.** A person of Cuban, Mexican, Puerto Rican, Cuban, South or Central American, or other Spanish culture or origin, regardless of race. The term, "Spanish origin," can be used in addition to "Hispanic or Latino."

- **Native Hawaiian or Other Pacific Islander.** A person having origins in any of the original peoples of Hawaii, Guam, Samoa, or other Pacific Islands.

- **White.** A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

Respondents shall be offered the option of selecting one or more racial designations. Recommended forms for the instruction accompanying the multiple response question are 'Mark one or more' and 'Select one or more.'"   (Emphasis added.)

### 15. Why doesn't the EEOC require agencies to report on the race of Hispanic employees and applicants?

Agency's reports to the EEOC use the minimum categories prescribed by OMB Directive 15 because we have determined that these categories provide the most useful statistics for federal oversight purposes. Also, inasmuch as the prior Management Directive 714 also did not require agencies to report the race of Hispanic employees or applicants, the use of the minimum categories allows for comparison of historical data.

However, nothing in MD-715 or the Instructions prohibit federal agencies from capturing more detailed racial and ethnic information, including the race of its Hispanic employees and applicants or the specific races selected by employees and applicants who select more than one race. Indeed, agencies are encouraged to capture such information to ensure that their data base is as comprehensive as possible. However, for reporting purposes, such detailed data must be aggregated into the minimum categories provided for in the Workforce Data Tables.

In addition, please note that when capturing racial and ethnic data, agencies should use a form that allows employees or applicants to select more than one race. Agencies should not use a form that has a box labeled "two or more races."

### 16. Why does the EEOC only require agencies to re-survey their Asian employees and those who have not been previously identified? Shouldn't all employees be afforded the opportunity to self-identify under the categories prescribed by OMB Directive 15?

In order to ensure that agencies would be able to timely submit their initial MD-715 report by January 31, 2005, the EEOC limited the requirement to re-survey existing employees to those who are identified as Asian because these employees must be placed accurately into either the category of "Asian" or "Native Hawaiian or Other Pacific Islander." Similarly, those employees who have not been previously identified need to be surveyed as reporting such employees as "Other" or "Non-category" does not comport with OMB Directive 15 or EEOC regulations. *See also* 29 C.F.R. § 1614.601(b).

The EEOC nonetheless encourages agencies to resurvey their employees for accurate race and national origin identification under OMB Directive 15. In addition, some agencies have concerns about the accuracy of their existing data and in such cases, re-surveying the workforce under the current categories would be a good idea. Finally, agencies are always strongly encouraged to periodically resurvey their employees to accurately capture current disability status.

**17. My agency has not finished re-surveying its workforce nor has my agency begun tracking applicants. Should we still file the MD-715 report?**

Yes. You should annotate your agency's Workforce Data Tables to indicate any data deviations or other assumptions made in the course of completing the Tables. You should also file as many PART Hs (EEO Plan To Attain the Essential Elements of a Model EEO Program) as may be necessary to address these deficiencies in your agency's EEO program. The Office of Personnel Management has revised Standard Form 181 to reflect OMB Directive 15. See http://www.opm.gov/forms/html/sf.asp .

**18. My agency does not appear to be reaching persons who identify themselves as two or more races. How does an agency target persons who are of two or more races?**

Broad targeting of recruitment efforts to a wide range of diverse sources of applicants generally should be sufficient to reach all races including those who select more than one racial identification.

**19. When re-surveying, does an agency's EEO Office or its Human Resources Office have the responsibility to request the data and conduct the survey?**

The EEOC has emphasized that coordination and cooperation between an agency's EEO Office and its Human Resources Office is necessary for MD-715 to be a success. Indeed, the cooperation of all offices (General Counsel, Information Technology, Budget and Finance, etc.,) is critical if an agency is to successfully remove workplace barriers or attempt to develop and maintain a Model EEO Program. Cooperation and coordination is a must. Thus, it would be beneficial for both offices to work together to accomplish the re-survey.

**20. How do I determine the appropriate Civilian Labor Force (CLF) Data to use on the various Workforce Data Tables? Where do I find the CLF data?**

The CLF data is available at: http://www.census.gov/eeo2000. The national CLF, as shown, should be used on Tables A1 and A2; however, no CLF data should be shown for occupational groups on Table A3.

For Tables A6 through A8, the appropriate or relevant CLF availability data generally depends on the employer's area of recruitment. If a job is recruited nationally, then it may be appropriate to use the national CLF for that occupation, particularly if individuals apply form all parts of the country and the location from which they apply is not a factor in the hiring decision.

On the other hand, if an agency's announcement is limited to a particular geographic area (e.g. region, state, county or city) or, although the agency advertised nationally for a low-graded position, the only applications received are from the city or county in which the position is located, then it may be more appropriate to consider the local area CLF.

An agency must have a justification for whichever CLF data it uses for comparison purposes in the Workforce Data Tables filed under MD-715. If the agency has questions about what CLF data to use, it should contact EEOC's Affirmative Employment Division at (202) 663-4555.

**21. How are foreign nationals reported?**

Foreign nationals are not reported in the Workforce Data Tables, whether or not the foreign national works overseas or in the United States. See Instructions, Section III, page 1, column 2. "All non-intermittent or non-seasonal employees except foreign nationals, will be reported". Employees who are U.S. citizens are included in the Workforce Data Tables, whether they are employed within the United States (including Puerto Rico) or abroad.

**22. What is the "Federal High" used on Table B1?**

This is the participation rate of the agency (with 500 or more permanent employees) which had the greatest participation rate of employees with targeted disabilities during the prior fiscal year. For 2005, that agency was the Equal Employment Opportunity Commission, where 2.16% of employees had a targeted disability.

**23. I am aware that my agency has employees with targeted disabilities who have not**

self-identified. May I visually identify these employees for purposes of reporting them in the agency's MD-715 Report?

No. The collection of data on disability status is governed by 29 C.F.R. § 1614.601(f). This regulation provides that data on disability status is collected by voluntary self-identification. Agencies are to explain the importance of the data to employees and actively encourage them to self-identify. Only if the employee is a Schedule A appointee and refuses to self-identify, may the agency identify the employee's disability using the records supporting the appointment. For all other employees, if the employee still refuses to self-identify even with encouragement, the agency should report the employee's disability status as "unknown." Note that the fact that such a non-Schedule A, non-self-identifying employee may have requested an accommodation and provided records supporting the request which establish a disability is irrelevant; the records used for purposes of the accommodation request cannot be used by the agency to unilaterally identify the employee. Thus, visual identification may not be used for the collection of disability data.

**24. Tables A1 and B1 ask agencies to report on employees who are paid with non-appropriated funds, in addition to reporting on permanent and temporary employees. Can you please explain this category?**

Under previous management directives, agency affirmative employment reports to the Commission only contained workforce data statistics that were otherwise contained in OPM's Central Personnel Data File (CPDF). The CPDF excludes large portions of non-appropriated fund employees, meaning these employees often went unreported. Thus, an accurate snapshot of the agency workforce was never seen and reviewed. Agency resources, planned activities, etc., were also not evaluated with an accurate picture of the workforce in mind. MD-715 requires that all employees be reported. Therefore, by including a category where non-appropriated fund employees can be reported, this gap between what's in the CPDF and an agency's actual workforce total can be bridged. Hence, the data to be included in this category should include individuals excluded from the CPDF and otherwise not traditionally reported in affirmative employment reports.

**25. In Tables A3 and B3, why is the EEOC using 9 occupational categories instead of the PATCOB categories used in the past? It is burdensome to have to use the 9 occupational categories for reports to the EEOC and PATCOB for reports to the Office of Personnel Management (OPM).**

Since the 1960s, private employees have reported information to the EEOC on one of the more well-known reports collected by the Commission, the EEO-1 report. The EEO-1 report provides a breakout of the employer's workforce by gender and race/ethnicity in nine job categories. The EEOC's experience in analyzing EEO-1 reports for many years has led us to determine that use of similar occupational categories in the federal sector will provide more useful information. Moreover, use of similar occupational categories will allow comparisons between the federal and private sectors. In particular, use of the Officials and Managers category, further divided into hierarchical subcategories, allows for the collection of data about racial and gender stratification that can help to identify the existence of a "glass ceiling." We view this as a positive development in our mission to eradicate discrimination from the federal workplace and move toward the ultimate goal of making the federal government a model employer.

Although OPM may decide to continue its historical use of PATCOB, OPM's data needs differ significantly from the EEOC's data needs in its role as the enforcer of the civil rights laws governing employment. The EEOC determined that the PATCOB categories are outdated, overly broad and too imprecise to allow the level of analysis desired. To the extent that certain agencies may object to grouping their data into the nine occupational categories as burdensome, the EEOC notes that other agencies have represented that their information technology departments have not found this to be a difficult task. Nevertheless, EEOC staff have met with OPM staff and discussed the nine categories used under MD-715 as OPM proceeds in the development of the new Enterprise Human Resources Integration (EHRI) system. We also conveyed to OPM the need for the system to be equally compatible with PATCOB and the nine occupational categories used for reporting under MD-715. We expect to continue to meet with OPM staff to further coordinate our mutual needs.

**26. Isn't this just obtaining information for the sake of having information? If the PATCOB is**

good enough for OPM, why isn't it good enough for EEOC?

As previously noted, EEOC's data needs differ substantially from those of OPM. While OPM's role is human resource management, EEOC is the enforcer of civil rights laws governing employment. We have concluded that the PATCOB categories are both outdated and too imprecise to provide the level of analysis needed in our mission to identify and eliminate impediments to equal opportunity. Moreover, PATCOB data does not give any information on the composition of an agency's managers or otherwise allow for the identification of 'glass ceilings.'

The information obtained in the MD-715 reports is vital to our - that is, the Commission's and the agencies' - understanding of the Federal workforce.

Many new Federal employees are drawn from the private sector. Clearly, the ability to cross-reference and analyze both Federal and private data moves all of us toward achieving our goal of making the Federal government a model employer. Organizations that want to recruit and retain an inclusive workforce - one that reflects the American public - must use all available sources of candidates in these increasingly competitive times. Any agency that fails to benchmark itself against the full spectrum of the labor market will not achieve the mission and business of the agency. As more Federal employees become eligible for retirement, succession planning provides an opportunity to engage in a deliberate and systematic effort to ensure that critical skills positions attract and hire persons from all groups. A system of measurement which allows for comparison to the private workforce allows agencies to more successfully monitor the effectiveness of their efforts.

**27. How do I know in which of the 9 occupational groups an employee should be placed?**

The EEOC's website contains a link to the OPM/Census Occupation Cross-Classification Table (Crosswalk). This Crosswalk is intended as general guidance in cross-classifying OPM occupation codes to the nine occupational categories. Agencies are encouraged to contact EEOC with specific questions about what category might be appropriate for their particular occupations.

The link to the Crosswalk is: http://www.eeoc.gov/federal/715instruct/00-09opmcode.html

Please remember that when an employee is classified as a supervisor or manager, that employee should be placed in the **Officials and Managers** category rather than in the category in the crosswalk that they would otherwise be placed in based on their OPM occupation codes. Those employees classified as supervisors or managers who are at the GS-12 level or below should be placed in the First-Level subcategory of **Officials and Managers**, those at the GS-13 or 14 should be in the **Mid-Level** subcategory, and those at the GS-15 or in the SES should be placed in the **Executive/Senior-Level** subcategory. An agency may also choose to place employees who have significant policy-making responsibilities, but do not supervise other employees, in these three subcategories.

The fourth subcategory, called **"Other,"** contains employees in a number of different occupations that are primarily business, financial and administrative in nature, and do not have supervisory or significant policy responsibility. For example, Administrative Officers (OPM Code 0341) are appropriately placed in the **"Other"** subcategory.

**28. May I utilize the codes used in the Federal Personnel Payroll System (FPPS) to identify my agency's supervisors or managers? These are the codes I would like to use: 02 - Supervisor or Manager, 04 - Supervisor, 05 - Management Official, 06 - Leader, and 07 - Team Leader.**

You may use whatever method you deem appropriate to properly account for and categorize employees reflected in the Workforce Data Tables. The EEOC has no objection to an agency's use of FPPS codes or other agency-specific codes to assist in identifying the supervisors and managers who should be placed in one of the first three subcategories of the Officials and Managers category. However, please note that the EEOC does not consider Team Leaders to be supervisors or managers within the definition of the occupational group "Officials and Managers." Therefore, FPPS codes 06 and 07 may not be used to identify supervisors and managers.

**29. What about Wage Grade employees who are supervisors or managers?**

Wage Grade employees who are supervisors or managers should be included in the Officials and Managers category. An agency will have to determine which of the first three subcategories is the appropriate one for placement of the employee. Should an agency have specific questions in this area, they are welcome to consult with the EEOC.

**30. I have employees in series that are not in the Crosswalk. Where do I place these employees?**

When questions are raised about a series not being included on the Crosswalk, it generally has been because the series no longer exists. For example, some agencies' data systems still show employees in the former GS-334 series, which is now the GS-2210, Information Technology Management Series. Similarly, the former GS-204, 205, 221, 233, and 235 series were all placed into the GS-201, Human Resource Management Series and the former GS-345 series is now part of the GS-301 series. Note that these changes include series both in the General Schedule and the Wage Grade areas. Also, another wrong or missing code example could occasionally be a violation of the "single agency code" rule. Specifically, when a GS code and title exists and is authorized only for one designated agency, sometimes others decide unilaterally to use it.

When these discrepancies are discovered, we suggest that Human Resources and EEO Offices coordinate on that matter, as the Human Resources office may need to reclassify the affected employees, using relevant OPM Position Classification Standards (PCS) that specify the "new" series relative to the "discontinued" series.

**31. Why does the Commission ask for data on the Occupational Categories (Tables A3-1, A3-2, B3-1 and B3-2), Participation Rates in General Schedule Grades (Tables A4-1, A4-2, B4-1 and B4-2) and Participation Rates in Wage Grades (Tables A5-1, A5-2, B5-1 and B5-2) to be displayed in two ways?**

These Tables display the data by either showing (1) participation rates, i.e. the percentage of a particular group participating in an occupational category or a grade or (2) distribution rates, i.e. the distribution of a particular group throughout all of the occupational categories or grades.

In order to show the percentage of a particular group participating in an occupational category or a grade, in Tables A/B 3-1, 4-1, and 5-1, the data is computed across the rows, with the sum of the row equaling 100%. Thus, these Tables show what percentage of all employees in that occupational category or grade is represented by a particular group.

For example, an agency's Table A4-1 reflects that the agency has 788 GS-13 employees, of which 18, or 2.3%, are Hispanic females. The Table also shows that the agency has 361 GS-14 employees, of which 3, or 0.8%, are Hispanic females.

The participation rate of a particular group in an occupational category or grade should be compared to that group's participation rate in the agency's total workforce. If the group's participation rate is not comparable to its participation rate in the total workforce, an agency should explore whether members of the group are encountering obstacles to full participation in an occupational category or grade.

In Tables A/B 3-2, 4-2 and 5-2, the data is computed **down** the columns, with the sum of the column equaling 100%. Thus, these Tables show the distribution of a particular group among the occupational categories or grades.

For the agency in the above example, its Table A4-2 reflects that the agency has 90 Hispanic female employees, of which 18, or 20% of all Hispanic female employees, are at the GS-13 level. The Table also shows that 3 of the Hispanic female employees, or 3.3% of all Hispanic female employees, are at the GS-14 level.

The distribution rate of a particular group should be compared to that group's participation rate in the agency's total workforce. If the group's distribution rate is not comparable to its participation rate in the total workforce, an agency should explore to what extent members of the group are clustered in a particular occupational category or grade and whether members of the group are encountering obstacles to participation in other occupational categories or in advancing to higher grades.

Thus, in the examples given above, the two Tables together suggest that the agency should explore whether there is any barrier or "glass ceiling" facing Hispanic females. In investigating the "triggers" reflected in these Tables, the agency will want to consider the data on Hispanic females presented in the remainder of the Tables. For example, the agency should explore the representation rates for Hispanic females employed in the agency's major occupations (Tables A4-1 and A4-2), data on the agency's new hires of Hispanic females (Table A8), data on the agency's selections for internal competitive promotions for major occupations (Table A9), the participation rate of Hispanic females in career development programs (Table A12), the participation rate of Hispanic females in awards (Table A13) and data on the separation rates for Hispanic females (Table A14). The agency may wish to gather more refined data; e.g. the agency may wish to explore whether Hispanic females at the GS-13 level are separating from the agency at rates higher than would be expected and/or gather data on the performance ratings of Hispanic females at the GS-13 level.

**32. My agency has pay bands. May I modify the Workforce Data Tables, particularly Tables A/B 4 and 5, to reflect pay bands instead of GS grades?**

In its MD-715 report, an agency may not provide the data required by Tables A/B 4 and 5 solely by modifying the Tables to use pay bands. Glass ceilings can occur within a pay band, and this method does not allow the agency to identify the specific pay level where a group may be experiencing barriers. In addition, government-wide data is reported by use of the GS grades, which remain the most common pay schedule. Agencies must use payroll data to break down these employees into the equivalent GS-grades for purposes of completing Tables A/B 4 and 5. We suggest that the agency's EEO office, in conjunction with its Human Resource office, determine the precise metrics for breaking down of the payroll data to ensure consistency throughout the agency. An agency may, of course, elect to perform additional analyses using pay band data.

**33. My agency has several different Wage Grade structures governing different employees and the actual pay for each grade level differs significantly from structure to structure. How do I fill out a single Workforce Data Table 5, as it will be difficult to reconcile the data from all the structures into one overall comparative Table?**

An agency may fill out more than one Workforce Data Table in this instance or similar instances where the result is the provision of more precise and useful information. The agency should indicate the basis for providing the additional tables.

**34. Workforce Data Tables A13 and B13 (Employee Recognition and Awards) require agencies to report on "Cash Awards - $100-$500" and Cash Awards - $501+." A large percentage of my agency's workforce received well over $500 in awards, with a substantial number receiving awards between $3,000 and $5,000, and others received over $5,000. May I modify these Workforce Data Tables to include additional levels of awards?**

Yes. This is another instance where the result is the provision of more precise and useful information.

**35. Whom should I contact for further information?**

For further information or questions on MD-715, please contact Gail S. Demers on (202) 663-4599 (voice) or (202) 663-4593 (TTY).

*This page was last modified on June 15, 2006.*

 Return to Home Page

# EXHIBIT 10

**United States General Accounting Office**

# GAO

## Report to Congressional Requesters

March 2001

# SENIOR EXECUTIVE SERVICE

# Diversity Increased in the Past Decade





GAO-01-377

According to EEOC, it advises agencies to first compare their workforces with established broad occupational categories, such as administrative, technical and clerical, within the CLF. Then, agencies are to compare specific significant occupations within their overall workforce with the same broad CLF occupational categories to identify areas of possible underrepresentation for further analysis. For professional occupations that require advanced degrees and/or licenses, such as engineers, doctors, or attorneys, EEOC advises agencies to compare each of the professional occupations in their agencies with the corresponding occupations in the CLF.

EEOC also said it advises agencies, in determining whether underrepresentation of minorities exists in the various levels of the workforce, to follow the guidance contained in the Department of Justice's February 29, 1996, memorandum on affirmative action in federal employment. Among other things, that memorandum gives examples of comparative labor forces that agencies can use to determine whether minority groups are underrepresented in particular jobs. For example, the memorandum states that an agency would determine whether minorities were underrepresented in its workforce by comparing minority representation in the job at issue to the relevant or qualified labor pool in the CLF, rather than to the national CLF. The memorandum also indicates that where the job at issue cannot be precisely matched to a job in the CLF, an agency should use the qualified labor force that most closely matches its qualifications for the job at issue. For example, the memorandum states that an agency would determine whether minorities were underrepresented in its SES workforce by comparing the number of minority GS-15 employees it employs, and others with similar qualifications, to the number of minority SES members it employs.

Comparisons with other labor forces are an important part of determining what further actions agencies need to take. However, even if women and minorities are not as well represented in the career SES when compared with other selected labor forces, this information alone would not be sufficient evidence to conclude that discrimination had occurred. In addition, it should not be concluded that affirmative employment efforts are no longer needed to further improve the representation of women and minorities in the career SES if the comparisons show they are as well or better represented in the SES as in other selected labor forces.

# EXHIBIT 11



# Special Emphasis Program

## OBJECTIVE:

*and who are the ?*

The overall goal of the Special Emphasis Program is to ensure that nationally recognized employee groups are employed at all levels, in all occupations, and are considered for all assignments that afford career development and advancement opportunities. This goal includes the following specific objectives:

Providing management with information and strategies for enhancing the advancement of special emphasis groups in order to bring about a more diverse and effective work force and to serve HUD's customers better.

Assisting the Department, through objective analysis of the existing employment situation, to achieve equal opportunity for in every personnel management policy and practice, including recruitment programs, training, selection, placement, counseling, career development and promotion.

Assuring that all managers and supervisors evaluate all employees by fair and equitable standards; eliminate barriers to advancement; and provide career opportunities commensurate with ability, potential, and commitment.

Promoting the equitable distribution of all employees, including persons with disabilities throughout professional, administrative, technical, clerical and other occupations, as well as advancement into managerial and supervisory positions.

## DUTIES AND FUNCTIONS:

As a result of the reorganization of the ODEEO, the role of the former Special Emphasis Program Managers has been transferred to the **EEO Program Managers** who will now be responsible for carrying out the following duties and functions, as well as advising their **EEO Officers** on these issues:

Assess employment trends to identify possible problem areas (e.g., statistical data on hires, promotions, internal movements, amount and types of training, EEO complaints filed and common concerns expressed by employees during counseling).

Review staffing patterns and position qualification requirements, and management staffing decisions in order to identify barriers to equality of opportunity.

Conduct self-assessments of organizational policies, procedures, and practices concerning employment decisions to identify their overall impact on the workforce (e.g., grade levels at which positions are filled, areas of consideration, factors and weights, paneling, interviewing and selection procedures).

Assist in designing and implementing career enhancement programs by examining the needs of all employees who are in "dead end" positions or who are at the top of their career ladder.

Participate in training sessions and meetings with managers and supervisors to inform them of EEO developments and refresh their basic EEO training.

Consult with the Office of Human Resources and ODEEO on initiatives regarding training and career development, Upward Mobility, Mentoring, and recruitment.

Maintain recruitment contacts and encourage the submission of job applications for announced vacancies, and actively participate in recruitment activities (e.g., career days, job fairs, Internet job advertisement).

Attend EEO/ADR and human resources training courses to remain abreast of changes in EEO and personnel practices.

---

Content current as of April 13, 2005

# EXHIBIT 12

# BUSINESS AND OPERATING PLAN

## Background

It is the policy and the intent of the Department to provide equality of opportunity in employment for all persons; to prohibit discrimination because of race, color, religion, sex, national origin, age, disability or sexual orientation in all aspects of its personnel policies, programs, practices, and operations and in all its working conditions and relationships with employees and applicants for employment; and to promote the full realization of equal opportunity in employment through continuing programs of affirmative employment at every management level within the Department **(HUD 24 CFR Part 7)** .

The Secretary delegated the Office of Departmental Equal Employment Opportunity (ODEEO) responsibility for planning, implementing, and managing the Department's Equal Employment Opportunity and Affirmative Employment (EEO/AE) activities surrounding the Department's work force in conformity with EEO statutes. ODEEO is charged with the preparation and monitoring of HUD's Affirmative Employment Program (AEP) and for providing guidance in the development and implementation of Program Offices' AEP Plans. ODEEO processes complaints of employment discrimination filed by HUD employees and applicants for employment under **Executive Order 11478, Title VII of the Civil Rights Act, the Age Discrimination in Employment Act**, as amended, the **Rehabilitation Act, the Equal Pay Act**, Equal Employment Opportunity Commission (EEOC) mandates, and Departmental regulations.

ODEEO's BOP, unlike most Program Offices, is specifically designed to focus, internally, at the HUD work force, its most valuable asset. Without capable and empowered human resources, the Department would be unable to meet its overall mission to promote adequate and affordable housing, economic opportunity, and suitable living environment. ODEEO's BOP goals and Action Plan directly support the Department's National Performance Goals, BOP Strategic Goal 6 (APP 5): Restoring Public Trust. It focuses on Equal Employment Opportunity, Affirmative Employment, and Work Force Diversity, including Valuing the HUD Employee, with the overall purpose of attaining and retaining a HUD work force that is empowered, capable, accountable for results and is reflective of the Nation's diversity.

This plan is unique because it proposes activities for ODEEO and Program Offices. Since Program Offices are the only entities which can make management decision and personnel actions which impact the diversity of the work force, they are the cornerstones to making HUD a model employer as envisioned by the President and the Secretary. It is imperative that each Program Office remain accountable for attaining and retaining a diverse and productive work place.

### Strategic Goal 6: Restoring Public Trust

Exhibit 17

11/08/2000 10:20 A

| | OUTCOME/GOAL | MEASURE | MEASURE TYPE | GOAL/TARGET |
|---|---|---|---|---|
| 6.1 | HUD's work force is reflective of the Nation's diversity in all occupations and at All grade levels | Percent increase in the employment of minorities and women | Outcome (quarterly) | Baseline/CLF |
| a. | Promote Equal Employment Opportunity and Affirmative Employment at all management levels | Reissue/issue EEO/AE policy guidance, Departmentwide | Outcome/Activity | Varied dates through 9/2000 (See Action Plan) |
| b. | Increase work force diversity by increasing the number of Hispanics, Departmentwide | Percent increase in the number of Hispanic employees | Outcome | 8 (2 each Quarter) |
| c. | Decrease in the number of of aged EEO discrimination complaints. | Number and percent reduction in the age EEO discrimination complaint inventory | Activity (quarterly) | 32 (8 each Quarter) |
| d. | Train HUD staff on Alternative Dispute Resolution (ADR) | Number and percent of managers, supervisors, and staff attending ADR training | Activity | 9000 by 9/2000 |

*(handwritten annotation: HUD is already there!)*

Note: Updated work force statistics are received and reported on a quarterly basis only.

# ACTION PLAN

**The following key actions outline ODEEO's Action Plan:**

11/08/2000 10:20 A

# EXHIBIT 13

## Robert

| | |
|---|---|
| **From:** | Grady, Mark (USAMA) [Mark.Grady@usdoj.gov] |
| **Sent:** | Wednesday, October 11, 2006 3:17 PM |
| **To:** | Robert Mantell |
| **Subject:** | RE: Supplemental response to requests for evaluations |

If the documents exist, I will certainly do so.  If they do not, I will so state by way of supplementary response.

---

**From:** Robert Mantell [mailto:rmantell@theemploymentlawyers.com]
**Sent:** Wednesday, October 11, 2006 3:16 PM
**To:** Grady, Mark (USAMA)
**Subject:** Supplemental response to requests for evaluations

Mark,

I am writing to further follow up on Mr. Patoski's document requests.

Mr. Patoski sought evaluations (EPPES) and awards of those who participated in his rejection(s).  He sought the evaluations for the period in which each actor took action that impacted Mr. Patoski.

While HUD provided many evaluations of these actors, it failed to provide the evaluations for the relevant time period within each FY requested.

Thus, Mr. Patoski seeks the evaluations of Mary Lou Crane, Jose Cintron, Anthony Brito, Marcella

Brown and Robert Paquin, covering their work during the period of October 1997 through April 1998.

Mr. Patoski seeks the evaluation of Cheryl Ann Teninga which covers the period of May 10 though June

30, 2000.

Mr. Patoski seeks the evaluations of Carmen Valenti, Debora Medvic, Jeffrey Lahmers Emmanuel

Yeow, and Maxine Saunders, for the period covering February 1, 2000 through June 30, 2000.

While HUD has provided an evaluation for Mirza Del Rosario coving the period of February 1, 2000 through September 30, 2000, it has not provided the EPPES evaluation for the period, and it should do so.

Will HUD supplement its document production and provide the evaluations covering the relevant time periods?

Robert S. Mantell
Rodgers, Powers & Schwartz LLP
18 Tremont Street
Suite 500
Boston, MA  02108
(617) 742-7010
fax (617) 742-7225
RMantell@TheEmploymentLawyers.com