UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| RICHARD S. PATOSKI, | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 05-11086 RCL |
| ALPHONSO JACKSON, SECRETARY, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) | |
| Defendant. | ) | |

## DEFENDANT'S RESPONSE TO THE PLAINTIFF'S MOTION TO COMPEL

### Introduction

The defendant, Alphonso Jackson, responds to the Motion to Compel as follows.

### Background

In fulfilment of its obligations under Title VII of the Civil Rights Act of 1964, the Equal Employment Opportunity Commission ("EEOC") promulgated Management Directive 714 ("MD 714") in 1987, which required each federal department and agency to prepare and submit to the EEOC an "affirmative employment plan" to be reviewed and approved by the EEOC. The directive required agencies to develop affirmative employment programs ("AEP") which hold senior management responsible for equal employment opportunity objectives and provides for the establishment of numerical "goals" where there is a "manifest imbalance" or "conspicuous absence" of minorities and women in the work force.[1]

The fundamental argument of the Plaintiff in this matter is that the collection and dissemination of workforce statistics, based upon race, to managers, in combination with

---

[1]In 2003, EEOC MD-714 was superceded by EEOC MD 715.  See, e.g., Worth v. Jackson, 451 F.3d 854, 856 (D.C. Cir. 2006) (finding, *inter alia*, that Plaintiff's claims with respect to the AEP Program were rendered moot by the adoption of MD 715 which eliminates the creation of any goals based upon the statistical analysis).

managerial performance standards based upon EEO considerations, leads managers to consider race (and/or gender) in making individual personnel decisions irrespective of whether taking race into account can be justified as a matter of law.

Plaintiff alleges that HUD's now superceded AEP violated the constitution - - and that HUD's present practices do so as well -- and seeks prospective injunctive relief. Plaintiff also brings claims pursuant to Title VII alleging that he was improperly denied two positions, one announced in 1998, and one announced in 2000, as result of the AEP.

## ARGUMENT

In the course of discovery in this matter, HUD has made a reasonable search of its records and has produced all non-privileged documents that are responsive to the Plaintiff's requests. To the extent documents have been withheld, declarations are submitted herewith for the purpose of establishing that the materials withheld are subject to claims of privilege and that specific requests are unduly burdensome. Moreover, where appropriate, declarations are submitted to establish that all responsive records that are in the possession, custody, and control of HUD have been produced.

Briefly, at issue in the Motion before this Court are four issues :

(1) Has HUD appropriately asserted privilege as to materials prepared by counsel in the course of prior litigation involving similar issues? (Requests 1, 2, 5, 8, 22, 24 and 33);

(2) Has HUD produced all records responsive to the Plaintiff's requests that are in its possession, custody or control?; (Requests 9, 10, 13, 15, 16, 19, 23, 26, 27-38 , 40, 42, 44, 45, 50 and 54)

(3) Has HUD properly objected to requests that are unduly burdensome with respect to personnel and payroll data held by the Department of Agriculture's National Finance Center?; (Request 39)

(4) Has HUD appropriately objected to requests for the performance evaluations of the head of HUD's Office of Departmental Equal Employment Opportunity ("ODEEO") on the ground that such materials cannot reasonably be construed as likely to lead to the discovery of admissible evidence? (Request 37).

For the reasons set forth below, the Motion to Compel should be denied.

## I.    HUD HAS PROPERLY ASSERTED PRIVILEGE AS TO DOCUMENTS WITHHELD

Several of Plaintiffs Requests, specifically, Requests Nos. 1, 2, 5, 8, 22, 24, and 33, seek materials that are protected by the attorney client privilege, work product doctrine, and deliberative process privilege.[2]   Indeed, several requests on their face request documents containing legal analysis.  In responding to these requests, HUD has asserted privilege as to the following materials.

1.    Correspondence between the General Counsel for HUD and the General Counsel of OPM with respect to the litigation in <u>Worth v. Jackson</u>, 02-CV-01576 (D.

---

[2]The above noted requests seek:

1.    All documents, studies, recommendations, reports and analyses relating to, or undertaken in response to, a memorandum from President Clinton, dated July 19, 1995, requiring that Heads of Executive Departments and Agencies undertake "an evaluation of programs you administer that use race or ethnicity in decision-making."

2.    All documents relating to any program changes or eliminations made as a result of any evaluations as described in document request 1.

5.    All documents, studies, recommendations, reports and analyses relating to whether HUD recruitment, hiring, training and/or promotion practices complied with the strict scrutiny standard enunciated as described in the document identified in document request 3.

8.    All documents, studies, recommendations, reports and analyses relating to whether HUD recruitment, hiring, training and/or promotion practices complied with the strict scrutiny standard enunciated in the decision of <u>Adarand Constructors, Inc. v. Pena</u>, 11 5 S. Ct. 2097 (1995).

22.    All documents, studies, recommendations, reports and analyses relating to whether the HUD Special Emphasis Program complied with Constitution-based Equal Protection scrutiny.

24.    All documents, studies, recommendations, reports and analyses relating to whether HUD's FEORP recruitment plans complied with Constitution-based Equal Protection scrutiny.

33.    All documents relating to whether HUD takes steps to maintain or increase minority or gender representation, even after under-representation has been cured in an applicable job category, from January 1, 1997 to the present.

3

D.C.),[3] dated December 13, 2002.  That letter, which includes four exhibits, memorializes an earlier  discussion between HUD General Counsel and OPM General Counsel regarding the <u>Worth</u> litigation and contains opinion of HUD General Counsel with respect to the HUD's legal position in that matter, a summary of the <u>Worth</u> litigation, a summary of the HUD AEP, a statement of Secretary Martinez (that statement has been released in discovery HUD 5963-5867), and two confidential memoranda prepared by the Civil Division of the Department of Justice for the White House from October and November 2002 which consist of legal analysis of the Plaintiff's claims in the <u>Worth</u> litigation in response to specific inquires posed by the Executive Office of the President. <u>See</u> Declaration of Carole Wilson, ¶¶ 6, 8.

2.    An internal memorandum prepared by Associate General Counsel Carole Wilson to the General Counsel of HUD with respect to her review of a memoranda prepared by the Civil Division of the Department of Justice analyzing the HUD AEP in the context of the Plaintiff's claims in the <u>Worth</u> litigation.  That memorandum contains legal analysis and mental impressions of counsel with respect to the memorandum and issues raised in the <u>Worth</u> litigation.  These materials are protected by the work product doctrine and attorney client privilege.  <u>Id</u>., ¶¶ 7-8.

3.    Memoranda, correspondence, e mails and other documents created by, David Reizes, counsel for HUD in the <u>Worth</u> litigation that are responsive to the above noted requests.  These materials were generated by, or at the direction of counsel, in the context of the <u>Worth</u> litigation and are protected by the work product doctrine and attorney client privilege.  <u>See</u> Declaration of David Reizes, ¶¶ 2-4.

---

[3]In <u>Worth</u>, the Plaintiff made similar claims, i.e., that HUD's AEP discriminated against white males.

HUD has no other documents responsive to the above noted requests numbers 1, 2, 5, 8, 22 and 24 that have not been produced.[4]

The materials as to which privilege has been asserted were created in prior litigation against HUD on the very issues raised in this matter.  See Worth v. Jackson, 451 F.3d 854, 856 (D.C. Cir. 2006).  In Worth, the Plaintiff alleged, as does the Plaintiff in this matter, that HUD's AEP program constituted unconstitutional affirmative action.   The above noted documents consist of legal analysis and opinion offered by counsel to their clients with respect to pending litigation, specifically, the matter of Worth v. Jackson.

The attorney-client privilege protects absolutely confidential communications between client and attorney.  In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 22 (1st Cir. 2003) (" By safeguarding communications between client and lawyer, the privilege encourages full and free discussion, better enabling the client to conform his conduct to the dictates of the law and to present legitimate claims and defenses if litigation ensues"); see also, Upjohn Co. v. U.S., 449 U.S. 383, 389 (1981).  HUD's Office of General Counsel is, indisputably, in an attorney-client relationship with HUD and, similarly, the Department of Justice is in an attorney-client relationship with both HUD and the Executive Office of the President.   Communications between counsel and their client with respect to ongoing litigation unquestionably fall within the attorney-client privilege.  See, e.g., United States v. Massachusetts Institute of Technology, 129 F.3d 681, 684 (1st Cir. 1997); United States

---

[4]Request 2 seeks materials reflecting program changes made in response to documents produced in response to the Executive Order identified in request number 1.  There are no such documents.  Request 3 sought a copy of a 1996 memorandum prepared by the Department of Justice Civil Division for the heads of all Executive Agencies.  The Defendant has conceded that any privilege as to that document has been waived and that request is, by agreement, no longer the subject of this motion.  Request 4 seeks documents reflecting the distribution of the memorandum identified in Request number 3.  HUD has no such documents.  Consequently, a motion to compel is as to those requests is unwarranted.

v. Mass. Inst. of Tech., 129 F.3d 681, 684 (1st Cir.1997) .  Consequently, these documents are protected from disclosure by the attorney-client privilege.

Further, the memoranda in question were prepared by the Executive Office of the President and  HUD in the context of specific litigation.  The attorney work product doctrine, which is codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure, allows the client and the attorney to put into writing legal analyses, tactics, and other material free of the chilling prospect that these documents would be freely accessible to others.  Hickman v. Taylor, 329 U.S. 495, 511 (1947).[5]  Legal memoranda prepared in the context of specific litigation against HUD are unquestionably protected by the work product doctrine.

To the extent that the Plaintiff seeks production of these materials, the Motion to Compel should be denied as privileges have been properly asserted as to these materials and Plaintiff has made no showing warranting overriding the privileges.  See, e.g, Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 225 (1st Cir. 2005) (Upon prima facie evidence that the privilege applies "[t]he party challenging the privilege carries the burden of establishing that any communications are discoverable.").

## III.    HUD HAS PRODUCED ALL MATERIALS IN ITS POSSESSION CUSTODY OR CONTROL

### A.    Requests Nos. 9, 10 and 23

In Requests No. 9, 10 and 23, Plaintiff has sought copies of AEP and FEORP (Federal Equal Opportunity Recruitment Program) reports of HUD from 1997 to the present.  Because HUD has produced all materials responsive to these requests in its possession, custody or control, the motion to compel should be denied.  In response to these requests, Keith Gaiter, who is employed as an Equal Opportunity Specialist at HUD's ODEEO (the keeper of records for HUD of such materials), and who is familiar with the record keeping systems of HUD ODEEO,

---

[5]The attorney work-product doctrine is applicable to the Government.  NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 154 (1975).

conducted a search of the records for materials responsive to this request.  The search in question

was reasonably calculated to uncover all responsive materials in the possession, custody or

control of HUD.  See Declaration of Keith Gaiter ("Gaiter Declaration"), ¶¶ 1-17.

All materials located as a result of this search have been forwarded to the Plaintiff.

Specifically, HUD has produced all Department wide AEP Reports prepared pursuant to MD

714 and both the 2004 and 2005 Reports prepared in accord with EEOC MD 715[6] and HUD has

produced all AEP reports of its sub elements and all FEORP reports that exist in its records.[7][8]

---

[6]The page numbers listed are in reference to the Defendant's bate stamped production of records.  HUD FY 1997 AEP Report, p. 3859-3961; HUD FY 1998 AEP Report, p. 3962-4070; HUD FY 1999 AEP Report, p. 4071-4180; HUD FY 2000 AEP Report, p. 4181-4286; HUD FY 2001 AEP Report, p. 4287-4389; HUD FY 2002 AEP Report, p. 4390-4497; HUD FY 2003 AEP Report, p. 4498-4600; HUD FY 2004 Management Directive Form 715, Affirmative Programs of EEO Report, p. 4601-4708; and HUD FY 2005 Management Directive Form 715, Affirmative Programs of EEO Report, p. 6131-6243.

Prior to the filing of the Motion to Compel, HUD had asserted the deliberative process privilege as to a draft of the 2005 MD-715 Report to EEOC.  Since the filing of the motion, the final version of the report has been issued and copy provided to the Plaintiff.  That Request (12) is no longer in dispute.

[7] HUD Office of Field Policy and Management FY 1999 and 2000 AEP Report, p. 1827-1880, and 1881-1921; HUD Real Estate Assessment Center FY 1999, 2000, 2001 AEP Report, p. 1922-1938, 1939-1951, and 1952-1964; HUD Office of Congressional and Intergovernmental Relations FY 1997, 1998, 1999 AEP Report, p. 1965-1988; 1989-2012 and 2013-2036; HUD Office of the Chief Procurement Officer FY 1999 and 2000 AEP Report, p. 2037-2050 and 2051-2062; HUD Office of Community Planning and Development FY 2000 and 2001 AEP Report, p. 2063-2109 and 5605-5659; HUD Office of the Chief Financial Officer FY 1997, 1998, 2000-2003 AEP Report, p. 2110-2199, 2200-2313, 2314-2357, 2358-2399, 2400-2435 and 2436-2470; HUD Office of the Assistant Secretary for Public and Indian Housing FY 1997-2002 AEP Report, p. 2471-2501, 2502-2530, 2531-2561, 2562-2594, 2595-2660 and 2661-2694; HUD Departmental Enforcement Center FY 1999, 2001 AEP Report, p. 2695-2731 and 2732-2798; HUD Office of Lead Hazard Control FY 1997 AEP Report, p. 2799-2810; HUD Office of General Counsel 1999, 2000 AEP Report, p. 2811-2857 and 2858-2900;  HUD Office of Inspector General FY 1997, 1998, 1999, 2000 and 2003 AEP Report, p. 2901-2930, 2931-2976, 2977-3024, 3025-3070 and 3071-3108; HUD Office of Administration FY 1997, 1999, 2000 AEP Report, 3109-3151, 3152-3191 and 3192-3229; HUD Office of the Assistant Secretary for Administration 2001 and 2002 AEP Report, p. 3230-3276 and 3277-3327; HUD Government National Mortgage Association FY 1997, 1998, 2000, 2001, 2002 AEP Report, p. 3328-3397, 3398-3456, 3457-3518, 3519-3580 and 3581-3653; HUD Office of Fair Housing and Equal

To the extent that records have not been produced, those records either never existed, or do not presently exist in the files of HUD ODEEO.  See Declaration of Keith Gaiter, ¶¶1-17.

The Federal Rules of Civil Procedure require production of documents "which are in the possession, custody or control of the party upon whom the request is served."  Fed. R. Civ. P. 34(a).  As the documents sought are not in the possession, custody or control of HUD, nor is HUD aware of any other location where the files may be kept, the request for an Order compelling further production in Response to these requests must be denied.

**B.    Request Number 13**

In request number 13, Plaintiff sought any and all documents related to the role of AEP managers in hiring and in the selection process for one of the positions for which Plaintiff was not selected.  HUD has provided all documents as it could locate concerning the role of AEP Managers, specifically materials related to the training of AEP managers.[9]  There are no other such documents in the records of HUD.  See Declaration of Linda Hawkins ("Hawkins Declaration"), ¶ 42.

---

Opportunity FY 1997-1999 AEP Report, p. 3654-3734, 3735-3783 and 3784-3858.

[8]FEORP Accomplishment Report 2002, p. 360-378; FEORP Plan Certification 2003, p. 379-384; Cover Sheets, Departmentwide FY 1997 Plan Certification, p. 4828-4829; FEORP Departmentwide FY 1996 Accomplishment Report, p. 4830-4857; FEORP Departmentwide FY 1998 Accomplishment Report, FY 1999 Plan Certification and Program Plan, p. 4858-4891; FEORP Departmentwide FY 1999 Accomplishment Report, FY 2000 Plan Certification and Recruitment Plan Update, p. 4892-4921; FEORP Departmentwide FY 2001 Accomplishment Report, p. 4922-4953; and FEORP Departmentwide FY 2002 Accomplishment Report, FY 2002 Hispanic Employment Analysis and Initiatives, FY 2003 Plan Certification and Recruitment Plan, p. 4986-5020.
Request number 24, which seeks legal analyses of the FEORP Program is addressed supra, in Section I.

[9]ODEEO, Affirmative Employment Division, Affirmative Employment Program Managers and Discrimination Complaint Managers Briefing February 3, 2005, p. 5021-5120.

**C.**      **Request Numbers 15 and 16**

In Requests 15 and 16, Plaintiff sought all data used to compare HUD's workforce to the 2000 and 1990 census data. HUD compared its workforce to the census data for the purpose of preparing its AEP Reports and now compares its workforce to the census data in preparing its MD 715 Reports. HUD does not maintain any of the data used to prepare the AEP and MD 715 Reports (but for the data contained in the Reports themselves). See Gaiter Declaration, ¶¶ 19-27.

The "data" that underlies the AEP and MD 715 Reports comes from the National Finance Center ("NFC"). In order to prepare those Reports, HUD's Office of Human resources ("OHR") will arrange for NFC to provide the data for a specified year to HUD. To utilize this data in preparing its AEP Reports, HUD retains contractors to take the information provided by the NFC and create a searchable database. The EEOMAS and EEOTRAK databases referred to by the Plaintiff are examples of such databases. By nature of the contracts involved, however, HUD has access to the database for only a finite period and does not have any proprietary interest in the database when the contract expires. See Gaiter Declaration, ¶¶ 19-27.

**D.**      **Request No. 19.**

In request number 19, Plaintiff sought production of materials related to the "Special Emphasis Program" of HUD. The purpose of the Special Emphasis Program is to educate HUD's workforce on the heritage of others. In response to this Request, HUD has provided the Special Emphasis Program outline which sets out the means by which anyone could seek to hold a Special Emphasis event. (HUD 5813-5835). There are no other documents responsive to this request. See Gaiter Declaration, ¶¶ 28-32.[10]

**E.**      **Request No. 26**

In request number 26, Plaintiff sought documents reflecting HUD's strategies for increasing diversity in the workforce. Aside from the materials produced in response to other

---

[10]Request No. 22, seeking legal analyses with respect to the "Special Emphasis Program" is addressed supra, in Section I.

requests, HUD has located no other documents responsive to this request.  See Hawkins

Declaration, ¶¶ 41-42.

**F.      Requests Numbers 27-31**

In requests numbers 27-31, Plaintiff sought various personnel records from 1998 and

2000 for individuals whom Plaintiff alleges were involved in his non-selections.  Plaintiff

complains that the records produced are not specifically responsive in that they do not cover the

specific periods requested.  Beyond what has been produced in discovery in this matter or in the

administrative process before the EEOC, however, HUD does not possess any additional records

sought by this request.  See Declaration of Yvonne Matthews, ¶¶ 1-9.

**G.      Request No. 32**

In request No. 32, Plaintiff sought copies of the "Business Operating Plan" of ODEEO.

In 1998 and 2000, ODEEO was not a separate component of HUD.  At that time, ODEEO was a

part of the Department of Fair Housing and Equal Opportunity.  It was not until 2001 or 2002

that ODEEO was created as a separate HUD component under the Secretary.  Keith Gaiter of

HUD's ODEEO has reviewed the document that the Plaintiff has attached as Exhibit 11 to his

Motion, neither he, nor any other ODEEO employee recognizes the document.  See Gaiter

Declaration, ¶¶ 34-35.

**H.      Request No. 33**

In request number 33, Plaintiff sought documents related to whether HUD takes steps to

increase gender representation under the AEP even after under representation has been cured.

The instant allegation was also made by the Plaintiff in the Worth litigation and the privileged

materials, discussed in Section I, supra, are responsive.   Beyond these materials and the

directives of the EEOC as set out in MD 714 and 715, there are no additional documents

responsive to this request.

**I.    Request Numbers 34, 35 and 38**

In requests 34, 35  and 38, Plaintiff sought to obtain records relative to "applicant flow data."   By way of background, the EEOC in 1981 directed Federal agencies to begin to collect and maintain data on applicants to track the flow of applicants ("flow data").  Flow data, which could include race and/or gender was provided by applicants on a separate, optional form filled out when submitting an application.  Upon receipt, the form is removed from the application. HUD does not presently store any flow data, nor has it done so for several years.  To the extent that such data exists (at all) in the records of HUD, the information will be contained in the data retrieved from the Merit Staffing Control System, which the defendant will produce in Response to Request No. 38.  See Hawkins Declaration, ¶¶ 8-9.  There is no other database at HUD to collect such information.  Id., ¶¶ 8-9 and 17-23.

With respect to claims raised in request 35 with respect to the use of applicant flow data to "cancel" vacancy announcements, there is no reasonable way for HUD to identify and compile responsive documents.  See Hawkins Declaration, ¶¶ 24-37.[11]

**J.    Request Number 36**

In request number 36, Plaintiff sought all "quarterly data submissions" by HUD made to OPM.  HUD has provided all such materials.  See Hawkins Declaration, ¶ 7.

**K.    Request No. 38**

In request number 38, Plaintiff sought all data contained in the "Merit Staffing Control System" maintained by HUD.  HUD has compiled the data in question and has forwarded it to undersigned counsel by overnight mail today.  See Hawkins Declaration, ¶¶ 8-9.  It will be forwarded to Plaintiff by undersigned counsel upon receipt.

---

[11]Briefly, Plaintiff appears to contend that HUD utilizes its collection of "flow data" to "screen" applicants for vacancy announcements to insure that every vacancy announcement garners adequate minority or female applicants.  See Plaintiff's Motion to Compel, p. 18-19.  . Putting aside that HUD simply does not track "flow data" beyond collecting the form required by the EEOC, the Management Officials who control whether a vacancy announcement is cancelled have no access whatsoever to the information.  See Hawkins Declaration, ¶ 24-26.

**L.    Request Numbers 40 and 42**

In requests numbers 40 and 42, Plaintiff sought all data contained in a database (EEOMAS) that is no longer used by HUD, and which has not been used by HUD since 2003. <u>See</u> Gaiter Declaration, ¶ 24-27.  It is not possible to comply with this request because HUD has no access to the database and has not had access since 2003.  <u>See</u> Gaiter Declaration, ¶ 24-27.

**M.    Request Number 44 and 45**

In requests numbers 44 and 45, Plaintiff sought records with respect to the Emerging Leaders Program.  HUD has produced all such records that exist in its regularly maintained records, including a list of current participants.[12]  To the extent that Defendant has asserted privilege, undersigned counsel has been informed that some archived e-mail communications between counsel for HUD and the DOJ attorneys handling the <u>Worth</u> litigation may have mentioned the Emerging Leaders Program in the context of assessing claims made by the plaintiff in the <u>Worth</u> litigation.  The  assertion of privilege with respect to the legal analysis and communications of HUD's counsel in the <u>Worth</u> matter is addressed <u>supra</u>, in Section I.  There are no other documents withheld.

**N.    Request Number 50**

In request number 50, Plaintiff sought:

> For each time in which HUD has concluded that there exists a Manifest Imbalance and/or Conspicuous Absence, from January 1, 1997 to the present, for any racial or ethnic group, or any gender, provide all data, reports, studies, calculations and other documents relied upon in reaching the Manifest Imbalance and Conspicuous Absence conclusions.

---

[12]Emerging Leaders Brochure, February 2004, p. 6076-6081; Emerging Leaders Program Announcement, February 2004, p. 6082-6088; Emerging Leaders Program Rating Criteria, p. 6089-6094; Emerging Leaders Program Guidelines for Reviewing Applications, p. 6095-6096; Emerging Leaders Program Application Evaluation Plan, p. 6097-6099; Emerging Leaders Program FY 2005, p. 6100-6105; Emerging Leaders Program Guidelines for Reviewing Applications 2005-2006, p. 6106-6108; Emerging Leaders Program Application Evaluation and Final Selection Plan 2005-2006, p. 6109-6110; and Emerging Leaders Program Participants 2005-2006, p. 6111; Emerging Leaders Program FAQ, p. 6112-6113.

Request No. 50.

Plaintiff now contends that HUD has improperly limited the scope of this request. In responding, Defendant indicated that the AEP Reports mandated by MD 714 were responsive to this request, as the terms "manifest imbalance" and "conspicuous absence" were defined by MD 714. The Plaintiff seeks an order compelling production of any calculations "using the same terms."[13] There are no additional records being withheld and an Order to produce such is unwarranted.

**O.    Request Number 54**

In request number 54, Plaintiff sought documents related to HUD's "Accelerated Promotion Policy." There are no documents responsive to this request. See Hawkins Declaration, ¶¶ 15-16; Gaiter Declaration, ¶ 33.

**III.    HUD HAS PROPERLY OBJECTED TO PLAINTIFF'S REQUEST FOR ALL DATA CONTAINED IN THE HUD PAYROLL DATABASE FROM 1997 TO THE PRESENT AS BEING UNDULY BURDENSOME**

**A.    Request Number 39**

In request number 39, Plaintiff sought all data contained in HUD's entire payroll database from 1997 to the present. The Defendant has objected on the ground that this request is unduly burdensome. For the reasons set forth below, a motion to compel the production of these materials should be denied.

As an initial matter, the records in question are maintained by the National Finance Center, a component of the Department of Agriculture not HUD. Thus, the records are not in the

---

[13] As briefly outlined in the introduction to this Response, prior to 2003, HUD, like all other federal agencies, was required to prepare a report in accord with Management Directive 714 of the Equal Opportunity Employment Commission. MD 714 required federal agencies to determine, *inter alia*, whether the agencies' workforce in various categories evidenced any "manifest imbalance" or "conspicuous absence." The Plaintiff has, apparently, attributed some nefarious motive to the defendant's reference to MD 714 in his response. There was, however, no illicit purpose for the statement, it was merely explanatory.

possession, custody or control of HUD and HUD cannot be compelled to produce such materials under the Federal Rules of Civil Procedure.  See Fed. R. Civ. P. 34.

Assuming, *arguendo*, that such records are deemed to be within the possession, custody or control of HUD, production of the data requested is unduly burdensome.  See e.g., Cognex Corp. v. Electro Scientific Industries, Inc., 2002 WL 32309413, *3 (D. Mass. 2002).  As described in the Declaration of Linda Hawkins, production of all data in the National Finance Center database for HUD from 1997 to the present would take a minimum of 4-6 months (likely substantially longer) and would cost, conservatively, in excess of one million dollars.  See Hawkins Declaration, ¶¶ 10-14.  Indeed, it would cost tens of thousands of dollars and take several months for the National Finance Center to simply determine whether it is even possible to retrieve the information requested by the Plaintiff.  See Hawkins Declaration, ¶¶ 10-14.

## IV.    HUD APPROPRIATELY OBJECTED TO REQUESTS THAT ARE NOT LIKELY TO LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE

### A.    Request 37

In request 37, the Plaintiff sought the performance evaluations of the HUD ODEEO director from 1997 to the present.  HUD ODEEO plays no role in hiring decisions.  See Gaiter Declaration, ¶ 3.  The performance evaluations of the ODEEO director, who played no part whatsoever in any non-selection of this plaintiff for any position simply are not relevant to this action nor can they reasonably be construed as likely to lead to discoverable evidence.  HUD requests that the motion to compel production of these records be denied.

14

## **CONCLUSION**

For the reasons stated herein, HUD requests that the Motion to Compel be denied.

Respectfully submitted,
MICHAEL J. SULLIVAN
United States Attorney

/s/ Mark J. Grady
MARK J. GRADY
Assistant U.S. Attorney
U.S. Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA   02210
Tel. No. (617) 748-3136

Certificate of Service

Review of the docket reflects that this response will be served electronically.

/s/ Mark J. Grady
MARK J. GRADY

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RICHARD S. PATOSKI,                           )
                        Plaintiff,          )
                                           )
v.                                            )    C.A. #05-11086-RCL
                                         )
ALPHONSO JACKSON, SECRETARY,                  )
DEPARTMENT OF HOUSING AND                     )
URBAN DEVELOPMENT,                            )
                        Defendant          )

## DECLARATION OF CAROLE WILSON

      I, CAROLE WILSON declare as follows:

1. My name is Carole Wilson and I am employed by the Department of Housing and
Urban Development as an attorney in the Office of General Counsel as the Senior Counsel
for Secretarial Appeals and Counselor to the Office of Departmental Equal Employment
Opportunity.

2. I have held this position since August 2005.

3. Prior to holding this position I was Associate General Counsel for Litigation in
the Department of Housing of Urban Development in the Office of General Counsel
from October 1995 to August 2005.

4. I am familiar with the recordkeeping system of HUD's Office of General Counsel
and, in response to the Plaintiff's request for production of documents in this matter,
I conducted a search of HUD OGC records.

5. I located two documents responsive to the Plaintiff's request in this matter in the
files of the HUD Office of General Counsel.

6. The first document is correspondence between the General Counsel for HUD and
the General Counsel of the Office of Personnel Management with respect to the claims
pressed in the matter of Worth v. Jackson, 02-CV-01576 (D. D.C.), dated December 13,
2002, In Worth, the Plaintiff made similar claims, i.e., that HUD's Affirmative
Employment Plan (AEP) discriminated  against white males.  That letter, which
includes four exhibits, memorializes a discussion between the HUD General Counsel
and the OPM General Counsel regarding the Worth litigation and contains the opinion
of the HUD General Counsel with respect to the HUD AEP.  The exhibits to that letter
include a summary of the Worth litigation, a brief description of the HUD AEP Program,

and an April 2, 2001, statement by Secretary Mel Martinez. (The third exhibit has been released in discovery). A fourth exhibit contains memoranda prepared by the Department of Justice Civil Division for the White House with respect to the <u>Worth</u> litigation.

7. The second document is an internal memorandum prepared by myself in my official capacity as Associate General Counsel for Litigation. I prepared that memorandum based upon my legal analysis and impressions of a memorandum prepared by the Department of Justice for the White House with respect to the <u>Worth</u> litigation. My memorandum consists of legal analysis of the Department of Justice's review and the merits of the claims pressed in the matter of <u>*Worth v. Jackson*</u>.

8. The above noted materials were prepared by counsel for HUD with respect to pending litigation and constitute attorney client privileged materials and attorney work product and reflect legal analysis and/or mental impressions of counsel for HUD in the <u>Worth</u> matter.

Executed on October 23, 2006.

Carole Wilson

**Carole Wilson**

RICHARD S. PATOSKI,

    Plaintiff,

v.

ALPHONSO JACKSON, SECRETARY,
DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT,

    Defendant

C.A. #05-11086-RCL

## DECLARATION OF DAVID M. REIZES

I, **David M. Reizes**, do declare as follows:

1. I am a Trial Attorney in the Office of General Counsel, Office of Litigation of the United States Department of Housing and Urban Development ("HUD"). I have held this position since December 3, 2001.

2. In August of 2002, I was the attorney in my office assigned to handle the case now known as Worth v. Jackson, et al., Civil Action No., 02-1576 (D. D. C.). The Plaintiff in that case asserted in his Complaint, *inter alia*, that HUD unlawfully discriminated against white males in violation of Title VII of Civil Rights Act 1964 and the Fifth Amendment of the United States Constitution due to the yearly renewal of its Affirmative Employment Plan ("AEP") drafted pursuant to Equal Employment Opportunity Commission Management Directive MD-715 and various other employment practices.

3. To the extent that there are communications, memoranda, notes, records or documents (collectively referred to as "documents") in the Worth case file that memorialize or record legal and factual analysis that attorneys at HUD or the

Department of Justice drafted, commented on, and/or exchanged regarding assertions made in Mr. Worth's Complaint, or legal issues or consequences for the Department arising out of his Complaint, these documents are either covered by the attorney-client privilege in that they contain information that would reveal the nature or substance of attorney client-communications, or these documents fall within the attorney work product exception under F. R. C. P. 26(b)(3) in that they contain mental impressions, conclusions, or legal theories.

4. To the best of my knowledge, the documents in the case file that are not covered by attorney-client privilege and/or attorney work product that are otherwise responsive to Mr. Patoski's discovery requests are ministerial in nature in that the documents do not communicate any information reasonably calculated to lead to the discovery of admissible evidence, but rather set forth information or direction to program offices on discovery compliance, appointments, or other similar administrative communications.

5. In order to help comply with discovery requests in Patoski v. Jackson, I helped facilitate access for Assistant United States Attorney Mark Grady to all of the discoverable documents that HUD produced on the AEP and HUD employment programs and practices as part of the Worth litigation.

2 & 3
and

2

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information and belief.

Dated: November 2 , 2006

David M. Reizes
Washington, DC

3 of 3
one

3

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD S. PATOSKI, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. #05-11086-RCL |
| | ) |
| ALPHONSO JACKSON, SECRETARY, | ) |
| DEPARTMENT OF HOUSING AND | ) |
| URBAN DEVELOPMENT, | ) |
| Defendant | ) |

## DECLARATION OF KEITH GAITER

1.  My name is Keith Gaiter and I am employed as a Equal Employment Specialist by the Department of Housing and Urban Development in its Office of Departmental Equal Employment Opportunity (ODEEO).

2.  I have been employed in this position since February 25, 2002.

3.  HUD ODEEO is the agency component vested with responsibility for monitoring HUD workforce data to determine whether HUD hiring practices are in compliance with government-wide EEOC requirements. ODEEO plays no role whatsoever in individual hiring decisions of HUD.

4.  Since my arrival in FY 2002, I have served as an advisor to all heritage committees covering special emphasis (es) programs at HUD Headquarters, prepared workforce profiles to comply with EEO Investigations, Freedom of Information inquiries or congressional inquiries, I have participated in the development and presentation of training modules and materials on equal employment opportunity and affirmative programs of EEO activities, I have developed and prepared drafts of the Management Directive 715 for submission to the Equal Employment Opportunity Commission, I have served as the Disability Program Coordinator, and I have represented the office of equal employment office as chairperson of the reasonable accommodation committee (RAC).

5.  I am familiar with the recordkeeping systems of HUD ODEEO.

6.  ODEEO is the component of HUD that was responsible for compiling and preparing the AEP Reports under EEOC MD 714. The agency no longer prepares the AEP Reports under the MD 714 as MD-715 superceded MD 714 in FY 2003.

7. ODEEO is now responsible for compiling and preparing the MD 715 Reports to EEOC on behalf of HUD.

8. ODEEO is the component of HUD that was responsible for compiling and preparing the FEORP Reports. The agency no longer prepares the FEORP Reports and has not done so since MD-715 superceded MD 714 in FY 2003.

9. I conducted a search of HUD ODEEO records for the purpose of locating records responsive to the plaintiff's documents requests. All responsive materials located have been produced.

10. With regard to the other specific allegations of the motion to compel, I state the following:

11. I am familiar with the record keeping systems of HUD ODEEO and in response to the Discovery requests in this matter, I conducted a search of ODEEO records for copies of HUD's past AEP and FEORP reports and Past AEP Reports of HUD's subcomponents in response to the following requests:

> All of HUD's Affirmative Employment Program Plans (AEP), Affirmative Employment Program Accomplishment Reports and Affirmative Employment Program Plan Updates from Fiscal Year 1997 through the present.

> All Affirmative Employment Program Plans (AEP), Affirmative Employment Program Accomplishment Reports and Affirmative Employment Program Plan Updates from Fiscal Year 1997 through the present prepared by sub-elements of NTD.

> All of HUD's FEORP recruitment plans and reports from January 1, 1997 to the present.

> All documents, studies, recommendations, reports and analyses relating to whether HUD's FEORP recruitment plans complied with Constitution-based Equal Protection scrutiny.

12. ODEEO is the keeper of records of HUD for the AEP reports, AEP Reports prepared by its sub-components, and FEORP Reports.

13. There is no computerized database of ODEEO Records. All records were maintained in file cabinets. Only hardcopies exist.

14. All materials responsive to the requests noted above that were located in ODEEO's files have been provided to the attorney representing HUD in this matter.

15. There are not, as Plaintiff's Motion alleges, separate AEP and AEP Accomplishment Reports. Accomplishment reports described activities within a given program office for that year and are part of the actual AEP report

16. The reports that the Plaintiff contends have been withheld were not found in the records of ODEEO.

17. I am unaware of any location that I have not searched where such materials may be kept in the files of HUD.

18. I also undertook to search the files of ODEEO in Response to other specific requests. ODEEO has no records responsive to Requests 1, 2, 3, 5, 6, 7, and 8.

19. HUD used the 1990 census data to prepare its AEP Reports until 2000 Census data was available.

20. The data used for comparison of HUD's workforce to the 1990 census data in preparing the department's AEP Reports came from the personnel payroll database at the Department of Agriculture National Finance Center (NFC).

21. HUD does not maintain the data used to prepare the AEP reports. Thus, there are no documents reflecting the data requested in Request 15, but for the AEP Reports themselves, which have been produced.

22. The 2000 census data was used by HUD in preparing its 2004 and 2005 MD 715 report.

23. HUD does not maintain the data used to prepare the MD 715 reports. Thus, there are no documents reflecting the data requested in Request 16, but for the AEP Reports themselves, which have been produced.

24. In order to prepare those Reports, HUD's OHR will arrange for NFC to provide the data for a specified year to HUD.

25. To utilize this data in preparing its AEP Reports, HUD retains contractors to take the information provided by the NFC and create a searchable database. The EEOMAS and EEOTRAK databases are examples of such databases.

26. By nature of the contracts involved, however, HUD has access to the database for only a finite period and does not have any proprietary interest in the database when the contract expires.

27. Thus, for example, information contained in the EEOMAS database, which HUD ceased using in 2003, is simply not available to HUD.

28. The purpose of the Special Emphasis Program is to educate the HUD's workforce on Heritage of others.

29. Asian Americans, Native Americans, African Americans and Hispanic Americans are federal recognized Heritage groups, although there is no impediment to any group seeking to hold special emphasis events.

30. The primary purpose is to promote awareness and appreciation of diverse heritages and the contributions those groups bring to the workplace.

31. The Special Emphasis Program Outline Provided lists how anyone could seek to hold a special emphasis event.

32. There are no other documents for the Special Emphasis Program responsive to the request.

33. HUD ODEEO has no documents with respect to any "Accelerated Promotion Policy."

34. With respect to the 1998 and 2000 "Business Plans," of ODEEO, I have reviewed the document Plaintiff attached to the Motion to Compel. Neither I, nor anyone at HUD ODEEO recognizes the document.

35. In 1998 and 2000, ODEEO was not a separate component of HUD. At that time, ODEEO was a part of the Department of Fair Housing and Equal Opportunity. It was not until 2001 or 2002 that ODEEO was created as a separate HUD component under the Secretary.

I swear the foregoing is true under the pains and penalties of perjury this 7th day of November 2006.

Keith Gaiter

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RICHARD S. PATOSKI,
                                    Plaintiff,

v.                                                          C.A. #05-11086-RCL

ALPHONSO JACKSON, SECRETARY,
DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT,
                                    Defendant

## DECLARATION OF LINDA HAWKINS

1.  My name is Linda K. Hawkins and I am employed as a Human Resources
    Specialist in the Department of Housing and Urban Development. I work in
    the Policy Research and Development Division in the Office of Human
    Resources.

2.  I have worked in Human Resources for the Federal service since 1979 and
    specifically in this position since approximately January 1995.

3.  The OHR oversees HUD's Human Resources program in Headquarters and in
    the field. The OHR is responsible for all aspects of Human Resources,
    including, but not limited to developing and classifying positions; recruiting
    and advertising vacant positions, labor and employee relations, etc. The
    Policy Research and Development Division within the OHR is responsible for
    a developing policy and guidance to be used nationwide on a vast number of
    human resources procedures in accordance with Federal laws and regulations.
    This division also provides guidance, assistance, interpretation and/or
    determinations on courses of action in technically complex or unusual matters.

4.  In the course of my work for HUD, I am familiar with OHR's rules,
    regulations, policies, procedures, standard operating practices, recordkeeping,
    HR programs, relating to staffing, classification, and pay.

5.  With respect to the instant litigation, I was asked to coordinate with
    appropriate offices and compile documents responsive to the Plaintiff's
    request for production of documents in this matter.

6.    A description of the search conducted, documents located and HUD's
      response with respect to specific requests identified in the Plaintiff's motion to
      compel is as follows.

### Request No. 36

All quarterly data submissions regarding HUD's staffing submitted to OPM, from
January 1, 1997 to the present.

> In response to this request I retrieved the following quarterly data submissions
> from the records of HUD.
>
> 1.    Fourth Quarter 2005, p. 6114-6117;
> 2.    First Quarter 2006, p. 6118-6125; and
> 3.    Second Quarter 2006, p. 6126-6130.

7.    There are no other records responsive to this request.

### Request No. 38

All data in the Merit Staffing Control System, entered or present on the System
from January 1, 1997 to the present.

8.    In response to this request, I contacted the consultant that maintains the
      database of this information for HUD.  A program was developed to
      accommodate this request.

9.    The information was compiled and forwarded to the Assistant United States
      Attorney on November 7, 2006, by overnight mail.

### Request No. 39

All data in the personnel payroll database, entered or present on the database from
January 1, 1997 to the present.

10.   The Department of Agriculture's National Finance Center (NFC) is
      responsible for HUD's payroll system and records. Since HUD pays for this
      service, any deviations from normal payroll services procedures, or requests
      for reports and information is an additional charge to the Department.

11.   In response to this request, I spoke to Bill Rice, Director, Compensation
      Performance and Organization Management Division. That division is
      responsible for working with and coordinating requests to the NFC.

12.   Mr. Rice explained that in order to obtain this information, the NFC would
      have to conduct a feasibility study to determine the ability to obtain the
      requested information, the resources needed, and the subsequent cost of
      project.

13.   This study alone would probably cost about $15,000.00 and would take a minimum of 4-6 months to complete.

14.   Based on the costs of previous requests to the NFC, and of which none were close in magnitude of this request, it is estimated the cost to produce the information requested by the Plaintiff would be in excess of 1 million dollars, and this is a conservative estimate. Once the process is complete, it would take several months to actually receive the information.

### Request No. 54

All documents relating to the "Accelerated Promotion Policy," including without limitation, its goals, the content of the program, date of inception, any changes in the program, any and all strategies used to assist minorities and women under the program, any and all justifications for the program.

15.   HUD does not have an "Accelerated Promotion Policy."

16.   HUD promotion practices are in accordance with Federal laws and regulations outlined in 5 CFR 300.601 and 5 CFR 335.103.

### Requests Nos. 34-35

All applicant flow data collected by HUD by position and grade, including that collected by the separate systems used by the Office of Departmental Equal Employment Opportunity and the Office of Human Resources, from January 1, 1997 to the present.

17.   There is no such data available.

18.   Applicant "flow data" is an optional form that can be completed by applicants for federal vacancies. It would include such information as race and gender.

19.   If submitted, the form is removed from the application before it is forwarded to any decision making official.

20.   Years ago, the flow data form was forwarded to our ODEEO office. ODEEO did not maintain these records and they are no longer available.

21.   When the MSCS database was established, there was the ability to enter the information into the system. To my knowledge, the information has never been used or accessed, until this request.

22.   While I understand that the capability exists, race and gender information is not entered in the MSCS system and has not been for several years.

23.   It is my understanding that ODEEO is developing a process for capturing and retaining this information.

## Request 35

All records of those who had access to or were given copies of the applicant flow data prior to the selections for the individual positions that the applicant flow data was collected for.

24. Human Resources Specialists and Assistants are the only individuals with access to this data.

25. Upon receipt, the flow data sheet is removed from the application.

26. No hiring official would have access to the information at any point.

## Request No 42

All data from the EEOMAS database regarding all vacancy announcements from January 1997 to the present that were cancelled, and a new vacancy announcement for the same position(s) subsequently reissued, and the race, sex and age of all new hires or HUD employees promoted under each new vacancy announcement.

27. HUD OHR does not have the capability to provide any data on vacancy announcements from January 1997 to present that were cancelled and re-issued.

28. The Office of Human Resources (OHR) does not "track" this sort of activity.

29. Once a request to advertise a position is made and the appropriate information is provided, an announcement is released.

30. Management specifies the area of consideration (inside/outside the Federal service). If they are advertising outside the Federal Service – 2 vacancy announcements are issued – one for candidates with competitive status (Federal service) and another for outside candidates.

31. Once the vacancy announcement(s) close, OHR reviews the resumes and determines which applicants are basically qualified. Once the positions are rated and ranked, a selection roster is developed for each vacancy announcement.

32. Another selection roster is issued for candidates that are eligible to be non-competitively reassigned (they are basically qualified for the position and are at (or above) the grade level of the position).

33. Management may select from any of these rosters and the other rosters are considered closed or cancelled.

34. Management may cancel a recruiting effort during any phase of the process.

35.    Management may cancel an announcement for a great number of reasons, such as budget concerns and constraints, work changes, reorganization, desired skill sets or experience on the list(s) of the candidates provided, etc.

36.    Once a selection is made, or a vacancy announcement is cancelled, all the documentation is filed.

37.    When another request is received to recruit for a position, it is not checked to see if it had been advertised before and/or to determine if it had been cancelled.

### Request No. 26

Any and all documents provided to HUD personnel officers, managers or supervisors, indicating HUDs desire for a diverse workforce, and/or indicating strategies for increasing the numbers of underrepresented populations in the workforce, circulated from January 1, 1997 to the present.

41.    Beyond materials provided in the discovery in this matter, there are no such documents.

42.    To my knowledge, there have never been any documents specifically addressing "strategies" to increase diversity. HUD staffs positions in accordance with federal regulations and the processes involved in reviewing, rating and ranking applications does not take anything into account except for experience. All vacancies indicate we are an Equal Opportunity Employer.

### Request No. 13

All documents and policy memorandums regarding the role of an AEP Manager in the selection process for training, promotion and hiring, from January 1, 1995 to the present, including, but not limited to the AEP Manager's role in the selection process for the Community Builders position in Boston, MA under vacancy announcement # 0s-MST-98-0002A and for the Public Housing Revitalization Specialist Position in Boston, MA under vacancy announcement # 06-DEU-2000-008 1A and # 06-MSR-2000-0099AZ.

42.    Aside from the materials produced which reflect training conducted for AEP Managers, there are no documents responsive to this Request.

I swear the foregoing is true under the pains and penalties of perjury this 7th day of November 2006.

Linda Hawkins

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

RICHARD S. PATOSKI, )
           Plaintiff, )
                 ) C.A. #05-11086-RCL
 )
v. )
 )
ALPHONSO JACKSON, SECRETARY, )
DEPARTMENT OF HOUSING AND )
URBAN DEVELOPMENT, )
           Defendant )

## DECLARATION OF YVONNE MATTHEWS

1.    My name is Yvonne Matthews and I am employed as a Supervisory Personnel Management Specialist with the U.S. Department of Housing and Urban Development in the Office of Human Resources ("OHR"), Employee Service Center.

2.    I have been employed in this position since October 24, 1999.

3.    My component within HUD's OHR is the Employee Service Center, which is the Departmental Division vested with the responsibility for serving as the custodian of employee records such as the Official Personnel Folders, payroll records, performance appraisal records, etc. of all employees except the Department's Executives and Schedule C employees.

4.    My official duties include providing advice and guidance to managers, supervisors, and employees on pay and benefit related matters, ensuring that records are established and maintained in accordance with applicable laws, rules, regulations, and agency policy, problem resolution, and providing technical advice and assistance on matter related to the Department's automated personnel systems.

5.    I am familiar with the filing and record-maintaining requirements of HUD and the Office of Personnel Management (OPM). I am familiar with HUD's record's retention schedule for personnel documents. I am also familiar with the guidelines prescribed by the U.S. Office of Personnel Management (OPM)

concerning the maintenance and disposition of the Official Personnel Folder (OPM) as set forth in the Guide to Personnel Recordkeeping.

6.   I am familiar with the Department's record-keeping requirements with respect to the filing and maintenance of performance evaluations and awards.

7.   Pursuant to the records disposition schedule for performance appraisals, OHR is required to maintain performance appraisal ratings for current employees for four (4) years. At the end of this retention period the appraisals are destroyed.

8.   While I am informed that some performance evaluations from that period were produced in the administrative proceedings and discovery in this matter, performance evaluations from 1998 and/or 2000, as sought in Requests 27-31, do not exist in the official records of HUD.

9.   ESC Staff have attempted to comply with the requests by providing records that did exist for persons named in the requests.

10.   I am unaware of any location that ESC Staff failed to search where the exact materials sought in Requests 27-31 may still be available in the course of business as part of the official files and records of HUD.

I affirm that the foregoing is true under the pains and penalties of perjury this 5th day of November, 2006.

Yvonne Matthews
Yvonne Matthews