UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RICHARD S. PATOSKI,              )
                                 )
                Plaintiff,       )
                                 )
v.                               )        C.A. No. 05-11086 RCL
                                 )
ALPHONSO JACKSON, SECRETARY,     )
DEPARTMENT OF HOUSING AND        )
URBAN DEVELOPMENT,               )
                                 )
                Defendant.       )
                                 )

PLAINTIFF'S SECOND MOTION TO AMEND THE COMPLAINT

Plaintiff Richard S. Patoski hereby moves, pursuant to Fed. R. Civ. P. 15(a), for

leave to amend the Complaint. The proposed Second Amended Complaint and Jury Trial

Demand is attached as Exhibit 1. Plaintiff's Complaint seeks recovery under Title VII

and the ADEA for employment discrimination, and includes, among other causes of

action, claims based on the failure to promote him to a Community Builder position, due

to his age and gender. Counts I, II & III. Plaintiff seeks to add claims for race

discrimination in connection with his non-selection for the Community Builder position.

As will be shown, during discovery in this case, Plaintiff uncovered direct evidence that

race played a factor in his non-selection. Plaintiff was not aware of this evidence during

the administrative proceedings in this case.

As grounds for filing the amended complaint, the Plaintiff states as follows:

1.      Jose Cintron was the Selecting Officer in charge of filling four Community

Builder positions at HUD in Boston. Answer, ¶ 8; Cintron Dep., at 5-6, 9, Exhibit 2.

Plaintiff was well-qualified, he applied, and his name was placed on the "Best Qualified List" for the positions. Cintron Affidavit, at 2, Exhibit 3.

2.    Mary Lou Crane was the Regional Director, to whom the Boston-based Community Builders would report, once they were hired. Crane Dep., at 88-89, Exhibit 4; Hearing Transcript (Cintron), at 157-158, Exhibit 5. Cintron spoke to Crane to determine who on the Best Qualified List should be hired into the four positions. Crane Dep., at 105, Exhibit 4. Cintron testified that Crane's recommendation was given particular weight, and that he considered Crane's determination to be "very, very important" to his selection. Cintron Dep., at 14, 17, 21-22, Exhibit 2; Hearing Transcript (Cintron), 153, Exhibit 5. To the extent that inconsistencies developed, or questions were generated concerning a candidates qualifications, Cintron made no effort to resolve them, other than to rely on the opinion of Crane, the Regional Director. Cintron Dep., at 21, 24, Exhibit 2; Hearing Transcript (Cintron), at 159, Exhibit 5.

3.    Crane refused to recommend Plaintiff for the position. Crane Dep., at 125, Exhibit 4. At that time, Crane knew Plaintiff was a White male. Crane Dep., at 144, Exhibit 4.

4.    At her deposition, Crane testified that Plaintiff's race (White) was a neutral factor in the decision not to recommend him. Crane Dep., at 144, Exhibit 4. **However, Crane also testified that if Plaintiff had been Black or Hispanic, Crane would have regarded this as a positive factor in his application for the Community Builder position. Crane Dep., at 144, Exhibit 4.**[1]

---

[1] This testimony was not isolated. Crane testified that it was important that the Community Builders be of diverse races. Crane Dep., at 89, Exhibit 4. Crane also testified that diversity (including the hiring of African-Americans), was "very important"

5.    Crane's analysis, considering the Caucasian race to be a "neutral" factor, but considering membership in the Black or Hispanic race to be a "plus" factor, constitutes a racial distinction that is per se illegal, absent justification. Grutter v. Bollinger, 123 S. Ct. 2325, 2342, 2343, 2346-2347 (2003) (where University considers race as a "plus" factor in an applicant's file, this is a racial distinction that must satisfy strict scrutiny to be legal).

6.    Title VII prohibits such racial distinctions in hiring, whether or not consideration of race is the "but for" reason for the rejection. 42 U.S.C. 2000e-2(a)(1); 42 U.S.C. § 2000e-2(m). In other words, even if Plaintiff would have been rejected for reasons other than his race, he is nevertheless entitled to relief under 42 U.S.C. § 2000e-2(m) if race was a consideration in the decision-making process. As Crane testified, Plaintiff's Caucasian status was of no benefit, but it would have been a plus if he were Black or Hispanic. Crane Dep., at 144, Exhibit 4. Thus, Plaintiff was disadvantaged in that he did not have the "plus" factor that he would have had if he were Black or Hispanic.

7.    Plaintiff timely filed an EEO complaint relating to his non-selection as a Community Builder, and he alleged discrimination based on gender and age. HUD apparently lost Plaintiff's pro se complaint to the EEO Counselor, as it failed to include it in the Record of Investigation. Therefore, we do not know for sure the scope of the claims that Plaintiff originally brought to the EEO Counselor.

---

to her. Crane Dep., at 58-59, 81, Exhibit 4. Ms. Crane acknowledged that in the past, she had recommended the hiring of an African American male, and that she expressly stated at the time that her recommendation was based in part on the candidate's race. Crane Dep., at 68-69, 107-108, Exhibit 4. She acknowledged that the candidate's race was a motivating factor in her decision to recommend him. Crane Dep., at 108, Exhibit 4. On another occasion, Crane recommended the hiring of a Latino male, in part because she felt that his race would be a benefit to the office. Crane Dep., at 70-72, Exhibit 4.

3

8.      At the time of his Formal Complaint, Plaintiff did not know the factual circumstances that give rise to the race claim that he is now pursuing. Indeed, all four candidates who were offered Community Builder jobs, and who were accepted, were White like the Plaintiff. Therefore, Plaintiff was not placed on notice of facts giving rise to a prima facie case of race discrimination, or that race was a consideration. Adding to Plaintiff's lack of knowledge, Crane refused to be deposed during the administrative proceedings. Crane Dep., at 149, Exhibit 4.

9.      The Plaintiff's lawsuit is not limited to the specifics as articulated in his original Formal Complaint. Rather, the Plaintiff is entitled to bring a civil action based on claims articulated in the charge, as well as other claims that can reasonably be expected to grow out of the EEOC's investigation of that charge. Powers v. Grinnell Corp., 915 F.2d 34, 38-39 (1st Cir. 1990). In this case, Ms. Crane, the person who strongly influenced the decision to reject Plaintiff, would very reasonably be the subject of the EEOC's investigation. Cariglia v. Hertz Equipment Rental Corp., 363 F.3d 77, 86-87 (1st Cir. 2004) (the discriminatory motive of a person who influences an employment decision constitutes the motive of the employer). Indeed, an affidavit from Ms. Crane was made a part of the HUD EEO's Record of Investigation.

10.     The Plaintiff's motion to amend should be "freely granted." Fed. R. Civ. P. 15(a). The interests of justice strongly support the proposed amendment, where **direct** evidence of race discrimination was first uncovered during a deposition in this civil action. It should be noted that the new claim will not change the general character of case, as Counts V-IX already contain allegations of race discrimination in other aspects of Plaintiff's employment at HUD.

4

11.    No undue prejudice will result from the amendment.  The discovery period is still

on-going, and Plaintiff would be willing to assent to any extensions to permit HUD to

take discovery relevant to this claim.  No discovery extensions will be necessary for

Plaintiff to prepare this claim for trial.

WHEREFORE, Plaintiff Richard Patoski requests that this Court grant the instant

motion for leave to file the Second Amended Complaint, attached as Exhibit 1.


The Plaintiff
By his attorneys,


_____/s/ Robert S. Mantell_____
Kevin G. Powers
BBO# 405020
Robert S. Mantell
BBO# 559715
Rodgers, Powers & Schwartz LLP
18 Tremont Street, Suite 500
Boston, MA  02108
(617) 742-7010, ext. 305
fax (617) 742-7225


### LR 7.1 CERTIFICATION

I certify that on October 26, 2006 and November 1, 2006, I communicated with
Attorney for Defendant, Mark Grady, Esq., in a good faith effort to resolve the matter
contained herein.  Defendant has failed to indicate whether it will oppose this motion.


_____/s/ Robert S. Mantell_____


Patoski motion to amend complaint2

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD S. PATOSKI, )<br><br>                    Plaintiff, )<br><br>v.                               )<br><br>ALPHONSO JACKSON, SECRETARY, )<br>DEPARTMENT OF HOUSING AND )<br>URBAN DEVELOPMENT, )<br><br>                    Defendant. ) | C.A. No. 05-11086 RCL |

SECOND AMENDED COMPLAINT AND JURY TRIAL DEMAND

A.    Nature of the Action

This is an action for equitable and legal relief, attorney's fees, costs and other

relief against Defendant, based on its discrimination against Plaintiff on account of his

age, race and or gender, and HUD's use of unlawful formal and informal affirmative

action programs and practices that have damaged Plaintiff and prevented him, and

continue to prevent him, from competing for training and positions at HUD on an equal

footing with members of targeted groups.  This suit is brought pursuant to Title VII of the

Civil Rights Act of 1964, as amended, the ADEA, and the Fifth Amendment of the

United States Constitution.

B.    . Jurisdiction

Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343.

Venue in this district is proper pursuant to 28 U.S.C. § 1391, in that each cause of action

arose in this district.  All conditions precedent to suit have been complied with, to wit:

Plaintiff timely initiated EEO activity, and the Equal Employment Opportunity

Commission ("EEOC") issued its Decision on February 25, 2005. The Plaintiff's present

Complaint is brought within the requisite 90 days of his receipt of the EEOC decision.

C.    Parties to the Action

1.    Plaintiff Richard S. Patoski is an individual with a place of residence at 28

      Brookhouse Drive, Marblehead, MA  01945.

2.    Defendant Alphonso Jackson is the Secretary of the United States Department of

      Housing and Urban Development and is sued in his official capacity only

      [hereinafter this defendant is referred to as "HUD"].

D.    FACTUAL ALLEGATIONS

3.    Plaintiff is a Caucasian male with a date of birth of January 2, 1949.

4.    Plaintiff began to work for HUD in 1972.

5.    Since 1980, Plaintiff worked as a Community Planning and Development

      ("CPD") Representative in the CPD Division in HUD's Boston Field Office.

      Plaintiff performed his job in a competent and professional manner.  Plaintiff

      received outstanding performance evaluations and special awards.

COUNT I – NON-SELECTION FOR COMMUNITY BUILDER POSITION --
ADEA – AGE DISCRIMINATION

6.    In or about October 1997, Plaintiff applied for one of four Community

      Builder/Community Resource Representative positions in HUD's Boston office at

      the GS-14 level.  These Community Builder positions were new positions, created

      to solely carry out a function that was one of Plaintiff's duties at the GS-12 level

      that he was in at the time.

2

7.    It was determined that Plaintiff met the minimum qualifications for the position at the GS-14 level. Plaintiff's application received the highest rating score possible and his name was placed on the "Best Qualified List" for the GS-14 level Community Builder position.

8.    Jose Cintron, then Acting Deputy Assistant Secretary for Public and Indian Housing in Washington, D.C., (then 44 years old), was the Selecting Officer for the Boston CB vacancies. In making the selections, Mr. Cintron relied on and/or deferred the selection decisions to the Secretary's Representative for the region where the vacancy was located.

9.    For the Boston Office, the Secretary's Representative was Mary Lou Crane.

10.   Ms. Crane made the selections for the Boston Community Builder positions based in part on her interest in workforce "diversity." On information and belief, Ms. Crane, who was not in the Plaintiff's chain of command, and who should not have been consulted, informed Mr. Cintron that Plaintiff did not have the interpersonal skills to successfully perform the Community Builder position. Mr. Cintron adopted Ms. Crane's selections, as he believed that it is more difficult for older persons to change their behavior.

11.   On or about April 3, 1998, Plaintiff received a letter dated March 20, 1998, in which he was informed that he was not selected for one of the Community Builder/Community Resource Representative positions.

12.   On or about July 1, 1998, Plaintiff filed an EEO complaint alleging discrimination based on age and gender, when he was not selected for one of four Community Builder/Community Resource Representative positions.

13.   On or about September 30, 1999, the District Inspector General for Audit Southwest District released an Audit, addressing the Community Builder selection process. HUD's own Inspector General Report documented the fact that after the Secretary of HUD was advised that he could not use race as a factor in hiring decision, the Secretary stated that he wanted to use diversity as a selection criteria, and another employee pointed out during that same meeting that "diversity was easy to tell from the volunteer activities in the resume, or that one could also determine it during the interview."

14.   At the time of the Plaintiff's rejection, HUD had promulgated, and implemented a formal affirmative action plan that unlawfully discriminated against white males, and gave preferences in numerous aspects of employment to applicants of certain racial and ethnic groups and women. The affirmative action plan implemented by HUD was not designed to cure past acts of discrimination and was not narrowly tailored to achieve legitimate goals. The existence of HUD's formal and/or informal affirmative action programs at the time of Plaintiff's rejections, and the fact that managers and supervisors were held accountable for meeting the goals of these programs, constitute circumstantial and/or direct evidence that Plaintiff was subjected to discrimination because of his race and/or gender.

15.   HUD collected and compiled minority data from the applications for each city which had a CB vacancy, and other documents show that diversity was a factor in the CB selection process.

16.   All the people chosen for the Community Builder position in Boston were endorsed by Ms. Crane. Ms. Teninga (female) and Mr. Reeves (black male) were

initially chosen because Ms. Crane favored their selection, but they declined the offers. Ultimately, three younger individuals, two of which were female, were selected for the Boston CB vacancies.

17.    Plaintiff's qualifications for the Community Builder were objectively better than the selectees (i.e., Ms. Griswold, Mr. Polito and Ms. Pellegrino). Ms. Pellegrino had much less experience than Plaintiff, and her experience was confined to one Agency program (Housing). Although Ms. Pellegrino was found eligible, other candidates were found ineligible because their applications showed that they lacked knowledge of Agency programs and or only had experience in one program area. Ms. Griswold's Supervisor felt that she lacked people skills.

18.    If the rating panel had averaged the rating scores of each panel member, as they had been required to do, Plaintiff would have received a higher rating than selectees Ms. Pellegrino and Mr. Polito.

19.    HUD offered pretextual reasons for Plaintiff's non-selection, relating to his purported lack of "people skills."

20.    When filling the Community Builder positions, HUD violated various policies and procedures, including, without limitation, the requirement to preserve all the selection records, and failing to use consistent rating and ranking procedures in the nationwide selection process.

21.    A departmental atmosphere of discrimination is also demonstrated by the fact that so many women and minorities were selected for the positions, even though they were already over-represented in the Agency's work force at the upper grade levels.

22.    HUD discriminated against Plaintiff on the basis of his age (49), in violation of

the ADEA, when it failed to select Plaintiff for one of the Community Builder

positions.

23.    As a result of the unlawful rejection of Plaintiff's application, Plaintiff has

suffered lost wages, lost benefits, inconvenience and emotional suffering for

which he seeks compensation.

COUNT II – NON-SELECTION FOR COMMUNITY BUILDER POSITION
TITLE VII – GENDER DISCRIMINATION

24.    Plaintiff reasserts and realleges the above allegations.

25.    HUD discriminated against Plaintiff on the basis of his gender (male), in violation

of Title VII, when it failed to select Plaintiff for one of the Community Builder

positions.

COUNT III – NON-SELECTION FOR COMMUNITY BUILDER POSITION
TITLE VII – RACE DISCRIMINATION

26.    Plaintiff reasserts and realleges the above allegations.

27.    HUD discriminated against Plaintiff on the basis of his race (White), in violation

of Title VII, when it failed to select Plaintiff for one of the Community Builder

positions

COUNT IV – NON-SELECTION FOR COMMUNITY BUILDER POSITION
TITLE VII AND ADEA – COMBINATION OF AGE, RACE AND GENDER
DISCRIMINATION

28.    Plaintiff reasserts and realleges the above allegations.

29.    HUD discriminated against Plaintiff on the based of his gender (male), his race

(White), his age (49), or any combination thereof, in violation of Title VII and the

6

ADEA, when it failed to select Plaintiff for one of the Community Builder positions.

## COUNT V – NON-SELECTION FOR COMMUNITY BUILDER POSITION
### TITLE VII – GENDER DISCRIMINATION WAS A MOTIVATING FACTOR
### 42 U.S.C. § 2000e-2(m)

30.     Plaintiff reasserts and realleges the above allegations.

31.     Whether or not Plaintiff would have been selected for a Community Builder position but for his gender, he is nevertheless entitled to relief 42 U.S.C. § 2000e-2(m), because his gender was improperly considered in the decision not to select Plaintiff for a Community Builder position.

## COUNT VI – NON-SELECTION FOR COMMUNITY BUILDER POSITION
### TITLE VII – RACE DISCRIMINATION WAS A MOTIVATING FACTOR
### 42 U.S.C. § 2000e-2(m)

32.     Plaintiff reasserts and realleges the above allegations.

33.     Whether or not Plaintiff would have been selected for a Community Builder position but for his race, he is nevertheless entitled to relief 42 U.S.C. § 2000e-2(m), because his race was improperly considered in the decision not to select Plaintiff for a Community Builder position

## COUNT VII – NON-SELECTION FOR PHRS POSITION
### TITLE VII – COMBINATION OF RACE AND GENDER DISCRIMINATION

34.     Plaintiff reasserts and realleges the above allegations.

35.     HUD put out two different vacancy announcements for a single Public Housing Revitalization Specialist (PHRS) position in Boston.  One vacancy was for only internal, career status candidates (MSR) and the other vacancy announcement was for both internal and external candidates (DEU).

36. When an agency fills a vacancy using a Delegated Examining Unit (DEU) process, the Agency must follow OPM's regulations for that process. OPM's DEU regulations are designed to achieve merit system objectives.

37. On or about January 21, 2000, Plaintiff timely submitted his applications for both the MSR and DEU vacancy announcements for the PHRS position in Boston.

38. On May 16, 2000, Plaintiff was notified that he was eligible and qualified under the PHRS DEU vacancy announcement at the GS-13, GS-14 and GS-15 level.

39. On June 25, 2000, Plaintiff was informed, incorrectly, that he was unqualified under the MSR PHRS vacancy at the GS-14 level. After Plaintiff complained about the inconsistency between the eligibility determinations for his MSR application and for his DEU application, HUD claimed there had been a procedural error and placed him in a "priority consideration," program for future job applications, to make up for the error, claiming that it was a benefit when in fact, there was no benefit.

40. Mr. Knighton, a black male and an unlawfully hired temporary HUD employee, inappropriately applied for a PHRS position under the MSR vacancy announcement, for which he was properly found ineligible. He did not submit an application under the DEU vacancy announcement. HUD, *sua sponte*, forwarded Mr. Knighton's application to the separate DEU selection process for only those applicants who applied under the DEU vacancy announcement. However, other white applicants who had applied under the MSR vacancy announcement did not have their applications forwarded to the DEU process. As a result of the

8

advantage gained by Mr. Knighton, he was placed on the PHRS DEU "Certificate of Eligibles" from which the selection for the position was made.

41.    Mr. Gallagher, a white male who had applied under the DEU vacancy announcement was determined ineligible for the PHRS position at the GS-15 level but was improperly placed on the DEU GS-15 rating roster, was rated for the GS-15 position in Boston, and received the highest rating. Mr. Gallagher also applied for the PHRS positions in Washington, D.C. where he was not placed in the rating pool for the positions at the GS-15 level and where he was ultimately selected for a GS-13 PHRS job in Washington, D.C. If Mr. Gallagher had not been placed in the rating pool for the position at the GS-15 level, the DEU GS-15 "Certificate of Eligibles" from which the selection was made would have contained the names of the only three African-Americans to have applied for the job and no others.

42.    But for the inappropriate processing of Mr. Knighton and Mr. Gallagher's applications, Plaintiff would have been on the DEU GS-15 "Certificate of Eligible" for the PHRS DEU job from which the selection was made.

43.    When filling the PHRS positions, HUD violated various policies and procedures, including, without limitation, the requirement to preserve all the selection records.

44.    The Agency's applicable Collective Bargaining Agreement (CBA) provisions require the Agency to use a crediting plan to rate and rank candidates. The Agency's CBA also requires that the "[r]atings shall be sufficiently documented in order to reconstruct the action." However, HUD is unable to confirm whether there was a crediting plan developed or used by the staffing panels who rated the

9

DEU applicants for the PHRS jobs. Indeed, there was no crediting plan developed for the staffing panels who rated the DEU applicants for the PHRS positions.

45. Eventually, Mr. Abbey Ogunbola, a younger black male, was chosen for the PHRS position. HUD improperly "groomed" Mr. Ogunbola for the position, by illegally using OPM Schedule A hiring authority to place him in the PHRS position as a temporary employee.

46. Plaintiff was discriminated against on the basis of his sex (male), his race (Caucasian), or a combination of both, when he was not selected for the PHRS position, in violation of Title VII.

47. As a result of the unlawful rejection of Plaintiff's application, Plaintiff has suffered lost wages, lost benefits, inconvenience, damage to his professional reputation and emotional suffering for which he seeks compensation.

### COUNT VIII – NON-SELECTION FOR PHRS POSITION
### TITLE VII – GENDER AND/OR RACE DISCRIMINATION WAS A MOTIVATING FACTOR

48. Plaintiff reasserts and realleges the above allegations.

49. Whether or not Plaintiff would have been selected for a PHRS position but for his gender or race, he is nevertheless entitled to relief pursuant to 42 U.S.C. § 2000e-2(m), because his gender and/or race was improperly considered in the decision not to select Plaintiff for the PHRS position.

### COUNT IX – AFFIRMATIVE ACTION PROGRAMS WITHOUT JUSTIFICATION DURING THE PERIOD OF PLAINTIFF'S REJECTIONS – TITLE VII – RACE AND/OR GENDER

50. Plaintiff reasserts and realleges the above allegations.

51.    In 1998 and 2000, the period of time in which Plaintiff was rejected for the PHRS and CB positions, HUD engaged in formal and/or informal affirmative action programs, including without limitation, an Affirmative Employment Plan (AEP). The AEP, and other affirmative action programs were designed to benefit the careers of women and members of certain ethnic and racial groups, but not White males.

52.    HUD's AEP was based on HUD's claim that women and various racial and/or ethnic groups were under-represented in its workforce. The internal analysis that was the basis for the claim of under-representation did not meet Title VII and/or Fifth Amendment standards for such analysis, and did not meet the standard as articulated in a memorandum from the Department of Justice, dated February 29, 1996. The AEP and other affirmative action programs were applied, even for job that lacked conspicuous imbalance in traditionally segregated job categories.

53.    Such efforts at affirmative action resulted in the steady increase of employment of women and those in certain ethnic and racial groups, especially at the grade levels of the positions that the Plaintiff applied for.

54.    There was no sufficient compelling state interest to justify the establishment of such formal and/or informal affirmative action programs.

55.    The formal and informal affirmative action programs were a factor which directly, or indirectly, led to the decisions to reject Plaintiff for the CB positions in 1998 and the PHRS position in 2000.

11

56.    As a result of the affirmative action programs, which were unlawful under Title

VII, Plaintiff suffered lost wages and benefits, damage to his professional

reputation, and emotional distress, for which he seeks compensation.

COUNT X – DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF –
ONGOING USE OF UNLAWFUL, DISCRIMINATORY EMPLOYMENT PATTERNS
AND PRACTICES THAT PREVENT PLAINTIFF FROM COMPETING ON EQUAL
FOOTING – TITLE VII – RACE AND/OR GENDER

57.    Plaintiff reasserts and realleges the above allegations.

58.    HUD has, and continues to engage in a pattern and practice of unlawfully

favoring women and certain races and ethnicities with regard to trainings and

promotions, whereby HUD has deprived, and continues to deprive Plaintiff of his

right to Equal Protection under the law.

59.    Plaintiff is a current Federal Civil Service Career employee at HUD and he

intends to continue to apply at HUD for trainings and promotions in the future.

Plaintiff continues to be affected by ongoing, institutionalized discrimination, as

he continues to apply for positions at HUD, and he continues to be rejected, in

favor of applicants from certain racial or ethnic groups.  Plaintiff is forced to

compete on an unequal footing with other "targeted" applicants on account of his

race and/or gender for promotions and training.

60.    Statistical and other evidence demonstrates that HUD favors women and certain

minorities, and disfavors White males in selections for promotions and training.

Plaintiff was not selected for positions because of actions emanating from a

formal and informal affirmative action programs pursued by HUD.

61.    There was no sufficient under-representation in traditionally segregated job

categories as to justify preferential treatment for women and certain minorities.

12

The formal and/or informal affirmative action programs which HUD has implemented and/or continued were/are not designed to cure past acts of discrimination, and were not narrowly tailored to achieve legitimate goals, and are in violation of Title VII.

COUNT XI – DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF –
ONGOING USE OF UNLAWFUL, DISCRIMINATORY EMPLOYMENT PATTERNS
AND PRACTICES THAT PREVENT PLAINTIFF FROM COMPETING ON AN
EQUAL FOOTING – THE FIFTH AMENDMENT OF
THE UNITED STATES CONSTITUTION – RACE AND/OR GENDER

62.     Plaintiff reasserts and realleges the above allegations.

63.     HUD has, and continues to engage in a pattern and practice of unlawfully favoring women and certain races and ethnicities with regard to promotions and training, including without limitation its current five year strategy for diversity hiring to address purported under-representations in the HUD workforce.

64.     Plaintiff is a current Federal Civil Service Career employee at HUD and he intends to continue to apply at HUD for trainings and promotions in the future. Plaintiff continues to be affected by ongoing, institutionalized discrimination, as he continues to apply for positions at HUD, and he continues to be rejected, in favor of applicants from certain racial or ethnic groups. Plaintiff is forced to compete on an unequal footing with other "targeted" applicants on account of his race and/or gender for promotions and training.

65.     HUD's formal and/or informal affirmative action programs violate the Fifth Amendment of the United States Constitution and deprive Plaintiff of his right to Equal Protection under the law. The past and/or continuing programs do not

satisfy strict scrutiny analysis, or any other standard required under the Fifth

Amendment.

66.    Plaintiff is entitled to a declaratory judgment and other equitable relief to ensure

that going forward, Plaintiff will be accorded equal footing for training and

promotions at HUD.

Wherefore, the Plaintiff requests that this Court order:

a)    That the Plaintiff be compensated for any loss of wages and/or benefits
incurred as a result of discriminatory rejection, incurred either before or
after judgment (back pay and front pay);

b)    that the Plaintiff be awarded an amount of money which will fairly
compensate him for his emotional and physical pain, suffering,
inconvenience, mental anguish, and loss of enjoyment of life.

c)    that the Plaintiff be awarded an amount of money which will fairly
compensate him for the damage to his reputation and/or the diminution of
his earning capacity;

d)    that the Defendant pay the Plaintiff costs and attorney's fees resulting
from this action and the prior proceedings at the EEOC;

e)    that the Defendant pay the Plaintiff prejudgment interest;

f)    that the Defendant be ordered to pay the Plaintiff punitive damages;

g)    that the Defendant immediately promote Plaintiff to a GS-15 position in
Boston;

h)    a declaratory judgment stating that HUD's past and/or continuing
practices and policies favoring women and certain racial or ethnic groups
be declared unlawful;

i)    an injunction preventing HUD from continuing to implement its ongoing
practices and policies favoring applicants based on gender, race and/or
ethnicity;

j)    equitable relief requiring that Plaintiff be given training, promotions or
other preferences to assist Plaintiff's career

k)      such relief as may be just and proper and/or which will make the Plaintiff whole.

THE PLAINTIFF DEMANDS A TRIAL BY JURY ON EACH ISSUE SO TRIABLE

Respectfully submitted,

The Plaintiff
By his attorneys,


_____/s/ Robert S. Mantell_____
Kevin G. Powers
BBO# 405020
Robert S. Mantell
BBO# 559715
Rodgers, Powers & Schwartz LLP
18 Tremont Street, Suite 500
Boston, MA  02108
(617) 742-7010, ext. 305
fax (617) 742-7225
RMantell@TheEmploymentLawyers.com

Patoski second amended complaint

15

# EXHIBIT 2

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
BOSTON AREA OFFICE

RICHARD PATOSKI,                  :
      Complainant,              :

        v.                      :  EEOC Hearing No. 160-AO-8342X
                       :
DEPARTMENT OF HOUSING          :  Agency Case Nos.
& URBAN DEVELOPMENT,           :  BN-98-02 & BN-01-01
      Agency                    :


    DEPOSITION OF **JOSE CINTRON**, a WITNESS in the
above-entitled cause, taken on behalf of the Complainant,
before Patricia A. Magnone, RPR, a Notary Public in and for
the State of Rhode Island, at the Office of the Department
of Housing and Urban development, 10 Weybosset Street,
Providence, Rhode Island, on June 13, 2002 at 1:00 p.m.

PRESENT:
FOR THE COMPLAINANT . . . LAW OFFICE OF JOLEEN PAYEUR OLSEN
                           156A FRONT STREET, UNIT 3
                           MARION, MA 02738
                BY: JOLEEN PAYEUR OLSEN, ESQ.

FOR THE AGENCY  . . . . . HUD, OFFICE OF THE ASSISTANT
                           GENERAL COUNSEL FOR NEW ENGLAND
                           O'NEILL FEDERAL BUILDING
                           10 CAUSEWAY STREET
                           BOSTON, MA 02222
                BY:  THOMAS W. RODICK, ESQ.
                     ABRAHAM BRANDWEIN, ESQ.

ALSO PRESENT:
RICHARD PATOSKI


ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RI  02920
(401) 946-5500

5

A.  I'm a senior special project officer.  Senior
special project officer for public housing.

Q.  And during the time that you have worked at the agency,
approximately how many selections have you been involved
in?

A.  Oh, hundreds.  They were almost all during the time
that the reorganization took place.

Q.  Okay.  And approximately how many times have you been a
selecting official?

A.  I was a selecting official several times for several
positions, all of the public housing positions during
Management 20/20 and for Community Builder positions,
internal Community Builder positions for two regions.
Region -- well, the New England region, Boston, the
Boston region and the Chicago region.

Q.  For the Community Builder selections that you were
involved in, approximately how long did it take for you
to make the selection decisions?

A.  Probably about two weeks or so.  I was doing the
selection decisions at the same time for the Community
Builder positions and for the public housing positions
that were advertised under the same public
advertisements.  So for all of those, it took about two
weeks.

6

Q.  Could you describe what you did as the selecting

official when filling the Community Builder position?

A.  Received packages from human resources that had the

alphabetical listing of all names of candidates who were

deemed to be qualified for the positions in each office.

For the Community Builder positions, I reviewed the

applications and then made telephone calls to the

directors or heads of each of the offices involved to

get references and information from those folks.

And then I made my determinations and made the

decisions and filled out the, as I recall, the rosters

were filled out by placing an "S" by the candidates that

I selected for the positions, and then putting numbers

in rank order next to the other candidates, so that it

would be -- let's say there were three positions being

selected, there would be three S's.

And then one, two, three, four, five, six, seven,

eight, nine, whatever, however many candidates there

were.  That was so that, if a candidate had been

selected in more than one place and chose one job over

another, they could then just go to the next alternate

and offer the next alternate the position.

Q.  Which is one of the things I was curious about.  What

happens in the selection process if somebody that you

9

```
 1      selection deliberations?

 2      A.  Not that I recall.  No.

 3   Q. When you came -- did you come to Washington for this?

 4      A.  I was on detail to Washington at the time.  I was

 5      serving as acting general deputy assistant secretary for

 6      Public and Indian Housing.

 7   Q. Did you -- I guess, again, just trying to understand the

 8      process.  Someone asked you to help fill these jobs as

 9      selecting official?

10      A.  Correct.

11   Q. When you are given instructions, were they verbal

12      instructions or written instructions?

13      A.  To the best of my recollection, they were verbal

14      instructions.

15   Q. That would have been from someone in human resources?

16      A.  Someone in human resources.  Yes.

17   Q. Do you remember who that was?

18      A.  Frankly, I'm not sure.  I did this on more than one

19      occasion, and I did this one five years ago.  It may

20      have been Barbara Edwards, but it could very well be

21      that I'm remembering Barbara because she did it at

22      another time.  So I'm not specifically sure which was

23      the person.

24   Q. After you made your selections and made the notations on
```

14

performance evaluation, their narrative response to the
quality ranking factors, their prior work experience --
out of those things, was there anything in particular --
or awards -- anything in particular that you felt was
more probative in helping you make your decisions?

A.   I think the entire package together would give me
more of a sense of whether I thought they would make a
good candidate.  And then, frankly, I gave a lot of
weight to the responses that I got as reference checks,
in effect, from the people who would be the supervisors
of these new employees.

Q.   You have used a word a couple of times in some of your
answers.  And I'm wondering if maybe it's a term of art
in your agency, and so I thought maybe I'd better check.
You talked about "facilitative" or "facilitating"?

A.   Yes.

Q.   Could you tell me what you mean by that, or what it
means in the context of this job?

A.   Well, it was something that was being pushed as a
distinction between the new jobs of community builders
and the existing jobs of what came to be known as public
trust officers.  One being much more regulatory, with
in-depth knowledge of program areas, in-depth knowledge
of the regs and the rules and the guidelines for

17

applicants was not to verify the information in the

application package so much as to see whether or not the

individual that you were calling felt that they would be

a good match for the job?

                MR. CAVANAGH:   Objection.   You may answer.

A.   I think it's to fill out the broader picture of the

person's abilities to do the job.   Yes.   The kind of

information that I got was very important, I thought, in

making the decisions for who would move into these

positions.

Q.   When you made the calls to folks, did you take notes

about the remarks?

A.   I didn't take notes.   What I would generally do

would be prepare, have my roster in front of me, make

the call, take into consideration the information I

received, and then fill in the selection rosters.

Q.   So you had already narrowed the field down before you

made the calls?

A.   No.   The field was narrowed down by ranking and

rating panels.   So everybody that was on my selection

roster was deemed qualified.

Q.   Yes.   I understand that part.   But, I mean, had you made

in your mind some sort of preliminary selection decision

and then made the calls to verify --

21

Ms. Pellegrino?

A.  I can't tell you right now.  This was five years

ago.  But I can, I mean, just my generic response would

be that, where I got confirmation from Marylou Crane

that matched those kinds of statements and a written

application, that lent credence to it.  And so...

        MS. OLSEN:  Okay.

A.  Where I got conflicting information from

Marylou Crane from what was in writing, I will tell you

that I took Marylou Crane's perception, I gave that more

weight than what was in the written record.

Q.  If Ms. Crane's perception appeared to differ with the

written record that you had, did you have maybe some

sort of tie breaker or something, contact a supervisor

who actually worked frequently with the employee?

A.  No.  Please understand, in a two-week period, I

can't tell you how many countless numbers of applicants

I read, applications I read.

    The calls that I made I thought were very, very

important calls to make, because it gave confirmation to

the written record to the degree that they could.  But

also because they would be the supervisors of these

employees when the selections were made.  And so I felt

it important to make that call.  To go beyond that would

22

1    have been pretty much physically impossible in the time

2    frame.  We were very cognizant of the fact that it was a

3    high-anxiety period for the HUD work force.  Thousands

4    of HUD folks applied for new jobs.  They were under

5    pressure to do so.

6         The atmosphere was one that HUD was going to be cut

7    back to 7500 people.  We were at 10,000 people at the

8    time.  That meant, over the course of three or four

9    years, there would be 2500 people without work.  So when

10   this was done, there was a great deal of pressure to try

11   to get responses to people as quickly as possible, so

12   they could know where they stood.

13        At least one way or the other, they could know

14   where they stood.  So it was done in a two-week period.

15   It was a very compressed time period.  I thought it

16   important to make those calls.  I think it made for

17   better selections.  But there was no way I would be able

18   to go to the next level of calls and still get the job

19   done.

20   Q.   Is there a particular part of Ms. Pellegrino's

21        application that you could show me that, to you, showed

22        that she had acquired and demonstrated unique diplomatic

23        skills?

24   A.   "I have been successful working with community

24

1    a broad knowledge base of HUD programs?

2    A.   Broad knowledge base of HUD programs, from my

3    perspective, was taken care of by -- I assumed that for

4    everyone.  Once you made it to the BQ list, that meant

5    you were qualified to be selected for the job based on

6    your knowledge.

7    Q.   Okay.  Did you get information about Ms. Pellegrino's

8    people skills primarily from Ms. Crane or the

9    application?

10   A.   It's a combination of both.  What you get in the

11   application, when confirmed with conversations with

12   Ms. Crane, gives you the full picture.  If you get one

13   picture from the application and different words from

14   Ms. Crane, as I said earlier, I gave more weight to the

15   information I received from Ms. Crane.

16        But lots of good writers applying for jobs, it

17   doesn't make them good community workers.

18   Q.   Was there any particular part of Ms. Pellegrino's

19   application that you felt demonstrated people skills?

20   A.   Well, I think when you look at what I just read,

21   that paragraph, it will indicate to me good people

22   skills.  To be able to get owners, residents, change

23   management companies, dealing with sensitive issues such

24   as race-based issues, that shows good people skills.

ALLIED COURT REPORTERS, INC. (401) 946-5500

# EXHIBIT 3

1                        **STATEMENT**

2                                Location: Miami, Florida

3         I, Jose Cintron, being first duly sworn on oath make the following statement freely and

4 voluntarily to Patricia Brightwell who has identified herself to me as an EEO Investigator,

5 Southwind Enterprises, Inc. assigned by the U.S. Department of Housing and Urban Development

6 (HUD) to perform this investigation, knowing that this statement may be used in evidence. I

7 understand that this statement is not confidential and may be shown to any party who must have

8 access to this information in order to carry out his or her official duties.

9         This statement is given in relation to the complaint of discrimination filed by Richard

10 Patoski.

11         The investigator has informed me that the accepted issue in this complaint is that

12 Mr. Patoski alleges discrimination on the basis of his age (49) and sex (male) when he was not

13 selected by Jose Cintron, Senior Community Builder, for one of the Community Builder/

14 Community Res Rep positions, GS-1101-13/14/15, located in the Office of the Secretary's

15 Representative of the Massachusetts State Office. The position was announced under vacancy

16 number OS-MST-98-0002A. He was advised by letter dated March 20, 1998, which he received

17 on April 3, 1998, that he was not selected.

18         My full name is Jose (NMN) Cintron, male, age 45 (DOB: 05/22/53), Senior Community

19 Builder/Coordinator for the State of Florida, GS-15, Department of Housing and Urban Development,

20 Miami, Florida. At the time of Mr. Patoski's non-selection, I was the Acting Deputy Assistant

21 Secretary for Public and Indian Housing, GS-15, Miami, Florida. I have held my current position

22 since September 1, 1995. My first level supervisor is Mr. Davey Gibson, Secretary's Representative

23 for the Southeast Region and the Caribbean, and my second level supervisor is Deputy Secretary, Saul

24 Ramirez. At the time of Mr. Patoski's non-selection, Kevin Marchman, Assistant Secretary for Public

EXHIBIT

6

1    and Indian Housing , was my first level supervisor and Deputy Secretary Dwight Robinson, was my

2    second level supervisor. I have no work relationship with Mr. Patoski.

3        I was the selecting official for the positions of Community Builder/Community Resource

4    Representative, GS-1101-13/14/15, vacancy number OS-MST-98-0002A, located in the Boston,

5    Massachusetts State Office. The Human Resources (HR) office issued me a roster of best qualified

6    candidates for these positions. The names of the best qualified candidates, including Mr. Patoski,

7    were listed on the roster in alphabetical order. I was never provided with, nor did I ask for, the scores

8    the promotion panel assigned to the applicants during their rating and ranking process. The only thing

9    that mattered to me was that they had made the best qualified list.

10       HUD was undergoing a major reorganization, including downsizing, when this vacancy

11    announcement was issued to fill approximately 2,000 positions. This was not only a rare opportunity

12    for employees to apply for positions with grade 15 potential, but those who were not selected feared

13    they would be terminated or downgraded.

14       The promotion panel screened out applicants who did not have a broad experience base,

15    including those with a background in only one HUD program area. Community Planning and

16    Development (CPD) applicants, with only CPD experience, would not automatically be assumed to

17    be able to perform the duties of the announced positions. Although they meet with mayors, mayoral

18    representatives, and other community leaders, CPD's focus and mission is to regulate, rather than

19    facilitate, HUD's mission.

20       As regulators, CPD employee interact with community representatives to determine that they,

21    and their organizations, follow and adhere to HUD's policies. CPD employees have a vast knowledge

22    of HUD programs and background, but they are not required, nor always successful, in demonstrating

23    exceptional "people" skills. Their is role is regulatory, not facilitatory. The candidates referred to

Initials ____                                                    Page 2 of 5

1   me by HR were experienced in more than one program area and, as I recall, were required by the rating

2   and ranking panels to be certified as a best qualified candidate.

3         The caliber of the individuals referred to me for consideration was outstanding.  The panels

4   had been diligent in screening the applicants and they represented the "cream of crop", in terms of

5   program knowledge.  The defining factor in making my selections was to determine that the candidate

6   had the ability to work with our customer base in facilitating HUD's programs.  These individuals had

7   to have acquired and demonstrated unique diplomatic skills and abilities when speaking before large

8   groups and elected officials on difficult and sensitive issues, without giving offense.

9         Five managers were appointed to make selections for two regions each and a designated HUD

10  program area.  I was on a detail to Washington, D.C., for another special project, and assigned to

11  serve as one of the selecting officials.  I was the selecting official for all Community Builder

12  vacancies in the Midwest Region (10 offices), the New England Region (six offices), and for all

13  program vacancies for Public and Indian Housing, for a total of more than 200 selections. There was

14  no time to arrange personal interviews with the candidates.

15        Mr. Patoski's contention that Assistant Secretary Susan Forward was the original selecting

16  official for the New England Region and, on or about the day the selections were to be announced,

17  the designation was changed to me, is untrue.  Ms. Forward had absolutely no role in the selection

18  process for the New England Region.  I have no idea why Mr. Patoski would make this allegation

19  because, to my knowledge, it has no basis and is totally inaccurate.  From the outset of the selection

20  process, Ms. Forward had been designated as the selecting official for the Fair Housing Office

21  vacancies, and I was the selecting official for the Public Housing Office vacancies.  HR sent all of the

22  promotion certifications, applications, and resumes' for the New England, Midwest, and Public

23  Housing Office  vacancies in Washington, D.C., to me.

Initials _____

Page 3 of 5

1        In making my selections, I was looking for an indication that the applicant had a broad

2    knowledge base of the HUD's programs and the ability to interact and deal with people on a personal

3    basis.  It was critical that the selectee(s) possessed this these skills in interacting with new and old

4    HUD customers    The Community Builders are our outreach arm to the community and the door

5    through which people find their way to HUD.

6        After reviewing every resume and application, I called every Secretary's Representative in the

7    Regional Offices and, if one was established, every Coordinator in the local offices.  There were

8    approximately 40 best qualified candidates for the Boston vacancies.  I spoke with Ms. Mary Lou

9    Crane, the Secretary's Representative for New England, located in Boston.  Ms. Crane provided

10   information about each candidate in her office.  With regard to Mr. Patowski she told me that he had

11   the program knowledge base to perform the duties of the Community Builder vacancy, but had

12   "horrendous" people skills and would not make a good Community Builder. I don't recall Ms. Crane

13   giving me any specific instances, but she stated emphatically that she could not recommend him

14   because of this trait.

15       The selection process took me two weeks to complete.  Because of the length of time that has

16   elapsed since I made these selections, I cannot compare the selectees' and Mr. Patoski's qualifications.

17   However, the reasons for my selections  went beyond HUD program knowledge.  I did not intend to

18   select anyone who did not have the people skills.  As a rule, program requirements can be learned,

19   but it is more difficult, if not impossible, to learn new or change old behaviors.

20       A majority of the candidates applied for vacancies in the location where they were employed.

21   I contacted every Coordinator and  Secretary's Representative to obtain feedback on the applicants'

22   program knowledge and people skills.  As I recall, not all of the Selecting Officials took this step.

23   However, I believed it was critical to determine that the individuals who were selected had the people

24   skills to do the job.  I reviewed the criteria established for the position and, taking into consideration

Initials _____

1    HUD or designated HUD funds, the candidates' resumes', the Coordinator's and Secretary's

2    Representatives's recommendations, made my selections. I did not take my role lightly because I

3    knew that many HUD employees had applied for these vacancies and that some could be affected by

4    the downsizing and possibly lose their jobs.

5          Mr. Patoski's age and gender were not factors in my decision to not select him for one of the

6    Community Builder positions. In summary, Mr. Patoski was not selected because he did not have the

7    necessary skills to successfully interact with the our customers in facilitating HUD programs

8

9          I have read this statement consisting of 5 pages, and I have made all the necessary changes,

10    additions or corrections, and I have signed or initialed every page.

11

12          I hereby declare under penalty of perjury that the foregoing statement is true, correct, and

13    complete to the best of my knowledge and belief.

14

15    Signature: _____

16    Date: _____ 1/25/99

17    Subscribed and sworn to before me this 25TH day of _____January_____ 1998 9.

18    _____

19    Notary Public

20    My commission expires: _____

> MIGDALIA NUNEZ
> MY COMMISSION # CC 641506
> EXPIRES: April 25, 2001
> Bonded Thru Notary Public Underwriters

21

22

Initials ____

Page 5 of 5

# EXHIBIT 4

Page 1

Volume 1
Pages 1 to 163
Exhibits 1 to 12
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
RICHARD S. PATOSKI,                    :
        Plaintiff,                     :
    vs.                                : Civil Action
                                       : No. 05-11086 RCL
ALPHONSO JACKSON, SECRETARY,   :
DEPARTMENT OF HOUSING AND      :
URBAN DEVELOPMENT,             :
        Defendants.                    :

DEPOSITION OF MARY LOU CRANE, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Deanna
J. Dean, Registered Professional Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Rodgers, Powers & Schwartz LLP, 18
Tremont Street, Boston, Massachusetts, on Friday,
    May 5, 2006, commencing at 10:03 a.m.
    PRESENT:
        Rodgers, Powers & Schwartz LLP
        (By Robert S. Mantell, Esq.)
    18 Tremont Street, Suite 500,
    Boston, MA 02108, for the Plaintiff.
        United States Attorney's Office
        (By Mark J. Grady, Esq.)
    John Joseph Moakley Courthouse,
    One Courthouse Way, Boston, MA 02210,
    for the Defendant.
    ALSO PRESENT:
        Jack Brandwein, Esq.
    House Counsel for Housing and Urban Development
        Richard Patoski

Page 2

INDEX
WITNESS      DIRECT   CROSS   REDIRECT   RECROSS
MARY LOU CRANE
BY MR. MANTELL      5              159
BY MR. GRADY       151

EXHIBITS
NO.    DESCRIPTION                        PAGE
1    HUD EEO/AE/Diversity Policy Memo  52
2    Critical Element No. 8 Document   59
3    Office of Departmental Equal      61
     Employment Opportunity Manager and
     Supervisor EEA Opportunity/AE/
     Diversity Performance Standard
4    Office of Departmental Equal      65
     Employment Opportunity Management
     Reform Diversity Considerations
5    Office of Departmental Equal      75
     Employment Opportunity FY-98
     Departmental AEP Plan
6    Office of Departmental Equal      79
     Employment Opportunity Reorganization
     Affirmative Employment Plan

Page 3

EXHIBITS, Continued
NO.    DESCRIPTION              PAGE
7    Merit Staffing Control System    101
     Selection Roster
8     Statement of Mary Lou Crane      103
9    10/9/96 Letter to K. Williams from   132
     C. Western
10   11/25/97 Letter to R. Paquin from A.   132
     Santos
11   11/20/96 Certificate of Appreciation   133
12   6/23/95 Certificate of Appreciation    134

Page 4

PROCEEDINGS

[1]
[2]    MR. MANTELL: All right. I'm going to read
[3] some of the usual stipulations and see if you agree
[4] with them.
[5]    It is hereby stipulated and agreed that the
[6] notarization and filing of the deposition are
[7] waived.
[8]    The deponent will get 30 days to review and
[9] sign, and HUD's attorneys will provide the deponent
[10] with a copy of that deposition.
[11]    It is further stipulated and agreed that
[12] all objections except objections as to the form of
[13] the questions, privilege, and motions to strike,
[14] will be reserved until the time of trial.
[15]    Is that acceptable?
[16]    MR. GRADY: Yes.
[17]    With regard to the issue of privilege, ·
[18] Ms. Crane as a former employee is not authorized to
[19] waive privilege on behalf of the United States.
[20] Thus, with regard to the stipulation as to
[21] privilege, the United States assert its interests
[22] itself in a proceeding other than this deposition.
[23]    MR. MANTELL: All right.
[24]

Page 5

MARY LOU CRANE
[1]
[2] a witness called for examination by counsel for the
[3] Plaintiff, having been satisfactorily identified by
[4] the production of her driver's license and being
[5] first duly sworn by the Notary Public, was examined
[6] and testified as follows:
[7]    DIRECT EXAMINATION
[8]    BY MR. MANTELL:
[9]    Q: Good morning, Ms. Crane.
[10]    A: I don't know what he said, what that was.
[11]    MR. GRADY: This is just a —
[12]    A: I was not an attorney in any of my jobs.
[13] I've never been an attorney, so ...
[14]    Q: Okay.
[15]    A: And they've let me know that they are the
[16] attorneys on every job I've had. I am not to speak
[17] as an attorney. I'm just speaking as me.
[18]    Q: Okay. Well, my name is Robert Mantell.
[19] I'm the attorney for Mr. Patoski, and he has a claim
[20] against HUD for a number of reasons, including
[21] discrimination, involving a non-selection for a
[22] community builder position that he applied for in
[23] 1998. And I'm going to be asking you a number of
[24] questions about that.

Page 54

[1] **Q:** Okay. So you may have seen this, but you
[2] don't have a specific recollection?
[3] **A:** I have no specific recollection, and I am
[4] surprised by the last paragraph on page three.
[5] **Q:** Okay. Well, looking at page one, in the
[6] middle, it talks about how diversity policies "are
[7] an integral part of HUD's mission."
[8]     Do you see under that, where it says, "I
[9] expect all employees to support EEO/AE/diversity?"
[10] **A:** Mm-hmm. I do.
[11] **Q:** Is that your understanding of Mr. Cuomo's
[12] position?
[13] **A:** Absolutely.
[14] **Q:** Do you see where it says under that, "All
[15] managers and supervisors are fully accountable for
[16] taking actions to assure that EEO/AE/diversity goals
[17] and objectives are achieved"?
[18] **A:** I do.
[19] **Q:** Is that consistent with your understanding
[20] of Mr. Cuomo's directive at the time?
[21] **A:** It is.
[22] **Q:** Okay. And did you feel that it was part of
[23] your responsibility to take action to assure that
[24] EEO/AE/diversity goals and objectives were achieved?

Page 55

[1] **A:** I did.
[2] **Q:** Now, under where we were just reading, it
[3] talks about the Affirmative Employment Program AEP
[4] Plan. Do you see that?
[5] **A:** The one in bold?
[6] **Q:** Underlined.
[7] **A:** Oh, underlined. Yes.
[8] **Q:** Let me back up.
[9] It says, "The EEO/AE/diversity goals and
[10] objectives of the department are expressed in HUD
[11] regulations at 24 CFR Part 7, as well as in the
[12] multi-year Affirmative Employment Program AEP Plan."
[13]     Do you see where it says that?
[14] **A:** I do.
[15] **MR. GRADY:** For the record, paragraph four.
[16] **Q:** Did you ever review the AEP plan?
[17] **A:** Not that I can remember.
[18] **Q:** Were you evaluated to the extent that you
[19] complied with or promoted EEO/AE/diversity goals?
[20] **A:** I was.
[21] **Q:** Okay. You were given an evaluation every
[22] year?
[23] **A:** I was. I was in the senior executive
[24] service, and I was evaluated by the secretary and

Page 56

[1] the deputy secretary.
[2] **Q:** And did you — how were you rated for
[3] EEO/AE/diversity?
[4] **A:** I was rated highly.
[5] **Q:** Okay. Each year?
[6] **A:** Yes, as I recall. I had an outstanding
[7] overall rating every year until the last year, when
[8] we were told that HUD was being criticized for being
[9] too nonspecific in the way we were being rated.
[10] **Q:** Okay. What were the types of things that
[11] you would do in order to comply with or promote
[12] EEO/AE/diversity goals?
[13] **A:** Well, at one point, and I can't remember
[14] what year it was, I was given authority to select
[15] someone as — I think her title was special
[16] assistant. And we did an internal posting, there
[17] were several candidates, and the person selected was
[18] an older Asian female.
[19] **Q:** What was her name?
[20] **A:** Dorothy Wong, W-o-n-g. I think that was
[21] her name.
[22] **THE WITNESS:** That was her name, wasn't it?
[23] **Q:** And what was her job title?
[24] **A:** You know, I don't remember. I treat her as

Page 57

[1] my special assistant. I don't know if that was her
[2] actual job title or not.
[3] **Q:** Is she still there?
[4] **A:** Oh, no.
[5] **Q:** Oh, okay.
[6] **A:** She left before I left. She was in her
[7] 70s, as it turned out. I didn't know she was in her
[8] 70s. I knew she was older. I did get some letters
[9] from older staff, congratulating me on selecting
[10] someone older, as they felt good.
[11] **Q:** Okay.
[12] **A:** And she's Asian.
[13] **Q:** So you felt that you —
[14] **A:** That was a positive step on my part. I was
[15] very supportive of any activities that we did for
[16] FHEO.
[17] **Q:** What you said, FHEO —
[18] **A:** Oh. Fair housing and equal opportunity.
[19] I'm sorry.
[20] **Q:** What sort of programs did you support?
[21] **A:** I supported Black History Month. We had a
[22] Hispanic Month. I supported — I actually started
[23] Bring Your Daughter to Work Day, which was a women
[24] managers kind of thing. I had been, when I was in

---

**Page 58**

[1] the Connecticut office, the Section 504 responsible
[2] person, which — is it 504? I think it's 504 —
[3] which is the disability thing. Again, I'm getting
[4] furry — you know, fuzzy on these things.
[5]     But certainly when I came to Boston,
[6] persons with disabilities were of great interest to
[7] me. I had persons using wheelchairs do a sit-in at
[8] my office. The staff was upset, but I wasn't,
[9] because I met and went with them. I mean, I had no
[10] problem with this type of thing.
[11]    Q: Do you recall doing anything else in order
[12] to promote diversity in the workforce at HUD?
[13]    A: You know, I'm sure I did, but I find these
[14] questions really difficult, given that they're going
[15] back 10 years.
[16]    Q: I can —
[17]    A: I considered myself very committed to this
[18] issue, and I just don't know how to prove it to you,
[19] because I don't — I have nothing in front of me to
[20] show me what I did those years. I know I did stuff;
[21] I just can't tell you what I did.
[22]    Q: Okay.
[23]    MR. MANTELL: Can I have this marked.
[24]

---

**Page 59**

[1]     (Document marked as Crane
[2] Exhibit 2 for identification)
[3]    Q: When you evaluated your staff of regional
[4] managers, did you evaluate them with regard to their
[5] EEO/AE —
[6]    A: I don't remember.
[7]    Q: Can you look at Exhibit 2 and see if you
[8] can recall that. I'm just going to ask if you can
[9] recall this.
[10]    A: (Perusing documents)
[11] This looks familiar to me. I don't know
[12] what it's from, but ...
[13]    Q: What is it?
[14]    A: It's entitled "Critical Element No. 8,"
[15] which would seem to indicate it's taken from a list
[16] of activities or performance things that we would
[17] rate an employee's performance on.
[18]    Q: And it's this type of — was it this
[19] standard that, for example, your EEO/AE activities
[20] were evaluated by?
[21]    A: This is probably what I was evaluated by,
[22] yes.
[23]    Q: And can you recall now whether you
[24] evaluated — whether you evaluated others under this

---

**Page 60**

[1] standard?
[2]    A: It would have been community builders who
[3] were evaluated, but I don't recall that I got to
[4] evaluate the directors. I don't know whether I got
[5] to evaluate the directors on this element or not.
[6]    Q: Okay. Do you recall whether your EEO/AE
[7] evaluations were either outstanding or highly
[8] satisfactory?
[9]    A: I don't recall.
[10]    Q: Okay. But were they positive throughout
[11] your career at that time?
[12]    A: Yes.
[13]    Q: Did you receive any bonuses during your
[14] time at HUD based on your evaluations?
[15]    A: The President declared that none of his
[16] appointees should receive any recompense for their
[17] performance, and I was constantly reminded by my
[18] public affairs officer that I was out about $100,000
[19] from my Republican predecessors, because they got at
[20] least 10,000 a year and I got zip. So it's a very
[21] sore point. I have a plaque on my wall from the
[22] Secretary for outstanding performance.
[23]    Q: Okay.
[24]    MR. MANTELL: Would you mark this.

---

**Page 61**

[1]     (Document marked as Crane
[2] Exhibit 3 for identification)
[3]    Q: So it's your testimony that during the
[4] second time that you were employed by HUD, you
[5] received an outstanding evaluation for every year
[6] except for the last one. Is that correct?
[7]    A: I think so.
[8]    Q: Okay. Could you review Exhibit 3, please.
[9]    A: (Perusing documents)
[10]    Q: Do you recognize this document?
[11]    A: No, but it looks like language I've seen
[12] before. So ...
[13]    Q: Is it fair to say that this document is
[14] consistent with your understanding about the
[15] EEO/AE/diversity performance standard?
[16]    A: Yes.
[17]    Q: And the standard was the same throughout
[18] your time at HUD. Is that correct?
[19]    A: The standard of promoting diversity was the
[20] same?
[21]    Q: Yes.
[22]    A: Yes.
[23] Now, the title of this is taken from a
[24] specific program area, so ...

Page 66

[1] Q: Okay. So is it your understanding that
[2] Exhibit 3 potentially could apply to you?
[3] A: Yes.
[4] Q: Is it your understanding that it did apply
[5] to you?
[6] A: Yes.
[7] Q: Okay. But it's your understanding that you
[8] don't have a current recollection of that policy?
[9] A: I under — I remember the policy. I don't
[10] remember exactly this document.
[11] Q: Okay. Well, what is your understanding of
[12] the policy?
[13] A: Insofar as what? Policy on what?
[14] Q: Fostering workplace diversity.
[15] A: We should do it.
[16] Q: Okay. What's — what should you do to do
[17] that?
[18] A: Whenever possible, we should look for
[19] candidates who are underrepresented in the workforce
[20] and who come from African-American, Latino
[21] communities, disabled communities, all the different
[22] protected classes. We should try and make sure that
[23] we have a workforce that is not completely of one
[24] type of person. It shouldn't be all female; it

Page 67

[1] shouldn't be all male; it shouldn't be all black; it
[2] shouldn't be all white. It should be diverse.
[3] I feel like I'm on trial for diversity
[4] here. This is very difficult talking to you about
[5] this stuff.
[6] Q: Well, you're not being sued for anything.
[7] Okay? I'm only asking you your best recollection at
[8] this point.
[9] You stated that it's your understanding of
[10] the policy that you were looking for people from
[11] underrepresented categories?
[12] A: Yes.
[13] Q: How would you know whether a certain group
[14] was underrepresented?
[15] A: By looking around the office, and if you
[16] all you saw were white males, you'd know you needed
[17] to get a little more people of color, maybe some
[18] women in management positions. Certainly there are
[19] bright, capable people who are disabled. That type
[20] of thing.
[21] Q: But did you ever consult any statistical —
[22] A: No.
[23] Q: — documents —
[24] A: No.

Page 68

[1] Q: — to determine underrepresentation?
[2] A: No. I did it all just by looking around.
[3] And when I was consulted, as I was, for director of
[4] the public housing office by the then-assistant
[5] secretary for public housing, I suggested a
[6] candidate who was a person of color.
[7] Q: Who was that?
[8] A: His name just went right out of my head.
[9] And he got the job.
[10] THE WITNESS: Who was the black guy we
[11] had — you can't talk to me?
[12] A: He doesn't want to help.
[13] MR. GRADY: He's not permitted to.
[14] THE WITNESS: Oh. And you don't know,
[15] because you weren't there.
[16] A: It was a — there was a black employee in
[17] Rhode Island in the Office of Public Housing who I
[18] suggested to the assistant secretary for public
[19] housing would be a good candidate to be director of
[20] public housing, because we needed some diversity in
[21] our public housing area because we didn't have very
[22] much, and the people we served tended to be people
[23] of minority groups. And he went along — he was one
[24] of the finalists and he was selected.

Page 69

[1] Q: And —
[2] A: Tony Brito. I knew it would come to me.
[3] Tony Brito.
[4] Q: How do you spell —
[5] A: That was his — B-r-i, I think one T, -o.
[6] I don't think it was two Ts. It was one or — I
[7] can't remember if it was one or two Ts.
[8] Q: Did you ever recommend anyone else and
[9] express a desire that it was important to hire this
[10] person to increase diversity?
[11] A: I did.
[12] Q: Who was that?
[13] A: Ellen Connelly, who was the, I believe the
[14] current director of the Office of Housing. Because
[15] the assistant secretary — this was a more recent
[16] one before I left. The assistant secretary asked
[17] for my input, asked me to help in the interview
[18] process, and she was of the candidates the one I
[19] preferred.
[20] Q: Okay. And she's a female?
[21] A: She's a female.
[22] Q: What was her race?
[23] A: White. Caucasian.
[24] Q: But you felt that the fact that she was a

Page 70

[1] gender — the fact that she was a female would help
[2] increase diversity?
[3]     **A:** Yes.
[4]     **Q:** And that help — assisted you in your
[5] decision to recommend her?
[6]     **A:** Yes.
[7] And there was another — do you want me
[8] to —
[9]     **Q:** Keep going.
[10]     **A:** We had an opening for the Office of
[11] Regional Council during my time there, and I
[12] expressed an interest in a candidate who is Latino.
[13]     **Q:** Who was that?
[14]     **A:** I can't remember his name now. He didn't
[15] get the job. An African-American got the job and
[16] continues in the job.
[17]     **Q:** What's the African-American's name?
[18]     **A:** Minyard Culpeper.
[19]     **Q:** But the fact that this individual was a
[20] Latino was a factor that you felt —
[21]     **A:** — would be strong for us to have
[22] someone —
[23]     **Q:** It was a benefit?
[24]     **A:** Yes.

Page 71

[1]     **Q:** Okay.
[2]     **A:** So I won some and I lost some.
[3]     **Q:** When you would make recommendations for
[4] certain candidates, would you call them up and say,
[5] "I think there's a position out there that would be
[6] good for you; you should apply"? Or how did it come
[7] to pass that you would recommend —
[8]     **A:** The Office of Public Housing was available,
[9] apparently people were applying, and the assistant
[10] secretary for public housing called me directly and
[11] asked me, and said, "These are the finalists. What
[12] do you think? Do you know any of these people?"
[13]     I knew the guy from Rhode Island. I
[14] thought it would be a positive pick. He was looking
[15] at somebody from Chicago. I have no idea what the
[16] race of that person was. But I — well, part of the
[17] thing was I would want some of our own people; but I
[18] also know that he was black — is black, and I went
[19] to bat for him.
[20]     In the case of the Office of Housing, I was
[21] asked to sit in on the interview. So I saw all the
[22] candidates, I interviewed the candidates, and I
[23] liked the candidate we selected.
[24]     **Q:** And which candidate was that?

Page 72

[1]     **A:** Ellen Connelly.
[2] In case of the Office of Regional Counsel,
[3] I had had some problems with the regional counsel
[4] when I got there. Apparently so did Washington,
[5] because they farmed him out and he resigned.
[6]     And our biggest customer at HUD in New
[7] England is the City of Boston; but the Boston
[8] Housing Authority, the Boston Community Development
[9] Program, they by far dwarf everything else in New
[10] England. So we spend a lot of time with the City of
[11] Boston. And I thought at the time that a minority
[12] regional counsel would be a good thing because we
[13] have a lot of issues with the City of Boston.
[14] Turned out we got a minority, not the one I had
[15] recommended.
[16]     **Q:** Okay. You have Exhibit 4 there. Do you
[17] recognize Exhibit 4?
[18]     **MR. MANTELL:** Did I give you one of these?
[19]     **MR. GRADY:** No.
[20]     **MR. MANTELL:** Oh. Sorry.
[21]     **A:** You know, I can't recognize stuff I read
[22] last year, so I have no idea if I've seen this
[23] before or not. It's certainly consistent with the
[24] thinking, as I recollect.

Page 73

[1]     **Q:** Okay. So you're not sure whether you
[2] actually read this specific document, but everything
[3] in this is consistent with your understanding of HUD
[4] policy. Is that correct?
[5]     **A:** You've got something starred here —
[6]     **Q:** Ignore the handwriting.
[7]     **A:** — No. 7.
[8] It's not handwriting; it's just a star.
[9]     **Q:** Well, okay. Ignore the star.
[10]     **A:** I don't remember that one.
[11]     **Q:** Anything else in here that is inconsistent?
[12]     **A:** I don't remember 8. I don't remember 9. I
[13] don't remember 11.
[14]     It doesn't mean it wasn't something I saw
[15] before. I just don't remember it. It wasn't
[16] something emphasized, maybe.
[17]     **Q:** Well, do you see at the top on page one
[18] where it says HUD "is committed to maintaining a
[19] diverse workplace in conformance with the agency's
[20] Affirmative Employment Plan"?
[21]     Do you see that?
[22]     **A:** The first paragraph, you're talking about?
[23]     **Q:** Yes. Is that consistent with your
[24] understanding of HUD policy?

Page 86

[1] mayors, meet with members of Congress in our area,
[2] and provide liaison back to the department on our
[3] program areas.
[4]    Q: So a community builder position was a new
[5] position?
[6]    A: It was created by Secretary Cuomo.
[7]    Q: Okay. And it was created in or about what
[8] year?
[9]    A: '96-97. Maybe '97, because the election
[10] was '96, I guess.
[11]    Q: Okay. Would it be inconsistent with your
[12] recollection that these positions were first staffed
[13] in 1998?
[14]    A: Could be '98.
[15]    Q: Okay.
[16]    A: I mean, we talked about them almost from
[17] the inception of his secretary. This was definitely
[18] something that Cuomo dreamt of, wanted, and ...
[19]    Q: Now, was there — what position was most
[20] comparable to the community builder position?
[21]    A: I think the regional director. That's why
[22] I call them Mini-Me's.
[23]    Q: Now, you mentioned that you were a
[24] community planning and development representative,

Page 87

[1] correct?
[2]    A: Correct.
[3]    Q: Would you regard that position, the CPD
[4] position, as comparable to the community builder
[5] position?
[6]    A: No, I would not.
[7]    Q: Why not?
[8]    A: Because the community planning and
[9] development position is very specific to those
[10] programs that that division deals with, which is
[11] community development, block grant, and, at the time
[12] I was doing it, UDAG. I saw the community builder
[13] position as being one which had expertise in public
[14] housing, fair housing, and housing. So it really
[15] was much more of an umbrella position. And as much
[16] as HUD says that it wants the program areas to have
[17] cross-training so that a community development rep
[18] really knows what a public housing specialist does,
[19] it doesn't happen. They don't do that. The people
[20] know what they do within their own program area.
[21]    Q: So it was important to you that the
[22] community builders have strong knowledge in other
[23] program areas within HUD. Is that correct?
[24]    A: Not exactly. The community builder was

Page 88

[1] not my idea; it was the secretary's idea. I think
[2] that we could have accomplished much the same if
[3] Washington had given the regional directors the
[4] ability to have some special assistance. We didn't
[5] need to create a whole new program area. But that
[6] was his idea. And so I was part of the team, and so
[7] we had to do what the secretary wanted, and the
[8] secretary wanted community builders. I happened to
[9] be one of his regional directors who liked the idea.
[10] Not everybody liked his idea, but I did because it
[11] gave me — I had a big workload and it gave me the
[12] opportunity to send people out in different areas.
[13] And to — I could be in Boston cutting a ribbon on
[14] something, and I could have somebody somewhere else
[15] speaking to a professional organization. I mean, it
[16] was ...
[17]    Q: Was there a prior attempt to create a
[18] community-builder-type function among the CPDs prior
[19] to the institution of the community builder
[20] position?
[21]    A: I don't know.
[22]    Q: Were there any — and the community builder
[23] position, who would the community builder report to?
[24]    A: The regional director.

Page 89

[1]    Q: And that was you?
[2]    A: Yes.
[3]    Q: And did you feel that it was important that
[4] the community builders reflect diversity and gender
[5] and race?
[6]    A: Yes.
[7]    Q: Okay. And why is that?
[8]    A: Because I think it was the face of the
[9] organization, and the organization sought to have a
[10] diverse face, and so these people would represent us
[11] and it would show that we were not all alike.
[12]    Q: Okay. And did you have any discussions
[13] with anyone about the importance of diversity in the
[14] community builder position?
[15]    A: I'm sure we did. I mean, I can't recall
[16] specific discussions, but that would have been
[17] typical that we would discuss it.
[18]    Q: Would you have that discussion with the
[19] secretary?
[20]    A: Yes.
[21]    Q: Would there have been more discussion about
[22] the importance of diversity in the community builder
[23] position?
[24]    A: More than what? What's the period you're

Page 102

[1] **Q:** The first round of the hiring of community
[2] builders, what was your role in that?
[3] **A:** I don't think I had any role in that. But
[4] I have trouble remembering, was that also open to
[5] internal candidates? See, I don't remember how this
[6] was staged.
[7] **Q:** Okay. My understanding is that there were
[8] Grade 13, 14, and 15 announcements. This is OSMST.
[9] I believe those are internal candidates?
[10] **A:** Those were the internal candidates?
[11] **Q:** Yes.
[12] **A:** Well ...
[13] **Q:** Do you recall speaking — well, who was
[14] Jose Cintron?
[15] **A:** He was the regional director for Region 2,
[16] based in New York. And then he left and became the
[17] director of the Miami-Dade office.
[18] **Q:** Do you recall that Mr. Cintron was involved
[19] in the selections for the first round of the
[20] community builder position?
[21] **A:** I don't think he was. Because the first
[22] round — I made a distinction because the first
[23] round brought me people I had never known before,
[24] from other parts of the country.

Page 103

[1] **Q:** Okay.
[2] **A:** They may have brought internal candidates.
[3] See, that's where my knowledge — my memory is
[4] really faulty.
[5] **Q:** Okay. Well, maybe this will jog your
[6] memory.
[7] **MR. MANTELL:** Could we have this marked,
[8] please.
[9] (Document marked as Crane
[10] Exhibit 8 for identification)
[11] **Q:** Would you review Exhibit 8, please.
[12] **A:** (Perusing documents)
[13] See, I still don't think Cintron was
[14] involved with the first round, but ...
[15] **Q:** Okay. Let me just stop you right there.
[16] Is that your signature on the third page?
[17] **A:** Yes.
[18] **Q:** And are those your initials on the first
[19] and second page?
[20] **A:** Yes.
[21] **Q:** Okay. Do you believe that Mr. Cintron was
[22] involved in the second round?
[23] **A:** I do.
[24] **Q:** Oh, okay. All right.

Page 104

[1] Well, we spoke before about Ms. Griswold,
[2] correct?
[3] **A:** Mm-hmm.
[4] **Q:** Was she involved in the first or second
[5] round?
[6] **A:** I think she was in the second round. But,
[7] again, I can't remember.
[8] **Q:** Okay. All right.
[9] The other individual that we discussed,
[10] which was — was it Mr. Nee? Who else — who was
[11] the person who was — you recommended for hire in
[12] the first round?
[13] Before I was even given a list of
[14] candidates?
[15] **Q:** Yes.
[16] **A:** Marty Nee.
[17] **Q:** Okay.
[18] **A:** But that was the second round.
[19] **Q:** Okay.
[20] **A:** Because the first round, I got people from
[21] around the country I never heard of before.
[22] **Q:** I see.
[23] **A:** And Jose, I don't think, had anything to do
[24] with the first round. I think he was still

Page 105

[1] Secretary's Representative at the time.
[2] **Q:** Okay.
[3] **A:** There was a break between the two rounds.
[4] **Q:** Okay. So what we're — what was
[5] Mr. Patoski involved in the second round?
[6] **A:** I think he was involved, yeah, when these
[7] people were: Bernard, Pellegrino, and Griswold.
[8] **Q:** Right. Okay.
[9] So has review of Exhibit 8 refreshed your
[10] recollection?
[11] **A:** It has.
[12] **Q:** Okay. Did you give Mr. Cintron your
[13] recommendations concerning the candidates?
[14] **A:** I did.
[15] **Q:** And was it unusual for you to give
[16] recommendations in the form that you did for the
[17] community builder position?
[18] **A:** Well, there was no usual standard, so that
[19] I could state what was unusual —
[20] **Q:** Okay.
[21] **A:** — in the community builder area. This was
[22] a new thing.
[23] **Q:** Okay. Had anyone ever called you before
[24] and said, "These are a list of candidates who you

Page 106

[1] recommend"?
[2]     A: If we're still talking about the first
[3] round, I don't believe I got any calls on the first
[4] round. I believe I just was told these were the
[5] assigned people.
[6]     Q: Okay. But I'm talking about in terms of
[7] 1993 to 2001. Was there any other situation in
[8] which someone called you and said, "These are the
[9] candidates for the position; who do you recommend?"
[10]     A: Yes.
[11]     Q: Okay. Who were the other occasions?
[12]     A: The assistant secretary for public housing
[13] asked me about the position of director of the
[14] Office of Public Housing for Region 1. The — and
[15] that was Assistant Secretary Joseph Shuldiner. He
[16] left, but he didn't complete the full two terms of
[17] Clinton. When there was the opening for the
[18] director of the Office of Housing, I was called and
[19] asked to participate in the selection process as
[20] well as the interview process. And to participate
[21] meant make a recommendation, who would you like to
[22] see.
[23]     Q: Okay.
[24]     A: I got to make a selection for whatever the

Page 107

[1] title was that Ms. Wong had, which I think of as a
[2] special assistant. And it may very well have been
[3] her title; I just can't remember.
[4]     Q: When you say the director of the Office of
[5] Public Housing, when was that position open?
[6]     A: Well, if Shuldiner were the candidate, it
[7] was during the first Clinton term. So sometime
[8] prior to '96.
[9]     Q: Is Shuldiner the individual that you
[10] recommended?
[11]     A: No. Tony Brito.
[12]     Q: Oh. Tony, you've already spoken to him?
[13]     A: Yes, I have. And Shuldiner was the
[14] assistant secretary who called me and said — I
[15] believe he said, "We have So-and-So and So-and-So
[16] and So-and-So. What do you think?"
[17]     And I said, "I would like to see Tony
[18] Brito."
[19]     Q: Okay. Did you mention at that time that
[20] you felt that it would be good for purposes of
[21] diversity —
[22]     A: Yes.
[23]     Q: — to hire Mr. Brito?
[24]     A: Oh, yeah. That was part of my argument why

Page 108

[1] we should have him. I mean, I actually had some
[2] reservations about Tony. He was very bureaucratic,
[3] I felt. But on balance and for all these reasons, I
[4] thought he would be good.
[5]     Q: So you would agree that his race was a
[6] motivating factor in your decision to recommend him?
[7]     A: In that case, very definitely it was.
[8]     Q: And with regard to the director of Office
[9] of Housing, who was the person you recommended?
[10]     A: I don't remember the guy's name, but
[11] somebody from Washington who was an assistant —
[12] like a deputy assistant secretary to the assistant
[13] secretary for the Office of Housing.
[14]     Q: You don't remember this person's name?
[15]     A: I don't.
[16]     Q: Were you consulted and given a list of
[17] candidates?
[18]     A: Not only that, but we interviewed those
[19] candidates.
[20]     Q: Oh, okay.
[21]     A: So I met them face-to-face.
[22]     Q: Do you recall the race of this individual?
[23]     A: The person from Washington?
[24]     Q: Yes.

Page 109

[1]     MR. GRADY: Object to form. Which
[2] individual?
[3]     Q: The person that you recommended for hire
[4] for the director of the Office of Housing, do you
[5] recall —
[6]     A: Oh. That's different from what you just
[7] said, I thought.
[8]     Q: Oh, okay.
[9]     A: You asked me the person who asked me to
[10] participate in this from Washington. The assist —
[11] the deputy assistant secretary was a Caucasian male.
[12]     Q: Okay.
[13]     A: Then we interviewed maybe — I don't know
[14] if it was three or five candidates for the position.
[15]     Q: Mm-hmm.
[16]     A: And the person we selected — or I
[17] recommended be selected, and she was then selected;
[18] not that it was my recommendation that did it — was
[19] a white female.
[20]     Q: Do you remember her name?
[21]     A: Ellen Connelly. I've already spoken of
[22] her.
[23]     Q: Oh, Ellen Connelly. That's right.
[24] And you would agree with me, wouldn't you,

---

Page 122

[1] A: You know, I have no idea. She's probably
[2] 60.
[3] Q: Is she male or female?
[4] A: She's female.
[5] Q: What's her race?
[6] A: I don't know. I really don't know. She
[7] could be black or have some black.
[8] Q: Okay. Would you be able to recognize her
[9] if you saw her?
[10] A: Yes.
[11] Q: And you don't think you recommended her?
[12] A: I don't think so. I would be surprised if
[13] I recommended Meryl.
[14] Q: Okay. And why is that?
[15] A: Meryl's very, very bright, but she's the
[16] kind of person that you'd want doing your research,
[17] not interacting with the public.
[18] Q: Why is that?
[19] A: Because she didn't have the skills to deal
[20] in interpersonal relationships.
[21] Q: Do you know Robert F. Cormier?
[22] A: I do.
[23] Q: Who is he?
[24] A: He, at the time I was at HUD, was an

---

Page 123

[1] employee at the Office of Housing.
[2] Q: And is he male or female?
[3] A: He's a white male.
[4] Q: How old is he currently?
[5] A: Late 50s.
[6] Q: Did you recommend his hire?
[7] A: I don't think so.
[8] Q: Why not?
[9] A: I don't know. I mean, maybe I already had
[10] recommended enough people. I have no idea.
[11] Q: Okay. Do you know Margaret Burns?
[12] A: I don't think so.
[13] Q: Okay. Do you know whether you recommended
[14] her?
[15] A: I don't remember who she is, if she's a HUD
[16] employee. I can't remember.
[17] Q: Do you know Wendy Lucas?
[18] A: That name is familiar, but I don't know
[19] why.
[20] Q: Okay. You have no memory of Ms. Lucas?
[21] A: No, but she could have worked right under
[22] me. I just don't remember who she is. Somebody
[23] mentioned a HUD name to me the other day and it took
[24] me a while to remember who she was. So ...

---

Page 124

[1] Q: Did you recommend that she be hired as a
[2] community builder?
[3] A: I don't think so.
[4] Q: Can you recall why?
[5] A: Because I don't know — remember who she
[6] is.
[7] Q: That's fair enough.
[8] Do you know Karen Marie Melfi?
[9] A: I do.
[10] Q: Who is she?
[11] A: Karen was an employee of the Office of
[12] Community Planning and Development when I went to
[13] HUD.
[14] Q: And did you recommend her hire —
[15] A: I don't —
[16] Q: — as a community builder?
[17] A: Yeah. I don't remember.
[18] Q: Is she male or female?
[19] A: She's a white female.
[20] Q: And how old is she currently?
[21] A: Late 50s.
[22] Q: Do you know William Motiel, M-o-t-i-e-l?
[23] A: No.
[24] Q: Do you know whether you recommended hiring

---

Page 125

[1] him?
[2] A: I would doubt it, since I don't even
[3] remember ever hearing the name.
[4] Q: Do you know Rick Patoski?
[5] A: I do.
[6] Q: Who is he?
[7] A: Rick is a community — well, was a
[8] community planning representative when I was at HUD
[9] in Connecticut initially, and was still in that
[10] position when I went to HUD in Boston.
[11] Q: Okay. Did you recommend Mr. Patoski for
[12] the community builder position?
[13] A: I did not.
[14] Q: What race is Mr. Patoski?
[15] A: He's white.
[16] Q: Is he male or female?
[17] A: He's male.
[18] Q: And why didn't you recommend him for the
[19] community builder position?
[20] A: Because I had had some complaints from
[21] community people about Mr. Patoski's style of
[22] dealing with them.
[23] Q: Okay. Such as?
[24] A: They thought he was brusque, which would be

---

Page 142

[1] I don't remember the timing.

[2] **Q:** Now, you mentioned before that, in your own
[3] personal experience, you found Mr. Patoski gruff —
[4] brusque?

[5] **A:** Mr. Patoski to me appears to be all
[6] business.

[7] **Q:** Okay. Can you recall any instances in
[8] which you recall Mr. Patoski having inappropriate
[9] interpersonal relationships or discussions?

[10] **A:** No, not inappropriate.

[11] **Q:** Not inappropriate?

[12] **A:** Correct.

[13] **Q:** But not optimal?

[14] **A:** Not optimal.

[15] **Q:** Can you recall any examples of that?

[16] **A:** No. I can tell you this: When I heard
[17] that he was acting on behalf of a political
[18] candidate outside the office on business — on his
[19] own time, I thought that was a positive sign, that
[20] he did stuff other than just business. Because I
[21] always thought of him as just business. I thought
[22] he needed a sense of humor.

[23] **MR. GRADY:** This probably isn't the venue
[24] where one will be developed.

Page 143

[1] **THE WITNESS:** No. But, you know, he's
[2] asking me these questions.

[3] **MR. GRADY:** No, I know.

[4] **THE WITNESS:** And the guy's sitting right
[5] here. It's hard.

[6] **MR. MANTELL:** I know it's tough.

[7] **MR. GRADY:** And for the record, Mr. Patoski
[8] did smile.

[9] **MR. MANTELL:** All right. Let's take a
[10] short break, give you a little rest.

[11]    (Recess taken)

[12]           **BY MR. MANTELL:**

[13] **Q:** I want to go back to Cheryl Ann Teninga
[14] again. Would you recognize her if you saw her?

[15] **A:** I don't think I ever met her. But she was
[16] a Washington official.

[17] **Q:** Okay. And you don't know how old she is?

[18] **A:** I don't.

[19] **Q:** And you don't know her race?

[20] **A:** I think she's black, but I don't know for
[21] sure. I haven't seen her, that I can recall.
[22] But — never mind.

[23] **Q:** Now, did you regard Mr. Patoski's gender as
[24] a factor in your decision not to recommend him?

Page 144

[1] **A:** No.

[2] **Q:** No. So it was a neutral —

[3] **A:** Yes.

[4] **Q:** Okay. So let me — so — let me ask it
[5] this way.

[6]    Was Mr. Patoski's gender a factor in your
[7] decision not to recommend him?

[8] **A:** No.

[9] **Q:** Okay. Was Mr. Patoski's race a factor in
[10] your decision not to recommend him for the community
[11] builder position?

[12] **A:** No.

[13] **Q:** Okay. It was a neutral factor. Is that
[14] correct?

[15] **A:** Correct.

[16] **Q:** Okay. If Mr. Patoski had been black or
[17] Hispanic, would you have regarded that as a positive
[18] factor in his application for the community builder
[19] position?

[20]    And this is, as we discussed before,
[21] perhaps one of many factors.

[22] **A:** Correct. Yes.

[23] **Q:** Okay. Was Mr. Patoski's age a factor in
[24] the decision not to recommend him for the community

Page 145

[1] builder position?

[2] **A:** Don't know his age, so, no.

[3] **Q:** Well, how old do you think Mr. Patoski is
[4] right now?

[5] **MR. GRADY:** Objection to form. Go ahead
[6] and answer it.

[7] **A:** I think he's younger than I am, so it would
[8] put him somewhere in his 50s.

[9] **Q:** Okay. Well, assuming that you're
[10] correct — and you knew Mr. Patoski at the time that
[11] you recommended —

[12] **A:** Yes.

[13] **Q:** — not to terminate him?

[14] So you had an understanding of his age,
[15] correct?

[16] **MR. GRADY:** Objection to form. You said
[17] that she recommended not to terminate him?

[18] **MR. MANTELL:** Not to hire him —

[19] **MR. GRADY:** Thank you.

[20] **MR. MANTELL:** — for the community builder
[21] position.

[22] **A:** What do you want me to answer? I'm sorry.
[23] What is the question?

[24] **MR. GRADY:** Objection to form.

Page 146

[1] Q: All right. Let me — let me ...
[2] Was Mr. Patoski's age a factor in your
[3] decision not to recommend him for the community
[4] builder position?
[5] A: Not at all.
[6] Q: Okay. So at the time that you made these
[7] recommendations, you think that you had heard of
[8] Cheryl Ann Teninga. Is that correct?
[9] A: Correct. I think she might have worked in
[10] the Office of Public Housing in Washington.
[11] Q: Was it your understanding that she was a
[12] male or female?
[13] A: Female.
[14] Can I say something? I — no. Okay.
[15] Q: Is there any testimony that you would like
[16] to correct or clarify?
[17] A: No.
[18] Q: Did you consult with anyone other than
[19] Mr. Grade concerning this deposition today, in
[20] preparation?
[21] A: When I first received the subpoena, I spoke
[22] to my son-in-law, who is an attorney, and he advised
[23] me that I should be represented by a federal lawyer
[24] since this was a federal process. And this was

Page 147

[1] during my time at HUD. So the next day I called Bob
[2] Kenison, who is a lawyer with expertise in the area
[3] of community planning and development, and I knew
[4] Mr. Patoski worked in that program area.
[5] Mr. Kenison —
[6] MR. GRADY: Before you get too-too far down
[7] this road, to the extent you have had communications
[8] with attorneys for HUD or with your own attorneys, I
[9] would advise you that such communications are
[10] subject to the attorney-client privilege, and with
[11] regard to any consultation you had as to any
[12] individual lawyer, you may exercise any privilege
[13] with regard to the nature or substance of those
[14] communications.
[15] Q: Let me ask the question differently.
[16] Other than lawyers, did you speak to anyone
[17] in preparation for this deposition?
[18] A: I have not been prepared for this
[19] deposition. I have reviewed no documents and I have
[20] had no lengthy conversations about — I said to you,
[21] "Tell me what you're going to do. I don't even know
[22] what a deposition consists of."
[23] Q: So you've spoken to no one who isn't a
[24] lawyer concerning what you were going to say here?

Page 148

[1] A: Yes, I have, because I was so annoyed at
[2] having to come down here today.
[3] Q: Who did you speak to?
[4] A: All my friends. No —
[5] Q: Anyone at HUD?
[6] A: No. Well, other than Bob Kenison in
[7] Washington, who referred me to — can I look at my
[8] notes? Somebody — can I look at my notes to get a
[9] name?
[10] Q: Is that name a lawyer?
[11] A: I think she is.
[12] Q: All right. Then I don't care.
[13] Did you speak to Mr. Cintron concerning
[14] your testimony today?
[15] A: No. I don't even know where he is now.
[16] Q: Okay.
[17] Now, looking at Exhibit 8, which is your
[18] affidavit, it took quite some time for you to
[19] prepare this affidavit. Isn't that correct?
[20] A: I didn't prepare the affidavit.
[21] Q: Who did?
[22] A: I have no idea. Didn't somebody call me
[23] and ask me questions?
[24] Q: Did that process take place over a period

Page 149

[1] of time or was that relatively quick?
[2] A: I have no recollection. It seems to me
[3] somebody asked me questions and then wrote it up.
[4] Q: To your recollection, did you speak to
[5] Mr. Cintron before signing this affidavit? Did you
[6] two talk and compare notes?
[7] A: I have no idea. Seven years — I have no
[8] idea.
[9] Q: Do you recall that Mr. Patoski sought to
[10] take your deposition in connection with the EEOC
[11] administrative proceedings?
[12] A: I think I was asked to come in for
[13] something.
[14] Q: Okay. And why didn't you?
[15] A: Because I didn't have to.
[16] Q: Any other reason?
[17] A: Because I didn't have to.
[18] Q: Did you speak to anyone concerning whether
[19] you should come in to take your deposition during
[20] the EEOC proceeding?
[21] A: My son-in-law, the lawyer.
[22] Q: Anyone else?
[23] A: I don't think so. I think he's the one who
[24] told me I didn't have to. So I said, "Good. I'm

# EXHIBIT 5

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
BOSTON AREA OFFICE

Administrative Judge:  Kathleen Mearn Clarke
EEOC, Boston Area Office

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
RICHARD PATOSKI,

   Complainant

 - vs. -

MEL MARTINEZ, SECRETARY,
U.S. DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT AGENCY,

   Respondent.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

EEOC Hearing No.
 160-AO-8342X
Agency Case No.'s:
 BN-98-02
 BN-01-01

Held at U.S. Merit Systems Protection Board
99 Summer Street, Suite 1810
Boston, Massachusetts
Friday, July 12, 2002

APPEARANCES:

 Joleen Payeur Olsen, Attorney at Law, 156A Front Street,, Unit 3, Marion, Massachusetts, 02378; on behalf of the Complainant.

 Abraham Brandwein, Deputy Assistant General Counsel, U.S. Department of Housing and Urban Development, O'Neill Federal Building, 10 Causeway Street, Boston, Massachusetts, 02222; on behalf of the Agency.

 Thomas W. Rodick, Deputy Assistant General Counsel, U.S. Department of Housing and Urban Development, O'Neill Federal Building, 10 Causeway Street, Boston, Massachusetts, 02222; on behalf of the Agency.

1    Q.      In making your selection decision, was there

2  one particular factor that you gave a lot of weight

3  to in terms of what you were looking for in a

4  selectee?

5    A.    Yes.  What I did, in addition to reviewing the

6  work that was -- the paperwork that was available

7  to me, was to call the people that were the heads

8  of the offices involved in the selections for the

9  Boston office, for example, that was Mary Lou Crane

10  who was the Secretary's Representative, and ask for

11  any information that they might have with regard to

12  the candidates on the list.  I thought this would

13  be appropriate since, in fact, they would be

14  supervising these people directly.

15       And what one signed on a written application

16  is one part of the story, and what is corroborated

17  by someone with personal experience dealing on a

18  day-to-day basis with candidates is another part of

19  the story, particularly since it's hard to judge

20  interpersonal skills and abilities solely from the

21  application.  Those comments were important to me

22  in making those selections.

23    Q.      Which is sort of what I was trying to

24  understand.

1          Guess, that's a guess at this point,

2     guesstimate.

3     Q.     I think you indicated that the person you

4     contacted for the Boston position was Ms. Crane, is

5     that correct?

6     A.     That's correct.

7          MS. OLSEN:  Your Honor, I'm just

8     directing the witness's attention to Tab 8 in the

9     report of investigation.

10         BY MS. OLSEN:

11    Q.     Would you take a look at the second page, it's

12    the vacancy announcement.

13         Are the four quality ranking factors what you

14    were referencing earlier in your testimony?

15    A.     Correct.

16    Q.     And this is one of the documents that you had

17    to help you make your decision?

18    A.     Yes.

19    Q.     I thought it might be, but until I got the

20    book back and looked at it for you, I couldn't turn

21    the page.

22         When you contacted Ms. Crane, were you aware

23    that she didn't have direct -- I'm not sure what

24    the word is -- supervisory authority over the

1          applicants?

2     A.       I was aware that there was not direct

3          supervisory authority.  I, in fact, had been in a

4          similar position as Ms. Crane.  I was the

5          Secretary's Representative for New York and New

6          Jersey before becoming the Florida state office

7          coordinator.  So, I'm very familiar with that job

8          and the role that it had in the office and the

9          interaction that one could have with many people

10         across program lines in the HUD office.

11    Q.       But wouldn't the applicants' immediate or

12         second-level supervisor have a more intimate day-

13         to-day knowledge of the applicants' qualities and

14         qualifications than Ms. Crane would, by virtue of

15         their position?

16    A.       The fact is that the people would be working

17         with Ms. Crane, not with their present supervisor.

18         So it was, in my opinion, important to hear Ms.

19         Crane's view of those candidates because she was

20         going to become their direct supervisor, which is

21         why I went to Ms. Crane in Boston, I went to people

22         who held those positions in each of the offices for

23         which I was a selecting official.

24    Q.       If the feedback that you got from Ms. Crane

1          differed from the information that you found in the

2          application, how did you resolve that conflict?

3     A.         If there seemed to be an apparent

4          inconsistency between what was being presented in

5          the paperwork and the application and what I heard

6          from Ms. Crane, I gave more weight to what I heard

7          from Ms. Crane than I did the application.

8               Many folks are skilled writers; that doesn't

9          make them skilled verbal communicators or people

10         that have the kinds of skills that we felt would be

11         necessary in the Community Builder role.

12              So the input that I received from Ms. Crane

13         and others in her position across the two regions

14         for which I was selecting official was more on

15         that, what kind of personal skills did they have or

16         are they the kind of people that we want out there

17         representing the front line of the HUD Department.

18    Q.         Did the other selecting officials for the

19         Community Builder jobs take a similar approach that

20         you did in contacting the folks at Ms. Crane's

21         level?

22    A.         I don't have direct information about whether

23         they did or not.  We each did what we had to do in

24         our own judgment to arrive at the best selections