UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

RICHARD S. PATOSKI,                    )
                                       )
         Plaintiff,                    )
                                       )
v.                                     )
                                       )          C.A. No. 05-11086-RCL
ALPHONSO JACKSON, SECRETARY            )
DEPARTMENT OF HOUSING AND              )
URBAN DEVELOPMENT,                     )
                                       )
         Defendant.                    )
_____)

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PROTECTIVE ORDER IN RESPONSE TO PLAINTIFF'S SECOND RULE 30(B)(6) DEPOSITION NOTICE TO THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

Introduction

In fulfilment of its obligations under Title VII of the Civil Rights Act of 1964, the Equal Employment Opportunity Commission ("EEOC") promulgated Management Directive 714 ("MD 714") in 1987, which required each federal department and agency to prepare and submit to the EEOC an "affirmative employment plan" ("AEP") to be reviewed and approved by the EEOC. The directive required agencies to develop affirmative employment programs which hold senior management responsible for equal employment opportunity objectives and provides for the establishment of numerical "goals" where there is a "manifest imbalance" or "conspicuous absence" of minorities and women in the work force.[1]

_____

[1]In 2003, EEOC MD-714 was superceded by EEOC MD 715. See, e.g., Worth v. Jackson, 451 F.3d 854, 856 (D.C. Cir. 2006) (finding, *inter alia*, that Plaintiff's claims with respect to the AEP Program were rendered moot by the adoption of MD 715 which eliminates the creation of any goals based upon the statistical analysis).

The Plaintiff, a white male, who was denied positions for which he applied within HUD in 1998 and 2000, seeks recovery under Title VII, alleging that the failure to hire him for those positions was based upon age, gender and racial discrimination.  In addition, Plaintiff contends that the collection and dissemination of workforce statistics, based upon race, to managers, in combination with managerial performance standards based upon EEO considerations, leads managers to consider race (and/or gender) in making individual personnel decisions irrespective of whether taking race into account can be justified as a matter of law.  In this regard, Plaintiff alleges that HUD's now superceded AEP violated the constitution - - and that HUD's present practices do so as well -- and seeks prospective injunctive relief.

Beyond the foregoing, Plaintiff's Complaint alleges that, "HUD has, and continues to engage in a pattern or practice of unlawfully favoring women and minorities and certain races and ethnicities with regard to training and promotions whereby HUD has deprived and continues to deprive Plaintiff of the equal protection of the law."

## **FACTS**

On November 21, 2006, the Plaintiff has served upon HUD a Second Rule 30(b)(6) Deposition Notice, originally designating one hundred and twenty eight (128) subject matters upon which HUD was required to designate an individual to testify under Rule 30(b)(6) on December 15, 2006. See Second Notice of Rule 30(b)(6) Deposition, attached hereto as Exhibit 1.  HUD has previously designated three individuals to testify in Response to the Plaintiff's First Notice of Rule 30(b)(6) Deposition.  See Plaintiff's First Notice of Rule 30(b)(6) Deposition, attached hereto as Exhibit 2.

## ARGUMENT

In discussions regarding the defendant's motion for a protective Order, the Plaintiff agreed to limit the scope of questions at the second deposition to those subjects listed in paragraphs 57, 62, 63, 66, 67, 75-77, 95-104, 115-119, 122, 125 and 128. The Parties have come to no further agreement and the Defendant hereby moves for a protective Order on the ground that the notice violates Fed. R. Civ. P. 30(a)(2)(B) in that the Plaintiff has served a second deposition notice without leave of Court and/or without the express assent of the defendant by stipulation. Fed. R. Civ. P. 30(a)(2)(B). Furthermore, this Court should not grant leave to conduct a second deposition as the testimony sought is wholly irrelevant, cumulative and likely to be less accurate than depositions already conducted in connection with this matter and/or seeks testimony concerning claims that have been forfeited by the Plaintiff.

## I.     The Second Deposition Notice is Invalid

Fed. R. Civ. P. 30(a)(2)(B) expressly provides a limitation upon the service of more than one deposition notice upon a party to the action. "Pursuant to Rule 30(a)(2)(B), '[a] party must obtain leave of court . . . if . . . the person to be examined already has been deposed in the case. . . .'" <u>Ameristar Jet Charter, Inc. v. Signal Composites, Inc.</u>, 244 F.3d 189, 192 (1st Cir. 2001) (quoting Fed. R. Civ. P. 30(a)(2)).

Here, without leave of Court, the Plaintiff has served a second notice of deposition upon HUD. Pursuant to the express language of Rule 30(a)(2)(B), it must be quashed.

## II.    This Court Should Not Afford the Plaintiff Leave to Serve A Second Deposition And/or Should Quash the Second Notice Pursuant to Fed. R. Civ. P. 26(b)(2)(C)

This Court should not grant the Plaintiff leave to conduct a second deposition of HUD. With respect to the issues to which the second deposition has now been narrowed from the one

hundred and twenty eight subjects originally designated: (1) the Plaintiff seeks to depose HUD as to specific events that occurred during the hiring process for the 2000 Public Housing Revitalization Specialist Position (Paragraphs 62-63, 66, 75-77 and 115) which are duplicative of issues raised in the first deposition and which would be cumulative of prior depositions of individuals taken in connection with this matter; (2) the Plaintiff seeks to depose HUD with respect to the authentication of documents relative to claims that have been forfeited (paragraphs 95-104, 116-118, 122 and 125); (3) and seeks to depose HUD as to an issue that cannot be rationally construed as relevant to the instant action in any fashion whatsoever (Paragraph 128).

For the reasons stated more fully below, a protective Order should enter and the subpoena as to these issues should be quashed.

A.     **Requests That HUD Designate an Individual to Testify Regarding the Hiring Process of the Public Housing Revitalization Specialist Position in 2000 are Duplicative of the First Notice and Cumulative of Depositions Already Conducted by the Plaintiff**

Paragraphs 62-63, 66, 75-77 and 115 seek to require HUD to designate an individual to testify at a second deposition regarding specific events allegedly occurring during the hiring process for the Public Housing revitalization Specialist in 2000.  HUD employees who directly participated in the process, however, have already been deposed in connection with this matter. Furthermore, in the first Rule 30(b)(6) Deposition, Plaintiff has already deposed HUD regarding its hiring policies practices and procedures.[2]  There has been no showing why the Plaintiff could

_____

[2]The first 30(b)(6) Deposition Notice required HUD to designate an individual to testify regarding:

8.     Whether any formal or informal program to foster or increase diversity at HUD impacted in any way the recruitment and/or selection process(es) for vacancy announcements OS-MST-98-0002-A, 06-DEU-2000-0081A and 06-

not have sought testimony with regard to specific events occurring in the hiring process during the first deposition. Plaintiff has simply re-noticed the deposition of HUD as to matters covered by the First Notice of Deposition with respect to a particular decision or event within the hiring process.        Some background is necessary to understand the issues as to which the Plaintiff seeks further discovery. In 2000, HUD announced that it intended to hire an individual to fill a Public Housing Revitalization Specialist Position in Boston. See First Amended Complaint, ¶31-32. It was announced under a process open to the public, the DEU process, and in a process open only to federal employees, the MSR process. Id. Mr. Patoski submitted applications under both announcements. Id., ¶33. It is conceded by HUD that Mr. Patoski was erroneously found not to qualify for the position under the MSR announcement. Id., ¶35. Nonetheless, the Plaintiff was found to be eligible for the position under the announcement made to the public at large, the DEU process, at all grade levels (GS-13, GS-14 and GS-15). Id., ¶34.

One applicant for the MSR position, Ralph Knighton, Plaintiff alleges, was not eligible for that announcement because he was not a career federal employee. Id., ¶36. HUD nonetheless referred Mr. Knighton's application to the DEU process. Id. Mr. Knighton, a black male, ultimately made the best qualified list for the DEU position. Id. Mr. Patoski contends that HUD's decision to forward Mr. Knighton's application from the MSR to DEU processes was improper and was done because Mr. Knighton is a black male. Id. Plaintiff contends that HUD's discrimination in this regard prejudiced him because he shouldn't have had to compete

---

MSR-2000-0099 AZ.
9.    The usual procedures(s) for filling positions at HUD, from January 1, 1997, to the present.

See First 30(b)(6) Notice.

with Mr. Knighton. Id.

Plaintiff also contends that he was prejudiced because a Mr. Gallagher, a white male, made the best qualified list for the DEU position at the GS-15 level. Id., ¶ 37. According to the Plaintiff, Mr. Gallagher was not found eligible for the position at the GS-15 level, and therefore, should not have made the best qualified list. Id., ¶ 37. It appears that Plaintiff believes that Mr. Gallagher was only placed on the GS-15 list so that the top three candidates would not have been all black males. Id., ¶ 38.

The Plaintiff has already conducted substantial discovery as to these events. He has deposed, in the administrative proceedings, Deborah Medvic, Emmanuel Yeow, Betty Smith and Jeffrey Lahmers, the HUD personnel specialists assigned to the PHRS hiring. Those depositions occurred in June 2002. A Rule 30(b)(6) Deposition of HUD would simply be duplicative (and now that additional time has passed) less accurate than the testimony of the individuals actually involved in the process.

Even assuming that the Notice is wholly proper, Rule 26(b)(2)(C) affords this Court discretion to limit discovery in these circumstances. Rule 26(b)(2)(C) provides limits upon discovery, even upon relevant information:

> The frequency or extent of use of the discovery methods otherwise permitted under these rules and by any local rule shall be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C). See Gill v. Gulfstream Park Racing Ass'n., Inc., 399 F.3d 391, 400

(1st Cir. 2005) ("All discovery is subject to the limitations imposed by Rule 26(b)(2)(i), (ii), and (iii)").

**B.    Testimony Regarding the Emerging Leaders Program is Duplicative**

Paragraph 125 seeks additional testimony from HUD regarding the Emerging Leaders Program.[3]   Again, by way of the second deposition, Plaintiff simply seeks to re-depose HUD on an issue that was the subject of the first deposition.   This request should be quashed as duplicative both as an abuse of the discovery process and pursuant to this Court's discretion afforded under Rule 26(b)(2)(C).

---

[3]The Plaintiff has already deposed HUD on this subject.  The first deposition sought testimony as to:

> 4.    All formal and informal programs implemented at HUD from January 1, 1997, to the present, including without limitation, the AEP, FEORP Plan, Special Emphasis Program, *Emerging Leaders Program*, Hispanic Employment plan, HUD intern Program, Corrective Action Plan, Proud to Be Goal, Accelerated Promotion Policy, the Diversity Recruitment plan, any diversity hiring strategies, Upward Mobility Program, to foster or increase diversity within the HUD workforce, and further the:
>
> A.    Dates of implementation of such programs;
> B.    Studies performed to determine whether such programs complied with Constitutional standards;
> C.    Any and all strategies and tactics suggested and/or used at HUD to increase the hiring of minorities and women; and
> D.    Any determinations or conclusions as to whether such programs were successful, and the extent of such success.

<u>See</u> First 30(b)(6) Deposition Notice.

7

C.    **Plaintiff Cannot Revive Claims That Have Been Forfeited For Failure to Exhaust Title VII Administrative Remedies by Re-characterizing Them as Challenges to "Policies and Practices," And Consequently, Discovery Requests With Respect to Such Claims Is Improper**

Paragraphs 95-104, 116-118 and 122 seek to require HUD to designate an individual to testify with respect to documents related to the failure to hire this Plaintiff for a position in 2003. Paragraph 125 seeks additional testimony from HUD regarding the Emerging Leaders Program.[4] These claims have been forfeited as a matter of law and attempts to seek discovery on these issues is an abuse of the discovery process.

The Plaintiff initiated a claim under Title VII's  administrative remedy process with respect to the denial of the 2003 position, but the Plaintiff's administrative claim was dismissed by the Administrative Judge as a sanction for failure to provide discovery responses.  The Plaintiff did not appeal that decision[5] and has not exhausted available remedies.  The Plaintiff has also testified that he applied for the Emerging Leaders Program in 2004 and claims that he was denied admission based upon race and/or gender, but never pursued any Title VII administrative remedies, at all, with respect to that denial.  Because Title VII provides the exclusive remedy for claims of federal employment discrimination, these claims are no longer actionable.

---

[4]Plaintiff testified at Deposition that HUD's Emerging Leaders Program affords training to its participants that substantially benefits participants in obtaining managerial positions. According to the Plaintiff's allegations, training undertaken in the Program serves in lieu of actual managerial experience for determining whether an individual is qualified to apply for management positions within HUD.  Thus, through the Program, individuals without actual management experience can become eligible to apply to management positions.

[5]The Defendant will supplement with the transcript of the Plaintiff's Deposition when it is completed, if necessary.

8

It is axiomatic that the United States is immune from suit unless it specifically agrees to be sued.  See Hercules v. United States, 516 U.S. 417 (1996).  While the Federal Government has waived sovereign immunity as to claims of discrimination in federal employment, Title VII provides the exclusive scheme for redress of claims of discrimination in federal employment. Brown v. General Service Administration, 425 U.S. 820, 828-829, 835 (1976).  In Brown, the Supreme Court held that because Congress' intent in enacting § 717 of Title VII was "to create an exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination," § 717 "provides the exclusive judicial remedy for claims of discrimination in Federal Court."  Brown, 425 U.S. at 835.  In Brown, the Supreme Court made it clear that attempts to circumvent Title VII's administrative procedures by artful pleading were prohibited.  See Brown, 425 U.S. at 833 (artful pleading could not be used to bypass Title VII "by the simple expedient of putting a different label on the pleadings").

While the plaintiff has conceded that Title VII's administrative remedies have not been exhausted as to these claims, the Plaintiff nonetheless seeks to pursue claims with respect to the 2003 position and his non-admission to the Emerging Leaders Program on the basis that these events were part of "policies and practices" of HUD in violation of the Equal Protection Clause. See First Amended Complaint, ¶¶ 53-62.  Title VII, however, preempts even constitutionally based claims arising from allegations of federal employment discrimination.  See Bush v. Lucas, 462 U.S. 367 (1983) (Congress may provide an alternative, exclusive remedy to claims for constitutional violations); Brown, supra; Ford v. West,  222 F.3d 767, 772 (10th Cir. 2000) (citing Belhomme v. Widnall, 127 F.3d 1214, 1217 (10th Cir.1997)); Williams v. General Servs. Admin., 905 F.2d 308, 311 (9th Cir.1990); Ethnic Employees of Library of Congress v. Boorstin,

751 F.2d 1405, 1415 (D.C.Cir.1985); Delaney v. Potter, 2006 WL 2469380 (D. Tenn. 2006);

Fulton v. Potter, 2005 WL 1770847 (D. Ark. 2005); Jones v. Mineta, 2004 WL 1534177 (D.

Kan. 2004); Gunning v. Runyon, 3 F.Supp.2d 1423 (D. Fla.1998); Christensen v. Lawrence F.

Quigley Memorial Hosp,. 656 F.Supp. 14 (D. Mass. 1985).

      Plaintiff's failure to exhaust administrative remedies as to the alleged failure to hire in

2003 and the denial of admission to the Emerging Leaders Program constitutes a forfeiture of

such claims.  See, e.g., Brown, 425 U.S. at 832 ("Initially, the complainant must seek relief in

the [federal] agency that has allegedly discriminated against him");  Cano v. United States Postal

Service., 755 F.2d 221, 223 (1st Cir.1985) (affirming district court's entry of summary judgment

failure to make timely exhaustion); Kwatowski v. Runyon, 917 F.Supp. 877, 883 (D. Mass.

1996) (same).

      These claims have been forfeited and the Plaintiff cannot pursue them under the guise of

a constitutional challenge to HUD's practices and policies.  Such a course runs afoul of the

express intent of Congress and the Supreme Court's exhortations that Plaintiff's should not be

permitted to evade Title VII's requirements "by the simple expedient of putting a different label

on the pleadings." Brown, 425 U.S. at 833.[6]

**D.**    **Finally, Attempts to Seek Testimony Regarding HUD's Decision to Send Employees to the Annual Conference of Blacks in Government Should be Quashed as Abusive**

      The Plaintiff's final request of the second notice of deposition (paragraph 128) seeks

discovery regarding HUD's practice of sending employees to conferences and/or trainings run by

---

[6]It should also be noted that nowhere in the Plaintiff's First Amended Complaint is any reference whatsoever made to the 2003 failure to hire claim.  See Plaintiff's First Amended Complaint.

the organization, Blacks in Government.  Plaintiff testified[7] that this practice was unfair because attendees (whom he alleges are solely black employees of HUD) receive training on resume preparation and other skills that would assist their advancement at HUD.   According to Plaintiff this "training" is unavailable to white males and, consequently, HUD's "policy or practice" in this regard violates the Equal Protection Clause.  Plaintiff conceded, however, that he has never applied to attend such "trainings."

As noted above, Title VII, rather than the Equal Protection Clause, provides the exclusive remedy for federal workplace discrimination.   For the reasons stated <u>supra</u>,  this claim is simply not actionable independent of Title VII.  Further, not only has the Plaintiff failed to contend that this issue was raised in any Title VII administrative claim, this Plaintiff has no basis upon which to contest the policy, as he concedes he has never applied for such "training."

Finally, discovery regarding any decision by HUD to send it employees to annual conferences of any group is not a matter that could reasonably be calculated  to lead to the discovery of evidence admissible in this matter.  There is simply no evidence relevant to the instant claims that can obtained through discovery on this issue.  At best, Plaintiff is engaging in a fishing expedition to attempt to discover some wrongdoing wholly unrelated to the claims appropriately pressed in this matter:

> When a plaintiff first pleads its allegations in entirely indefinite terms, without in fact knowing of any specific wrongdoing by the defendant, and then bases massive discovery requests upon those nebulous allegations, in the hope of finding particular evidence of wrongdoing, that plaintiff abuses the judicial process. . . .  The limits which Rule 26(b)(2)(iii) place upon discovery are aimed at just such a tactic.

---

[7]Again, Plaintiff's Deposition has not yet been transcribed, however, the Defendant will supplement with that document upon its completion.

Koch v. Koch Industries, Inc., 203 F.3d 1202, 1238 (6th Cir. 2000). See also, Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 187 (1st Cir. 1989) (holding that a party may not "undertake wholly exploratory operations in the vague hope that something helpful will turn up.").

## CONCLUSION

For the forgoing reasons, the Defendant respectfully requests that the Plaintiff's Second Rule 30(b)(6) Deposition Notice be quashed.

<div style="margin-left:40%">

Respectfully Submitted,
Alphonso Jackson,
By his Attorneys.

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

</div>

By:        _/s/ Mark J. Grady_____
                    Mark J. Grady
                    Assistant United States Attorney
                    United States Attorney's Office
                    1 Courthouse Way– Suite 9200
                    Boston, MA 02210
                    Telephone (617) 748-3136

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RICHARD S. PATOSKI,                  )
                                     )
                Plaintiff,           )
                                     )
v.                                   )
                                     )
ALPHONSO JACKSON, SECRETARY,         )
DEPARTMENT OF HOUSING AND            )
URBAN DEVELOPMENT,                   )
                                     )
                Defendant.           )
                                     )

## NOTICE OF RULE 30(B)(6) DEPOSITION OF DEFENDANT

To:

Mark J. Grady, Assistant U.S. Attorney
United States Attorney's Office
John Joseph Moakley Courthouse
One Courthouse Way
Boston, MA  02210

PLEASE TAKE NOTICE that, at 10:00 A.M., on **December 15, 2006**, at the office of
Rodgers, Powers & Schwartz, 18 Tremont Street, 5th Floor, Boston, MA  02108, the
Plaintiff, by his attorneys will take the deposition of Defendant, upon oral examination,
before a Notary Public, pursuant to Fed. R. Civ. P. 30(b)(6), and the Plaintiff calls upon
the Defendant to produce an employee(s) or agent(s) to testify as to the Defendant's
knowledge on subjects attached as Appendix A.  The oral examination will continue from
day to day until completed.

You are invited to attend and cross-examine.

Respectfully submitted,

The Plaintiff
By his attorneys,

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was
served upon the attorney of record for each other party
by mail (by hand) on _11/21/06_ .

_____
Kevin G. Powers
BBO# 405020
Robert S. Mantell
BBO# 559715
Rodgers, Powers & Schwartz LLP
18 Tremont Street
Suite 500
Boston, MA  02108
(617) 742-7010
fax (617) 742-7225
RMantell@TheEmploymentLawyers.com

Patoski notice deposition 30b6

2

## ATTACHMENT A

1.      Whether HUD was required to generate, maintain and carry out a plan of affirmative employment to promote equal opportunity in every aspect of employment policy and practice in the Office of Community Planning and Development, during fiscal years 1997, 1998, 1999 and 2000, and whether such plans were not retained by HUD, and were not provided to the Plaintiff, and should have been retained by Defendant pursuant to its ordinary document retention policies.  [see 24 CFR 7.4 (since revised)].

2.      Whether HUD was required to generate, maintain and carry out a plan of affirmative employment to promote equal opportunity in every aspect of employment policy and practice in the Office of Field Policy and Management, during fiscal years 1997, 1998, 1999 and 2000, and whether such plans were not retained by HUD, were not provided to the Plaintiff, and should have been retained by Defendant pursuant to its ordinary document retention policies.  [see 24 CFR 7.4 (since revised)].

3.      Whether Robert Yablonski's application for vacancy announcement 06-MSR-2000-0099AZ was rated and scored 24, and whether he was not referred for that position, as the cutoff for referral was 25.  [see BN-01-01, Exhibit B, M 1of2]

4.      Whether Cheryl Ann Teninga's application materials for vacancy announcement OS-MST-98-0002A were not retained by HUD, were not included in the Record of Investigation and were not produced by HUD to the plaintiff, and whether such application materials should have been retained by Defendant pursuant to its ordinary document retention policies.

5.      Whether Deborah Griswold's application materials for vacancy announcement OS-MST-98-0002A were not retained by HUD, were not included in the Record of Investigation and were not produced by HUD to the plaintiff, and whether such application materials should have been retained by Defendant pursuant to its ordinary document retention policies.  [See BN-98-02, Exhibit 14].

6.      Whether Deborah Griswold's performance appraisals for February 1, 1996 – January 31, 1997, and February 1, 1997 – January 31, 1998 were not retained by HUD, were not included in the Record of Investigation and were not produced by HUD to the plaintiff, and whether such application materials should have been retained by Defendant pursuant to its ordinary document retention policies.  [See BN-98-02, Exhibits 21 and 22].

7.      Whether James Polito's performance appraisal for February 1, 1997 – January 31, 1998 was not retained by HUD, was not included in the Record of Investigation and was not produced by HUD to the plaintiff, and whether such appraisal should have been retained by Defendant pursuant to its ordinary document retention policies.  [See BN-98-02, Exhibits 21 and 22].

8.     Whether the applications for the Best Qualified applicants, other than those of Mr. Patoski and the Selectee, for vacancy announcement 06-DEU-2000-0081A were not retained by HUD, were not included in the Record of Investigation and were not produced by HUD to the plaintiff, and whether such application materials should have been retained by Defendant pursuant to its ordinary document retention policies.  [See Agency Case No. BN-01-01, ROI, Tab F-16].

9.     Whether the Defendant did not preserve, and/or did not produce all of the individual panel rating sheets or all of the group's overall rating sheets for Mr. Patoski, Ms. Pellegrino, Ms. Griswold, Mr. Polito, or Mr. Bernard, with regard to vacancy announcement OS-MST-98-0002A. ˮ

10.     Whether, in 1996, HUD received a copy of "A Memorandum to General Counsels," dated February 29, 1996, from John R. Schmidt, of the United States Department of Justice, relating to "Post-*Adarand* Guidance on Affirmative Action in Federal Employment," a copy of which is contained in Exhibit 2 of Plaintiff's First Set of Interrogatories.

11.     Whether Exhibit 3 of Plaintiff's First Set of Interrogatories contains a true and accurate copy of the cover page, page 2 and page 59 of HUD's FY 2006 Annual Performance Plan, a document with pages numbered up to 191, and whether the document was generated and maintained in the ordinary course of business at HUD.

12.     Whether Exhibit 4 of Plaintiff's First Set of Interrogatories contains a true and accurate copy of the cover page, page 29, page 147, and page 150 of HUD's FY 2005 Performance and Accountability Report, a document with pages numbered up to 328, and whether the document was generated and maintained in the ordinary course of business at HUD.

13.     Whether Exhibit 5 of Plaintiff's First Set of Interrogatories contains a true and accurate copy of the cover page, and pages 147-150 of HUD's FY 2004 Annual Performance Plan, a document with pages numbered up to 205, and whether the document was generated and maintained in the ordinary course of business at HUD.

14.     Whether Exhibit 6 of Plaintiff's First Set of Interrogatories contains a true and accurate copy of the cover page, and page 149 of HUD's FY 2003 Annual Performance Plan, a document with pages numbered up to 205, and whether the document was generated and maintained in the ordinary course of business at HUD.

15.     Whether Exhibit 7 of Plaintiff's First Set of Interrogatories contains a true and accurate copy of the cover page, page 192 and page 195 of HUD's FY 2002 Annual Performance Plan, a document with pages numbered up to 244, and whether the document was generated and maintained in the ordinary course of business at HUD.

16.     Whether Exhibit 8 of Plaintiff's First Set of Interrogatories contains true and accurate copies (absent handwriting and a label stating "Exhibit 17") of two pages from

HUD's Office of Departmental Equal Employment Opportunity's (ODEEO) Business and Operating Plan, and whether the document was in effect or was posted on the internet as of November 8, 2000.

17.     Whether Exhibit 9 of Plaintiff's First Set of Interrogatories contains a true and accurate copy of the cover page, and a page marked "Highlights" of a report by the GAO of August 2006, entitled The Federal Workforce: Additional Insights Could Enhance Agency Efforts Related to Hispanic Representation, and whether the document was prepared and maintained in the ordinary course of business by an agency of the Federal Government.

18.     Whether Exhibit 10 of Plaintiff's First Set of Interrogatories contains a true and accurate copy of the coverage page, and pages 13, 19, 25, 31, 37 and 52 of the FY 2000 Federal Equal Opportunity Recruitment Program Annual Report to Congress, a document with pages numbered up to 54, and whether the document was generated and maintained in the ordinary course of business by the Federal Government.

19.     Whether Exhibit 11 of Plaintiff's First Set of Interrogatories contains a true and accurate copy of the coverage page, and pages 13, 19, 25, 31, 37 of the Federal Equal Opportunity Recruitment Program Annual Report to Congress, October 1, 1998 – September 30, 1999, and whether the document was generated and maintained in the ordinary course of business by the Federal Government.

20.     Whether, on or about October 3, 2000, an EEO counselor reminded the Agency, with regard to the Community Builder position, "that documents relating to the promotion action, which might ordinarily be destroyed, be retained while the inquiry is pending." [See BN-01-01 ROI, Tab B, M 1 of 2].

21.     Whether on or about October 13, 2000, an employee of HUD, acting within the scope of his or her employment, informed an EEO counselor by e-mail:    "For the 06-MSR-20000-0099AZ there was only one application, from Robert Yablonski. His application was rated and scored 24. The cutoff for referral was 25 so he was not referred and the selection was made from the DEU list." [See BN-01-01 ROI, Tab B, M 1 of 2].

22.     Whether, with regard to the PHRS positions for which Plaintiff's application was rejected, Selecting Officials could fill the PHRS vacancies at any of three grade levels GS-13, GS-14, or GS-15. HT, at 34-37.

23.     Whether Robert Yablonskie is a White male.

24.     Whether when Abbey Ogunbola was selected for the PHRS position, he was a Schedule A, excepted service employee working as a Community Builder Fellow under a temporary appointment. [See Agency Case No. BN-01-01; ROI, Tab F-8g, Notification of Personnel Action].

25.    Whether, with regard to vacancy announcement 0S-MST-98-0002A, Patoski made the Best Qualified List for the GS-14 roster for the Boston location, because he was one of the candidates who had been given the top score of 16 by the Rating Panel. [See Exhibit 2, at 19 of 20, of BN-98-02 ROI].

26.    Whether Defendant did not locate, and has failed to produce, Mr. Bernard's and Ms. Teninga's applications for vacancy announcement 0S-MST-98-0002A.

27.    Whether a true and accurate copy of the Office of Inspector General Fiscal Year 1999 Affirmative Employment Report is contained at HUD002977-3024, and whether the document was generated and maintained in the ordinary course of business by the HUD OIG.

28.    Whether a true and accurate copy of the HUD's Office of Departmental Equal Employment Opportunity Affirmative Employment Division, Affirmative Employment Program Managers and Discrimination Complaint Managers Briefing, dated and/or distributed February 3, 2005 is contained at HUD005021-5055, and whether the document was generated and maintained in the ordinary course of business by Defendant.

29.    Whether a true and accurate copy of HUD's Office of Departmental Equal Employment Opportunity AEP Manager Training materials, dated and/or distributed November 29, 2001 is contained at HUD005056-5095, and whether the document was generated and maintained in the ordinary course of business by Defendant.

30.    Whether HUD received a letter dated October 18, 1989, from James H. Troy, Director, Office of Program Operations, EEOC, whether HUD received the letter in 1989, and whether a true and accurate copy of the letter is contained at HUD005096-5097.

31.    Whether HE 4 is a true and accurate copy of the "Instructions for Panels" which was in effect during the period in which HUD was filling the PHRS position in 2000. [See HT, at 70-71].

32.    Whether copies of HE 4 were provided to the rating panels for the PHRS position vacancies in 2000.

33.    Whether HE 6, at 1, 3, 4, 6 – 8 are true and accurate copies of documents received and maintained by Defendant in the ordinary course of business.

34.    Whether HE 6, at 2, is a true and accurate copy of a "Certificate of Appreciation," dated November 20, 1996, that Defendant provided to Plaintiff.

35.    Whether HE 8 is a true and accurate copy of a Performance Appraisal of Plaintiff's work, for the appraisal period of 2/1/01 to 1/31/02, that was generated and maintained in the ordinary course of business by Defendant.

36.    Whether HE 9 is a true and accurate copy of documents relating to a Performance
Appraisal of Plaintiff's work, for the appraisal period of 2/1/00 to 1/31/01, that was
generated and maintained in the ordinary course of business by Defendant.

37.    Whether HE 10, at 1-5, is a true and accurate copy of documents relating to a
Performance Appraisal of Plaintiff's work, for the appraisal period of 2/1/99 to 1/31/00,
that was generated and maintained in the ordinary course of business by Defendant.

38.    Whether HE 10, at 9, is a true and accurate copy of a Performance Appraisal of
Plaintiff's work, dated 9/25/99 by the Reviewing Official, that was generated and
maintained in the ordinary course of business by Defendant.

39.    Whether HE 11 is a true and accurate copy of documents relating to a
Performance Appraisal of Plaintiff's work, for the appraisal period of 2/1/98 to 1/31/99,
that was generated and maintained in the ordinary course of business by Defendant.

40.    Whether HE 12 is a true and accurate copy of documents relating to a
Performance Appraisal of Plaintiff's work, for the appraisal period of 2/1/97 to 1/31/98,
that was generated and maintained in the ordinary course of business by Defendant.

41.    Whether HE 13, at 1, is a true and accurate copy of a "Notification of Personnel
Action," with an approval date of 9/11/00, relating to a "Special Act or Service Award"
accorded to Plaintiff, that was generated and maintained in the ordinary course of
business by Defendant.

42.    Whether HE 14, is a is a true and accurate copy of a "Notification of Personnel
Action," with an approval date of 9/8/97, and a "Recommendation for Performance and
Incentive Awards, which were generated and maintained in the ordinary course of
business by Defendant.

43.    Whether HE 15, at 1-4, is a true and accurate copy of documents relating to a
Performance Appraisal of Plaintiff's work, for the appraisal period of 2/1/96 to 1/31/97,
that was generated and maintained in the ordinary course of business by Defendant.

44.    Whether HE 15, at 5 is a true and accurate copy of a "Certificate of Appreciation"
from HUD, dated June 23, 1995, that Defendant provided to Plaintiff.

45.    Whether HE 16, at 1-4, is a true and accurate copy of a cover sheet and position
description for the Community Planning and Development Representative, that was
generated and maintained in the ordinary course of business by Defendant.

46.    Whether HE 16, at 5-20, is a true and accurate copy of a document entitled
"Elements and Standards for CPD Representatives and Program Specialists," dated
12/16/94, that was generated and maintained in the ordinary course of business by
Defendant.

47.     Whether HE 17 is a true and accurate copy of a form HUD-8054.2, which describes Elements and Standards for CPD representatives, dated 9/18/00, that was generated and maintained in the ordinary course of business by Defendant.

48.     Whether HE 17 was provided to Plaintiff by Defendant on or about 9/18/00.

49.     Whether HE 21 is a true and accurate copy of the Rating Schedule used for the purposes of rating applicants for the Community Builder position in 1998.

50.     Whether Copies of HE 21 were given to the rating panels for the purpose of rating applicants for the Community Builder position in 1998.

51.     Whether Kevin Gallagher was an applicant for the DEU PHRS position in 2000.

52.     Whether HE 23 is a true and accurate copy of the Selection Roster containing the Best Qualified Candidates for vacancy announcement OS-MST-98-0002A, for Grade 15 level candidates, and was generated and maintained in the ordinary course of business at Defendant.

53.     Whether HE 24 is a true and accurate copy of the Selection Roster containing the Best Qualified Candidates for vacancy announcement OS-MST-98-0002A, for Grade 14 level candidates, and was generated and maintained in the ordinary course of business at Defendant.

54.     HE 25 is a true and accurate copy of the Selection Roster containing the Best Qualified Candidates for vacancy announcement OS-MST-98-0002A, for Grade 13 level candidates, and was generated and maintained in the ordinary course of business at Defendant.

55.     Whether HE 25-F; HE 25-G; HE 25-H; HE 25-I; HE 25-J; HE 25-K; HE 25-M; HE 25-N; HE 25-O; HE 25-P; HE 25-Q; HE 25-R are true and accurate copies of applicant eligibility forms, generated for applicants for vacancy announcement OS-MST-98-0002A, which were created and maintained in the ordinary course of business at Defendant.

56.     Whether HE 25-L is a true and accurate copy of Linda Pellegrino's application materials for vacancy announcement OS-MST-98-0002A, which was maintained in the ordinary course of business at Defendant.

57.     Whether HE 25-Y is a true and accurate copy of a document entitled "QUAL DETERMINATION FOR COMMUNITY BUILDER, GS-13/14/15 POSITIONS, which was generated and maintained in the ordinary course of business at Defendant.

58.     Whether HE 26 is a true and accurate copy of the James Reeves' application for vacancy announcement OS-MST-98-0002A, and was maintained in the ordinary course of business at Defendant.

59.    Whether HE 33, at 1 is a true and accurate Applicant Eligibility Form indicating that Plaintiff was eligible for hire for the PHRS position at the GS-13, GS-14, and GS-15 levels, and was generated and maintained in the ordinary course of business at Defendant.

60.    Whether Mr. Patoski was deemed qualified at the GS-13, GS-14 and GS-15 levels under the DEU announcement for the PHRS position. [HE 33; Exhibit F8e of the BN-01-01 ROI].

61.    Whether HE 35, at 3-14 is a true and accurate copy of a document entitled Application for Federal Employment, which was submitted by Kevin Gallagher for the purpose of applying for the DEU PHRS position in 2000.

62.    Whether HUD conducted an initial review of Kevin Gallagher's application for the DEU PHRS position in 2000.

63.    HUD generated an Applicant Eligibility Form as a result of its initial review of Kevin Gallagher's application for the DEU PHRS position in 2000.

64.    Whether HE 35, at 1 is a true and accurate copy of the Applicant Eligibility Form for Kevin Gallagher's application to the DEU PHRS position in 2000, that was generated and maintained in the ordinary course of business by Defendant.

65.    Whether During the initial review of Kevin Gallagher's application for the DEU PHRS position in 2000, Mr. Gallagher was not found eligible at the GS-15 level.

66.    No document in HUD's possession reflects or evidences the fact that an initial review of Kevin Gallagher's application for the DEU PHRS position in 2000 resulted in the finding that he was eligible for the position at the GS-15 level.

67.    Whether No document in HUD's possession reflects or evidences the fact that Kevin Gallagher was notified that he was eligible for the GS-15 level DEU PHRS position in 2000.

68.    Whether HE 35, at 2, is a true and accurate copy of a letter dated January 22, 2000 sent by HUD to Kevin J. Gallagher, that was generated and maintained in the ordinary course of business by Defendant.

69.    In 2000, Kevin Gallagher was selected for a GS-13 PHRS job in Washington, D.C. [HE 55].

70.    Whether HE 25-D is a true and accurate copy of a cover sheet and position description for a Community Builder/Community Resource Representative, that was generated and maintained in the ordinary course of business by Defendant.

71.    Whether HE 29 is a true and accurate copy of a document entitled Merit Staffing Eligibility Codes, which was in effect at the time of Plaintiff's application to the PHRS position. See HT, at 19.

72.    Whether James Reeves, who applied to vacancy announcement OS-MST-98-0002A, was a black male.

73.    Whether Ralph Knighton applied for vacancy announcement 06-MSR-2000-0099AZ in 2000.

74.    Ralph Knighton was a black male.

75.    Whether When Ralph Knighton applied for vacancy announcement 06-MSR-2000-0099AZ, he was a temporary agency employee.

76.    Whether When Ralph Knighton applied for vacancy announcement 06-MSR-2000-0099AZ, he was not a career status employee, and therefore, he was not eligible for the internal MSR vacancy.

77.    Whether because Ralph Knighton was not eligible for the internal MSR vacancy to which he applied, HUD re-routed Mr. Knighton's application to the DEU process for the purposes of considering him for a PHRS position. [See HT, at 42-44; HE 36, at 1, 3].

78.    Whether Ralph Knighton was rated in the DEU process for vacancy announcement, 06-DEU-2000-0081A, and he was placed on the Best Qualified List for that position. [See HE 38, at 1; HE 49; HE 59].

79.    Whether HE 36 is a true and accurate copy of documents relating to Ralph Knighton's application for a PHRS position in 2000, which were maintained in the ordinary course of business by Defendant.

80.    Whether HE 36, at 1 is a true and accurate copy of an Applicant Eligibility Form relating to Ralph Knighton's application for a vacancy announcement, 06-MSR-2000-0099AZ, which was maintained in the ordinary course of business by Defendant.

81.    Whether HE 38, at 1 is a true and accurate copy of a Certificate of Eligibles for vacancy announcement 06-DEU-2000-0081A, which was generated and maintained in the ordinary course of business by Defendant.

82.    Whether HE 38, at 2-15 includes a true and accurate copy of Abbey Ogunbola's application for vacancy announcement 06-DEU-2000-0081A.

83.    Whether When Abbey Ogunbola was selected for the PHRS position, he was a Schedule A, excepted service employee working as a Community Builder Fellow under a temporary appointment.

84.    Whether HE 41 is a true and accurate copy of a crediting plan that was generated and used for the purpose of filling the GS-13 PHRS position for which Plaintiff applied in 2000.

85.    Whether HE 42 is a true and accurate copy of a crediting plan that was generated and used for the purpose of filling the GS-14 PHRS position for which Plaintiff applied in 2000.

86.    Whether HE 43 is a true and accurate copy of a crediting plan that was generated and used for the purpose of filling the GS-15 PHRS position for which Plaintiff applied in 2000.

87.    Whether HE 58 contains a true and accurate copy of the Delegated Examining Operations Handbook, dated October 1999, and a cover letter directed to "Delegated Examining Customers," which were issued by United States Office of Personnel Management.

88.    Whether HE 58 sets forth procedures that were applicable to HUD when it undertook to fill vacancy announcement 06-DEU-2000-0081A. [See HT, at 45].

89.    HE 60 is a true and accurate copy of a HUD Job Analysis Form which sets forth the KSAs for the GS-13 PHRS position for which Plaintiff applied in 2000, which was generated and maintained in the ordinary course of business by HUD.

90.    Whether HE 61 is a true and accurate copy of a HUD Job Analysis Form which sets forth the KSAs for the GS-14 PHRS position for which Plaintiff applied in 2000, which was generated and maintained in the ordinary course of business by HUD.

91.    Whether HE 62 is a true and accurate copy of a HUD Job Analysis Form which sets forth the KSAs for the GS-15 PHRS position for which Plaintiff applied in 2000, which was generated and maintained in the ordinary course of business by HUD.

92.    Whether Exhibit F9b, pages 4-8 of the BN-01-01 ROI (absent the handwriting), is a true and accurate copy of a list of the applicants for Vacancy Announcement 06-MSR-2000-0099AZ, which was generate and maintained in the ordinary course of business by HUD.

93.    Whether when Mr. Ogunbola applied for the PHRS position, under vacancy announcement 06-DEU-2000-0081A, he could not include a performance appraisal with his application because he had been working at the Agency for less than a year.

94.    Whether Exhibit G7, at 2-10 of the BN-01-01 ROI contains a true and accurate copy of HUD's ODEEO's form EEOMAS-001 for the years 1992 through 2000, which were generated and maintained in the ordinary course of business at HUD.

95.    Whether Exhibit F7a of the BN-04-01 ROI contains a true and accurate copy of vacancy announcement 02-MSD-2003-0009A, which was generated and maintained in the ordinary course of business at HUD.

96.    Whether Exhibit F7b of the BN-04-01 ROI contains a true and accurate copy of vacancy announcement 02-MSD-2003-0009B, which was generated and maintained in the ordinary course of business at HUD.

97.    Whether Exhibit F7c of the BN-04-01 ROI contains a true and accurate copy of vacancy announcement 02-MSD-2003-0011, which was generated and maintained in the ordinary course of business at HUD.

98.    Whether pages 1-4 of Exhibit F7e of the BN-04-01 ROI contains true and accurate copies of selection rosters for vacancy announcement 02-MSD-2003-0009B, which were generated and maintained in the ordinary course of business at HUD.

99.    Whether pages 5-8 of Exhibit F7e of the BN-04-01 ROI contains true and accurate copies of selection rosters for vacancy announcement 02-MSD-2003-0011, which were generated and maintained in the ordinary course of business at HUD.

100.    Whether Exhibit F8a of the BN-04-01 ROI contains a true and accurate copy of vacancy announcement 02-DEU-2003-0030A, which was generated and maintained in the ordinary course of business at HUD.

101.    Whether Exhibit F8c of the BN-04-01 ROI contains true and accurate copies of two Certificate of Eligibles for vacancy announcement 02-DEU-2003-0030A, which was generated and maintained in the ordinary course of business at HUD.

102.    Whether Exhibit F9c of the BN-04-01 ROI contains true and accurate copies of selection rosters two Certificate of Eligibles for vacancy announcement 05-MSI-2003-0001A, which was generated and maintained in the ordinary course of business at HUD.

103.    Whether Exhibit F9c of the BN-04-01 ROI contains true and accurate copies of selection rosters two Certificate of Eligibles for vacancy announcement 03-MSD-2003-0003, which was generated and maintained in the ordinary course of business at HUD.

104.    Whether pages 1-3 of Hawkins Deposition Exhibit 6 contain true and accurate copies of three Certificate of Eligibles for vacancy announcement 02-DEU-2003-0027B, where were generated and maintained in the ordinary course of business at HUD.

105.    Each and every reason why HUD contends, if it does so, that numerical goals for hiring women and/or certain racial or ethnic groups, contained in HUD's AEP plans, for the department, and for its sub-elements, satisfied constitutional scrutiny, as implemented in

        a.    1997

   b.  1998
   c.  1999
   d.  2000
   e.  2001
   f.  2002
   g.  2003

106. Whether Debora Medvic and/or Emmanuel Yeow were disciplined, counseled or warned for incorrectly evaluating Mr. Patoski's qualifications for vacancy announcement 06-MSR-2000-0099AZ.

107. The race and gender of

a.  James Reeves;
b.  George Bridgeman;
c.  Philip Holmes
d.  William Howell
e.  Earnest Nichols
f.  Jeffrey Twerago
g.  Alexander Vilardo
h.  Ralph Knighton
i.  Robert Yablonskie

108. The manner and extent to which the information contained in Exhibit 1 was published or posted, or otherwise made available to any employee(s) of HUD.

109. HUD's policy and practice with regard to reimbursing HUD employees for registration fees, travel costs, and other costs, and granting administrative leave for attending meetings of the Hispanic Employment Program.

110. The justifications used by HUD for reimbursing HUD employees for registration fees, travel costs, and other costs, and granting administrative leave for attending meetings of BIG and the Hispanic Employment Program.

111. HUD compliance with MD 715 requirements, including whether HUD has conducted any analysis for identifying and removing barriers to employment for white males, and if not, why not.

112. The standards used by HUD to determine whether its workforce composition demonstrates a barrier to employment, pursuant to MD-715 requirements.

113. All diversity hiring strategies in place, as referred to on page 292 of the HUD FY 2005 Performance and Accountability Report.

114. The job title and job duties, as of July 7, 1998, of the following individuals:

13

a.      Trish Enright (referred to in Exhibit 1);

b.      Willie Gilmore (referred to in Exhibit 1).

115.    The reason why Mr. Gallagher rated at the GS-15 level when he was not eligible for the GS-15 level, for vacancy announcement 06-DEU-2000-0081A.

116.    Whether Maria Ortiz Hill is a Hispanic woman, and whether she was hired from outside HUD for the position of CPD Director in Miami Florida, and the date of her hire.

117.    Whether Maria Ortiz Hill was hired at a time when HUD was over a statutory FTE staff limit, and whether HUD was without proper authorization to hire her.

118.    Whether after Maria Ortiz Hill was hired, HUD offered early retirement packages in order to meet statutory FTE staff limits, and whether the individuals offered such retirement packages were disproportionately white males.

119.    Whether Exhibit 1 contains a true and accurate copy of a memorandum dated May 14, 1993 from Raymond Solecki, former Director of HUD's Affirmative Employment Division, which was generated and maintained in the ordinary course of business at HUD.

120.    Whether the EEOC has issued instructions to Federal Agencies for the purpose of complying with MD-715, the first page of which is contained in Exhibit 2.

121.    HUD's practice of retaining forms known as SF-50s for its employees.

122.    Whether the records contained in Record of Investigation BN 04 01 contains authentic records which were generated and maintained in the ordinary course of business at HUD.

123.    Whether the documents produced by HUD in response to Plaintiff's Second Set of Document Requests are authentic, are what they purport to be, and whether they were generated and maintained in the ordinary course of business.

124.    Whether HUD's practice of reimbursing employees for costs, and paying salary to employees while attending BIG conferences, is an ongoing practice.

125.    Whether white males have been underrepresented in the ranks of employees participating in HUD's Emerging Leaders Program.

126.    The performance evaluations given to Keith Gaiter in each of the last two years.

127.    The person(s) responsible for staffing decisions within the HUD ODEEO since January 1, 2000.

128.     Whether the following individuals received reimbursement for costs incurred for attending a BIG conference, the year(s) in which they attended such conference(s), and the race of each individual.

1.     Althea R. Tinson
2      Angela M. Treadwell
3.     Belynda V. Hart
4.     Beverly Hardy
5.     Carleton K. Lewis
6.     Carolyn J. Price
7.     Charles E. Brice
8.     Charles V. Bell
9.     Christina E. Gillette
10.    Clarence D. Ryan
11.    Claretha P. Kashif
12.    Clifton E. Jones
13.    Consuelo Herndon
14.    Cozena D. Shelton
15.    Dallas Edward Fowler
16.    Debbie A. Wills
17.    Deborah E. Washington
18.    Deborah R. Harrison
19.    Dee Ann R. Walker
20.    Deloris L. Whitney
21.    Djana Todd
22.    Donna K. Nickens
23.    Edward Eitches
24.    Emma Thomas
25.    Erma O. Ellis-Stewart
26.    Eric P. Johnson
27.    Esther Pigg
28.    Floyd O. May
29.    Gail L. Robertson
30.    Garland Allen
31.    Gertrude N. Criddle
32.    Gertrude E. Johnson
33.    Glenda N. Green
34.    Gloria A. Anderson
35.    Howard L. Tutman
36.    Irenis Green
37.    Jack H. Lee
38.    Jacqueline Stevenson
39.    Jacquelyn l. Proctor
40.    Janice R. Teddleton
41.    Janie Ealey
42.    James David Reeves

43.   Jessy A. Woods
44.   Katina L. Flythe
45.   Keith T. Gaiter
46.   Kena McKnight
47.   Kimberlee L. Satterfield
48.   LaShaune P. Lewis
49.   Lawanda Young
50.   Lillie M. Zinnerman
51.   Linda Thompson
52.   Anderson-Portlock Lolinda
53.   Marcia Y. Sanford
54.   Margaret M. Singleton
55.   Margaret R. Stephens
56.   Marie H. Perry
57.   Marilyn L. Forney
58.   Marvel Robertson
59.   Mary J. Watkins
60.   Milton R. Pratt, Jr.
61.   Oswald S. Scantlebury
62.   Paulette D. Wade
63.   Phyllis G. Armstrong
64.   Ralpha L. Douglass
65.   Rita Delaney
66.   Rita G. Hebb
67.   Rochelle A. Brown
68.   Ron Armstead
69.   Roy Pierce
70.   Sandra Campbell
71.   Sandra J. Wright
72.   Sharron J. Kelly
73.   Steven H. Parson
74.   Theresa A. Slye
75.   Tina D. Williams-Walker
76.   Traci A. Carroll
77.   Ulysses W. McKinney, Jr.
78.   Vanessa D. Void-Taylor
79.   Vicki A. Gums
80.   Victoria E. Johnson
81.   Sandra M. Edward
82.   Lucretia Barnes
83.   Linda K. Hardway
84.   Eleanor Peyton
85.   Elsa Carr
86.   Donald Williams
87.   Kelly R. Martin
88.   Sandi Holland

89.  Doris Stevens
90.  Joyce Powell
91.  Michael B. Williams
92.  Mabel Reed
93.  Robert Falkenstein
94.  Herbert Green
95.  Mary Nelson
96.  Madeline Mickens
97.  Ella Mae Brewer
98.  Reginald Hayes

The Plaintiff
By his attorneys,

Kevin G. Powers
BBO# 405020
Robert S. Mantell
BBO# 559715
Rodgers, Powers & Schwartz LLP
18 Tremont Street, Suite 500
Boston, MA  02108
(617) 742-7010, ext. 305
fax (617) 742-7225

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was
served upon the attorney of record for each other party
by mail (by hand) on  11/21/06

*Exhibit 2*

**U. S. Department of Housing and Urban Development**
Washington, D.C. 20410-2000

May 14, 1993

OFFICE OF THE ASSISTANT SECRETARY
FOR FAIR HOUSING AND EQUAL OPPORTUNITY

MEMORANDUM FOR: All Regional and Field Office Directors of
　　　　　　　　　. Administration
　　　　　　　　　All Regional and Field Office Managers and
　　　　　　　　　Supervisors
　　　　　　　　　All Regional and Field Office Affirmative
　　　　　　　　　Employment Managers

FROM: Raymond Solecki, Director, Affirmative Employment
　　　　　Division, EMAA

SUBJECT: Fiscal Year 1992 Departmental Affirmative Employment
　　　　　　Program (AEP) Plan Accomplishment Report
　　　　　　and Fiscal Year 1993 Plan Update

　　　　Secretary Cisneros has continually reaffirmed his personal
commitment to making the Department a model employer of women and
minorities. He has also made the commitment to treating all
persons equitably and without discrimination, one of the three
central values in his efforts to "Reinvent HUD." He has
emphasized that Equal Employment Opportunity (EEO) is to be
carried out in every aspect of the Department's policy and
practice in the employment, development, advancement, supervision
and treatment of employees and applicants for employment.

　　　　The Secretary has further emphasized that it is the
responsibility of all managers and supervisors throughout the
Department to promote EEO by being sensitive and responsive to
all employees, by treating them with respect and dignity, by
making all decisions in a fair and equitable manner, and by
promoting a culture of mutual respect.

　　　　Only by valuing all our employees and by capitalizing on the
vast array of talents provided by their diversity will the
Department be able to be fully sensitive to and fully understand
and meet the diverse needs of our customers. The goal is not to
assimilate women and minorities into the dominant homogeneous
culture, but to create a new dominant heterogeneous culture in
its place.

Exhibit 2

With these principles in mind, the AEP Plan Accomplishment
Report and Update are attached for your use as a guide to
recruitment and hiring, as well as an outline of strategies to
removing barriers to equal employment opportunity.  Please refer
to them, as well as your office's AEP Plan Update, whenever you
are contemplating a personnel action.

Thank you for your cooperation and assistance.


**Atttachment**

*The U.S. Equal Employment Opportunity Commission*

Instructions to Federal Agencies for EEO MD-715

# Introduction

Purpose of Instructions

These Instructions represent the EEOC's guidance and standards to federal agencies for establishing and maintaining effective affirmative programs of equal employment opportunity. These Instructions clarify guidance published in Part C of EEO MD-715, provide federal agencies with additional operational instructions on how to accomplish the requirements of the management directive, and emphasize what federal agencies should do to ensure that personnel actions are made free of any discrimination.

The Instructions are organized as follows:

- **Section I: The Model EEO Program**
- **Section II: Barrier Identification and Elimination**
- **Section III: Reporting Requirements and Line-by-line Instructions**
- **EEOC FORM 715-01**
- **Workforce Data Tables**

Section I: The Model EEO Program

Section I focuses on EEO MD-715's definition of the "Essential Elements" for structuring a model EEO program. Attainment of a model EEO program at an agency will provide the infrastructure necessary for the agency to achieve the ultimate goal of a discrimination free work environment, characterized by an atmosphere of inclusion and free and open competition for employment opportunities.

The six elements identified as necessary for a model EEO program are:

- Demonstrated commitment from agency leadership;
- Integration of EEO into the agency's strategic mission;
- Management and program accountability;
- Proactive prevention of unlawful discrimination;
- Efficiency; and
- Responsiveness and legal compliance.

Section I details how to achieve each of these elements by fully integrating access, inclusion and equality of opportunity into all aspects of the mission of the agency, and aligning equal opportunity principles with strategic agency plans and objectives.

To usefully measure these integration efforts, agencies will conduct periodic self-assessments of their EEO programs against the six essential elements. EEOC has developed a self-assessment checklist to aid in the self-assessment process. The checklist provides a comprehensive listing of specific management documents and operating systems required to ensure that an agency's overall EEO program is properly established. It is expected that the checklist will serve as an early assessment tool for agencies, helping to increase accountability for any necessary corrective measures. Specific instructions on how to complete the checklist are included in Section I. EEOC is available to provide

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| RICHARD S. PATOSKI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ALPHONSO JACKSON, SECRETARY, | ) |
| DEPARTMENT OF HOUSING AND | ) |
| URBAN DEVELOPMENT, | ) |
| | ) |
| Defendant. | ) |

## **NOTICE OF RULE 30(B)(6) DEPOSITION OF DEFENDANT**

To:

Mark J. Grady, Assistant U.S. Attorney
United States Attorney's Office
John Joseph Moakley Courthouse
One Courthouse Way
Boston, MA  02210

PLEASE TAKE NOTICE that, at 10:00 A.M., on **May 31, 2006**, at the office of Rodgers, Powers & Schwartz, 18 Tremont Street, 5th Floor, Boston, MA  02108, the Plaintiff, by his attorneys will take the deposition of Defendant, upon oral examination, before a Notary Public, pursuant to Fed. R. Civ. P. 30(b)(6), and the Plaintiff calls upon the Defendant to produce an employee(s) or agent(s) to testify as to the Defendant's knowledge on subjects attached as Appendix A.  The oral examination will continue from day to day until completed.

You are invited to attend and cross-examine.

Respectfully submitted,

The Plaintiff
By his attorneys,

Kevin G. Powers
BBO# 405020
Robert S. Mantell
BBO# 559715
Rodgers, Powers & Schwartz LLP
18 Tremont Street
Suite 500
Boston, MA  02108
(617) 742-7010
fax (617) 742-7225
RMantell@TheEmploymentLawyers.com

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was
served upon the attorney of record for each other party
by mail (by hand) on  4/21/06  .

Patoski notice deposition beard

2

## ATTACHMENT A

1.     All studies and analyses performed by Defendant, from July 19, 1995 to the present, to determine whether programs implemented at HUD to foster diversity in the HUD workforce complied with Constitutional requirements.

2.     The method by which HUD, from January 1, 1997 to the present, has determined that a particular group or groups are under-represented in the HUD workforce.

3.     The method by which HUD, from January 1, 1997 to the present, has determined that a particular job or any job category at HUD was a traditionally segregated position.

4.     All formal or informal programs implemented at HUD from January 1, 1997 to the present, including without limitation, the AEP, FEORP Plan, Special Emphasis Program, Emerging Leaders Program, Hispanic Employment Plan, HUD Intern Program, Corrective Action Plan, Proud to Be Goal, Accelerated Promotion Policy, the Diversity Recruitment Plan, any diversity hiring strategies, Upward Mobility Program, to foster or increase diversity within the HUD workforce, and further the,

      A.     Dates of implementation of such programs;
      B.     Studies performed to determine whether such programs complied with Constitutional standards;
      C.     Any and all strategies and tactics suggested and/or used at HUD to increase the hiring of minorities and women;
      D.     Any determinations or conclusions as to whether such programs were successful, and the extent of such success.

5.     With regard to documents associated with formal or informal programs implemented at HUD from January 1, 1997 to the present, to foster or increase diversity within the HUD workforce, as described or requested in Plaintiff's First Set of Document Requests:

      A.     An identification of whether documents which are associated with such programs are authentic;
      B.     An identification of who authored documents associated with such programs;
      C      An identification of whether documents associated with such programs were generated and maintained in the usual course of business at HUD.

6.     Whether individuals involved in the recruitment of applicants, or in the selection of applicants for positions, were aware of whether particular groups were under-represented in the particular job categories in which vacancies were to be filled.

7.     All steps taken to inform people involved in recruitment and selection of hirees or promotees that under-representation had been eliminated for various positions.

8.    Whether any formal or informal program to foster or increase diversity at HUD impacted in any way the recruitment and/or selection process(es) for vacancy announcements OS-MST-98-0002A, 06-DEU-2000-0081A and 06-MSR-2000-0099AZ.

9.    The usual procedure(s) for filing positions at HUD, from January 1, 1997 to the present.

10.    Practices and policies regarding HUD retention of selection-related documents, from January 1, 1997 to the present.

11.    HUD document retention practices and policies, in effect from January 1, 1997 to the present, where an employee challenges a non-selection as discriminatory

12.    A description of the EEOTRACS System, the information it contains, the purposes for which it is used, and the date in began running.

13.    Whether any or all of the following strategies have been used to increase diversity:

      A.    Notifying minorities and women of position openings or expected openings;

      B.    Withdrawing vacancy announcements if not enough minorities apply and re-posting them;

      C.    Placing minorities and/or women in a position in an acting capacity to give them experience in the position.

14.    An identification of the individual who drafted the document attached as Exhibit 1, the extent to which Exhibit 1 was circulated, and whether Exhibit 1 was created and maintained in the usual course of business at HUD.

# INSTRUCTIONS FOR SELECTING OFFICIALS

In your package, you will find one or two selection rosters containing the names of the Best Qualified competitive applicants ("Selection Roster") and the eligible non-competitive applicants ("Non-Competitive Selection Roster"). You may make your selection(s) from either or both lists.

Below are the principles to guide you in the selection process:

o    You may NOT interview the candidates.

o    You may call or speak with the candidate's supervisor or references.

o    You may pursue leads from references contacted.

o    You must provide a brief justification in the "Remarks" section of the rosters for your selection(s).

o    You must annotate your selection(s) with an "S" in the "Action Taken" column.

Because in this process it is possible for your selectee(s) to be selected and accept another position, you must prioritize ALL of the non-selections on your list(s). You may select your first alternate from the non-selections on the competitive "Selection Roster" and your second alternate from the "Non-Competitive Selection Roster." Samples of both Rosters with selectees annotated and non-selectees prioritized are attached to these instructions.

All selection rosters must be signed by the Selecting Official and returned to the Office of Human Resources, Room 2272 within three days of receipt. Extensions may be approved ONLY by Joanne Simms, Director, Office of Human Resources. Her telephone number is 708-2000.

ALL JOB OFFERS WILL BE MADE BY THE OFFICE OF HUMAN RESOURCES.

INSTRUCTIONS FOR PANELS

**PURPOSE**

To rate and rank the qualified applicants.

**CONTENTS OF MERIT STAFFING PACKAGE**

- Each panel will be given a merit staffing package containing the following:

  o  <u>Coversheet</u> showing the vacancy announcement number, title, series, grade of the position

  o  Copy of <u>vacancy announcement</u>

  o  <u>Crediting Plan</u> which identifies the quality of experience at three levels

     Outstanding - 3 points
     Above Average - 2 points
     Average - 1 point

  o  <u>Position Description</u>

  o  <u>Rating sheets</u> containing the names of the qualified applicants and columns for rating each quality ranking factor, and columns for awarding points for performance appraisal and awards

  o  Applications of the qualified applicants

**PROCEDURE**

- An HR Specialist will open each panel with specific instructions (that you will also hear at this meeting).

- Each panelist will then independently rate each application against the crediting plan criteria.

  o  Since there is only one copy of the application, panel members will have to rate an application and pass it on to another panelist.

- If you come across an application of someone you know, you must rate the applicant based only on the information in the application and not on your knowledge of what the applicant is doing.

- If there is great disparity in the rating of a quality ranking factor by the panelists...for example if two panel members rate the factor a 3 for Outstanding level of experience and the other panel member rates the same factor as a 1 for Average experience...the panelists should discuss the rating on that factor before the rating is averaged.

- When all applications have been rated by each panelist against the crediting plan criteria, all individual scores will be added and divided by the number of panel member to arrive at an "average" score for each applicant.

- Those applicants who receive 70% of the available points advance to a Highly Qualified group. For example, if there are 3 quality ranking factors each worth up to 3 points, the maximum points an applicant can receive is 9. In order to advance to the Highly Qualified group, an applicant must receive at least 7 points, i.e. 6 points = 66 2/3% which is less than 70%.

- Those applicants who advance to the Highly Qualified group are then given up to 4 additional points for Awards and performance appraisal - 2 points for Awards and 2 points for their performance appraisal. Criteria for how to award those points will be provided at the panel but briefly, if an applicant claims an award like a Quality Step Increase or Special Achievement Award in the last 3 years, he/she can get 2 points or 1 point if the award is older than 3 years. For performance appraisal, 2 points are awarded for Outstanding and 1 point for Highly Successful appraisal.

- A final score is obtained for each of the Highly Qualified applicants; the panel members sign the summary rating sheet and the panel is completed.

  o The final summary rating sheet is returned to the HR Specialist who will generate a Best Qualified Selection Roster for the Selecting Official.

## OTHER INFORMATION

- Union observer on panels for bargaining unit vacancies.

- Confidentiality of proceedings.

## RATING SCHEDULE FOR COMMUNITY BUILDER, GS 1101 13, 14, 15

Quality Ranking Factor #1:   Ability to establish and maintain effective working relationships with broad-based, diverse community groups to determine customer service needs, priorities, and expectations.

**9 points**

Experience in a leadership role establishing and maintaining close contacts (including attending meetings, conferences or forums with a wide range of community organizations, resident groups, housing or community service providers, public or non-profit organizations, and/or advocacy groups) to promote, sell, or exchange ideas, evaluate customer service needs, and/or enhance service and delivery of housing and/or community development programs.

**6 points**

Experience as a senior staff member or lead liaison establishing and maintaining contacts (including participating in meetings, conferences or forums with community organizations, resident groups, housing or community service providers or other similar groups or organizations) to exchange ideas, evaluate customer service needs or enhance delivery of housing or community development programs.

**3 points**

Experience in a responsible staff position or as a specialist establishing or maintaining contacts with community and/or public or non-profit organizations, etc. to exchange ideas, resolve problems, or improve program delivery in relation to housing, community development, social service, health or other public issues or concerns.



| | |
|---|---|
| <u>Quality Ranking Factor #2</u> | Ability to assess the effectiveness and impact of integrated and coordinated delivery of agency programs and services on customers and communities. [1] |

9 points

Super experience conducting comprehensive program analyses or assessments using research or survey methodology, strategic planning, best business practices, TQM techniques or related techniques in an environment involving delivery or assessment of one or more housing and/or community or economic development programs impacting both communities and individuals.

6 points

Experience conducting program analyses or assessment using one of the above techniques in an environment involving delivery or assessment of a complex housing and/or community or economic development program impacting both communities and individuals.

3 point

Any experience analyzing any programs or operations to determine the effectiveness and impact on organizational effectiveness or services on communities or individuals.

---

[1] The intent of the crediting plan for this factor is to distinguish between the quality of the analytical experience. Extra credit is not intended for such experience in several program areas versus quality analytical experience in one program area.

Quality Ranking #3        Knowledge of state and local housing/community development related policies and socio-economic conditions.

9 points        Experience in the housing or community development area in a leadership or professional role, e.g., city administrator, housing or community development director, executive director of a large Public Housing Authority, or other managerial experience overseeing or managing housing or community or economic development programs covering a broad geographic area or jurisdiction, e.g., multi-state, or statewide, or multiple counties, or a city and the surrounding metropolitan area, etc.

6 points        Experience in the housing or community development area as the senior staff level person responsible for reviewing and resolving issues involving large-scale residential construction projects, multipurpose land development uses, mortgage lending for multifamily projects, etc., covering a broad geographic area or jurisdiction, as noted above.

3 point        Relevant experience in the housing or community development area involving a specific local area or jurisdiction; or education or training providing knowledge of local housing/community development related policies and socioeconomic conditions.

| Quality Ranking Factor #4 | Ability to mediate and/or negotiate with managerial and professional representatives of industry and state/local governments. |
|---|---|
| 9 points | Extensive experience negotiating, mediating, and or/ facilitating and resolving sensitive/controversial issues with top management officials, community leaders, or representatives of Federal, State or local government housing or community development firms by serving as the organization's spokesperson or community representative (e.g., trial lawyer, professional mediator, or experience dealing with dispute resolution, etc), or in other managerial level position. |
| 6 points | Experience, less extensive as above, negotiating, facilitating and /or resolving sensitive, controversial issues with management officials, etc., of the above organizations. Experience may have been gained, for example, as a mortgage underwriter, contracting specialist, housing development specialist, urban planner or similar position. |
| 3 point | Experience negotiating and resolving noncontroversial issues with mid-level representatives of the above organizations. |