UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| RICHARD S. PATOSKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-11086 RCL |
| | ) | |
| ALPHONSO JACKSON, SECRETARY, | ) | |
| DEPARTMENT OF HOUSING AND | ) | |
| URBAN DEVELOPMENT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S RESPONSE TO THE PLAINTIFF'S SECOND MOTION TO COMPEL

### Introduction

The defendant, Alphonso Jackson, responds to the Second Motion to Compel as follows.

### Background

In fulfilment of its obligations under Title VII of the Civil Rights Act of 1964, the Equal Employment Opportunity Commission ("EEOC") promulgated Management Directive 714 ("MD 714") in 1987, which required each federal department and agency to prepare and submit to the EEOC an "affirmative employment plan" to be reviewed and approved by the EEOC. The directive required agencies to develop affirmative employment programs ("AEP") which hold senior management responsible for equal employment opportunity objectives and provides for the establishment of numerical "goals" where there is a "manifest imbalance" or "conspicuous absence" of minorities and women in the work force.[1]

The Plaintiff pursues claims: (1) that he was denied a "Community Builder" position in 1997 based upon age and gender discrimination; and (2) that he was denied a Public Housing revitalization Specialist position in 2000 based upon gender and age discrimination. In support

---

[1]In 2003, EEOC MD-714 was superceded by EEOC MD 715. See, e.g., Worth v. Jackson, 451 F.3d 854, 856 (D.C. Cir. 2006) (finding, *inter alia*, that Plaintiff's claims with respect to the AEP Program were rendered moot by the adoption of MD 715 which eliminates the creation of any goals based upon the statistical analysis).

of these claims, Plaintiff makes allegations of specific wrongdoing but also contends that the collection and dissemination of workforce statistics based upon race, to managers, in combination with managerial performance standards based upon EEO considerations, leads managers to consider race (and/or gender) in making individual personnel decisions irrespective of whether taking race into account can be justified as a matter of law.

Plaintiff alleges that HUD's now superceded AEP violated the Constitution - - and that HUD's present practices do so as well -- and seeks prospective injunctive relief. Plaintiff also brings claims pursuant to Title VII alleging that he was improperly denied the two positions at issue, as result of the AEP.

The instant Motion, Plaintiff's Second Motion to Compel, seeks: (1) nationwide data as to the Community Builder and Public Revitalization Specialist positions for which this Plaintiff applied in 1997 and 2000, respectively, including the race, gender and age of applicants, offerees and hires; (2) nationwide data as to the hiring of Community Builder Fellows and Community Builder Fellow Specialists (while sharing the name "Community Builder," as detailed below, this was an entirely different hiring process, for a wholly different position, involving a wholly distinct applicant pool and for which this Plaintiff never applied) including the race, gender and age of applicants, offerees and hires; (3) information identified in an audit conducted by the HUD Office of Inspector General with respect to the Community Builder Fellow hirings; and (4) information regarding "applicant flow data."[2]

For the reasons stated more fully herein, the Defendant has objected to these requests as improperly overbroad and unduly burdensome.

---

[2]As described more fully herein, and as discussed in the Defendant's Response to the First Motion to Compel, the EEOC in 1981 directed Federal agencies to begin to collect and maintain data on applicants to track the flow of applicants ("flow data"). Flow data, which could include race and/or gender was provided by applicants on a separate, optional form filled out when submitting an application.

**ARGUMENT**

I.    **The 1997 Community Builder Position**

    A.    Plaintiff's Requests for Nationwide Data Regarding the Community
        Builder Position Are Overbroad and Unduly Burdensome

Defendant has provided the gender and age[3] of all applicants for the Boston Community

Builder Position for which this Plaintiff applied in 1997.  The Plaintiff has filed the instant

Motion contending that nationwide data as to the age, race and gender of the applicant pool,

offerees and hirees should be produced because statistical analysis of this data "may demonstrate

overwhelming, statistically significant evidence of HUD-wide discriminatory practices."

Plaintiff's Second Motion to Compel, p. 3.

Claims of discrimination do not automatically entitle a Plaintiff to define the scope of

appropriate discovery as the Plaintiff deems fit.  Discovery in Title VII actions may

appropriately be limited to employment units, departments, and sections in which there are

employees who are similarly situated to the plaintiff. As noted by the First Circuit,

> parties have a correlative obligation to tailor interrogatories to suit the particular
> exigencies of the litigation. They ought not to be permitted to use broadswords
> where scalpels will suffice, nor to undertake wholly exploratory operations in the
> vague hope that something helpful will turn up.

Mack v. Great Atlantic and Pacific Tea Co., Inc., 871 F.2d 179, 187 (1st Cir. 1989).   Here, the

Plaintiff puts forth vague claims as justification for his wholly exploratory request.

The Plaintiff's claims of discrimination in this matter are premised entirely upon events

unique to the Boston, MA, hiring.  As to issues of gender discrimination, Plaintiff takes issue

with the selecting official having sought the input of Mary Lou Crane, the Regional

Representative of the Secretary of HUD, in determining whom to hire for the Boston, MA

Community Builder Position.[4]  He contends that Ms. Crane, by her own admission, used

---

[3]Plaintiff's request for data related to the race of these applicants is addressed infra,
Section IB(1).

[4]The Regional Representative was in charge of the Community Builders.

3

"diversity" as a criteria in making recommendations as to who would be best suited for the position. First Amended Complaint, ¶ 10. With respect to age discrimination, Plaintiff relies exclusively upon a single statement from the hiring official, Jose Citron, to the effect that "he believed that it was more difficult for older persons to change their behavior." First Amended Complaint, ¶ 10.

As the allegations in this matter center upon the specific hiring process undertaken for the Boston Community Builder position, discovery should be appropriately limited to the position for which this Plaintiff applied, and for which relevant data has already been provided. See Earley v. Champion International Corp., 907 F.2d 1077 (11th Cir.1990) (limiting discovery in Title VII cases to employing unit); James v. Newspaper Agency Corp., 591 F.2d 579 (10th Cir.1979) (limiting discovery in gender discrimination case to plaintiff's department); Haselhorst v. Wal-Mart Stores, Inc., 163 F.R.D. 10 (D.Kan.1995) (discovery limited to employing unit); Rodger v. Electronic Data Systems, 155 F.R.D. 537 (E.D.N.C.1994) (appropriate scope of discovery in age discrimination case was relevant operations division); Obiajulu v. City of Rochester, Dep't of Law, 166 F.R.D. 293 (W.D.N.Y.1996) (limiting discovery to specifically classified employees within the department).

Even assuming, *arguendo*, that statistical evidence of HUD's general intent is at issue, the Plaintiff has general statistics outlining the race and gender for all hirings and promotions at HUD contained in its AEP Reports from 1992 through 2003 (when the AEP Program ended), and similar data from both 2004 and 2005 for all HUD hirings and promotions. If the general intent of HUD is at issue, these statistics (thirteen years of hirings and promotions by race and gender), are more than adequate to establish "statistically significant evidence" of general intent.

      B.      Assuming That This Court Were to Nonetheless Deem Nationwide Discovery Appropriate for the 1997 Community Builder Hirings, the Request Remains Overbroad and Unduly Burdensome in Seeking Nationwide Data as to Race and Age

Even were this Court to deem nationwide discovery with respect to the Community Builder position to be appropriate, the request nonetheless remains overbroad in seeking nationwide data as to race and age.

      1.      Requests For Data as to The Race of Applicants for the 1997 Community Builder Position Are Overbroad and Unduly Burdensome

Plaintiff's request for data regarding the nationwide data as to race is unquestionably overbroad. The Plaintiff has, unsuccessfully, attempted to add claims of racial discrimination with respect to the 1997 Community Builder hiring. <u>See</u> Docket # 29 (Denying a Motion to further amend the Complaint to add claims of racial discrimination with respect to the Community Builder position). In that there are no race-based claims at issue with respect to the 1997 Community Builder Position, Plaintiff's request for such information[5] is unquestionably inappropriate and unduly burdensome. The scope of discovery in Title VII cases is not without limits and, one readily identifiable limit is that discovery should only be had as to claims actually within the scope of the litigation. Stated another way, discovery must be tailored to the issues actually involved in the particular case. It is both overbroad and an undue burden to compel the Defendant to compile statistics as to issues that are not even the subject of this litigation.

---

     [5]As fully outlined in the Defendant's Response to the Plaintiff's First Motion to Compel, Applicants were not (and are not) required to provide any data on race. <u>See</u> Declaration of Linda Hawkins, ¶ 18, Docket # 19, Exhibit 4. To the extent that HUD received data on the race of applicants (which could be provided on a voluntary basis), it did not store such information in any database and any form containing that information was removed from the application prior to their being forwarded to hiring officials. Hawkins Declaration, ¶ 19-22. HUD did not, and does not now have, the ability to retrieve information regarding the race of applicants for the Community Builder, or any other, position. <u>See</u> Declaration of Linda Hawkins, ¶ 17-23.

2.      Requests For Nationwide Data as to the Age of Applicants is Overbroad and Unduly Burdensome

Plaintiff's efforts to obtain nationwide data as to the age of applicants, offerees and hirees for the Community Builder position are also overbroad.  The Plaintiff challenges no policy or practice of HUD with respect to the age of its hirees.[6]  Instead, Plaintiff relies exclusively upon a single statement from the hiring official, Jose Citron, to the effect that "he believed that it was more difficult for older persons to change their behavior."  First Amended Complaint, ¶ 10. These claims are specific to the Boston, MA hiring.  Requiring HUD to attempt to compile age data for all applicants for the Community Builder position nationwide simply because the Plaintiff alleges that one decision maker may have discriminated against him is excessively overbroad and would impose an undue burden upon the Defendant.[7]  Further, to the extent that Plaintiff would contend that such data is evidence of HUD's general intent, it would not be evidence of the intent of Mr. Citron, the relevant inquiry in this matter.  Plaintiff makes no allegation of any pattern or practice of HUD that discriminates on the basis of age for which such data would be relevant.

II.      **Plaintiff's Requests for Information Regarding the Hiring of Temporary Community Builder Fellows Are Overbroad and Unduly Burdensome**

This Plaintiff applied for and did not receive a Community Builder position.  These were full time federal civil service positions and the hirings in question took place between October and December of 1997.   See Deposition of D. Michael Beard, Auditor, HUD office of the Inspector General, p. 46 ("Beard Deposition").  In contrast, between May and October 1998, HUD began hiring the Community Builder Fellows.  Community Builders Fellows were temporary positions, in which non-HUD employees were appointed for one or two year periods.

_____

[6] See generally,  Smith v. City of Jackson, 544 U.S. 228, 241 (2005).

[7] Although the ADEA authorizes disparate impact claims, see Smith v. City of Jackson, 544 U.S. 228 (2005), such claims are substantially more narrow than those permitted under Title VII.  Id.  at 240.  More importantly, this Plaintiff makes no disparate impact claim with respect to age discrimination.

This Plaintiff did not apply for a Community Builder Fellow position. Thus, the Community Builder Fellows were hired in a different hiring process, involved a wholly distinct applicant pool, and were for a temporary appointment, rather than a federal civil service position. Whatever deficiencies Plaintiff may contend existed with respect to the Community Builder Fellows hirings, such deficiencies have no bearing on this case. See, e.g., Hicks v. Arthur, 159 F.R.D. 468, 471 (E.D. Penn. 1995) ("the positions that are relevant for discovery purposes are the positions that the plaintiffs occupied or requested promotions into.").

Further, requiring the Defendants to compile nationwide data as to a wholly distinct hiring process is overbroad and unduly burdensome. Between May and October 1998, HUD hired over 200 Community Builder Fellows from over 8,000 applications. Between January 1999 and May 1999, HUD hired 86 Community Builder Fellow Specialists from over 4,800 applications, and hired 124 Community Builder Fellows, from over 2,000 applications. Beard Depo., p. 47. Moreover, applications for federal employment do not contain race and gender information. See Declaration of Linda Hawkins, ¶ 17-23, Rule 30(b)(6) Deposition of HUD (Linda Hawkins), p. 85-86. Such information could be provided voluntarily, but any such information was removed from the application before it was forwarded to decision makers in the hiring process. Id. HUD did not store any voluntarily provided race and/or gender information. Id. See also, infra, Section IV (regarding applicant flow data).

The Plaintiff's request, thus, seeks to compel the Defendant to pour over in excess of 14,000 applications (if they even still exist), and paperwork attendant to the processing of those 14,000 applications, for some indication as to the applicant's race and gender. To compile the gender and race data requested for the Community Builder Fellow position would require that HUD individually survey 14,000 individuals, the vast majority of which have no connection to HUD whatsoever. The discovery rules do not contemplate requiring parties to produce information which they do not possess, nor do they contemplate transforming federal agencies into investigators for individuals claiming discrimination.

7

Further as noted above, see supra, Section IB(1)-(2), the Plaintiff's claims in this matter do not include challenges to the Community Builder hiring process based on race, and, nationwide data as to age is therefore irrelevant to the theory of this Plaintiff's claim of age discrimination.

Finally, the Plaintiff has directed interrogatories to the Defendant regarding specific deficiencies in the Community Builder Fellow hirings that were identified in an Audit conducted by HUD's Office of the Inspector General. See Plaintiff's Second Motion to Compel, p. 10-11 (Interrogatories Nos. 16-17, and 19). For the reasons noted above, these requests are overbroad and unduly burdensome. Moreover, even if it were possible to identify the individuals referred to in these interrogatories, the Defendant would not have gender or race information for those individuals.

III.    **Plaintiff's Requests For Nationwide Data as to the 2000 Public Housing Revitalization Position Are Overbroad and Unduly Burdensome**

The Plaintiff also challenges his non-selection for a Public Housing Revitalization Specialist Position in Boston, MA in 2000, claiming race and gender-based discrimination. He makes two specific challenges with respect to this position. First, he contends that he was erroneously found to be ineligible under a vacancy announcement for the position open only to federal employees.[8] (That such is the case is undisputed). First Amended Complaint, ¶ 35. Second, Plaintiff contends that HUD forwarded the application of an African American male who erroneously applied to the MSR (federal employees only) announcement to the DEU process open to the general public. First Amended Complaint, ¶ 36. He contends that HUD did so because that individual was a black male. Id. The individual, Ralph Knighton, ultimately made the certificate of eligibles from which the selection was made under the DEU announcement, although he was not selected. Id.

───────────────

[8]HUD announced that vacancy to federal employees and to members of the public at large. The process open to federal employees is the MSR process and the process open to the public at large is the DEU process. See, e.g., First Amended Complaint, ¶ 31.

With respect to the first claim, Plaintiff contends that the erroneous finding that he was ineligible under the vacancy announcement open only to federal employees (MSR announcement) was based upon HUD's intent to discriminate against white males. He seeks nationwide race and gender data for the applicants and selectees to the MSR PHRS vacancy announcement to establish that HUD did not find a single individual qualified under this announcement because "it fit HUD's scheme to fill the position with women and minorities." Plaintiff's Second Motion to Compel, p. 6; Interrogatories 8-9. Plaintiff further seeks nationwide data as to the age, race and gender of applicants and selectees for the DEU (open to the public) announcement for the purpose of for the purpose of establishing "departmentwide bias." Plaintiff's Second Motion to Compel, p. 7; Interrogatories 11-12.

As an initial matter, there is rather dubious logic supporting the Plaintiff's contention that the simple mistake at issue here is evidence of a vast race-based conspiracy. Especially where, as here, the Plaintiff was not prejudiced by the error. He had a full and fair opportunity to obtain the position under the DEU announcement. Other people within that applicant pool were simply better qualified. At worst, he competed against a larger applicant pool as a result of the error.

Nonetheless, Plaintiff seeks the race and gender of individuals for the MSR announcement contending that HUD has the data of the race of its own employees and should be compelled to produce it. Seemingly logical, such a contention fails to address that compiling such information is a substantial burden upon HUD. As previously noted applications for federal employment do not contain race and gender information. See Declaration of Linda Hawkins, ¶ 17-23, Rule 30(b)(6) Deposition of HUD (Linda Hawkins), p. 85-86. See also, infra, Section IV (regarding applicant flow data). HUD would be required to individually compile such information from other sources. With respect to non-HUD Employees in the DEU announcement, HUD does not have this information at all.

To compile the gender and race data requested, HUD would have to individually survey all of the individuals who applied for the position, the vast majority of which have no connection

to HUD whatsoever, or, alternatively (with respect to the MSR announcement) individually compile such information.  Requiring HUD to compile this information in these circumstances would be unduly burdensome, especially based upon the showing put forth by this Plaintiff.

With respect to the second allegation, Plaintiff has requested the names, race, and gender of any individuals from 1997 to the present who applied under an MSR (federal employees only) announcement, whose application was forwarded to the DEU process (open to the public.) Plaintiff's Second Motion to Compel, p. 11, Interrogatory No. 19.  On its face, requiring HUD to compile this data would be unduly burdensome.  HUD has undertaken thousands of hirings in this period and has no way of tracking the information requested.  Compiling the requested data would require reviewing every single vacancy announcement and every application eligibility determination for every application submitted to HUD since 1997.

## VI.    Plaintiff's Requests With Respect to Applicant Flow Data Are Overbroad and Unduly Burdensome

In 1981 the EEOC directed Federal agencies to begin to collect race and gender data on applicants to track the flow of applicants ("flow data").  Flow data, which could include race and/or gender was provided by applicants on a separate, *optional* form filled out when submitting an application.  Upon receipt, the form was removed from the application. Delcaration of Linda Hawkins, ¶ 17-23; Rule 30(b)(6) Deposition of HUD (Linda Hawkins), p. 85-86

HUD does not presently store any flow data, nor has it done so for several years.  To the extent that such data exists (at all) in the records of HUD, the information will be contained in the Merit Staffing Control System, which the defendant has fully produced.   There is no other database at HUD to collect or retain such information.  Id., ¶¶ 8-9 and 17-23.

To the extent that Plaintiff seeks information with respect to the EEOMAS database system, HUD no longer has such information.   As fully outlined in response to the Plaintiff's First Motion to Compel, the EEOMAS database is no longer used by HUD, has not been used by HUD since 2003.  See Gaiter Declaration, ¶ 24-27.  It is not possible to comply with the requests

10

at issue because HUD has no access to the database and has not had access since 2003. <u>See</u> Gaiter Declaration, ¶ 24-27. To the extent that EEOMAS reports dealing with the years in question and/or the Community Builder or Public Housing Revitalization Specialist Position have been located, they have been produced to the Plaintiff.[9]

---

[9]Plaintiff appears to contend that the instant discovery is sought to prove that HUD utilizes its collection of "flow data" to "screen" applicants for vacancy announcements to insure that every vacancy announcement garners adequate minority or female applicants. <u>See</u> Plaintiff's Second Motion to Compel, p. 11. HUD simply does not track "flow data" beyond collecting the form required by the EEOC, the Management Officials who control whether a vacancy announcement is cancelled have no access whatsoever to the information. <u>See</u> Hawkins Declaration, ¶ 24-26; Rule 30(b)(6) Deposition of HUD, by Linda Hawkins, p. 85-86; Rule 30(b)(6) Deposition of HUD (Keith Gaiter), p. 13 ("we do not have that capability.").

## **CONCLUSION**

For the reasons stated herein, HUD requests that the Second Motion to Compel be denied.

Respectfully submitted,
MICHAEL J. SULLIVAN
United States Attorney

/s/ Mark J. Grady
MARK J. GRADY
Assistant U.S. Attorney
U.S. Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA  02210
Tel. No. (617) 748-3136

Certificate of Service

Review of the docket reflects that this response will be served electronically.

/s/ Mark J. Grady
MARK J. GRADY

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In the matter of:

RICHARD S. PATOSKI,

                    Plaintiff,

v.                                    CA#05-11086-RCL

ALPHONSO JACKSON, SECRETARY,
DEPARTMENT OF HOUSING AND URBAN
DEVELOPMENT,

                    Defendant.

Washington, DC
Tuesday, July 18, 2006

DEPOSITION OF:

Michael Beard

called for examination by counsel for the Plaintiff
pursuant to notice of deposition in the law offices
of Passman & Kaplan, 1090 Vermont Avenue, NW
Washington, DC, when were present on behalf of the
respective parties:

2

APPEARANCES:

On Behalf of the Plaintiff:

        ROBERT MANTELL, ESQ.
of:    Rodgers, Powers, & Schwartz
        18 Tremont Street
        Boston, MA 02108
        (617) 742-7010
        fax (617) 742-7225

On Behalf of the Defendant:

        MARK GRADY, ESQ.
of:    United States Department of Justice
        John Joseph Moakley Courthouse
        1 Courthouse Way
        Suite 9200
        Boston, MA 02210
        (617)748-3136
        fax (617) 748-3969

        ABRAHAM BRANDWEIN, ESQ.
of:    United States Department of HUD
        Office of Counsel
        10 Causeway Street
        Room 310
        Boston, MA 02222
        (617) 994-8267

3

I-N-D-E-X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Michael Beard | 5 | | | |

E-X-H-I-B-I-T-S

| EXHIBIT | DOCUMENT | Page |
|---------|----------|------|
| 1 | Audit Report, HUD . . . . . . . . . . | 24 |
| 2 | Management Committee Minutes  . . . . | 69 |
| 3 | Draft Audit . . . . . . . . . . . . | 92 |
| 4 | Loter Draft Audit . . . . . . . . . | 92 |
| 5 | OPM Review  . . . . . . . . . . . . . | 97 |

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS

1323 RHODE ISLAND AVENUE, N.W.

(202) 234-4433          WASHINGTON, D.C. 20005          (202) 234-4433

4

1                     P-R-O-C-E-E-D-I-N-G-S

2                                      (10:03 a.m.)

3        Whereupon,

4                          MICHAEL BEARD,

5        was called as a witness by counsel for the agency and,

6        having been first duly sworn, was examined and

7        testified as follows:

8                    MR. MANTELL: Good morning, Mr. Beard.

9                    WITNESS: Good morning.

10                   MR. MANTELL: My name is Robert Mantell.

11       I'll be asking you a few questions today.  I am Rick

12       Patoski's attorney.  And Rick has a pending claim

13       against HUD, based on allegations of age, race, and

14       gender discrimination claims.  And I'm going to be

15       asking you a few questions about some of the positions

16       that he applied to.

17                        If, at any time, you're confused by a

18       question, please let me know, and I will try to

19       rephrase it.  Another thing is, everything you say

20       here is being taken down and recorded, and a

21       transcript will be printed out eventually.

22                        And when you answer a question, it would

1    be best if you answered very clearly yes or no.

2    Things like "uh-huh" don't translate well on the

3    record. Finally, please try not to interrupt me, and

4    I'll try not to interrupt you, again, just so the

5    transcript won't be confused. Could you --

6                MR. GRADY: Before we -- you want to agree

7    to the usual stipulations?

8                MR. MANTELL: Usual stipulations. Sure.

9    It is agreed that objections as to form and motions to

10   strike will be reserved until the time of trial. Mr.

11   Beard will have 30 days to review and sign the

12   deposition.

13               MR. GRADY: We'll waive the notary.

14               MR. MANTELL: Waive the notary. Okay.

15                       DIRECT EXAMINATION

16               BY MR. MANTELL:

17        Q     I may have asked you this already, but

18   what is your name?

19        A     D. Michael Beard.

20        Q     What's the D stand for?

21        A     Dana.

22        Q     How do you spell that?

6

1       A     D-A-N-A.

2       Q     And how do you spell Michael?

3       A     M-I-C-H-A-E-L.

4       Q     And how do you spell Beard?

5       A     B-E-A-R-D.

6       Q     What is your current residential address?

7       A     17 Rubins, R-U-B-I-N-S, Walk, W-A-L-K,

8  Fredericksburg, F-R-E-D-E-R-I-C-K-S-B-U-R-G, Virginia.

9       Q     And what's your zip code?

10      A     2-2-4-0-5.

11      Q     Okay.  What's your residential telephone

12  number?

13      A     I don't have one.

14      Q     Do you have a cell phone?

15      A     I have a cell phone.

16      Q     Okay.  What's that?

17      A     5-4-0-6-0-4-6-9-5-0.

18      Q     And are you currently employed?

19      A     Yes.

20      Q     Okay.  Where are you employed?

21      A     At the Department of HUD, Office of

22  Inspector General, in Washington, D.C.

1          Q      What's your business address?

2          A      451 7th Street SW, Room 8184, Washington,

3     D.C., 20410.

4          Q      And what's your work telephone number?

5          A      2-0-2-7-0-8-0-6-1-4, extension 8-1-1-6.

6          Q      Okay.  Have you ever been deposed before?

7          A      Yes.

8          Q      Okay.  When was that?

9          A      I've been deposed several times.

10          Q      Okay.

11          A      Criminal and civil proceedings.

12          Q      Okay.  Limit it to civil proceedings.

13     When were you deposed?

14          A      The last time I was deposed was on a --

15     I'm trying to think of the right name to call the case

16     -- but it's a case that HUD was winning against an

17     individual for equity skimming in Houston, Texas, and

18     it was a civil case.

19          Q      Any other civil cases in which you have

20     been deposed?

21          A      Yes.

22          Q      Okay.  Can you describe those?

8

1          A      I've been deposed for EO cases before.

2     I've been deposed in hearings against Certified Public

3     Accountants, to have their licenses removed, in Puerto

4     and Texas.  I've been deposed by the State Bar in

5     Texas, in a proceeding to take away a Texas lawyer's

6     license.

7          Q      Well, confine the question to the EO

8     claims.  What were those cases?

9          A      That was a case brought by a investigator

10    for the Office of Inspector General, against HUD,

11    discriminating against -- I think it was age and race.

12         Q      So someone from your department, within

13    HUD, sued HUD --

14         A      Yes.

15         Q      -- for age and race discrimination.  Do

16    you recall the name of that person?

17         A      Robbie, R-O-B-B-I-E, Tigh, T-I-G-H.

18         Q      And when was that case -- when was that

19    deposition?

20         A      I will guess 1998, 1999.

21         Q      Okay.  Was that the subject of a claim in

22    court, or was it in administrative proceedings?

9

1        A    At the time, it was administrative

2    proceedings, and it was in a setting like this.

3        Q    Okay.  And then -- do you know if it came

4    to court?

5        A    No.  I think it was dismissed.

6        Q    It was dismissed.  Did you -- were you a

7    deponent in any other EO claim?

8        A    No.  I've had affidavits taken, but never

9    deposed.

10        Q    Okay.  Tell me about those affidavits.

11        A    One was taken for a woman in the Atlanta,

12    Georgia office, who had a complaint that she wasn't

13    promoted.  And this was, again, Office of Inspector

14    General, and I had an affidavit taken from that.

15        Q    Were you involved in her -- in the failure

16    to promote her?

17        A    No.

18        Q    Okay.  What role -- what information did

19    you have in relation to that case?

20        A    I had found out she was not complying with

21    audit standards, and had written her up for that.

22        Q    Okay.

1          A    But I was not in her direct supervisor

2    chain.

3          Q    Okay.  Any other affidavits in any other

4    discrimination claims?

5          A    I don't think so.  I can't think of any

6    right now.

7          Q    Okay.  Did you review any documents in

8    preparation for this deposition?

9          A    Yes.

10         Q    What documents did you review?

11         A    Audit notes regarding interviews with Mr.

12   Patoski, and the reported audit on the Community

13   Builders, and a draft reported audit that was a

14   follow-up on Community Builders.

15         Q    Okay.  Any -- anything else?

16         A    No.

17         Q    Did you go to college?

18         A    Yes.

19         Q    Where did you go?

20         A    I went to Christopher Newport College and

21   the College of William and Mary in Virginia.

22         Q    When did you graduate?

11

1        A      1974.

2        Q      Did you get a degree?

3        A      Yes.

4        Q      What was your degree?

5        A      It's a Master's in Accounting.

6        Q      Did you get any other formal education

7   beyond that?

8        A      Yes.  I have a Master's from Metropolitan

9   College, Boston University.  And that's a Master's of

10  Science and Business Administration.

11       Q      When did you get that?

12       A      1985.

13       Q      Any other formal education after that?

14       A      No.

15       Q      What did you do between 1974 and when you

16  started at Metropolitan?

17       A      I was with Coopers and Lybrand CPAs until

18  1979, and then I -- until 1982, I think.  Then I went

19  with the Department of the Air Force, with the Air

20  Force Audit Agency, until '88.  And then I was with

21  the  Environmental  Protection  Agency  Office  of

22  Inspector General until '89.  And then I went with the

1  HUD Office of Inspector General in '89, and I've been

2  with them since.

3       Q    You're first governmental position was the

4  Department of the Air Force, did you say, Audit

5  Agency?

6       A    Air Force Audit Agency.

7       Q    What did you do in that job?  What was

8  your job title?

9       A    I was Audit Manager, and I prepared audit

10 programs for application by auditors on Air Force

11 programs.

12      Q    Can you say that again?

13      A    I prepared audit programs for application

14 by auditors on Air Force programs.MR. GRADY: Wow, now

15 five times fast.

16           WITNESS:  Yes.

17           BY MR. MANTELL:

18      Q    What's an audit program?

19      A    It is a document that gives instructions

20 to auditors as to what to do to achieve specific

21 objectives.

22      Q    So can you give me an example?

1          A     We were -- did one audit where we were

2     looking at whether or not the training was effective

3     for deploying F-16's to Europe.  So we followed those

4     F-16's to different bases, observed the training,

5     wrote up findings, and issued a report to the air

6     staff.

7          Q     And you were the person who prepared the

8     plan on how the audit would --

9          A     I prepared the plan, accompanied the

10    auditors, reviewed the work, drafted the report,

11    briefed the Generals.

12         Q     I see.  And you're job at the Air Force

13    involved audits similar to that?

14         A     Yes.

15         Q     And then after that, you went to the EPA?

16         A     The Environment Protection Agency.

17         Q     Okay.  And you were employed there, in the

18    Office of Inspector General?

19         A     In Atlanta, Georgia.  Yes.

20         Q     And what did you do there?

21         A     I was an Audit Manager, and I did

22    essentially the same thing, designed audit programs

14

1    for application by auditors, throughout the southeast

2    and southwest of the United States, on Environmental

3    Protection Agency programs.

4        Q    As an Audit Manager with the Air Force,

5    did you supervise anyone?

6        A    Yes.

7        Q    Okay.  Who did you supervise?  How many

8    people?

9        A    At -- I had -- that was -- during the time

10    of my career, I was also an Office Chief at Ramstein

11    Air Base, Germany, where I would have had a dozen

12    auditors, or so.  And I was an Office Chief at  RAF

13    Bentwaters, in England, and had four auditors there.

14    And I was an Office Chief in Sumter, South Carolina,

15    and I had four auditors there.

16        Q    What training or education gave you the

17    qualifications to prepare audit programs?

18        A    The -- I had a degree in accounting, and

19    a degree -- the Master's degree in Accounting from

20    Boston.  I am also a Certified Public Accountant, with

21    five years of public practice.  And then all these

22    years now, of government practice.  So over 30 years

15

1    involved.

2        Q    Okay.    And    how    would    you    describe

3    auditing?    What is auditing?

4        A    It is a profession, and it is a profession

5    that looks for objective and fair reports on programs

6    or issues of interest to people, whether they'd be

7    banks, governments, or whatever, independent of those

8    that they audit.

9        Q    Did you supervise anyone at the EPA, while

10    you were an Audit Manager?

11        A    Yes.    I had an audit team in Atlanta,

12    Georgia, and a small audit team in Dallas, Texas.

13        Q    Now, why did you go from the Air Force to

14    the EPA?

15        A    Sumter, South Carolina -- so you folks in

16    Boston will not be upset -- did not have a good enough

17    highschool for my daughter.    So I -- they couldn't

18    place me somewhere else, so I went with the EPA in

19    Atlanta, where I could get a better highschool.

20        Q    And how long were you at the EPA?

21        A    Two years.

22        Q    And then you left in 1989, was it?

16

1        A       Yes.

2        Q       And where did you go after that?

3        A       The HUD Inspector General in Atlanta.

4        Q       Now can you describe for me what the

5    Office of Inspector General is?

6        A       It is the independent auditor of the

7    government agencies -- just about every government

8    agency has one -- and they perform audits for the

9    entity that they audit, and for Congress, and anyone

10   else that asks for them.

11       Q       Can private citizens ask for them?

12       A       You can ask for them.  That's right.

13       Q       How would I do that?

14       A       You could write to your local Department

15   of Transportation, and say, "By golly, you guys should

16   audit the big dig (sic), and see what went wrong with

17   that."  And they would put that in an inbox, and maybe

18   or maybe not, they would have the resources to go look

19   at it.

20       Q       Okay.  But you're considered an employee

21   of HUD, correct?

22       A       No.

17

```
 1              Q      No?

 2              A      The HUD Office of Inspector General has

 3       its own budget, and my FTE, full time equivalent, is

 4       the HUD IG's, not HUD's.  If HUD advertised a job and

 5       said it was only for HUD employees, I'm not eligible

 6       to apply for that, and visa versa.

 7              Q      Other than performing audits, does the HUD

 8       -- well, have we said what HUD stands for yet?  What

 9       does HUD stand for?

10              A      Housing Urban Development.

11              Q      Does the Office of the Inspector General

12       do anything other than perform audits?

13              A      Yes.

14              Q      What does it do?

15              A      It has three functions.  One is the audit

16       function, one is an investigative function that

17       investigates criminal activity, and one is an

18       evaluation and inspection function, and they perform

19       evaluations and inspections.

20              Q      Were you -- have you been with the HUD

21       Office of Inspector General since 1989?

22              A      Yes, I have.
```

18

1          Q      Okay.  Of those three functions, have you

2     always been in one?

3          A      Yes.  The Office of Audit.

4          Q      So you were the IG in Atlanta.  What

5     position did you have when you began at HUD?

6          A      I was hired as a Assistant Regional

7     Inspector General in Atlanta, Georgia.

8          Q      Why did you leave the EPA?

9          A      They didn't promote me.  And the lady that

10    left went to HUD, and I followed her.

11         Q      Did she hire you?

12         A      She called when she found out I didn't get

13    the promotion, and said, "Do you want to come work

14    with me?"

15         Q      I see.  Was the move to the Assistant

16    Regional Inspector General a promotion for you?

17         A      No.  It was a lateral.

18         Q      Did you get a raise?

19         A      No.

20         Q      Did you consider that it had greater

21    career prospects?

22         A      Yes.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVENUE, N.W.
(202) 234-4433              WASHINGTON, D.C. 20005              (202) 234-4433

19

1     Q    Did -- what did you do as an Assistant

2  Regional Inspector General in Atlanta?

3     A    I designed audit programs for application

4  by auditors.  And I had a team in North Carolina,

5  Florida, and Puerto Rico.

6     Q    Did your job change at any time after

7  that?

8     A    I was promoted to a Regional Inspector

9  General.

10    Q    When was that?

11    A    1992.  And I moved to Fort Worth, Texas.

12    Q    And what did you do as a Regional

13  Inspector General?

14    A    I was in charge of all aspects of running

15  an audit office, and I had a five state territory of

16  planning the audits, supervising the auditors.  I had

17  a budget.  I would make sure they were trained.  I

18  would make sure that everything was running smoothly,

19  and I was with liaison with the HUD hierarchy in that

20  five state region, and any of the political folks, and

21  that sort of thing.

22          And  I  worked  in  conjunction  with  the

20

1    Office of Investigation down there to run joint

2    ventures into criminal activities, or things we were

3    going to take to civil court.

4        Q    I see.  Would you be the one to decide

5    whether a citizen's request for an audit would be

6    granted?

7        A    Yes.  Up until -- there was a policy that

8    we had that authority until, I think, 2002 or so.  And

9    that authority was moved up here to Washington, so the

10   decision would be made up here.

11           MR. MANTELL:  Let the record note that

12   Rick Patoski has come in.  Yes.  Richard Patoski, the

13   plaintiff.

14           BY MR. MANTELL:

15       Q    How long did you serve as the Regional

16   Inspector General in Fort Worth?

17       A    From 1992 until January 2005.

18       Q    And did your duties and title stay the

19   same until January 2005?

20       A    Yes.  There was a -- the title, for a

21   short period of time, I was a District Inspector

22   General.

21

| | | |
|---|---|---|
| 1 | Q | And why was that? |
| 2 | A | Mr. -- what's his name?  I was talking to |

3    -- he did away with the word "Regional" for all of

4    HUD, and we followed along, so we became District's.

| 5 | Q | But did your job change? |
|---|---|---|
| 6 | A | Job did not change. |
| 7 | Q | Did your duties change? |
| 8 | A | No. |
| 9 | Q | Okay.  So what happened in January 2005? |
| 10 | A | I was given a directive reassignment to |

11    work the Washington, D.C.

| 12 | Q | And what's a directive reassignment? |
|---|---|---|
| 13 | A | You either comply, or you retire or |

14    resign.

| 15 | Q | What job title did they give you in |
|---|---|---|

16    Washington, D.C.?

| 17 | A | I'm a Special Assistant. |
|---|---|---|
| 18 | Q | What are your job duties as a Special |

19    Assistant?

| 20 | A | Duties as assigned.  Special projects. |
|---|---|---|
| 21 | Q | Well, what have you been doing? |
| 22 | A | Right now, I'm reviewing training courses |

22

1    at the Inspector General Training Institute, with the

2    Curriculum Review Board.  I'm participating in a peer

3    review of another IG, a Tax Administration IG, and

4    this thing.

5         Q    Was it a promotion when you went from

6    District Inspector General to Special Assistant?

7         A    No.

8         Q    Was it a demotion?

9         A    Not in pay grade, no.

10        Q    Okay.  You kept the same pay grade?

11        A    Yes.

12        Q    What's your grade?

13        A    GS-15.

14        Q    What -- why were you reassigned?

15        A    That's a matter in litigation.

16        Q    Oh.  Are you suing?

17        A    Yes.

18        Q    You're suing.  Who are you suing?

19        A    HUD.

20        Q    You're suing HUD.  Are you suing the HUD

21    Office of Inspector General or HUD?

22        A    I wasn't anticipating this to be about me.

23

1          MR. GRADY:  It is not information, at this

2      point, that is privileged.  If you have concerns, and

3      you wish to consult a private attorney with respect to

4      answering questions as to your private cases, we can

5      stop them, and you can talk to, if you have counsel,

6      private  counsel.   But  in  the  context  of  the

7      government's interest in this particular case with Mr.

8      Patoski, I don't believe counsel has transcended any

9      privilege the government may assert on your behalf.

10          MR. MANTELL:  Well, let me push that off

11      until later.

12          WITNESS:  All right.

13          MR. MANTELL:  Okay?  And then if you want

14      to call someone, we'll deal with that.  Okay?

15          WITNESS:  All right.

16          MR. MANTELL:  Because I sense that you're

17      a little uncomfortable.

18          WITNESS:  Yes.

19          MR. MANTELL:  Okay.  All right.

20          BY MR. MANTELL:

21      Q     Do you have any other claims, other than

22      that, against HUD?

24

1         A      No.

2         Q      Okay.  Or against the Office of Inspector

3    General?

4         A      No.

5         Q      Okay.  And  have  you  been  deposed,  in

6    relation to that litigation, yet?

7         A      No.

8         Q      Okay.  Is that in court, or is that in

9    administrative?

10        A      No.  It's in District Court.

11        Q      It's in District Court.  Okay.  Well, I'm

12   going to ask you about an audit.  I'm just going to

13   show this to you.  Well, actually, let's mark it.

14               COURT  REPORTER:    How  would  you  like  it

15   marked?

16               MR. MANTELL:  How do pronounce it, Beard?

17               WITNESS:  Beard.

18               MR. MANTELL:  Beard, Exhibit 1.

19                         (Whereupon,  the  aforementioned

20                         document    was    marked    for

21                         identification as Beard Exhibit

22                         Number 1.)

1          WITNESS:   The large wooly thing in the

2     woods, with a "D" on the end.

3          MR. MANTELL:  You don't need to review it

4     yet.   I just want you to look at it, and ask if it's

5     something that you recognize.

6          WITNESS: Yes.  This looks like the report

7     that I issued.

8          BY MR. MANTELL:

9     Q     Okay.  When did you issue this report?

10    A     September 30, 1999.

11    Q     Okay.  Now, I don't want to ask you yet

12    about this.  I just want to ask you about how audits

13    are put together.  So when you performed this audit,

14    were you at HUD?

15    A     Yes.

16    Q     Okay.  And how would you ordinarily

17    compile such an audit?

18               (No response.)

19    Q     Would you get an assignment from someone?

20    A     Yes.  This particular one was assigned to

21    me.

22    Q     Okay.  Who would assign you audits?

26

1          A      In this particular case?

2          Q      Yes.   In this one.

3          A      We were doing several audits, as an

4     organization, of HUD 20/20, which was a program by the

5     department,   to   revitalize   and   reorganize   the

6     department.  And there were several audits that were

7     initiated, this being one.  And I was assigned this

8     particular  one  by  Susan  Gaffney,  the  Inspector

9     General.

10         Q      Was Ms. Gaffney your direct supervisor?

11         A      No.  My direct supervisor would have been

12    Kathy Kuhl-Inclan, K-A-T-H-Y, K-U-H-L, hyphen, I-N-C-

13    L-A-N.

14         Q      Would it be unusual for Ms. Gaffney to

15    assign you an audit?

16         A      No.   It's -- for her, personally, to do

17    it, that didn't happen every day, but it wouldn't be

18    unusual.

19         Q      Okay.   Who  would  usually  assign  you

20    audits?

21         A      We would meet -- when I say we, the

22    Regional Inspectors Generals -- would meet, usually

27

1    two to three times a year, discuss what needed to be

2    audited at HUD, and internal audits, which this is an

3    example of, those would be assigned then, based upon

4    who wanted to do it, and who had the resources or the

5    timing, or the interest.  That's how they'd be done.

6         Q    Okay.    And  then,  after  getting  the

7    assignment of an audit, then what did you do?

8         A    I   would   assign   Assistant   Regional

9    Inspectors General to the job, and auditors in charge,

10   and  auditors,  put  together  a  team,  start  holding

11   meetings to plan and scope the engagement, design an

12   audit  program.    And  then  go  and  apply  that  audit

13   program, interview people, look at records, look at

14   documents, gather all the information we can.

15        Q    So, even though you had a team, you would

16   also  perform  some  of  the  investigation?    Is  that

17   correct?

18        A    On this particular one, I did, because it

19   was a short notice.  She wanted it done in a specific

20   time period, so I did speak to some people.

21        Q    Was  it  unusual  to  have  such  a  short

22   notice?

28

1          A       Yes.

2          Q       All right.  What was the time period given

3     you?

4          A       I think I was assigned this in June of

5     1999, and I was told to have it done by September

6     30th.

7          Q       Was it assigned to you for any particular

8     reason?

9          A       Yes.

10         Q       What was that reason?

11         A       She wanted someone that could do something

12    this large in that short of time period, and I had

13    been doing large audits in the time slots provided.

14    So she knew I could do it.

15         Q       Okay.  And were you able to assemble a

16    team to do this audit?

17         A       Yes.

18         Q       And did you have adequate staffing for

19    that team?

20         A       Yes.

21         Q       Okay.  Now I want to jump back, again,

22    from this particular audit, and start asking you

29

1       questions generally on how audits work.

2              A      Okay.

3              Q      So you testified that you generally would

4       put together a team, start calling people, start

5       looking at things.  Sometimes you personally would do

6       so as well.  What sort of -- what sort of things and

7       documents would you look at?

8              A      Are we talking specifics about this -- any

9       documents relevant to the area, we are going to look

10      at.  We would have planned sessions in a room, what we

11      call brainstorming sessions, where we would try to

12      decide where can we find information on this

13      particular program, entity, whatever.

14                     And then write up a plan for how we're

15      going to go about doing that, to go look at these

16      documents, go talk to these people, find out things

17      about things.

18             Q      Would you have any special authority to

19      see documents from HUD?

20             A      Yes, we do.

21             Q      Okay.  What is that authority?

22             A      The authority is in the Inspector General

30

1    Act of 1978, and applies to all Inspector Generals.

2    We have access to all books and records of anybody in

3    HUD or doing business with HUD.

4         Q    Okay.  What about the federal government,

5    in general?

6         A    If  we  wanted  documents  from  another

7    agency, we would ask.

8         Q    Did you have any special authority to see

9    documents from other agencies?

10        A    No.  Not that I'm aware of.  But we would

11   be turned down very seldom.

12        Q    Would  you  have  to  issue  a  subpoena  or

13   anything for those documents?

14        A    I can.  I had administrative subpoena

15   power as the Regional Inspector General.

16        Q    But, usually, would you just send a letter

17   to another agency to see their documents?

18        A    To another agency?

19        Q    Yes.

20        A    Yes.  Or we'd just send auditors over

21   there to talk to the people in the other agencies

22   directly, to make an appointment for the audit.

31

1      Q      Now you mentioned that the Office of the

2   Inspector General was independent of HUD.   Is that

3   correct?

4      A      Yes.

5      Q      And so is it true then that the Secretary

6   cannot issue orders to you?  You don't report to the

7   Secretary?

8      A      I do not report to the Secretary.   That's

9   correct.

10      Q      And does the Secretary have any control

11   over the terms and conditions of your employment?

12      A      No, he does not.   Not directly.

13      Q      Does anyone at the Office of Inspector

14   General report to the Secretary of HUD?

15      A      Yes.

16      Q      Who is that?

17      A      The Inspector General.

18      Q      And what relationship is that?

19      A      Inspector General is a political

20   appointee, nominated by the President, and confirmed

21   by the Senate, and he serves at the pleasure of the

22   President.  So -- but the person who would write his

32

1    appraisal is the Secretary.  But the Secretary is not

2    allowed to give him any bonuses, because that would be

3    a violation of the independence.

4         Q    Does the Secretary direct the Inspector

5    General's work?

6         A    No.

7         Q    So if the Inspector General does something

8    that the Secretary doesn't like, the Secretary can

9    give  the  Inspector  General  a  poor  evaluation.

10   Correct?

11        A    Yes.

12        Q    Can the Secretary do anything else?

13        A    They would -- for the Secretary to take

14   any action, I believe they would have to talk to the

15   White House.

16        Q    I see.  Okay.  Can the Secretary fire the

17   Inspector General?

18        A    Not without the White House's approval.

19        Q    Well, is the Secretary of HUD the person

20   who fires the Inspector General?

21        A    No.  I've never known -- that's a legal

22   question.  To my knowledge, if the Secretary wants to

33

1    fire an IG, they could walk over to the White House,

2    and the White House has to fire him.

3        Q    Okay.

4        A    Now, most IG's that get in trouble, end up

5    resigning.  I don't know where of anybody actually

6    being fired (sic).

7        Q    Okay.  All right.  So we're back in the

8    auditing process, you've assembled a team, you have

9    decided how to investigate, do the audit.

10        A    We audit.  We don't investigate.

11        Q    Well what's the distinction?

12        A    If -- the investigators investigate, and

13    usually there's a criminal matter involved.  So we

14    keep a -- direct people to exercise the term, audit

15    applies to auditors, the term investigator or

16    investigate applies to investigators.

17        Q    Okay.  I will try to --

18        A    So there is a distinction.

19        Q    I will try to hue to that.  So then the

20    auditors decide on a plan of action, and then

21    interview people, and request documents?

22        A    Yes.

34

1          Q      And then what happens?

2          A      The auditors will write up the results of

3    interviews, write up the results of looking at the

4    documents, do other analysts or tests, come up with

5    conclusions, and try to satisfy the objectives of the

6    audit.

7          Q      And then what happens?

8          A      Then we get together and write it on the

9    report.  We issue a draft for comment to the people

10   that were audited, with their comments, and then issue

11   a final report.

12         Q      When you write up the results, put

13   together a draft, is there any sort of internal review

14   above you, before it gets sent out to the people that

15   you're auditing?

16         A      At that time, the internal review would

17   have consisted of Kathy Kuhl-Inclan.  And she had a

18   technician working for her by the name of Stan McLeod.

19   And, yes, they review the drafts above me.

20         Q      Okay.  So before you sent it out, it got

21   approval from them?

22         A      Oh.  Before we sent out the draft?

35

1      Q      Before you sent out the draft.

2      A      Yes.  Kathy had looked at it.  Stan had

3   looked at it.  And also IG Counsel had looked at it.

4      Q      Once that happened, then who do you send

5   it to?

6      A      To the auditee.  In this case, it was Saul

7   Ramirez, the HUD Deputy Secretary.

8      Q      Okay.  And then what happens?

9      A      He is given a time period to reply in

10  writing to the findings, and we hold an exit

11  conference with him, and discuss the findings across

12  the table.

13     Q      And then what happens?

14     A      We take their comments into consideration,

15  rewrite the report as appropriate, and then issue it.

16     Q      What's involved in the issuance of a final

17  report?

18     A      We set it in some sort of distribution to

19  get it to people.  I mean I don't understand the

20  question I guess.

21     Q      Well, is there some kind of approval

22  before the final report goes out?

36

1      A    Oh.

2      Q    Is it something formal that happens?

3      A    Yes.  Kathy tells me whether or not I can

4    issue it.

5      Q    Okay.

6      A    She looks at the -- what we're going to

7    say about the auditee's response, and then she either

8    agrees or disagrees with me, and we make changes as

9    necessary, and then out it goes.

10     Q    Is there any formal approval that's

11   necessary before it goes out?

12     A    Mine.  I mean there are documents in the

13   audit files, checklists, audit checklists, and those

14   sort of things.  We sign off on those.

15     Q    At some point, is the audit given to the

16   IG before it goes out?

17     A    She may or may not get involved in the

18   process.  And I think, and I'm not going to say this

19   is true, but I think she was staying clear of these

20   20/20 audits.

21     Q    Okay.

22     A    They were a little warm, and I don't think

37

1    -- I don't believe she got directly involved in them.

2         Q    Okay.  Do you know if the Secretary of HUD

3    ever saw the audit before it was issued?

4         A    No.  I do not know that.

5         Q    After it's sent out, is there any other

6    process that's involved with an audit?

7         A    Yes.  There's a follow-up process, and HUD

8    is supposed to come up with a plan to fix the

9    recommendations that we make.  And then the audit

10   isn't closed out until those recommendations have been

11   acted on.

12        Q    And anything after that?

13        A    No.

14        Q    Now let's turn to the audit contained in

15   Exhibit 1.  What, specifically, was your assignment?

16        A    I'm turning to the -- I'm trying to find

17   the Executive Summary.  Okay.  I'm on page iii, and

18   our objectives are stated there.  We were -- it was a

19   nationwide  audit  of  the  Community  Builders,  to

20   evaluate their hiring functions, responsibilities, and

21   their impact on other organizations within HUD.

22        Q    Well, going to the second page of Exhibit

38

1    1, where it says Audit Report.

2        A    Yes.

3        Q    Is that your signature there?

4        A    Yes, it is.

5        Q    Is it fair to say that you agreed with the

6    conclusions in this report?

7        A    Yes, I do.

8        Q    Why was a concern raised concerning the

9    staffing of the Community Builder position?

10       A    That is also on page iii.  This audit is

11   part of the Inspector General's continuing views of

12   HUD's 20/20 Management Reform Plan, but it also

13   responds to requests from members of Congress and

14   numerous citizen's complaints.

15       Q    Now is it fair to say that you prepared

16   this audit in the ordinary course of your employment

17   at the HUD IG's office?

18       A    I would say yes, except it was probably

19   the biggest one I had done, in the shortest time I had

20   done it.

21       Q    Right.  But this is what you do?

22       A    So ordinary is not to be a word that I

39

1   would apply to this one.  But, yes, this is what I do.

2        Q     Okay.  And did you -- after you were

3   assigned this audit, did you, in fact, assemble a

4   team?

5        A     Yes.

6        Q     Of inspect -- of auditors?

7        A     Auditors.

8        Q     And did you and the team put together --

9   write up the results of the audit?

10       A     Yes.

11       Q     And did you prepare a draft version?

12       A     Yes.

13       Q     And did you submit that draft to the

14  people above you?

15       A     Yes.

16       Q     But you've testified it probably didn't go

17  to Ms. Gaffney?

18       A     Probably -- well I don't -- I don't think

19  so.  I don't think she was looking at 20/20 audits.

20       Q     Okay.  And after that, did you submit the

21  draft to the auditee's?

22       A     Yes.

40

1          Q      In this case, HUD?

2          A      Yes.

3          Q      Okay.  And did you receive from HUD, their

4    response?

5          A      Yes, we did.

6          Q      And did you have -- what did you call it?

7    Some kind of interview with them?

8          A      Exit conferences.

9          Q      Exit conference.  Did you have an exit

10   conference with HUD?

11         A      Yes.

12         Q      Who was present on behalf of HUD?

13         A      That would reflected in the work papers,

14   but let me see if it just happens to be here.  On page

15   iv, we provided a draft of this report to the Deputy

16   Secretary and other senior HUD management officials,

17   on September 11, 1999.

18              Now there were a slew of other senior

19   management officials, and we would actually have a

20   record of that.  And an example of who that might be

21   is on the distribution page of this particular report,

22   which is on page 145.

41

1      Q      Were you present at the exit conference?

2      A      Yes, I was.

3      Q      Okay.    And   then,   after   the   exit

4   conference, did you and your team respond to HUD's

5   concerns?

6      A      They were supposed to give us a written

7   response for us to include in this report.

8      Q      And did they do that?

9      A      They did that.

10      Q      And did you, in this report, respond to

11   their response?

12      A      Yes, we did.

13      Q      And then after that, did you give the

14   updated draft to someone above you to approve?

15      A      Yes.   Kathy Kuhl-Inclan.

16      Q      And did she, in fact, approve the updated

17   draft of the audit?

18      A      Yes.

19      Q      Okay.  And at that point, was it sent out?

20      A      Yes.

21      Q      Now, what is a Community Builder?

22      A      It is a title for a position created by

42

1    HUD that had several functions assigned to it, and

2    there were several different types of Community

3    Builders.

4         Q    What were the different types?

5         A    There was -- I'm looking at page 4, where

6    there were Senior Career Community Builders at the 14

7    and 15 level.  There were Community Builders at the

8    13, 14, and 15 level.  There were Associate Community

9    Builders, and they started at 7 and 9, and went to

10   grade 12.  There were Community Builder Fellows, they

11   were 13, 14, and 15's.  And there were Community

12   Builder Fellow Specialists, and they were 13, 14, and

13   15.  These people had varying types of jobs.

14        MR. GRADY:  For clarity purposes, when you

15   refer to particular numbers, what are you referring

16   them in the context of?  When you say --

17        WITNESS:   Pay  grades.   Those  are  pay

18   grades.

19        BY MR. MANTELL:

20        Q    Was there any unifying principal of what

21   a Community Builder does?  Is there some general task

22   that a Community Builder did?

43

1      A      On -- on this table that I'm looking at,

2    no.   I mean the Senior Community Builders were doing

3    something  entirely  different  from  the  Community

4    Builder Fellow Specialists.

5      Q      Okay.   What did the Community Builder

6    Fellow Specialists do?

7      A      The Fellow Specialists -- I'm looking for

8    a schedule, that's in this report, of the different

9    tasks they were performing.   I'm not -- I'm not

10   supplied it.   There is a paragraph in here that talks

11   about the Specialists.   They were 82 of them, and they

12   were hired for very specific areas.

13              I know, for instance, ten of them ended up

14   working in the Hope 6 Arena (sic).   Some of them got

15   assigned to the Office of Fair Housing and Equal

16   Opportunity.   Page 15.   Eighty-two of them are listed

17   there.   And as you can see on that, Disaster Response

18   got three people, Migrant Farm Workers Initiative got

19   two people.

20     Q      Well, you've testified that they were

21   assigned to specific areas, but what did they do

22   within those areas?

44

1        A       I'm not sure I can answer the question for

2    those specific areas.

3        Q       Well, ignoring the Community Builder

4    Specialists --

5        A       Okay.

6        Q       -- for a while, did the other Community

7    Builder -- other Community Builder category share some

8    kind of unifying job duties?

9        A       The -- there were two distinct groups in

10   that -- other than the Community Builder Fellows.

11   There was an internal bunch of Community Builders that

12   were hired from within HUD.   And then there was a

13   group, which is that largest group, the 326 there?

14       Q       Yes.

15       A       The Community Builder Fellows, they were

16   hired outside HUD.   And we make the distinction of

17   calling those external Community Builders.   Now, these

18   folks were hired, and their particular assigned task

19   I've got listed on page 3, where we -- in the

20   announcement that went out to advertise for these

21   jobs, this was meeting with community leaders,

22   business owners, educators, working with developers.

45

1          And the list of their duties is also on

2     that page, serving as initial point of contact for all

3     elected officials, coordinate with Public Trust

4     Officers, prepare all community profiles and briefing

5     papers.

6          Q    Would internal candidates be not allowed

7     to apply for the Fellow positions?

8          A    No.   Anybody could apply for the Fellow

9     positions.

10          Q    Oh I see.   All right.   But only internal

11     candidates could apply for the Community Builder

12     positions that are not Fellows?   Is that true?

13          A    I don't know.   I don't know -- when they

14     advertise these -- I'd have to go back and

15     specifically look.   I think the first round it was

16     internal, then I believe, those were internal to HUD.

17     Only HUD employees could apply.   The second round that

18     was the externals, those were applied -- I mean they

19     were advertised to anybody in the public.

20          Q    Now, going to page 10.   Do you see where

21     it says, "After receiving over 8,400 applications, HUD

22     hired 214 Fellows in its first class, between May and

46

1    October 1998?"

2        A    Yes.

3        Q    To your knowledge, is that accurate?

4        A    Yes.

5        Q    And those were the external candidates?

6        A    Yes.

7        Q    How many internal candidates Community

8    Builders did it hire?

9        A    In this group here?

10       Q    Yes.

11       A    I don't believe there would have been any

12   internals?

13       Q    Okay.  Is there a part in here that lists

14   how many internal candidates were hired?

15                    (No response.)

16       Q    Oh.  Okay.  Let's go to page 12.

17       A    Okay.

18       Q    Do you see where it says, "October to

19   December 1997, hired 361 internal Community Builders?"

20       A    Right.

21       Q    To your knowledge, is that accurate?

22       A    Yes.

47

1       Q    And then, underneath it says, "March 1998

2    to October 1998, hired 214 Community Builder Fellows."

3       A    Right.

4       Q    Okay.   Does  that  include  the  Fellow

5    Specialists?

6       A    Yes.   I think they come later.   Yes.

7    They're down there, November 8, 1998.

8       Q    Okay.  So does it actually -- oh, I see.

9    Do you see where it says, "January 1999 to May 1999,

10    hired 86 Community Builder Specialists from 4,836

11    applications?"

12       A    Right.

13       Q    Is that accurate?

14       A    Yes.

15       Q    Okay.  And it says, in that same period of

16    time,  "124  Community  Builder  Fellows,  from  2,063

17    applicants were hired."

18       A    Right.

19       Q    And is that accurate?

20       A    Yes.

21       Q    And do you see where it says, "August 20,

22    1998,  15  unplaced  employees  assigned  as  Community

48

1    Builders, and 14 unplaced employees assigned as

2    Community Builder Associates?"  Do you see where it

3    says that?

4         A    Yes, I do.

5         Q    And did that actually occur?

6         A    Yes.

7         Q    Okay.  Now, looking at the Community

8    Builders, was there a job already at -- in place, at

9    HUD, that was similar, that performed similar work?

10        A    They were -- the HUD employees were doing

11   the work.  Yes.  So the concept here was to create a

12   position that was distinct, in that -- the argument

13   coming from -- in reorganization -- HUD employees were

14   charged with both enforcement and helping.  And the

15   same person would be charged with that, and that could

16   cause difficulties, and they wanted to separate that.

17            And this Community Builder bunch was going

18   to be the helping bunch.  They were going to go out

19   and help people, so that the Public Trust Officers

20   could then come behind them and keep folks in line,

21   and split the function.  But the functions were being

22   done by all the HUD employees at that time.

49

1        Q    Are you aware of the job titles of the

2    people at HUD who had been doing those functions?

3        A    I think -- I think they may be in this

4    report, because we specifically talk about community

5    planning and development people, in particular, that

6    were doing this kind of function.

7        Q    You mean the CPD Reps?

8        A    The CPD Reps.

9        Q    So it's your understanding that the CPD

10   Reps were doing this job that the Community Builders

11   were tasked to do?

12       A    Yes.

13       Q    But the theory was that the Community

14   Builders could do a part of that job better if they

15   were given an isolated portion of those tasks?

16       A    Right.

17       Q    Now, in this audit report, you came to

18   certain conclusions.  Is that correct?

19       A    That's correct.

20       Q    And, for example, on page 16, it says,

21   "Needed grade levels and needed skills not

22   determined."  Do you see where it says that?

50

1        A      That's right.

2        Q      Can you explain that conclusion?

3        A      The officials at HUD were not able to give

4    us any sort of written plan on how they arrived -- how

5    many Community Builders they needed, where they needed

6    them, and at what grade levels they needed them, and

7    what skills they needed.

8        Q      Now, did you take issue with HUD's

9    qualifications statement, in terms of the Community

10   Builder position?

11                        (No response.)

12       Q      Do you know what I am referring to?

13       A      No.

14       Q      So, for example, on page 16, it says, "The

15   problems   stem   from   HUD's   broad   qualification

16   statement, that included such terms..."  Do you see

17   that?

18       A      Yes.  I see that.

19       Q      What do you mean that the problem stem

20   from that?  What's the problem?

21       A      This is discussing the fact that, when

22   they were hiring Fellows at varying pay grades, 13,

51

1     14, and 15's, you could not tell from reading an

2     individual's resume, comparing it to the skill set

3     they had written down, why somebody got a 13, why

4     somebody got a 14, why somebody got a 15.  As a matter

5     of fact, they couldn't either.  We could look up the -

6     - they gave numeric scoring's to these resumes, and

7     people were getting 13's that had scored higher than

8     people getting 15's.  There was no logic to this.

9                And then what we show here in this text,

10    is some wording examples from the scoring sheets they

11    were using, like "A broad range of knowledge and a

12    solid educational background are essential."  What

13    does that mean to a score?  And these were scored by

14    a lot of different people.

15        Q     Is that wrong to have qualification

16    standards that are not subject to objective scores?

17        A     I don't know that it's wrong.  It makes it

18    difficult to make proper hiring decisions.

19        Q     It's suboptimal?

20        A     Yes.

21        Q     Yes?  What are the alternatives to that --

22    doing it that way?

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVENUE, N.W.
(202) 234-4433                WASHINGTON, D.C. 20005                (202) 234-4433

52

1        A        Well, you don't know what you're looking

2    for.  I mean this was open to just about anybody that

3    wanted to apply.  There was no specific skill set

4    being looked for, other than community activists,

5    people that were obviously involved already in housing

6    or community development projects.  They were looking

7    for those kind of individuals.

8        Q        And why is it suboptimal to do it in the

9    way that HUD did it?

10        A        I think that we say right in here.  What

11    they created was a round of problems within the

12    department, in the career people that were there, that

13    were seeing these higher graded people coming in with

14    skill sets that were undefinable.

15            Problems within the Community Builders

16    themselves,  when they found out that, "Hey, I got a

17    13,  but  that  individual  got  a  15.   What's  the

18    difference between us?  I scored higher.  How did that

19    happen?"  This  is  the  kind  of  problems  it  was

20    creating.

21        Q        Now --

22        A        At HUD -- is the one quote from that one

53

1    Public Trust Officer, where Cuomo says he was looking

2    for the best and the brightest, and he said, "Well, I

3    guess that makes us the dumbest and the ugliest."

4    That was the effect it was having on HUD employees.

5         Q    Would you agree with me that the

6    qualifications statement invited subjectivity in also

7    selecting officers into the ranking?

8         A    Yes, it did.

9         Q    Would you agree with me that the whole

10   context of this qualification statement could lead

11   people to conclude that favoritism and politics could

12   be an issue in the hiring of the Fellows?

13        A    Yes.  And the report says that.

14        Q    The Community Fellows were expected to

15   interact with the community and with political

16   figures.  Is that correct?

17        A    Yes.

18        Q    And were they expected to have a knowledge

19   of HUD's programs and benefits, and things like that?

20        A    Yes.  They were supposed to understand

21   everything at HUD.

22        Q    And wouldn't one assume that internal

54

1    candidates from HUD would have a distinct advantage in

2    being qualified for these positions?

3         A    Yes.

4         Q    Did you find that internal candidates were

5    overlooked for the Fellow positions?

6         A    On -- on -- on -- on these.  These were

7    Schedule A's.  Internal HUD people wouldn't have

8    applied for these because they're permanent employees.

9    They would lose their permanent employee status to

10   apply for a Schedule A.  So we wouldn't have seen

11   anybody at HUD, that was a career employee, actually

12   applying for these.

13        Q    I see.

14        A    Let me put it this way, I'm not aware of

15   any internal HUD employees that actually did, because

16   it would have changed their employment status.

17        Q    Okay.

18        A    There may be, because they could apply.

19        Q    All right.  I'll ask you about Schedule A

20   in a minute.  Now do you see where it says -- do you

21   see, on page 18, it says, "Grade levels exceed

22   departmental norm?"

55

```
 1        A     Yes.

 2        Q     Why did you conclude that?  Or what is

 3   that conclusion?  Could you explain that conclusion,

 4   and why would you conclude that?

 5        A     We compared pay grades at HUD before and

 6   after the hiring of the Fellows.  The average pay

 7   grade goes up sharply because of the hiring of the

 8   Fellows.  The people coming in were rated higher than

 9   the people who were working at HUD.

10             And this particular chart shows that, at

11   CPD, the GS-12 level was the most common level of pay.

12   And that's not true  when the Fellows come in.  It

13   jumps right up.  And somewhere in here, I had the

14   precise grades that it does jump up.

15        Q     I think it's on page 18.  It says, "At

16   that time, the department had 539 GS-15's.  It now has

17   850."

18        A     Yes.

19        Q     Is that what you're referring to?

20        A     No.  No.  There's a nice paragraph in

21   here, because the department was actually trying to

22   bring  its  grade  levels  down,  and  this  hiring
```

1    completely undid that.  That was under the National

2    Performance Review, what Vice President Gore was

3    pushing, to reduce the levels of 14's and 15's.  And

4    the department was in an active program to do just

5    that.  And it's in here somewhere.

6        Q    Is it on page 20, in the paragraph that

7    says, "Following the creation of Community

8    Builders..."  Is that what you're referring to?

9        A    There it is.  You're right.  "Hiring

10   Community Builders conflicts with National Performance

11   Review."  "The Deputy Secretary" -- this is in 1994,

12   "announced to principal staff that HUD would have to

13   reduce its GS-14's, 15's and SES Personnel, five

14   percent, from 1,579 to 1,503."  And they actually did

15   that.  But then this laying on, increases it.

16            Following the creation of the Community

17   Builders, the department had 1,894 GS-14's and 15's,

18   of which 512, 21%, were Community Builders.  That's

19   rather than decreasing the 14's and 15's, as directed

20   by the National Performance Review, HUD had increased

21   their numbers by 64%.

22       Q    Now what are the consequences under the

57

1    National Performance Review?

2         A    There were no consequences.  This was Mr.

3    Gore's push to lower the number of supervisors and

4    high paid grade levels.  This was what this particular

5    department was doing.

6         Q    Okay.  So it was -- the National

7    Performance Review was Mr. Gore's initiative.

8         A    Yes.  He was handing out hammers to

9    people, and cited HUD as an example.

10        Q    Yes.  But there are no consequences in

11   violating the goals?

12        A    No.

13        Q    Okay.  But that prior to the initiation of

14   this program, you're saying that HUD actually did

15   conform to the goals of the National Performance

16   Review?

17        A    Yes.  They were reducing the numbers of

18   14's and 15's through buyouts.

19             MR. MANTELL:  Again, try not to interrupt

20   me when I ask you a question, just for the tape.

21             BY MR. MANTELL:

22        Q    To your knowledge, when did this reduction

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVENUE, N.W.
(202) 234-4433                    WASHINGTON, D.C. 20005                    (202) 234-4433

58

1    take place?

2         A    The NPR reduction that we're talking

3    about?  The National Performance Review?

4         Q    Yes.

5         A    It's right here.

6         Q    Okay.

7         A    So it's August 1994 when the Deputy

8    Secretary announces it.  And they were supposed to do

9    it by September 30, 1995.

10        Q    And so you believe that by September 30,

11    1995, HUD had reduced those positions by five percent?

12        A    It says, "By 1997, the department had

13    reduced its GS-14's and 15's to 1,390."

14        Q    To your knowledge, was any study ever done

15    to determine the race and gender of those individuals

16    who left HUD at that point?

17        A    Who left HUD?

18        Q    Well --

19        A    These people that left, no.  Not that I'm

20    aware of.

21        Q    Well I'm referring to the reduction of the

22    GS-14's and the GS-15's.  I don't know where they

1    went.  But, in terms of taking them out of those

2    positions, was there any scrutiny as to racial or

3    gender composition of those individuals?

4         A    Not that I'm aware of.

5         Q    Did anyone ever suggest that those who

6    left the GS-14's and GS-15's were disproportionately

7    white, or disproportionately male?

8         A    That's who the GS-14's and 15's were at

9    HUD.  So you would expect it.

10        Q    Okay.  But did anyone suggest that the

11   people who left were disproportionately white or

12   disproportionately male?

13        A    I'm not aware of anyone suggesting that.

14        Q    Okay.  Now you mentioned Schedule A

15   before.

16        A    Yes.

17        Q    What is that?

18        A    That's a special hiring authority to hire

19   federal employees.

20        Q    And what is that hiring authority?  Can

21   you describe it?  I'm looking at pages 20 through 23.

22        A    Okay.  The Schedule criteria as set forth

60

1    in the Code of Federal Regulations, Chapter 5,

2    213.3101, and it's quoted in here in the report, in

3    that, under certain conditions, organizations can hire

4    people for temporary employments, and it spells out

5    those conditions; fellowship programs that are filled

6    from limited applicant pools and operating under a

7    specific criteria developed by the employing agency

8    and/or non-federal organizations.

9           These may include internships that provide

10   developmental professional experiences to individuals

11   who have completed their formal education, training

12   and associates at programs designed to increase the

13   pool of qualified applicants, in particular...

14   Anyway, the whole thing is quoted here.

15       Q    Okay.  So pages 20 through 21 quotes the

16   regulation governing Schedule A criteria?

17       A    Right.

18           MR. GRADY:  Let him finish.  I mean it's

19   not that I want to correct you, it's just for purpose

20   of the record.  He needs to write this down.  You're

21   smart enough to know where he's going with most of his

22   questions long before he finishes.  You really have to

61

1    train yourself not to sort of jump the gun.

2              BY MR. MANTELL:

3         Q    Now, at some point, did you conclude that

4    -- well, let me back up.  Did HUD purport to use

5    Schedule A authority to fill the Community Builder

6    Fellow positions?

7         A    Yes.

8         Q    At  some  point,  did  you  come  to  a

9    conclusion  with  regard  to  whether  that  was

10   appropriate?

11        A    The  report  concludes  that  it  was  not

12   appropriate.

13        Q    And why is that?

14        A    It did not meet the criteria spelled forth

15   in the law.

16        Q    Okay.  Can you describe why you conclude

17   that?

18        A    Well --

19        Q    Looking  at  the  limited  applicant  pool

20   criteria, why do you think that HUD violated that?

21        A    When it put out the advertisement, it got

22   8,000 applicants, which would indicate that it was not

62

1    a limited applicant pool.

2          Q    Okay.  And is there something about the

3    breadth of the qualification standards that feeds into

4    that?

5          A    There was a requirement that agencies make

6    appointments under the Schedule A that are not of a

7    policy determining character.  And we determined that

8    these Community Builder positions were of a policy

9    determined character.

10         Q    Well you testified earlier that the

11    qualification standards were very broad.  Correct?

12         A    Yes.

13         Q    And that they invited applicants from a

14    broad range of backgrounds.  Correct?

15         A    Yes.

16         Q    Would that impact the determination of

17    whether there was a limited applicant pool?

18         A    Yes.

19         Q    Okay.  And how would that impact your

20    analysis of whether there was a limited applicant

21    pool?

22         A    Based upon to what they're asking for,

63

1    just about anybody could apply for these positions.

2         Q    Now going to page 24, it says, "Selection

3    Irregularities."  Do you see that?

4         A    Yes.

5         Q    What sort of irregularities did you find?

6         A    We specifically took exception to HUD's

7    bidder to use reference preference, and its failure to

8    follow the Rule of Three, which is a selection process

9    when you have a list of applicants.  You can only

10   choose from the top three.

11        Q    Is there a regulation mandating the Rule

12   of Three be followed?

13        A    Yes.

14        Q    Looking at page 26.

15        A    And it's coming out of the Code of Federal

16   Regulations, Chapter 5, Part 302, where all these

17   rules are set forth.

18        Q    Can you explain what the Rule of Three

19   requires?

20        A    When you got a list of applicants, you can

21   normally only choose from the top three on the score,

22   and these are numeric scores.  Now if people start

64

```
 1        turning you down, you get to move down that list.  But

 2        you're normally limited to just to the top three.

 3            Q     And  this  is  the  top  three  on  the  best

 4        qualified list?

 5            A     The best qualified list.   Right.

 6            Q     And did you find instances in which the

 7        Rule of Three was not followed?

 8            A     Yes.  We found that.

 9            Q     Did you find that the Rule of Three was

10        not  followed  in  the  staffing  of  Community  Builder

11        Fellow positions?

12            A     Yes.

13            Q     What  about  in  the  Community  Builder

14        positions?

15            A     The internals?

16            Q     The internals.

17            A     We did not look at those.

18            Q     Why not?

19            A     I  --  we  concentrated  strictly  on  the

20        Fellows.

21            Q     Why is that?

22            A     That  was  our  primary  interest,  was  the
```

65

1    Fellows.

2        Q    Oh I see.  So the initial assignment of

3    this audit, you were directed to concentrate your view

4    of the Fellows?

5        A    No.  That's what we scoped out as what we

6    were going to be looking at.

7        Q    I see.  So you're assignment was broader

8    than what the audit actually focused on.  And you

9    actually focused the audit.  That was your call?

10       A    Yes.

11       Q    To your knowledge, does the Rule of Three

12   apply to the internal selection process?

13       A    I'm pondering here because these things

14   have changed drastically over the years.  And that

15   would be an internal hire -- I'm not certain --

16       Q    Okay.

17       A    -- as to what I thought the rules when it

18   happened.  Because this Rule of Three don't apply to

19   that.

20       Q    Did you do any review of the hiring or

21   promotion process of the internal candidates?

22       A    No.

66

1        Q      And that was your decision?

2        A      Yes.

3        Q      Okay.  Do you recall why you made that

4    decision?

5        A      I don't think that we were particularly

6    interested in the internals.

7        Q      Why not?

8        A      Our focus was on the externals.

9        Q      Why?

10       A      It's just how we scoped the job.  The

11   original career employees, particularly the senior

12   career Community Builders -- in fact, if I recall

13   correctly, they were in their jobs, and they just had

14   to reapply for them.  It was just really making these

15   people go through the motions again to keep their

16   existing jobs.  And I'm sure some of them didn't and

17   some of them did.  We did not get into that particular

18   process.

19       Q      I'm not sure I heard you right.  The

20   Community Builder position was a new position as of

21   1997, 1998.  Correct?

22       A      Right.

1    Q    Okay.  So you're saying that the internal

2    candidates were applying basically for their own jobs?

3    A    That's what I recall.  When we went from

4    regions to soldiers -- that was the lingo they were

5    calling it -- people that were like the office

6    director in Podunk (sic), Iowa, they lost their job,

7    and they advertised a Senior Career Community Builder

8    job to run that office.  And it was essentially the

9    same job.  So the incumbent, if they wanted to keep

10   it, would have reapplied.

11   Q    I see.

12   A    And that's what I remember.  I mean that's

13   -- we didn't audit that.

14   Q    Okay.

15   A    And there was a lot of that going on

16   during this reorganization of the 20/20.

17   Q    What about the non-senior Community

18   Builder position?  Did those simply parallel already

19   existing positions?

20   A    I'd have to go back.  I mean I'm not

21   aware.  I don't know off the top of my head.

22            MR. MANTELL:  Well let's take a short

68

1    break.

2                    (Whereupon, the forgoing matter went off

3    the record at 11:25 a.m. and back on the record at

4    11:37 a.m.)

5                    MR.  MANTELL:  Going  to  page  24,  under

6    Selection  Irregularities,  it  says,  "Despite  the

7    forgoing, the Secretary indicated he wanted diversity

8    as a selection criterion."  Do you see where it says

9    that?

10                   WITNESS:  Yes.

11                   BY MR. MANTELL:

12        Q    How did the Secretary indicate that?

13        A    These  are  taken  and  paraphrased  from

14   minutes of a manager's meeting.  So he would have said

15   that verbally, and the minute-taker would have written

16   it down on these minutes that we have.

17        Q    Okay.  And those minutes are the exclusive

18   reason why you believe that this paragraph is true?

19        A    Yes.

20        Q    Okay.  Would you recognize those minutes

21   if I showed them to you?

22        A    Maybe, maybe not.

69

1          COURT REPORTER:  Would you like me to mark

2     this Beard-2?

3               MR. MANTELL:  Yes.  Beard-2.

4                         (Whereupon, the aforementioned

5                         document    was    marked    for

6                         identification as Beard Exhibit

7                         Number 2.)

8               MR.  MANTELL:   Do  you  recognize  this

9     document?

10              WITNESS:  Yes.  This is what the committee

11    meetings look like -- the minutes.

12              BY MR. MANTELL:

13         Q    And are these the minutes that you relied

14    on when you prepared your audit?  Exhibit 1, page 24?

15         A    Well, I'm going to assume they are.   I

16    would have preferred looking at the ones that were in

17    the work papers.  There's a copy of these in the work

18    papers, and I'm assuming this is the same.

19         Q    Well, the work papers -- what work papers?

20         A    For the audit.

21         Q    Are the work papers attached to the audit?

22         A    Oh, heavens no.  They're --

70

1          Q      Okay.

2          A      -- in boxes galore.

3          Q      Oh I see.

4          A      And I -- we -- I could put my finger on a

5     copy of this document in those boxes, and say this is

6     the one we took it from.

7          Q      Okay.  All right.  Well right now, I'm

8     going to ask you to look at page 2 at the bottom, page

9     3 at the top, and ask you whether, in your current

10    recollection, this is the -- these are the notes that

11    you relied on when preparing the report?

12         A      This looks like the notes I was using.

13    Yes.

14         Q      Now, how are these notes prepared.  Well

15    let me back up.  Are these -- what is a Management

16    Committee Meeting?

17         A      Secretary Cuomo would have meetings with

18    his senior staff, and that's what this is.  This is

19    minutes of those meetings.

20         Q      And were these minutes posted anywhere at

21    HUD?

22         A      I don't know the answer to that question.

71

```
1          Q     Okay.  You don't know if they were posted

2     on the web, or anything like that?

3          A     I don't know that.

4          Q     Okay.  At these Management Committee

5     Meetings, is it hour understanding that the minutes

6     were routinely written up and assembled?

7          A     Yes.

8          Q     And they would be written up in the

9     ordinary course of business at HUD?

10         A     Yes.

11         Q     Do you recall how copies of these minutes

12    got to your attention?

13         A     I think that if I went back to the work

14    papers, I would find that I was sent them by Susan

15    Gaffney.  In other words, these were routinely

16    emailed, and then she would email them out to her

17    managers.

18         Q     I see.

19         A     I think.  I think that's how I got them.

20         Q     You mean you would get Management

21    Committee meeting minutes in the ordinary course of

22    your job?
```

72

1        A    I think.   I think that's where I got

2    these.

3        Q    Okay.

4        A    I'd have to verify by going back and

5    looking, specifically.

6        Q    Why would you -- why were you sent these

7    minutes in the general course?

8        A    Whatever Susan Gaffney got on her

9    distribution list, she automatically just churned it

10    out and send it to her field managers.  So if it was

11    sent to her from management on the 10th floor, which

12    is where the Secretary is, she just figured, "Well, if

13    it was important enough to send to me, it must be

14    important enough to send to my guys."  Out it would

15    go.

16        Q    All right.  Now, at the bottom of page 2,

17    it says -- well, second to the bottom -- paragraph to

18    the bottom, it says, "Ms. Enright."  Who is Ms.

19    Enright?

20        A    Relying on memory, I believe she worked in

21    the Field Operations group, and had field oversight.

22    And she is a Schedule C employee, I believe.

73

1        Q     Is she with HUD or with OIG?

2        A     She's with HUD.

3        Q     Okay.  Now do you see where it says, in

4   that paragraph, "The Senior Community Builder position

5   had to be advertised externally?"

6        A     Yes.

7        Q     What does that -- what did that mean to

8   you?

9        A     I think what it's saying is that D.C. does

10  not have a office.  In other words, there is no area

11  office for D.C., therefore it did not have a Senior

12  Community Builder there.   That's -- that's what  I

13  think it says.

14       Q     Okay.  So, page 2 talks about the external

15  Community Builder positions.  Correct?  Do you see the

16  first full paragraph?

17       A     Yes.

18       Q     And it talks about the Senior Community

19  Builder position in the second to the last paragraph.

20  Correct?

21       A     Yes.

22       Q     And -- so those are both the internal and

74

1    external Community Builder positions?

2       A    Well  a  Senior  Community  Builder  is

3    normally an internal job.

4       Q    Right.  So did these meetings --

5       A    Up above there, it looks -- that's the

6    applications for the external positions.

7       Q    Right.  So these minutes appear to comment

8    on both the internal and external Community Builder

9    positions.  Correct?

10      A    Yes.

11      Q    Okay.  And then it says, "Secretary Cuomo

12   asked whether diversity was a criteria for selection."

13   Do you see where it says that?

14      A    Yes.

15      Q    Okay.  So, to your understanding, is Mr.

16   Cuomo referring to both the internal and external

17   vacancy announcements?

18           MR.  GRADY:  Objection.  He can't read

19   Secretary Cuomo's mind, certainly not from a minute.

20   Go ahead and answer.

21           WITNESS:  I would -- I would say -- I'd

22   have to look at a time line, but it would seem to me,

1        at this particular time, this is 1998 --

2                    MR. GRADY:  Continue.

3                    WITNESS:  It depends on whether or not the

4        externals had been -- I mean the internals had been

5        filled.  And you can tell that from the time line.

6                    BY MR. MANTELL:

7              Q      So --

8              A      I wouldn't know.

9              Q      Do you have an idea of when these minutes

10       were generated?

11             A      This is for the July 7, 1998 meeting.

12             Q      So that's Exhibit 2, was for the July 7,

13       1998 meeting?

14             A      Right.

15             Q      Okay.  And then going to the time line on

16       page 12, you were about to conclude something?

17             A      I'm looking at when the internals are

18       filled.  Now that's saying it hired 361 internal

19       Community Builders in December of 1997.  So, from

20       that, you can conclude he's talking about the

21       applications for the externals.

22             Q      Okay.  Did any -- were there any internal

76

1    Community Builder positions that were not yet filled

2    as of July 7, 1998?

3          A     I don't know that off the top of my head,

4    and I don't see any on this time line.

5          Q     Okay.  Do you see, on the bottom of page

6    2 of Exhibit 2, it refers to a Willie Gilmore?

7          A     Yes.

8          Q     Who is Willie Gilmore?

9          A     I know Willie Gilmore, and I could picture

10   Willie Gilmore, but I don't know what he was doing,

11   what his title was.

12         Q     Well does it refresh your recollection to

13   go to page 24 of Exhibit 1?

14         A     Is his name here?

15         Q     No.  It just says, the Office of General

16   Counsel properly advised him.  Do you see that?  Does

17   that refresh your recollection as to --

18         A     "Willie Gilmore said that OGC" -- that's

19   the Office of General Counsel -- "had advised that the

20   applications could not ask the race of the candidate."

21   No.  That does not tell me who Willie Gilmore is.  I'd

22   have to look up his name.

77

 1          Q     Okay.

 2          A     But I do know him.

 3          Q     Yes.  Is he an employee of HUD?

 4          A     Yes, he is.

 5          Q     Okay.  And is he -- does he usually go to

 6     the Management Committee meetings?

 7          A     Yes.  He's a high-level manager-type.

 8          Q     Okay.  Do you know what prompted the

 9     Office of General Counsel to advise that applications

10     should not ask the race of the candidate?

11          A     No.  I don't.

12          Q     Who -- do you know if Willie Gilmore is

13     still at HUD?

14          A     I don't know that.

15          Q     Did you ever come to the conclusion that

16     race or gender was used as a factor in the staffing of

17     any of the Community Builder or Fellow positions?

18          A     No.

19          Q     Did you ever audit that question?

20          A     No.

21          Q     Did it ever occur to you to conduct an

22     audit of that issue?

78

| 1 | A | Yes. |

1      A    Yes.

2      Q    And why did it occur to you?

3      A    This statement.

4      Q    Okay.  And did you discuss the possibility

5 of auditing that question with other people?

6      A    Yes.

7      Q    Who did you discuss that with?

8      A    With my audit team.

9      Q    Okay.  Was anyone -- did you discuss it

10 with anyone above you in the hierarchy?

11     A    No.

12     Q    Okay.  So you only discussed it with your

13 audit team?

14     A    Right.

15     Q    Anyone else?

16     A    I don't think so.

17     Q    And did -- what did you say, and what did

18 they say?

19     A    We could not figure out a way to determine

20 the racial makeup of the applicant pool.  And that

21 would make it difficult to test.

22     Q    Is your understanding at the time that HUD

79

1       did not maintain applicant flow data?

2              A      Applicant flow data?

3              Q      Yes.

4              A      I don't know what that is.

5              Q      The race and gender of the applicants for

6       positions.

7              A      That's    voluntary.      And    on    the

8       applications, if  the  individual  filled  out  that

9       particular form, you would know.  If they did not, you

10      would not know.

11             Q      But your understanding was that HUD did

12      maintain that information at the time?

13             A      Yes.  It would have.

14             Q      And why couldn't you have used that?

15             A      It wouldn't give us a clear picture of the

16      applicant pool.

17             Q      Why is that?

18             A      It was voluntary.   The individuals only

19      answered that on a voluntary basis.

20             Q      To your understanding, did many applicants

21      refuse to answer?

22             A      I do.  I've never answered that question.

80

1          Q      Did you ever audit -- conduct an audit of

2     the issue of whether the composition of the selectees

3     of   the   Community   Builder   and   Fellow   positions

4     indicated that race and gender was a factor?

5          A      No.

6          Q      Did you consider that, doing an audit on

7     that?

8          A      Right now, thinking here, did you ask the

9     same question twice?

10          Q      Well --

11          A      Or   was   it   only   once   in   there   that   I

12     missed?

13          Q      Yes.    The first question was, you said

14     that   you   didn't   conduct   an   audit   involving   the

15     applicants,   because   you   didn't   think   you   had

16     sufficient data.

17          A      Right.

18          Q      Okay.    But couldn't you, ignoring that,

19     simply look to see who was hired, and try to determine

20     whether race and gender was a factor in those hiring

21     decisions?

22          A      We didn't do that.    No.

81

1       Q      Okay.  Did you consider doing that?

2       A      No.

3       Q      Why not?

4       A      What they -- without knowing what the

5    applicant pool was, I'm not sure you could make a

6    strong enough conclusion of what they hired.

7       Q      Did you discuss, with Susan Gaffney, the

8    possibility of determining -- of doing an audit to

9    determine whether race or gender was a factor in these

10   hiring decisions?

11      A      I don't know the answer to that question.

12   I know that I wanted to pursue an audit, and I

13   discussed it with Susan on EEO issues, and she didn't

14   want me to pursue it.  I don't know if race and gender

15   were in there.

16      Q      Was it involving this position, the

17   Community Builder position?

18      A      No.  I wanted to expand it.  I mean to me,

19   it looked as though there were some significant

20   problems, and I do mention them in this report.

21      Q      Can you show me?

22      A      On page -- the bottom of page 31, this is

1   -- this is in a section where we are evaluating

2   comments given to us by HUD. And the Deputy Secretary

3   has dismissed some things that we have said about EEO

4   complaints filed, that we had become aware of. And he

5   says he dismissed them, stating, "There has not been

6   a single finding of discrimination." And stated, "We

7   made unsubstantiated complaints about the hiring

8   process.                And then  I  note  that  the

9   department ranked 73 out of 79, for the fiscal year of

10  1996, Equal Employment Opportunity Commission Report

11  on the performance of agencies, in completion of the

12  formal EEO process. In that report, EEOC says, "HUD

13  took an average of 880 days to complete a formal EEO

14  complaint. According to HUD's own report, the time

15  for completion increased to 930 days in 1997, and 952

16  days in 1998. Thus, any findings of discrimination

17  involving Community Builder hiring will not be known

18  for some time."

19              I thought that looked like a lucrative

20  area to go audit, and I did wrote (sic) Susan on that.

21        Q    Would -- did you want to audit the reasons

22  why it took so long to complete the EEO process? Or

1      did you want to audit whether HUD was discriminating?

2          A     No.   I don't think I'd get into that.

3      That would open up a can of worms for us, because we

4      wouldn't make those kind of judgments.  The fact their

5      not making these deadlines means there's something

6      wrong with the process.  And I -- that begs an audit.

7      There's something wrong there.

8          Q     Okay.

9          A     Now, what we would audit -- we'd have one

10     of those brainstorming sessions.  We'd gather all the

11     information we can, and try to scope out what's worth

12     auditing here.  Just because we find this indication,

13     it doesn't mean we'd go and audit, but we'd want to

14     just go sniff around and look if there's one worth

15     doing.

16         Q     Now you said that you would not recommend

17     auditing whether discrimination played a role in

18     hiring practices because it would open up a can of

19     worms?

20         A     You were asking whether HUD discriminated.

21     I mean that would be -- to me, it would be wandering

22     off into a legal field, and we would stay away from

84

```
 1        something that would make that kind of determination.
 2             Q     Why --
 3             A     I would think.  I mean that's just my
 4        reaction to what you said.
 5             Q     To your knowledge, has the Office of
 6        Inspector General ever audited HUD's practice of
 7        giving preferences to people of certain races and
 8        genders?
 9             A     No.  I'm not aware of any.
10             Q     Okay.  And you haven't participated in
11        any?
12             A     No.
13             Q     Have you ever recommended any such audit
14        of HUD or any sub-part of HUD?
15             A     The one I was just speaking of.
16             Q     No.  Well you spoke of the proposed audit
17        to determine why the EEO process was taking so long.
18             A     Yes.
19             Q     I'm asking a different question, which is
20        an audit that would try to determine whether HUD is
21        discriminating based on gender or race.
22             A     No.  I didn't propose that.
```

85

1        Q    Okay.  Are you aware of any such audit

2    taking place at the Office of Inspector General --

3        A    No.

4        Q    -- for HUD?

5        A    No.

6        Q    Have you ever heard of an audit to

7    determine whether the Affirmative Employment Plan

8    played any role in hiring decisions at HUD?

9        A    I can't think of any.

10        MR. GRADY:  Mr. Mantell, just for the

11    record, we're venturing very, very, very deep into

12    areas I would consider covered by the deliberative

13    process privilege.  I have attempted, in this case, to

14    secure OIG's assent to allow testimony regarding the

15    draft report, and to allow the waiver of the

16    deliberative process privilege, with respect to

17    matters at issue in this case.  But -- and obviously,

18    the answer has been no.

19        But I do want to make clear that the

20    government is under the deliberative process.  This

21    would be an example if they were to do an audit of

22    this particular process, to determine whether to

86

1    change policy, or to evaluate how it is that this

2    particular policy effects an area, is exactly what is

3    protected by the privilege.

4            I'm not asking you to refrain from any

5    questions at this point, but I'm just raising the

6    issue that you're attempting to be very transparent on

7    the issue, but you're really, really pushing very,

8    very deep into areas covered by the privilege at this

9    point when you're asking about potential audits and

10    draft audits.

11            I just state that for the record.  I'm not

12    objecting to any question.  I'm telling you that you

13    can ask any question you wish, but we're starting to

14    get very far down that road.

15            BY MR. MANTELL:

16    Q       Did you ever conduct an audit concerning -

17    - well, let me back up.  You said that, on some

18    occasions, the Rule of Three was not followed with

19    regard to staffing of the Community Builder Fellows.

20    Is that correct?

21    A       Yes.

22    Q       Did you conduct an audit concerning

87

1    whether the people favored, by the violation of that

2    rule,   had   any   particular   racial   or   gender

3    characteristics?

4         A    Do you want to say that again?

5         Q    Who benefitted from the violation of the

6    Rule of Three?

7         A    We didn't sit down and run those kind of

8    statistics.

9         Q    Okay.

10        A    So  we  don't  know  the  answer  to  that

11   question.

12        Q    Did the possibility of such a review occur

13   to you?

14        A    No.  No.

15        Q    Do  you  have  a  list  somewhere  of  the

16   individuals who benefitted from the violation of the

17   Rule of Three?

18        A    Yes.

19        Q    How  many  people  are  on  that  list,

20   approximately?

21        A    I have -- I have lists, of all the offices

22   that we audited, of the scoring and the selection.  So

88

```
 1      we're probably talking hundreds of names.  And those

 2      lists show numerically where people were placed, and

 3      who was selected.

 4           Q    Would you also have the individuals who

 5      those people were selected over?  The people in the

 6      Three?

 7           A    Yes.

 8           Q    Okay.  Now the -- with regard to the

 9      internal Community Builder positions, you would have

10      the applicant flow data for those positions.  Correct?

11      Because once someone is hired at HUD, they have the

12      gender and race of those people.  Is that correct?

13           A    The Personnel Office would.

14           Q    The Personnel Office would.

15           A    Yes.

16           Q    So, with regards to the Community Builder

17      internal positions, you would have both the applicants

18      and the people selected.  Correct?

19           A    Yes.

20           Q    All right.  But you never -- did you think

21      of comparing those two to determine whether there was

22      a gender or racial disparity?
```

89

1      A     I don't believe we did any work on the

2  internals.

3      Q     Going to page 27 of Exhibit 1, it says

4  that, "Even though a staffing guide was prepared,

5  outlining the selection and ranking process, HUD did

6  not follow it."  Do you see where it says that?

7      A     Yes.

8      Q     In what ways did HUD not follow the

9  staffing guide?

10      A     In order to answer that question fairly,

11  I'd have to look at a staffing guide, because right

12  now, I can't remember what was on the thing.

13      Q     Okay.  Well it says, "HUD selected two

14  individuals whose names did not appear on the Best

15  Qualified List for Las Vegas and Greensboro."

16  Correct?

17      A     Right.

18      Q     And is it your understanding that only

19  individuals appearing on the Best Qualified List

20  should be selected?

21      A     That's correct.

22      Q     Okay.  Under HUD -- under the HUD Staffing

90

1    Guide?

2          A     I'm not sure if that's on the Staffing

3    Guide or not, but selecting off the Best Qualified

4    List is going to be in just the basic rules.

5          Q     Okay.

6          A     The Staffing Guide may have spelled that

7    out.

8          Q     Okay.

9          A     It may have been in a set of instructions

10   for the person making selections off the list.

11         Q     Yes.

12         A     But like I said, I'd have to see the

13   Staffing Guide again.  It may have spelled out the

14   rules.

15         Q     Okay.  And this -- pages 27 to 28 spells

16   out the other reasons you found that HUD's selection

17   and ranking process rules were not followed?

18         A     Right.

19         Q     Okay.  All right.  Do you see, on page 28,

20   it says, "Two selectees had a score of 35 points?"

21         A     Yes.

22         Q     And did you regard that as a hiring

91

1    irregularity?

2         A    Okay.  On the Selection Guide, they were

3    instructed to select individuals who scored 70 points

4    or better.  So the two individuals that were selected

5    with 25 points obviously violated that guide.

6         Q    Do you know the race and sex of those two

7    people?

8         A    No.

9         Q    Did you ever -- was there a follow-up to

10   the audit contained in Exhibit 1?

11        A    Yes.

12        Q    Okay.  And what happened with that audit?

13        A    That was not issued.

14        Q    Okay.  Is --

15             MR.  GRADY:    For  the  record,  I  have

16   provided plaintiff's counsel with a color copy of a

17   report that was  first  given  to  me  by  Mr.  Beard

18   yesterday afternoon, at about 4:30, probably.  I had

19   previously forwarded the copy that you have in a black

20   and white copy that I had received from the office of

21   HUD OIG.

22             MR. MANTELL:  Okay.  What I'll do is mark

92

1    both.

2              MR. GRADY:  That's fine.

3              MR. MANTELL:  Should we check if there's

4    a color copy for here.  I guess if you can make a

5    color copy, you can --

6              MR. GRADY:  Oh --

7              MR. MANTELL:  If not, I will get you a

8    color copy.

9              MR. GRADY:  One second.  I'll take a

10   break.

11             (Whereupon, the forgoing matter went off

12   the record at 12:11 p.m. and back on the record at

13   12:14 p.m.)

14             MR. MANTELL:  I'm going to show you what's

15   been marked Beard 3 and 4.  I'm going to ask you

16   whether you recognize those documents?

17                        (Whereupon, the aforementioned

18                        documents  were  marked  for

19                        identification as Beard Exhibit

20                        Numbers     3    and    4,

21                        respectively.)

22             WITNESS:  These are drafts of the --

| 1 | MR. MANTELL:  Of what? |

 1          MR. MANTELL:  Of what?

 2          WITNESS: -- follow-up report.

 3          MR. MANTELL:  And do you happen to know

 4     which one is the later draft?

 5          WITNESS:  I'm going to point out that this

 6     is an unissued draft.

 7          MR. MANTELL:  Okay.

 8          WITNESS:  And, under the HUD OIG rules,

 9     I'm not allowed to discuss about unissued drafts.  Now

10     is it your understanding that you and Mr. Saddler have

11     given me permission to speak about these drafts?

12          MR. MANTELL:  For the record, the -- I, on

13     behalf  of  the  United  States  Attorney's  Office,

14     conferred  with  the  Office  of  General  Counsel,  and

15     secured from Mr. Saddler, a representation to me that

16     he would authorize the testimony with respect to the

17     draft audit.  For the record.

18          And, therefore, to the extent of that, you

19     were  to  do  so.   I've  been  informed  by  Attorney

20     Saddler,  the  HUD  OIG,  that  you  have  been  fully

21     authorized to testify in this matter.

22          WITNESS:  Okay.

94

1              BY MR. MANTELL:

2         Q      Do you have an idea of which is the later

3    draft?

4         A      The one with the blue underlines at the

5    bottom, the text that has been underlined in blue.

6         Q      Yes.  So you're referring to Exhibit 4?

7         A      Exhibit 4.  Excuse me.

8         Q      Okay.  All right.  Now, when you did this

9    follow-up, did you receive a separate assignment to do

10   a follow-up, or did you just take on the follow-up as

11   a matter of course?

12        A      Susan Gaffney asked me to do the follow-

13   up.

14        Q      Okay.  Is it common that one auditor would

15   do the principal audit, and then another auditor would

16   do the follow-up?

17        A      That's common.  I mean it's common for the

18   auditor who did the audit to do the follow-up.

19        Q      Okay.  And what did you do after you

20   received the assignment?

21        A      The same -- I assembled a team, asked for

22   documents, and started auditing.

1          Q        And  the  subject  of  the  second  audit

2    appears to be a little different than the subject of

3    the first audit.  Can you explain what you're auditing

4    in the follow-up audit?

5          A        The objectives of this particular follow-

6    up  were  to  determine  if  HUD  created  new  permanent

7    positions  to  retain  Community  Builder  Fellows,  and

8    whether or not HUD followed the proper process to hire

9    Community Builder Fellows.

10          Q        Well, after the initial audit, contained

11    in Exhibit 1 --

12          A        Yes.

13          Q        -- was there some kind of backlash against

14    the Community Builder concept?

15          A        There were hearings held in the Senate and

16    the  House,  and  there  was  legislation,  or  language

17    contained   in   legislation,   and   it   was   to   --

18    essentially, to get HUD to cease and desist with the

19    external Community Builder program.

20          Q        And why did they want HUD to cease and

21    desist?

22          A        The  basis  --  or  the  subject  of  the

96

1      hearings were my initial report.  And based on the

2      conclusions of that report is what was being used to

3      say HUD should not proceed with this position.

4           Q      Did Congress take any action to have that

5      effectuated?

6           A      Just language placed into different Bills,

7      which I quote in this draft report.

8           Q      Okay.  So, going to Exhibit 4, page 5, the

9      top of page 5, is that the statutory language that you

10     refer to?

11          A      Yes.

12          Q      Okay.  And did you come to some kind of

13     conclusion as to whether HUD acted in compliance with

14     the statutory directive?

15          A      The   conclusion  we   came  to   was   pretty

16     carefully worded because -- and we were hassling over

17     that wording.  Overall, our audit concluded HUD did

18     not   technically  violate   the  law,   and  that  was

19     scratched out.   And then  we  were  talking about

20     changing that.

21                But, in essence, what we were trying to

22     put  across  was  that  HUD  did  convert  the  Community

1    Builders to permanent positions, which would have

2    violated the spirit of the law, but maybe not the law.

3         Q    Okay.   Now, in the preparation of this

4    draft, you refer to an audit by OPM.  Is that correct?

5         A    Yes.   I believe there is one.   They're

6    discussed in here.

7         Q    And -- beginning on page 5.

8         A    Yes.

9         Q    And, in the preparation of this draft

10   report and the audit, did you review an audit by OPM?

11        A    Yes.  We would have.

12             MR. MANTELL:  Have this marked please.

13   Thanks.  I'm just making a note to make a copy of

14   that.

15                        (Whereupon, the aforementioned

16                        document    was    marked    for

17                        identification as Beard Exhibit

18                        Number 5.)

19             Could you review Exhibit 5, please?  Do

20   you recognize this document?

21             WITNESS:  Yes.  This appears to be the

22   report issued by OPM.

98

```
1                    BY MR. MANTELL:

2          Q      And what is OPM?

3          A      Office of Personnel Management --

4          Q      What do they --

5          A      -- of the federal government.

6          Q      What do they do?

7          A      They  prescribe  the  rules,  for  federal

8     departments to follow, on hiring, firing, and caring

9     of federal employees.

10         Q     And,  from  time  to  time,  do  they  issue

11    reports as to whether federal agencies have complied

12    with those rules?

13         A     Yes, they do.

14         Q     Okay.  And is this one such report?

15         A     Yes, it is.

16         Q     And, to your knowledge, was this report

17    generated and maintained in the ordinary course of

18    business at OPM?

19         A     As far as I know.  I believe we request

20    it.

21         Q     Okay.

22         A     It might actually say that somewhere.  We
```

99

1    may have asked for this.

2        Q    Okay.  Well, have you seen other OPM

3    oversight reviews?

4        A    No.

5        Q    Okay. So, it's unusual for you to request

6    reviews from OPM?

7        A    This was the only time I've ever done

8    that.

9        Q    Okay.  So it's your present recollection

10   that you requested that OPM conduct a review of HUD's

11   practices?

12       A    Yes.

13       Q    Okay.  And this report is what you got in

14   response?

15       A    I think they sent the report to Mr.

16   Ramirez, but, yes.

17       Q    But you reviewed it?

18       A    Yes.

19       Q    And you reviewed it in preparation for

20   this draft --

21       A    Right.

22       Q    -- audit.  Correct?

100

1      A      That's correct.

2      Q      Okay.   And what did OPM conclude with

3    regard to the Schedule A authority?

4      A      That HUD had overstepped its bounds in

5    using the Schedule A authority.

6      Q      For which position?

7      A      For   the   Community   Builder   Fellows

8    position.

9      Q      Now you testified earlier that you felt

10   that HUD had violated not the letter, but the spirit

11   of  the  legislative  action,  with  regard  to  the

12   Community Builder Fellows position.

13     A      Yes.

14     Q      How did HUD violate the spirit of that

15   action?

16     A      The Senator that was really pushing the

17   issue, Senator Bond, was attempting to make sure that

18   the  external  hires  that  were  at  HUD,  were  not

19   permanently hired into full-time HUD positions.  And,

20   in effect, that happened.

21     Q      Do  you  agree  with  the  statements  and

22   conclusions contained in Exhibit 4?

101

1          A       There's about three people -- what these

2     different colors and lines mean, the typed black

3     portions that don't have any marks on them, that's the

4     initial draft.  And, yes, I agree with that.

5          Q       Okay.

6          A       After that, there's discussion going on in

7     here between...

8          Q       Okay.  And is that also true for Exhibit

9     3, that the regular typed portion reflects your views,

10    and the colored portions reflect other people's views?

11         A       Yes.

12         Q       To your knowledge, why was this report,

13    this audit, never issued?

14         A       Susan Gaffney left.

15         Q       Okay.  And what happened after she left?

16         A       I wasn't allowed to issue it.

17         Q       When you say you weren't allowed, who told

18    you that you could not issue it?

19         A       James Heist.

20         Q       Who is James Heist?

21         A       He would have -- is the Assistant

22    Inspector General for Audit.

102

1     Q     Did he become the Acting Inspector General

2  after she left?

3     A     He was Acting Inspector General.  Yes.

4     Q     Did he tell you why you could not issue

5  the audit?

6     A     I don't know.  I'd have to think about

7  that.  He's not a direct person.

8     Q     Well what did he tell you with regard to

9  the audit?

10     A     His -- it's his comments that are right in

11  here, that are outlined in the dark blue.

12     Q     Okay.

13     A     Those are his comments.

14     Q     What about the yellow?

15     A     Yellow -- he is highlighting the yellow,

16  and making a comment following in dark blue.

17     Q     I see.

18     A     And then the underlined portion is an

19  explanation in response to his question.

20     Q     Okay.  So the underlined portion, also in

21  blue, is your response to his comments?

22     A     Right.

103

1      Q    And do you agree with the underlined

2   portion in blue?

3      A    Yes.

4      Q    Okay.   What about the red, up top and

5   throughout?

6      A    I'm not sure who's putting the red in.

7   Those are changes being made, either by the Assistant

8   Inspector General, working for me, or one of his

9   people.

10     Q    So what exactly did -- what's his name?

11  Mr. Heist?

12     A    Heist.

13     Q    How do you spell that?

14     A    H-E-I-S-T.

15     Q    What did Mr. Heist tell you about the

16  issuance of this audit?

17     A    Well it was discussed at length, and it

18  was eventually not audit -- not issued.

19     Q    When you say it was discussed at length,

20  do you mean the text of the audit was discussed at

21  length, or do you mean the issue of whether it should

22  be issued at all was discussed?

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVENUE, N.W.
(202) 234-4433                WASHINGTON, D.C. 20005                (202) 234-4433

104

1        A      Whether it should be issued at all.

2        Q      And what were the considerations as to

3     whether it should be issued?  What were the arguments

4     against it?

5        A      There was a new administration, which is

6     true.  The people who did the Community Builders move

7     one because there's a change in presence, because of

8     the change in administrations.  And whether or not it

9     served any purpose to issue to the new bunch coming

10    in.

11       Q      Were  there  any  other  considerations

12    militating against the issuance of the audit?

13       A      You'd have to ask him that.

14       Q      No.  I'm asking you in your -- you said

15    you had lengthy conversations with him.

16       A      These were in the, you know, conference

17    calls.

18       Q      Yes.  And did he articulate any other

19    reasons why the audit should not be issued?

20       A      I  think  that  was  the  basis  of  his

21    argument.

22       Q      That    was    the    sole    basis?    New

105

1    administration?

2         A    I -- I can't remember any others that he

3    might have said.  That's why I'm saying you should ask

4    him.

5         Q    So you can't remember any other reason he

6    gave why the audit should not be issued?  Is that

7    correct?

8         A    Not at the moment.

9         Q    At this stage, did the issue of whether

10   the Community Builder Fellows were disproportionately

11   of a certain race or gender -- did that come up?

12        A    No.

13        Q    Was that ever suggested as a possible

14   aspect of your follow-up audit?

15        A    No.

16        Q    Did you ever consider taking up issues of

17   Affirmative Action, and race and gender, as part of

18   this follow-up audit?

19        A    No.

20        Q    Did you argue in favor of having the audit

21   published?

22        A    Yes.

106

1         Q    And what were the arguments that you used?

2         A    The -- to answer Congress' concerns that

3  HUD did do exactly what they thought they did.  And I

4  believe we were recommending that HUD attempt to undo

5  what was done.

6              Yes.  We were looking to see, for a

7  recommendation -- I'm looking at page 17 -- that

8  whether or not they could undo the hiring of those

9  people.  We were trying to figure out a way to word

10  that in a recommendation.

11        Q    The Community Builder Fellows were hired,

12  in large part, into the new Community Builder

13  positions.  Is that correct?

14        A    Yes.  There's some numeric statistics in

15  this report saying how many of them got converted.

16        Q    Were the Fellows given any preference over

17  the applicants for the Community Builder positions?

18        A    What we note in the report, is that, when

19  you're applying for a job, and you've been in the

20  incumbent for two years, when you write up your

21  resume, you have an advantage.  And that's discussed

22  in the draft report.

107

1      Q      Did you ever conclude, personally, that

2      Community Builder Fellows had an advantage to be hired

3      into the Community Builder position, other than the

4      two-year incumbency?

5      A      I was concluding that that was the person

6      of doing this, was to convert as many of them as they

7      could permanently into HUD employees.

8      Q      And why would they do that?

9      A      That's political.  I mean they were

10     looking to get their people into permanent positions

11     at HUD.

12     Q      Now the positions into which the Fellows

13     were hired, or many of them were hired, were permanent

14     positions.  Is that correct?

15     A      Yes.

16     Q      And were the Specialist -- Community

17     Builder Specialist positions eliminated?

18     A      I don't know the answer to that.  I'm not

19     sure without looking at the work papers.  The

20     Specialist may not have been Schedule A.

21     Q      They might not have been?

22     A      They might not have been Schedule A.  I'd

108

1    have to look and check that.

2        Q    Okay.

3        A    I don't remember an issue coming about it

4    on the Specialists.

5        Q    So you're not sure whether the Specialist

6    came under the Schedule A hiring authority.

7        A    Well, you know, I'd have to go back and

8    look.  See, in the original report, one of the things

9    we said that we did like were the hiring of the

10   Specialists.  Those --

11       Q    But those were temporary positions.  Were

12   they not?

13       A    Well, without going back and actually

14   looking...

15       Q    Would -- would -- would that -- would the

16   answer be in Exhibit 1?

17       A    No.  It's not -- and it's not in Exhibit

18   2.  I'd have to actually go look, unless they're...

19       Q    Can you look at page 10?

20       A    Okay.  Well, it says there that the

21   Specialists are Schedule A.

22       Q    Okay.    Does    that    refresh    your

109

1    recollection?

2         A    Well, that would mean that they were

3    Schedule A.

4         Q    Okay.

5         A    But I don't know where they were on this

6    Exhibit -- on the follow-up.

7         Q    On the what?

8         A    On the follow-up report.

9         Q    On the follow-up?

10        A    Your question has me interested as to

11   whether or not they were in there.

12        Q    Are you aware of any internal -- okay.  So

13   -- strike that.  After Congress eliminated the Fellow

14   positions, is it true that HUD generated new Community

15   Builder permanent positions?

16                        (No response.)

17        Q    That's what we're talking about, right?

18        A    Yes.

19        Q    The creation of --

20        A    Yes.  Yes.

21        Q    -- permanent positions?

22        A    These -- these -- yes.  They're converting

110

1      them to new full-time federal positions.  They're

2      taking them from the Schedule A, which is temporary,

3      and converting them to full-time federal employees.

4           Q     Are you aware of any internal HUD

5      employees, other than the Fellows, that were placed

6      into these new Community Builder positions?

7                MR. GRADY:  I'm going to object to form.

8      I think that he has said they're placed in federal

9      career positions.  You're using the term "Community

10     Builder position."  I think that misstates his answer

11     here.  That they didn't create new Community Builder

12     positions, they ultimately eliminated the Community

13     Builder position.

14               MR. MANTELL:  But I don't know if that's

15     true.  I -- I -- I don't know if it's clear from the

16     testimony.  And it's just -- as a form --

17               MR. GRADY:  I would just ask that that be

18     clarified.

19               MR. MANTELL:  All right.

20               MR. GRADY:  I'm not making any assertion.

21     If Mr. Patoski tells me otherwise, I don't know.

22               BY MR. MANTELL:

111

1       Q       After Congress eliminated the Fellows, did

2    HUD generate new Community Builder positions, which

3    were meant to be permanent?

4       A       Okay.  On page 7 of the draft --

5       Q       The second draft?  That's Exhibit 4?

6       A       Yes.  Exhibit 4.

7       Q       Okay.

8       A       Under the headline, "HUD converted 61% of

9    the Fellows,"  it says, "Less than two months after

10   the  Congressional  directive,  HUD's  former  Deputy

11   Secretary issued a staffing memorandum, recommending

12   a strategy to advertise 746 positions, including 450

13   Community Builders.  HUD then created and filled over

14   700  positions,  including  370  Community  Builder

15   positions.  In doing this, HUD effectively converted

16   248,  61%,  of  its  408  Fellows  into  permanent

17   positions."

18      Q       Now, of those 317 new Community Builder

19   positions, are you aware of any which were filled by

20   internal candidates at HUD, who were not formerly

21   Fellows?

22      A       I can't answer that question.

112

1       Q    Was that issue ever audited?

2       A    No.  We're -- we're looking at those first

3  two questions we're talking about.

4       Q    All right.  To your knowledge, did any HUD

5  OIG audit uncover racially favoritist (sic) practices?

6       A    Not to my knowledge.

7       Q    To your knowledge, did Susan Gaffney

8  harbor the believe that HUD was engaging in racially

9  favoritist practices?

10      A    Not to my knowledge.

11      Q    What about gender?  Did Susan Gaffney

12  harbor the believe that HUD was engaging in favoritist

13  policies -- practices, based on gender?

14      A    Not that I'm aware of.

15      Q    All right.  And it's your testimony that

16  you have never been involved in an audit to uncover

17  race or gender discrimination at HUD.  Is that

18  correct?

19      A    That's perplexed me since you asked that.

20  My memory is dragging up one --

21      MR. GRADY:  Hold on for a second.  I just

22  need to clarify some privileges here in consultation,

113

1    relative to whether, first of all, whether this was a

2    published or non-published audit that he's talking

3    about.    There are regulations that do govern his

4    permission to testify regarding draft reports.

5                    I have, for purposes of this deposition,

6    sought and obtained permission for him to testify with

7    regard to this draft.    I do not want him to run into

8    a situation where he's violating internal rules.    So

9    I would ask if we could take a 30-second or 1-minute

10    break so that I can have an opportunity to consult

11    with him.

12                    MR.    MANTELL:    Well,    let    me    ask    the

13    question.    Was this audit, that you're thinking of,

14    published or unpublished?

15                    WITNESS:    Published.

16                    MR. MANTELL:    Okay.

17                    MR. GRADY:    That's fine.    Go ahead.    Ask

18    the question.

19                    MR. MANTELL:    All right.

20                    WITNESS:    It's on the fringes of your

21    issue.    There's a thing called Section 3.    And it's in

22    the procurement rules that requires HUD contractors to

114

1    hire minority contractors under Section 3.  I did do

2    an audit, and proved that wasn't being done.

3              MR. MANTELL:  All right.  I want to ask

4    you some questions about the litigation that you have

5    against HUD.  And I'm just going to ask some general

6    questions, which is --

7              MR. GRADY:  Before you do, again, I want

8    to advise you that, if you do have personal counsel

9    with respect to this case, you are certainly entitle

10   to consult with personal counsel.  I, as a government

11   attorney -- Attorney Mantell's questions are not

12   transgressing any privilege that the government could

13   assert with respect to this deposition.

14             However, if you have independent counsel,

15   and you feel that you want to talk to them, it

16   shouldn't be felt that you  you cannot do that, or

17   either I or Mr. Mantell is suggesting that you don't

18   consult with your attorney, if you have one, in that

19   case, before answering questions regarding it.  Go

20   ahead.  I'm sorry.

21             MR. MANTELL:  What is the general outline

22   of your claims against HUD?

115

1           WITNESS:   It's a retaliation and an age

2   discrimination claim.

3           BY MR. MANTELL:

4       Q    And you believe that the transfer from

5   Texas to Washington was retaliatory?

6       A    Yes.

7       Q    And an example of age discrimination?

8       A    Yes.

9       Q    When were you born?

10      A    1949.

11      Q    What do you believe they are retaliating

12  against you for?

13      A    Testifying in EEO hearings.

14      Q    Oh.  Which EEO hearings did you testify at

15  that are the subject of your claim?

16      A    The case I mentioned with Robbie Tigh.

17      Q    When did you testify at that hearing?

18      A    I have to look that up, but I think I told

19  you it was May of '98.  Within that '98, '99 time

20  period.

21      Q    Okay.  Do you feel that your advocacy for

22  publishing the audit, contained in Exhibit 4, was a

116

1    factor in your transfer?

2        A    No.

3        Q    When you say that you feel you were

4    retaliated against based on participation in EEO

5    hearings, you mentioned one.  Is there another one

6    that you feel --

7        A    I mis-spoke.  That should have been

8    hearing.  Singular.

9        Q    Okay.  Where is your case filed?

10        A    Here, in the District.

11        Q    In the District.  In Federal District

12    Court?

13        A    Yes.

14        MR. MANTELL:  All right.  I'd like to take

15    a short break.  We're getting close to the end.

16        (Whereupon, at 12:46 p.m., the taking of

17    deposition in the above-entitled matter was concluded,

18    signature having been waived.)

19

20

21

22

117

## CERTIFICATE

This is to certify that the foregoing proceedings

in the matter of:    The Deposition of
Michael Beard

held on:    July 18, 2006

at the location of: Passman & Kaplan
1090 Vermont Avenue, NW

were duly recorded and accurately transcribed under my

direction; further, that said proceedings are a true

and accurate record of the testimony given by said

witness; and that I am neither counsel for, related

to, nor employed by any of the parties to this action

in which this deposition was taken; and further that

I am not a relative nor an employee of any of the

parties nor counsel employed by the parties, and I am

not financially or otherwise interested in the outcome

of the action.

Notary Public/Reporter in and for

The District of Columbia

My commission expires

March 31, 2011

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C. 20005-3701    www.nealrgross.com

1

Volume 1
Pages 1 to 90
Exhibits 1 to 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
RICHARD S. PATOSKI,              :
            Plaintiff,           :
                                 :
        vs.                      :   Civil Action
                                 :   No. 05-11086 RCL
ALPHONSO JACKSON, SECRETARY,     :
DEPARTMENT OF HOUSING AND        :
URBAN DEVELOPMENT,               :
            Defendants.          :
                                 :
- - - - - - - - - - - - - - - - -x

    DEPOSITION OF THE DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT by its designee, LINDA HAWKINS, a
witness called on behalf of the Plaintiff, pursuant
to Rule 30(b)(6) of the Federal Rules of Civil
Procedure, before Deanna J. Dean, Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Offices of
Rodgers, Powers & Schwartz LLP, 18 Tremont Street,
Boston, Massachusetts, on Thursday, October 26,
2006, commencing at 10:19 a.m.

PRESENT:

    Rodgers, Powers & Schwartz LLP
        (By Robert S. Mantell, Esq.)
        18 Tremont Street, Suite 500
        Boston, MA 02108, for the Plaintiff.

    United States Attorney's Office
        (By Mark J. Grady, Esq.)
        John Joseph Moakley Courthouse
        One Courthouse Way, Boston, MA 02210,
        for the Defendants.

2

ALSO PRESENT:

    Jack Brandwein, Esq.
    House Counsel for Department of Housing and
    Urban Development

    Richard Patoski

*  *  *  *  *

3

I N D E X

WITNESS                DIRECT   CROSS   REDIRECT   RECROSS

LINDA HAWKINS

 BY MR. MANTELL            5

*  *  *  *

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Rule 30(b)(6) Deposition of Defendant | 4 |
| 2 | 10/26/06 E-Mail from Grady to Mantell | 12 |
| 3 | Merit Staffing Handbook | 18 |
| 4 | Vacancy Announcement | 21 |
| 5 | Instruction Sheets for Selecting Official and Subject Matter Experts Panel, and Attached Crediting Plan | 25 |
| 6 | Best-Qualified List with Four Candidates | 67 |
| 7 | Upward Mobility Handbook | 72 |

*  *  *  *

4

1              P R O C E E D I N G S

2           MR. MANTELL:  Usual stipulations?

3           MR. GRADY:  Yes.  We will read and sign,

4     but waive the notary.

5           MR. MANTELL:  30 days?

6           MR. GRADY:  Make it a little bit longer.

7     Takes 45 days.

8           MR. MANTELL:  45 days.

9           MR. GRADY:  The wheels of justice grind

10    slowly from the government.

11          MR. MANTELL:  Okay.  And objections to form

12    and motions to strike will be reserved until the

13    time of trial.

14          Could we have this marked.

15                (Document marked as Hawkins

16                Exhibit 1 for identification)

17                  LINDA HAWKINS

18    a witness called for examination by counsel for the

19    Plaintiff, having been satisfactorily identified by

20    the production of his driver's license and being

21    first duly sworn by the Notary Public, was examined

22    and testified as follows:

23

24

5

1                    DIRECT EXAMINATION

2        BY MR. MANTELL:

3        Q.    Okay.  Good morning, Ms. Hawkins.

4        A.    Good morning.

5        Q.    My name is Robert Mantell, and I am the

6    attorney for Rick Patoski, who is to my right, and I

7    will be asking you a few questions this morning.

8            Just a few ground rules.  If you have any

9    questions, or you think my question is ambiguous at

10   all, please let me know and I'll try to rephrase it.

11            If you need to take a break at any time,

12   please let me know and I'll try to accommodate you.

13            What you say here today will be taken down

14   here and transcribed, so I'd ask that your answers

15   be clear -- for example, yes and no, as opposed to

16   "uh-huh," which doesn't translate well.

17            MR. GRADY:  There's no video.

18       Q.    So, with that said, have you ever been

19   deposed before?

20       A.    Deposed?

21       Q.    Deposed.

22       A.    Oh.  I think I was with an MFPB case.  Not

23   at this level, though.

24       Q.    Was it just one case?

6

1      A.   I think I did two.  It's been a long time

2  ago, if I did it.

3      Q.   What were those cases involving?

4      A.   I don't even remember.  It's probably been

5  15, 16 years.

6      Q.   Okay.  Well, let's back up a little.

7           What's your name?

8      A.   Linda Hawkins.

9      Q.   How do you spell your name?

10     A.   H-a-w-k-i-n-s.

11     Q.   And what is your current business address?

12     A.   451 Seventh Street S.W., Washington, DC

13  20410.

14     Q.   What agency do you work for?

15     A.   Department of Housing and Urban

16  Development.

17     Q.   What's your work telephone number?

18     A.   (202) 708-0614, extension 3095.

19     Q.   And what is your residential address?

20     A.   Okay.  9201 Robin Lynn Court, Manassas,

21  Virginia 20110.

22     Q.   What's your residential phone number?

23     A.   (703) 257-3428.

24     Q.   And how long have you worked for HUD?

7

1      A.    I've worked for HUD for about 17 years.

2      Q.    Okay.  What year were you hired by HUD?

3      A.    By HUD?  Probably about '89.

4      Q.    What were you -- what did you do for work

5  prior to 1989?

6      A.    I worked for the Department of Agriculture.

7      Q.    And what did you do for them there?

8      A.    I was also in human resources.

9      Q.    What was your title, last title at the

10  Department of Agriculture?

11      A.    Personnel management specialist.

12      Q.    And what did you do in that capacity?

13      A.    Pretty much staffing classification.  Pay

14  management.

15      Q.    And why did you leave the Department of

16  Agriculture?

17      A.    For a promotion.

18      Q.    Okay.  What was that promotion?

19      A.    Oh, a promotion potential, actually, to a

20  Grade 13.

21      Q.    Could you explain that, please.

22      A.    My position only at the Department of

23  Agriculture only went to a GS-12.  The position at

24  the Department of Housing and Urban Development went

8

1    to a Grade 13.

2        Q.    And what was the title of the position that

3    you went to at HUD?

4        A.    Personnel management specialist.

5        Q.    Did you receive an increase in salary when

6    you went to HUD?

7        A.    I don't believe initially.  I think I -- at

8    the lateral over, at the 12.

9        Q.    What did you do as a personnel management

10   specialist at HUD?

11       A.    When I first started, I was in staffing and

12   classification operations, which was the actual

13   staffing and classification of positions within the

14   department.  Eventually, I became a supervisor.

15       Q.    When did that happen?

16       A.    I'm not sure of the date.  Probably 10

17   years ago, so maybe 1996.

18       Q.    Okay.  When you say you were responsible

19   for staffing, what do you mean?

20       A.    We had specific servicing areas where we

21   did the vacancy announcements, the crediting plans,

22   job analysis.  Anything that was required in order

23   to staff or recruit for a position.

24       Q.    You said vacancy announcements, crediting

9

1    plans, and job --

2        A.    Description.

3        Q.    -- job description.

4        A.    And job analysis.

5        Q.    All right.  How did your duties change when

6    you became a supervisor in 1996?

7        A.    I had a small team that I supervised in

8    performing the same functions as a supervisor, for

9    about a year.

10       Q.    How big was your team?

11       A.    I believe there were -- I believe six.  I

12   might be off with that.

13       Q.    And then what happened after a year?

14       A.    After a year, they reorganized and cut down

15   on supervisors.

16       Q.    And that was in 1997?

17       A.    About.  I'm not -- can't give specific ...

18       Q.    So what happened in 1997, or about then?

19       A.    They reorganized, and I went back to a

20   personnel management specialist position.

21       Q.    And what duties did you do as a personnel

22   management specialist after the reorganization?

23       A.    The same.

24       Q.    Did anything happen after that with regard

10

1    to your job?

2        A.    Eventually, I went to policy.

3        Q.    Okay.  When was that?

4        A.    That was probably about nine years ago,

5    give or take.  I'm not sure of the exact date.

6        Q.    So approximately 1997 or 1998?

7        A.    Probably, yes.

8        Q.    Okay.  And what did you do in policy?

9              First of all, what was your job title in

10   policy?

11       A.    It would be the -- well, our titles have

12   actually changed now.  All of them used to be

13   personnel management specialist.  However, with new

14   OPM guidelines, the titles have changed over to

15   human resources specialist.  And --

16       Q.    But the change of title has nothing to

17   do --

18       A.    No.

19       Q.    -- with your move to policy; right?

20       A.    No.  Mm-mm.

21       Q.    Was your grade lowered when you were

22   reassigned from manager to staff in 1997?

23       A.    No, but I wasn't promoted when I went into

24   it anyway.

11

1      Q.    When you say you were moved to policy, is

2   that a different department?

3      A.    It's not a different department.  It's a

4   different aspect of human resources.  Instead of

5   actually staffing positions, putting out the

6   announcements to crediting plans, and that -- and

7   classifying positions, what I do is, I develop

8   policy in relation to how we go about that.

9   Procedures.  I also assist not only in the

10   Washington area but field offices, any problems or

11   difficult or unique cases that they may have, and

12   provide guidance and interpretation of regulations.

13      Q.    Did your job ever change after that?

14      A.    No.  I'm still in policy.

15      Q.    You're still in policy?

16      A.    Yes.

17      Q.    And you're still an HR specialist?

18      A.    Yes, sir.

19      Q.    And what's your current grade?

20      A.    Grade 14.

21      Q.    When did you become a Grade 14?

22      A.    August.

23      Q.    Of 2006?

24      A.    Yes, sir.

12

1    Q.    Okay.  Congratulations.

2    A.    Thank you.

3    Q.    And when did you become a Grade 13?

4    A.    Oh.  Probably around 1990.

5         MR. MANTELL:  Well, for the record, I've

6  marked the notice of the 30(b)(6) deposition as

7  Exhibit 1.  I'm also going to have marked as Exhibit

8  2 an e-mail from Mr. Grady.

9              (Document marked as Hawkins

10             Exhibit 2 for identification)

11         MR. MANTELL:  That e-mail sets forth some

12  limitations on the 30(b)(6) deposition, and

13  Mr. Grady had some more limitations.

14         Do you want to explain them?

15         MR. GRADY:  Sure.

16         With respect to Item 4, Ms. Hawkins will be

17  testifying within the context of 4 as to the HUD

18  Intern Program, the Proud to Be Goal Accelerated

19  Promotion Policy, and Diversity Recruitment Plan in

20  the Upward Mobility Program.  The individual --

21         THE WITNESS:  No, not the diversity.

22         MR. GRADY:  Oh, excuse me.  Not the

23  Diversity Recruitment Plan.  I apologize.

24         With respect to the other items listed as

13

1  formal or informal programs, the individual

2  designated to testify with respect to items 2 and 3

3  will testify within the context of 4 as to those

4  programs.

5          MR. MANTELL:  Okay.

6          MR. GRADY:  And the other programs in 4.

7          For any inconvenience and not providing you

8  any specificity as to that, I do apologize.

9  BY MR. MANTELL:

10     Q.  Well, you mentioned crediting plans before.

11 What is a crediting plan?

12     A.  A crediting plan is a scale, in essence,

13 that is used to determine best-qualified candidates.

14 It has a variety of levels and a description of the

15 type of experience and/or training, and it's a point

16 system.  So one type of experience might give a

17 certain number of points; another, another set of

18 points.

19     Q.  Let's back up further.

20         Is there a distinction between a

21 competitive process and a noncompetitive process in

22 terms of promotion?

23     A.  When you say "distinction" --

24     Q.  Yes.

14

1  A. -- and -- well, yes.  I mean, they're --

2  Q. What's the difference between a competitive

3 and a noncompetitive hire?

4  A. Okay.  "Competitive" means that you

5 advertise the position, either inside or outside of

6 the federal service, or both.  Actually, if you're

7 advertising outside, you have to also advertise

8 inside.  By doing that, you release a vacancy

9 announcement, which is a notification that there is

10 a position available.

11  Q. Okay.  And how is that different from a

12 noncompetitive hiring?

13  A. Hiring or promotion?

14  Q. Promotion.  Excuse me.

15  A. Okay.  Because there is a difference.

16   A noncompetitive promotion is one where

17 you're not promoted based on a vacancy announcement.

18 You've already competed for the position.

19   Say, for example, you released a vacancy

20 announcement that was a Grade 11, 12, 13.  The

21 person selected at the 11 level, they can then be

22 noncompetitively promoted to the 12, and then

23 noncompetitively promoted to the 13 level, is one of

24 the scenarios.

15

1     Q.   So if someone has already been hired to a

2  position --

3     A.   Mm-hmm.

4     Q.   -- and they are hired at the lower level of

5  the grade ladder within that position, they can be

6  promoted to a higher grade level without a vacancy

7  announcement or an advertisement?

8     A.   Correct.

9     Q.   Okay.  And, in fact, is that what happened

10  with you --

11     A.   No.

12     Q.   -- when you were promoted to a --

13     A.   No.  Mine was an accretion of duties

14  promotion, which means over the last several years,

15  I've taken on higher-level duties; servicing areas

16  changed.

17     Q.   And was your position advertised?

18     A.   No.  That's why it was an accretion of

19  duties.

20     Q.   Was your -- was it a grade level 14 within

21  the career ladder of the HR specialist position?

22     A.   A career ladder is -- no.  Typically, a

23  career ladder is advertised -- the position that I

24  applied for many, many years ago was a Grade 13.

16

1    Okay?  However, because of the type of work that
2    I've started doing, primarily because of the lack of
3    resources, they gave me an accretion of duties -- in
4    other words, a promotion -- which, in other words,
5    is my -- the classification standards that were
6    applicable to the 13, I exceeded and met those for
7    the 14.  So I was already performing at the higher
8    grade level.
9        Q.   What is a desk audit?
10       A.   A desk audit is what they perform in order
11   to determine that an accretion of duties -- in my
12   case, an accretion of duties, is justifiable and
13   supportable.  A desk audit, for the most part,
14   determines the proper title, series, and grade of
15   the person that's being audited.
16       Q.   And was there a desk audit to justify your
17   GS-14 position?
18       A.   Yes, sir.
19       Q.   Okay.  And it's called accretion of
20   duties --
21       A.   Accretion of duties.
22       Q.   -- promotion?
23       A.   Promotion.
24       Q.   And an accretion of duties promotion does

17

```
 1    not require an advertisement or a vacancy

 2    announcement; is that correct?

 3         A.    No, sir.

 4         Q.    I'm not correct, or --

 5         A.    No, it's not -- it does not require a

 6    vacancy announcement.

 7         Q.    Or an advertisement?

 8         A.    Or an advertisement.

 9         Q.    Okay.  How often does an accretion of

10    duties promotion occur?

11         A.    In the department?

12         Q.    Yes.

13         A.    In the government?

14         Q.    In HUD.

15         A.    I have no idea.  I have no idea.

16         Q.    Are there statistics kept on accretion of

17    duties promotions?

18         A.    Not that I'm aware of, because it's

19    primarily based on the duties of, you know, specific

20    individuals.

21         Q.    So if I were to request information on how

22    many people had been given an accretion of duties

23    promotion in 1999, would there be some way to find

24    out?
```

18

1      A.    I would imagine that it would have to be a

2   request from our national finance center in New

3   Orleans, which would require a request to them, and,

4   I would imagine, a great deal of money to retrieve

5   that information.  Because there's nothing that

6   would be maintained directly by the department, to

7   the best of my knowledge.

8      Q.    Okay.  Is an accretion of duties promotion

9   considered a noncompetitive promotion?

10     A.    Yes.

11     Q.    Now, you said that you were involved in

12  reviewing an applying regulations regarding

13  staffing; correct?

14     A.    Mm-hmm.  Staffing, classification pay.

15          MR. MANTELL:  Can we have this marked as

16  Exhibit 3, please.

17                (Document marked as Hawkins

18                Exhibit 3 for identification)

19     Q.    You can look at this one.  This one is the

20  one that's marked.

21     A.    Oh.

22     Q.    It's the same thing as that one.

23     A.    Okay.

24     Q.    Do you recognize this document?

```
 1        A.    Mm-hmm.

 2        Q.    What is this document?

 3        A.    This is our merit staffing handbook that

 4   gives us our policies and procedures in recruiting

 5   for positions.

 6        Q.    Now, is this handbook still in effect

 7   today?

 8        A.    No.   It's been revised.

 9        Q.    When was it revised?

10        A.    I believe I revised it in 2004.

11        Q.    Okay.   But from September 1, 1986, to

12   sometime in 2004, is it your understanding that this

13   was in effect at that time?

14        A.    That's my understanding.

15        Q.    Okay.   And all the regulations in here were

16   applied to the hiring of individuals at HUD?

17        A.    Yes, to my knowledge.

18        Q.    Okay.   And does this policy set forth the

19   regulations for filling a competitive promotion at

20   HUD?

21        A.    A competitive position?

22        Q.    Yes.

23        A.    Which could lead to a promotion?

24        Q.    A competitive position, yes.
```

20

1      A.    Yes.

2      Q.    All right.  Just on a general level, can we

3   discuss what the normal procedure for filling a

4   competitive position is?

5      A.    Sure.

6      Q.    What's the first step?

7      A.    Generally, management will notify OHR that

8   they have a vacant position.

9      Q.    Who is -- what's OHR?

10     A.    I'm sorry.  Office of human resources.

11     Q.    Okay.  Then what would -- then what

12  happens?

13     A.    They provide documentation which would

14  include a position description, generally a job

15  analysis and crediting plan.

16     Q.    Who provides this?

17     A.    Generally speaking, the office provides --

18  provides the documentation, but the OHR specialist

19  is responsible for reviewing it to make sure that it

20  is in line with what's being submitted.  Or -- or if

21  there's not one submitted, then the specialist will

22  develop it based on the duties of the position.

23     Q.    Okay.  I guess I'm just -- I just don't

24  understand who submits what.

21

1     A.    Generally speaking, the office that's
2  requesting the hire submits the information.
3  However, it's up to the OHR specialist to ensure
4  that it is in line with the request.
5     Q.    And then what happens?
6     A.    Once we receive the request, then a vacancy
7  announcement is developed and published.
8     Q.    And who develops and publishes the vacancy
9  announcement?
10    A.    That would be the human resources
11 specialist.
12        MR. MANTELL:  Okay.  May I have this marked
13 as Exhibit 4, please.
14             (Document marked as Hawkins
15              Exhibit 4 for identification)
16    Q.    Okay.  Have you had a chance to review
17 Exhibit 4, please?
18    A.    Mm-hmm.
19    Q.    And what is this document?
20    A.    This is a vacancy announcement.
21    Q.    Is this the type of document that you, for
22 example, would generate?
23    A.    Would have, yes.  I'm now policy.  But when
24 I was in operations, yes, it is.

1    Q.    Okay.  Now, on the first page, about a

2    third of the way down, it says "Series Grade," and

3    it says "GS-1101."

4    A.    Mm-hmm.

5    Q.    What does that refer to?

6    A.    That GS is general schedule which is the

7    pay plan that most federal employees are on.  The

8    1101 is a classification series -- I believe this

9    one is business and industry -- that there are

10   certain -- or many, many series that OPM has that

11   you classify positions in.  For example, I'm a 0201.

12   This is business and industry, I believe.

13   Q.    Who would class -- who would give the

14   number to the vacancy announcement?

15   A.    That would be the human resources

16   specialist.

17   Q.    Okay.  And how would they go about

18   assigning the classification?

19   A.    Well, each classification standard has the

20   type of work that would fall under it.  Typically --

21   managers typically know what types of positions that

22   their jobs would be filled under.  So the requests

23   might include the series, but ultimately it is the

24   specialist that has responsible -- that is

23

1    responsible for ensuring that that would be the

2    correct series versus another one.

3        Q.    Okay.  All right.  So you would -- the --

4    excuse me.  The HR specialist would generate a

5    vacancy announcement which would look something like

6    Exhibit 4?

7        A.    Yes, sir.

8        Q.    And then what would happen?

9        A.    Then we would receive vacancy

10   applications --

11       Q.    Okay.

12       A.    -- for this vacancy announcement.

13       Q.    Then what would happen?

14       A.    Then we would review the vacancy -- excuse

15   me, the applications -- to see whether or not the

16   applicant was qualified or not.

17       Q.    Okay.  And who would do that?

18       A.    The human resources specialist.

19       Q.    Okay.  And would that involve ranking the

20   applicants in terms of who is most qualified?

21       A.    Not necessarily.  Depending on the number

22   of jobs, the specialist could be the rater and

23   ranker, but ordinarily there is a panel of what they

24   call subject matter experts.  That's more the norm.

24

1    Q.   Okay.  So, in the normal situation, what
2    was the role of the HR specialist in evaluating the
3    applications?
4    A.   Basic quals.  Whether or not, you know,
5    based on OPM's regulations, the person was basically
6    qualified for the job.
7    Q.   And assuming they would weed out some
8    people who were unqualified --
9    A.   Yes.
10   Q.   -- and then, say, have another group of
11   people who were qualified, then what would happen?
12   A.   Those that were qualified would be rated
13   and ranked against the crediting plan.
14   Q.   Who would do the rating and ranking?
15   A.   Generally speaking, it would be a panel of
16   subject matter experts.
17   Q.   And who are subject --
18   A.   In some cases, the human resources
19   specialist could do it.
20   Q.   Who are subject matter experts?
21   A.   Those people that would be more directly
22   related to the type of duties that would be -- being
23   performed.  Normally, in, for example, this
24   particular case, somebody that was in the 1101

25

1  series, typically at the 14-15 level.

2      Q.    And what standards would the rating panel

3  use?

4      A.    They would use the crediting plan that has

5  the duties or types of experience -- not necessarily

6  duties; types of experience -- and assign scores

7  based on the types of experience.

8      Q.    Okay.

9            MR. MANTELL:  Can I have this marked,

10  please.

11                 (Document marked as Hawkins

12                 Exhibit 5 for identification)

13      Q.    Would you review Exhibit 5, please.

14      A.    (Perusing documents)

15      Q.    Okay.  What is Exhibit 5?

16      A.    Exhibit 5, the first sheet, is instructions

17  for the selecting official, what they -- how they

18  will process the application.  The second page is

19  the instruction for the panel, which is the panel of

20  subject matter experts I was referring to, as well

21  as the page after that.  And then the subsequent

22  pages are the crediting plan or ratings schedule.

23  They're both one and the same.

24      Q.    Okay.  Are the instructions to the

26

1    selecting officers -- officials, on page one, are

2    those standard?

3        A.   No.   This is, or was, I believe one that

4    was done for the Community Builders.

5        Q.   Okay.   This was done especially for the

6    Community Builders?

7        A.   I believe so, yes.

8        Q.   And this document was generated in the

9    ordinary course of business at HUD?

10       A.   What do you mean, "ordinary course"?

11       Q.   Well, does, for example, does HUD generate

12   instructions for selecting officials?

13       A.   Typically, yes.

14       Q.   Okay.

15       A.   Telling them, you know, how to mark the

16   certificate or the roster, whatever you want to call

17   it.  Yes.

18       Q.   So this -- generating this type of document

19   is something that HUD generally does; is that

20   correct?

21       A.   The instructions.   Not necessarily these

22   instructions.

23       Q.   Okay.   Instructions in general?

24       A.   Right.

27

1      Q.    But a HUD employee generated Exhibit -- the
2   first page of Exhibit 5; correct?
3      A.    I believe so.
4          MR. GRADY:  If it helps, if it has not
5   previously been stipulated, HUD has no problem with
6   this being admitted as a business record under any
7   hearsay exception.
8          MR. MANTELL:  Okay.  The entire Exhibit 5?
9          MR. GRADY:  Yes.
10          MR. MANTELL:  Okay.
11      Q.    Do you happen to know whether the portion
12   that you identified as the crediting plan was
13   actually used for the Community Builder hirings?
14      A.    I -- I would not say absolutely that this
15   is the one that was used.  If I had to guess, I'd
16   say yes.
17      Q.    Okay.  Do you happen to know who wrote in
18   the 9, 6, and 3 in handwriting?
19      A.    I -- no, I don't know who specifically
20   wrote it.
21      Q.    Is that something that --
22      A.    It's not significant.
23      Q.    Is it something that happens for other jobs
24   that people are ranked 9, 6, and 3 as opposed to 1,

28

1    2, and 3?

2         A.    In the scheme of things, it really makes no

3    difference, because you're still talking about the

4    same amount of points.  It's all going to come out

5    in the wash.  I don't know who changed it.

6         Q.    Okay.  Were you involved in the filling of

7    the Community Builder position?

8         A.    Yes, I was.

9         Q.    Okay.  How were you involved in that?

10        A.    I was an HR specialist that was doing basic

11   qualifications of the applications, and for the most

12   part, there was a -- there were a whole bunch of us

13   that pretty much pitching in and doing a little bit

14   of everything.

15        Q.    Okay.  Were you involved -- well, were you

16   involved in reviewing Mr. Patoski's application for

17   Community Builder?

18        A.    I -- I -- I don't know.  I don't know.  I

19   don't know, to be honest with you.  I reviewed

20   hundreds.

21        Q.    Okay.  Were you involved in -- okay.

22             What region were you involved in?

23        A.    We did pretty much anything that we were

24   told -- you know, we were just given a bunch of

29

 1   cases.  It was anything that was given to me.

 2        Q.   At the time were you aware of the AEP

 3   program?

 4        A.   No.

 5        Q.   Do you know what the AEP program is?

 6        A.   I know it was something that we used to

 7   have that had to do with affirmative action.  That's

 8   pretty much all I know about it.

 9        Q.   When did you first know about it, its

10   existence?

11        A.   I have no idea.  It's just something

12   that -- it's one of those terms that as a human

13   resources specialist, you know, we've -- we've heard

14   of.  But we had no involvement in it.  So I can't

15   really address --

16        Q.   So at the time -- I'm just asking about

17   your knowledge.

18        A.   Mm-hmm.

19        Q.   I'm not asking you about the program

20   itself.

21             At the time that you were filling the

22   Community Builder position, did you have knowledge

23   that HUD had an affirmative action program?

24        A.   No.

30

1      Q.    Were you ever given instructions to remove

2  barriers to the hiring of women and minorities?

3      A.    No.

4      Q.    Now, what happens after the ranking and

5  rating?

6      A.    Then a best-qualified list based on the

7  scores as compiled.

8      Q.    And what is a best-qualified list?

9      A.    It would be those people that scored the

10 highest because they had documented better

11 experience to meet the grade level.

12     Q.    And what happened after that?

13     A.    The best qualified are then put on a

14 selection roster and forwarded to the selecting

15 official.

16     Q.    Now, is there a certain number of people

17 who are supposed to be on a best-qualified list?

18     A.    It depends on the type of certificate

19 you're talking about.  Merit staffing, which is an

20 internal, generally you would refer -- there's no

21 set number that you can refer.

22          Say, for example, if you had four people

23 that had the same score, then, in that type of

24 announcement, you would generally go ahead and send,

1    you know, those four, or you might end up sending
2    six or seven or eight names.  Typically, you want to
3    try to keep it at five or six.  We generally base it
4    on what we call a natural break, which is where the
5    scoring comes in and makes it, you know, pretty much
6    easy.  If you've got, say, for example, a score of
7    20, being the highest possible amount, just to pull
8    a number out, and you've got scores up to -- let's
9    just say you've got a difference in the scoring of
10   maybe two or three points.  Before it starts
11   becoming consecutive again, then you'd want to cut
12   it off at that, depending on the number of
13   applicants.
14        Q.   So it's somewhat arbitrary, the number who
15   are put on the best-qualified list?
16        A.   Not arbitrary in that, you know, you
17   wouldn't send a slew up.  I mean, you have to use
18   some sort of reasonable judgment.
19        Q.   But, generally, you're looking for five or
20   six?
21        A.   Generally.  Not always.  And it also
22   depends on the number of positions you're
23   advertising.
24        Q.   Now, who makes the selection from the

32

1    best-qualified list?

2       A.    The selecting official.  Each organization

3    designates who would have the authority to make

4    actual selections, so there's not any set person.

5       Q.    And, generally, are instructions given to

6    selecting officials for -- to help them make --

7       A.    General --

8       Q.    -- the selection off the best-qualified

9    list?

10      A.    General instructions simply were to ask the

11   side to select the -- any notations, "interviewed,"

12   "not interviewed."  But the --

13           MR. GRADY:  One thing.  Make sure that you

14   wait for him to finish.  She has to write down

15   everything, and she can't if you talk over each

16   other.

17           THE WITNESS:  Oh, I'm sorry.

18           MR. GRADY:  You're smart enough to know

19   most times where he's going with the question --

20           THE WITNESS:  Okay.

21           MR. GRADY:  -- but one of the special

22   things about a deposition is you have to train

23   yourself to wait, because she does have to write

24   down everything; and when two people talk, it's very

33

1    difficult.  Okay?

2              THE WITNESS:  I'm sorry.

3       Q.    Well, are selecting officials given written

4    instructions on how to go about making the

5    selections?

6       A.    Ordinarily not.

7       Q.    Okay.  Under what circumstances would

8    instructions be given to a selecting official?

9       A.    Ordinarily, there are no circumstances.

10   Quite frankly, this is out of the norm.

11      Q.    And when you say "this," you're referring

12   to page one --

13      A.    I'm sorry.

14      Q.    -- of Exhibit 5?

15      A.    Yes.

16      Q.    Okay.  Do you know why the norm was

17   violated in this case?

18      A.    Yes, sir.

19      Q.    Why was it?

20      A.    The office of human resources was under a

21   very big time crunch, and if I recall correctly, we

22   had a very limited amount of time to get all of the

23   jobs nationwide filled.  In order to do that, we had

24   to cut down as far as allowing managers to take

34

1    their time, which we ordinarily would do.

2        Q.    Okay.  Were the -- so you're confident that

3    page one is directed for the selecting of officials

4    for the Community Builder position; is that correct?

5        A.    I -- I believe it is.

6        Q.    Okay.  And all of the selecting officials

7    were expected to follow these instructions?

8        A.    Yes, sir.  As far as I know.

9        Q.    Okay.  Generally, are selecting officials

10   entitled to do their own investigation as to whether

11   to select one person over another?

12       A.    Investigation ...

13       Q.    Calling up people.

14       A.    Reference check?

15       Q.    Yes.

16       A.    Yes, sir.

17       Q.    Okay.  That's generally expected of

18   selecting officials?

19       A.    It's generally encouraged.

20       Q.    Are there generally any limitations to who

21   the selecting official could call?

22       A.    Limitations?

23       Q.    Yes.

24       A.    No.

35

1    Q.    Who established cutoff scores for
2    best-qualified list?
3         Let's see.  Oh.  Yeah, let me back up.
4         You said that you would try to find a group
5    of people who were naturally at the top, and then
6    cut off the rest of the people to the best-qualified
7    list; is that correct?
8    A.    We tried to do a natural break, yes.
9    Q.    A natural break.
10        And who would do that?  Whose job was it to
11   do that?
12   A.    That would be the human resources
13   specialist.
14   Q.    Okay.  Would you ever establish a cutoff
15   score that leaves zero or only one person on the
16   best-qualified list?
17   A.    I can't think of any case where we would.
18   I don't want to say definitely, but not that I'm
19   aware of.
20   Q.    How many of these processes have you been
21   involved with?
22   A.    Many.  Hundreds.
23   Q.    Hundreds?
24   A.    Hundreds, over my career, yes.

36

```
 1        Q.    Okay.  So at least more than 200?

 2        A.    I would say so.

 3        Q.    Okay.  And you've never had the experience

 4   of there being zero or only one person left on the

 5   best-qualified list; is that correct?

 6        A.    When you say "left on," you're talking

 7   about from -- from --

 8        Q.    From the HR specialist.

 9        A.    No.  From qualified candidates?

10        Q.    Yes.

11        A.    I mean, if, for example, we advertised and

12   there were only one or two qualified candidates,

13   then, yes, you could certify one or two.

14        Q.    But if there were one or two qualified

15   candidates, would it be unusual to have zero or one

16   person on the best-qualified list?

17        A.    Yes.

18        Q.    Okay.

19        A.    Unusual.

20        Q.    Now, what is the Rule of Three?

21        A.    That would be on a outside vacancy

22   announcement, a DEU, which is a different type of

23   certificate.

24        Q.    Okay.
```

37

1      A.    Okay?

2      Q.    What have you been describing so far?

3      A.    Merit staffing, internal vacancy
4   announcements.

5      Q.    Okay.  But on an outside process, how would
6   the Rule of Three be used?

7      A.    The Rule of Three is typically the top
8   three scores.  Out of the top three scores, the
9   selection should be made.

10     Q.    Would the Rule of Three influence the
11  number of people who are placed on the
12  best-qualified list?

13     A.    Generally, if I recall correctly, you would
14  still put, you know, five or six, depending on the
15  scores.  The difference with DEU is, if there are a
16  number of the same score, then they would use what
17  they call a tiebreaker, which is based on a random
18  chart that has numbers, and, at least back then,
19  they used the social security numbers to the
20  closest, or the last number that was closest went
21  forward.

22     Q.    So it would be a completely arbitrary
23  process?

24     A.    If the scores were the same.

38

1      Q.    Okay.  Other than the Rule of Three, would

2   the DEU process be different from the MSR process --

3      A.    Excuse me one second.

4      Q.    Go ahead.

5      A.    The DEU -- what I was talking about was

6   if -- the Rule of Three is veterans, if veterans are

7   involved.

8      Q.    Okay.

9      A.    I don't know if I said that.  I just wanted

10  to make sure it was --

11     Q.    No.

12     A.    -- clear.

13     Q.    So if veterans are not involved, no Rule of

14  Three is applicable?

15     A.    No.  No.

16     Q.    So if there is a veteran, would there be

17  more than one -- excuse me -- would there be more

18  than three names on a DEU best-qualified list?

19     A.    There could be.  There could be, but

20  typically we send three.

21     Q.    Okay.  But say there were four or five on

22  such a list.  The selecting officer would still be

23  expected to select at least one person from the top

24  three?

39

1      A.    With or without veterans?

2      Q.    With veterans.

3      A.    I -- depending on the type of veteran, no.

4   There would not be -- they do not have to select

5   within the Rule of Three on a DEU certificate.

6      Q.    Then I guess I don't understand what the

7   Rule of Three is.  Would you explain that again.

8      A.    The Rule of Three has to do with when there

9   are veterans on the certificate.  Then you have

10  to -- I'm trying to remember.  Then you have to

11  select from those veterans -- I beg your pardon.

12  Let me back up.

13          If it's CPS, you have to select those.  The

14  other veterans, they simply get a higher score

15  because of the points.

16          And yes, the Rule of Three does apply with

17  vets and nonvets.  I apologize.  I misspoke.

18     Q.    Okay.  What is the Rule of Three?

19     A.    The Rule of Three is, you select from the

20  top three people.  If, say, for example, one

21  declines, then it goes out and you have a new set of

22  three.

23     Q.    Okay.  I guess I don't understand.

24          Say there is a person ranked 100, another

40

1    ranked at 99, 98, 97, 96.  There's five people on

2    the best-qualified list and they have scores of

3    that.  Can the selecting officer select any one of

4    those people?

5        A.    No.  They have to select from the highest

6    scores.

7        Q.    So the highest three scores?

8        A.    Yes, sir.

9        Q.    So -- but do they have to select the person

10   with 100, or can they go and select a person with

11   the 99?

12       A.    Can select the 99.

13       Q.    So a selecting officer may select anyone

14   from the top three people on the best-qualified

15   list; is that correct?

16       A.    Yes, sir.

17       Q.    Okay.

18       A.    To my recollection, yes.

19       Q.    What if two people are to be selected?

20   Must the two people be selected from the top three

21   scores?

22       A.    If I recall correctly -- and it's been a

23   number of years since I've actually worked

24   certificates -- if I remember correctly, the first

41

1    selection then knocks out one.  So then the Rule of

2    Three goes into force again.  So actually, it would

3    then go down to four.

4           Do you understand what --

5       Q.   Okay.

6       A.   To the best of my recollection.  It's been

7    a number of years.

8       Q.   Okay.  So the first selection has to be in

9    the top three, and then the next selection --

10      A.   Would still --

11      Q.   -- would still have to be in the top three

12   available; correct?

13      A.   Right.  Yes.

14      Q.   Okay.  Are you certified to process DEU

15   applications?

16      A.   Not anymore.

17      Q.   Were you?

18      A.   Yes, I was.

19      Q.   During what period of time?

20      A.   I'd say up until maybe four years ago,

21   three years ago.

22      Q.   And are you sure that more than three names

23   can be on a DEU best-qualified list?

24      A.   I would not say a hundred percent sure.

42

1    I -- it's been a long time, quite frankly.

2        Q.    Okay.   Now, you said that it's your

3    understanding that the pages began on the fourth

4    page of Exhibit 5 where the crediting plan for the

5    Community Builder position.   Do you recall that?

6        A.    Mm-hmm.

7        Q.    Now, this crediting plan purports to be for

8    positions with grades 13, 14, and 15.   Do you see

9    that?

10       A.    Yes, sir.

11       Q.    Is it unusual to have one crediting plan

12   for different grades?

13       A.    It's done actually both ways within the

14   department.   Sometimes it's one grade; sometimes

15   it's two, three.   It -- it -- there's no set

16   procedure as far as how it's done in the department.

17       Q.    So how does that work, that positions of

18   different grades -- that people are being ranked for

19   positions of different grades?

20       A.    Well, I don't know typically how this

21   particular one was worked.   At least, I don't

22   recall.   But typically what you would do, for

23   example, is, if you were rating for a Grade 15, then

24   you would apply, in this case, the 9, the 6, and the

43

1    3.   Okay?  If you were rating for the 14 -- if you

2    were to think of the 9 as outstanding, the 6 as

3    successful, and the 3, you know, minimally

4    qualified, then for the 14, the 6 would become your

5    9, in essence, your 3 would become your 6.  And then

6    anything below that.

7         Do you understand what I'm saying?

8         Q.   Yes.

9         Is that just your understanding or is there

10    something department-wide that reflects that?

11        A.   There's nothing that is actually written.

12    That's the way that I practiced it and, I believe,

13    most of my coworkers.

14        Q.   Did you hear anything from above that

15    that's how you should apply a crediting plan that

16    applied to various grades?

17        A.   I don't understand.

18        Q.   Did you get an instruction from a

19    supervisor, telling you to implement a crediting

20    plan in the way you've just described?

21        A.   That's pretty much standard operating

22    procedure, and we only have one crediting plan.

23        Q.   And how do you know it's standard operating

24    procedure?

44

1      A.   Because I actually served as a staffing
2  specialist.
3      Q.   No, but my question is, did someone tell
4  you that this is standard operating procedure?  Is
5  it just something that you noticed when looking over
6  the shoulder of your coworkers?
7      A.   Something that you learn when you're in the
8  field.  I mean, when they're showing you how to do
9  things, you know, early on, it's one of those things
10  that you just learn how to do it.
11      Q.   Okay.  You said that you dealt with issues
12  as they came up.  Have you ever been involved in a
13  situation where someone alleges that a selecting
14  official has spoken to someone that they shouldn't
15  have spoken to?
16      A.   No, sir, nothing's ever come up like that.
17      Q.   Would it be a good practice or a bad
18  practice for the selecting official to ask the
19  person to whom the promotee would report to, whether
20  they wanted that person promoted?
21      A.   I'm sorry.  Say that again.
22      Q.   Okay.  So -- let's assume that someone
23  wants to be promoted to a position, and that
24  position would report to a supervisor.  Would it be

45

1    appropriate for the selecting official to ask that

2    supervisor whether they wanted the applicant to be

3    promoted to the position below the supervisor?

4         A.    Whether they wanted them to --

5         Q.    Yes.

6         A.    -- or just conducting a reference check as

7    far as what their skills and abilities were?

8         Q.    Either.

9         A.    I -- I know of no case where a supervisor

10   said, "No, I don't want him promoted."  Generally,

11   the supervisors don't give instructions to other

12   supervisors.

13        Q.    Well, let me explain it again, and see if I

14   can ask the question again.

15        A.    Okay.

16        Q.    Say someone like Rick is applying for a

17   promotion.

18        A.    Okay.

19        Q.    And say, for example, the promotion would

20   be to the Community Builder position.

21        A.    Okay.

22        Q.    And that position would report to someone

23   above, a regional -- a secretary's representative.

24              Would it be appropriate for the selecting

1   official for the Community Builder position to call

2   the secretary's representative and say, "Do you want

3   Rick promoted to the position beneath you?"

4       A.   I -- I can't address that, because I don't

5   know the chain of command that you're talking about,

6   whether the person that you're talking about was in

7   the chain of command to the person -- to the

8   secretary's representative or whatever.  I don't

9   know -- I don't know what the chain of command was.

10          If, for example, I applied for a job with

11  the director's office, the director's office was in

12  the chain of command of the assistant secretary, and

13  that was -- the person had to approve the actions of

14  the lower grades, then that would be acceptable, I

15  suppose, because it's in the course of directing.

16      Q.   Would it be acceptable if the secretary's

17  representative never was directly above Mr. Patoski,

18  never evaluated him, and never reported to her?

19      A.   I don't know -- I don't believe that

20  there's anything that really addresses that.

21      Q.   Okay.  Assuming -- assuming that the

22  secretary's representative was outside the chain of

23  command, in Mr. Patoski's case, would it be

24  incorrect for the selecting official to ask her

47

1  whether it was best that Mr. Patoski be promoted?

2      A.   I cannot say whether it would be incorrect

3  or correct.  As far as I know, there would be

4  nothing prohibiting it.

5      Q.   Would it be unusual for someone outside of

6  the applicant's chain of command to be consulted as

7  to whether that applicant should be hired off the

8  best-qualified list?

9      A.   There's a difference between hiring and

10 promoting.  You're asking me --

11     Q.   I'm asking you about promoting.

12     A.   -- about promoting.

13          Again, it depends on the context.  If a

14 person is doing a reference check, which could

15 include, "Do you believe that this person can work

16 at the next higher grade level?" then that would be

17 certainly appropriate.

18     Q.   But when I asked you that before, you said

19 it may or may not be, depending on chain of command

20 issues.  And I'm trying to ask you, how would chain

21 of command issues affect the reference check?

22     A.   The way that I understood the question is,

23 "Do you want this person promoted?"

24     Q.   Right.

48

1     A.    That's the way that you asked it, and

2    that's the way that I answered it.

3         What I am saying is, in response to your

4    last question, is, in the context of a reference

5    check, and asking a supervisor if they felt that the

6    person was working at or above the grade level and

7    would be able to perform a higher level position

8    that would be a promotion, that is certainly

9    encouraged.

10     Q.    Even if that person is outside the chain of

11    command?

12     A.    Regardless of whether the person is, OHR

13    encourages strongly that reference checks be

14    conducted on all applicants.

15     Q.    Do they do that in writing?

16     A.    Yes.  Actually, we have an interview guide.

17     Q.    How long has that interview guide been in

18    effect?

19     A.    I believe I wrote it a year, maybe --

20    probably the first part of this year, if I recall.

21     Q.    Was there any written instruction regarding

22    reference checks before that?

23     A.    I don't believe so.

24     Q.    Now, you say that page one of Exhibit 5 was

49

1    generated because there were a lot of positions to

2    be filled; is that correct?

3        A.    Yes, sir.

4        Q.    And how would generating this instruction

5    sheet help with that goal?

6        A.    First of all, we're instructing managers

7    not to interview candidates, which means the

8    selection process would go a lot faster, based on

9    the paper, rather than the interview process of

10   getting people and ...

11       Q.    So this was intended to speed things up?

12       A.    I believe so.  To the best of my knowledge.

13       Q.    And then -- so going back to the process,

14   the selecting official selects the candidate he or

15   she wants; correct?

16       A.    Mm-hmm.

17       Q.    Is that the end of the process?

18       A.    Well, no.  Because once they make a

19   selection, then the certificate comes or the roster

20   comes back down to OHR, and then we have to make the

21   actual job offer.

22       Q.    Okay.  Now, this process that you've

23   described, is there any difference between the MSR

24   process and the DEU process, other than the Rule of

50

1    Three that you've described?

2        A.    Not anything different that I've described

3    thus forth.  Not that I can think of.

4        Q.    Are both processes described in Exhibit 3?

5        A.    This is merit staffing.  It -- no.  It's

6    more geared towards advertising within the federal

7    service.  There may be some reference to DEU in

8    here.  I really don't recall.  But there's also

9    issued by the office of personnel management a DEU

10   handbook, which tells how we have to staff those

11   positions.

12       Q.    Now, could you go to Rule 35 in Exhibit 3.

13       A.    Merit staffing case files?

14       Q.    That's right.

15       A.    Okay.

16       Q.    Do you see where it says, "Merit staffing

17   case files shall be kept by the servicing personnel

18   office for a period of two years"?

19       A.    Yes, sir.

20       Q.    Do you see that?

21       A.    Mm-hmm.

22       Q.    Okay.  Was that in fact the policy for the

23   MSR process?

24       A.    To my knowledge.

51

1      Q.   Okay.  And what about the DEU process?  Was
2   there a requirement to keep case files for two
3   years?
4      A.   I'm not a hundred percent sure it was two
5   years, but I believe that that would be outlined in
6   the DEU handbook.  But I believe it was.
7      Q.   Okay.  And if there was an EEO claim filed,
8   regarding the filling of a position, what was the --
9   what was the procedure with regard to retaining
10  files?
11     A.   If OHR was notified that there was some
12  sort of an EEO case, and they requested the merit
13  staffing file or we knew about it, we would pull it
14  and retain it.
15     Q.   Okay.  Until when?
16     A.   Until we heard back from EEO.
17     Q.   And was that the same with the DEU?
18     A.   That that would -- yes, sir.
19     Q.   Can you go to Rule 18C.
20     A.   Mm-hmm.
21     Q.   It talks about the cancellation of
22  announcement.
23     A.   Mm-hmm.
24     Q.   Is there a similar rule for the DEU

52

1    process?

2        A.    It would be, yes.  It would be the same.  I

3    mean, you can cancel a job at any time.

4        Q.    Okay.  And it can be done either by an

5    amendment to the original announcement or by

6    notification of all applicants?

7        A.    A cancellation is different than an

8    amendment.

9        Q.    Well, it says here, "Cancellation of

10   announcement may either be done by an amendment to

11   the original announcement or by notification to all

12   applicants for the position."

13            Do you see where it says that?

14       A.    Yes.  Okay.  In this reference, they're

15   talking about, if you were going to -- if the

16   amendment was going to be too late, it wouldn't give

17   the applicants enough time to address any new

18   factors or what-have-you.  Then what they're talking

19   about is, that's how you would amend it, and you

20   would then, in essence, extend the date and a number

21   of other things.  But, yes.

22       Q.    All right.  And that's the same rule for

23   the DEU process as well?

24       A.    Yes, sir.

53

1    Q.    Now, we talked about the job series before,
2    the 1101.  Would there be some situations in which
3    some staff would have an 1101 job series while
4    others doing a similar job would have a 301 job
5    series?

6    A.    Yes, sir.

7    Q.    What would the reason for that be?

8    A.    I can't -- every office is different, so I
9    can't say specifically.  But generally speaking, a
10   301 is a program analyst or a management analyst,
11   which more gets into the actual processes and
12   functions and analyzing, and may not have to have
13   the same type of skill set.  While they have a
14   knowledge of, say, for example, whatever the 1101 in
15   that office does, they may not necessarily have the
16   same duties.  There would be variances.  Again,
17   that's a very general description.

18   Q.    Well, what is at issue here in terms of
19   being placed in one series or another?  What's the
20   difference?

21   A.    The difference is, the classification
22   standards issued by the office of personnel
23   management pretty much dictates what type of jobs
24   and what the duties and responsibilities would be

54

1   that go into a certain series.  Say, for example --

2   as I said, I'm a 0201.  Most of the people in my

3   office are in the same series, but there are

4   certainly other series, depending on the type of

5   work.  That doesn't mean the person doesn't have,

6   for that matter, even the same skills as I do.  They

7   just do something different in applying those

8   skills.

9        Q.    Who at HUD establishes these series?

10       A.    The series are already pre, I guess,

11   authorized by OPM.  Those are the series that we

12   have to use.

13       Q.    Okay.  Now, what's the -- are you aware of

14   a one-year-at-a-lower-grade standard?

15       A.    Yes, sir.

16       Q.    What is that?

17       A.    That is the timing grade requirement, which

18   means that a person has to be in a grade for a

19   minimum of the one year in order to be promoted to

20   the next level.

21       Q.    Is this a standard known to all HR

22   specialists?

23       A.    Yes, sir.

24       Q.    Okay.  Would you regard this as basic

55

1    knowledge --

2        A.    Yes, sir.

3        Q.    -- that everyone had to know?

4        A.    Yes, sir.

5        Q.    Now, going to Subject 1 of the attachment

6    of the 30(b)(6) deposition, I'm going to ask you

7    about studies and analyses done by HUD to determine

8    whether programs implemented at HUD to foster

9    diversity comply with constitutional requirements.

10            You became aware at some point of the AEP

11   program -- is that correct? -- what you've described

12   as an affirmative action program?

13       A.    I simply know what AEP is from many years

14   ago, as far as what it means.

15       Q.    Did HUD perform any studies or analyses to

16   determine whether its AEP program complied with

17   constitutional requirements?

18       A.    Not that I'm aware of.

19       Q.    Do you know what the FEORP is?

20       A.    No, sir.

21       Q.    Are you aware of any studies or analyses

22   performed by HUD to determine whether the FEORP

23   program as implemented by HUD complied with

24   constitutional requirements?

56

1       A.    No, sir.

2       Q.    Are you aware of the special emphasis

3   program?

4       A.    No, sir.

5       Q.    Are you aware of any studies or analyses

6   performed by HUD to determine whether the special

7   emphasis program complied with constitutional

8   requirements?

9       A.    No, sir.

10      Q.    Are you -- do you know about the Emerging

11  Leaders Program?

12      A.    No, sir.

13      Q.    Are you aware of any studies or analyses

14  performed by HUD to determine whether the Emerging

15  Leaders Program complied with constitutional

16  requirements?

17      A.    No, sir.

18      Q.    Do you know about the Hispanic Empowerment

19  Plan?

20      A.    No, sir.

21      Q.    Are you aware of any studies or analyses

22  performed by HUD to determine whether the Hispanic

23  Empowerment Plan complied with constitutional

24  requirements?

57

1          MR. GRADY:  Just as to form, the question

2     before this you said, "Hispanic Empowerment Plan."

3     Did you mean "Hispanic Employment Plan"?

4          MR. MANTELL:  Yes.

5          MR. GRADY:  Okay.  Thank you.

6          MR. MANTELL:  Thank you.

7     Q.    Are you aware of the HUD Intern Program?

8     A.    Yes, sir.

9     Q.    Okay.  Are you aware of any studies or

10    analyses performed by HUD to determine whether the

11    HUD Intern Program complied with constitutional

12    requirements?

13    A.    No, sir.

14    Q.    Are you aware of the Corrective Action

15    Plan?

16    A.    No, sir.

17    Q.    Are you aware of any studies or analyses

18    performed by HUD to determine whether the Corrective

19    Action Plan complied with constitutional

20    requirements?

21    A.    No, sir.

22    Q.    Are you aware of the Proud to Be goal?

23    A.    I'm aware of it.

24    Q.    Are you aware of any studies or analyses

58

1    performed by HUD to determine whether the Proud to

2    Be goal complied with constitutional requirements?

3        A.    No, sir.

4        Q.    Are you aware of the accelerated promotion

5    policy?

6        A.    There is no accelerated promotion policy.

7        Q.    There's no such thing?

8        A.    No, sir, not as stands alone.  There are

9    actual programs within the federal service that

10   allow for some accelerated program -- promotion.

11       Q.    Is that within HUD?

12       A.    Yes.  HUD does utilize a couple of those

13   programs, yes, sir.

14       Q.    And where are those programs utilized?

15       A.    The Upward Mobility Program, I believe, has

16   an accelerated promotion.  I'm not sure about the

17   HUD Intern Program.  There might be somewhat of an

18   accelerated promotion there, but I need to

19   double-check that one.

20       Q.    Are you aware of the Diversity Recruitment

21   Plan?

22       A.    No, sir.

23       Q.    Are you aware of any studies or analyses

24   performed by HUD to determine whether the Diversity

59

1  Recruitment Plan complied with constitutional

2  requirements?

3      A.   No, sir.

4      Q.   You said you were -- you referred to an

5  Upward Mobility Program; is that correct?

6      A.   Yes, sir.

7      Q.   Are you aware of any studies or analyses

8  performed by HUD to determine whether the Upward

9  Mobility Program complied with constitutional

10  requirements?

11      A.   No, sir.

12      Q.   Now, in all these questions, I referred to

13  studies and analyses performed by HUD.  Do you know

14  of any studies or analyses performed by anybody, any

15  agency, to determine whether any of these programs

16  complied with constitutional requirements?

17      A.   No, sir, I don't.

18          MR. GRADY:  Just with the objection noted

19  that the documents identified by the defendant in

20  its privileged log are not necessarily studies and

21  analyses, but there have been documents identified

22  by way of the privileged log that reflect analysis

23  of those programs by either the Department of

24  Justice or by the Office of General Counsel of HUD.

60

1          But, again --

2          MR. MANTELL:  Why shouldn't I be able to

3    ask about those in response to 1?

4          MR. GRADY:  You can ask that they exist.

5    We can assert privilege.  It's simply if you want to

6    ask about them, we -- I wanted the answer to be

7    clear.  She's been authorized to testify beyond her

8    own knowledge with regard to 30(b)(6) in response to

9    1.  There are no such studies.

10         For purposes of clarity, I simply want to

11   let you know again that there are analysis, legal

12   analysis in the context of the Worth litigation

13   prepared by the Justice Department, prepared by HUD

14   Office of General Counsel, that have been listed in

15   the privileged log, that address the

16   constitutionality of the programs.

17         MR. MANTELL:  I guess what I'm referring to

18   is, maybe you have a privilege with regard to legal

19   analysis; but if you have done a factual analysis on

20   which that legal analysis is based, I believe I'm

21   entitled to it.

22         MR. GRADY:  And, again, we've asserted the

23   privilege, and we'll resolve that within the context

24   of the motion to compel.  If you want to stop the

61

1    deposition to also resolve that in the context of

2    this --

3            MR. MANTELL:  Yes.

4            MR. GRADY:  -- that's fine.  I would

5    suggest we finish what we have, and we can reserve

6    that issue, but it's the same issue that's coming up

7    with the motion of compel with respect to the same

8    documents.

9            MR. MANTELL:  Yeah.  Just to be clear on

10   the record, I'm asking, in No. 1 of the 30(b)(6)

11   deposition notice, all studies and analyses

12   performed by HUD with regard to whether HUD complied

13   with constitutional requirements in implementing

14   various programs and plans to foster diversity

15   within HUD.

16           MR. GRADY:  There are no studies by HUD.

17           MR. MANTELL:  And my understanding is that

18   there were some legal analyses which are being

19   withheld as privileged.  My concern is, I would also

20   want to see the factual bases on which the legal

21   analysis is based, and I do not believe that the

22   factual basis would be privileged.

23           MR. GRADY:  I understand your position with

24   respect to the assertion of privilege; but, again, I

62

1  want it to be clear that there are no studies, per

2  se.  There are, however, legal materials prepared in

3  the context of the Worth litigation.

4         I don't want it to be -- from the record

5  appear as if HUD is saying there are no documents

6  that could possibly be determined to be analyses.

7  But there are no studies.

8         MR. MANTELL:  Okay.  So I'm going to

9  reserve my rights.

10        MR. GRADY:  No, absolutely.  I fully

11  understand that and I fully agree that resolving

12  this with a motion to compel would resolve it for

13  purposes of this deposition as well.  If that's --

14        MR. MANTELL:  Well, I'm not sure it does,

15  but --

16        MR. GRADY:  Well, we can come back on the

17  deposition.  But it would resolve the issue, not

18  necessarily all of the attending consequences.

19  How's that?

20        MR. MANTELL:  I'm not sure that the issue

21  as I'm framing it --

22        MR. GRADY:  No, I understand the issue as

23  you're framing it.

24        MR. MANTELL:  -- is different than in the

63

1   motion to compel.

2            MR. GRADY:  Well, I recognize that you

3   reserve with respect to the deposition all rights

4   attendant to your objection and my assertion to

5   privilege in that regard.  How's that?

6            MR. MANTELL:  Okay.

7            MR. GRADY:  We don't have to go over it

8   again, do we?

9            MR. MANTELL:  All right.  Let's take a

10  short break.

11           MR. GRADY:  Okay.

12           (Recess taken)

13      BY MR. MANTELL:

14      Q.   Looking back to Exhibit 5, first page, it

15  talks about, you can call or speak with the

16  candidate's supervisor or references.

17           Does that include the references that the

18  candidate him- or herself listed in the application?

19      A.   Does it include?

20      Q.   Yeah.

21      A.   Of course, yeah.

22      Q.   Of course?

23      A.   Yes.

24      Q.   Okay.  And it talks about the candidate's

64

1    supervisor.  Who is that referring to?

2        A.    The candidate's supervisor.

3        Q.    Direct report; correct?

4        A.    It really wouldn't matter.  It could be

5    another chain up.

6        Q.    Okay.  Beyond the candidate's supervisor or

7    the references that the candidate lists on his or

8    her application, is any other contact authorized?

9        A.    Yes, sir.  It says, "You may pursue leads

10   from references contacted."

11       Q.    Okay.  But if references are not contacted,

12   is there anyone else that's authorized -- that a

13   selecting official is authorized to contact under

14   these instructions?

15       A.    Yes.

16       Q.    Okay.  Who else?

17       A.    The selecting official can contact previous

18   supervisors or any leads.  They are in fact

19   encouraged to reference, in fact, previous

20   supervisors and people with the knowledge, primarily

21   because a lot of current supervisors may give a

22   glowing recommendation even if the person isn't

23   glowing.

24       Q.    Okay.  So you would interpret the

65

1    supervisor on this document to include past

2    supervisors as well?

3        A.    Yes.

4        Q.    Okay.  All right.  And the references are

5    simply the people that the applicant has listed on

6    his or her application?

7            MR. GRADY:  Objection.  She's already

8    testified that's not her definition.

9        Q.    Is that correct?

10       A.    If they choose to contact the references.

11   Managers aren't required.

12       Q.    Right.  This -- this instruction for

13   selecting officials says that the selecting official

14   may call or speak with the candidate's supervisor;

15   correct?

16       A.    Correct.

17       Q.    And by "supervisor," you would say that

18   that includes the applicant's present supervisor,

19   maybe a supervisor one level up, or even a past

20   supervisor; correct?

21       A.    Yes, sir.

22       Q.    Okay.  Anyone else?

23       A.    Anyone else with the knowledge of the

24   candidate.

66

1    Q.    So you're interpreting this document to say

2    that the selecting official is entitled to contact

3    any person that they believe would have any

4    knowledge of the candidate?

5    A.    Yes.

6    Q.    I'm not talking about the next line that

7    says "pursuing leads."

8    A.    Okay.

9    Q.    All right?  Forget that line.  I'm just

10   asking you about the line that says, "You may call

11   or speak with the candidate's supervisor or

12   references."  Do you see that line?

13   A.    Okay.  Yes.

14   Q.    All right.  Only with regard to that line,

15   it's my understanding that you're saying that the

16   selecting official can contact a candidate's

17   supervisor, maybe a second-level supervisor, and

18   past supervisors; correct?

19   A.    I would say that might be a little loose.

20   I would say if you're talking about solely this

21   line, if they were going to take it as it states,

22   any supervisor within the chain of command.

23   Q.    Okay.  And with regard to references, would

24   you agree with me that they should speak only to the

67

1    people that the applicant lists on their

2    application?

3         A.    No, sir, I do not agree.

4         Q.    Okay.  How would you interpret the word

5    "references"?

6         A.    Past supervisors.  Past coworkers.  Anyone

7    that would have a knowledge of the candidate.

8         Q.    So you're saying that this line entitles a

9    selecting official to speak with virtually anyone

10   who has not of the candidate's work?

11        A.    In my opinion, yes, sir.

12             MR. MANTELL:  Can we have this marked,

13   please, as the next exhibit.

14                  (Document marked as Hawkins

15                  Exhibit 6 for identification)

16             MR. GRADY:  Sorry, I don't have a copy.

17        Q.    Could you review the first two pages of

18   Exhibit 6?

19        A.    (Perusing documents)

20             Okay.

21             MR. GRADY:  Hold on for a moment.  Let me

22   just take a look.

23        Q.    Now, looking again to the first two pages

24   of Exhibit 6, that appears to be a best-qualified

68

1    list with four candidates; is that correct?

2        A.    Yes, sir.

3        Q.    Is that unusual to have four candidates for

4    a best-qualified list?

5        A.    Unusual in what way?

6        Q.    In your -- based on the Rule of Three.

7        A.    No, sir.  Not on -- no.

8        Q.    Was it your understanding -- why was there

9    two documents, two pages in this best-qualified

10   list?

11              MR. GRADY:  I'm just going to object to the

12   question in that this is a 30(b)(6) deposition.  If

13   you wish to conduct a review of an individual

14   decision-making process, you certainly can notice a

15   deposition for that purpose; but I think the

16   question as to form must be why generally may there

17   be two pages as opposed to why in the specific case,

18   in the context of a Rule 30(b)(6) deposition.

19              MR. MANTELL:  And that's my intent.

20              MR. GRADY:  Okay.

21       A.    Not only that, I can't even be sure that

22   it's the absolute same job.  This has handwriting on

23   it; this is typed.  I -- I don't know.

24       Q.    Okay.  Would there be a reason, if it were

69

1     the same job, why there would be only three names on

2     one and one name on the other, as opposed to, say,

3     one list with four names?

4          A.    I'd have to see the form.  I don't know

5     whether there wasn't room.  I don't know.

6          Q.    Okay.  I'd like to ask you a few things

7     about the HUD Intern Program.  When did such

8     programs begin?

9          A.    I don't know when it actually began.  It's

10    actually been around for a long time.

11         Q.    Since the 1980s?

12         A.    I don't know.

13         Q.    What is the HUD Intern Program?

14         A.    It's a program geared towards lower-level

15    positions and entry-level professional jobs.

16    Generally, recruiting is often geared towards, you

17    know, college.  It's intern; people come in and they

18    have, you know, mentors and learn.  But it's

19    certainly open to anybody and everybody.

20         Q.    And did you work on the HUD Intern Program?

21         A.    I don't recall, years ago, if I worked on

22    it or not.

23         Q.    Was the HUD Intern Program in effect after

24    1997?

70

```
 1        A.    I would say so, but I won't -- I don't know
 2   for sure.
 3        Q.    Is it still in effect?
 4        A.    Yes, it is.
 5        Q.    To your knowledge, did the HUD Intern --
 6   was the HUD Intern Program used to increase the
 7   hiring of women and certain minorities at HUD?
 8        A.    No.
 9        Q.    Was there any strategies or tactics used at
10   the HUD Intern Program to increase the
11   representation of women or certain minorities at
12   HUD?
13        A.    No.
14        Q.    Do you know of any studies done to
15   determine whether those enrolled in the HUD Intern
16   Program were disproportionately female or minority?
17        A.    Not that I'm aware.
18        Q.    Are you aware of any studies or conclusions
19   that the HUD Intern Program was successful in
20   creating diversity at HUD?
21        A.    I have -- I have no knowledge.
22        Q.    What is the Upward Mobility Program?
23        A.    The Upward Mobility Program is a program
24   geared to recruit entry-level professional positions
```

71

 1    within the department from its ranks:  those people

 2    that have demonstrated the ability to do

 3    higher-level work.  And the -- it's a growth

 4    program, geared towards -- generally filled at the

 5    GS-5, GS-7 level.

 6         Q.    And you testified earlier that the

 7    accelerated promotion policy was part of the Upward

 8    Mobility Program?

 9         A.    There -- there is no accelerated promotion

10    policy.  What I said earlier was one facet of the

11    Upward Mobility Program does allow for accelerated

12    promotion.

13         Q.    And how does it do that?

14         A.    It -- in the regulations allows for a

15    limited number of experience and training to

16    constitute a longer -- what would ordinarily be, in

17    a regular competitive position, a longer period of

18    time.  For example, the -- it may designate that six

19    months of experience would be credited as one year

20    of experience.

21         Q.    Did you do work on the Upward Mobility

22    Program?

23         A.    Years ago, I'm sure that I had vacancies

24    that involved the Upward Mobility Program.  We

72

1    really don't utilize it a whole lot.

2        Q.    Now, was the Upward Mobility Program used

3    to increase the representation of women and/or

4    certain minorities at HUD?

5        A.    The positions are for within HUD.  Those

6    people already worked in HUD.

7        Q.    Oh, okay.  Was the Upward Mobility Program

8    used to increase the representation of women and/or

9    certain minorities at higher levels within HUD?

10       A.    No.

11       Q.    Within that program, were there any

12   strategies or tactics used to increase the promotion

13   of women or minorities at HUD?

14       A.    No.

15       Q.    Were there any studies or determination as

16   to whether the Upward Mobility Program was

17   successful in assisting women and minorities being

18   promoted at HUD?

19       A.    No, not that I'm aware of.

20            MR. MANTELL:  Can we have this marked,

21   please.

22                    (Document marked as Hawkins

23                     Exhibit 7 for identification)

24       Q.    What is this document?

73

1      A.    This is the Upward Mobility handbook.

2      Q.    And when was it in effect?

3      A.    December 1998.

4      Q.    So is it still in effect?

5      A.    As far as I know, I believe so.

6      Q.    Okay.  Can you go to the last page, under

7  paragraph 311, where it says, "There is a direct

8  relationship between the Department's annual Federal

9  Equal Opportunity Recruitment Program (FEORP) and

10  Upward Mobility Program plans.  FEORP is designed to

11  encourage affirmative recruitment of minorities and

12  women both internally and externally.  Positions

13  identified for targeted internal recruitment on the

14  FEORP should be consistent with the Upward Mobility

15  Program plan."

16         Is it still your testimony that the Upward

17  Mobility Program had nothing to do with getting

18  women and certain minorities hired or promoted at

19  HUD?

20      A.    Yes, at least to my knowledge.  I know of

21  nothing -- and I'm not even going to say for sure

22  this is the current copy.  '98 -- I don't know when

23  it was last updated.  So you might need to verify

24  that.  But, no.

74

1    Q.   Well, this is the materials given to me by
2    HUD.
3         THE WITNESS:  Is this --
4         MR. GRADY:  Yeah.
5    A.   Then this is it.  This is it, then.
6    Q.   Okay.  Are you aware of any practice of
7    gearing the Upward Mobility Program to the FEORP
8    program?
9    A.   No, sir.
10   Q.   Are you aware of that having ever been
11   done?
12   A.   No, sir.
13   Q.   Do you know who would?
14   A.   I don't believe that it's been done, at
15   least not to my knowledge.
16   Q.   Has there ever been a study to determine
17   whether the Upward Mobility Program
18   disproportionately affects women or certain
19   minorities?
20   A.   Not that I'm aware of.
21   Q.   Going back to Exhibit 6 --
22   A.   Okay.
23   Q.   -- assuming that the first two pages were
24   the same best-qualified list, and noting that the

75

1    third and fourth seem to have the same score, who

2    would have been selected?  Who falls within the

3    first three?

4         A.    The first three.

5         Q.    Okay.  On the first page.

6         A.    Oh, I see what you're saying.  The scores

7    are the same.

8         Q.    Yes.

9         A.    I don't remember.  I'd have to look it up.

10        Q.    Okay.  If no one was selected from any of

11   these lists, what should be done before a new

12   vacancy announcement is issued?

13        A.    I don't know what you mean.

14        Q.    Well, if no one was selected from this

15   best-qualified list, or a similar one, yet they

16   still wanted to fill that position, what would they

17   do after that?

18        A.    They could cancel this position and

19   re-advertise it.

20        Q.    And what would they have to do to cancel

21   the position?

22        A.    Not make a selection.

23        Q.    Would they have to do anything more?

24        A.    "They," meaning ...?

76

1      Q.    You tell me.  What would have to happen in

2    order for there to be -- for them not to select

3    anyone from this list, and yet they want to hire

4    someone for the position?

5            MR. GRADY:  Objection as to form.  From a

6    list similar to this.

7      Q.    From a list similar to this.  What would

8    have to happen?

9      A.    They would not make a selection, return it

10   to OHR, and they would have start over again.

11   Request the position be filled.

12     Q.    Now, would the -- at this stage, would the

13   vacancy announcement have to be amended?

14     A.    Amended in --

15     Q.    Well, do you recall when we were

16   discussing --

17     A.    It would be an entirely new job.

18     Q.    Okay.

19     A.    It would be an entirely new vacancy

20   announcement.

21     Q.    I see.  So they would not have to amend the

22   vacancy announcement or alert the candidates?

23     A.    It would be a closed vacancy announcement.

24   Depending on, again, and generally speaking,

77

1    sometimes they would send out letters, saying you

2    were not selected for the position.  Of course, they

3    could also make a selection off of the merit

4    staffing certificate as well, even though they

5    didn't select from this one.

6        Q.    Can you explain that to me a little more?

7        A.    Well, when they advertise outside of the

8    department, which is what this is, they also have to

9    advertise within the federal service.

10       Q.    Mm-hmm.

11       A.    So, for one job, you have two certificates.

12       Q.    Okay.

13       A.    Possibly sometimes three certificates,

14   if -- for noncompetitive promotions.  There's people

15   that already have, or are at or have promotion

16   potential to the grade level, can go on a separate

17   certificate.  So even though they didn't make a

18   selection off of a DEU certificate, they could make

19   the selection off of the merit staffing certificate.

20   Okay?

21       Q.    But say no one was hired from any of the

22   certificates, and yet they continue to want to hire

23   someone in that position.  What would happen?

24       A.    They would re-advertise the positions.

78

1      Q.    Would they -- would they be required to

2    tell the candidates that this vacancy announcement

3    is closed but a new one is being opened?

4      A.    No, sir.  No, sir.  Not in any case.

5      Q.    Are you aware of any situation in which

6    some people were informed of a new vacancy

7    announcement, but others weren't?

8      A.    No, sir.

9      Q.    How would candidates know that the vacancy

10   announcement has been canceled?

11     A.    It's incumbent upon all applicants to

12   follow their applications, keep up on status of jobs

13   they've applied for, or jobs that they may want to

14   apply for.

15     Q.    Would it be posted somewhere that the

16   vacancy announcement would be canceled?

17     A.    They could call the OHR office and -- now,

18   in different levels of time, there used to be -- and

19   I have no idea of the time frames -- there used to

20   be a time where there would be postings when we did

21   stuff on paper that, you know, might indicate that

22   the vacancy had been canceled or closed or

23   what-have-you.  But they would call the OHR office

24   and ask the status of their application.

79

1          MR. GRADY:  Before we get too-too far down

2     this road, it is a little bit past 12:30, if you

3     want to break for lunch.

4          MR. MANTELL:  Oh, okay.  We can break and

5     come back.

6          MR. GRADY:  1, 1:05?

7          MR. MANTELL:  I don't know how much more I

8     have, but I do have a good amount.

9          So, at 1:05 we'll come back.

10               (Luncheon recess taken

11               at 1:05 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

80

1                    AFTERNOON SESSION

2        BY MR. MANTELL:

3        Q.    Okay.  Now, I want to discuss No. 6 of the

4    Rule 30(b)(6) deposition notice.  My question to you

5    is whether the individuals -- it's on the next page.

6             MR. GRADY:  6, on this one?

7             MR. MANTELL:  Oh.

8             MR. GRADY:  On 6, it's on --

9             MR. MANTELL:  Oh, okay.  Yeah.  All right.

10   Yes.

11            MR. GRADY:  The one that you put in as an

12   exhibit was slightly different than the one I had

13   ahead of time.

14            MR. MANTELL:  Exactly.  Okay.

15            MR. GRADY:  Not in words, just in format.

16       Q.    My question is, were any of the HR

17   specialists made aware, when they were processing

18   these vacancy announcements or creating plans or

19   rating and reviewing people, whether there were

20   underrepresentations of women or certain minorities

21   in the groups -- in the positions that they were

22   filling?

23       A.    No, sir.  We were just given applications

24   and we worked the applications.

81

1      Q.    Were you ever informed that there were --
2   there was an underrepresentation of women for a
3   certain position?
4      A.    No, sir.
5      Q.    Were you ever informed that there was an
6   underrepresentation of certain ethnic groups within
7   a particular position?
8      A.    No, sir.
9      Q.    Were you aware of any HUD policy to
10  eliminate underrepresentations of women or
11  minorities in the workforce?
12     A.    No, sir.
13     Q.    Did you ever see HUD policies on the HUD
14  Web site relating to elimination of
15  underrepresentation?
16     A.    No, sir.
17     Q.    Did you ever hear -- were you ever given a
18  notification that an underrepresentation of women or
19  minorities in a certain position had been
20  eliminated?
21     A.    No, sir.
22     Q.    Are you aware of the position AEP manager?
23     A.    No, sir.
24     Q.    No.  You don't know of any AEP managers?

82

1     A.    There used to be one years ago.

2     Q.    What was that manager's name?

3     A.    I don't even remember.

4     Q.    Was it in the '90s?

5     A.    I don't remember.

6     Q.    To your understanding, what was that AEP

7 manager's job functions?

8     A.    I have no idea.

9     Q.    Did you ever interact with this AEP

10 manager?

11    A.    No, I did not.

12    Q.    To your knowledge, was anyone who was

13 involved in the recruitment or selection of hirees

14 or promotees informed about the existence of

15 underrepresentation of women or minorities?

16    A.    No, sir.

17    Q.    To your knowledge, was anyone who was

18 involved in the recruitment or selection of hirees

19 or promotees given notice that underrepresentation

20 of women and minorities had been eliminated for

21 various positions?

22    A.    No, sir.  Not that I'm aware of.

23    Q.    Now, are you aware that Mr. Patoski applied

24 for two jobs that are at issue in this case?

83

1    A.    I know that only because they've asked me
2  questions.

3    Q.    Okay.  Well, Mr. Patoski applied for the
4  Community Builder position.  Are you aware of that?

5    A.    Yes.

6    Q.    Okay.  And he was not selected.  Are you
7  aware of that?

8    A.    I don't know what he wasn't selected from.
9  I only know that this case involved.  I had no
10  knowledge of this case until I was asked questions.

11   Q.    Okay.  Well, at this point you understand
12 that Mr. Patoski is suing because he was not
13 selected for the Community Builder position; is that
14 correct?

15   A.    I got that, yes.

16   Q.    Okay.  Was there any formal or informal
17 program to foster or increase diversity at HUD with
18 regard to the Community Builder position that
19 Mr. Patoski applied for?

20   A.    Not that I'm aware of.

21   Q.    Mr. Patoski also applied for a PHRS
22 position.  Are you aware of that?

23   A.    No.

24   Q.    Could you go to No. 8.

84

1  A. Oh, okay.  The vacancy announcement

2 numbers.  Okay.

3  Q. Are you aware of those vacancy announcement

4 numbers?

5  A. I just know them from this.  No, I'm not

6 aware of what the jobs are.

7  Q. Okay.  Are you aware of any formal or

8 informal program to foster or increase diversity

9 with regard to the staffing of those vacancy

10 announcement numbers?

11  A. No, I'm not.

12  Q. Okay.  But you did not even know what those

13 position -- those vacancy announcement numbers stood

14 for; is that correct?

15  A. Right.  I'm speaking on general vacancies.

16 There's no notification, no nothing.

17  Q. So there is no effort by HUD to impress

18 upon those involved in selection or recruitment that

19 it's important to retain, hire, or promote more

20 women and/or minorities?

21  A. Not that I'm aware of.

22  Q. Okay.  And that's during your entire period

23 at HUD?

24  A. That's correct.

85

1    Q.    Do you know whether the applicant flow was

2    ever checked prior to staffing positions or filling

3    positions at HUD?

4    A.    Checked in what manner?

5    Q.    The gender and minority status of the

6    applicants.

7    A.    The form was removed when the application's

8    received.

9    Q.    Say that again?

10    A.    The form is removed when the application is

11    received.

12    Q.    And do you know what happens to the

13    information on that form?

14    A.    Now, or in the past?

15    Q.    In the past.  In the 1997-2001 era.

16    A.    Well, I can't speak, you know,

17    specifically, but we used to send them to ODEEO.  At

18    some point the merit system control -- it's a

19    database -- was designed where you could enter that

20    position -- that information.  But I don't think

21    that, for the most part, it was ever really entered.

22    Q.    Okay.  So, to your knowledge, the applicant

23    flow data was never checked before filling the

24    position?

86

1      A.    Checked, no.

2      Q.    So, for example, someone wouldn't say,

3   "Gee, I wonder how many women have applied for this

4   job"?

5      A.    Oh.  No.  No.

6      Q.    Okay.

7            What is merit system control?

8      A.    You're talking about the merit system

9   control system?

10      Q.    The database that you just mentioned.

11      A.    That's more or less just a database that

12   enters the name of the applicants, address, social

13   security numbers.  It's more of a listing of the

14   applicants.

15      Q.    And does it contain their gender and ethnic

16   status?

17      A.    I don't think that it's generally put in.

18   I think it has the ability to accept the

19   information, but I don't believe that OHR enters it.

20      Q.    You were a supervisor at one point; is that

21   correct?

22      A.    Mm-hmm.

23      Q.    Were you ever evaluated with regard to

24   whether you furthered the goals of the AEP?

87

1    A.    No, I was not.

2    Q.    Do you know if anyone at HUD ever was?

3    A.    Not that I'm aware of.

4    Q.    To your knowledge, has the following

5    strategy been used to increase diversity at HUD:

6    notifying certain minorities or women of position

7    openings or expected openings?

8    A.    Not that I'm aware of.

9    Q.    Withdrawing vacancy announcements if not

10   enough minorities and/or women apply?

11   A.    No.

12   Q.    Placing minorities or women in a position

13   of acting capacity to give them experience in the

14   position?

15   A.    No.

16        MR. MANTELL:    Can we take a short break.

17        (Recess taken)

18   BY MR. MANTELL:

19   Q.    Were you aware in the late 1990s of, for

20   example, white men at HUD being angry that HUD

21   policies disfavored them?

22   A.    No, sir.

23   Q.    You weren't aware of any controversy like

24   that?

88

1          A.    No, sir.

2               MR. MANTELL:  Okay.  I have no further

3     questions.

4               MR. GRADY:  We also have no questions.

5               MR. MANTELL:  Thank you very much.

6                    (Whereupon, the deposition was

7                    concluded at 1:19 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

89

1                    C E R T I F I C A T E

2        I, LINDA HAWKINS, do hereby certify that I have

3    read the foregoing transcript of my testimony, and

4    further certify under the pains and penalties of

5    perjury that said transcript (with/without)

6    suggested corrections is a true and accurate record

7    of said testimony.

8        Dated at _____, this ____ day of _____,

9    2006.

10

11                              _____

12

13

14

15

16

17

18

19

20

21

22

23

24

90

1   COMMONWEALTH OF MASSACHUSETTS)

2   SUFFOLK, SS.                    )

3       I, Deanna J. Dean, Registered Professional

4   Reporter and Notary Public in and for the

5   Commonwealth of Massachusetts, do hereby certify that

6   there came before me on the 26th day of October,

7   2006, at 10:19 a.m., the person hereinbefore named,

8   who was by me duly sworn to testify to the truth and

9   nothing but the truth of her knowledge touching and

10  concerning the matters in controversy in this cause;

11  that she was thereupon examined upon her oath, and

12  her examination reduced to typewriting under my

13  direction; and that the deposition is a true record

14  of the testimony given by the witness.

15      I further certify that I am neither attorney or

16  counsel for, nor related to or employed by, any

17  attorney or counsel employed by the parties hereto

18  or financially interested in the action.

19      In witness whereof, I have hereunto set my hand

20  and affixed my notarial seal this _8th_ day of

21  November, 2006.

22          _____Deanna J. Dean_____

23                Notary Public

24                My commission expires January 12, 2012

1

Volume 1
Pages 1 to 133
Exhibits 1 - 17

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
RICHARD S. PATOSKI,                :
              Plaintiff,           :
                                   :
        vs.                        :   Civil Action
                                   :   No. 05-11086 RCL
ALPHONSO JACKSON, SECRETARY,       :
DEPARTMENT OF HOUSING AND          :
URBAN DEVELOPMENT,                 :
              Defendant.           :
- - - - - - - - - - - - - - - -x

        DEPOSITION OF KEITH T. GAITER, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Kelly
A. Mortellite, Professional Court Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Rodgers, Powers &
Schwartz LLP, 18 Tremont Street, Boston,
Massachusetts on Wednesday, November 15, 2006,
commencing at 11:28 a.m.

PRESENT:

    Rodgers, Powers & Schwartz LLP
        (By Robert S. Mantell, Esq.)
        18 Tremont Street, Boston, MA 02108,
        for the Plaintiff.

    United States Attorney's Office
        (By Mark Grady, Esq.)
        One Courthouse Way, Boston, MA 02210,
             -and-
    U.S. Department of Housing and Urban Development
        (By Abraham Brandwein, Esq.)
        Thomas P. O'Neill, Jr. Building
        10 Causeway Street, Room 378, Boston, MA
        02222, for the Defendant.

ALSO PRESENT:  Richard S. Patoski

2

I N D E X

| WITNESS | DIRECT | CROSS |
|---------|--------|-------|

KEITH T. GAITER

BY MR. MANTELL                    4

* * * *

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 1 | HUD Business & Operating Plan | 14 |
| 2 | AEP Managers - Affirmative Employee Program | 17 |
| 3 | US EEOC Memo to Directors from James Troy | 20 |
| 4 | Office Of the Inspector General Fiscal Year 1999 Affirmative Employment Program Report | 23 |
| 5 | Equal Employment Opportunity Commission Management Directive | 25 |
| 6 | HUD Department-wide Fiscal Year 1998 Affirmative Employment Program Report | 33 |
| 7 | HUD Department-wide Fiscal Year 2000 Affirmative Employment Program Plan | 56 |
| 8 | List of Affirmative Employment Program Managers/Names and Phone Numbers | 72 |
| 9 | Annual AEP Accomplishment Report for Fiscal Year 2000 | 75 |

3

E X H I B I T S, Continued

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 10 | Request for Authorization and Certification of Training form | 85 |
| 11 | Request For Authorization and Certification of Training form | 89 |
| 12 | HUD Fiscal Year 2004 Management Directive - 715 | 99 |
| 13 | EEOC Management Directive - 715, Effective date 10/1/03 | 102 |
| 14 | HUD Fiscal Year 2005 MD-715 Affirmative Programs EEO Report | 113 |
| 15 | Document prepared by Mr. Mantell titled Percentage of Parity | 117 |
| 16 | HUD Fiscal Year 2006 Annual Performance Plan | 126 |
| 17 | ODEEO Staff list | 127 |

* * * *

4

<div style="padding-left: 2em;">

1                   P R O C E E D I N G S

2                     KEITH T. GAITER

3     a witness called for examination by counsel for the

4     Plaintiff, having been satisfactorily identified by

5     the production of his driver's license and being

6     first duly sworn by the Notary Public, was examined

7     and testified as follows:

8                   DIRECT EXAMINATION

9         BY MR. MANTELL:

10        Q.    Good morning.  Once again my name is Rob

11    Mantell.  I represent Rick Patoski in a

12    discrimination claim against HUD.  I'll be asking

13    you a few questions this morning.  If you have any

14    question about one of my questions, if something is

15    ambiguous, if you don't understand, please let me

16    know and I'll try to rephrase it.

17        A.    Okay.

18        Q.    I'm going to ask you to give verbal

19    responses to each of my questions.  Everything you

20    say here is going to be taken down and transcribed.

21    Sometimes the record does not reflect well when you

22    say "uh-huh," things like that.

23        A.    Okay.

24        Q.    So I'm going to ask you for "yes" or "no."

</div>

5

1          MR. GRADY:  One thing before we get any

2    further.  If you're smart enough to know the answers

3    to his questions before he can finish them, before

4    he is done with them, you have to wait until he

5    finishes.

6          A.    Okay.

7          MR. GRADY:  If both of you talk at the same

8    time -- she only has two hands -- it's very

9    difficult.  So you have to kind of train yourself

10   not to jump ahead.

11         A.    Okay.

12         Q.    Have you ever been deposed before?

13         A.    I'm sorry?

14         Q.    Have you ever been deposed before?

15         A.    "Deposed," what do you mean by that?

16         Q.    Well, this is a deposition.

17         A.    Yes.  Twenty years ago.

18         Q.    Okay.  What did that deposition relate to?

19         A.    Automobile accident.

20         Q.    Okay.  Were you ever deposed any other

21   time?

22         A.    No.

23         Q.    Could you please state your name for the

24   record.

6

1      A.    My name is Keith Gaiter.

2      Q.    What's your middle name?

3      A.    Tarrance.  Keith T. Gaiter.  Middle name is

4   Tarrance, T-a-r-r-a-n-c-e.

5      Q.    How do you spell Gaiter?

6      A.    G-a-i-t-e-r.

7      Q.    What is your present work address?

8      A.    My present work address is 451 7th Street

9   Southwest, and that's Washington, D.C.  20410 is the

10  ZIP code.

11     Q.    And what is your business telephone number?

12     A.    202 area code, 708-0614, extension 6116.

13     Q.    And what is your work e-mail?

14     A.    My work e-mail address is

15  Keith_T._Gaiter@HUD.com.

16     Q.    Okay.  What is your current residential

17  address?

18     A.    My current residential address is 12760

19  Wood Hollow Drive, that's Woodbridge, Virginia

20  22192.

21     Q.    And Wood Hollow, is that two words?

22     A.    Yes, that's two words, Wood Hollow.

23     Q.    You're currently an employee at HUD; is

24  that correct?

7

1      A.    That is correct.

2            MR. MANTELL:  Let me just stop for a

3   second.  Usual stipulations?

4            MR. GRADY:  Yes, we will read and sign,

5   waive notary.

6            MR. MANTELL:  And all objections except as

7   to privilege and motions to strike will be reserved

8   until the time of trial.

9            MR. GRADY:  Privilege and form, all

10   objections except as to privilege and form.

11            MR. MANTELL:  Okay.

12      BY MR. MANTELL:

13      Q.    When were you first employed at HUD?

14      A.    I was employed at HUD February 25, 2002.

15      Q.    What was your job before that?

16      A.    Equal employment --

17            MR. GRADY:  Let me stop for a second.  With

18   respect to those stipulations, I ordinarily would

19   not include privilege in the usual stipulations.  I

20   would ordinarily say all objections except as to

21   form reserved until the time of trial.  I would not

22   agree to waive issues of privilege at this point,

23   and we'd reserve those until trial as well.

24            MR. MANTELL:  Okay.

8

1      Q.   What was your job prior to February 25,

2  2002?

3      A.   Equal Employment Opportunity Specialist.

4      Q.   And where were you employed?

5      A.   U.S. Army Corps of Engineers.

6      Q.   And how long were you in that position?

7      A.   I was in that position with the U.S. Army

8  Corps of Engineers for two years.

9      Q.   And why did you leave?

10     A.   I was given a promotional opportunity at

11  HUD.

12     Q.   And what was the position that you attained

13  at HUD?

14     A.   Equal Employment Opportunity Specialist.

15     Q.   Okay.  How was that a promotion?

16     A.   I was a GS-12 with the U.S. Army Corps of

17  Engineers, promoted to GS-13.

18     Q.   And do you remain a DS-13?

19     A.   I am still currently a DS-13.

20     Q.   Okay.  And what were your -- do you remain

21  an EEO Specialist at HUD?

22     A.   Yes, I am, sir.

23     Q.   You have not been promoted since you got to

24  HUD?

9

1      A.    Since 2002.

2      Q.    What are your job duties as an EEO

3  Specialist?

4      A.    My duties entail complying with EEOC

5  guidance by preparing work force profiles to support

6  EEO investigations, congressional inquiries, Freedom

7  of Information Act inquiries, as well as providing

8  guidance on reasonable accommodations as to

9  disability policy coordinator, as well as providing

10  assistance and guidance on Special Emphasis

11  Programs, as well as preparing the Management

12  Directive 715.

13      Q.    Now, when you say you are involved in

14  putting together work force profiles, why would you

15  do that?

16      A.    That is to support EEO investigations.

17  That request comes from investigators requesting

18  work force data to support any particular EEO

19  complaint.

20      Q.    Now, what is a work force profile?

21      A.    A work force profile may consist of, for

22  example, an organization breakout by race, sex, age,

23  disability status, position title.  Those are some

24  examples of a work force profile.  The work force

10

1   profile normally consists of an organization of some
2   kind.
3       Q.   And is data available to you to make work
4   force profiles for particular job categories at HUD?
5       A.   In terms -- our database is limited.  For a
6   particular job category, it's not.  But just in
7   terms of the demographics of a particular
8   organization or particular program, that's my
9   capability.  Our database is not designed to focus
10  on a particular job unless we are talking about a
11  professional occupation.
12          There are some profiles that EEOC requires
13  federal agencies to be able to at least abstract
14  data from, and that's called a PATCOB, and that's
15  Professional Administrative Technical Clerical and
16  Other Blue Collar category.  Now that is -- and if
17  you are talking in that sense, yes, we were at some
18  point able to do that, but we're now, as we speak,
19  unable to do that.
20      Q.   You're now unable to do that?
21      A.   That is right, sir.
22      Q.   Okay.  And if I wanted to, for example,
23  find out the race and gender composition of Public
24  Housing Resource Specialists, would you be able to

11

1   generate that work force composition?

2       A.    In the past we would have been able to do

3   that.  As we speak we don't have an EEO system to

4   generate those reports.

5       Q.    When did you stop being able to generate

6   such reports?

7       A.    Well, we just recently -- I would say

8   August -- we no longer have an EEO tracking system,

9   but even previously before then -- we are under

10  contract for a new EEO tracking system as we speak.

11  Previously we had an EEO tracking system, and prior

12  to the EEO tracking system, we had an EEO mass

13  tracking system.  Those two systems are no longer

14  available, and therefore, even with the new

15  implementation of the new EEO tracking system, we

16  are currently in a position now that we are unable

17  to get any type of data.

18      Q.    What is the difference between -- what's an

19  EEO tracking system as opposed to an EEO mass

20  tracking system?

21      A.    Those are the names normally that we have

22  contractors that work with the agency in terms of

23  developing an EEO tracking system.  That is the

24  names that they call their systems.

12

1    Q.    How does EEO mass tracking differ from EEO
2  tracking?

3    A.    They both have the same concept, and that
4  is to provide data to the EEO Office.  They both
5  were contractors.  That was their name of their
6  particular contract and the name of their system to
7  us, but the sole purpose is to provide work force
8  data to us to support various work force profiles.

9    Q.    Now, you stated that as of August 2006 you
10  stopped being able to produce EEO track reports?

11    A.    Yes.  And those track reports as of 2006
12  were limited.

13    Q.    So prior to August 2006 the reports were
14  limited?

15    A.    Yes.  EEO mass, I'm not even familiar with
16  that system.  That was prior to my coming on board.

17    Q.    Now, how were the reports limited prior to
18  August 2006?

19    A.    What I mean by "limited" means that EEOC
20  requires federal agencies to obtain certain data,
21  and certain data the agency was unable to obtain,
22  such as finding out how many applicants apply for a
23  job.  That information, for example, is not captured
24  as a required data field through the National

13

1   Finance Center.   The National Finance Center is the

2   agency that controls and manages all personnel data

3   and simulate that data to the federal agencies for

4   use.

5        I had no direct control of any personnel

6   data.   That data is tabulated and generated and

7   provided to the EEO contractors that manage our

8   system, and they were limited with certain data.

9   That's what I mean.   Certain data we just couldn't

10  capture.

11       Q.   So you, for example, would not be able to

12  determine the race and gender composition of a group

13  of applicants for a particular job; is that correct?

14       A.   That is correct because we do not have that

15  capability.

16       Q.   What department do you work for within HUD?

17       A.   I work for the Office of the Department of

18  Equal Employment Opportunity Office.

19       Q.   Do you refer to that as the ODEEO Office?

20       A.   That is correct.

21       Q.   And have you always worked at that office

22  at HUD?

23       A.   Yes, sir.

24       Q.   And what's the purpose of that office?

14

1    A.    The purpose of the office is to ensure fair
2  and equal treatment to all employees, freedom of
3  discrimination, as well as to comply to ensure that
4  all EEOC enforcement guidelines are carried out,
5  such as policy and prevention of sexual harassment,
6  like that, that the agency is required to have and
7  to monitor the agency work force.
8    Q.    Okay.  Does ODEEO have a business and
9  operating plan?
10    A.    Not to my knowledge, nor does anyone in our
11  office in ODEEO have any recollection of any
12  business plan.  I may have had -- prior to my tenure
13  at HUD, from 1998 to 200, HUD was part of Fair
14  Housing and Equal Opportunity.  It was not a
15  separate entity.  So that's an office that is a
16  separate entity.  They would normally have a
17  business plan, so it's possible that the business
18  plan would fall under the Fair Housing and Equal
19  Opportunity.
20        MR. MANTELL:  Could we have this marked,
21  please.
22            (Document marked as Gaiter
23             Exhibit 1 for identification)
24    A.    And I did see that.

15

1        MR. GRADY:  Wait for the question.
2     Q.   I'm going to show you what has been marked
3  Gaiter Exhibit 1.  Do you recognize that document?
4     A.   No.  I just seen this here but wasn't aware
5  of it at the time.
6     Q.   Now, you were just saying as the reporter
7  was marking this document that you had seen
8  something like that?
9     A.   No.  I did not see it, per se, but I heard
10  of it.
11     Q.   What did you hear of it?
12     A.   That somewhere it could possibly be, but I
13  don't recall it at all.
14     Q.   Now, do you see up top where it says "HUD
15  Web" on Page 1?
16     A.   Yes, I see that.
17     Q.   Does HUD have a Web site, HUD Web?
18     A.   It's not called "HUD Web."  But the Web
19  site that I'm familiar is with is called
20  "HUDAtWork."  I don't recall a "HUD Web."
21     Q.   Okay.  Can you go to Page 2 --
22     A.   Okay.
23     Q.   -- where it talks about outcome goals.  And
24  next to 6.1 it talks about, "HUD's work force is

16

1    reflective of the nation's diversity in all

2    occupations and at all grade levels."  And where it

3    says, "Measure, percent increase in the employment

4    of minorities and women."  Do you see where it says

5    that?

6        A.   Yes, I do, sir.

7        Q.   Is the first box reflective to your

8    understanding of HUD's goal?

9        A.   I'm trying to follow you.

10       Q.   Let me say it again.  Let me ask it again.

11   In 2002 when you first were employed at HUD --

12       A.   Yes, sir.

13       Q.   -- did HUD have a goal of having a work

14   force that is reflective of the nation's diversity

15   in all occupations and at all grade levels?

16       A.   No, I'm not aware of any goal.

17       Q.   Did you work on the AEP Program?

18       A.   When I arrived, sir, in 2002, I primarily

19   was working with Special Emphasis Programs and

20   providing work force profiles to support EEO

21   investigations, congressional inquiries and Freedom

22   of Information inquiries.  I had no direct role at

23   that time in working with the Affirmative Employment

24   Plans that focus on increase -- and to my knowledge,

17

1    I don't recall any goal as being set for any hiring
2    of anyone that is underrepresented.
3          Q.    Okay.  So you never saw Exhibit 1 before?
4          A.    No, I'm not familiar with this.
5                MR. MANTELL:  Rick Patoski just entered.
6                      (Document marked as Gaiter
7                      Exhibit 2 for identification)
8          Q.    I'm going to show you what's been marked
9    Gaiter Exhibit 2.
10               MR. MANTELL:  Sorry, I don't have a copy.
11               MR. GRADY:  You'll get me one though?
12               MR. MANTELL:  Yes.
13               MR. GRADY:  Okay.
14               MR. MANTELL:  Well, this is one of the
15   documents that I wanted to get authenticated.
16               MR. GRADY:  Is it among my disclosures to
17   you?
18               MR. MANTELL:  Yes.
19               MR. GRADY:  Okay.  If there's a page number
20   there, I just need to know what the disclosure
21   numbers were.  I'll look at it when he's done.
22               MR. MANTELL:  Okay.
23          BY MR. MANTELL:
24          Q.    Do you recognize this document?

18

 1       A.    Yes, I was responsible for responding to an

 2   inquiry that was sent as part of my duties to

 3   support EEO investigations and Freedom of

 4   Information Act inquiries.  And I think this is part

 5   of the information that was requested of me to send

 6   to you.

 7       Q.    Was this document generated by employees of

 8   HUD in the ordinary course of their business at HUD?

 9       A.    If so, it was done by my predecessor, and

10   that would be Thelma Cockreel, C-o-c-k-r-e-e-l.  She

11   was the director of the Affirmative Employment

12   Division during this era, 2002 and beyond.

13       Q.    Is it your understanding that this document

14   was used for an AEP Managers briefing?

15       A.    It's my understanding prior, up to 2002 I

16   believe, it was used as maybe a management tool

17   because this is in support of the previous directive

18   MD-714 to my understanding.

19            MR. GRADY:  Just let me see the last page.

20       A.    But I didn't look through the whole

21   complete document.

22            MR. GRADY:  You should do that.

23       A.    Yeah, but it looks like -- yes, this is

24   from the previous EEO tracking system.  It looks

19

1    like these are documents that were used prior to my

2    tenure.

3            MR. MANTELL:  Mr. Grady, are you willing to

4    stipulate that this is what it purports to be and

5    that it was generated and retained as a business

6    record?

7            MR. GRADY:  Well, if it's among the Request

8    For Admissions, it would likely be implicative.  But

9    if I have not already, then there's likely some

10   reason that I have not, that I would have to further

11   discuss with my client.  I've attempted to -- I

12   think I stipulated to several hundred documents

13   already.  I don't think I've been in any way

14   unreasonable.  If there is a Request For Admission

15   outstanding, we will respond to it.

16           And with respect this document, it was

17   among the documents that I reviewed for first round

18   stipulations -- what I would call them -- and if it

19   was not amongst those, then there's a reason why,

20   and we'll respond to the Request For Admissions.

21           MR. MANTELL:  Well, I have a 30(b)(6)

22   Deposition Notice asking for someone who could

23   authenticate these documents.

24           MR. GRADY:  If it becomes necessary, I will

20

1     have someone come in and respond to every single
2     document produced for 30(b)(6) documents.  It's not
3     my intent to waste your time.  I have, to the extent
4     possible, stipulated without Request For Admission
5     or producing a witness as many of the documents as
6     possible.
7          There are now Requests For Admissions
8     pending.  I will try to respond to them
9     expeditiously.  If they do not cover every document
10    you would like to have produced at trial or
11    authenticated, we will bring someone up to
12    authenticate those documents pursuant to your
13    Deposition Notice.
14         MR. MANTELL:  Could I have this marked,
15    please.
16              (Document marked as Gaiter
17              Exhibit 3 for identification)
18         MR. GRADY:  You can certainly continue.
19    I'm just trying to expedite as much as possible.
20    BY MR. MANTELL:
21    Q.    Could you review Exhibit 3, please.
22    A.    (Witness reviews document)
23    Q.    Do you recognize this document?
24    A.    I think this may be a document that I was

21

1    sent along with other requests, I believe.

2        Q.    Okay.

3        A.    And to the extent for MD-714.

4        Q.    Was this document maintained in HUD's

5    records?

6        A.    Let me say this:  I work in the Affirmative

7    Employment Division, and this here document dated

8    1989 or stamped 1989 -- I provided everything I had

9    in the filing cabinets and whatnot.  I don't know

10   whether something is authenticated or not.  That's

11   your question.  Is this in the --

12       Q.    Did you find this in HUD records?

13       A.    This document, yes, it was part of the

14   records I found.

15       Q.    What sort of records was it among?

16       A.    I submitted to you I believe the Management

17   Directive 714 Regulations, what's required, what

18   EEOC requests in terms of preparing an Affirmative

19   Employment Plan.  I think it was submitted with

20   other documents that was requested, AEP Plans and

21   AEP Reports.  To the best of my knowledge I believe

22   this information was provided along with all of

23   those requests.

24       Q.    Was this document stored along with those

22

1   other documents at HUD?

2        A.    All the file -- we have a filing cabinet.

3   Every single thing that we had in the filing

4   cabinets was provided.

5        Q.    And this document was among those?

6        A.    To the best of my knowledge and my

7   understanding, it might have been a part of it.

8        Q.    To your knowledge was this document

9   received by HUD in 1989?

10       A.    I wouldn't know that, sir.  I came to HUD

11  in 2002, but it's stamped 1989.

12       Q.    And what does that indicate to you?

13       A.    That means that once a document is

14  received, it's stamped, to the best of my knowledge,

15  from the office.

16       Q.    So if everything worked the way it should

17  and the way it usually worked, you can confirm that

18  HUD received that document in 1989?

19            MR. GRADY:  There is no dispute as to that,

20  Counselor, if that's where you're going with these

21  questions.  HUD was made aware of the Troy

22  Memorandum in 1989.  We have no issue with that.

23            MR. MANTELL:  Thank you.  Could I have this

24  marked, please.

23

```
 1                    (Document marked as Gaiter
 2                    Exhibit 4 for identification)
 3         Q.   Would you review Exhibit 4, please.
 4         A.   (Witness reviews document) Again, it looks
 5    like an AEP Report I submitted to you as part of
 6    your request.  You asked for all AEPs from 1987 I
 7    believe to 2003.  And I believe this is the program
 8    office, Office of the Inspector General's Fiscal
 9    Year 1989 AEP Report.
10         Q.   Okay.  And was that report among the others
11    in this filing cabinet that you described?
12         A.   Yes, all the AEP reports that we had.
13         Q.   To your knowledge was this document
14    generated and maintained in the usual course of
15    business at HUD?
16         A.   I couldn't answer that with certainty.
17              MR. GRADY:  Was this something we hadn't
18    entered into a stipulation?
19              MR. MANTELL:  Yes.
20              MR. GRADY:  Then we would.  That is a
21    business record that is regularly maintained.  I
22    apologize if I did not include that.  My intent was
23    to include it, and would do so now.
24              MR. MANTELL:  Okay, thank you.
```

24

 1          MR. GRADY:  I apologize for any oversight
 2   on my part and for any work you had to do as a
 3   result.
 4          BY MR. MANTELL:
 5          Q.    Now, HUD provided and generated AEP Reports
 6   from 1997 to 2003; is that correct?
 7          A.    That's my understanding.
 8          Q.    What is your understanding of the AEP
 9   Report Program?
10          A.    What do I understand of the AEP Report
11   Program?
12          Q.    Yes.
13          A.    In terms of what it entails or what it's
14   supposed to do?
15          Q.    Yes.
16          A.    It is simply, in my understanding, used
17   only as a management tool, for management to see a
18   data tabulation of their work force.  Basically the
19   intent of it is just to highlight the work force and
20   to be used as some form of measurement on how we are
21   doing as work force.
22          Q.    When you say a "management tool," how is it
23   supposed to be used?
24          A.    I would think it shows that we're committed

25

1   to some of the affirmative proactive programs such

2   as prevention of sexual harassment, showing the

3   agency we have a policy in place that shows its

4   commitment to equal opportunity.  It's also based on

5   the MD-714 requirements used to possibly identify

6   potential barriers that may be a hindrance to ensure

7   equal opportunity.

8          It is not something that is used to -- that

9   requires any particular manager to hire as a result

10  of a plan.  It's basically used just to show the

11  work force demographics and also to comply with

12  EEOC's enforcement guidelines.  They ask us to do it

13  so that they can report it to Congress and the

14  President.

15      Q.   Now, when you refer to "enforcement

16  guidelines," what are you referring to?

17      A.   I'm referring to the Management Directive

18  714 itself.  It was established and signed in 1987.

19          MR. MANTELL:  Have this marked, please.

20              (Document marked as Gaiter

21              Exhibit 5 for identification)

22      Q.   Is this MD-714?

23      A.   Absolutely correct, except for one thing.

24  The date is 1987 and not '67.  It was signed by

1    Clarence Thomas at that time who was EEOC Chairman.

2        Q.    Number 3 it says --

3        A.    Oh, I see it.  1987, okay.  That is

4    correct.

5        Q.    Maybe it was amended that date or --

6        A.    Maybe it was.

7        Q.    But if you could look through.  Is this is

8    this the MD-714 that you're aware of and used?

9        A.    This was the MD-714 prior to 2003, and the

10   Affirmative Employment Plans you're referring to

11   from 1997 to 2002, this is the regulation that

12   governed it at that time.

13       Q.    Okay.  And under this plan or under this

14   rule, is it true that HUD was required to do an

15   analysis as to whether particular groups were

16   underrepresented in the work force?

17       A.    The agency was required as part of the

18   requirement in MD-714 to do a work force analysis of

19   the entire work force, and yes, in doing those

20   analyses -- analysis consists of not identifying any

21   particular group but comparing all groups to the

22   civilian labor force.  That's how the term

23   underrepresentation was basically used, comparing

24   the statistics of the work force with the civilian

27

1    labor force.

2        Q.    Now, what civilian labor force data was
3    used?

4        A.    Well, from 1997 to the year 2002, the 1990
5    census I believe was used.

6        Q.    And how do you -- do you believe a
7    different data was used in 2003?

8        A.    2003 we didn't even do a plan because of
9    MD-714 implementations.  We no longer do any
10    employment plans, Affirmative Employment Plans we
11    used to do, because of the new Management Directive
12    715.  They look at the entire population as a whole.
13    Prior to 2002 the agency was in compliance with
14    MD-714.

15        Q.    And it's your understanding that all the
16    reports from 1997 on generated under 714 used the
17    1990 census data?

18        A.    Well, from 1997 to your request --

19        Q.    To the end of the program?

20        A.    -- to 2002 it is my understanding -- I
21    could be misspoken.  It's my understanding the 1990
22    census data was used.

23        Q.    For 2001-2002 why wasn't more current data
24    used?

28

1      A.    When you say "2001-2002," because the data

2   is based on the national census, and I think the

3   census comes out every ten years.  I think we just

4   recently as of 2003 are using the 2000 census.  That

5   is also my understanding.  If there's some data in

6   between there, I'm not aware of it.

7      Q.    Well, there's 1990 data from a 1990 census;

8   is that correct?

9      A.    1990 census is based on the national as

10  well as the local civilian labor forces compared to

11  that -- that 1990 census, it wasn't amended or any

12  other data changed until 2000 -- it's my

13  understanding -- when they had the 2000 census.

14     Q.    So then you have a census in 2000?

15     A.    Right.

16     Q.    So my question is why did you continue

17  using -- and when I say "you," I mean HUD -- why did

18  you continue using 2000 data in the years 2001 and

19  2002?

20     A.    I guess -- and maybe again I may have

21  misspoken.  From 2000 to 2002, 2000 data could

22  possibly have been used, so don't quote me as being

23  definite; I'm not exactly sure.  But I do know from

24  1997 up to 2000 -- that's when the census for 2000

1  took place, in 2000.

2      Q.   Now, so you would compare the civilian

3  labor force using the 1990 census data with what?

4      A.   HUD's work force.

5      Q.   Okay.  And you described the PATCOB

6  categories; correct?

7      A.   Yes, right, the Professional Administration

8  Technical category of the entire work force, the

9  demographics of the work force by race -- everyone

10 is included -- that data is compared with the

11 civilian labor force.  That's the way the agency at

12 that time compared it.

13     Q.   Right.  And I'm asking about the AEP under

14 714.

15     A.   That's correct.

16     Q.   Was the civilian labor force compared to

17 various job series and major occupations?

18     A.   Yeah.  That is a requirement on the MD-714,

19 and whatever those major occupations that are

20 identified were used.

21     Q.   Was there any statistical analyses for any

22 job categories that were narrower than the job

23 series?

24     A.   Not to my knowledge.  It's not the goal,

1    other than what those series may have been.

2        Q.    Now, the AEP Report, to my understanding,

3    has categories of "Manifest Imbalance" and

4    "Conspicuous Absence."  Are you aware of that?

5        A.    Yes, sir, I am.  Based on MD-714, yes, I

6    am.

7        Q.    How was conspicuous absence defined?

8        A.    Conspicuous absence is defined in MD-714 as

9    a particular category.  In the EEO group, all the

10   EEO groups, a particular group was non-existent in

11   the work force in that particular occupational

12   series or as a professional category or whatever you

13   want to identify.  That means that person is

14   absolutely not existent.  That's what conspicuous

15   absence means.

16       Q.    What about manifest imbalance?

17       A.    Manifest imbalance in MD-714 means that it

18   was below, significantly below the civilian labor

19   force.

20       Q.    Okay.  How much less below the civilian

21   labor force did it have to be in order for it to be

22   significantly below?

23       A.    I'm not sure of an exact high/low, but

24   high/low would be, for example, if you had a

31

1    civilian labor force of a particular category that
2    says there must be 26.7 women working in a
3    particular occupation and there were only 5 percent
4    of the women working in a particular group or
5    working in that particular area.

6         Q.   Okay.

7         A.   So 5 percent as opposed to what the
8    civilian labor force of 26.7 percent says, that is
9    significantly below what that 26.7 requires.

10        Q.   Okay.  Under the AEP program as implemented
11   by HUD, under the civilian labor statistics, if you
12   would expect 27 percent women --

13        A.   In a particular --

14        Q.   -- in a particular job, and instead at HUD
15   you had 26.95 percent women, would that be deemed to
16   be a manifest imbalance?

17        A.   No.  If you had 26.9 percent women working
18   in a particular category and the civilian labor
19   force said 26.7 in this particular occupation, that
20   person would be above what the civilian labor
21   force -- it was 26.9, so that would be considered a
22   person that is okay, if I'm understanding your
23   question correctly.

24        Q.   Let me rephrase it.  The civilian labor

32

1    force, you would expect 27 percent women --

2        A.    Right.

3        Q.    -- but HUD only has 26.95 percent women, so

4    they're almost there but not quite.

5        A.    Right, right.

6        Q.    Would that be a manifest imbalance or do

7    you know?

8        A.    No, that would not be.

9        Q.    Okay.  How low would it be in order for it

10   to be a manifest imbalance?

11       A.    It would have to be more or less than half.

12   If it was 27 percent and there is 7 or 8 percent of

13   women working in that area, that is a manifest

14   imbalance.

15       Q.    So in order --

16       A.    A manifest imbalance is little bit above

17   conspicuous absence but not that far above.  This is

18   just based on my understanding.

19       Q.    You referred to a Thelma Cockreel before.

20       A.    Yes.

21       Q.    Who is she?

22       A.    She was the previous director of the

23   Affirmative Employment Division.

24       Q.    Okay.  To your knowledge did she have a

33

1   more accurate understanding of the AEP Program than
2   you?

3       A.    I would say she did.

4       Q.    But it's your understanding sitting here
5   today that a group would have to be at only half of
6   the percentage of --

7       A.    I would say less than half.  If you are
8   referring to a particular group at 26.7, I'd say
9   less than half of that would be considered a
10  manifest imbalance.

11      Q.    And how much would be a conspicuous
12  absence?

13      A.    Absolutely none exists.  According to
14  MD-714 it states that that person would have to be a
15  non-existent in the work force.

16      Q.    Okay.  Did HUD have any inquiry or analysis
17  to determine whether any job or job category at HUD
18  was traditionally segregated?

19      A.    I am not familiar with that at all.

20                  (Document marked as Gaiter

21                   Exhibit 6 for identification)

22      Q.    Do you recognize Exhibit No. 6?

23      A.    Yes, I do, sir.  This is the one of many
24  requests to respond to your --

34

1           MR. GRADY:  Just state what the document

2      is.

3           A.    This is a Department-wide 1998 Affirmative

4      Employment Program Plan and Update.

5           MR. MANTELL:  Here are some of the pages

6      that I'm going to be looking at in there.

7           MR. GRADY:  Okay.

8           Q.    Going to Page 2 --

9           A.    When you say "Page 2," just open it up --

10          Q.    It's --

11          MR. GRADY:  3968.

12          Q.    3968.

13          A.    Okay.

14          Q.    And do you see bullet point one it says,

15     "Hold subordinate managers and supervisors

16     accountable for promoting EEO diversity in every

17     aspect of the Department's policies"?  Do you see

18     where it says that?

19          A.    Yes, I do, sir.

20          Q.    How were the managers and supervisors held

21     accountable for promoting these policies?

22          A.    There are several ways.  First by

23     supporting the EEO Special Emphasis Programs.  The

24     agency has more ways than one way of promoting the

1    EEO program.  Normally it's by supporting policies

2    that's in place, for example, prevention of sexual

3    harassment.  Second policy, another policy would be

4    insuring that reasonable accommodations are provided

5    to applicants as well as employees.  Those are some

6    of the policies that I'm aware of that is proactive.

7        Q.   My question is a little different, which

8    is, how were the subordinate managers and

9    supervisors held accountable?

10       A.   When you say "held accountable," that means

11   through their performance evaluations, if for

12   whatever reason they're not in compliance with

13   supporting the agency's set goals for -- and by

14   "goals" I mean subordinate policies.  I'm talking

15   prevention of sexual harassment, reasonable

16   accommodations, those kind of things, supporting

17   Special Emphasis Programs.  I'm not talking about

18   hiring.  I'm talking about subordinate policies that

19   the agencies have to ensure equal opportunity.

20       Q.   Well, how were these policies communicated

21   to managers and supervisors?

22       A.   Well, the EEO Office now currently -- and

23   I'm pretty sure in the past -- had training on the

24   prevention of sexual harassment, training on how to

36

1   provide reasonable accommodations, those kind of
2   things.
3       Q.   Managers and supervisors, did they have
4   access to these AEP Reports?
5       A.   Yes, they're all hard copied in our files,
6   and it is my understanding that they were forwarded
7   and submitted to the managers annually.  That is my
8   understanding.
9       Q.   Including this report, Exhibit 6?
10      A.   That is my understanding.
11      Q.   Do you see number three it says, "Make a
12  vigorous effort to ensure full and fair
13  representation of qualified minorities, women and
14  persons with disabilities when recruiting, hiring
15  and providing advancement opportunities"?
16      A.   Yes, I see that, sir.
17      Q.   How were managers and supervisors supposed
18  to make a vigorous effort to ensure full and fair
19  representation?
20      A.   Again this is the -- let me point this out.
21  The Office of the Department of Equal Employment
22  Opportunity, my role and what the role of the Equal
23  Opportunity Office is is to monitor and insure a
24  fair and equal process is done in terms of the

1   actual hiring and ensuring qualified applicants.
2   That is normally the role of the Office of Human
3   Resources.  I am within the Office of Equal
4   Opportunity, so I cannot give a fair answer to that
5   because my role is not to hire.  My role is to
6   monitor the work force and to provide guidance and
7   assistance and letting managers know.

8        Q.   It says, "I expect all managers and
9   supervisors to be proactive in implementing EEO AE
10  diversity."  Do you see where it says that?

11       A.   Right.  This may be an excerpt from the
12  policy statement that the EEO Office is responsible
13  for insuring that the agency have an EEO policy
14  statement.  And in most of those EEO policy
15  statements it is stated that in accordance with
16  whoever was the secretary at that time, to insure
17  that fair and equal opportunity is provided to all
18  employees.  It states in the statement not only this
19  but also the prevention of sexual harassment and all
20  those other things.

21       Q.   So is it your understanding that this
22  statement does not apply to all managers and
23  supervisors?

24       A.   No, I'm not saying that, sir.  I'm pretty

38

1    sure it does.  All managers are held accountable

2    when it comes down to insuring the fair and equal

3    opportunity with respect to recruitment and hiring.

4    I'm just not sure what you expect of me in terms of

5    answering this.  This is a question that is best

6    suited for the person who actually receives job

7    applications and then communicates the results of

8    those applications with the managers, letting them

9    know who applied, who were qualified, who were best

10   qualified.

11        Q.   So you don't know what managers and

12   supervisors did to make a vigorous effort to insure

13   full and fair representation?

14        A.   Not at this point in time, 1998, sir.  I

15   came to HUD in 2002.  That would not be something

16   that I would know.

17        Q.   Okay.

18             MR. MANTELL:  Again, I requested this in a

19   30(b)(6) Deposition Notice.  I'd like to ask that

20   someone else be designated for this purpose.

21        Q.   Do you see where it says bullet point

22   eight?

23        A.   Okay.

24        Q.   "Expects all managers and supervisors to

1    refer to the AEP Plan goals and objectives before

2    initiating any recruitment, hiring, training,

3    reassignment and promotional actions."  Do you see

4    where it says that?

5        A.   Yes, I do, sir.

6        Q.   So your understanding is that all managers

7    and supervisors were expected to refer to AEP's

8    planned goals and objectives?

9        A.   It's my understanding that at the time that

10   this plan was done, each manager -- according to

11   what the culture was at that time -- was expected to

12   adhere to.  But I have no way of authenticating that

13   or ensuring that that took place.

14       Q.   No.  I'm just asking you, that was the

15   system at that time or that was the expectation at

16   that time; that all managers and supervisors would

17   review the AEP's planned goals before initiating any

18   hiring, training, reassignment or promotion?

19       A.   I guess so.  I'm not familiar with that.

20       Q.   Okay.  Could you go to Page 3990.

21       A.   Yes.

22       Q.   Actually, may I pick this up for a second?

23   I'd like to refer you to Page 3981.

24       A.   Okay.

40

1    Q.    And ask you, do you see where it says
2    "Manifest Imbalance"?
3        A.    Yes, sir.
4        Q.    And it includes for the "Administration"
5    category "Asian males" and "Asian females"?
6        A.    Professional White females, administrative
7    White females and Asians.
8        Q.    Yes.
9        A.    Yes.
10    Q.    Under the "Administrative" category
11    apparently there was a manifest imbalance of Asian
12    males and Asian females.  Do you see where it says
13    that?
14    A.    Yes, according to this.
15    Q.    Now can we go to Page 3990.
16    A.    3990, "Administrative," okay.
17    Q.    And if you go to the "Administrative"
18    line --
19    A.    Okay.
20    Q.    Do you see where it shows that Asian males
21    were 1.1 percent of the HUD population and 1.4
22    percent of the civilian labor force?
23    A.    Yes.
24    Q.    Do you see where Asian females were 1.3

41

1   percent of the HUD population and 1.4 percent of the

2   civilian labor force?

3       A.   Yes, sir.

4       Q.   Does this change your view that manifest

5   imbalance only occurs when the HUD work force is one

6   half of the civilian population?

7       A.   No.  I was only using that as an example

8   that we used, 26.7.  The numbers change and you make

9   an assessment based on the numbers you provide.  I

10  don't mean that in a sense on every single number

11  there is one half, because of course you're going to

12  have 1.4 labor force here, civilian labor force, for

13  manifest imbalance, and then for males you have 1.1

14  in the work force.  Of course you're not going to go

15  less than half because there is no such thing as a

16  half of a person.  All I'm just saying is you do an

17  assessment based on the statistics that you have.

18      Q.   No.  This is not 1.1 person.  This is 1.1

19  percent.

20      A.   Okay.  So we're looking at percentage, so

21  1.4 is what the labor force is saying.

22      Q.   Let's look specifically at Asian American

23  females.

24      A.   Okay.

42

1    Q.    There's 1.3 percent in the HUD work force?

2    A.    That is correct.

3    Q.    And 1.4 percent in the civilian labor

4    force?

5    A.    Uh-hum.

6    Q.    According to this AEP Report there is a

7    manifest imbalance of Asian American females;

8    correct?

9    A.    That is correct.

10    Q.    Now, my question to you earlier was how

11    substantial does the imbalance have to be in order

12    to be a manifest imbalance?

13    A.    Okay.

14    Q.    I thought your answer was the HUD

15    population had to be one half or less?

16    A.    No, I didn't mean it in that sense and will

17    apologize.  I don't mean that the HUD population has

18    to be that way.  I was referring to what MD-714

19    indicates.  It's an assessment that whoever is doing

20    the analysis -- I don't think in MD 714 there is

21    percentage there.  If there is, maybe that is the

22    percentage to be used.

23    Q.    Do you know what percentage HUD used to

24    determine whether there was a manifest imbalance?

43

1      A.    No, I do not know from the past, but it's

2    normally an assessment -- the manifest imbalance is

3    normally when it's below the civilian labor force.

4      Q.    When it's below the civilian labor force?

5      A.    That's correct.

6      Q.    Now, looking to the category of White

7    males, these are percentages?

8      A.    Where are we looking?

9      Q.    This is Page 3990 again.

10      A.    Okay.

11      Q.    So for "Professional," there is 49.4

12    percent White males in HUD?

13      A.    Uh-hum.

14      Q.    And 54.7 in the civilian labor force?

15      A.    Yes.

16      Q.    Okay.  For "Administration" there's 31.3

17    percent White males at HUD but 42.1 in the civilian

18    labor force.  Do you see that?

19      A.    Yes, I do.

20      Q.    Continuing down there's 4.6 percent White

21    males in the "Technical" category at HUD but 36.1 in

22    the civilian labor force; 44.4 percent White males

23    in the HUD "Clerical" work force but 14 percent in

24    the civilian labor force?

44

1      A.    Uh-hum.

2      Q.    There was zero White males in the "Other"

3   category at HUD but 67.6 percent in the civilian

4   labor force?

5      A.    Uh-hum.

6      Q.    And 33.3 percent White males at HUD in the

7   "Blue Collar" category but 65.4 percent in the

8   civilian labor force.  Do you see that?

9      A.    Yes, I do.

10      Q.    So for each category White males were

11   underrepresented at HUD; is that correct?

12      A.    Well, according to MD-714 -- now just

13   looking at statistics here, if you're looking at the

14   statistics, yes.  But in accordance with MD-714,

15   White males was not included.  The MD-714, when they

16   initiated this, was looking mainly at that time at

17   minorities and women.

18      Q.    Well, okay.

19      A.    But in terms of the statistics that you

20   showed me at face value, yes, it shows slightly

21   below the civilian labor force in the "Professional"

22   category.  It shows a conspicuous absence of White

23   males in the "Other" category, 0.0 percent, and

24   manifest -- would be a judgement for manifest

45

1    imbalance in "Administrative" and so forth, but

2    based on the statistics, what you're stating is

3    correct.

4        Q.    Okay.  But your understanding is MD-714

5    does not provide for analysis of underrepresentation

6    for White males; is that correct?

7        A.    I think that in accordance with -- the

8    MD-714 to the best of my knowledge was mainly geared

9    to focus on minorities and women in that area.

10            MR. GRADY:  Exhibit 3 was a directive from

11   the EEOC to federal agencies.  We're not contesting

12   that.

13            MR. MANTELL:  Okay.

14       A.    So this was optional for other agencies to

15   use.

16       Q.    Okay.  So my understanding is there is

17   nothing in MD-714 that says that White males are

18   excluded from this analysis; correct?

19       A.    I don't know for sure, but I just know that

20   some agencies did not include them, so I cannot

21   answer definitive that that absolutely was not.

22       Q.    Okay.  Because before, you testified that

23   it was a requirement of MD-714 that White males were

24   not included, but now your testimony is that you're

46

1   not sure that MD-714 states that.  It may state that

2   in that letter which is Exhibit 3.

3       A.   It's stated in this letter, but I'm pretty

4   sure it did not include White males in MD-714.

5       Q.   Well, if you'd like to review it --

6       A.   Yeah, let me do that.  (Witness reviews

7   document) Okay.  So it did include White males also

8   as part of the EEO group.

9            MR. GRADY:  MD-714 included them?

10      A.   Yes, according to this 1987 memo, in

11  "Definition G, EEO group," it included White males

12  as well as White females.

13      Q.   Okay.  Now looking at Page 3990 again of

14  Exhibit 6.

15      A.   Okay.

16      Q.   I want to turn your attention to the

17  "Administrative" category of Hispanic males and

18  Hispanic females.  So the Hispanic males were 2.9

19  percent of the HUD population but 2.6 percent of the

20  civilian labor force?

21      A.   Yes.

22      Q.   So would you agree with me that Hispanic

23  males were overrepresented in the Administrative

24  category at HUD?

47

1      A.    I wouldn't state it in terms of
2    overrepresented, no.
3      Q.    Were they underrepresented?
4      A.    No, they were not.
5      Q.    What about Hispanic females, do you see
6    where it says they were 3.3 percent of the HUD work
7    force and the civilian labor force was 2.6 percent?
8      A.    I see that.
9      Q.    Do you believe that Hispanic females were
10   underrepresented at HUD?
11     A.    Not according to this "Administrative"
12   category.  We're referring to just this chart?
13     Q.    That's right, Page 3990.
14     A.    Okay.
15     Q.    Now, going to Page 4002, these are
16   "Combined Hiring and Numerical Movement" -- excuse
17   me -- "Combined Hiring and Internal Movement
18   Numerical Objectives by PATCOB Fiscal Year 1998";
19   correct?
20     A.    Well, I'm looking at it, it says 1998 right
21   up here.  It says "By PATCOB."
22     Q.    By PATCOB?
23     A.    That is correct.
24     Q.    Now, do you see for Hispanic males in the

 1    "Administrative" category --

 2         A.    Yes, I do.

 3         Q.    -- there is a goal to hire 19?

 4         A.    Yes, I see that.

 5         Q.    And do you see in the Hispanic female

 6    category there's a goal to hire 18?

 7         A.    That is correct.

 8         Q.    So why did HUD have goals to hire Hispanic

 9    males and females into the "Administrative" category

10    when there was no underrepresentation there?

11         A.    Now, I can't speak for this particular

12    plan.  This is in 1998, prior to my tenure there,

13    but I can only assume that there must be other

14    categories within the administrative area that may

15    be certain series and occupations that's considered

16    administrative, that there may not have been any

17    existence of Hispanics at all.

18              So we're basing this on these two charts,

19    and I'm not sure that I can answer that this chart

20    is compared just specifically with the one before

21    it, because this 4002 page could refer to the other

22    analysis.  I'm just assuming -- see, you showed me

23    the chart initially that showed that

24    administratively Hispanics were above the labor

49

1    force but 2002 -- there's no such thing -- I think

2    the AEP does not direct anyone to hire.  Let me make

3    sure I put that on the record.  Those are normally

4    just what they are, what EEOC requires federal

5    agencies to do, and oftentimes those goals may not

6    be met.  What the EEOC federal agencies do is set

7    numerical goals.  Those goals are not mandates for

8    hiring.  They're just what they are, a plan.

9         In terms of your answer to this particular

10   question, there's no way I can give a concrete

11   answer based on the statistics analysis you just

12   showed me, again referring to 2004, because there

13   could have been a particular series or categories

14   where there was no existence of Hispanics, but also

15   based on the total work force it could have been

16   significantly below in that area.

17        These are just goals.  It doesn't

18   necessarily mean they are factual.  I'm not sure how

19   they came up with the assessment either to give you

20   some concrete answer.  But just as I stated, EEOC

21   requires federal agencies to set a goal.  That

22   doesn't mean that the goal has to be met.

23        Q.   Why do you think the EEOC requires the

24   agencies to set goals?

50

1       A.    Because there's a lot of history there, and
2    I think the establishment of the MD-714 merely just
3    to --
4       Q.    Well, do you think that the requirement to
5    set goals is contained in MD-714?
6       A.    It should be in terms of what the goals are
7    supposed to be for.  I don't have the language
8    verbatim.
9       Q.    I do.
10      A.    I can read that.
11      Q.    Let me direct your attention to MD-714,
12   13-D, where it says --
13      A.    "Agencies may establish numerical
14   objectives."
15      Q.    "May establish" does not say "shall
16   establish"?
17      A.    It doesn't say "shall."
18      Q.    Do you know any place that the EEOC directs
19   HUD that they shall establish numerical goals?
20      A.    I don't think they use that same language,
21   but I think it's in the MD-714 numerical goals.
22   Now, how we arrive at that and what the agencies
23   should do, I'm not sure of that particular language.
24      Q.    You testified that you believe that the

51

1   EEOC has directed HUD to establish numerical goals?

2       A.    No.   Let me -- I don't mean it in that

3   sense, no.   I mean, what I'm testifying to is I

4   believe that's in the MD-714.   I'm not stating what

5   EEOC directed HUD to do.   MD-714 was established for

6   federal agencies.   It was a requirement from

7   Congress to EEOC that federal agencies must

8   establish an MD-714 Affirmative Employment Plan.

9   That's the only thing that I'm testifying.   I'm not

10  saying that EEOC directed HUD.

11      Q.    So your understanding is EEOC did not

12  direct HUD to establish numerical goals, is that

13  correct, but simply permits it?

14      A.    No.   I mean in accordance with MD-714,

15  numerical goals and objectives, it's a form of a

16  management tool.

17      Q.    I'm asking you something different, sir.

18  I'm asking, you indicated that you believe that HUD

19  was required to develop numerical goals.   You

20  mentioned MD-714 as the basis for your belief that

21  HUD was required to establish numerical goals.   I've

22  pointed out to you where it says "may" and not

23  "shall."   I'm asking you, do you have any other

24  basis for believing --

52

1       A.    No, no.

2       Q.    Please don't interrupt.

3             MR. GRADY:   Let him finish.

4       Q.    Do you have any other basis for believing

5    that HUD was required to establish numerical goals?

6       A.    No, I don't have any other basis.

7       Q.    Okay.   Now, going back to Page 4002 of

8    Exhibit 6, it shows various numerical objectives for

9    hiring and movement by PATCOB.   For example, in the

10   "Professional" category there are 28 hires which are

11   objective, including 14 female, White female, two

12   Hispanic males, and for example in the

13   "Administrative" category there's 185 planned hires

14   among White females and Hispanic males and females.

15            Were there any hiring objectives given for

16   White males in any of these categories?

17      A.    Let me state this for the record.   This is

18   the 1998 plan that we were talking about.   I don't

19   know if you're asking just for my understanding, my

20   knowledge or whatnot as it relates to this document.

21   I was not at HUD at this time, so I would have no

22   way of answering that with any certainty.

23            MR. GRADY:   Does this document reflect it?

24      A.    It does not -- to my understanding, it does

53

1  not.

2      Q.    Well, are there any White male hiring

3  objectives or movement objectives in this document?

4      A.    Well, I have to look through this document.

5            MR. GRADY:  On this page.

6      A.    Based on this, there's none based on what I

7  can see.

8      Q.    Okay.  Thank you.

9            MR. GRADY:  I don't mean to interrupt or

10  coach.  I'm trying to move it along, Rob.  I'm not

11  trying to hinder you in any way.  I'm just trying to

12  get you to the answer you want.

13            MR. MANTELL:  Okay.

14            MR. GRADY:  And I will certainly not do so

15  if you don't want me to.  Let me know.

16      Q.    And going to Page 4005 --

17      A.    Okay.

18      Q.    Here is an analysis by occupational

19  category -- not an analysis.  "Hiring Objectives,"

20  do you see that for fiscal year 1998?

21      A.    "Combined Hiring Internal Movement

22  Numerical," is that the same page?

23      Q.    Yes.

24      A.    Yes, I see that.

54

1      Q.    And there are hiring objectives and

2    internal movement objectives among various

3    occupational categories; correct?

4      A.    Yes, I see that.

5      Q.    Some are for White females and some are for

6    Asian American males, things like that; correct?

7      A.    Uh-hum.

8      Q.    Were there any hiring objectives or

9    internal movement objectives for White males?

10     A.    No, not according to this, sir.

11     Q.    You testified that these were plans?

12     A.    That's what the EEOC called them,

13   Affirmative Employment Plans.

14     Q.    Well, the numbers that were established for

15   hiring, your testimony is that they were not hiring

16   goals.  What do you think these numbers are here?

17     A.    I think that the EEOC requires federal

18   agencies to set -- I will say I don't know if --

19   there are so any meanings for "goals."  I will say

20   they're measurements showing where we were lacking

21   in terms of according to the MD-714 at the time,

22   underrepresentation of particular groups to show a

23   proactive approach to ensuring that all employees of

24   all segments of the population is given the

55

1    opportunity.  I am assuming that at the time this

2    plan was done these particular groups were

3    underrepresented at that time, and that maybe they

4    prepared this.  EEOC MD-714 enforcement guidelines,

5    they do set goals.  So the numerical goals I guess

6    was to try to enhance the applicant pool to address

7    these groups that are underrepresented.  It does not

8    say, my understanding, to hire these groups but to

9    at least provide this information to the management

10   to give them the opportunity to seek a diverse

11   applicant pool for these positions.

12       Q.   So --

13       A.   So my testimony is that I do not know

14   whether this was hiring or not.  Numerical goals is

15   just what EEOC required federal agencies to do.

16       Q.   Well, we just established that the EEOC did

17   not require federal agencies to do this, or at least

18   you cannot tell me why you believe that.

19       A.   I cannot -- well, I just assumed that, I'm

20   sorry.  I just think MD-714, what it says, a lot of

21   federal agencies I believe misinterpret it.  But the

22   goals, I'm not familiar with that term.

23       Q.   How were these numbers, these hiring goals

24   arrived at?

56

```
 1        A.    Like I said, I assumed this was based on my
 2   predecessor's analysis.
 3        Q.    So you don't know?
 4        A.    I don't.
 5              MR. MANTELL:  Will you mark this exhibit.
 6                    (Document marked as Gaiter
 7                     Exhibit 7 for identification)
 8        Q.    Would you review Exhibit 7, please.
 9        A.    Okay.
10        Q.    Do you recognize that document?
11        A.    Yes, I do, sir.
12        Q.    What is that document?
13        A.    It's the document I sent to you.  You
14   requested a lot of documents of me during the
15   summer.  This is one of the AEPs that you asked for,
16   department-wide, from 1997 to 2002.  This is one of
17   the documents I sent you.
18              MR. GRADY:  What's the title of the
19   document?
20        A.    That's the Affirmative Employment Program,
21   AEP Update for Fiscal Year 2000.  The one previously
22   was the 1998.
23        Q.    And again, you believe that this document
24   was sent out to managers and supervisors?
```

57

1        A.    That is my belief; that these documents
2    were provided to all managers.
3        Q.    And supervisors?
4        A.    And supervisors.
5        Q.    Okay.  I'd like you to go to Page 4272.
6        A.    Okay.
7        Q.    And it says "Promotion Activity Analysis"?
8        A.    Okay, I see that.
9        Q.    Do you see where it has White males for
10   fiscal year 1999 at 27.7 percent of the work force?
11       A.    I see that.
12       Q.    And combined for fiscal year 1999 they are
13   24.8 percent of all the promotions.  Do you see
14   where it says that?
15       A.    Yes, I do.
16       Q.    Okay.  Now, going on it says "competitive"
17   and "non-competitive."  What does that mean to you?
18       A.    This is Office of Human Resources
19   terminology.  Non-competitive -- to be honest with
20   you, sir, I don't have the language in front of me.
21   I just would be assuming if I gave you an answer to
22   that.
23       Q.    Now, do you see where it says for
24   Hispanic -- so if you look at the White males, the

58

1    White males were receiving combined promotion less

2    than the amount of their representation in the work

3    force.  Do you see that?

4        A.    Help me.  I don't understand that.

5        Q.    For White males, 27.7 percent of the work

6    force?

7        A.    That's correct.

8        Q.    And 24.8 percent of the combined

9    promotions?

10       A.    Yes, I see that.

11       Q.    And 24.8 is less than 27.7, so they're

12   receiving promotions at a rate less than their

13   representation in the work force.  Do you see that?

14       A.    Yes, I see that.

15       Q.    Now, going to Hispanic females, they are

16   4.1 percent of the work force and 4.2 percent of all

17   the promotions; correct?

18       A.    I see that.

19       Q.    So are they underrepresented in terms of

20   their promotions?

21       A.    I'm not sure how this analysis was done,

22   but there may be other variables why it's 4.2, and I

23   can't definitively answer that.  There may be other

24   reasons why it's at 4.2.  Based on these statistics

59

1   alone, no, it does not show an underrepresentation
2   when it comes down to promotions.
3       Q.   Okay.  Thank you.  Now, going to Page
4   4276 --
5       A.   Okay.
6       Q.   Do you see where it says "Problem Barrier
7   Statement"?
8       A.   Yes, I see that, sir.
9       Q.   I'm sorry.  Do you see where it says
10  "Objective"?
11      A.   Yes, I do see that.
12      Q.   It says "Objective, an increase in the
13  percentages of..."  and then it says under Part 2,
14  "combined and competitive promotions for Hispanic
15  females."
16      A.   Yeah, I see that.
17      Q.   Do you have any idea why this report calls
18  for combined promotions to increase for Hispanic
19  females when there is no underrepresentation in the
20  promotion of Hispanic females?
21      A.   Like I said, this here Page 4276 and 4272 I
22  have no way of knowing any correlation of that
23  question with the one you just asked, with that
24  answer that I provided to you on 4272 with the

60

1    answer on 4276.  Like I indicated earlier, there may

2    be other variables why there may be a desire to

3    increase the promotion of Hispanic females under

4    this particular objective.

5        Q.    But you don't know how that was arrived at;

6    correct?

7        A.    That's correct.

8        Q.    Okay.  Pursuant to the AEP Program, what

9    strategies and tactics were used by HUD to increase

10   the hiring of minorities and women?

11       A.    There's a few things that I can only answer

12   because the Office of Human Resources again is

13   responsible for the recruitment of employees.

14   Office of Human Resources is also responsible in the

15   areas of promotions.

16            Again, let me state ODEEO, the office in

17   which I work, does not have the authority to hire,

18   but some of the strategies that I can attest to that

19   are used is making sure that positions are

20   advertised through the USAJobs.OPM.GOV, to insure an

21   applicant a fair and equal opportunity for all

22   employees.  Applicant pool may consist of going out

23   to outreach organizations and colleges, make sure

24   people with disabilities are aware of opportunities.

61

1    There may be opportunities sent to out West if there

2    is no Native Americans in the Washington area.  So I

3    would just say they do have a proactive approach in

4    seeing that the advertisement of positions reach

5    various groups.  I just use those two groups as an

6    example.

7        Q.    Okay.  So for example, if there is a

8    traditionally Black college, they would advertise at

9    that college?

10       A.    Yeah, not only Black institutions and

11   colleges but in the Hispanic institutions.

12       Q.    Any other strategies or tactics that were

13   used to increase diversity hiring?

14       A.    I'm not aware of any in terms other than

15   ensuring that jobs were posted.

16       Q.    Was there practice of specifically alerting

17   female or minority employees of HUD of potential job

18   postings that affected them?

19       A.    Could you rephrase that again or at least

20   state it again to me.

21       Q.    Okay.  Say there's a department at HUD, and

22   there is two Black employees, three female employees

23   and five White male employees, and a promotion

24   opportunity opens up that these ten employees would

62

1   be interested in.  Would there be a policy or

2   practice of notifying, say, the two Black employees

3   and the three females of the opportunity but not the

4   White male employees?

5        A.    I'm not aware of any such thing isolating

6   any particular group.  Now, I do know that they do

7   advertise in different forms.  I'm not familiar with

8   all of the HUD organizations, but there are some

9   organizations at HUD -- and I am not aware of how

10  it's attributed to those folks -- but in terms of

11  advertisement, positions are normally advertised

12  just like any other position through USAJobs.  They

13  do have a one-stop employment office.  Maybe they

14  can go in there and get the announcements.  I don't

15  know if any announcements triggered down to third

16  parties, somebody saying there is a position open

17  and not notifying White males.

18       Q.    What about withdrawing vacancy

19  announcements if not enough minorities and women

20  apply?

21       A.    I am not aware of that taking place.

22       Q.    Is it possible that happened?

23       A.    No, I don't believe in my heart something

24  like that would happen.

63

1      Q.    What about a practice of placing women or
2    minorities in a position in an acting capacity to
3    give them experience of a position?  Did that ever
4    happen?
5      A.    I'm not aware of any particular group being
6    singled out to be put in any kind of upward mobility
7    or any kind of promotional status without it being
8    advertised to the entire work force.
9      Q.    How did you find out about your position at
10   HUD?
11     A.    Through USAJobs.OPM.GOV.
12     Q.    And no one else informed you about the job?
13     A.    No one informed me about it.
14           MR. GRADY:  Very weak objection to outside
15   the scope of the deposition.  The answer stands.
16     Q.    You referred to the numerical goals as a
17   plan on the part of HUD.  Was there an expectation
18   by HUD that the plan would be fulfilled within a
19   certain amount of time?
20     A.    There was no time frame provided.  The
21   EEOC, as you say, they don't require it but agencies
22   implement it.  It was just something that the agency
23   used as a management tool.  How it is measured is
24   based on the next year's plan to see whether or not

64

1    those goals that agencies set were met.  If they

2    were not met, it's a part of the next year's plan.

3    It's no timetable, no set date saying that you must

4    meet these goals.

5        Q.    Were the goals supported by any statistical

6    analysis that did not appear in the AEP Reports?

7        A.    To the best of my knowledge, no.

8        Q.    What role did the AEP managers have in this

9    AEP program as it existed up through 2002?

10       A.    I can only just share to the best of my

11   ability my understanding, and they no longer are in

12   place.  The MD-715 is now the management plan which

13   I'm responsible for.  I was not responsible for any

14   prior MD-714 Reports.  The role that the AEP

15   managers I believe play -- just in my belief -- that

16   was just to provide a statistical analysis report to

17   the director at that time, Thelma Cockreel, of their

18   particular program office.

19       Q.    Okay.  I'm going to show you what's been

20   marked as Exhibit 4, and that's a Public Housing

21   Revitalization Specialist Vacancy Announcement.  I'm

22   just going to show you where it says "GS-1101."

23   What does that signify?

24       A.    That is the series of that particular

65

 1    occupation, and I'm not familiar with 1101, but

 2    according to HUD, it's a Public Housing

 3    Revitalization Specialist position.  The series is

 4    normally the first four numbers after the GS.

 5        Q.   Okay.  Going to Exhibit 7 and going to Page

 6    D227 which is down --

 7        A.   D227?

 8        Q.   Yes.  Let me see if I can find it faster

 9    than you.

10             MR. GRADY:   4216.

11             MR. MANTELL:   Wait.  I need to just grab

12    this from you.

13        Q.   Going to Page 4232 --

14        A.   Okay.

15        Q.   Those are "Combined hiring and internal

16    movement objectives by major occupation"?

17        A.   I see that.

18        Q.   So looking to the part where it says

19    "GS-1101" --

20        A.   That is correct.

21        Q.   To the extent that -- and there is an

22    objective to hire seven White females into the

23    GS-1101 position there.  To the extent that a White

24    female was hired into the vacancy, an announcement

66

1    that I just showed you, that would count towards the

2    7 number; is that correct?

3         A.    Give me a minute to digest that.  You say

4    if you hired --

5         Q.    If you hired a White female into the

6    position --

7         A.    Right.

8         Q.    -- which I just showed you which is a 2000

9    GS-1101 position, 2000?

10        A.    Right.

11        Q.    That would count towards this goal of

12   hiring seven females; is that correct?

13        A.    Yes, it should.

14             MR. MANTELL:  Okay, thank you.  Why don't

15   we take a break.

16             MR. GRADY:  Off the record.

17                  (Luncheon recess taken

18                   at 1:06 p.m.)

19

20

21

22

23

24

67

1                    AFTERNOON SESSION

2            MR. MANTELL:   Let's go back on.

3        BY MR. MANTELL:

4        Q.    Now, you testified about the nature of the

5   numerical goals in the AEP program as not mandating

6   hiring?

7        A.    It's not, it's not set for that.  It's set

8   as a management tool, in my opinion, to give

9   managers the opportunity to insure a diverse

10  applicant pool for those goals.  Now, the term

11  "goal" is a part of what EEOC said you may

12  establish.  So that's what most people set just as a

13  form of some type of setting, but it's not mandated

14  that an agency must hire based on that.

15       Q.    How was it communicated to the managers and

16  supervisors that they need not hire this number?

17       A.    I hope you're not misunderstanding me.  In

18  terms of providing --

19            MR. GRADY:   Objection to form.  Go ahead,

20  you can answer.

21       A.    The AEP Report is provided to all the

22  managers, in my opinion, by hard copy, stating the

23  goals they will establish in the preparation of

24  this, but it's nowhere indicated and mandated that

1   they must hire based on those goals.  That is used
2   as a management tool for them to look at to ensure
3   that a diverse applicant pool is used for those
4   goals that they -- you know -- to look at for hire.

5       Q.   So the only rule of the numerical goals,
6   according to you, is that it serves as a signal to
7   the managers and supervisors for particular job
8   actions to try to obtain a diverse applicant pool;
9   is that correct?

10      A.   It's based on whatever tabulation was done
11  in preparing a report based on groups, all groups
12  that might have been underrepresented.  That's just
13  in my opinion, it was used as a form of a tool to
14  assist them in trying to provide some type of a
15  direction.  Now, I'm not saying that it was set up
16  to mandate them to the hire but just only used as a
17  management tool.

18      Q.   Well, you said that it was set up to give
19  them direction for hiring.

20      A.   That's what I would -- that's an
21  appropriate way to put it.  It's just direction or
22  some type of guidance, according to the MD-714
23  requirements, at least that EEOC said that you may
24  establish as some form of goal.

69

1    Q.    Because to me, if it was only to be used as
2    a signal to managers and supervisors to look out for
3    the applicant pool for certain situations, then all
4    you would need was a check mark or a zero; you
5    wouldn't need specific numbers.

6    A.    I hear what you're saying, but just in my
7    opinion I think that those numbers are needed for
8    the agency heads, and when the report goes to EEOC
9    and eventually to Congress and the President, they
10   need to know how is the work force -- what is the
11   demographics of the work force.

12   Q.    That may be right but if you're -- well,
13   okay.  And to your knowledge was your understanding
14   that the numerical goals were tools to be used
15   merely for guidance or direction ever communicated
16   to the managers and supervisors?

17   A.    I can't speak for these --

18        MR. GRADY:  Objection to form.  Go ahead
19   and answer.

20   A.    I can't speak for these previous plans, but
21   it's part of EEO training that managers are informed
22   of their particular program offices and the work
23   force demographics of their program offices.  I
24   can't answer definitive on that, but I assume that

70

1    they all were informed and trained on their work

2    force demographics and the makeup of their

3    demographics.

4        Q.   Right.  But my question is do you know if

5    -- and the answer is yes or no -- the managers and

6    supervisors were instructed with regard to these

7    goals?

8        A.   No.

9        Q.   Thank you.  Now, you testified earlier

10   about the role of the AEP manager to generate work

11   force compositions, and I'm talking about during the

12   AEP period 2000 and prior.  Did they have any other

13   role?

14       A.   I'm not aware of what their roles were in

15   addition to just preparing the sub-component AEP

16   Reports.

17       Q.   To your knowledge did they review the

18   recruitment and personnel actions of managers and

19   supervisors?

20       A.   I don't have no knowledge, prior knowledge.

21       Q.   What is the current role of the AEP

22   manager?

23       A.   Since the implementation of MD-715?

24       Q.   Yes.

71

1       A.     No role, they play no role.

2       Q.     Really?

3       A.     The Management Directive 715

4    implementation?

5            MR. GRADY:  Not to be unduly splitting

6    hairs, but since we've come back to Exhibit 2 and

7    you had asked about a stipulation earlier, why it

8    wouldn't be, I had a chance to go back and discuss

9    it.  One of the issues that arose with respect to

10   this document, I couldn't find anyone who actually

11   participated in, handled or conducted training or

12   indicated a training actually took place in November

13   29, 2001.  That would be the reason it was not

14   authenticated in that regard.

15           With respect to the document -- not to be

16   unduly splitting hairs -- this is a document that

17   exists in the files of HUD.  It purports to be an

18   example of -- excuse me -- it purports to be the

19   materials used at a training on Thursday, November

20   29, 2001.  HUD has no reason to doubt that these are

21   the materials that were used on that date and would

22   agree to such for purposes of stipulations in this

23   case, if that is adequate.

24           MR. MANTELL:  Well, is it a business

72

1    record?

2           MR. GRADY:  It is what it purports to be.

3    This would be a record that would be generated in

4    the ordinary course of HUD's business and training

5    of AEP managers.

6           MR. MANTELL:  Okay.

7           MR. GRADY:  I hope that adequately

8    addresses the concerns that you may have had with

9    respect to that.

10          MR. MANTELL:  Okay.  Could we have this

11   marked, please.

12                 (Document marked as Gaiter

13                 Exhibit 8 for identification)

14      Q.    Would you review Exhibit 8, please.

15      A.    Yes, I see this.

16      Q.    What is this document?

17      A.    This is the current roster prior to 2003, a

18   list of all the AEP managers.  However, I see it's

19   current as of January 12, 2006, but as we speak,

20   there are no particular functional roles with

21   respect to the new implementation of MD-715 that

22   they are involved in.

23      Q.    To your knowledge are any of the people

24   listed here as AEP managers no longer at HUD?

73

1      A.    To be honest with you, sir, I only know one

2   or two folks on this list.  I don't know if they are

3   active or not because since my arrival and with the

4   new implementation of MD-715, AEP managers have had

5   no requirements to report to the Affirmative

6   Employment Division with respect to MD-715.  Now,

7   they did on the MD-714.

8      Q.    Now, "HUDAtWork," this is a Web site you

9   referred to?

10     A.    Yes.  Their official title hasn't been

11  removed; however, they are not doing anything.

12     Q.    They're not doing anything?

13     A.    What I mean is --

14         MR. GRADY:  Just answer the question.

15     Q.    I thought you had said under your breath

16  "They're not doing anything" so I said louder

17  "They're not doing anything."  Is that correct?

18     A.    With respect to the AEP they're not because

19  it's no longer called AEP.

20     Q.    Other than to send around hard copies of

21  the AEP Reports to the managers and supervisors, was

22  there any other efforts to publicize the AEP goals?

23     A.    I think I may have alluded to it earlier

24  that the only other form of publicizing -- I would

74

1   say training -- we do have an EEO Web site within

2   the Office of the Department of Equal Opportunity.

3   That is merely just for information.  I don't know

4   of anything particular other than Special Emphasis

5   Programs that we do.  We do promote the Special

6   Emphasis Programs.

7       Q.    To your knowledge is this list posted on

8   the HUD Web site currently?

9       A.    It states here -- this might have been

10  typed -- I haven't seen it, to be honest with you,

11  sir.  If it's there, it's probably a collateral duty

12  assignment.  They still have that title, but they're

13  not doing anything.

14      Q.    Now, under the AEP program that we've been

15  discussing, did HUD generate AEP reports for

16  sub-elements?

17      A.    Yes, they did.

18      Q.    And why did they do that?

19      A.    Sub-elements, my understanding from the

20  previous director, the AEP managers, that was their

21  role from 1997 to 2002 for those reports I forwarded

22  to you.  They did that to provide a cohesiveness of

23  reports to the director of accomplishments from

24  those field officers or those component officers.

75

1     Q.    Were these reports from sub-elements or

2     reports on sub-elements sent to the EEOC?

3     A.    No, they were not sent to the EEOC.  It was

4     not required.

5     Q.    Was the Department-wide AEP Report sent to

6     the EEOC?

7     A.    Yes, sir.

8          MR. MANTELL:  Could I have this marked,

9     please.

10         MR. GRADY:  Are there any other AEP Reports

11    besides the one we noted earlier that are not

12    authenticated by agreement?

13         MR. MANTELL:  No.  That's the only one that

14    I wanted to pursue.

15         MR. GRADY:  Okay.

16              (Document marked as Gaiter

17              Exhibit 9 for identification)

18    Q.    Do you recognize this document?

19    A.    Yes.  This is one of the AEP Reports you

20    requested that I had sent along with numerous

21    others.

22    Q.    To your knowledge were the AEP Reports

23    relating to the sub-elements communicated to

24    managers and supervisors?

76

1      A.    I can't answer that; I'm not sure.  I do
2    know that those reports were submitted to the
3    Affirmative Employment Division which was directed
4    at that time by Thelma Cockreel, and she in turn
5    prepared one report by including those reports in
6    that one report.
7      Q.    Now, going to Page 2577 --
8      A.    Okay.
9      Q.    This is a Summary of Hiring and Numerical
10   Objectives by PATCOB.  It has the numerical
11   objectives and what has been accomplished.  Do you
12   agree with that characterization?
13     A.    Before I agree with that, could you repeat
14   that again.
15     Q.    Sure.  So for example, where it says
16   "Professional," it says "Planned, Total 9," so that
17   represents the nine; the four White females, the one
18   Black female the one Hispanic female, the one Asian
19   female and the one American Indian Alaskan Native
20   goal?
21     A.    I see that.
22     Q.    Then it says, "Actual, 6."  So it has the
23   goals and it has what actually happened?
24     A.    Yeah, okay.

77

1    Q.    Is that correct?

2    A.    How are you defining "goal"?  When you say

3    "goals," you mean in what -- this is something that

4    was actually planned for setup in the AEP Report,

5    numerical objectives.

6    Q.    Yes, the numerical objectives.

7    A.    Those objectives were to obtain nine, and

8    she actually got in six I guess, according to her

9    document here.

10   Q.    You would agree that's the proper

11   interpretation of this chart; correct?

12   A.    In term of goals, I don't know if I can,

13   because I don't know if that's what this was.  If

14   she's saying in terms of accomplishments, she's just

15   reporting accomplishments on hiring, summary of

16   hiring.

17   Q.    Well, with regard to the goals, the

18   "Numerical Objectives" on this page, do you know how

19   those were developed?

20   A.    I do not.

21   Q.    Okay.  Do you know how the numerical goals

22   for any of the AEP Reports relating to sub-elements

23   were generated?

24        MR. GRADY:  Other than what's explained in

78

1    the reports themselves, or just does he personally

2    know?

3              MR. MANTELL:  Does he know?

4         A.    All I can tell you is just based on what I

5    can see here.  I don't know how the person actually

6    developed all of them.

7         Q.    And again, was there any period of time in

8    which there was an expectation that these numerical

9    objectives would be accomplished?

10        A.    You said were there ever any expectation --

11        Q.    Was there a period of time in which there

12   was an expectation that these numerical goals would

13   be accomplished?

14        A.    To the best of my knowledge there was no

15   specific time.  These plans -- I think I indicated

16   earlier they are monitored each year, and

17   subsequently the year after there was no mandate

18   that these goals need to be set for hiring or

19   whatnot.

20        Q.    Are you aware of the FEORP plan?

21        A.    I'm aware of it.

22        Q.    What is that?

23        A.    That's the Federal Equal Opportunity

24   Recruitment Plan.

79

1      Q.    And what does that plan entail?

2      A.    That plan entails -- it's a requirement

3   that OPM requires the federal agencies to do.

4            MR. GRADY:   Objection to form with respect

5   to pre or post 715.  Go ahead and answer.

6      A.    Let me just say this:  From 1997 to 2002

7   the Office of Equal Opportunity was responsible for

8   preparing this report.  Since implementation of

9   MD-715 2003, this report is prepared by the Office

10  of Human Resources.  This report itself -- you asked

11  what is this report.  It's a breakdown of the work

12  force demographics, particularly women and

13  minorities, that is required by OPM for submission

14  each year.

15     Q.    Now, you say that the FEORP Reports are

16  generated by HUD after 2003?

17     A.    I have no recollection or knowledge that it

18  has been done.  All I can tell you is that the

19  office of EEO no longer does the reports and has not

20  done the reports since up to 2002.

21     Q.    So up to 2002 HUD did generate FEORP

22  Reports; correct?

23     A.    That's correct.

24     Q.    And did those reports contain numerical

80

1    hiring goals?

2        A.    I think according to the report maybe

3    similar language was used in the AEP Report and was

4    provided in that report.

5        Q.    Did the FEORP plan suggest strategies for

6    increasing the hiring or promotion of EEO groups

7    within HUD?

8        A.    I think that that report did entail some

9    strategies as did the AEP Report in it, yes.

10       Q.    What strategies did HUD suggest through the

11   FEORP Program?

12       A.    I think some of the same similar strategies

13   as I mentioned earlier:  ensuring that jobs are

14   posted on USAJobs; ensuring that proactive

15   preventions are done, such as prevention of sexual

16   harassment and making sure you provide reasonable

17   accommodations, those kind of things; ensuring that

18   outreach groups, Native Americans and Hispanic

19   institutions and Black institutions are aware of

20   opportunities in that formal sense as well as

21   disability groups.  Those are some of the strategies

22   that I'm with aware of.

23       Q.    Are you aware of any other strategies?

24       A.    No, I'm not.

81

1       Q.    Okay.  Are you aware of any studies or

2   analyses that were performed to determine whether

3   the FEORP plan complied with constitutional

4   standards?

5       A.    I'm not aware of any standards.

6           MR. GRADY:  Objection.  With respect to

7   materials that have been identified in the Privilege

8   Log that are presently the subject of the Motion to

9   Compel and response that will be ruled on, in the

10  context of that, that objection is just stated for

11  the record to the question.

12      Q.    To your knowledge, were there any studies

13  or analyses performed to determine whether the AEP

14  program as it existed from 1997 to 2000 complied

15  with constitutional standards?

16      A.    Again --

17          MR. GRADY:  Hang on, there's an objection.

18  With respect to materials that have been identified

19  in the Privilege Log in response to document

20  requests that are presently under the subject of a

21  Motion To Compel, there's an objection.  Otherwise,

22  you can go ahead.

23      A.    I am not aware of any studies in the past.

24      Q.    Okay.  Are you aware of any other

82

1    strategies or tactics used at HUD to increase the

2    hiring of EEO groups that you have not testified to

3    so far today?

4        A.    I'm not aware of any.

5        Q.    What is the Special Emphasis Program?

6        A.    That is a program that is designed to

7    promote the awareness and appreciation of a diverse

8    work force as well as to educate the work force on

9    the contributions that others bring to the

10   workplace.

11       Q.    Do these programs contribute to the hiring

12   or promotion of certain EEO groups?

13       A.    These groups are only observance and

14   awareness type programs.  They have no correlation

15   to any hiring or recruitment.  They provide only

16   information on their work force particular groups.

17   You have Special Emphasis Committees; you have

18   Blacks In Government; you have Hispanic Employment

19   groups; you have the Asian Pacific Islander Special

20   Emphasis Committees.  They address issues and

21   concerns with respect to their heritage and culture.

22            To my knowledge, to the best of my

23   knowledge they have no direct hiring authority, nor

24   do they go and suggest any hiring of anyone.

83

1    Q.    They don't influence the hiring and
2    promotion of employees of HUD?
3    A.    No, they don't have that influence.  They
4    only provide feedback and guidance on those
5    particular groups.  That is to my knowledge.
6    Q.    Now, you mentioned Blacks In Government.
7    What is that?
8    A.    That is a nationally recognized -- this is
9    just my language of it.  I don't have the definition
10   of it.  They are groups, volunteers, and they have
11   chapters throughout the nation that basically
12   promote awareness, cultural education to the work
13   force on the history of Blacks throughout the
14   country.  This is just my way -- the best way I can
15   articulate.  They educate the work force.  They
16   sponsor Special Emphasis Committees.  They sponsor
17   programs such as Martin Luther King National Holiday
18   each year at our particular agency, at HUD, and they
19   basically educate the work force on Blacks in the
20   Federal Government.
21   Q.    Would it be your understanding that Blacks
22   In Government is a private, non-profit group?
23   A.    I don't know, to be honest with you.  I am
24   not even a member.

84

1       MR. GRADY:  Why wouldn't you be a member?
2       A.    It's not that I wouldn't be a member.  It's
3  just that I haven't had that involvement.  I don't
4  know exactly whether they are private or whatnot.  I
5  do know they're nationally recognized within the
6  Federal Government.
7       Q.    Would it be fair to say that the Blacks In
8  Government Program is set up to assist and advocate
9  for increased numbers of Blacks in Federal
10 Governmental positions?
11      MR. GRADY:  Objection to form.  Go ahead.
12      A.    I don't think they advocate in that sense.
13 I think for positions, no.  I think they more so
14 advocate for understanding and knowledge of heritage
15 groups.  That information is provided on Blacks
16 throughout Federal Government, but I don't think
17 they advocate any particular hire.  That's just my
18 opinion.  I don't think they do that.
19      Q.    Now, you went to one of the these
20 conventions, right, for Blacks In Government?
21      A.    I have, yes.
22      Q.    Do they have yearly conventions?
23      A.    They do.
24      Q.    Now, does HUD provide administrative leave

85

1   and reimbursement of costs for people who go to

2   these conventions?

3        A.    Yes, if I went on travel, yes.

4              MR. MANTELL:  Mark this Exhibit No. 10.

5                    (Document marked as Gaiter

6                    Exhibit 10 for identification)

7        Q.    Now, do you recognize the form of Exhibit

8   10?

9        A.    Yes, I do.

10       Q.    What is the form?

11       A.    This is a travel -- a Request for

12  Authorization for Training.  This is required for

13  attending the training as well as for authorization

14  for travel to the training.

15       Q.    Now, under 16 on this form there is an

16  expectation that you write down what benefits are to

17  be derived by the training?

18       A.    Number 16?

19       Q.    Yes.

20       A.    Okay.  What are you asking of me?

21       Q.    I'm asking, have you filled out these forms

22  in the past?

23       A.    Yes, I have.

24       Q.    Is there an expectation that in order to

86

1    justify the expense, you're supposed to put in what

2    benefit it would be to the Government when you go to

3    this training?

4        A.    Yes.    Normally you indicate in a brief

5    sentence here, in 16, your objectives, what your

6    personal objectives would be.

7        Q.    And in this case, Ms. Nickens has said,

8    "BIG training is designed to promote the advancement

9    and enhancement of Africans' careers in Federal

10   Government."  Do you see that?

11       A.    Yes.

12       Q.    Do you agree with her characterization

13   of --

14       A.    This is her own personal -- I could agree

15   with her if this is her personal goal or this is her

16   personal reason for justifying this.  It's also to

17   promote awareness, also to have career workshops.

18   They have numerous activities to enhance and to

19   prepare an individual development plan.  There are

20   several correlations to this particular statement

21   that she made.  I can agree if she says, "This is

22   why and what I believe this would do for me."

23       Q.    My question is a little different.  My

24   question is do you believe that BIG training is

1   designed to promote the advancement and enhancement
2   of African Americans' careers in Federal Government?
3       A.   I don't believe it in that sense of the
4   word.   I believe it is designed to increase
5   understanding as well as help you meet some of your
6   educational developments and educational development
7   toward reaching maybe perhaps an opportunity.
8       Q.   What is taught in these career workshops?
9       A.   A lot of things.   Basically --
10          MR. GRADY:   Objection.   With respect to the
11   one occasion where you attended one or that you know
12   otherwise.
13      A.   Yes.   Only the one that I attended that I
14   can speak for.
15      Q.   Sure.
16      A.   I went to a writing workshop.   It's
17   educational because Blacks In Government does not
18   have the authority to hire or promote.   Blacks In
19   Government in my opinion is designed to help you in
20   preparing yourself for opportunities.
21      Q.   And how does it do that?
22      A.   By establishing -- by having seminars,
23   workshops, doing the conferences.   The conference I
24   attended was a workshop, and they have workshops on

88

 1    communication skills, workshops on writing skills.
 2    Those are some of the things that help you in future
 3    endeavors.
 4         Q.    How to write a resume?
 5         A.    How to write a resume.
 6         Q.    How to write an application?
 7         A.    How to prepare an application.
 8         Q.    You referred to a development plan?
 9         A.    Yeah, development plan means setting
10    yourself up at the career path.  Where you are here
11    at the GS-5 level, where you want to be at the
12    GS-11; what do you have to do to get to that level.
13    You may want to take some college courses if you
14    don't have a degree.  It's merely an informational
15    workshop, in my opinion, for this particular person.
16    This could have been for her, what she sees it as,
17    so I cannot argue with that.
18         Q.    Now, to your knowledge was everyone who
19    attended this conference African American?
20         A.    No.  They were White Americans, Hispanic.
21    This is not opened up to just Blacks.  It's opened
22    up to all the federal employees, this membership.
23    It just more focuses on some of the concerns of
24    African Americans in the Federal Government.

89

1      Q.    Do these Affirmative Action Plans and these

2    numerical objectives get discussed at this

3    conference?

4            MR. GRADY:  Objection to form.  Go ahead

5    and answer.

6      A.    No.

7      Q.    To your knowledge did other individuals

8    from HUD attend this conference?

9      A.    I attended once, and I would say yes, there

10   were a few that attended.

11     Q.    That you knew of that were from HUD?

12     A.    That I knew of but don't know personally.

13     Q.    Did you know of anyone from HUD who

14   attended this conference who was anything other than

15   African American?

16     A.    I can't recall because it was 2000 I

17   believe -- no, 2002, the first year I came, 2002.  I

18   can't recall.

19            MR. MANTELL:  Mark that as Exhibit 11.

20                  (Document marked as Gaiter

21                  Exhibit 11 for identification)

22     Q.    Would you review Exhibit 11, please.

23     A.    Okay.

24     Q.    Do you recognize this document?

90

1       A.    Yes, I do.

2       Q.    What is this document?

3       A.    This is my training document that I put in

4   to go to the national training conference, Blacks In

5   Government conference, yes.

6       Q.    Now, going to Box 12 where it says

7   "GS-0260-122," do you see where it says that?

8       A.    Yes.

9       Q.    I thought you said you were a Grade 13?

10      A.    Yes, I went to HUD on a 12/13 to grow

11  position.  It was a 12/13 position when I went to

12  HUD.  I am now a GS-13, and I was promoted to a

13  GS-13 in 2002.

14      Q.    Okay.  Did you attend this conference while

15  you were an employee of HUD or before?

16      A.    Yes, I did.

17            MR. GRADY:  Objection.  It's beyond the

18  scope of this deposition, but go ahead and answer.

19      A.    Yes, I did.

20      Q.    I guess I don't understand why it lists you

21  as a Grade 12.

22            MR. GRADY:  Objection.  Beyond the scope of

23  the deposition.  Go ahead and answer.

24      A.    Like I said, sir, when I was hired at HUD I

1    was hired as a GS-12/13 with no competition for

2    promotion because that's what I applied for.  So at

3    that time I was a GS-12.  That was in February.

4        Q.    And when you became a Grade 13, was that a

5    competitive promotion?

6            MR. GRADY:  Objection.  Beyond the scope of

7    this deposition.  You can go ahead and answer.

8        A.    I was in an -- in August the way the

9    position was advertised, it was advertised as a

10   GS-12/13 position.

11       Q.    When did you become a GS-13?

12       A.    I became a GS-13 in August of 2002.

13       Q.    When did you first become employed at HUD?

14       A.    I became employed at HUD in February 2002,

15   actually February 25.

16       Q.    Now, this was a four-day conference?

17       A.    Yes, sir, four days and travel on the fifth

18   day.

19       Q.    Well, this has expenses for eight days.

20       A.    Let me see.  I traveled I believe on the

21   weekend.

22           MR. GRADY:  Counsel, you're getting very

23   fair afield of the Rule 30(b)(6) deposition at this

24   point, to the point where I think objections

92

1    directing the witness not to answer on those grounds

2    would be appropriate.  Just to apprise you of that,

3    you're getting very far afield of the Rule 30(b)(6)

4    deposition.

5        A.    Do you need me to answer that?

6              MR. GRADY:  Go ahead and answer.

7        A.    Sir, the conference was in Atlanta, and I

8    believe I may have left on Friday or Saturday or

9    Sunday or something to that effect.  There are

10   travel dates involved when you go on travel.  The

11   travel actually was scheduled for -- the training

12   itself was from Monday through Friday, so Friday was

13   the conclusion of the program.  I probably left on

14   Sunday, and I can't recall here, but there's a

15   justifiable reason why it may be eight days.

16       Q.    Okay.  It's my understanding that you're

17   supposed -- you drove to this conference; correct?

18       A.    Let's see here if that's the case.  I

19   probably did.  I'm trying to remember back then.

20   Yes, I did drive.

21       Q.    Okay.  Isn't there some kind of rule that

22   you have to fly if it's quicker if you're getting

23   per diem reimbursement?

24       A.    I think it was --

93

1          MR. GRADY:  Objection.  Outside the scope

2  of this deposition.  Go ahead and answer.

3      A.   I think it was actually calculated less

4  than for me to fly because I took my own private

5  vehicle, so I don't have any of these statistics

6  here in front of me, but it was actually less.

7      Q.   And were you reimbursed for food?

8      A.   That's a part of the per diem that is

9  required.

10          MR. GRADY:  Objection.  Outside of the

11  scope.  Go ahead and answer.

12      Q.   What else were you reimbursed for?

13          MR. GRADY:  Objection.  Outside the scope.

14  Go ahead and answer.

15      A.   I'm also reimbursed for mileage, lodging,

16  if there's tolls or anything else involved, parking.

17  Those are the kind of things I'm reimbursed for.

18      Q.   And were you paid for the days that you

19  attended the convention?

20          MR. GRADY:  Objection.  Outside the scope.

21  Go ahead and answer.

22      A.   All federal employees on days they travel

23  are paid salary, what they make.  It's official

24  duty.

94

1      Q.    What is the Emerging Leaders Program?

2      A.    That's a program -- I'm not that familiar

3   with the content of it, but yes, I became part of it

4   this past year.

5      Q.    What is it?

6      A.    It's designed to enhance the skills of

7   up-and-coming potential leaders in the Federal

8   Government and focus on leadership training.

9      Q.    How does it do that?

10      A.    They have annually -- it's a year program.

11   You take various leadership training courses.  You

12   participate in a project action learning team that's

13   a group of your peers, five or six of your peers.

14   You work on a project, a meaningful project to try

15   to benefit your agency in a sense, and it also

16   requires OJT, on-the-job training.  You may go to a

17   particular office other than your office and learn

18   more about that agency.

19          The whole purpose of the Emerging Leaders

20   Program is to enhance your skills and your

21   leadership skills for paving the way for future

22   leadership positions.

23      Q.    Now, was the Emerging Leaders Program used

24   in any way to improve diversity at HUD?

95

1      A.    In a sense just speaking, it helps if you
2  have a diverse group involved in the leadership
3  program, but I think the program is designed to pick
4  the best candidates that applies for it.
5      Q.    Do members of certain EEO groups have an
6  advantage or preference in getting into the Emerging
7  Leaders Program?
8      A.    No, they do not.
9      Q.    Can you describe to me the Hispanic
10 Employment Plan?
11     A.    I'm not familiar with the Hispanic
12 Employment Plan.  I'm familiar with the FEORP plan
13 but not the Hispanic Employment Plan.
14     Q.    Are you aware of the Corrective Action
15 Plan?
16     A.    No, I'm not aware of the Corrective Action
17 Plan.
18     Q.    What about a Diversity Recruitment Plan?
19     A.    I'm not familiar with that either.
20     Q.    Who selects the people who get into the
21 Emerging Leaders Program?
22     A.    That is the responsibility of the Office of
23 Human Resources, not the EEO Office.
24     Q.    Do you know the individuals who were

96

1   responsible?

2       A.    I don't know a particular person's name,

3   but this is run through the Office of Human

4   Resources, this program.

5           MR. GRADY:  I'm sure I can find that out

6   for you.  So the question, you just want to know who

7   specifically picks the people?

8           MR. MANTELL:  Who picks them.

9           MR. GRADY:  People who get into the

10  Emerging Leadership Program.  That's fine.  I will

11  get that information to you.

12      Q.    Now, you say that there was a file cabinet

13  full of AEP documents that you took all those AEP

14  Reports and reports on sub-elements out of?

15      A.    Yes, sir.

16      Q.    Is there a policy or practice of retaining

17  AEP documents at HUD?

18      A.    I don't know of one physically, but most of

19  them are maintained for at least five years or so.

20  I just think that they're just normal correspondence

21  that they need to be maintained, hard copies on

22  file.

23      Q.    So it's HUD's practice to retain all these

24  sub-elements?

1      A.    It's good business practice, not only you

2   should in cases such as this to provide --

3      Q.    But my question is, is it HUD's practice to

4   retain the AEP Department-wide documents and the AEP

5   sub-element reports?

6      A.    Yes.

7      Q.    Is there any reason why an AEP Report might

8   be thrown out?

9      A.    No, there is no reason whatsoever.

10      Q.    Now, you stated that you were involved in

11   the MD-715 Program.

12      A.    That is correct.

13      Q.    Can you describe the program for me.

14      A.    Actually it supersedes MD-714.  It's no

15   longer called Affirmative Employment.  It's called

16   Affirmative Programs of EEO.  MD-715 replaced

17   MD-714.  What it entails, it's a data compilation of

18   the work force, focuses on nine major categories,

19   and that is for supervisors and managers --

20   supervisors and managers focus on the occupation,

21   major occupations within the Department.  Some

22   categories we do not have, such as salespeople or

23   laborers.  So it focuses mainly on people with

24   disabilities that work, for demographics, and the

98

1    total work force of non-disabled people.

2           MR. MANTELL:  Actually, let's take a short

3    break?

4           (Off the record)

5       Q.    In the MD-715 Program does HUD continue to

6    do analysis of various EEO groups to see if there's

7    underrepresentation?

8       A.    No.

9       Q.    What do you do when working on the MD-715

10   Program?

11      A.    I basically do analysis of the entire work

12   force and provide that data analysis to the EEOC

13   through the proper chain of command.

14      Q.    And what analysis of the work force do you

15   do?

16      A.    Those nine categories I indicated, focus on

17   those nine categories, basically the report, the

18   Management Directive 715 report, including all HUD

19   employees.  There's no particular group singled out

20   for the representation of any kind.  It's just

21   merely data compilation explaining how each group --

22   which include White males, everyone -- compares to

23   the civilian labor force.

24      Q.    I see.  So the work force representation of

99

1   various EEO groups are compared to the civil labor
2   force statistics; is that correct?
3       A.    That's correct.
4       Q.    But now there's no indication as to whether
5   any EEO group is underrepresented?
6       A.    That is correct.
7       Q.    Now, in this program, is it part of the
8   program to identify potential barriers to employment
9   for various EEO groups?
10      A.    It doesn't call it barriers anymore.
11      Q.    What are they called?
12      A.    It's called state agencies I think -- it's
13  something like state of the agency condition or
14  something to that effect.  I'm not exactly sure of
15  the exact language.
16           MR. MANTELL:  Okay.  Exhibit No. 12,
17  please.
18                  (Document marked as Gaiter
19                   Exhibit 12 for identification)
20      A.    It may include -- for barriers it may
21  indicate something to that effect, conditions of
22  some kind.
23      Q.    Can you go to page -- well, do you
24  recognize that document?

100

1      A.    Yes, I do.

2      Q.    What is that document?

3      A.    This is the document submitted to the EEOC,

4    this is the MD-715 Report.

5      Q.    And this is a report that you worked on?

6      A.    Yeah, this is a report I worked on.

7      Q.    So going to Page 4630 --

8      A.    Okay.

9      Q.    -- it talks about a statement of condition

10   that was a trigger for a potential barrier.

11     A.    Yeah, that's what I had mentioned earlier,

12   statement of condition of some kind.

13     Q.    Is it fair to say that under the 715

14   Program you analyze the work force to determine

15   whether there are barriers to the employment of

16   certain EEO groups?

17     A.    No.  EEOC and MD-715 in this manual wants

18   us to just look at the totality of all of HUD's work

19   force.  In terms of the EEO groups, that would

20   include White males, so if you want to look at it in

21   that sense just as a whole, this is the condition of

22   our agency, et cetera, et cetera.

23     Q.    Right, but what is it referring to here

24   when it says "barrier"?  Barrier to what?

101

1     A.    It could be anything.  In this case you're

2  looking at our tracking system.  We don't have the

3  best EEO tracking system, so on this particular

4  page, the example that I indicated here, the

5  tracking system happened to be the barrier,

6  collection of applicant flow data.  That's one of

7  our barriers.  We don't have a good EEO tracking

8  system.  A barrier could be anything, not

9  necessarily race-based.

10     Q.    So for example, if HUD employed no female

11  Hispanics, would you identify that and look for a

12  potential barrier to the hiring of female Hispanics?

13     A.    I think it's something that could be

14  noteworthy and mentioned, but according to MD-714,

15  in the past, that would be a major highlight.

16  MD-715 focuses on groups.  All I do is do a data

17  compilation on the work force.

18     Q.    Who decides whether something is a

19  potential barrier or not?

20     A.    That's something that I think the agency

21  head would probably look at as a whole, just in my

22  opinion.  I think this report that I have here that

23  eventually goes to EEOC and to Congress and to the

24  President, I think it would probably start at the

1    top to identify these issues.  Because according to

2    the MD-715, we do just basically a data compilation,

3    and we try to address everything in accordance with

4    MD-715, which does not focus on any particular

5    group.

6          MR. MANTELL:  All right.  Well, let me just

7    take a short break.

8              (Document marked as Gaiter

9              Exhibit 13 for identification)

10       Q.   Could you review Exhibit 13, please.

11       A.   Okay.

12       Q.   Do you recognize this document?

13       A.   Yes, I do, sir.

14       Q.   What is it?

15       A.   It's the implementation for the MD-715

16    issued by EEOC.

17       Q.   What do you mean "the implementation"?

18       A.   This means -- in other words, this is what

19    they expect federal agencies to base their MD-715

20    Plan on.  It superseded 714.  This is some of the

21    things that they expect.

22       Q.   Let me just back up.  It says on the first

23    page "Management Directive 715"?

24       A.   That's correct.

103

1      Q.    So this is MD-715?

2      A.    That is correct, sir.

3      Q.    Now, on the bottom it has Pages 1 of 21.

4   Go to Page 7 of 21.

5      A.    The number is cut off, so I'll count.  Yes,

6   this is it, sir.

7      Q.    It says "Agency Self-Assessment"?

8      A.    Yes.

9      Q.    And it talks about agencies generating work

10  force statistics involving EEO groups and comparing

11  them to the relevant civilian labor force; is that

12  correct?

13     A.    Yeah, that is correct, sir.

14     Q.    And that's what your job is; correct?

15     A.    That is correct.

16     Q.    And if you could turn the page where it

17  says "Barriers to Equal Employment Opportunity," it

18  says, "Where an agency self-assessment indicates

19  that a ratio of national or gender group may have

20  been denied equal access to employment

21  opportunities, the agency must take steps to

22  identify the potential barrier."  Do you see where

23  it says that?

24     A.    Yes, sir.

104

1    Q.    Does that refresh your recollection as to
2    whether HUD can identify potential barriers where it
3    finds underrepresentation of a specific EEO group?
4    A.    The agency does not focus on
5    underrepresentation.  With this new implementation,
6    this MD-715, no self-assessment of the work force
7    demographics has taken place to even raise a flag to
8    maybe even look in that area.  By no means does
9    MD-715 state that you must do underrepresentation
10   analysis, but it does say you to have to bear in
11   mind as you read here, must take some measures to
12   identify potential barriers, whatever they may be.
13   Q.    And an analysis indicating that a certain
14   EEO group is underrepresented may flag an area in
15   which there is a potential barrier; correct?
16   A.    But they do not reflect that language in
17   MD-715 of a potential EEO group because it no longer
18   refers to a particular group or individual.  It's
19   considered all federal employees.  So the analysis
20   would reflect whether it's White, Black -- I guess
21   you're referring to White, Black, everybody else?
22   Q.    Yes.
23   A.    That is -- I understand where you're coming
24   from, but MD-715 doesn't refer to it in that sense.

105

1    But yes, if you did a self-assessment, which the
2    agency had that opportunity to do, the agency
3    identified barriers such as EEO tracking system,
4    which I indicated on that page here that you
5    referred me to.
6        Q.    Perhaps it doesn't refer to EEO groups but
7    it does refer to race, national origin and gender;
8    correct?
9        A.    Yes, that's correct.
10       Q.    And MD-715 indicates that where a
11   self-assessment indicates that a racial, national or
12   gender group has been denied equal access to
13   employment opportunities, the agency must take steps
14   to identify the potential barrier?
15       A.    I would agree with that statement.
16       Q.    And the self-assessment that they're
17   referring to is the assessment described in Section
18   2 above which talks about the work force analysis
19   that you engage in; correct?
20       A.    The work force analysis that I was engaged
21   in only compared it to the civilian labor force, and
22   that was the extent of the analysis.
23       Q.    Right, and that's the analysis.  So where
24   that analysis indicates potential denial of equal

106

1   access to employment opportunities, the agency
2   should identify a potential barrier?
3       A.   No, no, not based on the analysis that I'd
4   done.  It's the analysis based on those nine
5   categories I indicated earlier.
6       Q.   What are the nine categories?
7       A.   Again, it focuses on -- It's A through 14,
8   those categories.  Just so I have them read to
9   you --
10      Q.   Sure.
11      A.   -- "A1:  Total Work Force, Distribution By
12  Race, Ethnicity and Sex."  I'm referring to 4603.
13  "A2:  Total Work Force By Component, Distribution By
14  Race and Ethnicity," and "A3-1:  Occupational
15  Categories," and "A4-1:  Participation Rate for
16  General Schedules, GS Grade," and "A5-1:
17  Participation Rate for Wage Grade," and "A6:
18  Participant Wage for Major Occupations," "A7:
19  Applicant and Hires for Major Occupations," and "A8:
20  New Hires by Type of Appointment," and "A9:
21  Selection for Internal Competitive Promotions for
22  Major Occupations," and "A10:  Non-Competitive
23  Promotions," and "A11:  Internal Selections for
24  Senior Level Positions," "A12:  Participation in

107

 1    Career Development," and "A13:  Employee Recognition
 2    and Awards," and "A14:  Separations."  All I had to
 3    basically do is do a data compilation of those
 4    statistics.

 5         Q.    And that's the self-assessment MD-715?

 6         A.    The self-assessment is something that the
 7    agency has not done in MD-715.  So that's all -- but
 8    I was just sharing with you just a second ago what I
 9    actually did.

10         Q.    Well, it says under Paragraph 2, "Agency
11    Self-Assessment," it says, "A first step in
12    conducting a self-assessment involves looking at the
13    racial, national origin and gender profile of
14    relevant occupational categories in the agency's
15    work force."

16         A.    Uh-hum.  And that is in -- so what I did
17    was -- I think that is the occupational category.

18         Q.    So you have done the first step in the
19    self-assessment; correct?

20         A.    First step for us in the MD-715 was doing
21    the analysis.  That analysis was an analysis of
22    those occupational groups that we identified.

23         Q.    Okay.

24         A.    Now, the next step in the future would be

1    to take it the next step further, as you indicated,

2    to see if there are any potential barriers to those

3    groups under those particular occupations.

4        Q.   But you're saying that after the first step

5    of the self-analysis, HUD has not engaged in any

6    subsequent step to determine whether there's

7    potential barriers?

8        A.   No, I can't say that.  After MD-715 was

9    implemented we basically had done a data compilation

10   of our data, and that's the extent of it.

11       Q.   That's the extent of the self-assessment?

12   There's been no more?

13       A.   When you say "self-assessment," are you

14   referring to just that particular occupational

15   group, the occupational category?  Because it's in

16   the report, all of the analysis that is required by

17   EEOC.  Going a step further --

18       Q.   Okay.  Well, HUD has taken the first step

19   in the self-assessment?

20       A.   I will say the first step according to the

21   MD-715 Report.

22       Q.   Okay.  Now go to the paragraph after the

23   next, it says, "The initial snapshot conducted by

24   the agency must include but is not necessarily

109

1  limited to an evaluation of the following data," and

2  then it lists various analyses.

3      A.    The total work force distribution by race,

4  national origin, that's included in the report.

5  That's A1, permanent and temporary work force

6  Participation rate for each grade level.  That's

7  also in the report.  So all of these particular

8  bullets, "Voluntary," "Involuntary," "Separations,"

9  is all included in the report.  This is the initial

10  step that we have taken, what's in this.

11      Q.    Okay.  So HUD has done those analyses?

12      A.    Yes, we have.

13      Q.    Then under that it says, "In conducting its

14  self-assessment agencies shall compare their

15  internal participation rates with corresponding

16  participation rates in the relevant civilian labor

17  force."  Has HUD done that?

18      A.    Yes.

19      Q.    Okay.  Has HUD done anything else in order

20  to assess whether a racial, national origin or

21  gender group has been denied equal access to

22  employment opportunities other than engaging in

23  these analyses?

24      A.    No, not to my knowledge.

110

1        Q.    Do you know how much of a disparity between

2    work force composition and civilian labor force

3    composition is necessary for HUD to establish that

4    there is a potential barrier to equal opportunity?

5        A.    Could you repeat that, sir.

6        Q.    Do you know how substantial the difference

7    between HUD work force of an EEO category or race

8    category and the relevant civilian labor force has

9    to differ in order for HUD to investigate whether

10   there is a potential barrier to equal employment?

11       A.    According to MD-715 there's no guidance on

12   that.   Previously in MD-714 we looked at manifest

13   imbalances or conspicuous absences as a measurement

14   tool, but MD-715 does not direct federal agencies to

15   do that.

16       Q.    Does HUD have a directive or policy that

17   establishes a difference that would raise a flag

18   like that?

19       A.    No, not to my knowledge.

20       Q.    Now, did we mark the 2004 report?   You have

21   that?

22       MR. GRADY:   It's 12.

23       Q.    Okay.   Now, if you could go to Page 4661.

24       A.    Okay.

111

1      Q.   Do you see where it shows that White males

2   make up 25.1 percent of the HUD work force --

3      A.   4661?

4      Q.   4661.

5      A.   Okay.  Yes, I see it.

6      Q.   -- 25.1 percent of the HUD work force, as

7   compared to 39 percent of the relevant civilian

8   labor force?

9      A.   Yes, I see that.

10      Q.   Does that indicate to you a potential

11   barrier to opportunities for employment for White

12   males?

13      A.   Like I indicated, sir, I've been directed

14   on MD-715 not to focus on hiring recruitment or

15   underrepresentation of any kind like that.

16      Q.   I thought I just showed you the part where

17   it said that you are supposed to focus --

18           MR. GRADY:  We agree with you --

19      A.   But we haven't done that.

20      Q.   You haven't done that, but that's not what

21   the MD-715 has said.

22      A.   Well, I'm not --

23      Q.   The MD-715 -- and correct me if I'm

24   wrong -- the MD-715 said you do a work force

112

1   analysis and based on that analysis if there's some

2   disparity there, you identify potential barriers to

3   equal opportunity.  That's what it said.  Agreed?

4           MR. GRADY:  Objection to form.  You can go

5   ahead and answer.

6       A.   I'm not sure what I'm agreeing to.  I'm

7   following EEO enforcement guidelines.  I read

8   through it also.  It indicates that agencies must do

9   self-assessment, which we haven't gotten to that

10  point yet.  This is not enough information to even

11  go there to address that in the sense that you are

12  asking.  We do not focus on underrepresentation at

13  this point.

14      Q.   Okay.  Well, if you could go to Page

15  4665 --

16      A.   Okay.

17      Q.   Do you see where it says in the category of

18  "Officials and Managers" it says that there are 49

19  White males.  Do you see where it says that?

20      A.   Yes, I see that, sir.

21      Q.   Now I'm going to ask you to review the 2005

22  report.

23          MR. MANTELL:  I'd like this marked, please.

24

113

1              (Document marked as Gaiter

2              Exhibit 14 for identification)

3       Q.    Do you recognize this document?

4       A.    Yes, I do, sir.

5       Q.    What is Exhibit 14?

6       A.    This is the MD-715 for 2005.

7       Q.    Can you go to Page 6199.

8       A.    6199, okay, I'm there.

9       Q.    Do you see in the same category it says for

10   "Executives 15 and above," "307 White males"?

11      A.    Yes, I see that.

12      Q.    Can you tell me how approximately 250 White

13   males were added to HUD in one year?

14      A.    I'm not -- I'm not sure how that data was

15   tabulated because of the EEO tracking system.

16   Again, this information is provided through our

17   contractor's EEO tracking system and so is the

18   previous one.  It is my understanding maybe possibly

19   during the implementation of getting our tracking

20   system on track it may have included other

21   categories that may not necessarily be just 15.  It

22   could be political appointees.  It could be

23   anything.  I'm not exactly sure how that data became

24   so screwed there.

114

1         MR. GRADY:   You may want to use a different
2    word.

3         Q.   You meant skewed I think.

4         A.   That's what I mean, skewed.  But I can just
5    tell you that it's a possibility because our EEO
6    tracking system -- as I indicated, this is not data
7    that I sit down and tabulate.

8         Q.   Now, who's the contractor that's in charge
9    of this data?

10        A.   Previous contractors that we had was --
11   previous contractor was Tech Solutions.  They are no
12   longer with us.  They were responsible for obtaining
13   this data from the National Finance Center to us.

14        Q.   But you would disbelieve that HUD added
15   approximately 250 White males in Category 15 and
16   above in one year; correct?

17        A.   Yes, I would disbelieve that.

18        Q.   Were you instructed by any HUD official not
19   to do an analysis of underrepresentation?

20        A.   I was actually following the MD-715
21   enforcement guides.  I'm not -- I was not provided
22   any instruction not to do that.

23        Q.   Okay.  And you believe that it would be the
24   head of the agency that would determine what is a

115

1    potential barrier and what is not?

2        A.    No.   I would think that based on my

3    understanding, EEOC is still working on this issue

4    to address to federal agencies.   It wouldn't be my

5    agency head.   This would be guidance that comes from

6    EEOC.

7        Q.    The issue of what constitutes a potential

8    barrier and what does not, that's a live issue right

9    now?

10       A.    It is a live issue.

11       Q.    Okay.   Whose job is it to determine whether

12   -- within HUD, whose job is it to determine whether

13   there is a potential barrier?

14       A.    I think that upon self-assessments, taking

15   the lead on the issue would be the lead officer of

16   equal opportunity providing guidance from the EEOC

17   on behalf of the agency.

18       Q.    And who within the Office of Department of

19   Equal Opportunity would have the job of identifying

20   potential barriers?

21       A.    That would be the Affirmative Employment

22   Division in which I work.

23       Q.    Would that be your job?

24       A.    That would be the job of the director of

116

1    the Affirmative Employment Division.

2        Q.    Who is that?

3        A.    She's a new person, just came on staff,

4    Roslyn Brown.

5        Q.    So you believe it's Roslyn Brown's job to

6    identify potential barriers to equal opportunity

7    under MD-715 for HUD?

8        A.    I think it would be my understanding she

9    would take the lead on behalf of the EEO Office to

10   look at potential flags, pending guidance from EEOC.

11       Q.    Well, we already identified one potential

12   barrier.  Who came up with that?  Who identified

13   that as a potential barrier?

14       A.    I did, sir.

15       Q.    Okay.

16       A.    That was the issue in reference to the

17   tracking system, yeah.  We do not have a good system

18   in place for tracking information, and that is the

19   first direction toward ensuring that you have

20   adequate numbers to work with such as the 49 versus

21   the 307.

22       Q.    So it is your job to identify potential

23   barriers based on this information in the MD-715; is

24   that correct?

117

 1       A.    Yes, based on the new implementation of
 2   MD-715.

 3       Q.    Okay.

 4            MR. GRADY:   For clarity purposes, do you
 5   make the final report?  Or who makes the final
 6   report?

 7       A.    The final report is sent through a
 8   clearance process, and that clearance process
 9   consists of the Office of Human Resources, the
10   Office of General Counsel and Office of the
11   Secretary, and eventually the secretary signs off on
12   the report.

13            MR. MANTELL:   Mark that, please.

14                 (Document marked as Gaiter

15                 Exhibit 15 for identification)

16       Q.    Would you review Exhibit 15.  Let me just
17   state for the record I've taken the information from
18   the fiscal year 2005 MD-715 and made this chart,
19   which indicates the percentage of HUD -- the
20   composition of the HUD work force as compared to the
21   relevant civilian labor force.  So for example, in
22   the 201 job series, White males were represented at
23   34.67 percent of the civilian labor force, Black
24   males were represented at 220.54 percent of the

118

1    civilian labor force, Black females were represented

2    at 644.88 percent of the civilian labor force.  And

3    overall, White males were 63.49 percent of the

4    civilian labor force, Black males were 205.83 of the

5    civilian labor force, and Black females were

6    represented at 497.19 percent of the civilian labor

7    force.  Do you understand that chart?

8        A.    No, sir.

9        Q.    Okay.

10       A.    This is you say a sheet you made; correct?

11       Q.    That's right.  But if you go to the 715

12   report --

13       A.    The 2005 or 2004?

14       Q.    2005.

15       A.    Okay.

16       Q.    6196 -- I'm sorry, 6202.

17       A.    Is this an actual -- I don't have anything

18   here really clear.  I see 6201.  Is this 6202 where

19   it's -- you're looking at the gray area?

20       Q.    Yes.  So for example, do you see --

21            MR. GRADY:  You're not looking at the same

22   page we are.

23       A.    I'm not looking at the same page?  6202 you

24   said.

119

| 1 | MR. GRADY:  No.  That's 6202. |

1             MR. GRADY:  No.  That's 6202.

2        A.   On the other side here.

3        Q.   So do you see where it says for the 201

4    series, it says that 8.84 percent of the 201 series

5    are White males?

6        A.   I see it.

7        Q.   And the civilian labor force is 25.5

8    percent.  So White males are represented at 34.67

9    percent of their expected representation at HUD?

10            MR. GRADY:  If you wish to give him a

11   calculator, he can confirm it.  Otherwise, your data

12   speaks for itself.  There's little reason having him

13   do the calculation.

14       A.   I really don't --

15       Q.   You don't understand that 8.84 is about 34

16   percent of 25.5?

17       A.   I don't have my calculator.  You're saying

18   8.84 is 34 percent of 25?

19       Q.   Yes.

20       A.   I don't know that offhand.

21       Q.   Do you know what eight times three is?

22       A.   Oh, yeah, I know that.  Yes.  That's 24.

23       Q.   Eight is about one-third of 25; correct?

24       A.   Okay.  Put it that way, yeah.

120

1      Q.    I'm not trying to mislead you.  I went

2    through this thing and I calculated it.

3      A.    I understand that portion of your

4    calculation.

5      Q.    White males are 34 percent of --

6          MR. GRADY:  Counsel, this is something that

7    can be established by notice, if nothing else.  If

8    you're simply doing a mathematical calculation and

9    having him confirm it, either give him a calculator

10   or let the math -- these are mathematical

11   calculations -- stand for themselves.

12          MR. MANTELL:  I'm just showing him what the

13   calculation is.

14     Q.    I don't want you to go through here and

15   confirm that all these numbers are right.  I just

16   want you to understand what this number represents.

17     A.    Well, I understand the way you just

18   explained it.

19     Q.    Okay.  All right.  So going back to this

20   document, which is Exhibit 15, if that document is

21   accurate, and if White males are employed at less

22   than 64 percent of their expected composition and

23   Black males are represented at more than 200 percent

24   of expectations and Black females are represented at

121

1   almost 500 of their expected work force, doesn't

2   that raise to you the possibility that there are

3   potential barriers to the equal opportunities for

4   White males in the HUD work force?

5       A.   Like I said, sir, we haven't done a

6   self-assessment.  Our first step was to go the

7   analysis.  Obviously when you have statistics such

8   as this, it does raise some concerns, but the agency

9   is -- at this time I have not done a self-assessment

10  to the extent to look into that.

11      Q.   But it's your job to identify potential

12  barriers; correct?

13      A.   Potential barriers.  It's done through the

14  self-assessment, and this is a newly implemented

15  Management Directive, and the agency is working

16  toward those steps as indicated in the report.

17  There's an agency self-assessment checklist that

18  shows what we did.

19          Now, this requires a little more in-depth

20  look in the agency.  We haven't done that.  I'm not

21  saying that it's not my job.  It's just that we

22  haven't at this time.

23      Q.   If the numbers were switched around, say

24  for example if Hispanic females were represented at

122

1   64 percent of their expected levels and White males
2   were represented at 500 percent of their expected
3   levels, do you think that HUD would identify a
4   potential barrier to the equal employment of
5   Hispanic females?
6        MR. GRADY:  Objection to form.  "Expected
7   levels" makes a presumption about what's going on,
8   and these are levels set by the census data, so the
9   use of the term "expected" I'm objecting to.  You
10  can go ahead and answer.
11       A.   Like I said, sir, in the self-assessment
12  portion, regardless of what race it's looking at,
13  the significant lower percentage area, I think that
14  the agency would look at those concerns in
15  accordance with MD-715.
16       Q.   Now, you say that the standard for
17  establishing a potential barrier is a live issue;
18  correct?
19       A.   Yes.  There is guidance still pending from
20  the EEOC on how to address barriers.
21       Q.   When is that expected?
22       A.   I have no idea, sir.
23       Q.   How do you know that guidance from the EEOC
24  on this issue is expected?

123

```
 1        A.    Because I am a part of a committee that is
 2    with federal agencies that is raising this as a
 3    concern, how to address such issues as a barrier.
 4    Plus the previous directive does not allow us to
 5    focus on underrepresentation of those kind of sorts.
 6        Q.    When you say that 715 does not permit you
 7    to focus on underrepresentation, what do you mean?
 8        A.    What I mean is we cannot indicate that in
 9    the report.   We don't look at a race-based analysis
10    such as underrepresentation of any particular group.
11        Q.    How does --
12        A.    We do an assessment.
13        Q.    How does comparing the work force
14    composition to the civilian labor force render
15    anything other than an underrepresentation analysis?
16    That is an underrepresentation analysis.
17        A.    We don't use that language.   That's in the
18    MD-715.   Show me where it says that we must indicate
19    underrepresentation.
20        Q.    It doesn't.   It indicates that you compare
21    work force population with the relevant civilian
22    labor work force.
23        A.    That's what we do.
24        Q.    Why would you do that?
```

124

1        A.    Civilian labor force to show--

2        Q.    To show what?

3        A.    That in the future that's something to be

4    raised or to be looked at.  Now that's something

5    that EEOC hasn't fully articulated to federal

6    agencies on how to address.

7        Q.    I understand that it's something for the

8    future, but the only reason why you would compare

9    work force composition to the civilian labor force

10   is to determine whether there's an

11   overrepresentation or underrepresentation as

12   compared to the civilian labor force.  Am I correct?

13       A.    In a speaking sense, yes, but the EEOC has

14   not issued any guidance for federal agencies to do

15   that type of analysis.

16       Q.    Okay.  What group are you participating in

17   to seek further guidance from the EEOC?

18       A.    There's just volunteer agencies that attend

19   Brown Bag Lunches at EEOC to address their

20   particular concerns, such as the concern raised on

21   how to address a barrier analysis.

22       Q.    And has the EEOC responded that they are

23   going to provide guidance on this issue?

24       A.    There's no response in writing.  There's

125

1    only a response of doing some Brown Bag Lunches that

2    they are trying to address the issue.  That is a

3    concern --

4          MR. GRADY:  We're getting very close to

5    deliberations with regard to policy that are

6    privileged.  Nothing here is particularly

7    concerning, but we're getting very close to that.

8    I'm trying to let you ask as many questions as

9    possible.

10         Q.   In this Brown Bag group of yours or

11   otherwise, have you become aware of any other

12   governmental agency that has found potential

13   barriers to equal employment based on these

14   self-assessments?

15         A.   No.

16         Q.   You said the previous director told you not

17   to focus on underrepresentation.

18         A.   No, I did not say that.

19         Q.   Who was the previous director?  What was

20   his name?

21         A.   The previous director was Thelma Cockreel.

22   No.  I take that back.  The previous director was

23   Dana Jackson.  She retired in September, and she

24   superseded Thelma Cockreel.  Now we have a new

126

1    director which is Roslyn Brown.

2              MR. MANTELL:  May I have this marked,

3    please.

4                   (Document marked as Gaiter

5                   Exhibit 16 for identification)

6        Q.    Do you recognize this document?

7        A.    No, I do not, sir.

8        Q.    Are you involved in developing the Annual

9    Performance Plans?

10       A.    No, sir.

11       Q.    Can you go to Page 59, please.

12       A.    Okay.

13       Q.    Do you see where it says "Human Capital"?

14       A.    Yes, sir.

15       Q.    Do you see number four that says,

16   "Diversity hiring strategies are in place to address

17   underrepresentation"?

18       A.    I see that, sir.

19       Q.    Do you know what that's referring to?

20       A.    I have no idea.  It could possibly be a

21   number of things.  They could be referring to the

22   FEORP Report that I was referring to.  That is

23   addressed by Human Resources.  Human Resources

24   addresses the underrepresentation issue.

127

1     Q.   But the FEORP is not a HUD document, you

2  testified?

3     A.   I did not testify it's not a HUD document.

4  I said the ODEEO Office no longer prepares it.  It's

5  been prepared after 2002 -- if it's prepared --

6  because I think I testified I'm not sure -- with

7  Office of Human Resources.

8        MR. GRADY:  Please don't guess.

9     A.   I don't know.

10     Q.   So you don't know what it's referring to

11  when it says "Diversity hiring strategies are in

12  place"?

13     A.   No, I don't.

14        MR. MANTELL:  Can we take a short break.

15        (Off the record)

16            (Document marked as Gaiter

17             Exhibit 17 for identification)

18     Q.   Do you recognize Exhibit 17?

19     A.   Yes, I do, sir.

20     Q.   What is this document?

21     A.   This is an organization of telephone

22  numbers as well as titles.

23     Q.   Does this document accurately reflect the

24  current staff of the ODEEO?

128

1          A.    Yes, sir.

2          Q.    I'm going to ask you to go down and tell me

3     which EEO category each person falls into.   Linda

4     Bradford Washington?

5          A.    She's the deputy director.

6          Q.    Is she female?

7          A.    Yes.

8          Q.    What's her race?

9          A.    She's African American.

10         Q.    What about Phyllis Williams?

11         A.    She is the staff assistant.   She is African

12    American.

13         Q.    What about Dianne Taylor?

14         A.    She is an administrative officer, and she

15    is African American.

16         Q.    What about Bridget Harvey?

17         A.    She is a budget analyst.   She is African

18    American.

19         Q.    What about Gregory or --

20         A.    It's Gregory Hawkins.

21         Q.    What about Gregory Hawkins?

22         A.    He's a budget analyst, and he's African

23    American.

24         Q.    You are an African American male?

129

| 1 | A. | Yes, sir. |
| 2 | Q. | What about Sonya Torres? |
| 3 | A. | She is Hispanic. |
| 4 | Q. | What about Roslyn Brown? |
| 5 | A. | She is African American. |
| 6 | Q. | What about Tania Watson? |
| 7 | A. | She is African American. |
| 8 | Q. | Kenneth Gant? |
| 9 | A. | African American. |
| 10 | Q. | What about Jerry Jones, Jr.? |
| 11 | A. | African American. |
| 12 | Q. | What about Lejuan Gladden? |
| 13 | A. | She is African American. |
| 14 | Q. | What about Erika Selmon? |
| 15 | A. | She is African American. |
| 16 | Q. | What about Carolyn Smith? |
| 17 | A. | African American. |
| 18 | Q. | Is she a female or male? |
| 19 | A. | Yeah, she's a female. |
| 20 | Q. | What about John Burden? |
| 21 | A. | Where are we at? |
| 22 | Q. | Right on the bottom of Page 1. |
| 23 | A. | Oh, yes, African American. |
| 24 | Q. | What about Shelley Austin-Daggett? |

130

1    A.    She is African American.

2    Q.    What about Paul Grandpierre?

3    A.    He's African American.

4    Q.    What about Jerry Holloway?

5    A.    He is White.

6    Q.    What about Theresa Kerns?

7    A.    She's African American.

8    Q.    What about Angela Parker?

9    A.    She's African American.

10   Q.    What about Chrydonna White?

11   A.    She is African American.

12   Q.    What about Joyce Corley?

13   A.    African American.

14   Q.    Is it a he or she?

15   A.    She, she's African American.

16   Q.    What about Joseph Davalos?

17   A.    Hispanic American.

18   Q.    What about Donald Johnson?

19   A.    African American.

20   Q.    African American male?

21   A.    Yes.

22   Q.    What about Sandra Scott?

23   A.    African American female.

24         MR. MANTELL:  Okay, thank you.  I have no

131

1    further questions.

2            MR. GRADY:   No questions.

3                    (Whereupon the deposition

4                    concluded at 3:45 p.m.)

132

1                    C E R T I F I C A T E

2         I, KEITH T. GAITER, do hereby certify that I

3    have read the foregoing transcript of my testimony,

4    and further certify under the pains and penalties of

5    perjury that said transcript (with/without)

6    suggested corrections is a true and accurate record

7    of said testimony.

8         Dated at _____, this ____ day of _____,

9    2006.

10

11                           _____

12

13

14

15

16

17

18

19

20

21

22

23

24

133

1   COMMONWEALTH OF MASSACHUSETTS)

2   SUFFOLK, SS.                    )

3        I, Kelly A. Mortellite, Registered Professional

4   Reporter and Notary Public in and for the

5   Commonwealth of Massachusetts, do hereby certify

6   that there came before me on Wednesday, November 15,

7   2006 at 11:28 a.m., the person hereinbefore named,

8   who was by me duly sworn to testify to the truth and

9   nothing but the truth of his knowledge touching and

10  concerning the matters in controversy in this cause;

11  that he was thereupon examined upon his oath, and

12  his examination reduced to typewriting under my

13  direction; and that the deposition is a true record

14  of the testimony given by the witness.

15       I further certify that I am neither attorney or

16  counsel for, nor related to or employed by, any

17  attorney or counsel employed by the parties hereto

18  or financially interested in the action.

19       In witness whereof, I have hereunto set my hand

20  and affixed my notarial seal this _28th_ day of

21  November, 2006.

22              *Kelly A. Mortellite*

23                  Notary Public

24         My commission expires  1/8/2010

132

1                    C E R T I F I C A T E

2        I, KEITH T. GAITER, do hereby certify that I

3    have read the foregoing transcript of my testimony,

4    and further certify under the pains and penalties of

5    perjury that said transcript (with/without)

6    suggested corrections is a true and accurate record

7    of said testimony.

8        Dated at _____, this ____ day of _____,

9    2006.

10

11                            _____

12

13

14

15

16

17

18

19

20

21

22

23

24