UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| RICHARD S. PATOSKI, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 05-11086 RCL |
| ) | |
| ALPHONSO JACKSON, SECRETARY, ) | |
| DEPARTMENT OF HOUSING AND ) | |
| URBAN DEVELOPMENT, ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR
SUMMARY JUDGMENT, FILED PURSUANT TO FED. R. CIV. P. 56(d) AND (e)**

Plaintiff Richard S. Patoski, a White male, has filed a broad employment

discrimination claim against his employer, the Department of Housing and Urban

Development (HUD).  Plaintiff hereby submits his memorandum in support of summary

judgment in his favor on Counts IV and VII, and seeking an order establishing facts for

the purposes of trial, pursuant to Fed. R. Civ. P. 56(d).

Plaintiff is entitled to Judgment on Count IV, because HUD admits that gender

was a motivating factor for its refusal to promote Plaintiff in 1998.  SOF 159-162, 169-

171.  The undisputed facts demonstrate a facial violation of 42 U.S.C. § 2000e-2(m).

Plaintiff is entitled to Judgment on Count VII, because HUD implemented an

affirmative action plan which established numerical objectives and goals, and took other

actions, for the purpose of increasing the rate of hiring, promotion and training of all

types of people, except for White males.  Judgment should enter, and facts should be

established in Plaintiff's favor, because the plan constituted a discriminatory

classification disfavoring White males, in violation of 42 U.S.C. § 2000e-2(a)(2).

## I.     FACTUAL BACKGROUND

Plaintiff incorporates by reference "Plaintiff's Rule 56.1 Statement of Facts in Support of his Motion for Summary Judgment" ("SOF").

## II.    PLAINTIFF IS ENTITLED TO JUDGMENT ON COUNT IV

Count IV alleges that consideration of Plaintiff's gender was "a motivating factor" in his non-selection for a Community Builder (CB) position, in violation of "Section 2(m)" of Title VII, 42 U.S.C. § 2000e-2(m).  Under Section 2(m), "An unlawful employment practice is established when the complaining party demonstrates that . . . sex . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).  Liability under this section obtains even if "a respondent demonstrates the respondent would have taken the same action in the absence of the impermissible motivating factor." 42 U.S.C. § 2000e-5(g)(2)(B).  In other words, there is liability even if the unlawful consideration of gender had no effect on the final decision.

A "motivating factor" is defined as follows:

> In saying that gender played a motivating part in an employment decision, we mean that, if we asked the employer at the moment of the decision what its reasons were and if we received a truthful response, one of those reasons would be that the applicant or employee was a woman.

Price Waterhouse v. Hopkins, 109 S. Ct. 1775, 1790 (1989).

Direct evidence establishes that gender was a motivating factor in the decision to reject Plaintiff for the CB position.  Mary Lou Crane, who recommended the hiring of at least two women over Plaintiff, acknowledged that she considered the gender of those successful candidates to be a positive factor for purposes of her recommendations.  SOF 169-171.  This preference for women constitutes a per se violation of Section 2(m).

2

A.    UNDER SECTION 2(M), PLAINTIFF NEED NOT PROVE THAT GENDER
      WAS THE 'BUT FOR' CAUSE OF THE REJECTION

The "motivating factor" claim under Section 2(m) differs from other Title VII

claims. For claims under the more familiar Title VII provision, 42 U.S.C. § 2000e-

2(a)(1), the "but for" standard is used; the Plaintiff must prove that he or she would have

gotten the job "but for" consideration of gender. For claims alleging a violation of §

2000e-2(a)(1), it is not sufficient for the Plaintiff simply to prove that the employer

considered gender. Plaintiff must prove that the consideration cost Plaintiff the job.

For example, in Price Waterhouse v. Hopkins, the Supreme Court held that even

if gender was considered by an employer when making an adverse employment action, a

"defendant may avoid a finding of liability . . . by proving by a preponderance of the

evidence that it would have made the same decision even if it had not taken the plaintiff's

gender into account." Price Waterhouse, 109 S. Ct. at 1795. There is no liability under

42 U.S.C. § 2000e-2(a)(1) where the employer considers gender in an employment

decision, but where it would have made the same decision if it had not considered gender.

Section 2(m) was enacted in part to reverse Price Waterhouse. Estate of Reynolds

v. Martin, 985 F.2d 470, 475 (9th Cir. 1993), reh. denied 994 F.2d 690 (1993) ("Section

107 modifies the Supreme Court's holding in Price Waterhouse . . ."). Under Section

2(m), liability is established upon a mere showing that gender was considered as a factor

in an employment decision. 42 U.S.C. § 2000e-2(m). Such consideration is illegal even

though "other factors also motivated the practice," (Id.), and even if "a respondent

demonstrates the respondent would have taken the same action in the absence of the

impermissible motivating factor." 42 U.S.C. § 2000e-5(g)(2)(B). Thus, consideration of

gender is a violation of Section 2(m), even if it makes no difference in the final decision.

3

B.    HUD USED GENDER AS A MOTIVATING FACTOR WHEN REJECTING
       PLAINTIFF FOR THE COMMUNITY BUILDER POSITION

Jose Cintron was the Selecting Officer in charge of filling four Community

Builder (CB) positions in Boston. SOF 156. Plaintiff applied for, and was qualified to be

a CB, and his name was on the "Best Qualified List" for those jobs. SOF 153-5. Cintron

was tasked to make selections from the names appearing on the list. SOF 156-157.

Mary Lou Crane was a highly placed official within HUD, a Secretary's

Representative, to whom the Boston-based CBs would report. SOF 158. Cintron

contacted Crane for the purpose of seeking her recommendation as to who on the Best

Qualified List should be hired as a CB. SOF 159. Cintron testified he considered

Crane's recommendations to be "very, very important" to his decision, and everyone he

selected was positively endorsed by Crane. SOF 160-164.

Crane recommended various candidates, including two women, Debra Griswold

and Linda Pellegrino. SOF 166. Crane testified that she considered Griswold's and

Pellegrino's female gender to be a "positive factor" in her recommendation of each. SOF

169-171. For example, Crane testified,

Q.    When you recommended [Griswold], did you regard it as a positive factor
       that she was a female?

A.    Yes. [SOF 171].

Crane did not recommend Plaintiff, who she knew to be male. SOF 172. She

considered Plaintiff's male gender to be a "neutral" factor for purposes of her

recommendation. SOF 174. Crane also acknowledged in an affidavit that she made the

CB recommendations "based on two factors; [her] knowledge of each candidates'

performance and [her] interest in diversity." SOF 181.[1]

Thus, direct evidence demonstrates that gender was a motivating factor in Crane's mind when she made recommendations for the hiring of the Boston CBs. Her recommendations were based in part on the fact that Griswold and Pellegrino were female. As such, liability under Section 2(m) has been established.

In the similar case of Hannon v. Chater, 887 F. Supp. 1303 (N.D. 1995), Hannon, a White male, was passed over for a position in the Social Security Administration. Id., at 1306. A female candidate was selected instead. Id., at 1308. The female candidate was selected based on the recommendation of the Chief ALJ. Id., at 1308. The Chief ALJ asserted that he recommended the female candidate because of her superior qualifications; however, he also acknowledged that "the fact that she . . . was a wom[a]n was a factor in her favor as well." Id., at 1308.

Hannon filed suit against the SSA, claiming that the employer improperly considered gender as a motivating factor, in violation of 42 U.S.C. § 2000(e)-2(m). Based on the Chief ALJ's admission that the selectee's gender was a positive factor, the Court granted summary judgment in Hannon's favor on the 2(m) claim. Hannon, 887 F. Supp. at 1315-1316. "[A]n employer violates Title VII by taking gender into account in making a hiring decision, even if the employer would have made the same decision on the basis of wholly legitimate criteria alone." Id., at 1316. Here, where Crane admitted that female gender was a positive factor that she considered, summary judgment should issue as it did in Hannon v. Chater. SOF 169-171.

Defendant may seek to avoid the clear operation of Section 2(m) by arguing that

---

[1] When Crane stated that she made recommendations based on her interest in "diversity," she meant the hiring of women and members of races such as African-Americans, Hispanics and Asians, but "not white men." SOF 181. Crane also considered race and gender in the staffing of other positions. SOF 183-185.

Crane's discriminatory motives should be ignored, because Cintron was the person who ultimately made the hiring decision. However, under Title VII, if a person recommending an adverse action is acting with a discriminatory motive, the employer is responsible for that motive where the ultimate decision-maker relies on the recommendation. Cariglia v. Hertz Equip. Rental Corp., 363 F.3d 77, 87 & n.4 (1st Cir. 2004). Cintron testified that he gave Crane's recommendations particular weight, and that he considered Crane's determination to be "very, very important" to his selection decisions. SOF 159-164. Since it is beyond dispute that Cintron relied on Crane's recommendations, HUD must be held liable for Crane's consideration of gender.

IV.    **PLAINTIFF IS ENTITLED TO JUDGMENT ON COUNT VII**

Count VII alleges that HUD administered an affirmative action program, called the Affirmative Employment Plan ("AEP"), which violated Title VII proscriptions against discriminatory classifications. 42 U.S.C. § 2000e-2(a)(2). The AEP established numerical goals and objectives for increasing the rates of hiring, promotion and training, for members of all genders and ethnicities, except White males. As will be shown, the Plaintiff is entitled to judgment on Count VII. Equally important, Plaintiff seeks a declaration, pursuant Rule 56(d), that the AEP constituted an unlawful discriminatory practice, so that when the rest of the case is tried, the jury will know that when Plaintiff was rejected, that HUD illegally disfavored White males through this formal program.[2]

A.    HUD'S AEP PROGRAM SUPPORTED EMPLOYMENT OPPORTUNITY FOR EVERYONE EXCEPT WHITE MALES

---

[2] In April 1998, HUD rejected Plaintiff's application for a CB position, and in May 2000, Plaintiff was rejected for a Public Housing Revitalization Specialist (PHRS) position. SOF 186, 194. Plaintiff, a White male, has filed suit alleging that these rejections were based on his gender, and his gender and/or race, respectively. SOF 2. At the trial of these claims, Plaintiff intends to rely on the AEP as proof that HUD was engaging in discriminatory practices, at the time of these rejections. SOF 43-124. A jury will not fairly be able to evaluate the importance of the AEP as evidence, unless the Court establishes by the time of trial whether the AEP was legal or illegal. Hence, the Rule 56(d) application is of critical importance.

1.    EEOC Management Directive 714

In 1987, the EEOC issued Management Directive 714 ("MD-714"), for the purpose of implementing an affirmative program of equal employment opportunity in the Federal Government. SOF 11. MD-714 requires Federal agencies to perform workforce composition analysis based on EEO Group,[3] and determine whether any EEO group is under-represented as compared to the Civilian Labor Force (CLF). SOF 14. MD-714 permits, but does not require, the establishment of numerical objectives to correct instances where an EEO group is substantially under-represented. SOF 15-16.

2.    HUD's AEP Program

During FY1993-FY2003, HUD annually analyzed its workforce composition by EEO group, and compared its workforce to the CLF. SOF 31-143. Purporting to remedy under-representation, HUD would institute numerical goals and objectives for increasing the rates of hiring, promotion and training of members of certain EEO groups. SOF 51, 53, 55-6, 62, 68, 69, 70, 72, 80, 83-5, 87-8, 100-2, 104-5, 111, 115-7, 119. White males were singled out as the only EEO group for whom HUD refused to institute a hiring, promotion or training goal or objective, no matter how great their under-representation. SOF 53, 55, 57, 60, 69, 70, 73, 76, 84-5, 89, 93, 97, 102, 105, 108, 112, 115, 117, 120.

a.    Promotion

When the promotion rate for an EEO group was lower than its percentage of the workforce, HUD considered that to be an "UNDESIRED CONDITION." SOF 48, 56, 72, 88, 105. To correct such a condition, HUD would announce an objective to increase

---

[3] There are 10 EEO Groups, which include male and female Whites, male and female African-Americans, male and female Hispanics, male and female Asians/Pacific Islanders, and male and female Native Americans. SOF 13.

that EEO group's promotion rate. Id. For example, when Black males constituted 8.1%
of the HUD workforce, but received only 6.1% of the promotions, HUD announced an
"objective" to increase the rate of promotion for Black males. SOF 56. HUD
communicated the "expectation" that there would be "increased rates of promotion" for
Black males. Id.

Often, HUD would establish an objective to increase an EEO group's promotion
rate, even if that group had already been promoted in numbers commensurate with its
workforce composition. SOF 58, 74, 90, 106. However, White males were not treated
similarly. From FY1992 through FY2002, White males were never promoted in numbers
reaching their representation in the HUD workforce. SOF 35, 37, 42, 48, 57, 73, 89, 105,
120, 132, 142. Despite this ubiquitous under-representation, HUD never established an
objective to increase the promotion rates of White males, and never imposed an
"expectation" that their promotion rate would increase. Id.

b.    Numerical Goals in PATCOB Categories

On an annual basis, HUD compared its workforce composition by EEO group
with that of the Civilian Labor Force (CLF). SOF 24. The comparison would be
undertaken by PATCOB categories. SOF 24. The PATCOB categories include
Professional, Administrative, Technical, Clerical, Other & Blue Collar. SOF 14. When
an EEO group was found to be under-represented at HUD as compared to the CLF, HUD
would adopt a numerical goal to add members of that EEO group.[4] SOF 25.

Often, HUD established numerical goals for adding members of an EEO group,
even if they were already employed in excess of parity in the applicable PATCOB

---

[4] For example, the CB position that Plaintiff applied for in FY1998 fell within the "Administrative"
PATCOB category. SOF 153. The AEP Plan in effect at the time called for the addition of 113 White
females in Administrative positions. SOF 53.

category. SOF 54, 71, 86, 103, 118, 130. However, White males were not treated similarly. From FY1992 though FY2002, White males were underrepresented in the HUD workforce in every PATCOB category. SOF 31, 37, 43, 49, 65, 81, 98, 113, 125, 135. However, HUD never established an objective to increase the numbers of White males in those categories, and HUD never generated an "expectation" that their numbers would increase. SOF 53, 55, 69,70 84-5, 97, 102, 112, 115, 117, 127.

c.     Trainings

HUD conducted similar analyses of those being trained in Special Employment Programs (SEPs). On an annual basis, when an EEO group at HUD was enrolled in SEPs in numbers less than its percentage in the overall HUD workforce, HUD would establish an objective to increase that EEO group's participation. SOF 59, 75, 91, 107. Sometimes, HUD established an objective for the increased participation of an EEO group, even though that group was already enrolled in SEPs at rates exceeding their workforce representation. SOF 61, 77, 92, 109. However, White males were not treated similarly. White males from FY 1992 through FY 2002 were underrepresented in their enrollment in SEPs in each year. SOF 34, 40, 46, 60, 76, 93, 108, 143. However, HUD failed to establish any objective for increasing the training of White males. Id.

d.     Goals and Objective Were Acted Upon

These objectives and goals to benefit women and minorities were communicated to Managers and Supervisors on an annual basis. SOF 23. Managers and Supervisors were evaluated based on efforts to assure "that EEO/AE/Diversity goals and objectives are achieved," as part of HUD's yearly appraisals. SOF 19, 64, 79, 96, 110, 198. Managers and Supervisors were instructed to "achieve measurable results" in compliance

with EEO/AE/Diversity goals. SOF 64, 79, 96. One performance standard included the requirement to "make decisions regarding . . . promotions . . . [and] recommendations for selection . . . that further the Departments EEO/AE programs and policies and foster diversity within the HUD workplace." SOF 179. Those who were given high ratings in these evaluations could expect monetary bonuses. SOF 199. Moreover, in light of its goals and objectives, HUD would institute concrete recruitment and manipulate the selection process to improve chances of women and minorities in terms of training, promotion and hiring. SOF 144.

e.    The AEP as Applied to Plaintiff

Plaintiff, a White male, applied for two promotions: a CB position in 1997 and a PHRS position in 2000. SOF 2, 154, 192. These positions were categorized as part of the "Administrative" PATCOB category. SOF 153, 191. If White males were treated similarly to other EEO groups, then during those periods, HUD would have established numerical goals to add White males into the Administrative jobs. SOF 49-51, 53, 81-84. HUD would have established objectives for increasing the promotion rate of White males, generally. SOF 56, 88. Managers and Supervisors would have been informed of these goals and objectives, and reminded that they would be evaluated based on their compliance. SOF 63-4, 95-7. However, these steps were never taken, because HUD discriminated against White males.

B.    STANDARD FOR AFFIRMATIVE ACTION BY THE FEDERAL GOVERNMENT

According to Title VII, "It shall be an unlawful employment practice for an employer to . . . classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his

status as an employee, because of such individual's race . . . [or] sex . . .." 42 U.S.C. §
2000e-2(a)(2). It would seem that this provision would bar any race or gender based
affirmative action, and this should be the sole applicable standard. However, the standard
for determining whether an affirmative action program run by a Federal Agency complies
with Title VII is less than settled.

There are at least three other possible standards to determine whether a voluntary
affirmative action plan adopted by a Federal agency complies with Title VII. The first
standard asks whether the affirmative action program is designed to remedy a
conspicuous imbalance in a traditionally segregated job (the "Imbalance Standard").
Johnson v. Transportation Agency, 107 S. Ct. 1442, 1451-1452 (1987). The second
standard is whether the program satisfies Constitutional Equal Protection analysis: strict
scrutiny for racial classifications, and intermediate scrutiny for gender classifications
("Constitutional Standard"). See Adarand Constructors, Inc. v. Pena, 115 S. Ct. 2097,
2105-2107 (1995). The third standard is a combination of the first two. As will be
shown, Plaintiff prevails under any standard.

1.    The Imbalance Standard

In a case not involving the Federal government, the Supreme Court interpreted
Title VII to permit voluntary affirmation action in a State program when there is a
"conspicuous imbalance in a traditionally segregated job category." Johnson v.
Transportation Agency, 107 S. Ct. 1442, 1451-1452 (1987). In that 1987 case, the
Defendant Transportation Agency adopted an affirmative action plan, setting numerical
goals for hiring women and those in certain ethnic groups to reach the proportion of
women and ethnic groups in the labor pool. Id. at 1446, 1448. After a lower scoring

female was selected for a position based, in part, on consideration of "affirmative action matters," the non-selected male filed suit challenging the plan. Id. at 1445, 1448.

The Supreme Court approved the affirmative action plan, where there was evidence at the Transportation Agency that employees of different genders were congregated into traditionally segregated jobs. Id. at 1453. For example, while women were well-represented in administrative jobs, only one of the 110 road maintenance workers and none of the 238 skilled craft workers were female. Id. at 1453-1454. Affirmative action was permitted in the face of these lop-sided groupings which tracked stereotypically genderized occupations, and where goals for hiring women were used in positions that were staffed overwhelmingly with males. Id. at 1453-1454, 1456.

The Agency's affirmative action plan was approved because it had particular, important qualities. Gender was to be only one of a variety of factors to be taken into account in making hiring decisions. Id., at 1454, 1455, 1457. The affirmative action plan was intended to attain a balanced workforce, not to maintain one. Id., at 1455, 1456. Moreover, the Agency sought annually to develop more refined measures of the under-representation in each job category that required attention. Id. at 1453-1454.

The Supreme Court established the Imbalance Standard, knowing it to be less stringent than Constitutional standards. The Court recognized, under the standard it announced, that an affirmative action plan may be lawful under Title VII, but could nevertheless be illegal under Equal Protection principles. Id., 107 S. Ct. at 1450 n.6. Id.

2.    The 1991 Amendments to Title VII – 42 U.S.C. § 2000e-2(m) and Section 116 of the 1991 Civil Rights Act

Soon after the Johnson decision, in 1991, Congress promulgated amendments to Title VII that had the effect of harmonizing Title VII with Constitutional standards.

12

Section 107(a) of the Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071, 1075. As discussed above, Section 2(m) was added to prohibit consideration of race or sex as "a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). Consideration of gender is unlawful, even if it is only one of many factors considered, and even if it is a non-dispositive factor. Id; 42 U.S.C. § 5(g)(2)(B).

Section 2(m) profoundly changed the law and rendered certain affirmative action plans illegal. In making the amendment, several senators, led by Senator Robert Dole, in a section-by-section analysis of the 1991 Civil Right Act, stated that § 2(m) "is equally applicable to cases involving challenges to unlawful affirmative action plans, quotas, and other preferences." 137 Cong. Rec. S15,476 (daily ed. October 30, 1991).

While the Johnson court had approved an affirmative action plan under Title VII because gender was but one factor of many to be considered by the employer, Title VII was thereafter changed to expressly prohibit use of race or gender as any type of consideration. Compare Johnson, 107 S. Ct. at 1454, 1455, 1457, with 42 U.S.C. § 2000e-2(m). Johnson was thereby statutorily overruled.

The reach of Section 2(m) was limited by §116 of the 1991 Civil Rights Act. Section 116 of the 1991 Act provides that "nothing in the amendments made by this title shall be construed to affect court-ordered remedies, affirmative action, or conciliation agreements, that are in accordance with the law." Section 116 of the Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071, 1079. Thus, Section 2(m) does not invalidate otherwise legal affirmative action; this clause saves only plans that are "in accordance with the law." Necessarily, Section 116 permits Section 2(m), and the rest of Title VII, to

prohibit affirmative action plans when those plans are otherwise illegal, i.e. unconstitutional. Where a plan is unconstitutional, it will also be illegal under Title VII.[5]

      3.     Constitutional Standards

In 1995, the Supreme Court recognized that the Fifth Amendment of the United States Constitution requires that the Federal Government accord parties Equal Protection, in a manner similar to what is required under the Fourteenth Amendment. Adarand Constructors, Inc. v. Pena, 115 S. Ct. 2097, 2105-2107 (1995). The Fifth Amendment prohibits Federal affirmative action programs that are unjustified and/or exceed narrow Constitutional limits. Id. The burden of production is on the governmental actor to show that a racial or gender classification is justified under strict and intermediate scrutiny, respectively. Id. at 2111 (governmental actor must "justify" race classification); United States v. Virginia, 116 S. Ct. 2264, 2275 (1996) (placing the burden on the state to justify a gender classification). As will be shown, HUD's AEP violated Title VII, regardless of whether one applies the Imbalance Standard, the Constitutional Standard, or both.

C.     HUD'S AEP DEPRIVED, OR TENDED TO DEPRIVE, WHITE MALES OF EQUAL OPPORTUNITIES IN VIOLATION OF TITLE VII.

HUD violated Title VII in that it "classified" its employees in a "way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee" based on race and/or gender. 42

---

[5] To summarize, the Johnson Court held that Title VII permits affirmative action which allowed employers to consider race or gender as one of many factors, in order to remedy conspicuous absences in traditionally segregated jobs, even if those plans violated the Constitution. See Johnson, 107 S. Ct. at 1450 n.6. Thereafter, Section 2(m) was added to prohibit any consideration of race or gender at all, even if race or gender were but one of many factors considered. 42 U.S.C. 2000e-2(m); 42 U.S.C. § 2000e-5(g)(2)(B). Section 2(m) had the effect of prohibiting certain affirmative action plans. 137 Cong. Rec. S15,476 (daily ed. October 30, 1991). Title VII acknowledged that Section 2(m) would prohibit affirmative action plans, if those plans violated the law (or Constitution). § 116, 105 Stat at 1071. Thus, for the purposes of government-ordered affirmative action, Title VII was harmonized with Constitutional law; if a plan violates the Constitution, Section 2(m) and other parts of Title VII may prohibit the plan as well.

U.S.C. § 2000e-2(a)(2). The AEP classified each HUD employee as a member of a single EEO Group, such as White male, Hispanic Female, Asian Male, etc. SOF 13, 24. The AEP thus classifies all HUD employees by their race and gender.

HUD then used its classification to establish goals and objectives to further the employment opportunities only for women and minorities. Supra IV(A)(2)(a), (b) & (c). Goals were set to add EEO groups into certain categories of jobs, and to increase their overall promotion and training rates. Id. HUD communicated those goals and objectives to HUD Managers and Supervisors on an annual basis, evaluated them based on their effectiveness in producing measurable results to satisfy those goals, and rewarded those who complied with positive evaluations and monetary bonuses. Supra IV(A)(2)(d); See Johnson, 107 S. Ct. 1442, 1467 (1987) (Scalia, dissenting) (evaluations of personnel based on their ability to attain an affirmative action plan's objective for diversity "unmistakably communicated" that concrete numerical results in hiring were expected). Concrete employment practices were implemented to attain the goals. SOF 144.

White males did not get the benefit on any of these AEP initiatives. Supra IV(A)(2)(a), (b) & (c). During the time of the AEP, White male representation in the workforce declined inexorably, and White males were never promoted at levels nearing their workforce representation. SOF 200-203. As such, the AEP is in facial violation of 42 U.S.C. § 2000e-2(a)(2), because it involved a racial and gender classification expressly treated White males differently than everyone else, and did so in a way that tended to affect their employment opportunities adversely. Byrd v. Ruben, 1997 U.S. Dist. Lexis 10863 (affirmative action program similar to AEP violates Title VII). The AEP also violates 42 U.S.C. § 2000e-2(m), which prohibits any consideration of race or

gender. Id.

D.    THE AEP VIOLATED THE IMBALANCE STANDARD

Even if the Imbalance Standard articulated by the Johnson case is applicable to affirmative action used by the Federal Government and remains good law (it is not), the AEP as implemented by HUD does not pass muster.

1.    No Finding of Traditional Segregation

HUD fails to demonstrate that its goals and objectives were designed to remedy a "conspicuous imbalance in a traditionally segregated job category." Johnson, 107 S. Ct. at 1451-1452. HUD made no inquiries as to whether its positions were "traditionally segregated," and it never reached any conclusions that some or all of its positions were traditionally segregated. SOF 149. Looking more specifically to the positions for which Plaintiff applied, HUD does not contend that the PHRS and CB positions were traditionally segregated. SOF 149. In fact, the CB position was new, as of 1997, and could not be traditionally segregated. SOF 152. Therefore, the AEP is not justified under the Imbalance Standard.

2.    No Finding of Conspicuous Imbalance

Under Johnson, another element to justifying affirmative action is the presence of a "conspicuous imbalance" between gender composition in the workforce as compared to the CLF. Johnson, 107 S. Ct. at 1451-1452. However, HUD corrected all imbalances, and not just conspicuous imbalances. SOF 25, 27, 30. In other words, if there was a shortfall of even one member an EEO Group in a large occupational category, HUD would establish a numerical goal to correct that slight imbalance. Id. HUD's exhuberance for affirmative action means that it is unjustified under Johnson.

3.     No Finding of Imbalance in Specific Jobs

The affirmative action plan in Johnson was approved in part because the Agency constantly sought to develop more refined measures of the under-representation in each job category that required attention. Johnson, 107 S. Ct. at 1453-1454. Over the years, HUD has done nothing to hone its analysis, and tailor it to smaller and smaller job categories. For example, we do not know whether there is a conspicuous imbalance of an EEO group in the CB or PHRS positions, because HUD never did that analysis. SOF 145, 147, 150. Since the CB position was new, it could not have been the subject of imbalance. SOF 152. HUD's failure to tailor its inquiry to specific jobs prevents it from receiving the protection of the Imbalance Standard.

4.     Goals to Add Women and Minorities to Exceed Parity

HUD's AEP routinely called for the adding of members of an EEO group into a PATCOB category, even though there was no under-representation of that EEO group within the category. SOF 54, 71, 86, 103, 118, 130. According to the Imbalance Standard, affirmative action may be used to fix an imbalance; it may not be used to maintain balance. Johnson, 107 S. Ct. at 1456. Furthermore, affirmative action may not be utilized to tip the balance in favor of disparity favoring minorities. See Mackin v. City of Boston, 969 F.2d 1273, 1275-6 (1st Cir. 1992). HUD 's goals to add women and minorities into categories with no under-representation violates the standard.

5.     Objectives to Increase Promotion Rates in Excess of Parity

HUD also established goals to increase the rate of promotion and trainings for members of EEO groups (not White males), even when there was no under-representation in the promotion and trainings rates of those groups. SOF 58, 74, 90, 106.

17

These objectives to exceed parity violate the principle that affirmative action may be used only to fix an imbalance. Johnson, 107 S. Ct. at 1456.

6.    Promotion Goals Were HUD-Wide

HUD would establish general objectives to increase the promotion rate of certain EEO groups (not White males). SOF 48, 56, 72, 88, 105. Managers were thus exhorted to promote women and minorities to positions, even if there was no under-representation of that EEO group in such positions. Supra IV(A)(2)(d). HUD's objectives would have the effect of creating an excess of parity for women and minorities in many positions.

7.    Whose Ox is Being Gored?

The affirmative action found to be lawful in Johnson assisted females to the detriment of males. However, in that context, males were overwhelmingly represented in the affected jobs. Only one of the 110 Road Maintenance Workers was female and none of the 238 skilled craft workers were female. Johnson, 107 S. Ct. at 1453-1454. In that context, it was proper to give preferences to women to the detriment of men. In this case, however, White males were subjected to the AEP while they were substantially underrepresented in every single PATCOB category at HUD and their numbers were constantly declining. SOF 31, 37, 43, 49, 65, 81, 98, 113, 125, 135, 200-203. There is no way that such a plan would have been countenanced by the Supreme Court.

Thus, the AEP does not satisfy the Imbalance Standard.

E.    THE AEP VIOLATES CONSTITUTIONAL STANDARDS

HUD'S AEP also violates Constitutional standards. Under the United States Constitution, racial classifications are permitted only if they are narrowly tailored to further a compelling governmental interest. Adarand, 115 S. Ct. at 2113, 2117. The

remedying of past discrimination is a compelling state interest, so long as there is a strong basis in evidence that the governmental action services a remedial purpose with respect past discrimination. Cotter v. Boston, 323 F.3d 160, 169 (1st Cir. 2003), cert. denied, 124 S. Ct. 179 (2003). The objective of remedying societal discrimination or providing more minority "role models" are not compelling state interests; evidence of discrimination must be specific to the agency. Id; Wygant v. Jackson Board of Education,106 S. Ct. 1842, 1847-1848 (1986); id. at 1854 (O'Connor, J., concurring in part); id; at 1858 (White, J., concurring in judgment). .

With regard to gender preferences, intermediate scrutiny applies. Parties who seek to defend gender-based government action must demonstrate an "exceedingly persuasive justification" for that action. United States, 116 S. Ct. at 2274. Gender classifications are viewed with skepticism, whether or not they deny opportunity to women or men. United States, 116 S. Ct. at 2275. The government must show that the challenged "classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." United States, 116 S. Ct. at 2275.

In this case, HUD is not alleging that the goal of its AEP is to cure past discrimination. SOF 21. Rather, the only justification advanced by HUD is that HUD's workforce should reflect diversity contained in the civilian labor force and the nation itself. SOF 22. The urge to achieve EEO parity between the workforce, and the CLF (or the nation), is not a compelling or important state interest, and is insufficient justification for preferences based on race or gender. Grutter v. Bollinger, 123 S. Ct. 2325, 2339 (2003) ("[O]utright racial balancing . . . is patently unconstitutional).

HUD has failed to satisfy its burden to establish that its program was justified. Adarand, 115 S. Ct. at 2111; United States, 116 S. Ct. at 2275. Importantly, HUD is unable to present any analysis or study to demonstrate that its program withstands Constitutional scrutiny. SOF 146. The only justification advanced by HUD for its program is per se inadequate to surmount the Constitutional hurdles to affirmative action.

Moreover, as shown in Supra Section 4(D), the steps taken by HUD are not narrowly tailored to address its goals, even if it could be said that those goals were Constitutionally permissible. HUDs strategies are designed to assist EEO groups in exceeding parity, at the expense of under-represented White males. Thus, under any standard used, HUD's AEP is unlawful, and summary judgment should enter.

Defendant may argue that this issue is moot, because HUD ended the AEP program in 2003. SOF 20. However, this remains a live issue because Plaintiff timely brought claims opposing the AEP at the time it was in effect. "A defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville, 113 S. Ct. 2297, 2301 (1993). Moreover, the AEP was in effect at a time when Plaintiff was twice rejected for promotion, and those rejections are at issue in this case. Therefore, the issue remains live for Plaintiff.

## CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court enter Judgment in his favor on Counts IV and VII, and establish, pursuant to Fed. R. Civ. P. 56(d) the factual statements as identified at the end of Plaintiff's Motion for Summary Judgment.

The Plaintiff
By his attorneys,


_____/s/ Robert S. Mantell_____
Kevin G. Powers
BBO# 405020
Robert S. Mantell
BBO# 559715
Rodgers, Powers & Schwartz LLP
18 Tremont Street, Suite 500
Boston, MA  02108
(617) 742-7010, ext. 305
fax (617) 742-7225

Patoski memo summary judgment