UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD S. PATOSKI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    C.A. No. 05-11086 RCL |
| | ) |
| ALPHONSO JACKSON, SECRETARY, | ) |
| DEPARTMENT OF HOUSING AND | ) |
| URBAN DEVELOPMENT, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**PLAINTIFF RICHARD PATOSKI'S RULE 56.1 STATEMENT OF FACTS IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

Plaintiff Richard S. Patoski hereby submits his Rule 56.1 Statement of Facts in Support of his Motion for Summary Judgment.

<u>THE PARTIES – HUD AND MR. PATOSKI</u>

1.      Defendant Alphonso Jackson is the Secretary of the United States Department of Housing and Urban Development and is sued in his official capacity only [hereinafter this defendant is referred to as "HUD"]. <u>Answer</u>, ¶ 2.

2.      Plaintiff Richard S. Patoski is a White male with a date of birth of January 2, 1949. <u>Answer</u>, ¶ 3. Plaintiff began to work for HUD in 1972. <u>Answer</u>, ¶ 4.

3.      Since 1980, Plaintiff worked as a Community Planning and Development ("CPD") Representative in the CPD Division in HUD's Boston Office. <u>Answer</u>, ¶ 5.

4.      The goal of a CPD Representative is to represent "the Department and its community development programs and priorities to grantee officials, citizens, potential and current customers, HUD personnel and other government personnel." <u>Exhibit 1</u>, at 1.

A successful CPD Representative "Deals with all in a courteous, tactful, and professional manner" and represents the Department "with a positive, professional demeanor." Exhibit 1, at 1.

5.      As a CPD Representative, and at all relevant times, Plaintiff reported to Robert Paquin, Director of the Office of Community Planning and Development, who served as Plaintiff's second level supervisor. Patoski Affidavit, Exhibit 2, at page 7-8 of 23; EEOC Hearing Transcript, at 83-84, Exhibit 3. Mr. Paquin had been with HUD since its inception, approximately 35 years, and he had worked with Plaintiff for 10-15 years. EEOC Hearing Transcript, at 83, Exhibit 3. Paquin was the reviewing official on Patoski's evaluations. EEOC Hearing Transcript, at 84, Exhibit 3.

6.      Plaintiff also reported, at all relevant times, to Arthur Tonini, Community Planning and Development Program Manager, who was Plaintiff's immediate supervisor for most of his duties. Patoski Affidavit, Exhibit 2, at 7-8 of 23.

7.      Tonini, then a Program Manager, was Plaintiff's immediate supervisor at the time of that Plaintiff applied for a Community Builder position in 1997. EEOC Hearing Transcript, at 132, Exhibit 3; Tonini Dep., at 6-8, Exhibit 4.

8.      HUD admits that from 1980 through at least June 7, 2002, Plaintiff's performance has never been rated unsatisfactory in any critical element. Exhibit 5, at 1; EEOC Hearing Transcript, at 135-136, Exhibit 3.

9.      Plaintiff has received various letters of appreciation from people he has worked with. Exhibit 6.

10.     Tonini testified that Plaintiff was very good at meetings in the field, "superb." Tonini Dep., at 34, Exhibit 4. Tonini also described Plaintiff as devoted, very diligent,

informed and the most knowledgeable CPD Rep. in economic development. <u>EEOC Hearing Transcript</u>, at 133-134, 145, <u>Exhibit 3</u>.

<u>EEOC MANAGEMENT DIRECTIVE 714</u>

11.    Title VII prohibits employment discrimination in the federal government, and requires each federal agency to "maintain an affirmative program of equal employment opportunity." 42 U.S.C. § 2000e-16(b). Equal employment plans are to be developed by federal agencies on at least an annual basis, and are to be reviewed by the EEOC. <u>Id</u>.

12.    In response to this requirement, in 1987, the EEOC issued Management Directive 714 ("MD-714") to establish instructions, policies, procedures and formats for (1) multi-year affirmative employment program ("AEP") plans, (2) annual affirmative employment program accomplishment reports; and (3) annual affirmative employment program plan updates. MD-714, ¶ 2, <u>Exhibit 7</u>; <u>Gaiter Dep.</u>, at 25-26, <u>Exhibit 8</u>.

13.    MD-714 requires that agencies analyze their workforce composition by "EEO group." The term "EEO Group" is defined as encompassing a variety of racial and gender categories, including, without limitation, Black males, Black females, Hispanic males, Hispanic females, White males and White females. MD-714, ¶ 10(g), <u>Exhibit 7</u>. Each agency is directed to undertake an analysis of its work force, by EEO Group, and compare the agency workforce composition to that of the "appropriate civilian labor force." MD-714, ¶¶ 13(2)(a), 14(b)(1) & Appendix C, <u>Exhibit 7</u>.

14.    According to MD-714, each agency shall analyze the workforce by "PATCOB" category, grade groupings and major occupations. MD-714, ¶¶ 13(2)(a), 14(b)(1); <u>Exhibit 7</u>. PATCOB is an acronym for a variety of occupational groups, including Professional, Administrative, Technical, Clerical, Other White-Collar categories and

3

Blue-Collar occupations. MD-714, ¶ 10(s); Exhibit 7. Agencies are required to engage in other types of analysis of workforce composition, comparing their respective workforces to the civilian labor force. Id.

15.    MD-714 permits, but does not require, the establishment of "numerical objectives (goals) for each job category or major occupation where there is a manifest imbalance or conspicuous absence of EEO Group(s) in the work forces." MD-714, ¶ 13(d) & 13(d)(2); Exhibit 7; Gaiter Dep., at 50-52, 67, Exhibit 8.

16.    "Conspicuous Absence" is defined as an EEO group that is nearly or totally nonexistent from a particular occupation or grade level in the work force. MD-714, ¶ 10(f); Exhibit 7. "Manifest Imbalance" is defined as an EEO group that is substantially below its representation in the appropriate CLF. MD-714, ¶ 10(m); Exhibit 7.

17.    MD-714 requires numerical goals to be reasonable, and bear a reasonable relation to the extent of manifest imbalance or conspicuous absence, and other factors. MD-714, ¶ 13(d) & 13(d)(4), Exhibit 7.

18.    Numerical goals must be based on "an appropriate work force analysis," and must be developed in light a review of the case of Johnson v. Transportation Agency, Santa Clara County, 107 S. Ct. 1442 (1987). MD-714, ¶¶ 13(d)(1) & 13(d)(2), Exhibit 7. The purpose of the numerical goals is to attain, rather than maintain, a balanced workforce. MD-714, ¶ 13(d)(6), Exhibit 7.

19.    MD-714 dictates that Managers, Supervisors and Personnelists share responsibility for the implementation of the AEP, and requires that the performance appraisals of such individuals should contain an "element based on meeting equal employment opportunity objectives." MD-714, ¶ 14(a)(1)(d); Exhibit 7.

20.     MD-714 was in effect from October 1, 1987 until October 1, 2003, when it was

replaced by Equal Employment Opportunity Management Directive 715 (EEO MD-715)

became effective.  Gaiter Dep., at 27, Exhibit 8.

## HUD'S AEP REPORTS

21.     During the period of time in which MD-714 was in effect, HUD developed

Affirmative Employment Program (AEP) plans, analyses and documentation to submit to

the EEOC.  The goal behind HUD's AEP plans was not to cure discrimination, but

simply to achieve a proportionate representation within HUD that is equal to the gross

population as a whole with respect to the PATCOB categories.  Cockrell Dep., at 25, 35-

36, Exhibit 9.

22.     According to HUD, the "desired condition is to attain and retain a work force that

is reflective of the nation's diversity."  HUD's FY2000 AEP Update Report, at 4253

(DIV-3), Exhibit 18.  HUD's "EXPECTED RESULTS" from the AEP "is the attainment

of a diversified, balanced work force that is representative of the Civilian Labor Force

(CLF) and the Nation's diversity."  HUD's FY2000 AEP Update Report, at 4258 (DIV-

8), Exhibit 18.

23.     HUD required that all manager, supervisors and employees be informed of their

EEO/AE responsibilities on an annual basis, and they were provided with AEP reports

every year.  Gaiter Dep., at 36, 56-57, 67, Exhibit 8; HUD's FY2000 AEP Update

Report, at 4259 (DIV-9), Exhibit 18.

24.     On an annual basis, HUD would compare its workforce composition by EEO

group with the composition of the civilian labor force.  Cockrell Dep., at 10-17, Exhibit

9.  The comparison would be undertaken by PATCOB categories.  Id. & 7-8.

25.    When HUD's comparison found than an EEO group other than White males was underrepresented in any PATCOB category, a numerical goal would be generated to bring up the representation of that EEO group. Cockrell Dep., at 36, Exhibit 9; Cockrell Dep. (Worth), at 89-91, Exhibit 10.

26.    A "manifest imbalance," according to the HUD AEP, existed if the proportion of a particular racial/ethnic/gender group for any of six PATCOB categories was anywhere between 50% and 100% of the civilian labor force proportion for that group in that category. Cockrell Dep., at 24-25, Exhibit 9; Cockrell Dep. (Worth), at 89-91, Exhibit 10. A conspicuous absence" would be present if the proportion were between 0% and 50%. Cockrell Dep., at 23, Exhibit 9.

27.    Any and all statistical under-representation of females and non-whites demonstrated for HUD an imbalance which warranted a numerical goal. Cockrell Dep. (Worth), at 89-91, Exhibit 10; see HUD FY1998 AEP Update Report, at 3992 (DII-12), Exhibit 16 (objectives have been established for all instances of under-representation). Thus, HUD's policy in implementing MD - 714 was to eliminate any and all instances of under-representation regardless of size and regardless of whether there are any special requirements for HUD-related positions that would make civilian labor force statistics inappropriate in comparison to the HUD workforce, or whether or not discrimination played a role in the shortfall.

28.    Ostensibly, the adoption of a numerical goal in the AEP does not require that the goal be satisfied within a particular period of time. So, for example, when the FY 1998 AEP Plan Update report sets a goal for hiring 103 White women in the Administrative category, there is no requirement that HUD achieve that goal in that year. Gaiter Dep., at

67-68, Exhibit 8. Rather, the goal is intended to be shown to managers reflecting HUD's "plan" and "provide direction for hiring." Gaiter Dep., at 49, 67-68, Exhibit 8. However, there is no evidence that managers and supervisors were informed that there was no need to satisfy the goal. Gaiter Dep., at 69-70, Exhibit 8.

29.    While MD-714 permits an agency to correct under-representation for each EEO group, the HUD AEP Program, HUD refused to take any action to remedy under-representation by White males. Cockrell Dep., at 26-27, 31, Exhibit 9; Gaiter Dep., at 45-46, Exhibit 8. White males were the only EEO group that did not benefit from AEP efforts to correct under-representation. Cockrell Dep., at 26-27, 31, Exhibit 9; Gaiter Dep., at 44-45, Exhibit 8.

30.    While MD-714 permits the implementation of numerical objectives only when an EEO group that is substantially below its representation in the appropriate CLF, HUD's AEP permits numerical objectives to eradicate virtually any under-representation by a female or minority group as compared to the civilian labor force, even if that under-representation is only by a single person. Cockrell Dep., at 24-25, Exhibit 9; Cockrell Dep. (Worth), at 89-91, Exhibit 10.

## FY1993 AEP UPDATE REPORT

31.    In FY 1992, White males were underrepresented in each of the PATCOB categories. FY 1993 AEP Update Report, at 7351 (DII-8), Exhibit 11. White males constituted 50.6% of those in the GS/GM 13-15 positions. FY 1993 AEP Update Report, at 7352 (DII-9), Exhibit 11. White males constituted 36.2% of those in HUD's Administrative positions, as compared to 60.4% in the Civilian Labor Force. FY 1993 AEP Update Report, at 7351 (DII-8), Exhibit 11.

32.     Where an EEO group was underrepresented in a PATCOB category, HUD

establishes a numerical goal for adding members of that group.  Often, HUD would

establish numerical goals for adding members of an EEO group, even when there was no

under-representation of that group in the PATCOB category.  For example, HUD

established goals for adding Hispanic males and females, and American Indian males and

females into Administrative jobs, even though there was no under-representation of those

groups in that PATCOB category.  FY 1993 AEP Update Report, at 7351, 7361 (DII-8,

DII-18), Exhibit 11.

33.     However, White males were treated differently.  Despite their under-

representation in every category, HUD failed to establish numerical goals for adding

White males into any of the PATCOB categories.  FY 1993 AEP Update Report, at 7351,

7361 (DII-8, DII-18), Exhibit 11.

34.     With regard to Employee Development Programs, while White males were 29.7%

of the entire HUD workforce, they constituted only 21% of those enrolled in Special

Employment Programs.  FY 1993 AEP Update Report, at 7392 (DV-2), Exhibit 11.

35.     With regard to promotions, while White males were 29.7% of the HUD

workforce, White males received only 20.6% of the promotions.  FY 1993 AEP Update

Report, at 7395, 7396 (DVI-1, DVI-2), Exhibit 11.  While HUD established an objective

to raise the promotion rate of other EEO groups when they were promoted at a rate less

than their workforce representation, HUD failed to do so for White males.  FY 1993 AEP

Update Report, at 7395, 7396, 7399 (DVI-1, DVI-2, DVI-5), Exhibit 11.

8

FY 1994 AEP ACCOMPLISHMENT REPORT

36.     In FY 1993, White males were 29.6% of HUD's overall workforce. FY 1994
AEP Accomplishment Report, at 7421 (DS-6), Exhibit 12. White males constituted only
20.5% of those enrolled in Special Employment Programs. FY 1994 AEP
Accomplishment Report, at 7553 (DV-2), Exhibit 12.

37.     White males received only 21.3% of the promotions. FY 1994 AEP
Accomplishment Report, at 7565 (DVI-3), Exhibit 12. While HUD implemented
objectives to increase the promotion rate of other EEO groups who were not promoted at
a rate equaling their workforce representation, no objective was implemented to increase
the promotion rate of White males. FY 1994 AEP Accomplishment Report, at 7569
(DVI-7), Exhibit 12.

FY 1995 AEP UPDATE REPORT

37.     In FY 1994, White males were underrepresented in each of the PATCOB
categories. FY 1995 AEP Update Report, at 7627 (DII-11), Exhibit 13. White males
constituted 48.0% of those in the GS/GM 13-15 positions. FY 1995 AEP Update Report,
at 7625 (DII-9), Exhibit 13. White males constituted 34.4% of those in HUD's
Administrative positions, as compared to 42.1% in the Civilian Labor Force. FY 1995
AEP Update Report, at 7627 (DII-11), Exhibit 13.

38.     Where an EEO group was underrepresented in a PATCOB category, HUD
established a numerical goal for adding members of that group. Often, HUD would
establish numerical goals for adding members of an EEO group, even when there was no
under-representation of that group in the PATCOB category. For example, HUD
established goals for adding Hispanic males and females, and American Indian males and

9

females into Administrative jobs, even though there was no under-representation of those groups in that PATCOB category. FY 1995 AEP Update Report, at 7627, 7637 (DII-11, DII-21), Exhibit 13.

39.    However, White males were treated differently. Despite their under-representation in every PATCOB, HUD failed to establish numerical goals for adding White males into any of the PATCOB categories. FY 1995 AEP Update Report, at 7627, 7637 (DII-11, DII-21), Exhibit 13.

40.    With regard to Employee Development Programs, while White males were 29.1% of the entire HUD workforce, they constituted only 19.3% of those enrolled in Special Employment Programs (SEP). FY 1995 AEP Update Report, at 7671 (DV-2), Exhibit 13. Where an EEO group was underrepresented in enrollment in SEPs, HUD would establish an objective to raise that group's rate of enrollment. FY 1995 AEP Update Report, at 7674 (DV-5), Exhibit 13. HUD even established an objective to increase Asian females' enrollment in SEPs, even though Asian females were not underrepresented in their SEP enrollment. FY 1995 AEP Update Report, at 7671, 7674 (DV-2, DV-5), Exhibit 13.

41.    However, White males were treated differently. Despite their under-representation in Special Employment Programs, HUD failed to establish any objective to increase their rate of participation. FY 1995 AEP Update Report, at 7671, 7674 (DV-2, DV-5), Exhibit 13.

42.    With regard to promotions, while White males were 29.1% of the HUD workforce, White males received only 19.5% of the promotions. FY 1995 AEP Update Report, at 7671, 7678 (DV-2, DVI-3), Exhibit 13. While HUD established an objective

to raise the promotion rate of other EEO groups when they were promoted at a rate less than their workforce representation, HUD failed to do so for White males. FY 1995 AEP Update Report, at 7681(DVI-6), <u>Exhibit 13</u>.

FY 1996 AEP UPDATE REPORT

43.     In FY 1995, White males were underrepresented in each of the PATCOB categories. FY 1996 AEP Update Report, at 7715 (DII-10), <u>Exhibit 14</u>. White males constituted 32.8% of those in HUD's Administrative positions, as compared to 42.1% in the Civilian Labor Force. FY 1996 AEP Update Report, at 7715 (DII-10), <u>Exhibit 14</u>. White males made up 46% of the GS/GM 13-15 positions. FY 1996 AEP Update Report, at 7713 (DII-8), <u>Exhibit 14</u>.

44.     Where an EEO group was underrepresented in a PATCOB category, HUD established a numerical goal for adding members of that group. Often, HUD would establish numerical goals for adding members of an EEO group, even when there was no under-representation of that group in the PATCOB category. For example, HUD established goals for adding Black females, Hispanic males and females, and American Indian males and females into Administrative jobs, even though there was no under-representation of those groups in that PATCOB category. FY 1996 AEP Update Report, at 7715, 7726 (DII-10, DII-21), <u>Exhibit 14</u>.

45.     However, White males were treated differently. Despite their under-representation, HUD failed to establish numerical goals for adding White males into the PATCOB categories. FY 1996 AEP Update Report, at 7715, 7726, 7728, 7729 (DII-10, DII-21, DII-23, DII-24), <u>Exhibit 14</u>.

46.    With regard to Employee Development Programs, while White males were 28.2%

of the entire HUD workforce, they constituted only 19.4% of those enrolled in Special

Employment Programs. FY 1996 AEP Update Report, at 7760 (DV-2), Exhibit 14.

Where an EEO group was underrepresented in enrollment in SEPs, HUD would establish

an objective to raise that group's rate of enrollment. FY 1996 AEP Update Report, at

7763 (DV-5), Exhibit 14. HUD even established an objective to increase Asian males'

enrollment in SEPs, even though Asian males were not underrepresented in their SEP

enrollment. FY 1996 AEP Update Report, at 7760, 7763 (DV-2, DV-5), Exhibit 14.

47.    However, White males were treated differently. Despite their under-

representation in Special Employment Programs, HUD failed to establish any objective to

increase their rate of participation. FY 1996 AEP Update Report, at 7760, 7763 (DV-2,

DV-5), Exhibit 14.

48.    With regard to promotions, while White males were 28.2% of the HUD

workforce, White males received only 18.6% of the promotions. FY 1996 AEP Update

Report, at 7760, 7768 (DV-2, DVI-2), Exhibit 14. While HUD established an objective

to raise the promotion rate of other EEO groups, it failed to do so for White males. FY

1996 AEP Update Report, at. 7773 (DVI-7), Exhibit 14.

THE FY 1997 AEP UPDATE REPORT

49.    HUD's FY 1997 AEP Update Report included an analysis whereby its workforce

was compared, by PATCOB categories, to the civilian labor force. FY 1997 AEP Update

Report, at 3886 (DII-10), Exhibit 15. That analysis revealed that White males were

underrepresented in each of the six PATCOB categories, FY 1997 AEP Update Report, at

3886 (DII-10), Exhibit 15.

| OCCUPATIONAL CATEGORY | | WHITE MALE PERCENTAGE |
|---|---|---|
| | | |
| PROFESSIONAL | HUD WORKFORCE | 50.0% |
| | CIVILIAN LABOR FORCE | 54.7% |
| | | |
| ADMINISTRATIVE | HUD WORKFORCE | 32.3% |
| | CIVILIAN LABOR FORCE | 42.1% |
| | | |
| TECHNICAL | HUD WORKFORCE | 5.0% |
| | CIVILIAN LABOR FORCE | 36.1 |
| | | |
| CLERICAL | HUD WORKFORCE | 4.3 % |
| | CIVILIAN LABOR FORCE | 14.0 % |
| | | |
| OTHER | HUD WORKFORCE | 0.0% |
| | CIVILIAN LABOR FORCE | 67.6% |
| | | |
| BLUE COLLAR | HUD WORKFORCE | 30.8% |
| | CIVILIAN LABOR FORCE | 65.4% |

FY 1997 AEP Update Report, at 3886 (DII-10), Exhibit 15.

50.    For example, in the Administrative category, White males were 32.3% of the

workforce, while White males constituted 42.1% of the civilian labor force in that

category.  FY 1997 AEP Update Report, at 3886 (DII-10), Exhibit 15.  The

Administrative category is notable because the two applications directly at issue in this

case were for positions in the Administrative category.  FY 1997 AEP Update Report, at

3899 (DII-25), Exhibit 15 (GS-1101 positions fall with the Administrative category).

51.    With regard to the HUD workforce, the "DESIRED CONDITION" announced by

HUD was "to attain and retain a work force that is reflective of the nation's diversity."

FY 1997 AEP Update Report, at 3926 (DIV-6), Exhibit 15.

52.    With regard to FY 1996, the best applicants/candidates for hire at HUD were

71.1% women and minorities.  However, of those actually selected, 74.6% were women

and minorities.  Conversely, White males were 28.9% of the best applicant/candidate

pool, and were selected only 26.6% of the time. FY 1997 AEP Update Report, at 3924, (DIV-4), Exhibit 15.

53.    HUD established numerical goals for hiring women and minorities in the PATCOB categories. FY 1997 AEP Update Report, at 3896 (DII-22), Exhibit 15. With regard to the Administrative PATCOB category, HUD's FY 1997 goal was to add 202 women and minorities, though hiring or internal movement, including 113 White females, 10 Black females, 19 Hispanic males, 18 Hispanic females, 13 Asian American males, 11 Asian American females, 8 American Indian males, and 10 American Indian females. FY 1997 AEP Update Report, at 3896 (DII-22), Exhibit 15. Despite the under-representation by White males in every PATCOB category, the AEP fails to have any goals for the addition of or promotion of White males. FY 1997 AEP Update Report, at 3896, 3899 (DII-22, DII-25), Exhibit 15.

54.    HUD established numerical goals for adding women and minorities, even if they were already employed in excess of parity in the applicable PATCOB category. For example, in the Administrate category, HUD set numerical gals for adding Black females, Hispanic males and females, and American Indian males and females, despite the fact that each of these EEO groups were already employed in excess of parity in the Administrative category. FY 1997 AEP Update Report, at 3886, 3896 (DII-10, DII-22,) Exhibit 15.

55.    With regard to the GS-1101 series, the FY 1997 AEP established a goal of hiring or the internal movement of 44 White women or minorities to the position. FY 1997 AEP Update Report, at 3899 (DII-25). HUD did not set numerical goals for the hiring or promotion of White males for this job category. Id., Exhibit 15

14

56.    With regard to promotions, it was considered an "UNDESIRED CONDITION" when the promotion rate for an EEO group fell below its percentage of representation within the HUD workforce. FY 1997 AEP Update Report, at 3945 (DVI-4), Exhibit 15. For those EEO groups who rate of promotion was less than the percentage of their representation in the HUD workforce, HUD announced the "DESIRED CONDITION" and "objective" that there would be an increase in their promotion rates. FY 1997 AEP Update Report, at 3945, 3947 (DVI-4, DVI-6), Exhibit 15. For example, when Black males constituted 8.1% of the HUD workforce, but received only 6.1% of the promotions, HUD announced an "objective" to increase the rate of promotion for Black males. FY 1997 AEP Update Report, at 3945, 3947 (DVI-4, DVI-6), Exhibit 15. HUD expected "Increased rates of promotion" for all targeted EEO groups whose percentages of promotion are below their percentages of work force representation. FY 1997 AEP Update Report, at 3946, (DVI-5), Exhibit 15.

57.    However, White males did not benefit from equal application of goals. According to the FY 1997 AEP Update Report, White males, at 28.2% of the workforce, but were given 16.6% of the promotions. FY 1997 AEP Update Report, at 3944 (DVI-3), Exhibit 15. White males were promoted at a rate less than half that of White females. FY 1997 AEP Update Report, at 3944 (DVI-3), Exhibit 15. The White males' promotion rate was lower than the promotion rate of eight of the nine other EEO groups. Id. However, HUD failed to establish an objective to increase the rate of promotion of White males. FY 1997 AEP Update Report, at 3946 (DVI-5), Exhibit 15.

58.    HUD sometimes established goals for increasing promotion rates for an EEO group, even without evidence that the EEO group had been underrepresented in the

15

provision of that type of promotion. The 1997 AEP Update Report established the objective of increasing the rate of non-competitive promotions of Asian females, even though Asian females were not underrepresented in that category of promotion. FY 1997 AEP Update Report, at 3944, 3947, (DVI-3, DVI-6), Exhibit 15.

59.     With regard to Employee Development Programs, HUD considered it an "UNDESIRED CONDITION" when percentages of participation of non-White male EEO groups in Special Employment Programs fell below their percentages of work force representation. FY 1997 AEP Update Report, at 3935-3937, (DV-2 – DV-4), Exhibit 15. The Report established an "OBJECTIVE" for increased participation of those EEO Groups who did not participate in Special Employment Programs at rates commensurate with their workforce representation. FY 1997 AEP Update Report, at 3937, 3939 (DV-4, DV-6), Exhibit 15.

60.     While White males constituted 28.2% of the total HUD workforce, they constituted only 18% of those enrolled in Special Employment Programs. FY 1997 AEP Update Report, at 3935 (DV-2), Exhibit 15. Despite this under-representation, there was no goal for increasing the participation rate for White males. FY 1997 AEP Update Report, at 3935-3937 (DV-2 – DV-4), Exhibit 15.

61.     Sometimes, HUD established an objective for the increased participation of non-White EEO groups in Special Employment Programs, even though that group, such as White females, were already enrolled in such programs at rates exceeding their workforce representation. FY 1997 AEP Update Report, at 3935-3937, 3939 (DV-2 – DV-4, DV-6), Exhibit 15.

62.    Despite the under-representation by White males in every PATCOB category, a hiring rate that lagged behind their numbers as "best applicants," and despite promotion rates that lagged behind their workforce representation, and behind the promotion rate of every other EEO Group, the FY 1997 AEP fails to include any goals for adding or promoting White males.

63.    In HUD's FY 1997 AEP Update Report, the Secretary of HUD, Andrew Cuomo instructs HUD Managers and supervisors that they are expected to review AEP reports before initiating any hiring, training or promotion, and that they will be held accountable for promoting AE/Diversity goals. FY 1997 AEP Update Report, at 3865 (D-4), Exhibit 15. Managers and supervisors are to make a "vigorous effort" to assure "full . . . representation of qualified minorities [and] women . . . when . . . hiring, and providing advancement opportunities." FY 1997 AEP Update Report, at 3865 (D-4), Exhibit 15. Given HUD's downsizing mode at the time, the AEP report stressed that its goals would have to be met through internal movements. FY 1997 AEP Update Report, at 3887 (DII-12), Exhibit 15.

64.    The Report includes a Memorandum addressed to "All HUD Employees," which states: "In carrying out their responsibilities, all managers and supervisors are fully accountable for taking actions to assure that EEO/AE/Diversity goals and objectives are achieved." FY 1997 AEP Update Report, at 3864 (D-3), Exhibit 15. The report/memorandum further states: "EEO/AE/Diversity is a separate critical element in our managerial performance appraisal system, which requires the Senior Executive Service (SES) and managers and supervisors under the Performance Management and

Recognition System (PMRS) to achieve measurable results in their management of the

Department.  FY 1997 AEP Update Report, at 3864 (D-3), Exhibit 15.

THE FY 1998 AEP UPDATE REPORT

65.     HUD's FY 1998 AEP Update Report included an analysis whereby its workforce

was compared, by PATCOB categories, to the civilian labor force.  FY 1998 AEP Update

Report, at 3990 (DII-10), Exhibit 16. "That analysis revealed that White males were

underrepresented in each of the six PATCOB categories.  FY 1998 AEP Update Report,

at 3990 (DII-10), Exhibit 16.

| OCCUPATIONAL CATEGORY | | WHITE MALE PERCENTAGE |
|---|---|---|
| | | |
| PROFESSIONAL | HUD WORKFORCE | 49.4% |
| | CIVILIAN LABOR FORCE | 54.7% |
| | | |
| ADMINISTRATIVE | HUD WORKFORCE | 31.3% |
| | CIVILIAN LABOR FORCE | 42.1% |
| | | |
| TECHNICAL | HUD WORKFORCE | 4.6% |
| | CIVILIAN LABOR FORCE | 36.1 |
| | | |
| CLERICAL | HUD WORKFORCE | 4.4 % |
| | CIVILIAN LABOR FORCE | 14.0 % |
| | | |
| OTHER | HUD WORKFORCE | 0.0% |
| | CIVILIAN LABOR FORCE | 67.6% |
| | | |
| BLUE COLLAR | HUD WORKFORCE | 33.3% |
| | CIVILIAN LABOR FORCE | 65.4% |

FY 1998 AEP Update Report, at 3990 (DII-10), Exhibit 16.

66.     For example, in the Administrative category, White males were 31.3% of the

HUD workforce, while they were 42.1% of the civil labor force.  FY 1998 AEP Update

Report, at 3990 (DII-10), Exhibit 16.

67.    With regard to FY 1997, the best applicants/candidates for hire in positions HUD-wide were 77.8% women and minorities. However, of those actually selected, 83.3% were women and minorities. Conversely, White males were 22.2% of the best applicant/candidate pool, and were selected 16.7% of the time. FY 1998 AEP Update Report, at 4029, 4030 (DIV-3 & 4), Exhibit 16.

68.    With regard to HUD workforce composition, the FY 1998 AEP Update Report asserts that the "DESIRED CONDITION" is "A diversified work force that is reflective of the Nation's diversity." FY 1998 AEP Update Report, at 3991 (DII-11), Exhibit 16.

69.    HUD established numerical goals for increasing representation of women and minorities in the PATCOB categories. With regard to the Administrative PATCOB category, HUD's FY 1998 goal was to add 103 White females, 6 Black females, 19 Hispanic males, 18 Hispanic females, 13 Asian/Pacific males, 11 Asian/Pacific females, 7 American Indian/Alaskan males and 8 American Indian/Alaskan females. FY 1998 AEP Update Report, at 4002 (DII-22), Exhibit 16. There was no goal to add White males, despite their under-representation in the Administrative category. Id.

70.    With regard to the GS-1101 job series, the FY 1998 AEP established a goal of adding 31 White females, 3 Asian/Pacific males and 2 Asian/Pacific females. FY 1998 AEP Update Report, at 4005 (DII-25), Exhibit 16. There was no goal to add White males, nor could there be, by design of the AEP. Id. Agency-wide, HUD established the goal of adding 315 women and/or minorities, and maintained a numerical goal for each EEO Group except for White males. FY 1998 AEP Update Report, at 4002 (DII-22), Exhibit 16.

71.    HUD would sometimes establish a numerical goal to add members of a non-White male EEO group, even when there was no under-representation of that group.  For example, the FY 1998 AEP Update Report lists Black females as 21.2% of HUD's workforce in the Administrative category, while Black females are only 5.3% of the civilian labor force.  FY 1998 AEP Update Report, at 3990, Exhibit 16.  Despite the fact that Black females exceed the civilian labor force by close to 400%, HUD established the numerical goal of hiring six more Black females into the Administrative category.  FY 1998 AEP Update Report, at 3990, 4002, Exhibit 16.  Likewise, HUD exceeded the civilian labor force in employing Hispanic females in the Administrative category, and yet HUD sets a goal of hiring 18 more Hispanic females in that category.  FY 1998 AEP Update Report, at 3990, 4002, Exhibit 16.  A goal was set for hiring 19 more Hispanic males in the "Administrative" category, even though Hispanic males' percentage in the HUD Administrative category exceeded that of the civilian labor force.  FY 1998 AEP Update Report, at 3990, 4002, Exhibit 16.  Likewise, HUD established numerical goals for adding Hispanic males, American Indian males and females for positions in the Administrative category, despite the fact that there was no under-representation of these EEO groups in the Administrative category.  FY 1998 AEP Update Report, at 3990, 4002, Exhibit 16.

72.    With respect to promotions, it was considered an "UNDESIRED CONDITION" when a non-White male EEO group was promoted in rates below its percentage of representation in the HUD workforce.  FY 1998 AEP Update Report, 4054 (DVI-4), Exhibit 16.  For those EEO groups whose rate of promotion were less than the percentage of their representation in the HUD workforce, HUD announced the "DESIRED

CONDITION" and "objective" that there would be an increase in their promotion rates. FY 1998 AEP Update Report, 4054, 4056 (DVI-4, DVI-6), Exhibit 16. HUD expected "Increased rates of promotion for all targeted EEO groups whose percentages of promotion are below their percentages of work force representation." FY 1998 AEP Update Report, 4055 (DVI-5), Exhibit 16.

73.    However, White males were not treated equally. The FY 1998 AEP Update Report stated that although White males constituted 28.1% of the entire HUD workforce in FY 1997, White males received only 15.8% of the promotions. FY 1998 AEP Update Report, at 4053 (DVI-3), Exhibit 16. White males were promoted at the lowest rate of any EEO group. FY 1998 AEP Update Report, at 4053 (DVI-3), Exhibit 16. However, it was not considered a "DESIRED CONDITION" that White males would be promoted at an increased rate, and no such objective for increased promotion was adopted.

74.    With regard to EEO groups other than White males, HUD would sometimes put in place an objective to increase promotion rates for an EEO group, **even if the EEO group was already being promoted in excess of its representation within HUD.** For example, in FY 1997, Hispanic males were 2.6% of the HUD workforce, and yet received 2.7% of the Competitive promotions. FY 1998 AEP Update Report, at 4053 (DVI-3), Exhibit 16. Despite the fact that Hispanic males were receiving Competitive promotions in excess of parity, HUD generated an objective to increase the Competitive promotion rates for Hispanic males. FY 1998 AEP Update Report, at 4053 (DVI-3), Exhibit 16.

75.    With respect to Employee Development Programs, HUD considered it an "UNDESIRED CONDITION" when the percentage of enrollment of a non-White male EEO group in Special Employment Programs fell below the percentage of representation

of that group in the HUD workforce.  FY 1998 AEP Update Report, at 4045 (DV-4),

Exhibit 16.  The "DESIRED CONDITION" would include increase participation in

Special Employment Programs for those EEO groups who were underrepresented in

those programs.  FY 1998 AEP Update Report, at 4045 (DV-4), Exhibit 16.

76.     While White males constituted 28.1% of the total HUD workforce, they

constituted only 15.6% of those enrolled in Special Employment Programs.  FY 1998

AEP Update Report, at 4044 (DV-3), Exhibit 16.  Despite this under-representation,

HUD did not consider it a "DESIRED CONDITION" to increase White male

participation.  FY 1998 AEP Update Report, at 4044-4045 (DV-3 – DV-4), Exhibit 16.

Instead, HUD's "OBJECTIVE" and "EXPECTED RESULTS" include "Increased

minority and women participation in all training and developmental programs."  FY 1998

AEP Update Report, 4046, 4049 (DV-5, DV-8), Exhibit 16.

77.     Sometimes, HUD called for the increased participation of non-White EEO groups

in Special Employment Programs, even though that group, such as White females, were

already enrolled in such programs at rates exceeding their workforce representation.  FY

1998 AEP Update Report, at 4044, 4047 (DV-3, DV-6), Exhibit 16.

78.     In HUD's FY 1998 AEP Update Report, the Secretary of HUD, Andrew Cuomo

instructs HUD Managers and Supervisors that they are expected to review AEP reports

before initiating any hiring, training or promotion, that they should make adjustments in

activities to meet AEP goals and objectives, and that they will be held accountable for

promoting AE/Diversity goals.  FY 1998 AEP Update Report, at 3968 (D-4), Exhibit 16;

Gaiter Dep., at 39, Exhibit 8.  Managers and supervisors are to make a "vigorous effort"

to assure "full . . . representation of qualified minorities [and] women . . . when . . .
hiring, and providing advancement opportunities." Id.

79.     The Report includes a Memorandum addressed to "All HUD Employees," which
states: "In carrying out their responsibilities, all managers and supervisors are fully
accountable for taking actions to assure that EEO/AE/Diversity goals and objectives are
achieved." FY 1998 AEP Update Report, at 3967 (D-3), Exhibit 16.  The
report/memorandum further states: "EEO/AE/Diversity is a separate critical element in
our managerial performance appraisal system, which requires the Senior Executive
Service (SES) and managers and supervisors under the Performance Management and
Recognition System (PMRS) to achieve measurable results in their management of the
Department.  FY 1998 AEP Update Report, at 3967 (D-3), Exhibit 16.

80.     Despite the under-representation by White males in every PATCOB category, and
despite promotion rates that lagged behind their workforce representation, and behind the
promotion rate of every other EEO Group, the FY 1998 AEP fails to include any goals
for adding or promoting White males.  FY 1998 AEP Update Report, at 4002, 4005 (DII-
22, DII-25), Exhibit 16.

THE FY 1999 AEP UPDATE REPORT

81.     HUD's FY 1999 AEP Update Report included an analysis whereby its workforce
was compared, by PATCOB categories, to the civilian labor force.  That analysis
revealed that White males were underrepresented in each of the six PATCOB categories.
FY 1999 AEP Update Report, at 4101 (DII-12), Exhibit 17.

| OCCUPATIONAL CATEGORY | | WHITE MALE PERCENTAGE |
|---|---|---|
| PROFESSIONAL | HUD WORKFORCE | 49.9% |
| | CIVILIAN LABOR FORCE | 54.7% |
| | | |
| ADMINISTRATIVE | HUD WORKFORCE | 30.9% |
| | CIVILIAN LABOR FORCE | 42.1% |
| | | |
| TECHNICAL | HUD WORKFORCE | 5.1% |
| | CIVILIAN LABOR FORCE | 36.1 |
| | | |
| CLERICAL | HUD WORKFORCE | 5.3 % |
| | CIVILIAN LABOR FORCE | 14.0 % |
| | | |
| OTHER | HUD WORKFORCE | 0.0% |
| | CIVILIAN LABOR FORCE | 67.6% |
| | | |
| BLUE COLLAR | HUD WORKFORCE | 25% |
| | CIVILIAN LABOR FORCE | 65.4% |

FY 1999 AEP Update Report, at 4101 (DII-12), Exhibit 17.

82.     In the Administrative category, White males were 30.9% of the HUD workforce, while they were 42.1% of the civil labor force. FY 1999 AEP Update Report, at 4101 (DII-12), Exhibit 17.

83.     With regard to workforce composition, the FY 1999 AEP Update Report asserts that the "DESIRED CONDITION" is "A diversified work force that is reflective of the Nation's diversity." FY 1999 AEP Update Report, at 4102 (DII-13). The Report states that the "EXPECTED RESULTS" of the AEP to be "An increase in the diversification and balanced representation of EEO groups, whose current composition of the Department's work force shows manifest imbalances and/or conspicuous absences." FY 1999 AEP Update Report, at 4103 (DII-14), Exhibit 17.

84.     HUD established numerical goals for increasing representation of women and minorities in the PATCOB categories. With regard to the Administrative PATCOB

category, HUD's FY 1999 goal was to add 217 White females, 15 Black females, 15

Hispanic males, 18 Hispanic females, 11 Asian/Pacific males, 14 Asian/Pacific females,

8 American Indian/Alaskan males and 9 American Indian/Alaskan females.  FY 1999

AEP Update Report, at 4113 (DII-24), Exhibit 17.  There was no goal to add White

males, despite their under-representation in that category.  FY 1999 AEP Update Report,

at 4101 (DII-12), Exhibit 17.

85.    With regard to the GS-1101 job series, the FY 1999 AEP established a goal of

adding 5 White females, 3 Asian/Pacific males and 2 Asian/Pacific females.  FY 1999

AEP Update Report, at 4122 (DII-33), Exhibit 17.  There was no goal to add White

males.  Id.  Agency-wide, HUD established the goal of adding 392 women and

minorities, and established a numerical goal for each EEO Group except for White males.

FY 1999 AEP Update Report, at 4113 (DII-24), Exhibit 17.

86.    Sometimes, HUD would set a numerical goal to add members of an EEO group,

even when there was no under-representation of that group.  For example, the FY 1999,

AEP Update Report lists Black females as 21.6% of HUD's workforce in the

Administrative category, while Black females are only 5.3% of the civilian labor force.

FY 1999 AEP Update Report, at 4101 (DII-12), Exhibit 17.  Despite the fact that Black

females exceed the civilian labor force by close to 400%, HUD established the numerical

goal of hiring 15 more Black females into the Administrative category.  FY 1999 AEP

Update Report, at 4113, (DII-24), Exhibit 17.  Likewise, HUD exceeded the civilian labor

force in employing Hispanic males and females, Asian males and females, and American

Indian males and females in the Administrative category, and yet HUD set numerical

goals of hiring more of each group into the Administrative category. FY 1999 AEP

Update Report, at 4101, 4113 (DII-12, DII-24), Exhibit 17.

87.    With regard to Recruitment and Hiring, HUD stated that "every effort will be

made to eliminate instances of under-representation of the identified EEO groups (listed

below) in each of the major occupational series." FY 1999 AEP Update Report, at 4142,

(DIV-4), Exhibit 17. According to the Report, HUD would continue to encourage the use

of internal movements as a means of correcting under-representation, and that

management and selecting officials would be advised of HUD's "commitment to increase

representation of targeted EO groups in all occupations and at all grade levels." FY 1999

AEP Update Report, at 4146, Exhibit 17.

88.    With respect to promotions, it was considered an "UNDESIRED CONDITION"

when a non-White male EEO group was promoted in rates below its percentage of

representation in the HUD workforce. FY 1999 AEP Update Report, at 4163 (DVI-4),

Exhibit 17. For those EEO groups whose rate of promotion was less than the percentage

of their representation in the HUD workforce, HUD announced the "DESIRED

CONDITION" and "objective" that there would be an increase in their promotion rates.

FY 1999 AEP Update Report, at 4163, 4166 (DVI-4, DVI-7), Exhibit 17. For example,

where Black males were 8.1% of the HUD workforce, but were given 6.9% of the

promotions, HUD established an objective to increase the rate of promotion of Black

males. FY 1999 AEP Update Report, at 4162, 4166 (DVI-3, DVI-7), Exhibit 17. HUD

expected "Increased rates of promotion for all targeted EEO groups . . . whose

percentages of promotion are below their percentages of work force representation." FY

1999 AEP Update Report, at 4165 (DVI-6), Exhibit 17.

89.     However, White males were not treated equally.  The FY 1999 AEP Update
Report stated that although White males constituted 28.0% of the entire HUD workforce
in FY 1998, but that White males received only 15.8% of the promotions.  FY 1999 AEP
Update Report, at 4162 (DVI-3), Exhibit 17.  In contrast, White females represented
28.0% of the workforce, and received 33% of the Non-Competitive promotions and
33.2% of the Competitive promotions. FY 1999 AEP Update Report, at 4162 (DVI-3),
Exhibit 17.  Many non-White male EEO groups were promoted at rates exceeding their
workforce composition, and no other EEO group, except for Indian males, was promoted
as infrequently as White males.  FY 1999 AEP Update Report, at 4162 (DVI-3), Exhibit
17.  However, HUD failed to recognize the objective to increase the rate of promotion of
White males, despite the fact that their promotion rate fell below their representation
level. FY 1999 AEP Update Report, at 4163 (DVI-4), Exhibit 17.

90.     With regard to EEO groups other than White males, HUD would sometimes put
in place an objective to increase promotion rates, **even if the EEO group was being
promoted in excess of its representation within HUD**.  For example, in FY 1998,
Indian females were 0.7% of the HUD workforce, and yet received 0.8% of the
promotions.  FY 1999 AEP Update Report, at 4162 (DVI-3), Exhibit 17.  Despite the fact
that Indian females were receiving their share of promotions in excess of parity, HUD
generated an objective to increase their promotion rate.  FY 1999 AEP Update Report, at
4163 (DVI-4), Exhibit 17.

91.     With respect to Employee Development Programs, HUD considered it an
"UNDESIRED CONDITION" when the percentage of enrollment of a non-White male
EEO group in Special Employment Programs fell below the percentage of representation

27

of that group in the HUD workforce. FY 1999 AEP Update Report, at 4154 (DV-4),

Exhibit 17. The "DESIRED CONDITION" would include increase participation in

Special Employment Programs for those EEO groups who were underrepresented in

those programs. FY 1999 AEP Update Report, at 4154 (DV-4), Exhibit 17.

92.     Sometimes, HUD called for the increased participation of non-White EEO groups

in Special Employment Programs, even though that group was already enrolled in such

programs at rates exceeding their workforce representation. For example, in FY 1998,

White females were 28% of the HUD workforce, but constituted 33.4% of those

participating in Special Employment Programs. Nevertheless, HUD established an

objective to increase the participation of White females in Special Employment

Programs. FY 1999 AEP Update Report, at 4153, 4157 (DV-3, DV-7), Exhibit 17.

93.     However, White males were not treated equally. While White males constituted

28.0% of the total HUD workforce, they constituted only 5% of those enrolled in Special

Employment Programs. FY 1999 AEP Update Report, at 4153 (DV-3), Exhibit 17.

Despite this under-representation, HUD did not implement any objective to increase

White male participation. FY 1999 AEP Update Report, at 4156 (DV-6), Exhibit 17.

94.     HUD's "EXPECTED RESULTS" include "Increased minority and women

participation in all training and developmental programs." FY 1999 AEP Update Report,

at 4155 (DV-5), Exhibit 17.

95.     In HUD's FY 1999 AEP Update Report, the Secretary of HUD, Andrew Cuomo

instructs HUD Managers and Supervisors that they are expected to review AEP reports

before initiating any hiring, training or promotion, that they should make adjustments in

activities to meet AEP goals and objectives, and that they will be held accountable for promoting AE/Diversity goals. FY 1999 AEP Update Report, at 4077 (D-4), Exhibit 17.

96.     The Report includes a Memorandum addressed to "All HUD Employees," which states: "In carrying out their responsibilities, all managers and supervisors are fully accountable for taking actions to assure that EEO/AE/Diversity goals and objectives are achieved." FY 1999 AEP Update Report, at 4076 (D-3), Exhibit 17. The report/memorandum further states: "EEO/AE/Diversity is a separate critical element in our managerial performance appraisal system, which requires the Senior Executive Service (SES) and managers and supervisors under the Performance Management and Recognition System (PMRS) to achieve measurable results in their management of the Department. FY 1999 AEP Update Report, at 4076 (D-3), Exhibit 17.

97.     Despite the under-representation by White males in every PATCOB category, and despite promotion rates that lagged behind their workforce representation, and behind eight of the other nine EEO Groups, and despite participation in special training programs that significantly lagged behind their numbers in the HUD workforce, the FY 1999 AEP fails to include any goals or objectives that would assist employment opportunities for White males. FY 1999 AEP Update Report, at 4113 (DII-24), Exhibit 17.

THE FY 2000 AEP UPDATE REPORT

98.     HUD's FY 2000 AEP Report revealed that White males were underrepresented in each of the six PATCOB categories. FY 2000 AEP Update Report, at 4216, DII-18, Exhibit 18.

| OCCUPATIONAL CATEGORY | | WHITE MALE PERCENTAGE |
|---|---|---|
| PROFESSIONAL | HUD WORKFORCE | 45.8% |
| | CIVILIAN LABOR FORCE | 54.7% |
| | | |
| ADMINISTRATIVE | HUD WORKFORCE | 30.2% |
| | CIVILIAN LABOR FORCE | 42.1% |
| | | |
| TECHNICAL | HUD WORKFORCE | 5.1% |
| | CIVILIAN LABOR FORCE | 36.1 |
| | | |
| CLERICAL | HUD WORKFORCE | 5.2 % |
| | CIVILIAN LABOR FORCE | 14.0 % |
| | | |
| OTHER | HUD WORKFORCE | 21.9% |
| | CIVILIAN LABOR FORCE | 67.6% |
| | | |
| BLUE COLLAR | HUD WORKFORCE | 22.2% |
| | CIVILIAN LABOR FORCE | 65.4% |

FY 2000 AEP Update Report, at 4216, DII-18, Exhibit 18.

99.    In HUD's Administrative category, White males were 30.2% of the workforce, while White males were 42.1% of the civilian labor force.  FY 2000 AEP Update Report, at 4216, DII-18, Exhibit 18.

100.    HUD established numerical goals for increasing representation of women and minorities in the PATCOB categories.  With regard to the Administrative PATCOB category, HUD's FY 2000 goal was to add 143 White females, 23 Black females, 23 Hispanic males, 26 Hispanic females, 12 Asian/Pacific males, 9 Asian/Pacific females, 11 American Indian/Alaskan males and 10 American Indian/Alaskan females.  FY 2000 AEP Update Report, 4228, DII-30, Exhibit 18.

101.    With regard to the GS-1101 job series, the FY 2000 AEP established a goal of adding 55 White females and 5 Asian/Pacific males.  FY 2000 AEP Update Report, at 4231, DII-33, Exhibit 18.

30

102.    Agency-wide, HUD established the goal of adding 430 women and/or individuals from certain ethnic groups, and maintained a numerical goal for each EEO Group except for White males. FY 2000 AEP Update Report, 4228, DII-30, Exhibit 18. Despite under-representation in every category, no goals were established to add White males. Id.

103.    Sometimes, HUD would set a numerical goal to add members of an EEO group, even when there was no under-representation of that group. For example, the FY 2000 AEP Update Report lists Black females as 22.1% of HUD's workforce in the Administrative category, while Black females are only 5.3% of the civilian labor force. FY 2000 AEP Update Report, at 4216, DII-18, Exhibit 18. Despite the fact that Black females exceed the civilian labor force by close to 400%, HUD established the goal of hiring six more Black females into the Administrative category. FY 2000 AEP Update Report, at 4216, 4228, DII-18, DII-30, Exhibit 18. Likewise, HUD exceeded the civilian labor force in employing male and female Hispanics, male and female Asians and male and female American Indians in the Administrative category, and yet HUD establishes numerical goals for hiring more members of each of these EEO groups into the Administrative category. FY 2000 AEP Update Report, at 4216, 4228, DII-18, DII-30, Exhibit 18. Satisfaction of these objectives would necessarily come at the expense of White males.

104.    With regard to promotions, the FY 2000 AEP Update Report stated that although White males constituted 27.7% of the entire HUD workforce in FY 2000, White males received only 24.8% of the promotions. FY 2000 AEP Update Report, at 4272, DVI-2, Exhibit 18. In contrast, for example, White females, while also representing 27.7% of the

workforce, received 28.7% of the promotions. FY 2000 AEP Update Report, at 4272, DVI-2, Exhibit 18. Other EEO Groups including Blacks, Hispanics, Asians and Indians were all promoted at rates exceeding the promotion rate of White males. FY 2000 AEP Update Report, at 4272-4273, DVI-2-3, Exhibit 18.

105.    In cases where a non-White male EEO Group was promoted below their percentage of representation in the HUD workforce, this constitutes an "Undesired Condition" or "Problem." FY 2000 AEP Update Report, at 4274, 4276, DVI-4, 6, Exhibit 18. For these EEO Groups, HUD generated objectives to increase the rate of promotion. FY 2000 AEP Update Report, at 4276, DVI-6, Exhibit 18. However, HUD failed to recognize the objective to increase the rate of promotion of White males, despite the fact that their promotion rate fell below their representation level. FY 2000 AEP Update Report, at 4276, DVI-6, Exhibit 18.

106.    With regard to EEO groups other than White males, HUD would sometimes put in place an objective to increase promotion rates, **even if the EEO group was already being promoted in excess of its representation within HUD.** For example, in FY 2000, White females were 27.7% of the HUD workforce, and received 28.7% of the promotions. FY 2000 AEP Update Report, at HUD 4272, DVI-2, Exhibit 18. Despite the fact that White females were receiving their share of promotions, HUD generated an objective to increase the overall promotion rate for White females. FY 2000 AEP Update Report, at 4272, 4276, DVI-2, DVI-6, Exhibit 18. Likewise, HUD issued an objective to increase competitive, non-competitive and combined for promotion rates for Asian males, combined promotion rates for Hispanic females, combined promotion rates for Indian males, non-competitive promotion rates for Asian females, and non-competitive

32

promotion rates for Black females, **even though each group's promotion rate in each of these categories already exceeded their workforce representation.** FY 2000 AEP Update Report, at 4272-3, 4276, DVI-2, DVI-3, DVI-6, <u>Exhibit 18</u>.

107.    With respect to Employee Development Programs, HUD considered it an "UNDESIRED CONDITION" when the percentage of enrollment of a non-White male EEO group in Special Employment Programs fell below the percentage of representation of that group in the HUD workforce. FY 2000 AEP Update Report, at 4266, DV-6, <u>Exhibit 18</u>. The "DESIRED CONDITION" would include increase participation in Special Employment Programs for those EEO groups who were underrepresented in those programs. FY 2000 AEP Update Report, at 4266, DV-6, <u>Exhibit 18</u>.

108.    While White males constituted 27.7% of the total HUD workforce, they constituted only 17.4% of those enrolled in Special Employment Programs. FY 2000 AEP Update Report, at 4265, DV-5, <u>Exhibit 18</u>. Despite this under-representation, HUD did not implement an objective to increase White male participation. FY 2000 AEP Update Report, at 4268, DV-8, <u>Exhibit 18</u>. Instead, HUD's "OBJECTIVE" and "EXPECTED RESULTS" include "Increased minority and women participation in all training and developmental programs." FY 2000 AEP Update Report, 4267, 4268, DV-7, DV-8, <u>Exhibit 18</u>.

109.    Sometimes, HUD called for the increased participation of non-White EEO groups in Special Employment Programs, even though that group, such as Black females, Hispanic males, Hispanic females, Asian females and Indian females, was already enrolled in such programs at rates exceeding their workforce representation. FY 2000 AEP Update Report, 4265, 4266, DV-5, DV-6, <u>Exhibit 18</u>.

33

110.    In HUD's FY 2000 AEP Update Report, the Secretary of HUD, Andrew Cuomo

instructs HUD Managers and Supervisors that they are expected to review AEP reports

before initiating any hiring, training or promotion, that they should make adjustments in

activities to meet AEP goals and objectives, and that they will be held accountable for

promoting AE/Diversity goals.  FY 2000 AEP Update Report, 4184, D-4, Exhibit 18.

111.    The Foreword of the document states:

> Numerous analyses were conducted to determine the under-representation in the
> Department's work force and to surface any barriers that would impede equality
> of opportunity for minorities and women.  Manifest imbalances and conspicuous
> absences have been identified for each Equal Employment Opportunity (EEO)
> group (excluding White males) by occupational category . . . grade groupings and
> major occupations.  The Fiscal Year 2000 AEP Plan Update Report contains the
> objective, action items, and **numerical goals targeted to correct imbalances** and
> remove barriers that impede progress in our AEP within the Department.

FY 2000 AEP Update Report, at 4182, D-1, Exhibit 18.

112.    Despite the under-representation by White males in every PATCOB category,

under-representation in Special Employment Programs, and despite promotion rates that

lagged behind their workforce representation, the FY 2000 AEP fails to include any goals

or objectives benefiting White males.  FY 2000 AEP Update Report, 4216, 4228, DII-18,

DII-30, Exhibit 18.

THE FY 2001 AEP UPDATE REPORT

113.    HUD's FY 2001 AEP Report revealed that White males were underrepresented in

each of the six PATCOB categories.  FY 2001 AEP Update Report, 4330, DII-20, Exhibit

19.

34

| OCCUPATIONAL CATEGORY | | WHITE MALE PERCENTAGE |
|---|---|---|
| PROFESSIONAL | HUD WORKFORCE | 45.3% |
| | CIVILIAN LABOR FORCE | 54.7% |
| | | |
| ADMINISTRATIVE | HUD WORKFORCE | 29.7% |
| | CIVILIAN LABOR FORCE | 42.1% |
| | | |
| TECHNICAL | HUD WORKFORCE | 5.1% |
| | CIVILIAN LABOR FORCE | 36.1 |
| | | |
| CLERICAL | HUD WORKFORCE | 5.3% |
| | CIVILIAN LABOR FORCE | 14.0 % |
| | | |
| OTHER | HUD WORKFORCE | 29% |
| | CIVILIAN LABOR FORCE | 67.6% |
| | | |
| BLUE COLLAR | HUD WORKFORCE | 20% |
| | CIVILIAN LABOR FORCE | 65.4% |

FY 2001 AEP Update Report, 4330, DII-20, <u>Exhibit 19</u>.

114.    In HUD's Administrative category, White males were 29.7% of the workforce, while White males were 42.1% of the civilian labor force.  FY 2001 AEP Update Report, at 4330, DII-20, <u>Exhibit 19</u>.

115.    HUD established numerical goals for increasing representation of women and minorities in the PATCOB categories.  With regard to the Administrative PATCOB category, HUD's FY 2001 goal was to add 151 White females, 50 Black females, 30 Hispanic males, 28 Hispanic females, 17 Asian/Pacific males, 12 Asian/Pacific females, 12 American Indian/Alaskan males and 12 American Indian/Alaskan females.  Despite the under representation of White males in the Administrative category, there was no goals to add White males.  FY 2001 AEP Update Report, at 4342, DII-32, <u>Exhibit 19</u>.

116.    With regard to the GS-1101 job series, the FY 2001 AEP established a goal of

adding 55 White females, 2 Hispanic males and 5 Asian/Pacific males. FY 2001 AEP

Update Report, at 4345, DII-35, <u>Exhibit 19</u>.

117.    Agency-wide, HUD established the goal of adding 501 women and/or individuals

from certain ethnic groups, and maintained a numerical goal for each EEO Group except

for White males. FY 2001 AEP Update Report, at 4342, DII-32, <u>Exhibit 19</u>.

118.    Sometimes, HUD would set a numerical goal to add members of an EEO group,

even when there was no under-representation of that group. For example, the FY 2001

AEP Update Report establishes goals for adding, in Administrative positions, Black

females, Hispanic males and females, Asian males and females, and American Indian

males and females, despite the fact that there was no under-representation of these EEO

groups in the Administrative category. FY 2001 AEP Update Report, at 4330, 4342, DII-

20, DII-32, <u>Exhibit 19</u>. Satisfaction of these objectives would necessarily come at the

expense of White males.

119.    With regard to promotions, in cases where a non-White male EEO Group was

promoted at a rate below its percentage of representation in the HUD workforce, this

constitutes an "Undesired Condition" or "Problem." FY 2001 AEP Update Report, at

4378, DVI-3, <u>Exhibit 19</u>. For these EEO Groups, HUD generated objectives to increase

the rate of promotion. FY 2001 AEP Update Report, at 4380, DVI-5, <u>Exhibit 19</u>.

120.    However, White males were not treated equally. The FY 2001 AEP Update

Report stated that although White males constituted 27.8% of the entire HUD workforce

in FY 2000, White males received only 22.8% of the promotions. FY 2001 AEP Update

Report, 4377, DVI-2. However, HUD failed to establish an objective to increase the rate

of promotion of White males, despite the fact that their promotion rate fell below their

representation level.  FY 2001 AEP Update Report, at 4380, DVI-5, Exhibit 19.

121.    With regard to EEO groups other than White males, HUD would sometimes put

in place an objective to increase promotion rates, even if the EEO group was already

being promoted in excess of its representation within HUD, as it did, for example for

Combined promotions for White females, non-competitive promotions for Black females,

non-competitive promotions for Hispanic females, and combined promotions for Indian

females.  FY 2001 AEP Update Report, at 4377-8, 4380, DVI-2-3, DVI-5, Exhibit 19.

122.    With respect to Employee Development Programs, HUD was unable to compile

statistics for the FY 2001 Report.  FY 2001 AEP Update Report, 4372, DV-1.  Therefore,

HUD adopted the objectives from the previous year to enroll more non-White males in

Special Employment Programs.  Id.

123.    The FY 2001 AEP Update Report sets the goal of hiring 50 Black female

Administrative workers, even though HUD already employed Black female

Administrative workers in numbers that well exceeded parity.  FY 2001 AEP Update

Report, at 4330, 4342, DII-20, DII-32, Exhibit 19.

124.    The EEOC faulted HUD for setting such a goal, stating:

> Black females in the Administrative category at HUD are already over four times
> their representation in the CLF [Civilian Labor Force].  Therefore, it is
> inappropriate to set such a high goal for this group.

Exhibit 22; Cockrell Dep. (Worth), at 111-113, Exhibit 10.

FY 2002 AEP UPDATE REPORT

125.   HUD's FY 2002 AEP Report revealed that White males were underrepresented in

each of the six PATCOB categories.  FY 2002 AEP Update Report, at 4432, DII-15,

Exhibit 20.

| OCCUPATIONAL CATEGORY | | WHITE MALE PERCENTAGE |
|---|---|---|
| | | |
| PROFESSIONAL | HUD WORKFORCE | 42.9% |
| | CIVILIAN LABOR FORCE | 54.7% |
| | | |
| ADMINISTRATIVE | HUD WORKFORCE | 28.9% |
| | CIVILIAN LABOR FORCE | 42.1% |
| | | |
| TECHNICAL | HUD WORKFORCE | 5.2% |
| | CIVILIAN LABOR FORCE | 36.1 |
| | | |
| CLERICAL | HUD WORKFORCE | 4.6 % |
| | CIVILIAN LABOR FORCE | 14.0 % |
| | | |
| OTHER | HUD WORKFORCE | 30.8% |
| | CIVILIAN LABOR FORCE | 67.6% |
| | | |
| BLUE COLLAR | HUD WORKFORCE | 25% |
| | CIVILIAN LABOR FORCE | 65.4% |

FY 2002 AEP Update Report, at 4432, DII-15, Exhibit 20.

126.   In HUD's Administrative category, White males were 28.9% of the workforce,

while White males were 42.1% of the civilian labor force.  FY 2002 AEP Update Report,

at 4432, DII-15, Exhibit 20.

127.   HUD established numerical goals for increasing representation of women and

minorities in the PATCOB categories.  With regard to the Administrative PATCOB

category, HUD's FY 2002 goal was to add 83 White females, 5 Black females, 11

Hispanic males, 16 Hispanic females, 7 Asian/Pacific males, 10 Asian/Pacific females, 7

American Indian/Alaskan males and 7 American Indian/Alaskan females.  FY 2002 AEP

Update Report, 4446, DII-29, <u>Exhibit 20</u>. Despite significant under-representation, no goals were established for the addition of White males. <u>Id</u>.

128.    With regard to the GS-1101 job series, the FY 2002 AEP established a goal of adding 20 White females. FY 2002 AEP Update Report, at 4449, DII-32, <u>Exhibit 20</u>.

129.    Agency-wide, HUD established the goal of adding 252 women and/or individuals from certain ethnic groups, and maintained a numerical goal for each EEO Group except for White males. FY 2002 AEP Update Report, at 4446, DII-29, <u>Exhibit 20</u>.

130.    Sometimes, HUD would set a numerical goal to add members of an EEO group, even when there was no under-representation of that group. For example, the FY 2002 AEP Update Report establishes goals for adding, for positions in the Administrative category, Black females, Hispanic males and females, Asian American males and females, and American Indian males and females, despite the fact that there is no under-representation of these EEO groups in the Administrative category. FY 2002 AEP Update Report, at 4432, 4446, DII-15, DII-29, <u>Exhibit 20</u>. Satisfaction of these objectives would necessarily come at the expense of White males. <u>Id</u>.

131.    With regard to promotions, in cases where a non-White male EEO Group was promoted below their percentage of representation in the HUD workforce, this constitutes an "Undesired Condition." FY 2002 AEP Update Report, 4484, DVI-5, <u>Exhibit 20</u>. For these EEO Groups, HUD generated objectives to increase the rate of promotion. FY 2002 AEP Update Report, at 4486, DVI-7, <u>Exhibit 20</u>.

132.    The FY 2002 AEP Update Report stated that although White males constituted 27.0% of the entire HUD workforce in FY 2001, White males received only 15.7% of the promotions. FY 2002 AEP Update Report, at 4481, DVI-2, <u>Exhibit 20</u>. Despite this

39

under-representation, HUD failed to establish an objective for increasing the rate of promotion of White males.  FY 2002 AEP Update Report, at 4486, DVI-7, <u>Exhibit 20</u>.

133.    With regard to EEO groups other than White males, HUD would sometimes put in place an objective to increase promotion rates, even if there was no under-representation in the number of promotion that members of the EEO group were receiving.  For example, this happens with HUD's objective to increase the rate of non-competitive promotions for Asian American females and American Indian females.  FY 2002 AEP Update Report, at 4483, 4486, DVI-4, DVI-7, <u>Exhibit 20</u>.

134.    With respect to Employee Development Programs, while White males constituted 27% of the HUD workforce, they constituted only 17.8% of those participating in Employee Development Programs.  FY 2002 AEP Update Report, at 4476, DV-4, <u>Exhibit 20</u>.  Nevertheless, HUD failed to establish any objective to increase the participation of White males in Employee Development Programs.  FY 2002 AEP Update Report, at 4478, DV-6, <u>Exhibit 20</u>.

FY 2003 AEP UPDATE REPORT

135.    HUD's FY 2003 AEP Report revealed that White males were underrepresented in each of the six PATCOB categories.  FY 2003 AEP Update Report, at 4536, DII-14, <u>Exhibit 21</u>.

| OCCUPATIONAL CATEGORY | | WHITE MALE PERCENTAGE |
|---|---|---|
| | | |
| PROFESSIONAL | HUD WORKFORCE | 42.5% |
| | CIVILIAN LABOR FORCE | 54.7% |
| | | |
| ADMINISTRATIVE | HUD WORKFORCE | 27.5% |
| | CIVILIAN LABOR FORCE | 42.1% |
| | | |
| TECHNICAL | HUD WORKFORCE | 4.9% |

|  | CIVILIAN LABOR FORCE | 36.1 |
|---|---|---|
|  |  |  |
| CLERICAL | HUD WORKFORCE | 5.0 % |
|  | CIVILIAN LABOR FORCE | 14.0 % |
|  |  |  |
| OTHER | HUD WORKFORCE | 40% |
|  | CIVILIAN LABOR FORCE | 67.6% |
|  |  |  |
| BLUE COLLAR | HUD WORKFORCE | 33.3% |
|  | CIVILIAN LABOR FORCE | 65.4% |

FY 2003 AEP Update Report, at 4536, DII-14, Exhibit 21.

136.    In HUD's Administrative category, White males were 27.5% of the workforce, while White males were 42.1% of the civilian labor force.  FY 2003 AEP Update Report, at 4536, DII-14, Exhibit 21.

137.    HUD established numerical goals for increasing representation of women and minorities in the PATCOB categories.  With regard to the Administrative PATCOB category, HUD's FY 2003 goal was to add 148 White females, 4 Black females, 7 Hispanic males, 7 Hispanic females, 9 Asian/Pacific males, 8 Asian/Pacific females, 6 American Indian/Alaskan males and 6 American Indian/Alaskan females.  FY 2003 AEP Update Report, at 4547, DII-25, Exhibit 21.  Despite significant under-representation, no goals were established for the addition of White males.  Id.

138.    With regard to the GS-1101 job series, the FY 2003 AEP established a goal of adding 53 White females and 2 Asian American/Pac. Islanders.  FY 2003 AEP Update Report, at 4550, DII-28, Exhibit 21.

139.    Agency-wide, HUD established the goal of adding 326 women and/or individuals from certain ethnic groups, and maintained a numerical goal for each EEO Group except for White males.  FY 2003 AEP Update Report, at 4547, DII-25, Exhibit 21.

140.    Sometimes, HUD would set a numerical goal to add members of an EEO group, even when there was no under-representation of that group. For example, the FY 2003 AEP Update Report establishes goals for adding, for positions in the Administrative category, Black females, Hispanic males and females, Asian American males and females, and American Indian males and females, despite the fact that there is no under-representation of these EEO groups in the Administrative category. FY 2003 AEP Update Report, at 4536, 4547, DII-14, DII-25, Exhibit 21. Satisfaction of these objectives would necessarily come at the expense of White males. Id.

141.    With regard to promotions, in cases where a non-White male EEO Group was promoted below their percentage of representation in the HUD workforce, this constitutes an "Undesired Condition." FY 2003 AEP Update Report, at 4587, DVI-5, Exhibit 21. For these EEO Groups, HUD generated objectives to increase the rate of promotion. FY 2003 AEP Update Report, at 4589, DVI-7, Exhibit 21.

142.    However, White males were not treated equally. The FY 2003 AEP Update Report stated that although White males constituted 26.3% of the entire HUD workforce in FY 2002, White males received only 15% of the promotions. FY 2003 AEP Update Report, at 4584, DVI-2, Exhibit 21. Despite this under-representation, HUD failed to establish an objective for increasing the rate of promotion of White males. FY 2003 AEP Update Report, at 4589, DVI-7, Exhibit 21.

143.    With respect to Employee Development Programs, while White males constituted 26.3% of the HUD workforce, they constituted only 17.3% of those participating in Employee Development Programs. FY 2003 AEP Update Report, at 4578, DV-4, Exhibit 21. Nevertheless, HUD failed to establish any objective to increase the participation of

White males in Employee Development Programs. FY 2003 AEP Update Report, at

4581, DV-7, Exhibit 21.

### HUD'S STRATEGIES FOR ASSISTING WOMEN AND MINORITIES

144.    HUD explicitly followed various initiatives to locate qualified minorities and

women for employment. HUD would expand the geographical area of consideration for

vacancy announcements to ensure the broadest practical spectrum of applicants, with

emphasis on minorities and women. HUD would also extend the closing date on position

vacancy announcements to ensure receipt and adequate response time and use paid

advertisements. It would use the HUD Intern Program to recruit qualified minorities and

women for employment. HUD would restrict position vacancy announcements when

there is an available pool of qualified employees identified as underrepresented. HUD

would recruit at traditionally Black and Hispanic institutions. HUD would redesign mid-

level vacant positions at the entry level with career advancement potential for lower

graded employees including the use of the Upward Mobility Program. HUD's

announcements include a statement noting that proficiency in languages other than

English is highly desirable. Gaiter Dep., at 60-61, Exhibit 8; Cockrell Dep. (Worth), at

93-98, Exhibit 10; Exhibit 23, at 40; Exhibit 24, at 4891, 4898.

### LACK OF JUSTIFICATION FOR THE AEP PROGRAM

145.    HUD's numerical hiring and promotion goals were not supported by any studies

or analyses beyond those contained in the AEP reports. Gaiter Dep., at 64, 80-82, Exhibit

8.

146.    HUD did not perform any studies or analyses to determine whether its AEP

program complied with constitutional requirements, although there are some document

referenced in the HUD privilege log. Hawkins Dep., at 55-62, Exhibit 46. The sole

exceptions involve post hoc analyses begun in 2002, and involving a pending lawsuit

against HUD, which HUD considers to be privileged pursuant to the Attorney-

Client/Deliberative Process/Work Product privileges. HUD's Opp. to Plaintiff's Motion

to Compel, at 3-5. Plaintiff's Motion to Compel production of those documents has been

denied.

147.    For purposes of the AEP, there was no analysis of any job categories that were

narrower than the job series; that is, there was no analysis to determine whether there was

under-representation in more specific categories than those identified in the AEP reports.

Gaiter Dep., at 29-30, Exhibit 8; Cockrell Dep. (Worth), at 44-45, Exhibit 10.

148.    For the period of October 1, 1998 through September 30, 2001, the HUD

workforce exceeded the Relevant Civilian Labor Force for rates of employing women,

Blacks, Hispanics, Asian/Pacific Islanders and Native Americans. FY 1999 FEORP

Report, at 13, 19, 25, 31, 37, Exhibit 25; FY 2000 FEORP Report, at 13, 19, 25, 31, 37,

52, Exhibit 26; FY 2001 FEORP Report, at 10, 16, 22, 28, 34, Exhibit 23.

149.    HUD does not contend that the PHRS and Community Builder positions to which

Plaintiff applied were traditionally segregated. HUD's Ans. to Int. 23, Exhibit 27. HUD

did not make any inquiries or make any designations as to whether particular jobs were

traditionally segregated. Gaiter Dep., at 33, Exhibit 8.

150.    HUD can provide no evidence that women or any minorities were under-

represented in the PHRS and Community Builder positions to which Mr. Patoski applied.

HUD's Ans. to Int. 24, Exhibit 27.

## THE COMMUNITY BUILDER POSITION

151.    In 1997, then-Secretary Andrew Cuomo sought to create a new position at HUD,

a "Community Builder" position, to develop a cadre of people who would represent the

department to external customers, go out in the community, and meet with mayors and

members of Congress.  Crane Dep., at 85-86, Exhibit 28.  HUD had various departments,

and the Community Builder position was envisioned as a single point-person who could

help customers navigate the various regulatory requirements of the various departments,

and assist customers in getting projects completed.  EEOC Hearing Transcript, at 155-

156, 188, Exhibit 3.

152.    The Community Builder position was a new position at HUD, as of 1997.

Cintron Dep., at 14, Exhibit 29; EEOC Hearing Transcript, at 150, 164, Exhibit 3; Crane

Dep., at 86, Exhibit 28; Beard Dep., at 66, Exhibit 30.

153.    On or about October 14, 1997, HUD posted a notice of vacancy announcement,

No. 0S-MST-98-0002A for the position of Community Builder.  Exhibit 31.  That

announcement sought applicants for our Community Builder positions in Boston.  Id.;

EEOC Hearing Transcript, at 169, Exhibit 3.  The Community Builder position is

categorized as a GS 1101 position.  Id.  The GS 1101 job series falls within the

"Administrative" category of the PATCOB categories used for AEP purposes.  FY 1998

AEP Update Report, at 4005, 4017, DII-25, DII-37, Exhibit 15.

154.    In or about October 1997, Plaintiff applied for one of the four Community Builder

positions in HUD's Boston office at the GS-14 level, and he submitted an application,

which included a statement of his relevant qualifications.  Patoski Affidavit, at 10 of 23,

Exhibit 2; Answer, ¶ 6.

155.    HUD determined that Plaintiff met the minimum qualifications for the Community Builder position at the GS-14 level and his name was placed on the "Best Qualified List" for the GS-14 level Community Builder position. Answer, ¶ 7; Cintron Affidavit, at 2, Exhibit 32.

156.    Jose Cintron was the Selecting Officer in charge of filling four Community Builder positions at HUD in Boston. Answer, ¶ 8; Cintron Affidavit, at 2, Exhibit 32. The Human Resources office issued Cintron a roster of best qualified candidates for the CB positions in the Boston office, which included Plaintiff's name. Cintron Affidavit, at 2, Exhibit 32.

157.    The position was being filled at grades 13, 14, and 15. Cintron Dep., at 44, Exhibit 29. Cintron had the discretion to fill the four Boston positions with any mix of grade level candidates. Medvic Dep., at 42, Exhibit 33; Cintron Dep., at 44-45, Exhibit 29; EEOC Hearing Transcript, at 169.

158.    Mary Lou Crane, a female, was the Regional Director, to whom the Boston-based Community Builders would report, once they were hired. Crane Dep., at 8, 88-89, Exhibit 28; EEOC Hearing Transcript, at 157-158, Exhibit 3; Cintron Dep., at 15-16, Exhibit 29.

159.    Cintron spoke to Crane to determine who on the Best Qualified List should be hired into the four positions in the Boston office, and Crane was asked who she wanted in the position. Crane Dep., at 105, 154, Exhibit 28; Cintron Dep., at 28, Exhibit 32.

160.    Cintron testified that Crane's recommendations were given particular weight, and that he considered Crane's determination to be "very, very important" to his selection. Cintron Dep., at 14, 17, 21-22, Exhibit 29; EEOC Hearing Transcript, at 153, Exhibit 3.

Cintron gave more weight to Crane's assessments of candidates than the files describing the candidates' qualifications. Cintron Dep., at 31, Exhibit 29.

161.    Cintron testified that the kind of information he obtained from the Regional Directors, like Crane, was "very important, I thought, in making the decisions for who would move into these positions." Cintron Dep., at 17, Exhibit 29.

162.    These calls, according to Cintron, were, "I thought were very, very important calls to make . . . also because they would be the supervisors of these employees when the sections were made." Cintron Dep., at 21, Exhibit 29.

163.    To the extent that inconsistencies developed, or questions were generated concerning a candidates qualifications, Cintron made no effort to resolve them, other than to rely on the opinion of Crane, the Regional Director. Cintron Dep., at 18, 21, 24, Exhibit 29; EEOC Hearing Transcript, at 159, Exhibit 3. Other than speaking with the relevant Regional Director, Cintron did not consult with anyone else concerning his decisions. Cintron Dep., at 18, 38, Exhibit 29.

164.    Everyone who was selected as a Community Builder in Boston was positively endorsed by Crane, and everyone she did not endorse did not get selected. EEOC Hearing Transcript, at 161-162.

165.    Cintron did not ask Crane what experience she had working with each candidate. Cintron Dep., at 35-36, Exhibit 29. Cintron would not know the foundation of Crane's assessment. Cintron Dep., at 36, Exhibit 29. Crane knew or had something to say about almost everyone on the Boston list. Cintron Dep., at 28, Exhibit 29.

166.    In her conversation with Cintron, Crane recommended three women for the Community Builder positions: Cheryl Ann Teninga, Debra Griswold, and Linda

Pellegrino.  <u>EEOC Hearing Transcript</u>, at 183-4, <u>Exhibit 3</u>; <u>Crane Dep.</u>, at 95, 112-116,

<u>Exhibit 28</u>; <u>Cintron Dep.</u>, at 24, <u>Exhibit 29</u>.

167.    Cintron originally selected Cheryl Teninga.  <u>EEOC Hearing Transcript</u>, at 167,

<u>Exhibit 3</u>; <u>Teninga Dep.</u>, at 39, <u>Exhibit 34</u>.  Crane "very, very much wanted Cheryl Ann

Teninga as one of her Community Builders."  <u>EEOC Hearing Transcript</u>, at 183-4,

<u>Exhibit 3</u>.  At the time, Crane knew Teninga was female, but never interacted with her

personally, was not aware of her work performance, reputation or ability to be a

Community Builder, and does not think she would recognize Teninga.  <u>Crane Dep.</u>, at

120-121, <u>Exhibit 28</u>.  Teninga declined the Community Builder position that was offered

to her.  <u>Answer</u>, ¶ 16; <u>Teninga Dep.</u>, at 39-40, <u>Exhibit 34</u>.

168.    Cintron made his decision to select a female, Linda Pellegrino in part based on the

recommendation from Crane.  <u>Cintron Dep.</u>, at 24, <u>Exhibit 29</u>; <u>Crane Dep.</u>, at 112-116,

<u>Exhibit 28</u>.  Crane considered Pellegrino to be personable and bright, but Crane did not

know of Pellegrino's expertise in the various offices of HUD.  <u>Crane Dep.</u>, at 112,

<u>Exhibit 28</u>.

169.    Crane felt that Ms. Pellegrino's gender was a positive factor in the decision to

recommend her for the Community Builder position.  <u>Crane Dep.</u>, at 114-6, <u>Exhibit 28</u>.

170.    Crane recommended another White female, Debra Griswold for the position.

<u>Crane Dep.</u>, at 95, <u>Exhibit 28</u>.  Prior to the recommendation, Crane did not have intimate

knowledge of Griswold's work.  <u>Crane Dep.</u>, at 96, <u>Exhibit 28</u>.  When Crane

recommended Griswold, she regarded it as a positive factor that Griswold was female.

<u>Crane Dep.</u>, at 97-98, <u>Exhibit 28</u>.  Ms. Griswold was hired as a Community Builder.

<u>Crane Dep.</u>, at 98, <u>Exhibit 28</u>.

171.    Crane testified,

      Q.    When you recommended [Griswold], did you regard it as a positive factor that she was a female?

      A.    Yes.

Crane Dep., at 97-98, Exhibit 28.

172.    Crane refused to recommend Plaintiff for the Community Builder position. Crane Dep., at 125, Exhibit 28. Crane stated that Plaintiff had poor people skills, although she did not provide specifics. Cintron Dep., at 28, 33, Exhibit 29. At the time that Crane recommended against hiring Plaintiff, Crane knew Plaintiff was a White male. Crane Dep., at 144, Exhibit 28.

173.    There was nothing in Plaintiff's file indicating poor people skills. Cintron Dep., at 29, 31, 35, Exhibit 29. Later, Crane acknowledged that Plaintiff did a very good job as a CPD Representative. Crane Dep., at 138, Exhibit 28.

174.    When Crane recommended not hiring Plaintiff, she considered his male gender to be a neutral factor. Crane Dep., at 143-144, Exhibit 28. Crane testified that if Plaintiff had been black or Hispanic, she would have regarded that as a positive factor in his application for the community builder position. Crane Dep., at 144, Exhibit 28.

175.    Crane claims that she did not recommend Plaintiff for hire as a Community Builder, because she had received complaints about him from Lowell's City Manager and the Mayor of Gloucester. Crane Dep., at 126-127, Exhibit 28.

176.    The problems that Patoski had with Lowell's City Manager and the Mayor of Gloucester arose after the Community Builder selection process was completed. Patoski Dep., at 114, Exhibit 35; Patoski Affidavit, Exhibit 36.

177.    At the time of the recommendations, Crane already had two white male Community Builders from a previous round of hiring working under her. Crane Dep., at 114, Exhibit 28.

178.    At the time of the recommendations, Crane understood that HUD had a strong commitment to diversity, including the hiring of women. Crane Dep., at 46, Exhibit 28.

179.°   At HUD, Crane was evaluated by a performance standard that measured the extent the she promoted EEO/AE/diversity goals at HUD, and each year she was rated highly in that category. Crane Dep., at 55-56, 59-61, Exhibit 28. One such performance standard, which Crane understood applied to her, was the requirement to take "actions and make decisions regarding . . . promotions . . . [and] . . . recommendations for selection . . . that further the Department's EEO/AE programs and policies and foster diversity within the HUD workplace." Crane Dep., at 61-62, 65-66, Exhibit 28; Crane Dep. Exh. 3, at 1, Exhibit 37.

180.    Crane's understood HUD to be "committed to maintaining a diverse workplace in conformance with the agency's Affirmative Employment Plan," that the "AEP plan goal is to assure the full representation of women, minorities, and persons with disabilities at all levels of the department," and that HUD held all managers and supervisors accountable for using personnel action opportunities for meeting the department's AEP goals." Crane Dep., at 73-74, Exhibit 28; Crane Dep. Exh. 4, Exhibit 38.

181.    Crane acknowledged that she made the Community Builder recommendations "based on two factors; [her] knowledge of each candidates' performance and [her] interest in diversity." Crane Affidavit, at 2, Exhibit 39. When Crane mentioned that she made recommendations based on her interest in "diversity," by "diversity" she means

50

"not white men." Crane Dep., at 47, Exhibit 28. "Diversity" to Crane means the hiring

of women, different abilities (or disabilities), and different ethnicities, such as African

Americans, Hispanics, and Asians. Crane Dep., at 47-48, Exhibit 28. Crane never felt

that more white men were needed to maintain diversity. Crane Dep., at 82-83, Exhibit

28.

182.    Crane testified that it was important that the Community Builders reflect diversity

in race and gender. Crane Dep., at 89, Exhibit 4. Crane also testified that diversity was

"very important" to her, and she was "very committed" to the issue of promoting

diversity in the HUD workforce. Crane Dep., at 58-59, 81, Exhibit 28.

183.    Ms. Crane acknowledged that in the past, she had recommended Ellen Connelly, a

female, for a position. Crane Dep., at 69, Exhibit 28. The fact that Ms. Connelly was a

female, and that she would increase diversity, assisted in Ms. Crane's decision to

recommend Ms. Connelly. Crane Dep., at 70, Exhibit 28. Crane testified that she

considered Ms. Connelly's gender to be a positive factor in the decision to recommend

her. Crane Dep., at 110, Exhibit 28. Crane was part of the formal interviewing process

in the hiring of Ms. Connelly. Crane Dep., at 69, Exhibit 28.

184.    Crane, when she was Director of the Public Housing Office, advocated the hiring

of a black candidate, Tony Brito, for the Director position, because, as she suggested at

the time, they "needed some diversity" in the public housing area. Crane Dep., at 68,

107, Exhibit 28. Mr. Brito was selected for the position. Crane Dep., at 68-69, Exhibit

28. Mr. Brito's race was a motivating factor in Crane's decision to recommend him.

Crane Dep., at 108, Exhibit 28. Crane recommended a Latino in the Office of Regional

Council, and she felt that the fact that the candidate was a Latino was a positive factor in

favor of his candidacy. Crane Dep., at 70-71, Exhibit 28. Crane thought at the time that a minority regional counsel would be a good thing because of issues that had arisen with the City of Boston. Crane Dep., at 72, Exhibit 28.

185. When Crane made recommendations to hire or promote certain individuals, feeling that their particular gender or race was a positive factor in their recommendation, she felt that she was acting consistent with HUD policy. Crane Dep., at 85, Exhibit 28.

186. On or about April 3, 1998, Plaintiff was informed that he had not been selected for one of the Community Builder positions. Answer, ¶ 11.

187. Notes from a Management Committee Meeting, a meeting between Secretary Cuomo and his senior staff, dated July 7, 1998 indicate that then-Secretary of HUD Cuomo was interested in using considerations of diversity to staff the Community Builder positions. Beard Dep., at 68-70, Exhibit 30. The notes state:

> "Community Builders . . .
>
> . . . . .
>
> Secretary Cuomo asked whether diversity was a criteria for selection. Willie Gilmore said that OGC had advised that applications could not ask the race of the candidate. Ms. Enright said it was easy to tell from the volunteer activities or that it could be determined during the interview.
>
> Secretary Cuomo directed the General Counsel to determine why ethnicity was deleted from the application.

Beard Dep. Exh. 2, at 2-3, Exhibit 40; Beard Dep., at 68-70, Exhibit 30.

188. An auditor from the HUD Office of Inspector General concluded thereby that "the Secretary indicated that he wanted diversity as a selection criterion." Beard Dep. Exh. 1, at 24, Exhibit 41.

PHRS POSITION

189.    HUD put out two different vacancy announcements for a single Public Housing

Revitalization Specialist (PHRS) position in Boston.  Answer, ¶ 30.  One vacancy

announcement was for only internal, career status candidates (MSR) and the other

vacancy announcement was for both internal and external candidates (DEU).  Answer, ¶

30; EEOC Hearing Transcript, at 14-15, Exhibit 3.

190.    The job qualifications in both vacancy announcements were similar.  EEOC

Hearing Transcript, at 62-63, Exhibit 3.

191.    The PHRS positions were GS-1101 series positions, which falls within the

Administrative category for AEP purposes.  Exhibit 42.

192.    On or about January 21, 2000, Plaintiff timely submitted his applications for both

the MSR and DEU announcements for the PHRS position in Boston.  Answer, ¶ 32.

193.    Patoski was qualified for the PHRS position.  Exhibit 43; Yeow Dep., at 17-18,

Exhibit 44.

194.    On or about May 25, 2000, Plaintiff was rejected for both PHRS vacancy

announcements, and another person, a Black male, was selected.  Exhibit 43; Teninga

Dep. Exh. 3.

195.    The Selecting Official for the PHRS position, Cheryl Ann Teninga, understood

HUD's policy and practice to be that if all things were equal, a personnel decision could

be made taking into account the race and gender of the candidate.  Teninga Dep., at 49,

53, Exhibit 34.  Ms. Teninga understood HUD's policy to be that it was her obligation to

make a vigorous effort to assure full representation of qualified minorities, women and

persons with disabilities when recruiting, hiring and providing advancement opportunities. <u>Teninga Dep.</u>, at 50, <u>Exhibit 34</u>.

196.    Ms. Teninga admitted that she had a history of taking race and gender into account in making a personnel selection, and she specifically recalled recommending an African-American female for a position, with the understanding that the candidate's race and gender were positive factors for the recommendation. <u>Teninga Dep.</u>, at 53-55, <u>Exhibit 34</u>.

197.    The AEP goals applied to the specific positions that Mr. Patoski applied for, including the Community Builder and the PHRS positions.  For example, to the extent that a White female was hired for the PHRS position, that would count against HUD's numerical goal for hiring White women into the GS-1101 position. <u>Gaiter Dep.</u>, at 64-66, <u>Exhibit 8</u>.

<u>PERFORMANCE EVALUATIONS OF THOSE INFLUENCING HIRING DECISIONS</u>

198.    In the period of 1998 through 2000, some HUD employees were evaluated to the extent that they take actions and make decisions regarding hiring, promotions, work assignments, recommendations for selection, and other personnel or administrative matters that further HUD's EEO and AEP policies and foster diversity within HUD. HUD employees who were evaluated in light of this standard include Teninga (Selecting Officer for the PHRS position); Mirza Del Rosario (Rating Panel member for the DEU PHRS vacancy announcement), Carmen Valenti (Rating Panel member for the DEU PHRS vacancy announcement), Deborah Medvic (Human Resource Specialist, who made a qualification determination that Plaintiff was unqualified for the MSR PHRS vacancy announcement), Emmanuel Yeow (Subject Matter Expert who found Plaintiff unqualified

54

for the MSR PHRS position), Jose Cintron (Selecting Officer of the Community Builder position), Crane (primary recommendation for the Boston Community Builder position); and Robert Paquin, Tony Brito, and Marcella Brown (Rating Panel members for the Community Builder position).  Teninga Dep., at 43, 56, 59-60, 73-74, Exhibit 34; EEOC Hearing Transcript, at 84-85, 197-198.  For purposes of protecting confidentiality, the actual evaluations are not appended, however, if the Court requests, Plaintiff will file the evaluations under seal for the Court's review.

199.    A positive evaluation for complying with HUD AEP policies placed one in the position of receiving monetary awards.  Teninga Dep., at 62-63, Exhibit 34.

DURING AEP, WHITE MALE REPRESENTATION STEADILY DECLINES

200.



201.



202.



203.



The Plaintiff
By his attorneys,


_____/s/ Robert S. Mantell_____
Kevin G. Powers
BBO# 405020
Robert S. Mantell
BBO# 559715
Rodgers, Powers & Schwartz LLP
18 Tremont Street, Suite 500
Boston, MA  02108
(617) 742-7010, ext. 305
fax (617) 742-7225

Patoski motion summary jud 56.1