UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD S. PATOSKI, )<br>    Plaintiff, )<br>v. )<br>ALPHONSO JACKSON, SECRETARY )<br>DEPARTMENT OF HOUSING AND )<br>URBAN DEVELOPMENT )<br>    Defendant. ) | C.A. No. 05-11086-RCL |

## DEFENDANT'S STATEMENT OF UNDISPUTED FACT

1. Richard Patoski ("Patoski") is employed by the Department of Housing and Urban Development ("HUD") as a public trust specialist. Deposition of Richard Patoski ("Pl. Depo."), p. 8.

2. Patoski has worked for HUD in various positions since 1972. Pl. Depo., p. 12.

### 1998 Community Builder ("CB") Position Non Selection

3. Patoski Applied for a CB position in late 1997, when he was 48. Pl. Depo., p. 94.

4. There were six selectees for CB position. Four individuals accepted the position, two females and two males: Linda P., Deborah G., Jim P., and Edward B.. Two individuals, on female and one male, declined the position: Cheryl T. and James R. Pl. Depo., p. 95. MSPB Tr., p. 167-169, 192-194.

5. The selecting official was Jose C. Pl. Depo., p. 96, Merit Systems Protection Board Transcript ("MSPB Tr."), p. 149.

6. Jose C. felt that the CB position required, among other things, exceptional interpersonal skills. MSPB Tr., p. 154-156, 187-190, Affidavit of Jose C., p. 3.

7. Jose C. did not select the Plaintiff based upon the recommendation of Mary Lou C., the Secretary's Representative for New England. MSPB Tr. 153, 158-159,160-161; Affidavit of Jose C., p. 4; Deposition of Mary Lou C., p. 105, 113, 117-124, 130-131, 151-152, 195-196.

8. Mary Lou C. felt that while Patoski had exemplary skills for enforcement, Patoski lacked the interpersonal skill necessary for the CB position. Mary Lou C. Depo., p. 125-127, 138, 152-154.

9. Prior to the community building selection process, Mary Lou C. had received complaints about Patoski. Id., p. 125-127, 131-132, 141. She could not recall the exact complaints. Id., p. 129.

10. Mary Lou C. also received complaints about Mr. Patoski from members of Congress but did not recall whether such complaints were prior to the selection process. Id., ¶ 140-141.

11. Jose C. recalled that Mary Lou C. described Patoski's interpersonal skills as "horrendous." Affidavit of Jose C., p. 4

12. Patoski's age and gender did not play a role in Mary Lou C.'s recommendation. Mary Lou C. Depo., p. 144, 146, 155-156.

13. Another supervisor of Patoski, Robert P., testified before the Merit Systems Protection Board in the Administrative Proceedings in this matter. While generally complimentary of Patoski's professional interpersonal skills, he did recall at least one complaint from public officials. MSPB Tr., p. 93-94, 98.

14. Robert P. also testified that he had needed to speak to Patoski concerning his interactions with co-workers because he had been "sharp" with people in the office. MSPB Tr., p. 118-119.

15. Arthur T., Patoski's immediate supervisor, also testified in the administrative proceedings. Arthur T. Testified that he had received complaints about Mr. Patoski prior to 1998 and that there were problems with interpersonal skills in the office. MSPB Tr., p. 140-141.

16. Patoski was ranked last among the eleven candidates by Jose C. MSPB, Tr. 192-194, 195-196.

17. Mary Lou C. had no knowledge of any hiring goals of HUD. Crane Depo., p. 75-76, 81-82. While she was, and believed that HUD was, committed to diversity, that commitment applied to all groups, including white males. Mary Lou C. Depo., p. 83-84.

18. While Mary Lou C. stated that she viewed Deborah G.'s status as a female as a "positive," when asked if gender was a "motivating factor," Mary Lou C. was quick to distinguish between a "positive factor" and whether gender was a "motivating factor." Mary Lou C., p. 97-98; 114-115.

19. A "positive factor" did not mean that gender was a "motivating factor." Mary Lou C. Depo., p. 114-115.

20. Patoski acknowledges disputes with some officials from the City of Lowell in 1998. Patoski contends that the justification is fabricated because he was not assigned to Lowell until after the CB selection process. Pl. Depo. P. 117.

21. As evidence of age discrimination in the CB selection process Patoski relies upon general statements by Secretary Cuomo that HUD had to bring in younger people. Pl Depo., p. 90.

22. Patoski further contends that a statement in the Affidavit of Jose C. Evidences his belief that "it is harder for older people to change their behavior." First Amended Complaint, ¶

23. That Affidavit provides, "[a]s a rule, program requirements can be learned but it is more difficult, if not impossible, to learn or change new behaviors." Jose C. Affidavit, p. 4.

24. There is no other basis for the age discrimination claim. Pl Depo p. 100.

<u>Plaintiff's Non Selection for the Public Housing Revitalization Specialist Position</u>

25. In 2000, HUD announced that it intended to hire an individual to fill a Public Housing Revitalization Specialist ("PHRS") position in Boston. <u>See</u> First Amended Complaint, ¶31-32.

26. That PHRS Position would work on a Specific HUD Program, the Hope VI Program. Pl. Depo., p.130, 132.

27. The PHRS was announced under a process open to the public, the DEU process, and in a process open only to federal civil service employees, the MSR process. Pl. Depo. P. 134- 135; Jeffrey L. Depo., p. 10, 15; 23-24; Betty S. Depo., p. 5-6.

28. Patoski submitted applications under both the DEU and MSR announcements. First Amended Complaint, ¶33.

29. Generally speaking, under both the DEU and MSR processes, applicants are initially screened to determine if they are eligible. Linda H. Depo., p. 20-26; Jeffrey L. Depo., p. 19; Deborah M. Depo., p. 7-8. Applicants are then rated, often using a crediting plan. Linda H. Depo., p. 25; Jeffrey L. Depo., p. 13.

30. Once the ratings are done, the top three DEU applicants are forwarded to the selecting official, who can chose any one of the three. Linda H. Depo., p. 36-37, 40; Jeffrey L. Depo., p. 15. Also, a list of the best rated MSR applicants, a "best qualified" list, is sent to the selecting official. Linda H. Depo. P. 30-31. In vacancies involving both processes, both lists are forwarded to the selecting official who can pick from either list. Linda H. Depo 77.

31. No applicants, minority or otherwise, made the best qualified list under the MSR process. Pl. Depo., p. 164.

32. Patoski was found, however, to be eligible for the PHRS position under the

       announcement made to the public at large, the DEU process, at all grade levels (GS-13, GS-14 and GS-15).  First Amended Complaint, ¶34.

33. The rating officials for the PHRS position were Mirza Del R. and Carmen V.  MSPB Tr., p. 197.

34. In rating applicants, neither Mirza Del R. nor Carmen V. relied upon the applicant's gender or age.  MSPB Tr., p. 204; Affidavit of Carmen V., p. 4 and 9.

35. Mirza Del R. did not recall if she used a crediting plan in rating applicants, although Carmen V. recalls being given a "rating sheet."  MSPB Tr., p. 198, 202; Affidavit of Carmen V., p. 8.

36. While Patoski complains that this process discriminated against white males, he acknowledges that a white male scored the highest under the rating system.  Pl. Depo., p. 152.

37. Neither Mirza Del R., nor Carmen V., ever saw or relied upon any AEP Report or plan.  MSPB Tr., p. 202-203; Exhibit F4, Affidavit of Mirza Del R., p. 1; Affidavit of Carmen V., p. 3 and 9.

38. The individuals placed in selection lists, *i.e.*, rated higher than Patoski, for the PHRS position were there because those individuals had the best qualifications.  MSPB Tr., p. 202-203; Exhibit F4, Affidavit of Mirza Del R., p. 2.

39. Carmen V. did not recall the reasons why he rated particular applicants and, due to the passage of time felt it was unlikely he could reconstruct that process.   Affidavit of Carmen V., p. 3 and 8.

40. Patoski did not have as much experience as other applicants with the Hope VI Program that the PHRS Position would focus on.  MSPB Tr., p. 202-203; Exhibit F4, Affidavit of Mirza Del R., p. 2-3; Pl. Depo., p. 88.

41. As a Community Builder Fellow, Abbey O. worked extensively within the Hope VI Program.  Pl. Depo., p. 87-88.

42. Patoski acknowledged at deposition that the selectee, Abbey O., had substantially more experience with the Hope VI Program than Patoski did.  Pl. Depo., p. 88.

43. Patoski did not have any experience with the Hope VI Program. Pl. Depo. P. 88.

44. Selections lists from the DEU process were sent to the selecting official, Cheryl T.  Depo. of Cheryl T., p. 42.

45. Cheryl T. Selected Abbey O. for the PHRS position. Depo. of Cheryl T., p. 73.

46. She selected Abbey O. because he was the best qualified for the job. Depo. of Cheryl T., p. 74-75; 77-78; 81-83.

47. Cheryl T. did not know if Abbey O. was male or female. Depo. of Cheryl T., p. 80.

48. Cheryl T. acknowledged that HUD had a policy of encouraging diversity. Depo. of Cheryl T., p. 44, 46-48. Diversity was important but it was more important to select the right person for the job. Id., p. 44.

49. Cheryl T. has never been instructed to give any preference to any race or gender in making a hiring decision. Depo of Cheryl T., p. 41-42; 48.

50. Cheryl T. was not aware of any "goal" with respect to the PRHS position and did not consult the AEP in making any hiring decision. Depo. of Cheryl T., p. 47; 52-53.

51. Patoski contends that the AEP set goals for the 2000 PHRS position and that these "goals" would be in either the Administartive or Professional category. Pl. Depo p. 61-63.

52. Neither HUD's 1999, nor 2000, Affirmative Employment Plan set any goal for the hiring of black males for the PHRS position. Affirmative Employment Plan, FY 1999, HUD 4113-4130; Affirmative Employment Plan, FY 2000 HUD 4228-4242.

53. Nor did the 1999 or 2000 AEP identify any manifest imbalance for black males in the Professional or Administrative categories. Affirmative Employment Plan, FY 1999, HUD 4142-4146; Affirmative Employment Plan, FY 2000 HUD 5254-5257.

Patoski's Claims with Respect to the Community Builder Fellows Role In PHRS Non Selection

54. Patoski alleges that Abbey O. was given a "heads up" for the permanent PHRS position because during his time as a CB Fellow he was doing an identical job, work on the Hope VI Program. Pl. Depo., p. 87-88.

55. While Patoski never applied for a Community Builder Fellow[1] position, he contends that discriminatory hiring practices in the Community Builder Fellow process allowed women and minorities, such as Abbey O., to improperly gain work experience at HUD. Pl. Depo., p. 81-85.

56. According to Patoski, HUD would then hire these women and minorities into permanent

---

[1] Community Builder Fellows were temporary, non-civil service hires. Pl. Depo., p. 81.

positions such as the PHRS position based upon the experience that these individual gained in the CB Fellow Program. Pl. Depo p. 81-82.

57. Patoski acknowledges he has no idea whether AO was the most qualified individual for the CB Fellow position for which he applied. Pl Depo. P. 157.

58. Plaintiff, nonetheless, contends that the hiring of community builder fellows was discriminatory based upon, "the amount of community builder fellows who were women or minorities. . . And just my general observation of the quality of the people they brought in" Pl. Depo., p. 83-84.

### Allegations of Mistakes in the PHRS Process

59. It is conceded by HUD that Mr. Patoski was erroneously found not to qualify for the position under the MSR announcement. First Amended Complaint, ¶35; Jeffrey L. Depo., p. 48; Emmanuel Y. Depo., p. 13, 15, 17; Betty S. Depo., p. 25-26.

60. Even though Patoski was considered for the position under the DEU process, he contends he was prejudiced because "he wasn't considered under MSR." Pl Depo., p. 161.

61. Patoski acknowledges however that he would be competing against the same people he competed against under the DEU process and even if he had been on the selection roster for the MSR announcement, and he had no guarantee to receive the position. Pl. Depo., p. 161-162. Patoski's claim in this regard is not that he was not selected for the position, it is that he was not "considered." Pl Depo., p. 162-163.

62. One applicant for the MSR position, Ralph K., a black male, was not a federal civil service employee, and was not eligible under the MSR Announcement. First Amended Complaint, ¶36; Pl. Depo., p. 147. HUD personnel nonetheless referred Ralph K.'s application to the DEU process, where he would be eligible. First Am. Comp., ¶36.

63. Patoski claims he has been harmed because "now I have to compete - compete with another applicant that shouldn't have been there and he was a minority." Pl Depo. P. 154-155.

64. Ralph K., a black male, ultimately made the selection list for the DEU position. First Am. Comp., ¶36.

65. It was not uncommon for HUD personnel to forward applications that were erroneously filed in the MSR process to the DEU process. Jeffrey L. Depo., p. 30-31.

66. HUD personnel involved with the PRHS selection process did not believe anything prohibited such a transfer. Jeffrey L. Depo., p. 32; Deborah M. Depo., p. 19, 55, 62-63.

67. Plaintiff is not aware of any white male who erroneously applied to the MSR process whose application was not forwarded to the DEU process. Pl. Depo., p. 155.

68. A white male, Kevin G., made the selection list for the DEU position at the GS-15 level. First Amended Complaint, ¶ 37. Kevin G. was not found to eligible for the position at the GS-15 level, and therefore, should not have made the selection list. First Amended Complaint, ¶ 37. When considered in the rating process Kevin G. received the highest rating. Pl. Depo., p. 146.

### HUD'S Affirmative Employment Plan and EEOC Management Directive 715

69. In fulfilment of its obligations under Title VII of the Civil Rights Act of 1964, the Equal Employment Opportunity Commission ("EEOC") promulgated Management Directive 714 ("MD 714") in 1987, which required each federal department and agency to prepare and submit to the EEOC an "affirmative employment plan" to be reviewed and approved by the EEOC.   EEOC Management Directive 714.

70. HUD developed an affirmative employment programs ("AEP") that, in accord with MD 714 compared its workforce to the civilian labor force (as reflected in the census) and which provided for the establishment of numerical "goals" where there is a "manifest imbalance" or "conspicuous absence" of minorities and women in the work force. Keith G. Depo., p. 26-27, 30-33. The "goals" were not mandatory. Keith G. Depo., p. 67, 76.

71. Under MD 714, HUD did not conduct any analysis for under representation of white males, nor did it set "goals" for white males. See Thelma C. Depo., p. 39-41; Pl. Depo p. 50; Keith G. Depo., p. 45-46, 54, 67-69.

72. MD 714 was superseded by MD 715 in October 2003. EEOC Management Directive 715; Thelma C. Depo., p. 16-19; Keith G. Depo., p. 98-99.

73. HUD will not establish "goals" in the future, nor will it exclude white males or any race or gender from any analysis. Under MD 715, all races and genders are included in the statistical comparison analysis. Thelma C. Depo., p. 17; Pl Depo., p. 68-69; 78-79; Keith G. Depo., p. 98-100.

74. MD 715 does not direct HUD to make any hiring decision based upon race or gender. Pl. Depo. p. 78-79.

### Plaintiff's Challenge to MD 715

75. HUD is required under MD 715 to compare its workforce to the civilian labor force as established by the census, then generate a statistical analysis. MD 715; Instructions to Federal Agencies for MD 715 (Introduction) and (Section II - Barrier Analysis), available

     in full at www.eeoc.gov; Pl. Depo. P. 70-71.  Linda W. Depo., p. 34, 52.

76. Plaintiff acknowledges that HUD has conducted the statistical analysis required by MD 715, Pl. Depo., p. 72-73.

77. Plaintiff complains that HUD has not undertaken efforts to identify "barriers" to the employment of white males that are revealed by the statistical analysis.  Pl. Depo. P. 73-76; 79-80.

78. According to Patoski, HUD's failure to find a "barrier" to the hiring of white males under MD. 715 violates his  "constitutional right to equal protection."  Pl. Depo., p. 80.

79. HUD has identified only one "barrier" to date.  <u>See</u> 2004 and 2005 MD 715 Reports, p. HUD 4626-4632; HUD 6158-6164.  HUD presently lacks the capability to completely record and track data on race and gender in its workforce.  <u>Id</u>.;  Keith G. Depo., p. 101.

80. With respect the identification of any "barrier" to the employment of any particular race or gender, HUD is awaiting further instructions from EEOC.  Keith G. Depo., p. 122; Linda W. Depo., p 56, 64-65, 69.

81. Prior to the adopting of MD 715, AEP Managers compiled the Reports of HUD's subdivision.  They have no  have no role after MD 715.  Keith G. Depo., p. 70-71.

<u>Trainings</u>

82. Plaintiff takes issue with HUD's decision to send employees to training held by Hispanic and African American Groups.  Pl. Depo., p. 32-35.

83. While according to Patoski, these trainings are exclusively for minority groups, he has never applied to go to any of these trainings.  Pl. Depo., p. 35-36.

84. Further, plaintiff has no idea if HUD sends only minority employees to such trainings.  Pl. Depo. P. 37.

<u>Upward Mobility Program</u>

85. The Upward Mobility Program is designed to advance low level employees who have shown ability to do higher level work.  Linda H. Depo., p. 70-71; Pl. Depo. P. 28.

86. The Program has aspects that allow for accelerated promotions.  Linda H. Depo., p. 71-72.

87. HUD does not provide any preferences to women and/or minorities under the policy.  Linda H. Depo., p. 72.

88. Patoski has never been eligible for or applied for the Program. Pl. Depo., p. 28-29.

89. Patoski cannot describe any instance in which he has been harmed by the upward Mobility program. Pl. Depo., p. 29-30.

90. Plaintiff does not contend that the Upward Mobility program played any role in either the 1997 CB non selection or 2000 PHRS non selection. Pl. Depo., p. 30-31.

### 2003 Non Selection Claim

91. Patoski applied for a Community Planning and Development (CPD) position in the Miami Office of HUD in late 2003, early 2004. Pl. Depo., p. 14, 20.

92. A Hispanic woman was selected for that post. Pl. Depo., p. 14.

93. Patoski alleges that HUD discriminated in the process by issuing a vacancy announcement under which he applied, cancelling that announcement, and then hiring a Hispanic woman in a newly issued vacancy announcement. Pl. Depo., p. p 14-20; 93-94.

94. Patoski alleges that because the first selection process resulted in a white male (not Patoski) being placed at the top of the best qualified list, HUD reissued the vacancy announcement so as not to award the job to a white male. Pl. Depo., p. 14-20, 93-94.

95. Patoski recognized this claim to be actionable under Title VII, and initiated the administrative process. Pl. Depo., p. 20-22.

96. Patoski concedes, however, that he did not properly exhaust that administrative claim. Pl. Depo., p. 21-22.

### Hispanic Employment Plan

97. The Hispanic Employment Plan was established by Executive Order. See Executive Order 13171, available at 2000 WL 1518853; Pl. Depo. P. 12-13; Linda W. Depo., p. 24-25.

98. The Hispanic Employment Program seeks to increase awareness of Hispanic culture and increase recruiting of Hispanic Applicants and their representation in the federal workforce. See Executive Order 13171.

99. Plaintiff acknowledges that the Hispanic employment plan did not play a role in either the 1997 CB non selection or the 2000 PHRS non selection. Pl. Depo. P. 13-14.

100. Plaintiff does contend that the Hispanic Employment plan played a role in his non

selection for a position at HUD in Florida in late 2003 or early 2004. Pl. Depo, P. 14, 20. See <u>supra</u>.

HUD Special Emphasis Program

101. HUD has a Special Emphasis Program that is intended to increase awareness of the contributions of particular heritages. Keith G. Depo., p. 82; <u>see also</u> 2005 MD 715 Report, p. 6142-6143 (describing Special Emphasis events); 2004 MD 715 Report, p. 4611 (same); Linda W. Depo., p. 12.

102. The Special Emphasis Program has no correlation to hiring practices. Keith G. Depo., p. 82-83.

103. Patoski is unaware if any selectee for the Boston CB position ever participated in the Special Emphasis Program. Pl. Depo., 36.

104. Patoski is unaware if Abbey O., the selectee for the 2000 PHRS position, participated in the Special Emphasis Program. Pl. Depo., p. 37.

Emerging Leaders Program

105. The Emerging Leaders Program is a HUD Program designed to provide managerial experience to non-managerial employees. Keith G. Depo., p. 94; Pl. Depo., p. 43. The Program allows individuals who complete it to apply for supervisory positions. P. Depo. P. 43.

106. Participants can substitute participation in the Program for actual managerial experience in applying for managerial position. Pl. Depo. P. 43. According to Patoski, it is very critical training if you wish to move up from GS 13 to higher grades. Pl. Depo. P. 43.

107. HUD selects the best candidates for these positions. There is no preference from women and/or minorities. Keith G. Depo, p. 95.

108. Patoski does not have managerial experience and desired such training in order to apply for managerial positions. Pl. Depo. P. 43. Patoski applied for the Program in 2004, but was not selected. Pl. Depo., p. 44.

109. Patoski believed the denial to be denial of a tangible employment benefit and that he was not selected for discriminatory reasons. Pl. Depo., p. 44-45.

110. Patoski did not pursue Title VII administrative remedies with respect to such claims. Pl. Depo., p. 45.

111. Patoski believes he was discriminated against because, according to Patoski, you can tell

by looking at the pictures of the program participants on HUD's website that there is discrimination against white males because the participants are "almost exclusively women and minorities."  Pl. Depo., p. 46.

                                                   Respectfully Submitted,
                                                   United States of America,
                                                   By its Attorneys.

                                                 MICHAEL J. SULLIVAN
                                                 UNITED STATES ATTORNEY

By:                         _/s/ Mark J. Grady_____
                                                 Mark J. Grady
                                                 Assistant United States Attorney
                                                 United States Attorney's Office
                                                 1 Courthouse Way– Suite 9200
                                                 Boston, MA 02210
                                                 Telephone (617) 748-3136