UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD S. PATOSKI,         ) | |
|     Plaintiff,         ) | |
| v.         ) | C.A. No. 05-11086-RCL |
| ALPHONSO JACKSON, SECRETARY         ) | |
| DEPARTMENT OF HOUSING AND         ) | |
| URBAN DEVELOPMENT         ) | |
|     Defendant.         ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF THE MOTION FOR PARTIAL SUMMARY JUDGMENT**

Introduction

The Plaintiff, Richard Patoski ("Patoski"), has brought the instant action alleging that with respect to two positions for which he applied, a Community Builder ("CB") position in 1997 and a Public Housing Revitalization Specialist ("PHRS") position in 2000, the Department of Housing and Urban Development ("HUD") unlawfully discriminated against him in violation of Title VII and the Constitution. Specifically, he alleges that HUD discriminated against him on the basis of his race (white) – with respect to the 2000 PHRS position; and on the basis of gender (male) – with respect to both 1997 CB position and the 2000 PHRS position. Plaintiff also contends that HUD discriminated against him in violation of the Age Discrimination in Employment Act ("ADEA") in denying him the 1997 CB position. In addition to these claims, Patoski further contends that HUD's Affirmative Employment Program ("AEP") constituted an impermissible affirmative action program.[1] According to Patoski, the collection and

---

[1] In fulfilment of its obligations under Title VII of the Civil Rights Act of 1964, the Equal Employment Opportunity Commission ("EEOC") promulgated Management Directive 714 ("MD 714") in 1987, which required each federal department and agency to prepare and submit to the EEOC an "affirmative employment plan" to be reviewed and approved by the EEOC. The directive required agencies to develop affirmative employment programs which hold senior management responsible for equal employment opportunity objectives and provides for the establishment of numerical "goals" where there is a "manifest imbalance" or "conspicuous

dissemination of workforce statistics based upon race and gender, to managers, in combination with managerial performance standards based upon EEO considerations, led HUD hiring officials consider race and/or gender in making individual personnel decisions irrespective of whether taking race into account can be justified as a matter of law.  Finally, Patoski seeks to pursue claims that HUD's ongoing policies and procedures discriminate against him on the basis of his race (white) and gender (male) in violation of Title VII and the Equal Protection Clause of the Constitution.

Patoski seeks back pay, injunctive relief, attorneys fees, and compensatory damages for these alleged violations of Title VII.

For the reasons more fully set out below summary judgment should be entered in favor of HUD: (1) as to claims arising under the constitution because Title VII is the sole and exclusive remedy for alleged discrimination in federal employment; (2) as to claims challenging HUD's ongoing policies and practices because Patoski cannot, as an individual, challenge such policies; (3) as to claims challenging ongoing policies because Patoski has not suffered an adverse employment action under such policies and/or has failed to exhausted administrative remedies with respect to any adverse employment action under such policies; (4) as to claims challenging ongoing policies because Patoski simply lacks standing to challenge such practices; (5) as to claims of age, race and gender discrimination in Patoski's non selection for the PHRS and CB positions because HUD has provided legitimate non-dicriminatory justifications for its actions.

---

absence" of minorities and women in the work force.  In 2003, EEOC MD-714 was superceded by EEOC MD-715.  See, e.g., Worth v. Jackson, 451 F.3d 854, 856 (D.C. Cir. 2006) (finding, inter alia, that Plaintiff's claims with respect to the AEP Program were rendered moot by the adoption of MD 715 which eliminates the creation of any goals based upon the statistical analysis).

**Argument**

I. **No Claim For Discrimination in Federal Employment May Be Pursued Under the Equal Protection Clause**

In Count IX, Patoski seeks to recover for alleged "pattern and practice" of ongoing discrimination under the Fifth Amendment to the Constitution. See Pl. Ans. Ints., No. 1, p. 3-5; First Amended Complaint, ¶58-62. Because Congress has provided a comprehensive and exclusive remedy for alleged discrimination in federal employment, Patoski cannot pursue a free standing constitutionally based claim.

Title VII provides the sole and exclusive remedy for federal workplace discrimination. Brown v. General Services Administration, 425 US 820, 835 (1976). Because Congress has provided a comprehensive and exclusive statutory scheme to remedy federal workplace discrimination in Title VII, that scheme preempts constitutionally based claims. See Brown, supra; Ford v. West, 222 F.3d 767, 773 (10th Cir. 2000); Williams v. General Servs. Admin., 905 F.2d 308, 311 (9th Cir.1990); Kizas v. Webster, 707 F.2d 524, 542 (D.C. Cir. 1983); Ethnic Employees of Library of Congress v. Boorstin, 751 F.2d 1405, 1415 (D.C.Cir.1985); Delaney v. Potter, 2006 WL 2469380 (D. Tenn. 2006); Fulton v. Potter, 2005 WL 1770847 (D. Ark. 2005); Jones v. Mineta, 2004 WL 1534177 (D. Kan. 2004); Gunning v. Runyon, 3 F.Supp.2d 1423 (D. Fla.1998); Christensen v. Lawrence F. Quigley Memorial Hosp., 656 F.Supp. 14 (D. Mass. 1985).[2]

---

[2]Indeed, in matters related to federal employment, where Congress has a significant interest and has provided a comprehensive statutory remedy, courts should defer to Congress' judgment as to what remedies are necessary and not infer constitutionally based causes of action. See, e.g., Bush v. Lucas, 462 US 367, 390 (1983) (declining to create a constitutionally based remedy for alleged violations of First Amendment rights of federal employees where such action is redressable within a comprehensive statutory scheme established by Congress). See also, Correction Services Corp. v. Malesko, 534 US 61, 68 (2001) (noting that the Supreme Court has refused, since 1980, to extend Bivens remedies).

As a consequence, plaintiff's claim that HUD's past or present practices violate(d) the Fifth Amendment must be dismissed or summary judgment must be entered in favor of HUD.

**II.    Patoski Cannot Pursue Challenges to HUD's "Ongoing" Practices and Procedures Because Patoski Cannot, as an Individual, Pursue a "Pattern and Practice" Claim, Patoski Has Not Suffered, or Exhausted Title VII Administrative Remedies With Respect to, Any Adverse Employment Action Occurring Under Ongoing Policies, and, Because Patoski Lacks Standing**

In Counts VII, VIII and IX, Plaintiff seeks to pursue "pattern or practice claims" based upon, in Count VII, HUD's now defunct AEP, and in Counts VIII and IX, with respect to "ongoing practices of HUD" under Title VII and the Constitution.  See generally, Int'l Brotherhood of Teamsters v. United States, 431 U.S. 324 (1977) (recognizing class based relief for claims alleging discriminatory "patterns and practices.").  For the reasons more fully stated below, summary judgment should be entered in favor of HUD with respect to these claims.

    A.    Patoski Cannot Pursue a Free Standing "Pattern and Practice" Claims Under Title VII in the Context of An Individual Claim

To the extent that the Plaintiff seeks to pursue claims based upon "patterns and practices" independent of his individual non selection claims, those claims must be dismissed.  While Patoski may certainly introduce evidence of practices of HUD to show discriminatory intent as to his no selection for the CB and PHRS positions, Title VII does not recognize a right of individuals to challenge patterns and practices.

> Title VII prohibits discriminatory employment *practices,* not an abstract policy of discrimination.  The mere fact that an aggrieved private plaintiff is a member of an identifiable class of persons of the same race or national origin is insufficient to establish his standing to litigate on their behalf all possible claims of discrimination against a common employer.

General Telephone Co. v. Falcon, 457 U.S. 147, 159 n.15 (1982) (emphasis in original).

Independent pattern and practice claims have only been recognized by the Supreme Court in the context of class action claims, or, claims brought by the Equal Employment Opportunity

Commission.³ As noted by the Sixth Circuit in rejecting attempts by an individual to pursue such claims:

> [A] pattern-or-practice claim is focused on establishing a policy of discrimination; because it does not address individual hiring decisions, it is inappropriate as a vehicle for proving discrimination in an individual case.

Bacon v. Honda of America Mfg., Inc., 370 F.3d 565, 575 (6th Cir. 2004) (quotation omitted). Accordingly, the overwhelming majority of courts have rejected attempts by individuals to pursue independent "pattern and practice" claims.  See, e.g., Bacon,, 370 F.3d at 575; Williams v. Giant Food Inc., 370 F.3d 423, 429 (4th Cir. 2004); Celestine v. Petroleos de Venezuella SA, 266 F.3d 343, 355 (5th Cir. 2001); Babrocky v. Jewel Food Co., 773 F.2d 857, 866-67 n. 6 (7th Cir.1985);  DeWalt v. Meredith Corp., 2007 WL 1310184, *8 (D.Kan. 2007); Gilyard v. Northlake Foods, Inc., 367 F.Supp.2d 1008, 1016 (E.D. Va. 2005); Strader v. American Federation of State, County and Mun. Employees, Local 1027, 2006 WL 2373182, *3 (S.D. Oh. 2006); Tucker v. Gonzales, 2005 WL 2385844, *5 (S.D.N.Y. 2005); Murphy v. PriceWaterhouseCoopers, LLP, 357 F. Supp.2d 230, 247 (D. D.C. 2004); Venugopal v. Shire Laboratories, 334 F.Supp.2d 835, 845 (D.Md. 2004); Ramirez v. DeCoster, 194 F.R.D. 348, 361-362 (D.Me. 2000); Herendeen v. Michigan State Police, 39 F.Supp.2d 899, 905 (W.D. Mich. 1999); Cooper v. Diversicare Management Services Co., Inc., 115 F.Supp.2d 1311, 1322 (M.D. Ala. 1999).  See also Tucker,  2005 WL 2385844, *5 (S.D.N.Y. 2005) (where the Complaint contains a cause of action for disparate treatment the separate "pattern and practice" claim should be dismissed as duplicative).

---

³See, e.g., Arbaugh v. Y&H Corp., 126 S.Ct. 1235, 1239 (U.S. 2006) ("a separate jurisdictional provision, 42 U.S.C. § 2000e-6(b), authorizing suits by the Government to enjoin "pattern or practice" discrimination.")

This Court should follow the reasoning of the overwhelming majority and dismiss Plaintiff's pattern and practice claims in the context of this individual discrimination claim.

> B    Title VII is the Sole and Exclusive Remedy For Claims of Federal Workplace Discrimination And Patoski Has not Stated Any Claim Actionable Under Title VII With Respect to Allegations of Ongoing Discrimination
> 1.    Patoski Cannot Pursue Claims That Have Been Forfeited For Failure to Exhaust Administrative Remedies by Re-characterizing Them as "Pattern or Practice" Challenges.

Even assuming that such claims exist on behalf of individuals, Patoski has not stated any injury in fact or claim actionable under Title VII with respect to ongoing policies.  For instance, as evidence of "ongoing" discrimination, Patoski relies upon several alleged instances of discrimination, amounting to adverse actions under Title VII, yet, for which, Patoski has either failed to even initiate administrative remedies, or has, by his own admission, failed to properly exhaust Title VII administrative remedies.

Patoski, at deposition, cited the denial of a position for which he applied in late 2003, a position for which a Hispanic woman was selected, as evidence of "ongoing discrimination." Defendant's Statement of Undisputed Facts ("Def. Facts"), ¶ 91-96.  Patoski recognized this non selection to be actionable under Title VII, initiated the administrative process, but failed to properly exhaust those remedies.  Def Fact, ¶ 95  Similarly, Patoski seeks to challenge HUD's "Emerging Leaders Program" on the ground that it improperly discriminates against white males, by affording specialized training and advancement to minorities and women.   Def. Facts, ¶ 105-111.[4]  Patoski applied for and was denied entry to this Program in 2004, and alleges that the

---

[4]Participants are allowed to substitute their participation in the program for work experience in applying for managerial positions where actual managerial experience is required. Def. Facts, ¶  106.   As the basis for claims that the Program discriminates against white males, Patoski relies upon "photographs from the HUD website" which reveal that the participants in this program are "almost exclusively women and minorities."  Def. Facts, ¶ 111.

denial was because of his race and gender. Def. Facts, ¶ 109. While Patoski contends that his no selection is actionable under Title VII,[5] he has elected not to pursue administrative remedies as to that claim. Def. Facts, ¶ 110.

Patoski's failure to exhaust administrative remedies as to the alleged failure to hire in 2003 and the denial of admission to the Emerging Leaders Program constitutes a forfeiture of such claims. Frederique-Alexandre v. Department of Natural and Environmental Resources Puerto Rico, 478 F.3d 433, 440 (1st Cir. 2007) ("A plaintiff must exhaust his administrative remedies, including EEOC procedures, before proceeding under Title VII in federal court"); Jorge v. Rumsfeld, 404 F.3d 556, 563-564 (1st Cir. 2005) (same); Morales-Vallellanes v. Potter, 339 F.3d 9, 18 (1st Cir. 2003) (same); Jensen v. Frank, 912 F.2d 517, 519 (1st Cir. 1996) (same); Cano v. United States Postal Service., 755 F.2d 221, 223 (1st Cir.1985) (same); Kwatowski v. Runyon, 917 F.Supp. 877, 883 (D. Mass. 1996) (same). Patoski cannot revive such claims, or evade the exhaustion requirements of Title VII, by simply re-characterizing his claims as a challenges to "patterns or practices" or constitutional claims.

    2.  Patoski Fails to State a Claim Under Title VII and Lacks Standing As to His Remaining Challenges to Ongoing Policies of HUD.

As described more fully below, Patoski further seeks to challenge in this action ongoing "policies" of HUD that have had no discernable effect upon Patoski. He has neither standing nor an actionable claims under Title VII with respect to such policies.

---

[5] See, e.g., Bryson v. Chicago State Univ., 96 F.3d 912, 917 (7th Cir.1996) (finding that depriving an individual of the building blocks to promotion is just a serious as denying the position itself); Rowlett v. Anheuser-Busch, Inc., 832 F.2d 194, 201-202 (1st Cir. 1987) (recognizing failure to train as actionable under Title VII), rev'd on other grounds, Iacobucci v. Boulter, 193 F.3d 14 (1st Cir. 1999). Compare, Serna v. City of San Antonio, 244 F.3d 479, (5th Cir.2001) (finding no adverse employment action where the plaintiff presented no objective evidence his chances for promotion were reduced by employer's act).

For instance, Patoski seeks to challenge HUD's Upward Mobility Program[6] as discriminatory. Yet, Patoski has never applied for, nor been harmed by that program. Def. Facts, ¶ 85-90. As the harm suffered, Patoski posits that someday in the future he may have to compete with someone who participated in the Program. Def. Facts, ¶ 89-90. He has neither suffered an "injury in fact" so as to state a claim cognizable within this Court's Article III jurisdiction, nor alleged any adverse employment action, so as to allow a claim under Title VII. See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (a plaintiff must allege some personal injury fairly traceable to the defendant's allegedly unlawful conduct and such standing is a prerequisite to federal court jurisdiction); Baena v. KPMG LLP, 453 F.3d 1, 4 (1st Cir. 2006) (same); and Burlington Indus. v. Ellerth, 524 U.S. 742, 761 (1998) (to state a Title VII claim there must be "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"); Lee-Crespo v. Schering Plough Del-Caribe, Inc., 354 F.3d 34, 37 (1st Cir. 2003) (same).

Patoski also challenges HUD's decision to send employees to training furnished by Blacks in Government, and agency Patoski contends is "dedicated to promoting the advancement of black employees in the federal government. Def. Facts, ¶ 82-84. Patoski has never applied for such training. Def. Facts, ¶ 83. He has suffered neither injury nor adverse employment action and neither Title VII nor the Constitution afford a cause of action to challenge where a federal agency may deem to send its employees for trainings. See Lujan, supra; Lee-Crespo, supra.

---

[6]HUD's Upward Mobility Program provides an opportunity for low level HUD employees (GS 5-7) who have demonstrated an ability to handle more substantial work, to advance more quickly through the GS system. Def. Facts, ¶ ??.

Patoski further contends, as evidence of ongoing discrimination, that HUD has failed to comply with MD-715. Def. Facts, ¶ 69-81. MD 715 is an EEOC directive requiring federal agencies to conduct statistical comparisons of its workforce to the civilian workforce. Def. Facts, ¶ 75. Where statistical analysis shows significant disparities, agencies should review their practices to determine if "barriers" exist. Def. Facts, ¶ 77. According to Patoski, "statistical analysis" shows that barriers exist to the hiring of white males and that HUD, therefore, must state in its MD 715 Report that such barriers exist and take steps to eliminate those barriers.[7] Def. Facts, ¶ 78.

Such claims neither state an injury in fact on account of race nor any adverse employment action. See Lujan, supra; Lee-Crespo, supra. Patoski does not claim, for instance, that HUD has found such "barriers" for any other racial group to the exclusion of white males. HUD is awaiting further guidance from the EEOC as to what "barrier" analysis is appropriate and is reviewing the issue. Def. Facts, ¶ 80 It has not yet determined whether any barriers exist, or do not exist, for any group. Def. Facts, ¶ ??. As such analysis has been applied equally to all groups, Patoski cannot complain that white males have been treated differently under MD 715.

Patoski's remaining contentions as to HUD's ongoing policies, even if true, do not establish any claim under Title VII or the constitution. For instance, Patoski contends that HUD continues to have AEP Managers "whose duties are to effectuate AEP goals." While the title AEP manager may still exist, AEP Managers have no duties. Def. Facts, ¶ 81.

Patoski next refers to various statements as reflected in various annual reports prepared by HUD to the effect that HUD wishes to increase diversity in its workforce as evidence of

---

[7] At best, this issue may be actionable as a claim under the Administrative Procedures Act, See 5 U.S.C. § 701, et seq.

ongoing Title VII and constitutional violations.[8] These statements are evidence of a commitment to a diverse workforce, a laudable and perfectly appropriate goal for federal agencies. Nothing in these statements can be interpreted as evidence that white males will be discriminated against, now or in the future.[9]

Patoski also complains that HUD maintains a Special Emphasis Program that does not recognize White males. Def. Facts, ¶ 101-104; Pl. Ans. To Ints., No. 1., p. 4. The Special Emphasis Program is intended to increase awareness of the contributions of individuals of particular heritages. Def. Facts, ¶ 101. It has no correlation to hiring practices. Def. Facts, ¶ 102.

---

[8] See Pl. Ans. To Ints., No. 1., p. 3-5 (2002 and 2003 Annual Performance Plans - HUD "establishes numerical goals for increasing Hispanic and White female representation;" 2004 Annual Performance Plan - it is HUD's goal to "further diversify its workforce;" 2005 and 2006 Performance and Accountability Reports - HUD wishes to "further diversify its workforce" and that "diversity hiring strategies are in place;" HUD seeks to increase Hispanic representation in its workforce through its Hispanic Employment Plan). See also, Pl. Depo., p. 16-17 (Secretary Jackson made public statements that HUD needed to hire more Hispanic employees).

[9] See, e.g., Silver v. City Univ. of New York, 947 F.2d 1021, 1022 (2d Cir.1991) (internal memorandum stating that lists of candidates for Distinguished Professor "should include a very significant representation of minorities and females" in no way suggested that appointments to that position would be race-or gender-based) (per curiam); Altizer v. City of Roanoke, Virginia, 2003 WL 1456514, *4 (W.D.Va.,2003) (statements deploring lack of diversity and that increasing diversity is an important goal are not evidence of discrimination against white males); Lutes v. Goldin, 62 F. Supp.2d 118, 131-132 (D.D.C.,1999) (numerous public statements about the importance of diversity at NASA are not evidence of discrimination against white males); Blanke v. Rochester Telephone Corp., 36 F.Supp.2d 589, 597 -598 (W.D.N.Y.,1999) (statement of desire to increase diversity is not evidence that White males would be fired); Brown v. Time, Inc., 1997 WL 231143, *4 (S.D.N.Y. 1997) (newsletter circulated by defendant's chairman stating, "[W]e must make diversity a reality . . . We must do as well at recruiting, retaining, and promoting minorities as we have with women in publishing" "express[ed] a commitment to diversity, but d[id] not thereby suggest a policy of discrimination"); Payne v. Norwest Corp., 911 F.Supp. 1299, 1305-06 (D.Mont.1995) (internal memo that recommended increasing the number of women and minorities in certain positions, and fact that company had diversity goals and kept statistics on the number of minorities employed at managerial levels, did not give rise to inference that plaintiff was fired because he was white), *aff'd in part and rev'd on other grounds in part,* 113 F.3d 1079 (9th Cir.1997).

In sum, Plaintiff has Failed to state any actionable claim for "ongoing" violation under either Title VII or claim for which Patoski has standing under the constitution (even assuming such a claim existed, it does not).  As such, Summary judgment should be entered in favor of HUD on Counts VII, VIII and IX.

### III.     Claims With Respect to HUD's AEP Are Moot

It is undisputed that HUD's AEP was superceded in October 2003.  As of that date, a new EEOC Directive, MD 715 replaced the prior policy.  Def. Facts, 72.  MD 715 requires that HUD conduct statistical analysis of its workforce in comparison to the civilian labor force with respect to all races and genders.  Def. Facts, ¶ 75.  It eliminates any reference to the establishment of "goals" and/or any disparate treatment of white males that may have occurred under MD 714.  Def. Facts, ¶ 73.

Count VII of Plaintiff's Complaint appears to seek some form of declaratory judgment with respect to HUD's AEP as it existed prior to October 2003.  First Amended Complaint, ¶ 46-52.  Patoski can certainly introduce evidence of the manner in which he contends the AEP, under MD 714, demonstrated discriminatory intent with respect to his non selections, however, as the policy has been superseded and will not return, questions with respect to the AEP as it existed under MD 714, are moot.[10]  Thus, as was noted by the Circuit Court for the District of Columbia, addressing claims that a Plaintiff's challenge to HUD's AEP

> Because the Constitution nowhere licenses us to rule on the legality of an agency policy that no longer exists and that, according to the district court, will never again exist, Worth's challenge to HUD's AEP is moot.

---

[10] Aside from contending that HUD has improperly implemented MD-715, see supra, Patoski does not otherwise contend that MD 715 discriminates against white males.  In any event, such claims, if they exist, arise with respect to MD 715, not the AEP as it existed prior to October 2003.

Worth v. Jackson, 451 F.3d 854, 861 (D.C. Cir. 2006). See also, e.g., Mangual v. Rotger Sabat, 317 F.3d 45, 60 (1st Cir. 2003) ("If events have transpired to render a court opinion merely advisory, Article III considerations require dismissal of the case.").

Plaintiff's claims with respect to the now defunct AEP are, thus, moot.

**IV.     Summary Judgment Should Be Entered in Favor of HUD As to Patoski's Non Selection Claims for the PHRS Position**

Patoski applied for a PHRS position in 2000, that was ultimately awarded to a Black male, Abbey.O.  Def. Facts, ¶ 25-68.  Patoski contends that he was denied the PHRS position on account of his race (white) and gender (male) and that race and or gender was a motivating factor in the decision.  See Complaint (Counts V-VI).

To prove a claim of Title VII discrimination a Plaintiff can put forward direct evidence of discrimination or, where no direct evidence exists, the claim is analyzed under the burden shifting analysis set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  In the first stage of that framework, a plaintiff must demonstrate a prima facie case.  Dicher v. Liberty Travel, 141 F.3d 24, 29-30 (1st Cir. 1998).  "In order to prove a *prima facie* case . . . the evidence must show 1) that the plaintiff is within a class protected by Title VII; 2) that plaintiff applied, and was qualified for the position for which the employer was seeking a replacement; 3) that despite plaintiff's qualifications he or she was rejected; and 4) that after plaintiff's rejection the position was filled or continued its efforts to fill, the position with someone with complainant's qualification."  Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 32 (1st Cir. 1990).  The burden then shifts to the employer to provide a nondiscriminatory reason for the decision.  See, e.g., Byrd v. Ronayne, 61 F.3d 1026, 1031 (1st Cir. 1995).  Upon such a showing, the Plaintiff must present evidence to demonstrate that the employer's justification is a pretext.

See, e.g, Byrd, 61 F.3d 1026

    A.    <u>Plaintiff Has Not Provided Direct Evidence of Discrimination</u>

In support of claims of race and gender discrimination for the PHRS position, Patoski relies upon: (1) evidence that a black male's application (Ralph K.) was forwarded from the MSR vacancy to the DEU Announcement because that individual applied for the wrong announcement; (2) a white male, Kevin G., was placed on the best qualified list at the GS-15 level because otherwise the DEU GS-15 would have contained the names of the only three African Americans to have applied for the job and no others; (3) but for the inappropriate processing of Ralph K.'s and Kevin G.'s applications, Plaintiff would have made the "Certificate of Eligibles;" (4) Plaintiff contends that the rating process was flawed because no "crediting plan" used by staffing panels; and that (5) the selectee Abbey O., a black male, was "improperly groomed for the position." See First Amended Complaint, ¶ 30-45; Plaintiff's Ans. To Int. No. 1; Def. Facts, ¶ 25-68. Plaintiff also relies upon HUD's AEP Plan generally as evidence of discrimination in this process. See Def. Facts, ¶ 51.

None of the foregoing are "direct" evidence of discrimination. Plaintiff cannot rely upon the mere existence of the AEP as direct evidence of discrimination as to the PHRS hiring. Instead, Patoski must establish that the AEP actually played a role in this decision. Assuming, for purposes of summary judgment, the truth of the Plaintiff' contention with respect to the AEP, that it improperly urged mangers to achieve "goals" based upon racial criteria, he has nonetheless failed to establish how the AEP applied to the PHRS selection. See, e.g., Axel v. Apfel, 171 F. Supp.2d 522, 529 (D.Md. 2000)("[T]he mere existence of an Affirmative Employment Program plan is insufficient to prove discriminatory intent as there has been no proof that the actions of [the decision maker] were motivated by the plan.") (and cases cited).

Stated another way, it is not sufficient at this stage adequate for Patoski to simply claim that the AEP's "goals," coupled with standards that evaluated HUD managers based upon accomplishment of diversity goals, demonstrates discrimination. He must actually substantiate those claims as to the PHRS position. This, he cannot do.

A black male was hired for the PHRS position. In neither 1999, nor 2000, did the AEP establish any "goal" of hiring black males for this position. See Def. Fact, ¶ 52-53.[11] Nor has Patoski demonstrated that any of the decision makers with respect to the PHRS position were aware of, much less relied upon, any specific goal set by the AEP in hiring Abbey O. instead of Patoski. Patoski simply argues that the very existence of the AEP is evidence that HUD discriminated against white males in every hiring decision. It is not. Since the plaintiff cannot demonstrate that the AEP played a role in this decision, it cannot serve as direct (or indirect) evidence of discrimination.[12]

> B. Under the *McDonnell Douglas* Analysis, Patoski's Gender Discrimination Claim as to the PHRS Position Fails Because He Cannot Establish a Prima Facie Case. Moreover, Both Patoski's Race And Gender Based Claims Fail Because He Does Not Contest HUD's Non-Discriminatory Justification for Hiring Abbey O.

As an initial matter, in that the position was filled by a male (albeit of a different race), the Plaintiff does not state a prima facie case for gender based discrimination in the PHRS hiring. See Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 33 (1st Cir.1990) ("The fourth

---

[11]The Plaintiff testified that the PHRS position, within the parlance of the AEP, fell into the administrative or Professional Category. Neither the 1999 nor 2000 AEP contained any "goal" for the hiring of black males.

[12]The Plaintiff's remaining claims, discussed more thoroughly below in the context of the McDonnell Douglas analysis, are not, on their face, "direct" evidence of discrimination. See, e.g., Lucas v. Chicago Transit Authority, 367 F.3d 714, 728 n. 12 (7th Cir. 2004) ("Direct evidence of discrimination is evidence that without reference or explanation, ties the illicit motive with the adverse employment action.").

prong [of the *prima facie* case] would require [the plaintiff] to show that he was not hired but for his gender."); Cumpiano v. Banco Santander Puerto Rico, 902 F.2d 148, 155 (1st Cir.1990) (Plaintiff must show that the job "was filled by a person not possessing the protected attribute"); Rossy v. Roche Products, Inc., 880 F.2d 621, 624 (1st Cir.1989) (the Plaintiff must show that "the position was filled by a person not within the protected class."). The fact that a male, Abbey O., was hired demonstrates, *ab initio*, that Patoski's non selection was not based upon the fact he was male and Patoski's claim of gender discrimination in the PHRS process is a non-starter.

Assuming, nonetheless, that Patoski has stated a prima facie claim for both race and gender discrimination, HUD has provided a reasonable explanation for selecting AO over Patoski. See Def. Fact, ¶ 38, 40-43. The rating official, Mirza Del R., has stated that Patoski did not make the final selection roster because the other applicants, including Abbey O., were better qualified. Def Fact, ¶ 38. Faced with a non-discriminatory justification, the burden shifts to Patoski to demonstrate that this proffered reason is a pretext for unlawful discrimination.

Patoski utterly fails to demonstrate pretext. The position in question was for a Hope VI Specialist. Def. Fact, ¶ 26. Patoski himself testified that Abbey O. was as, if not better, qualified with respect to the Hope VI Program. Def. Fact, ¶ 40-43. Indeed, Abbey O. had worked on the Hope VI Progam as a CB Fellow, while Patoski did not have experience in the Hope VI Program. Def Fact, ¶ 40-43. Conceding that AO's experience at HUD rendered him as, if not unquestionably more, qualified for the PHRS (Hope VI) position than himself, Patoski contends that AO was "improperly groomed" for the position relying upon unsubstantiated allegations of discrimination wholly outside the PHRS hiring process. Def Facts, ¶ 40-43, 54-58.

In this regard, Patoski argues that HUD discriminatorily filled the CB Fellow positions favoring minorities and women.[13] Thus, Abbey O. *improperly* gained his significant expertise in the Hope VI Program. Def. Fact, ¶ 54-58. As a consequence, Abbey O.'s superior qualification should somehow be disregarded. These allegations (they are not facts) are not evidence of discrimination in the PHRS selection process. Patoski has simply concocted an elaborate and illogical theory, under which, HUD has discriminated against Patoski by selecting the better qualified candidate. This turns Title VII (and common sense) on its head. Even in cases involving so ineffable a matter as motive or intent, summary judgment is warranted where "the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. RJR Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

The Plaintiff's remaining allegations do not establish pretext. An intent to discriminate cannot be inferred from the fact that HUD forwarded the application of a black individual, Ralph K., who erroneously applied to the MSR process (open only to civil service employees) to the DEU process (open to all). There was nothing unusual about such action, the individuals involved in the process testified that such occurred, if not routinely, then certainly frequently. Def. Facts, ¶ 62-67. Further, those individuals were aware of no prohibition as to such action. Def. Facts, ¶ 66. Even putting aside that such conduct is essentially simply decency, Patoski has provided no evidence that the individual who forwarded the application did so on account of, or even with knowledge of, Ralph. K.'s race. Conversely, Patoski is unaware of any white male

---

[13]Patoski contends that the hiring was discriminatory in favor of women and minorities based upon "the amount of community builder fellows who were women or minorities. . . And just my general observation of the quality of the people they brought in." Def. Facts, ¶ ??.

who erroneously applied under MSR processed whose application was not forwarded to the DEU process.  Def. Fact, ¶ 67.

Patoski's allegation that the rating process was deficient because rating officials did not utilize a "crediting plan" does not support a claim of either pretext or discrimination against white males.  Def. Facts, ¶ 35 (one rating official recalled a rating sheet while the other did not).  Especially, whereas here, a white male received the highest score under those ratings.  Def. Facts, ¶ 68.  Indeed, it is difficult to see how such an absence is even of assistance to the Plaintiff as it would not alter the fact that the selectee, Abbey O. was, by Patoski's own admission, better qualified.  Def. Facts, ¶ 40-43.  Similarly, assuming the truth of Plaintiff's allegation that Kevin G., a white male, was erroneously placed upon the DEU GS 15 Selection roster does nothing to establish either pretext or discrimination.  Def. Facts, ¶ 68.  A mistake in favor of a white male hardly demonstrates discriminatory intent against white males nor does this fact in any way undercut the fact that Abbey O. was more qualified for the position.  Similarly, fully crediting the allegation that but for the mistakes in the processing of applications, Patoski would have made the final selection roster does not establish either pretext or discriminatory intent.  Abbey O. would remain the better qualified candidate.  Def. Facts, ¶ 61.

Finally, HUD's admitted error in concluding that Patoski was not eligible under the MSR announcement establishes neither pretext nor discriminatory intent.[14]  "Pretext is more than a mistake on the part of the employer; it is a phony excuse."  Debs v. Northeastern Illinois Univ., 153 F.3d 390, 395 (7th Cir.1998).  First, in that Patoski was found to be  eligible for the position

---

[14]It is not contested that HUD made a mistake in this regard.  That error is not evidence of discrimination.  Ronda-Perez v. Banco Bilbao Vizcaya Argentaria--Puerto Rico,  404 F.3d 42, 47 (1st Cir. 2005) ("Title VII  does not ensure against inaccuracy by an employer, only against gender-based discrimination.")(quoting Rivas Rosado v. Radio Shack, Inc., 312 F.3d 532, 534-535 (1st Cir. 2002)).

under the DEU announcement, he had a full and fair opportunity to compete for the position. Def. Facts, ¶32. Patoski admits that even assuming that Patoski would have made the selection roster under the MSR process[15] and that he would have been "considered" for the PHRS position, is of no practical significance. Def. Facts, ¶ 61. Abbey O. would remain the better qualified candidate.[16]

In sum, that Patoski alleges mistakes or deficiencies in the PHRS hiring process is not evidence of discrimination.

> Neither the defendants' managerial judgment nor their recruiting acumen is on trial in this case. Like any other employer, the Navy was at liberty to err in filling a post, and OPM was equally at liberty to err in compiling rankings or denying a passover request. Errors in judgment are not the stuff of Title VII transgressions- so long as the "mistakes" are not a coverup for invidious discrimination. Title VII does not presume to obliterate all manner of inequity . . .

Keyes v. Secretary of the Navy, 853 F.2d 1016, 1026 (1st Cir. 1988).

Under the McDonnell Douglas standard, the burden is on Patoski to demonstrate that the proffered justification is a pretext. Having admitted the validity of HUD's proffered justification, Patoski's discrimination claim as to the PHRS position necessarily fails.

---

[15] It is common for two selection lists may be provided to selecting officials when a vacancy is announced under both the DEU and MSR procedures, one reflecting the persons who may be selected for the position from the MSR process and one reflecting persons who may be selected from the DEU process. In such a situation, the selecting official is free to pick a candidate from either list. Def. Facts, 30.

[16] One final issue with respect to the PHRS position is raised by Plaintiff. At deposition, Patoski claimed that his cause of action was not for the non selection, but instead, that because of HUD's processing error in the MSR process he was not "considered" for the PHRS position. Def. Fact, ¶ 60; contrast, First Amended Complaint, Counts V and VII. That Patoski was not "considered" for a position where the selected individual was admittedly better qualified does not state a cause of action under Title VII. "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." Dollis v. Rubin, 77 F.3d 777, 781-82 (5th Cir.1995).

**V.    Summary Judgment Should be Granted to HUD as to the Community Builder Non Selection As to Both Claims of Age and Gender Discrimination.**

As previously noted, in the absence of direct evidence of discrimination, Patoski's claim is analyzed under the burden shifting analysis.[17] Assuming *arguendo* a *prima facie* case, HUD has provided a clear and well documented non discriminatory justification for its decision not to select Patoski.  The evidence reflects that Patoski had less than stellar interpersonal skills, with both public officials and within HUD.  Def. Facts, ¶ 8-11; 13-15.  In the wake of this explanation, the burden is on Patoski to demonstrate that this explanation is pre textual.  See, e.g., Byrd v. Ronayne, 61 F.3d 1026, 1031 (1st Cir. 1995).

With respect to claims of age discrimination, Patoski relies upon an, at best, vague statement in the affidavit of Jose C.  Def. Facts, ¶ 21-24.  That document provides, "[a]s a rule, program requirements can be learned but it is more difficult, if not impossible, to learn or change old behaviors."  Jose C. Affidavit, p. 4.  It strains reason to believe that such is evidence of age discrimination.  The statement in question merely emphasized the importance of people skills in the selection process.  Patoski cannot rely "upon conclusory allegations, improbable inferences, and unsupported speculation" to defeat summary judgment.  Medina-Munoz,, 896 F.2d at 8.  Similarly, public statements of a senior HUD official indicating a desire that the agency become

---

[17]Plaintiff makes much of Mary Lou C.'s statement that she viewed it as a positive factor that a candidate was female.  Mary Lou C. Depo., p. 97-98.  Mary Lou C., however, expressly distinguished between a "motivating factor," which gender was not, and a "positive factor."  Mary Lou C. Depo., p. 114-115.  Nor, as with the PHRS position, is there any direct evidence that the AEP or its goals played a role in this selection process.  Def. Facts, ¶ 17.  Simple acknowldgements of a commitment to diversity are not evidence of likely discrimination against white males.  See supra note 9.  See also Axel v. Apfel, 171 F. Supp.2d 522, 529 (D.Md. 2000)("[T]he mere existence of an Affirmative Employment Program plan is insufficient to prove discriminatory intent as there has been no proof that the actions of [the decision maker] were motivated by the plan.") (and cases cited).  There is no evidence supporting a claim that Jose C. or Mary Lou C. were aware of any "goal" for the CB hiring.  Def. Facts, ¶ 17.

more youthful are not evidence that older workers will be discriminated against. See supra, note 9.

With respect to claims of gender discrimination, Patoski simply relies upon the AEP and statements by Mary Lou C. that HUD was committed to diversity in the workforce. Generalized statement of a desire for a diverse workforce are not evidence of an intent to discriminate. See supra note 9. Nor can statements about viewing an applicants status as positive be deemed evidence of discrimination where Mary Lou C. expressly stated that viewing gender as a "positive factor" did not mean that is was a "motivating factor." Def. Facts, ¶ 18-19.

In short, plaintiff offers nothing to rebut HUD's legitimate justification and summary judgment should be entered in favor of HUD.

## Conclusion

For the foregoing reasons, Defendant requests that this Court enter summary judgment in its favor as to all Counts of the Plaintiff's Complaint.

                                      Respectfully Submitted,
                                      United States of America,
                                        By its Attorneys.

                                        MICHAEL J. SULLIVAN
                                        UNITED STATES ATTORNEY

By:                          _/s/ Mark J. Grady_____
                                        Mark J. Grady
                                        Assistant United States Attorney
                                        United States Attorney's Office
                                        1 Courthouse Way– Suite 9200
                                        Boston, MA 02210
                                        Telephone (617) 748-3136