UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD S. PATOSKI,<br>                    Plaintiff,<br><br>v.<br><br>ALPHONSO JACKSON, SECRETARY,<br>DEPARTMENT OF HOUSING AND<br>URBAN DEVELOPMENT,<br>                    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 05-11086 RCL

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff Richard S. Patoski hereby submits his opposition to Defendant HUD's

Motion for Summary Judgment. Plaintiff, a White male who was born in 1949, will

demonstrate that there is sufficient evidence on which to proceed to trial on the following

Counts: [1] but for Plaintiff's age, he would have been promoted to a Community

Builder (CB) position (Count I); [2] but for Plaintiff's gender, he would have been

promoted to a CB position (Count II); [3] but for consideration of a combination of

Plaintiff age and gender, he would have been promoted to a CB position (Count III); [4]

gender was a "motivating factor" in the decision to reject Plaintiff for the CB position

(Count IV); [5] but for Plaintiff's race, he would have been promoted to a PHRS position

(Count V); [6] race was a "motivating factor" in the decision to reject Plaintiff for the

PHRS position (Count VI); [7] HUD's Affirmative Employment Plan subjected Plaintiff

to a discriminatory classification on the basis of gender and/or race (Count VII); and [8]

HUD's continuing discriminatory employment patterns and practices prevent Plaintiff

from competing on an equal footing, in violation of the 5th Amendment (Count IX).

Citations to the SOF 1-203 refer to the Plaintiff's Rule 56.1 Statement of Facts

filed in Support of Plaintiff's Motion for Summary Judgment. Citations to "Resp. to

HUD Fact" and SOF 204, et seq. refer to facts contained in Plaintiff's Rule 56.1

Statement filed in opposition to HUD's motion for summary judgment.

I.    PLAINTIFF'S TITLE VII CHALLENGE TO THE AFFIRMATIVE
      EMPLOYMENT PROGRAM IS NOT MOOT

As more fully explained in Plaintiff's Motion for Summary Judgment, and

supporting memorandum, at 6-20, Count VII seeks recovery under 42 U.S.C. § 2000e-

2(a)(2), based on HUD's Affirmative Employment Program (AEP).[1]  At the time that

Plaintiff was non-selected for the CB and PHRS positions, HUD maintained its AEP.

SOF 49-97.  Under that program, HUD classified all of its employees by race and gender

into EEO groups, such as Black female, White male, Asian male, etc.  Plaintiff's Memo.

In Support of Motion for Summary Judgment, at 15.  The AEP established numerical

goals and objectives for increasing the rates of hiring, promotion and training, for

members of all EEO groups, except White males.  Id., at 7-10.  The goals and objectives

were given to HUD Managers to "provide direction for hiring."  SOF 28.  HUD failed to

establish any legal justification for its affirmative action program, to satisfy Title VII or

---

[1]  According to Title VII, "It shall be an unlawful employment practice for an employer
to . . . classify his employees . . . in any way which would deprive or tend to deprive any
individual of employment opportunities or otherwise adversely affect his status as an
employee, because of such individual's race . . . [or] sex . . .."  42 U.S.C. § 2000e-2(a)(2).
As a victim of a discriminatory classification, Plaintiff need not demonstrate that the use
of such classification caused him harm.  Rather, such classification is illegal even where
it merely tends to deprive an individual of employment opportunities.  42 U.S.C. §
2000e-2(a)(2); see Lorance v. AT&T Technologies, 109 S. Ct. 2261, 2266 n.3, 2269
(1989) (concrete harm when discriminatory system is adopted, even before it affects the
plaintiff); Northeastern Florida Chapter of the Associated General Contractors of
America v. Jacksonville, 508 U.S. 656, 658, 666 (1993).

Constitutional requirements. Id., at 14-20.[2] The AEP applied directly to the positions for which Plaintiff applied and was rejected. Id. at 8 n.4, 10; Resp. to HUD Fact 52.

HUD's only argument with regard to Count VII is that it is moot, because the AEP is no longer in existence, and HUD apparently promises not to renew it. Def.'s Mem., at 11-12.[3] The general rule is that voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot. City of Los Angeles v. Davis, 99 S. Ct. 1379, 1383 (1979). A case is moot if it can be said [1] that there is no reasonable expectation that the alleged violation will recur; **and** [2] interim relief has completely and irrevocably eradicated the effects of the alleged violation. Id.

In this case, Plaintiff's claim with regard to the AEP remains a viable legal controversy, despite the demise of the AEP program. First, Plaintiff suffered damage from the AEP which has not yet been remedied. The illegal classification caused Plaintiff to suffer emotional distress. SOF 204. The AEP caused and contributed to Plaintiff's anxiety, depression and anger, for a period of years, for which he sought treatment and for which he took medication. SOF 204. Plaintiff viewed the AEP year after year, and had numerous discussions with others about its illegal provisions, leading

---

[2] HUD mischaracterizes the Plaintiff's claim by suggesting that Plaintiff has an issue with the dissemination of workforce "statistics." Def.'s Mem., at 2. Rather, Plaintiff takes issue with HUD's numerical goals and objectives for increasing the hiring, promotion, and training of all women and racial groups, except for White males. See Plaintiff's Memo. In Support of Motion for Summary Judgment, at 6-20. HUD evaluated its Supervisors and Managers on a yearly basis to ensure that these numerical goals and objectives were met, and rewarded those who promoted minorities. SOF 198, 199, 205.

[3] HUD implies that its AEP was based on the EEOC Management Directive MD 714, although it does not claim this as a defense. Def.'s Mem., at 1 n.1. In actuality, the AEP contained race and gender based affirmative action that went well beyond what was required or suggested by MD-714. Resp. to HUD Fact 70A(i) – 70A(ix)(g).

to inconvenience and loss of enjoyment of life.  SOF 204.  This injury-in-fact has not

been remedied, and therefore the claim is still live.

Second, Plaintiff seeks declaratory judgment that the AEP was illegal.  As HUD

correctly points out, the fact that HUD had a program of numerical goals and objectives

for hiring and promoting women and minorities may be used as evidence that he was

rejected for the CB and PHRS promotions because he was a White male.  Def.'s Mem., at

11.  An employer's general policies and practices may be relevant to determining whether

an individual plaintiff was the subject of discrimination.  McDonnell Douglas Corp. v.

Green, 93 S. Ct. 1817, 1825 (1973).  The AEP evidence becomes all the more potent as

evidence of bias if it is established that HUD maintained the AEP in violation of Title

VII.  Without such a finding, a jury may conclude that HUD's program is benign and

lawful, and that there would be nothing wrong in following it.  Without knowing that the

AEP is illegal, a jury may fail to infer a corporate-wide atmosphere of discrimination

from it.  Thus, there remains a very live and present issue concerning the legality of the

AEP, in order for the jury properly consider it for the other claims.

Third, HUD's alleged promise not to renew its AEP program fails to demonstrate

that the problem will not recur.  That promise, at HUD Fact 73, is unsupported by sworn

statement.  There is no statement made by any officer that binds HUD.  Even if there

were such a sworn statement, while HUD may speak to its present intention, it is a

political entity, subject to whatever elected and appointed authority eventually controls it.

The present Presidential Administration must leave office by January 20, 2009.  It is

uncertain how HUD can purport to make promises about a political matter for the

foreseeable future.  Indeed, there are numerous indications that HUD will revert to using

the policy.[4]  Plaintiff disputes that HUD has made a reliable promise not go back to the

AEP.  Thus, Count VII is not moot.

The case that HUD relies upon, Worth v. Jackson, 451 F.3d 854, 861 (D.C. Cir.

2006), is distinguishable on the grounds that the Plaintiff in that case sought solely

prospective relief.  In that case, Worth sought to enjoin reliance on HUD's AEP in the

future.  Id. at 856.  Faced with this very limited requested forward-looking remedy, the

Court dismissed the claim as moot, because HUD already had promised not to rely on the

AEP in the future.  Id. at 861.  But in this case, Plaintiff also seeks a retrospective relief,

in the form of declaratory relief and emotional distress damages.  The different requested

remedies here easily distinguishes the Worth case.  Plaintiff's claim is not moot.

II.     THERE IS SUFFICIENT EVIDENCE THAT GENDER WAS "A
        MOTIVATING FACTOR" IN THE DECISION TO REJECT PLAINTIFF FOR
        A COMMUNITY BUILDER POSITION

Count IV alleges that that consideration of Plaintiff's gender was "a motivating

factor" in his non-selection for a Community Builder (CB) position, in violation of

"Section 2(m)" of Title VII, 42 U.S.C. § 2000e-2(m).  Under Section 2(m), "An unlawful

---

[4]  AEP Managers continue to exist at HUD. SOF 206; HUD Fact 81. While AEP
Managers allegedly have no role anymore, their role was to take actions "to ensure the
achievement of AEP objectives." SOF 206. HUD fails to explain why AEP Managers
still exist, if they have no role. The Upward Mobility Program is an existing program
that is designed to advance the careers of lower level employees and permits accelerated
promotions. HUD Fact 85-86. The Upward Mobility Handbook, as it currently exists,
states that the Upward Mobility Program can be used to correct manifest imbalances
and/or conspicuous absences identified as internal movement goals, which are goals of
the AEP. SOF 207. HUD's FY 2005 and 2006 reports contain a pledge to "further
diversity its workforce" and state that "diversity hiring strategies are in place to address
under-representation," although HUD denies that such strategies are in existence. SOF
209. MD-715 requires HUD to analyze its workforce, and identify and eliminate barriers
causing underrepresentation of EEO groups. HUD has identified that White males are
vastly underrepresented in the workforce, but it has done nothing to identify potential
barriers to equal opportunity to White males, and has failed to undertake any analysis to
eliminate such barriers, in violation of EEOC instructions. SOF 210-221.

employment practice is established when the complaining party demonstrates that . . . sex
. . . was a motivating factor for any employment practice, even though other factors also
motivated the practice." 42 U.S.C. § 2000e-2(m). Liability under this section obtains
even if "a respondent demonstrates the respondent would have taken the same action in
the absence of the impermissible motivating factor." 42 U.S.C. § 2000e-5(g)(2)(B).
Thus, proof that gender was considered in a decision is sufficient to establish liability,
even if such consideration did not affect the final decision. Hannon v. Chater, 887 F.
Supp. 1303, 1316 (N.D. 1995) ("[A]n employer violates Title VII by taking gender into
account in making a hiring decision, even if the employer would have made the same
decision on the basis of wholly legitimate criteria alone").

The Plaintiff's evidence on this claim is especially strong, relying on ample direct
and circumstantial evidence. While Jose C. was responsible for selecting applicants for
four CB positions in Boston, he relied very heavily upon the recommendations of Mary
Lou C. in making those selections. SOF 156, 159-164. Mary Lou C. recommended three
women for the positions, including Cheryl Ann T., Linda P., and Debra G., each of whom
was offered a CB position. SOF 166. 167, 168, 170.

Mary Lou C. acknowledged that in deciding to recommend Linda P., Mary Lou
C. regarded it as a positive factor that Linda P. was female. SOF 169. Mary Lou C. also
acknowledged that she considered Debra G.'s female gender to be a positive factor, in
Mary Lou C.'s recommendation to promote her. SOF 170. Mary Lou C. testified,

    Q.    When you recommended [Debra G.], did you regard it as a positive factor
          that she was a female?

    A.    Yes. [SOF 171].

6

In contrast, Mary Lou C. considered Plaintiff male gender to be a "neutral" factor. SOF 174. Thus, in treating gender differently, female as a "positive" factor and male as a "neutral" factor, HUD violated the law in considering gender as "a motivating factor," in violation of 42 U.S.C. § 2000e-2(m). Hannon, 887 F. Supp. at 1308, 1316 (where a candidate's female gender was considered to be a "factor in her favor," this constitutes a violation of 42 U.S.C. § 2000e-2(m) as a matter of law).

HUD argues that Mary Lou C. denied considering gender as "a motivating factor." Def.'s Mem., at 19 n.17 & 20. In actuality Mary Lou C. denied that gender was a sole determining factor; she admitted, however, that gender was one of the factors, that motivated her decision. Resp. to HUD Fact 18. The relevant testimony is as follows:

> Q.   Okay. So I'm not saying that – asking whether, but for her gender, you would not have recommended her. I'm simply asking whether it is one of possibly many factors which motivated your recommendation.
>
> Mr. Grady:   Objection to form. Go ahead and answer.
>
> A.   Yes. [Resp. to HUD Fact 18].

Thus, Crane expressly admits that gender was one of the factors that motivated her recommendation to hire women, and thus it constitutes "a motivating factor" under 42 U.S.C. § 2000e-2(m). See Price Waterhouse v. Hopkins, 109 S. Ct. 1775, 1790 (1989) (a motivating factor need only be one factor out of possibly many that were considered).

HUD asserts without citation that consideration of female gender as a "positive factor" does not mean that it was a "motivating factor." HUD is wrong as a matter of law. Hannon, 887 F. Supp. at 1308, 1316. The purpose of 42 U.S.C. § 2000e-2(m), is to eliminate any consideration at all of an illegal motive, and provide relief even if such

consideration did not make a difference in the final decision. Estate of Reynolds v.
Martin, 985 F.2d 470, 475 (9th Cir. 1993), reh. denied 994 F.2d 690 (1993).

Further evidence of use of gender as a motivating factor was Mary Lou C.'s
admission that she made the CB recommendations "based on two factors; [her]
knowledge of each candidates' performance and [her] interest in diversity." SOF 181.
When Mary Lou C. acknowledges that she was motivated by considerations of
"diversity," by "diversity" she means "not White men." SOF 181. Rather, diversity to
Mary Lou C. means the hiring of women and members of racial groups that are not
White. SOF 181; Resp. to HUD Fact 17(ii).

In addition to the direct evidence of consideration of gender, discussed above,
there is additional evidence that gender was a motivating factor in Plaintiff's non-
selection, as described in the section below. Plaintiff incorporates the discussion of that
additional evidence herein. The Plaintiff's evidence of gender as a motivating factor is so
strong that Plaintiff has moved for summary judgment in his favor on Count IV in a
separate pleading. Plaintiff incorporates pages 2-6 of Plaintiff's Memorandum in Support
of Summary Judgment herein. The evidence discussed above, and as will be discussed in
the section below, demonstrates that a reasonable jury could find that HUD considered
gender as "a motivating factor" in the decision to reject Plaintiff for the CB position.

III.    THERE IS SUFFICIENT EVIDENCE THAT GENDER WAS A "BUT FOR"
        REASON WHY PLAINTIFF WAS NOT SELECTED FOR A COMMUNITY
        BUILDER POSITION

Count II alleges that HUD violated 42 U.S.C. § 2000e-2(a) by refusing to promote
Plaintiff to a CB position because of his male gender. To prevail on Count II, the
Plaintiff must demonstrate that he would have been hired as a CB if he were female. In

8

this way Count II is distinguished from Count IV discussed above, in that Count IV does not require proof that consideration of gender affected the final decision.

Proof of a prima facie case of gender discrimination, along with proof that the employer's articulated reasons for the rejection are pretextual, can raise an inference of discrimination. St. Mary's Honor Center v. Hicks, 113 S. Ct. 2742, 2749 (1993).

Plaintiff has demonstrated a prima facie case of gender discrimination. [1] he is male, and was known by the decisionmakers to be male. Resp. to HUD Fact 12B(i). [2] he was qualified for the position in that he was given the highest possible score by the rating panel, was placed on the Best Qualified List for the position, and was known to have performed his job extremely well in a position that performed the same functions as a CB. Admission 25, Exhibit 72; Resp. to HUD Fact 12B(i), 12B(ii), & 13(ii). [3] Plaintiff was rejected. SOF 186. [4] Three White women were offered CB positions, instead of Plaintiff. SOF 166, 167, 168, 170. These undisputed facts give rise to a prima facie case of gender discrimination. Cumpiano v. Banco Santander Puerto Rico, 902 F.2d 148, 155 (1st Cir. 1990).

In addition, Plaintiff can demonstrate that HUD's articulated reasons for the rejection are pretextual. According to HUD, Plaintiff was rejected because Mary Lou C. received two complaints about Plaintiff: one from the Mayor of Gloucester and one from the City Manager of Lowell. Resp. to HUD Fact 12B(ix). However, the uncontested evidence was that the problems between Plaintiff and the Lowell City Manager, and the Mayor of Gloucester, arose only after the CB selection process was completed. Resp. to HUD Fact 12B(ix). Thus, a jury could believe that HUD's articulated reasons were knowingly false, and were merely a post hoc justification that did not bear upon the true

reason for the rejection. Proof of a prima facie case, along with proof of pretext, means that there is sufficient evidence of gender discrimination to require a jury trial. St. Mary's Honor Center, 113 S. Ct. at 2749.

HUD seeks to rely on other examples of Plaintiff's allegedly poor interpersonal skills, which either happened after the CB selection process, or were not relied upon by Mary Lou C. at the time she made her dispositive rejection. Def.'s Mem., at 19. These post hoc issues, or issues not known to, or relied upon by the decision-maker, are simply irrelevant and may not be considered at this stage. Resp. to HUD Fact 8-11, 13-15; Sabree v. United Broth. Of Carpenters and Joiners, 921 F.2d 396, 404 (1st Cir. 1990) (employer may not rely on post hoc justifications for employment actions). An employer's proffered reason for dismissing an employee "must be based on information that it knew and relied upon at the time it decided to take the adverse employment action." Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996).

Also, post hoc assertion of poor interpersonal skills constitutes inadmissible character evidence, which should be stricken from the summary judgment record. Fed. R. Evid. 404; Davidson v. Mass. Casualty Ins. Co., 325 Mass. 115, 122 (1949) ("For the purpose of proving that one has or has not done a particular act, it is not competent to show that he has or has not been in the habit of doing similar acts."). The only relevant reasons articulated by HUD have been proven to be pretextual.

Thus, Plaintiff has established a prima facie case, along with proof of pretext, which withstands a summary judgment challenge. St. Mary's, 113 S. Ct. at 2749. There is other evidence indicating that gender was the reason for Plaintiff's rejection. As stated above, Mary Lou C. acknowledged considering gender to be a positive factor for the

female candidates, but only a neutral factor for Plaintiff, a male candidate. SOF 169,

170, 171, 174, Resp. to HUD Fact 18. Admission that the gender was a "positive factor"

may be considered by a fact finder for the purpose of showing that the plaintiff was

evaluated and judged on account of his gender. Dow v. Donovan, 150 F. Supp. 2d 249,

265 (D. Mass. 2001).

Mary Lou C. acknowledged that she made recommendations for the CB positions

"based on two factors; [her] knowledge of each candidates' performance and [her]

interest in diversity." SOF 181. By "diversity", Mary Lou C. means "not white men,"

but rather women and people of other races. SOF 181.[5]

While Mary Lou C. recommended Debra G. and Cheryl Ann T. for the CB

position, Mary Lou C. knew very little to nothing about their work performance. Resp. to

HUD Fact 12B(vi) & (viii). Therefore, the only possible factor that caused these women

to be recommended was considerations of diversity. SOF 181. Crane testified that she

felt it was important that the CB position reflect "diversity" in race and gender, and that

White men did not reflect diversity. SOF 181, 182. Mary Lou C. admitted to a history of

considering non-White race and female gender of applicants for other positions to be

positive factors when recommending them for hire or promotion. Resp. to HUD Fact

12B(x). Likewise, the Secretary of HUD indicated that he wanted diversity as a selection

---

[5] While HUD attempts to make the argument that Mary Lou C.'s concern for diversity
extended to every type of group, she expressly admitted that her concern for diversity did
not extend to "White men." SOF 181; Resp. to HUD Fact 17(ii). Indeed, Mary Lou C.
acknowledged that she never believed that White men should be added into positions by
virtue of their gender or race. Resp. to HUD Fact 17(ii). This is significant, given that
White males were underrepresented in every major occupational category at HUD from
1992 through 2003. Resp. to HUD Fact 17(ii).

criterion in the filling of CB positions, even after being told that such consideration was illegal. Resp. to HUD Fact 12B(xiii).[6]

Most importantly, at the time of Plaintiff's rejection, HUD had in place an affirmative action plan, the AEP, which set forth numerical goals to accelerate the hiring and promotion of women. Resp. to HUD Fact 12B(xiv). The CB position was classified by HUD as an "Administrative" position. SOF 153. HUD's FY 1997 AEP Update Report established a goal of adding 113 White females into the Administrative category, through hiring or internal movement. SOF 53. The FY 1998 AEP Update Report established the goal of adding 103 White females into the Administrative category, through hiring or internal movement. SOF 69. However, White males, under the AEP, were never given the benefit of these numerical goals, even though White males were underrepresented in the Administrative category (as well as every other PATCOB category). SOF 29, 49, 65. Mary Lou C. was aware of these hiring goals (Resp. to HUD

---

[6]     HUD attempts to dilute the significance of these admissions with citation to cases for the proposition that general concerns to improve diversity do not indicate unlawful bias. Def.'s Mem., at 10 n.9. The cases cited by HUD are distinguishable because in those situations, the employers [1] merely expressed a desire to obtain a diverse candidate pool, (Silver v. CUNY, 947 F.2d 102, 1022 (2nd Cir. 1991) (employer sought a diverse candidate pool, but did not indicate that selection decisions be based on diversity)) [2] expressed a concern for diversity, and there is no link between that concern and the job action at issue, (Blanke v. Rochester Tel. Corp., 36 F. Supp.2d 589, 597-598 (W.D.N.Y. 1999) (employer's general desire for diversity was not linked to the decision to terminate the plaintiff); Brown v. Time, Inc., 1997 WL 231143 * 4 (S.D.N.Y. 1997) (desire for diversity did not express a policy of discrimination); or [3] expressed concerns about the lack of diversity in the context of an overabundance of White male employees (Lutes v. Goldin, 62 F. Supp. 2d 118, 131-132 (D.D.C. 1999); Ltizer v. Roanoke, Virginia, 2003 WL 1456514, *4 (W.D.Va 2003) (statements deploring lack of diversity). These cases are inapt because here considerations of diversity were linked with specific selection decisions, in the context where White males were already dramatically underrepresented in the HUD workplace.

Fact 17(i), and Mary Lou C. understood that considering female gender to be a positive selection factor to be consistent with HUD policy. SOF 185.

The existence of the AEP which sets forth goals for hiring women into the same category of jobs that Plaintiff applied for constitutes direct as well as circumstantial evidence of gender discrimination. Bass v. Bd. Of County Comm'rs, 256 F.3d 1095, 1105, 1109-1110 (11th Cir. 2001) (evidence that governmental employer's implementation of an affirmative action plan led to plaintiff's rejection is direct evidence of race discrimination). The fact that Managers were evaluated and rewarded to the extent they effectuated AEP goals is evidence that discriminatory motives were involved. SOF 198, 199, 205. See Johnson v. Transportation Agency, Santa Clara County, , 107 S. Ct. 1442, 1467 (1987) (Scalia, dissenting) (evaluations of supervisory personnel based on their ability to attain an affirmative action plan's objective for a diverse workforce "unmistakably communicated" that concrete numerical results in hiring were expected); Adamson v. Wyeth Pharm., 2005 U.S. Dist. Lexis 20579 (D. Mass.), at 58-59.

There is enormous statistical evidence of institution-wide bias against White males. From 1993-2003, HUD's White males were underrepresented in every single major occupational category, and yet, their representation kept declining inexorably. SOF 31, 37, 43, 49, 65, 81, 98, 113, 125, 135, 200-202. White males were never promoted in numbers representative of their workforce representation. SOF 203. In FY 1998, when the CB non-selection occurred, White males were 28% of the entire HUD workforce, but White males received only 15.8% of the promotions. SOF 89. In FY 1997, White males were 22.2% of the best applicant/candidate pool, and were selected 16.7% of the time. SOF 67. With regard to the Community Builder position, while only

43.8% of the qualified applicants were female for one of the vacancy announcements, over 55% of the 300+ Community Builders hired were female. Resp. to HUD Fact 12B(xi). Thus, there is ample evidence from which a jury could conclude that Plaintiff was discriminated against on the basis of gender, in violation of 42 U.S.C. § 2000e-2(a).

IV.   THERE IS SUFFICIENT EVIDENCE THAT AGE WAS A "BUT FOR" REASON WHY PLAINTIFF WAS NOT SELECTED FOR A COMMUNITY BUILDER POSITION

Count I alleges that HUD discriminated against Plaintiff on the basis of age in violation of the ADEA. Count III alleges that HUD discriminated against Plaintiff on the basis of a combination of age and gender. As will be shown, Counts I and III should not be dismissed, as there is sufficient evidence that that Plaintiff's age was a determinative factor in the decision to reject him for the CB job.

Plaintiff has established a prima facie case of age discrimination. [1] As of 1998, Plaintiff was 49 years old. SOF 2. Plaintiff was qualified for the CB position, and he applied in a timely fashion. Resp. to HUD Fact 12B(i), 12B(ii), & 13(ii); SOF 155. Plaintiff was rejected for the position. SOF 159-163, 172. Linda P, who was twenty nine years old, was offered the position. Resp. to HUD Fact 12A(i). The preference for a candidate twenty years younger than Plaintiff establishes the prima facie case. O'Connor v. Consolidated Coin Caterers Corp., 116 S. Ct. 1307, 1310 (1996) (preference for a candidate substantially younger than the plaintiff established the prima facie case).

Plaintiff was much more qualified that Linda P. As of 1998, Plaintiff had been a HUD employee for 26 years, with positive evaluations. Resp. to HUD Fact 12A(iii). For eighteen years of those years, Plaintiff performed as a Community Planning and Development Representative (CPD) in HUD's Boston Office, performing the same

functions that a CB would perform. Resp. to HUD Fact 12A(iii). In contrast, Linda P.

had been at HUD for only six years, and not as a CPD. Resp. to HUD Fact 12A(iv).

Mary Lou C. testified that she did not have knowledge of Linda P.'s expertise in HUD's

various divisions. Resp. to HUD Fact 12A(iv). This is important, because a CB was

expected to have knowledge of all of HUD's departments. SOF 151. Thus, Crane

selected someone who was much younger, with far fewer qualifications than Plaintiff.

The reasons given for Plaintiff's rejection were pretextual. As stated above, Mary

Lou C. testified that she gave Plaintiff a poor recommendation because of complaints she

received from the Mayor of Gloucester and the Lowell City Manager. Resp. to HUD

Fact 12A(v). Those reasons are pretextual, since those complaints did not arise until after

Mary Lou C. rejected Plaintiff. Resp. to HUD Fact 12A(v).

In addition, Jose C., the selecting officer, made an ageist remark, stating, "[a]s a

rule, program requirements can be learned, but it is more difficult, if not impossible, to

learn new or change old behaviors." Resp. to HUD Fact 12A(vi). The strong prima facie

case, proof of pretext, proof that Plaintiff was much more qualified than Linda P., and the

ageist comment generate an inference of age discrimination sufficient to preclude

summary judgment. St. Mary's, 113 S. Ct. at 2749. Therefore, a reasonable jury could

find that Plaintiff was rejected because of his age (Count I), or because of his age and

gender (Count III), and dismissal of those Counts is unwarranted.

V.    THERE WAS SUFFICIENT EVIDENCE THAT RACE WAS A MOTIVATING
      FACTOR, AND BUT FOR FACTOR IN PLAINTIFF'S NON-SELECTION
      FOR THE PHRS POSITION

Counts V and VI allege that race was a "but for" factor, and/or a "motivating

factor" in the denial of the PHRS promotion, in violation of 42 U.S.C. § 2000e-2(a) & §

15

2000e-2(m), respectively.  Circumstantial evidence may satisfy the burden of proof under either claim.  <u>Desert Palace, Inc. v. Costa</u>, 123 S. Ct. 2148, 2153-2155 (2003).

Plaintiff's prima facie case of race discrimination is as follows:  Plaintiff is White. SOF 2.  Plaintiff applied for the PHRS position, both through the internal (MSR) and external (DEU) vacancy announcements, and was qualified for both position.  SOF 189-193; <u>HUD Fact 32, 59</u>.  Plaintiff was rejected for the position under both vacancy announcements.  SOF 194.  Abbey O., a Black male, was selected.  SOF 194.  Thus, the prima facie burden has been satisfied.  <u>Cumpiano</u>, 902 F.2d at 155.

Plaintiff applied for the same PHRS position through parallel MSR and DEU applicant processes.  SOF 189-193; <u>HUD Fact 27-29</u>.  He submitted the same application for both processes.  SOF 237.  Except for having or not having civil service status, the eligibility standards were the same for both the DEU and MSR process.  SOF 190. Plaintiff was qualified for the position under both processes.  SOF 226; <u>HUD Fact 32, 59</u>. Nevertheless, Plaintiff was rejected under the MSR process.  SOF 224.

The first reason HUD gave for the rejection under the MSR process was that Plaintiff failed to meet the basic qualifications for the position.  SOF 222-224.  However, that reason is false, and HUD now acknowledges that Plaintiff was qualified.  SOF 226, <u>HUD Fact 32, 59</u>.  The enormity of the error demonstrates blatant pretext.  Under the DEU process, Plaintiff was found to be qualified at all available levels, including GS-13, GS-14, and the highest possible level, GS-15.  <u>HUD Fact 32</u>.  However, under the MSR process, Plaintiff's application was found to not even meet the basic job qualifications at any level, and was not even sent along to the rating panel.  SOF 222, 223.  Thus, there is significant evidence that the MSR process was rigged to prevent Plaintiff's consideration.

The second reason given by HUD for the rejection was that there was a "procedural error" in the MSR review process. SOF 225. However, that reason is false, as we now know that there was no "procedural error" at all. SOF 227. HUD's shifting and patently pretextual reasons for the MSR rejection indicate a discriminatory bias. Had Plaintiff been properly evaluated, his name would have been provided to the Selecting Officer for consideration for the PHRS position. HUD Fact 30.

Not a single candidate in the MSR process had their application considered by the Selecting Officer. HUD Fact, at 31. Other White candidates who were undoubtedly qualified for the PHRS position, were found to be unworthy of consideration in the MSR process, including Mary K., a White female who was actually hired into a PHRS position in Los Angeles. SOF 229, 230, 232. A jury may conclude that the MSR process was manipulated so that Plaintiff and other White applicants would not be considered by the Selecting Officer, who would then consider candidates from the DEU process that contained the only Black applicants. Miller-El v. Dretke, 125 S. Ct. 2317 (2205) (manipulation of the selection process demonstrates discrimination).

At the time that Plaintiff was rejected and Abbey O. hired, the AEP called for increased rates of promotions for Black males. Resp. to HUD Fact 52. It did not do so for White males, who were dramatically underrepresented. Resp. to HUD Fact 52-53. Cheryl Ann T., the Selecting Officer, testified that her understanding of HUD policy was that she could take into account the race of a candidate, and that she had a history of considering a candidates' African-American race to be a positive factor in her decisions to recommend candidates for hire. SOF 195-196. Cheryl Ann T. was evaluated on an

annual basis to determine whether she furthered AEP goals, and based on positive evaluations, she received monetary awards. SOF 198-199.

Abbey O. was improperly considered for the PHRS position. Abbey O. had been a Community Builder Fellow. SOF 233. HUD had hired the Community Builder Fellows, as temporary workers, in violation of its Schedule A authority. SOF 234-235. In response, Congress instructed HUD to eliminate the CB Fellows and prohibited HUD from using any funds to convert the CB Fellows to career employees. SOF 236. In violation of this directive, Abbey O. was hired as a PHRS career employee, based in part on the experience he improperly acquired as a CB Fellow. SOF 236; HUD Fact 41.

Even if Defendant's argument is true that Abbey O. would have been selected for the PHRS, in the absence of race discrimination (which Plaintiff denies), Plaintiff may still recover under 42 U.S.C. § 2000e-2(m) if race was a motivating factor in any event that placed barriers in the way of his consideration for the position. Thus, Counts V and VI should not be dismissed.

VI.    PLAINTIFF MAY PURSUE A CONSTITUTIONAL CLAIM FOR ONGOING EMPLOYMENT PRACTICES THAT PREVENT HIM FROM COMPETING ON EQUAL FOOTING, ON THE BASIS OF RACE AND/OR GENDER

In Count IX, Plaintiff seeks relief under the 5th Amendment from ongoing formal and informal practices at HUD that continue HUD's discriminatory aims. White males at HUD are vastly underrepresented as compared with the Civilian Labor Force in every measured job category except for one, while Black males and Black females greatly exceed the CLF in each of the eight job categories. SOF 220.

AEP Managers, whose job it is to ensure the achievement of AEP objectives, continue to exist at HUD, indicating that HUD continues to pursue AEP goals SOF 206;

HUD Fact 81. HUD's Upward Mobility Program is designed to advance the careers of

lower level employees and permits accelerated promotions. HUD Fact 85-86. The

Upward Mobility Handbook confirms that the Program is to be used to further AEP goals

such as correcting manifest imbalances and/or conspicuous absences. SOF 207. HUD's

FY 2005 and 2006 reports contain a pledge to "further diversity its workforce" and state

that "diversity hiring strategies are in place to address under-representation." SOF 209.

HUD sends selected employees to special four day trainings which focused on career

enhancement strategies for African Americans. SOF 208. MD-715 requires HUD to

analyze its workforce, and identify and eliminate barriers causing underrepresentation of

EEO groups. HUD has identified that White males are vastly underrepresented in the

workforce, but it has done nothing to identify potential barriers to equal opportunity to

White males, and has failed to undertake any analysis to eliminate such barriers, in

violation of EEOC instructions. SOF 210-221. This evidences a system-wide disfavor of

the hire and promotion of White males, and demonstrates that HUD's formal and

informal policies create a barrier to equal employment opportunities for White males, in

violation of the 5th Amendment.

Ordinarily, Title VII provides the exclusive remedy for claims of discrimination

against a Federal Government employer. Brown v. General Services Administration, 96

S. Ct. 1961, 1969 (1976). However, there is an exception to Title VII exclusivity where

the Constitution provides a broader avenue for recovery that Title VII. Ethnic Employees

of Library of Congress v. Boorstin, 751 F.2d 1405, 1414-16 (D.C. Cir. 1985) (allowing

federal employees to sue employers "for constitutional violations against which Title VII

provides no protection at all"). Indeed, Title VII states that "[n]othing contained in this

Act shall relieve any Government agency or official of its or his primary responsibility to assure nondiscrimination in employment as required by the Constitution." 42 U.S.C. § 2000e-16(e).  Thus, the Fifth Amendment can provide relief for institutionalized formal and informal affirmative action programs that accord special consideration for women and minorities.  E.g., Byrd v. Ruben, 1997 U.S. Dist. Lexis 10863 (W.D. Lo.), at 24-29. Plaintiff claims arising under the Fifth Amendment assert that he has been a victim of race and/or gender discrimination.

In this case, the Fifth Amendment of the United States Constitution accords Plaintiff with greater protections against discrimination than Title VII.  See Bass v. Bd. Of County Comm'rs, 256 F.3d 1095, 1103 (11th Cir. 2001) (Title VII constraints are not identical to those of Constitutional Equal Protection principles).  HUD correctly argues that Plaintiff has no claim under Title VII for HUD's ongoing practices, because he is not seeking damages under that Count, and is an inappropriate party to bring a "patterns and practices" claim under Title VII.  However, under the Constitution, a plaintiff has standing to assert an equal protection claim for prospective relief, even if he does not have standing to pursue a claim for damages, where he is not been able to compete on an equal footing, and where he is able and ready to apply for the benefits that had been denied him under the challenged discriminatory policy.  Donahue v. Boston, 371 F.3d 7, 12 (1st Cir. 2004).  Thus, Count IX should not be dismissed.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendant HUD's motion for summary judgment on Counts I, II, III, IV, VII & IX.

20

The Plaintiff
By his attorneys,


_____/s/ Robert S. Mantell_____
Kevin G. Powers
BBO# 405020
Robert S. Mantell
BBO# 559715
Rodgers, Powers & Schwartz LLP
18 Tremont Street, Suite 500
Boston, MA  02108
(617) 742-7010, ext. 305
fax (617) 742-7225


Patoski opposition to summary judgment