UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| RICHARD S. PATOSKI,                )<br><br>             Plaintiff,                )<br>                                    )<br>v.                                  )<br>                                    )<br>ALPHONSO JACKSON, SECRETARY,        )<br>DEPARTMENT OF HOUSING AND           )<br>URBAN DEVELOPMENT,                  )<br>                                    )<br>             Defendant.             ) | C.A. No. 05-11086 RCL |

## PLAINTIFF RICHARD PATOSKI'S RULE 56.1 STATEMENT OF FACTS DISPUTING HUD'S FACTS, AND ADDITIONAL STATEMENT OF FACT IN OPPOSITION TO HUD'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Richard S. Patoski hereby submits his Rule 56.1 statement of facts in dispute, in opposition to Defendant HUD's motion for summary judgment and its Rule 56.1 statement. Plaintiff has previously submitted a Rule 56.1 statement of facts in support of his motion for summary judgment (hereinafter "SOF"). Defendant HUD's statement of facts will be referred to as "HUD Fact."

**HUD Fact 8:**  Mary Lou C. felt that while Patoski had exemplary skills for enforcement, Patoski lacked the interpersonal skill necessary for the CB position. Mary Lou C. Depo., p. 125-127, 138, 152-154.

**Denied.**  There is ample evidence from which a reasonable juror could conclude that Ms. Crane did not believe that Patoski lacked the interpersonal skills necessary for the CB position. Mary Lou C. testified to only two complaints about Mr. Patoski that were raised prior to her negative recommendation, one from the Mayor of Gloucester and one from the Lowell City Manager. Mary Lou C. Dep., at 125-126, Def.'s Exh. 14. Mary Lou C. testified that these two complaints were the only reason why she refused to recommend Plaintiff. Mary Lou C. Dep., at 126-127, Def.'s Exh. 14. However, the uncontested evidence is that the friction between Plaintiff and the Lowell City Manager and/or the Mayor of Gloucester arose after the Community Builder selection process was completed. SOF 176, Patoski Dep., at 114, Exhibit 35; Patoski Affidavit, Exhibit 36. Mary Lou C. testified that Plaintiff did his job well, that he was competent and professional, and that he interacted with Mary Lou C. and others in a professional manner. Mary Lou C. Dep., at 127, 138, Def.'s Exh. 14.

**HUD Fact 9**:  Prior to the community building (sic) selection process, Mary Lou C. had received complaints about Patoski. Id. [Mary Lou C. Depo.], p. 125-127, 131-132, 141. She could not recall the exact complaints. Id., p. 129.

**Denied**.  There is ample evidence from which a reasonable juror could conclude that Ms. Crane did not receive complaints about Patoski before her negative recommendation. Mary Lou C. testified to only two complaints about Mr. Patoski that were raised prior to her negative recommendation, one from the Mayor of Gloucester and one from the Lowell City Manager. Mary Lou C. Dep., at 125-126, Def.'s Exh. 14. Mary Lou C. testified that these two complaints were the only reason why she refused to recommend Plaintiff. Mary Lou C. Dep., at 126-127, Def.'s Exh. 14. However, the uncontested evidence is that the friction between Plaintiff and the Lowell City Manager and/or the Mayor of Gloucester arose after the Community Builder selection process was completed. SOF 176, Patoski Dep., at 114, Exhibit 35; Patoski Affidavit, Exhibit 36. Therefore, no relevant complaints about Patoski preceded Mary Lou C.'s negative recommendation.

**HUD Fact 10**. Mary Lou C. also received complaints about Mr. Patoski from members of Congress but did not recall whether such complaints were prior to the selection process. Id. [Mary Lou C. Depo.], ¶ 140-141.

**Motion to Strike as Irrelevant**:     Mary Lou C. testified that there were only two complaints which formed the basis of her negative recommendation, and neither of those complaints came from members of Congress. Mary Lou C. Dep., at 125-127, Def.'s Exh. 14.  Therefore, hearsay complaints which do not bear on the decision, and/or which arose after Mary Lou C.'s decision should be stricken as irrelevant.  Moreover, this is character evidence, rendered inadmissible under Fed. R. Evid 404.

**HUD Fact 12**:  Patoski's age and gender did not play a role in Mary Lou C.'s recommendation.  Mary Lou C. Depo., p. 144, 146, 155-156.

FOR THE PURPOSES OF HUD FACT 12, PLAINTIFF WILL SEPARATE THE ALLEGATION INTO TWO, THE FIRST RELATING TO AGE AND THE SECOND RELATING TO GENDER

**HUD Fact 12A:  Denied**:     There is ample evidence from which a reasonable jury could conclude that age was a factor in Mary Lou C.'s refusal to recommend Plaintiff for a CB position.

i.     As of 1998, Plaintiff was 49 years old.  SOF 2.  Plaintiff applied for the Community Builder position, for which HUD acknowledges that he was qualified.  SOF 155.  Plaintiff was rejected based on Mary Lou C.'s recommendation.  SOF 159-163, 172.  Instead of Plaintiff, one of the people Mary Lou C. recommended was Linda P. SOF 166.  As of 1998, Linda P. was twenty nine years old.  Stipulation of December 1, 2006, Exhibit 47.  Linda P. was approximately twenty years younger than Plaintiff.

ii.      Mary Lou C. acknowledged that she considered Plaintiff to be an expert, that she relied on his expertise, that he did a very good job. Mary Lou C. Dep., at 127, 138, Def.'s Exh. 14. Mary Lou C. knew Plaintiff to be intelligent, that he did his job well, that he was competent and professional, and that he interacted with Mary Lou C. and others in a professional manner. Mary Lou C. Dep., at 127, 138, Def.'s Exh. 14.

iii.     As of 1998, Plaintiff had been a HUD employee for twenty-six years. SOF 2. Since 1980, Plaintiff worked as a Community Planning and Development Representative in HUD's Boston Office. SOF 3. From 1980 through at least June 7, 2002, Plaintiff's performance has never been rated unsatisfactory in any critical element. SOF 8. The new Community Builder position involved performing functions already being performed by the Community Planning and Development Representatives. SOF 152; Beard Dep., at 48-49, Exhibit 48; Mary Lou C. Dep., at 11-22, Def.'s Exh. 14.

iv.     By the time that Linda P. applied for the Community Builder position, she had been employed by HUD for only six years, and not as a Community Planning and Development Representative. Linda P. Application, Exhibit 49. Crane testified that she did not have knowledge of Linda P.'s expertise in HUD's various divisions. Mary Lou C. Dep., at 11-22, Def.'s Exh. 14.

v.      The reason Mary Lou C. gave for rejecting Plaintiff was pretextual. Mary Lou C. testified that she gave Plaintiff a negative recommendation based on complaints raised by the Mayor of Gloucester and the Lowell City Manager. to only two complaints about Mr. Patoski that were raised prior to her negative recommendation, one from the Mayor of Gloucester and one from the Lowell City Manager. Mary Lou C. Dep., at 125-127, Def.'s Exh. 14. However, the uncontested evidence is that the friction between Plaintiff and the Lowell City Manager and/or the Mayor of Gloucester arose after the Community Builder selection process was completed. SOF 176, Patoski Dep., at 114, Exhibit 35; Patoski Affidavit, Exhibit 36.

vi.     Jose C., who was the selecting officer for the Community Builder position, felt that, "[a]s a rule, program requirements can be learned, but it is more difficult, if not impossible, to learn new or change old behaviors." Cintron Affidavit, p. 4, Exhibit 32.

**HUD Fact 12B: Denied:**    There is ample evidence from which a reasonable jury could conclude that gender was a factor in Mary Lou C.'s refusal to recommend Plaintiff for a CB position.

i.      Plaintiff is a male and Mary Lou C. knew him to be a male. SOF 2, 172. Plaintiff applied for the Community Builder position, for which HUD acknowledges that he was qualified. SOF 155. Plaintiff was rejected based on Mary Lou C.'s recommendation. SOF 159-163, 172. Mary Lou C. is female. SOF 158.

ii.      Mary Lou C. acknowledged that she considered Plaintiff to be an expert, that she relied on his expertise, that he did a very good job. Mary Lou C. Dep., at 127, 138, Def.'s Exh. 14. Mary Lou C. knew Plaintiff to be intelligent, that he did his job well, that

he was competent and professional, and that he interacted with Mary Lou C. and others in a professional manner. <u>Mary Lou C. Dep.</u>, at 127, 138, <u>Def.'s Exh. 14</u>.

iii.    As of 1998, Plaintiff had been a HUD employee for twenty-six years. SOF 2. Since 1980, Plaintiff worked as a Community Planning and Development Representative in HUD's Boston Office. SOF 3. From 1980 through at least June 7, 2002, Plaintiff's performance has never been rated unsatisfactory in any critical element. SOF 8. The new Community Builder position involved performing functions already being performed by the Community Planning and Development Representatives. SOF 152; <u>Beard Dep.</u>, at 48-49, <u>Exhibit 48</u>; <u>Mary Lou C. Dep.</u>, at 11-22, <u>Def.'s Exh. 14</u>.

iv.    Instead of recommending Plaintiff, Mary Lou C. recommended three White women for the CB position. Cheryl Ann T., Debra G., and Linda P. SOF 166.

v.    Mary Lou C. acknowledged that she made recommendations for the CB positions "based on two factors; [her] knowledge of each candidates' performance and [her] interest in diversity." SOF 181. By "diversity", Mary Lou C. means "not white men," but rather women and people of other races. SOF 181.

vi.    Mary Lou C. strongly recommended Cheryl Ann T., despite the fact that Mary Lou C. was not aware of the quality of Cheryl Ann T.'s work performance, her reputation, or ability to be a Community Builder. SOF 167. Therefore, since Mary Lou C. did know about Cheryl Ann T.'s work performance, only considerations of diversity could have motivated Mary Lou C.'s choice. <u>See Above Fact</u>. Mary Lou C. testified that she did not think she would recognize Cheryl Ann T. if the two crossed paths. SOF 167. The only relevant fact Mary Lou C. apparently knew that supported her recommendation was that Cheryl Ann. T. was female. SOF 167.

vii.    By the time that Linda P. applied for the Community Builder position, she had been employed by HUD for only six years, and not as a Community Planning and Development Representative. <u>Linda P. Application, Exhibit 49</u>. Crane testified that she did not have knowledge of Linda P.'s expertise in HUD's various divisions. <u>Mary Lou C. Dep.</u>, at 11-22, <u>Def.'s Exh. 14</u>. Mary Lou C. testified that Linda P.'s gender was a positive factor in the decision to recommend her for the Community Builder position. <u>Crane Dep.</u>, at 114-116, <u>Exhibit 28</u>; see SOF 169.

viii.    Mary Lou C. recommended Debra G. for the Community Builder position, and Debra G. was thereby hired. SOF 170. Mary Lou C. did not have intimate knowledge of Debra G.'s work. SOF 170. When Mary Lou C. recommended Debra G., Mary Lou C. regarded Debra G.'s female gender to be a positive factor in that recommendation. SOF 170-171.

ix.    The reason Mary Lou C. gave for rejecting Plaintiff was pretextual. Mary Lou C. testified that she gave Plaintiff a negative recommendation based on complaints raised by the Mayor of Gloucester and the Lowell City Manager. <u>Mary Lou C. Dep.</u>, at 125-127, <u>Def.'s Exh. 14</u>. However, the uncontested evidence is that the friction between Plaintiff

and the Lowell City Manager and/or the Mayor of Gloucester arose after the Community Builder selection process was completed. SOF 176, Patoski Dep., at 114, Exhibit 35; Patoski Affidavit, Exhibit 36.

x.     Crane admitted to a history of considering the race and the female gender of applicants for other positions to be a positive factor in favor of hiring them, and that she had recommended other female applicants based in part on their gender. SOF 169-171, 183, 184. Crane testified that when she made recommendations to hire and promote certain individuals, and considered their (non-White male) gender and race to be a positive factors in that recommendation, and in doing so, she felt that she was acting in a manner consistent with HUD policy. SOF 185. Mary Lou C. testified that if Plaintiff had been Hispanic or African-American, she would regarded that as a positive factor in favor of his promotion. SOF 174.

xi.     Over 300 Community Builders were hired within the relevant time period. 1999 AEP Update Report, at 4140, DIV-2, Exhibit 50. One vacancy announcement OS-MST-98-0002A, pertained to 154 Community Builder positions. Exhibit 31. Of the candidates deemed eligible by HUD for the Community Builder position under OS-MST-98-0002A, only 43.8% were female. Patoski Affidavit, ¶¶ 1-5, Exhibit 51. Nevertheless, of all the candidates who were selected for Community Builder positions, 55.1% were female. FY 1999 AEP Update Report, at 4140, DIV-2, Exhibit 50. Thus, females were selected at a rate far exceeding their representation in the qualified labor pool.

xii.     An auditor from the HUD Office of Inspector General concluded that "the Secretary [of HUD] indicated that he wanted diversity as a selection criterion in the filling of Community Builder positions." SOF 187-188; see Patoski Dep., at 89, Def.'s Exh. 1.

xiii.     In FY 1998, when the non-selection occurred, White males were 28% of the entire HUD workforce, but White males received only 15.8% of the promotions. SOF 89. In FY 1997, White males were 22.2% of the best applicant/candidate pool, and were selected 16.7% of the time. SOF 67.

xiv.     At the time of the Plaintiff's rejection, in April 1998, HUD was implementing an affirmative action program which discriminated against White males, in violation of Title VII and the 5th Amendment of the United States Constitution. The AEP established goals and objectives for the hire, promotion and training of members of all EEO groups, except for White males. Under that program, White males could never get the benefit of the programs which were designed to increase employment opportunities. This program was implemented at a time when White males were underrepresented in all major job categories, and when they were being promoted and trained in numbers far fewer than their workforce representation. SOF 21-150; see Plaintiff's Memorandum in Support of His Motion for Summary Judgment, at 6-20.

xv.     The Community Builder position was classified as an "Administrative" position. SOF 153. HUD's FY 1997 AEP Update Report established a goal of adding 113 White

females into the Administrative category, through hiring or internal movement.  SOF 53.
The FY 1998 AEP Update Report established the goal of adding 103 White females into
the Administrative category, through hiring or internal movement.  SOF 69.

**HUD Fact 13**: Another supervisor of Patoski, Robert P. testified before the Merit
Systems Protection Board in the Administrative Proceedings in this matter.  While
generally complimentary of Patoski's professional interpersonal skills, he did recall at
least one complaint from public officials.  MSPB Tr., p. 93-94, 98.

**Motion to Strike as Irrelevant**:

i.       The issues raised by Robert P. arose either after Ms. Crane's recommendation, or,
by her admission, were irrelevant to that recommendation.  Mary Lou C. Dep., at 125-
127, Def.'s Exh. 14; SOF 176, Patoski Dep., at 114, Exhibit 35; Patoski Affidavit,
Exhibit 36.  Moreover, this is character evidence, rendered inadmissible under Fed. R.
Evid 404.

ii.      Robert P. was Plaintiff's second level supervisor.  EEOC Tr., at 84, Def.'s Exh. 8.
Robert P. was on the screening panel for the Community Builder position.  The panel
reviewed the applicants and scored them based on criteria relevant to that position.
EEOC Tr., at 84-85, Def.'s Exh. 8.  Robert P. evaluated Plaintiff application for the CB
position.  Id. at 89.  The rating panel rated Plaintiff's application for the CB position with
the top possible score, a "16."  EEO Communication, Exhibit 52.

**HUD Fact 14**:  Robert P. also testified that he had needed to speak to Patoski concerning
his interactions with co-workers because he had been "sharp" with people in the office.
MSPB Tr., p. 118-119.

**Motion to Strike as Irrelevant**:

This fact is irrelevant to the extent that it discusses complaints and problems that Mary
Lou C. did not rely on when refusing to recommend Plaintiff for the CB position, or
which occurred after Mary Lou C. made her recommendations.  Mary Lou C. Dep., at
125-127, Def.'s Exh. 14.  Robert P. did testify that he was not sure that problems
occurred before the CB hiring process, but "if they did occur," things got worse after the
process was completed.  EEOC Tr., at 119, Def.'s Exh. 8.  Moreover, this is character
evidence, rendered inadmissible under Fed. R. Evid 404.

**HUD Fact 15**:  Arthur T., Patoski's immediate supervisor, also testified in the
administrative proceedings.  Arthur T. testified that he had received complaints about Mr.
Patoski prior to 1998 and that there were problems with interpersonal skills in the office.
MSPB Tr., p. 140-141.

**Motion to Strike as Irrelevant**:

This fact is irrelevant to the extent that it discusses complaints and problems that Mary Lou C. did not rely on when refusing to recommend Plaintiff for the CB position, or which occurred after Mary Lou C. made her recommendations. Mary Lou C. Dep., at 125-127, Def.'s Exh. 14. Moreover, this is character evidence, rendered inadmissible under Fed. R. Evid 404.

**HUD Fact 17:**  Mary Lou C. had no knowledge of any hiring goals of HUD. Crane Depo., p. 75-76, 81-82. While she was, and believed that HUD was committed to diversity, that commitment applied to all groups, including white males. Mary Lou C. Depo., p. 83-84.

**Denied**:

i.       It is disputed that Mary Lou C. had no knowledge of any hiring goals of HUD. The objectives and goals to benefit women and racial minorities were communicated to Managers and Supervisors on an annual basis. SOF 23. Managers and Supervisors were evaluated based on efforts to assure "that EEO/AE/Diversity goals and objectives are achieved," as part of HUD's yearly appraisals. SOF 19, 64, 79, 96, 110, 198. Mary Lou C. testified that she was evaluated by a standard that measured her efforts to further AEP goals, and that each year, she was rated highly in that category. SOF 179-180. AEP goals and objectives were placed on-line and were available to HUD employees. Patoski Affidavit ¶ 8, Exhibit 51. Crane testified that when she made recommendations to hire and promote certain individuals, and considered their (non-White male) gender and race to be a positive factor in that recommendation, she felt that she was acting in a manner consistent with HUD policy. SOF 185. Based on this evidence, a jury could reject Mary Lou C.'s allegation that she was unaware of HUD's AEP goals.

ii.      It is disputed that Mary Lou C. felt HUD's commitment to diversity extended to all groups, including white males. Diversity, according to Mary Lou C., included everyone but "not white men." SOF 181.

> Q.      When you say "diverse," what do you mean?  Different –
>
> A.      I mean not white – not white men, first of all . . .

Mary Lou C. Dep., at 47, Def.'s Exh. 14. While Mary Lou C. later backpedaled, and claimed that there were hypothetical situations where it would be good to hire a white male, she testified that there was never an actual occasion in which she felt that there should be more white males in a position. Mary Lou C. Dep., at 82-83, Def.'s Exh. 14; SOF 181. This admission is significant given that White males were underrepresented in every single major occupational category at HUD from 1992 through 2003. SOF 31, 37, 43, 49, 65, 81, 98, 113, 125, 135, 200-203.

**HUD Fact 18:**       While Mary Lou C. stated that she viewed Deborah G.'s status as a female as a "positive," when asked if gender was a motivating factor," Mary Lou C. was

quick to distinguish between a "positive factor" and whether gender was "a motivating factor." Mary Lou C., p. 97-98; 114-115.

**Disputed**:    Mary Lou C. was initially confused about what "a motivating factor" was. Eventually, she admitted that gender was one of a number of factors that motivated her decision. Mary Lou C. Dep., at 115-116, Def.'s Exh. 14.

> Q.    Okay. So I'm not saying that – asking whether, but for her gender, you would not have recommended her. I'm simply asking whether it is one of possibly many factors which motivated your recommendation.
>
> Mr. Grady:    Objection to form. Go ahead and answer.
>
> A.    Yes.

Mary Lou C. Dep., at 115, Def.'s Exh. 14.

**HUD Fact 19**:    A "positive factor" did not mean that gender was a "motivating factor." Mary Lou C. Depo., p. 114-115.

**Disputed**:    According to Mary Lou C., yes it does. See Response to HUD Fact 18.

**HUD Fact 24**. There is no other basis for the age discrimination claim. Pl Depo p. 100.

**Disputed**:    See Response to HUD Fact 12A.

**HUD Fact 49**: Cheryl T. has never been instructed to give any preference to any race or gender in making a hiring decision. Depo. Of Cheryl T., p. 41-42, 48.

**Disputed**.    The AEP, which contained numerical goals and objectives for hiring and promoting women and racial minorities, was provided to Cheryl T. on an annual basis, and she was evaluated yearly to ensure that she acted in compliance with those goals. SOF 23, 28, 198, 199. Moreover, Cheryl T. understood it to be HUD's practice and policy that if qualifications among candidates were equivalent, that a personnel decision could take into account the race and gender of a candidate. Cheryl T. Dep., at 49, 53, Exhibit 34.

**HUD Fact 52**: Neither HUD's 1999, nor 2000 Affirmative Employment Plan set any goal for the hiring of black males for the PHRS position. Affirmative Employment Plan, FY 1999, HUD 4113-4130; Affirmative Employment Plan, FY 2000 HUD 4228-4242.

**Disputed**:    Both the 1999 and 2000 AEP Plans establish amorphous goals to increase the promotion rate of black males into positions HUD-wide, and establishes the "expectation" that promotion of black males will increase. SOF 88, 105; FY 2000 AEP Update Report at 4274, DVI-6, Exhibit 18. However, White males, who were

underrepresented in the amount of promotions received, were not assisted by similar objectives. SOF 89, 105.

**HUD Fact 53**:  Nor did the 1999 or 2000 AEP identify any manifest imbalance for black males in the Professional or Administrative categories. Affirmative Employment Plan, FY 1999, HUD 4142-4146; Affirmative Employment Plan, FY 2000 HUD 5254-5257.

**Agreed**:        There was no manifest underrepresentation of Black males.  In fact, the 2000 AEP Plan demonstrates that in the Professional category Black males were represented at HUD at a rate of 340% above the rate of Black males in the civilian labor force.  In the Administrative category, Black males were represented at HUD at a rate of 260% above the rate of black males within the civilian labor force.  However, White males were represented at HUD at rates well below the civilian labor force in both the Professional and Administrative categories.  FY 2000 AEP Update Report, at 4216, DII-18, Exhibit 18.  Despite the enormous representation of Black males in these positions, well in excess of parity, HUD instituted a HUD-wide goal to increase the rate of promotion of Black males, which would have the effect of further increasing their representation in these positions.  SOF 88, 105; FY 2000 AEP Update Report at 4274, DVI-6, Exhibit 18.

**HUD Fact 69**.  In fulfillment of its obligations under Title VII of the Civil Rights Act of 1964, the Equal Employment Opportunity Commission ("EEOC" promulgated Management Directive ("MD 714" in 1987, which required each federal department and agency to prepare and submit to the EEOC an "affirmative employment plan" to be reviewed and approved by the EEOC.  EEOC Management Directive.

**Denied in part**:  Plaintiff denies that MD-714 was promulgated in fulfillment of the EEOC's obligations under Title VII.

i.        MD-714 conflicts with Title VII.  Title VII did not require the EEOC to develop an "affirmative employment plan" in the form of MD-714.  In fact, MD-715 replaced MD-714, out of concerns that MD-714 was illegal.  See MD-715, § 1.  Plaintiff reserves the right to argue that MD-714, as promulgated and implemented by the EEOC, violated Title VII, for many reasons, including the following:

ii.        First, Title VII does not authorize the use of numerical goals to remedy alleged imbalance in the Federal workforce.  In fact, Title VII makes it very clear that nothing within that statute shall require any employer to grant any preferential treatment based on race or sex on account of an imbalance which may exist in the workforce as compared the workforce in the community.  42 U.S.C. § 2000e-2(j) ("Preferential treatment not to be granted on account of existing number or percentage imbalance").

iii.        Second, while Title VII applies to protect White males in a fashion equal to other EEO groups (see McDonald v. Santa Fe Trail Transp. Co., 96 S. Ct. 2574 (1976)), MD-714 as implemented by EEOC and HUD excluded White males from consideration in

efforts to improve employment opportunities. <u>HUD's Facts</u>, ¶ 71. MD-714 was implemented to assist every other group except for White males. <u>Id</u>.

iv.      Third, MD-714 did not establish appropriate criteria for implementing hiring goals. There is an (erroneous) argument that Title VII permits voluntary affirmative action to remedy a "conspicuous imbalance in a traditionally segregated job" (<u>see Johnson v. Transportation Agency</u>, 107 S. Ct. 1442, 1451-1452 (1987)). However, MD-714 may be read in a manner to permit affirmative action to remedy more subtle imbalance, in jobs that are not traditionally segregated. <u>See</u> MD-714, ¶¶ 10(m), 13(d), 13(d)(2), <u>Exhibit 7</u> (permitting numerical objectives where an undefined "manifest imbalance," and without requiring a finding of a traditionally segregated job). Thus, Plaintiff disagrees that MD-714 was promulgated in fulfillment of the EEOC's obligations under Title VII.

**HUD Fact 70 consists of two sentences, which Plaintiff will address as fact 70A and 70B**

HUD Fact 70A.       HUD developed an affirmative employment programs ("AEP") that, in accord with MD 714 compared its workforce to the civilian labor force (as reflected in the census) and which provided for the establishment of numerical "goals" where there is a "manifest imbalance" or "conspicuous absence" of minorities and women in the work force. Keith G. Depo., p. 26-27, 30-33.

**Denied in part**. HUD's Fact 70A is denied to the extent that it indicates that HUD's AEP conformed with, or was required by the EEOC's MD 714. HUD's AEP went well beyond the requirements of the MD-714 in terms of granting preferences to women and minorities. HUD went beyond what was required by MD-714 in the following ways:

i.       HUD voluntarily adopted numerical goals:   MD-714 does not **require** that agencies adopt numerical goals to establish parity in the PATCOB categories, but only stated that agencies "may" establish goals. SOF 15. Thus, HUD generated numerical goals because of its own policy; and not because such goals were compelled by MD-714.

ii.      HUD adopted goals without undertaking sufficient investigation:   MD-714 states that an agency may adopt numerical goals where it has engaged in an "appropriate workforce analysis," conducted in light of a review of <u>Johnson v. Transportation Agency, Santa Clara County</u>, 107 S. Ct. 1442 (1987). SOF 18. The <u>Johnson</u> case permitted a voluntary affirmative action program to remedy a "conspicuous imbalance in a traditionally segregated job." <u>Johnson v. Transportation Agency</u>, 107 S. Ct. 1442, 1451-1452 (1987)). HUD implemented goals and objectives without complying with this standard. First, HUD failed to identify which, if any of its jobs were "traditionally segregated." SOF 149. Second, HUD failed to tailor its goals and objectives to positions that were "traditionally segregated." SOF 21-150. Third, instead of eliminating only "conspicuous imbalance," HUD issued numerical goals and objectives to eliminate any imbalance, no matter how slight. SOF 27.

iii.    HUD used goals to eliminate insubstantial underrepresentation. MD-714 provides that agencies may establish numerical goals to correct imbalance only when the agency's workforce representation of an EEO group is "substantially below its representation in the appropriate CLF." SOF 16. However, HUD generated numerical goals purportedly to correct underrepresentation, no matter how insignificant the underrepresentation was, and even if the underrepresentation was not "substantial." SOF 27.

iv.    HUD failed to treat White males equally. On its face, the MD-714 entitles White males to benefit from the same sort of goals and objectives as other EEO groups, to remedy underrepresentation, and to eliminate barriers to equal employment. SOF 13. However, under HUD's AEP, White males could never benefit from goals and objectives, no matter how great their underrepresentation. SOF 29. As such, gains of other EEO groups were likely to be made at the expense of White males, who were already underrepresented in every major job occupation at HUD.

v.    HUD used AEP numerical goals and objectives to <u>maintain</u> diversity: MD-714 clearly states that the purpose of numerical goals is to attain, rather than maintain, a balanced workforce. MD-714, ¶ 13(d)(6), SOF 18. However, HUD would use AEP goals to maintain diversity, after it had already been achieved. For example, in the FY 1998 AEP Update Report, there was no goal to add Asian American/Pacific Islander females in the Technical category, because parity had been achieved in that area. <u>FY 1998 AEP Update Report</u>, at 4002, DII-22, <u>Exhibit 16</u>. However, there was a goal to add three Asian American/Pacific Islander females in the Technical category. <u>FY 1999 AEP Update Report</u>, at 4113, DII-24, <u>Exhibit 17</u>. Thus, even after parity was achieved in that category, HUD continued to use affirmative action to maintain diversity, in violation of MD-714, and in violation of <u>Johnson</u>, 107 S. Ct. at 1455 (affirmative action is permitted to attain diversity, and not to maintain it).

vi.    HUD's AEP Designed to Exceed Parity of Women and Minorities in PATCOB categories:    MD-714 made it clear that numerical goals and objective were meant to attain parity. SOF 18; MD-714, ¶ 13(d)(6), <u>Exhibit 7</u>. However, HUD consistently established numerical goals for adding women and minorities into PATCOB categories, even in categories where those EEO groups already exceeded parity. SOF 54, 71, 86, 103, 118, 130. In one particularly egregious instance, HUD established a goal of adding 50 Black female Administrative workers, even though Black females in the Administrative category at HUD were already over four times their representation in the Civilian Labor Force in that category. SOF 123, 124. The EEOC objective to this goal. SOF 124.

vii.    HUD Established Objectives For Increasing The Promotion Rates Of Women And Minorities, But Not For White Males: MD-714 makes no provision for establishing broad objectives for increasing the promotion rates of EEO groups. However, when the promotion rate for an EEO group was lower than its percentage of the workforce, HUD would announce an objective to increase that EEO group's promotion rate (except for White males). SOF 48, 56, 72, 88, 105. Such a broad objective would encourage promotion of women and minorities into positions, where parity had already been

11

exceeded. See id. Often, HUD would establish an objective to increase an EEO group's promotion rate, even if that group had already been promoted in numbers commensurate with its workforce composition. SOF 58, 74, 90, 106. From FY1992 through FY2002, White males were never promoted in numbers reaching their representation in the HUD workforce. SOF 35, 37, 42, 48, 57, 73, 89, 105, 120, 132, 142. Despite this ubiquitous under-representation, HUD never established an objective to increase the promotion rates of White males, and never imposed an "expectation" that their promotion rate would increase. Id. This affirmative action was never sanctioned by MD-714.

viii.    HUD Established Objectives For Increasing The Training Of Women And Minorities, But Not For White Males: MD-714 makes no provision for establishing broad objectives for increasing the training rates of EEO groups. However, when an EEO group at HUD was enrolled in Special Employment Programs in numbers less than its percentage in the overall HUD workforce, HUD would establish an objective to increase that EEO group's participation. SOF 59, 75, 91, 107. Sometimes, HUD established an objective for the increased participation of an EEO group, even though that group was already enrolled in SEPs at rates exceeding their workforce representation. SOF 61, 77, 92, 109. Such objectives would have the effect of increasing the representation of women and minorities, even in areas in which disparity had disappeared, at the expense of the representation of White males. White males from FY 1992 through FY 2002 were underrepresented in their enrollment in SEPs in each year. SOF 34, 40, 46, 60, 76, 93, 108, 143. However, HUD failed to establish any objective for increasing the training of White males. Id. This affirmative action was never sanctioned by MD-714.

ix.    HUD Failed to Take Into Account Qualifications. MD-714, ¶ 13(d)(6) states that numerical objectives must be reasonable, and must take into account "relevant qualifications" of the candidate pool. Exhibit 7. However, HUD did not do this. Generally, the candidate pool for an upper level promotion are those in the lower levels. All things being otherwise equal, an EEO group should have roughly the same representation in the lower levels as it has in the upper levels. For example, in the absence of discrimination and consideration of other factors, an EEO group with 20% representation in the lower levels should expect to receive 20% of the promotions, and constitute 20% representation in the upper levels. HUD would establish broad based objectives for increasing promotion rates for EEO groups, even if such groups were represented at higher or greater rates than at lower levels. As shown below, HUD established objectives for promoting black males, even though there was abundant evidence that black males had already been promoted at rates greatly exceeding their representation in the qualified labor pool.

ix(a).    The FY 1997 AEP Update Report establishes an objective for increasing the promotion rate of Black males. FY 1997 AEP Update Report, at 3945, DVI-4, Exhibit 15. At the time, Black males were already represented in much greater rates at higher levels than at lower levels within HUD.

| Race/Sex | Senior | GS/GM 13- | GS 9-12 | GS 5-8 | GS 1/4 |
|---|---|---|---|---|---|

| | Level | 15 | | | |
|---|---|---|---|---|---|
| | | | | | |
| Black males | 15.8 | 10.2 | 8.6 | 3.5 | 3.5 |

FY 1997 AEP Update Report, at 3884, DII-8, Exhibit 53.

ix(b).   The FY 1998 AEP Update Report establishes an objective for increasing the promotion rate of Black males.  FY 1998 AEP Update Report, at 4054, DVI-4, Exhibit 16.  At the time, Black males were already represented in much greater rates at higher levels than at lower levels within HUD.

| Race/Sex | Senior Level | GS/GM 13-15 | GS 9-12 | GS 5-8 | GS 1/4 |
|---|---|---|---|---|---|
| | | | | | |
| Black males | 15.2 | 10.4 | 8.5 | 3.5 | 2.8 |

FY 1998 AEP Update Report, at 3988, DII-8, Exhibit 54.

ix(c).   The FY 1999 AEP Update Report establishes an objective for increasing the promotion rate of Black males.  FY 1999 AEP Update Report, at 4163, DVI-4, Exhibit 17.  At the time, Black males were already represented in much greater rates at higher levels than at lower levels within HUD.

| Race/Sex | Senior Level | GS/GM 13-15 | GS 9-12 | GS 5-8 | GS 1/4 |
|---|---|---|---|---|---|
| | | | | | |
| Black males | 12.0 | 10.2 | 7.9 | 3.8 | 3.8 |

FY 1999 AEP Update Report, at 4163, DII-10, Exhibit 50.

ix(d).   The FY 2000 AEP Update Report establishes an objective for increasing the promotion rate of Black males.  FY 2000 AEP Update Report, at 4276, DVI-6, Exhibit 18.  At the time, Black males were already represented in much greater rates at higher levels than at lower levels within HUD.

| Race/Sex | Senior Level | GS/GM 13-15 | GS 9-12 | GS 5-8 | GS 1/4 |
|---|---|---|---|---|---|
| | | | | | |
| Black males | 12.5 | 10.0 | 8.1 | 4.5 | 6.5 |

FY 2000 AEP Update Report, at 4213, DII-15, Exhibit 55.

ix(e).   The FY 2001 AEP Update Report establishes an objective to increase the promotion rate of Black males.  FY 2001 AEP Update Report, at 4380, DVI-5, Exhibit 19.  At the time, Black males were already represented in much greater rates at higher levels than at lower levels within HUD.

| Race/Sex | Senior Level | GS/GM 13-15 | GS 9-12 | GS 5-8 | GS 1/4 |
|----------|--------------|-------------|---------|--------|--------|
|          |              |             |         |        |        |
| Black males | 13.9 | 10.5 | 7.9 | 4.6 | 0 |

FY 2001 AEP Update Report, at 4325, DII-15, Exhibit 56.

ix(f).    The FY 2002 AEP Update Report establishes an objective to increase the promotion rate of Black males.  FY 2002 AEP Update Report, at 4486, DVI-7, Exhibit 20.  At the time, Black males were already represented in much greater rates at higher levels than at lower levels within HUD.

| Race/Sex | Senior Level | GS/GM 13-15 | GS 9-12 | GS 5-8 | GS 1/4 |
|----------|--------------|-------------|---------|--------|--------|
|          |              |             |         |        |        |
| Black males | 15.2 | 10.3 | 8.0 | 4.5 | 9.6 |

FY 2002 AEP Update Report, at 4425, DII-9, Exhibit 57.

ix(g).    The FY 2003 AEP Update Report establishes an objective to increase the promotion rate of Black males.  FY 2003 AEP Update Report, at 4589, DVI-7, Exhibit 21.  At the time, Black males were already represented in much greater rates at higher levels than at lower levels within HUD.

| Race/Sex | Senior Level | GS/GM 13-15 | GS 9-12 | GS 5-8 | GS 1/4 |
|----------|--------------|-------------|---------|--------|--------|
|          |              |             |         |        |        |
| Black males | 13.7 | 10.1 | 8.2 | 5.9 | 14.3 |

FY 2003 AEP Update Report, at 4531, DII-9, Exhibit 58.

HUD Fact 70B.        The "goals" were not mandatory.  Keith G. Depo., p. 67, 76.

**Denied in part**:        HUD's Fact 70A is denied to the extent that it alleges that HUD's "goals" were not mandatory.  Managers and Supervisors were given the goals every year.  SOF 23.  They were given written evaluations and rated based on efforts to assure "that EEO/AE/Diversity goals and objectives are achieved."  SOF 19, 64, 79, 96, 110, 198.  Managers and Supervisors were instructed to "achieve measurable results" in compliance with EEO/AE/Diversity goals.  SOF 64, 79, 96.  One performance standard included the requirement to "make decisions regarding . . . promotions . . . [and] recommendations for selection . . . that further the Departments EEO/AE programs and policies and foster diversity within the HUD workplace."  SOF 179.  Positive evaluations increased Managers and Supervisors' opportunities for advancement, and were rewarded with cash awards.  SOF 199.  Thus, for those Managers and Supervisors seeking the highest possible evaluations and cash awards, compliance with AEP goals was "mandatory."

The AEP goals and objectives reflected HUD's "plan" and "provide direction for hiring." SOF 28.

## ADDITIONAL STATEMENTS OF FACT IN SUPPORT OF THE PLAINTIFF

SOF 204.      During the period of 1997 through 2003, Plaintiff was aware of HUD's AEP goals. Patoski Affidavit, Exhibit 51. It caused him an enormous amount of emotional distress, resulting in problems with his marriage and workplace relationships. Id. The AEP Program contributed to anxiety, depression, anger, and loss of enjoyment of life, for which Plaintiff sought counseling, and for which he took medication. Id.

SOF 205.      The result of the MD-714 program, which ended in 2003, is illustrated in HUD's FY-2004 Affirmative Programs EEO Report, which includes data on EEO group participation in the Officials and Managers category divided into Senior Level (GS-15 and above), Mid-Level (grade 13-14), and Grade 12 and below subcategories. The following table reflects Officials and Managers data reported in HUD's FY-2004 Affirmative Programs EEO report:

HUD FY=2004 MD-715 Report -
Officials and Managers
(EEO group participation percentage rates)

| | White Males | White Females | Black Males | Black Females | Hispanic Males | Hispanic Females | Asian Males | Asian Females | Native-Am Males | Native-Am Females |
|---|---|---|---|---|---|---|---|---|---|---|
| Senior Level, GS-15 and above: | 7.6% | 33.2% | 18.0% | 26.8% | 4.2% | 3.9% | 2.6% | 2.0% | 1.2% | 0.1% |
| Mid-Level, GS-13/14: | 36.0% | 24.5% | 10.0% | 15.8% | 4.9% | 4.0% | 1.9% | 2.0% | 0.4% | 0.3% |
| Grade 12 and below: | 47.0% | 18.8% | 10.6% | 14.1% | 1.2% | 5.9% | 1.2% | 1.2% | 0.0% | 0.0% |

FY 2004 MD – 715 Report, at 4665, Exhibit 59.

As indicated in the above table, only white males are significantly underrepresented at the Senior Level (7.6%) as compared to their representation in the Mid-Level (36.0%). Likewise, the Mid-Level representation 36% is low compared with the Lowest Level (47%). Id. Thus, White Male representation is pyramid shaped, few at the top, lots at the bottom. On the other hand, the representation of White Females, Black Males, Black Females, Asian Males, Native American Males is "V-shaped" – lots at the top and few at the bottom. No group's representation is as pyramid shaped as that of White males, and yet White males are the only group who receives no assistance in getting promoted under the AEP. Id.

205.    In 2000, one of the people who rated Plaintiff for the PHRS position was evaluated. Exhibit 60; Def.'s Exh. 7, at 2. In Critical Element 1, the Rater was evaluated to the extent that he

> Takes actions and makes decisions regarding hiring, promotions, work assignments, training, upward mobility, recommendations for selection, and other personnel or administrative matters that further HUD's EEO and AEP policies and foster diversity within HUD.

Exhibit 60, at 5391. In that evaluation, the Rater was given a positive rating, noting that "All non-supervisory promotions this fiscal year were achieved by minority members of the staff." Exhibit 60, at 5393. Thus, it appears that the fact that the Rater promoted minorities helped him receive a positive evaluation.

206.    AEP Managers continue to exist at HUD. Keith G. Dep., at 72, Def.'s Exh. 6. AEP Managers review personnel actions taken by managers and supervisors "to ensure the achievement of AEP objectives." AEP Manager Training Materials, at 5069, Exhibit 61.

207.    The Upward Mobility Handbook, which describes the Upward Mobility Program, and which remains in effect, states, "[i]n many instances, the Upward Mobility Program can be used to correct manifest imbalances and/or conspicuous absences identified as internal movement goals." Linda H. Dep., at 72-73, Def.'s Exh. 5; Upward Mobility Program Handbook, at 5862, Exhibit 62.

208.    HUD provides for salary, food, travel, lodging, etc., for those employees who attend trainings provided by "Blacks in Government." Keith G. Dep., at 84-85, 93, Def.'s Exh. 6. It is a four day conference that focuses on the concerns of African-Americans in the Federal Government. Id at 88, 91.

209.    HUD's FY 2005 Performance and Accountability Report states that HUD's mission requires it to "further diversity its workforce," and that a five year strategy, with detailed implementation plans, including diversity hiring strategies to address under-representation were in place. Exhibit 63, at 29, 147, 292. HUD later asserted that there were no diversity hiring strategies, and that the line was included in error and should have been deleted. Def.'s Supp. Resp. to Doc. Req. 18, Exhibit 64. However, the FY 2006 Annual Performance Plan likewise states that it is HUD's mission to "further diversity its workforce," and that Diversity hiring strategies are in place to address under-representation." Exhibit 65, at 2, 59.

210.    The EEOC's Equal Employment Opportunity Management Directive 715 ("MD-715") became effective in October 1, 2003. Def.'s Exh. 19. MD- 715 superseded MD –714. Id. MD – 715 purports to provide guidance and standards to Federal agencies for establishing and maintaining affirmative programs of equal employment opportunity, pursuant to 42 U.S.C. § 2000e-16(b). Def.'s Exh. 19, at 1. The purpose of MD – 715 is to "ensure that all employees and applicants for employment enjoy equality of

opportunity in the federal workplace regardless of race, sex, national origin . . . [etc.]."
Id., at 1.

211.    The Directive reflected recent and significant changes in the law, including recent
Supreme Court decisions. Def.'s Exh. 19, at 3. MD – 715 differed from MD – 714 in
that agencies are no longer permitted to establish numerical goals for hiring and
promotion of EEO groups. Id.

212.    The EEOC issued instruction to Federal agencies for the purpose of complying
with MD – 715. MD-715 Instructions, Exhibit 66.

213.    Agencies are obligated to eliminate "barriers" that impede free and open
competition in the workplace, and preventing individuals of any racial or national origin
group, or either gender, from realizing their full potential. Def.'s Exh. 19, at 7.

214.    According to EEOC instructions, the elimination of barriers entails four steps:

1.      Identify Possible Barriers Using a Variety of Sources;
2.      Investigate to Pinpoint Actual Barriers and Causes;
3.      Barrier Elimination;
4.      Assess Success of Plan.

MD-715 Instructions, Section II, 2 of 16, Exhibit 66.

215.    The first step includes conducting an annual self-assessment, a series of analyses
or "snapshots," in which the agencies' workforce is compared to the relevant civilian
labor force, in a variety of ways. Def.'s Exh. 19, at 7; MD-715 Instructions, Section II, 3-
4 of 16, Exhibit 66. These "snapshots" are similar to the analyses used in the AEP
reports generated under MD – 714. Def.'s Exh. 19, at 7; MD-715 Instructions, Section II,
3-4 of 16, Exhibit 66.

216.    The snapshots are reviewed to determine whether any groups are employed at the
agency in numbers less than the Civilian Labor Force. If a group is represented in the
workforce at a rate below the Civilian Labor Force, that is a trigger of the possible
existence of a barrier. MD-715 Instructions, Guidance for Completing the EEOC Form
715-01 Workforce Data Tables, 2 of 9, Exhibit 66.

217.    If there is a disparity between actual and expected participation rates for a
particular group, the agency should proceed to Step 2, and further investigation becomes
necessary to determine whether a barrier to employment exists. MD-715 Instructions,
Section II, 5 of 16, Exhibit 66. Such an investigation should include, for example, an
examination of statistics, an examination of relevant policies and practices, and a review
of complaints. Id. at Section II, 6 of 16.

218.    If a barrier is identified, the third step is to eliminate the barrier. Id. at Section II,
8-9 of 16, Exhibit 66. The fourth step is to assess the plan for eliminating the barrier, to

make sure the barrier has been eliminated and to adjust the plan when necessary. Id. at Section II, 9-10 of 16.

219.    HUD submitted an MD – 715 report for fiscal year 2005. FY 2005 MD-715 Report, Exhibit 67. According to the report, as of September 30, 2005, White males were 24.76 of the HUD workforce, as compared to the CLF of 39%. Id., at HUD 6196. Black males were 9.88% of the HUD workforce, as compared to CLF of 4.8%. Id., at 6196. Black females were 27.77% of the HUD workforce, and 5.7% of the CLF. Id., at 6196. As of September 30, 2005, White males were 25.74% of the 1101 series, while the CLF was30.2%. Id., at 6202. Despite being 24.76% of the workforce, in FY 2005, White males received only 18.01% of the non-competitive promotions. Id., at 6206. The numbers for competitive promotions are not available. Id., at 6203, 6205.

220.    The MD – 715 showed substantial underrepresentations for White males, but also showed that the HUD workforce exceeded the CLF for Black males and females, as shown by the following chart.

**Percentage of Parity – Percentage of Representation of the Particular Group within the HUD workforce as of September 30, 2005 as compared with the percentage of representation of the Same Group in the 2000 Census Civilian Labor Force**

| HUD Job Series | White Male | Black Male | Black Female |
|---|---|---|---|
| 201 – Personnel Management | 34.67% | **220.54%** | **644.88%** |
| 301 – General Administration | 84.50% | **236.73%** | **358.35%** |
| 343 – Management Analyst | 34.50% | **476.15%** | **1076.47%** |
| 360 – Equal Employment Compliance | 34.43% | **370.87%** | **544.08%** |
| 511 – Auditing | **111.43%** | **248.08%** | **238.89%** |
| 905 – Attorney | 63.53% | **220.48%** | **731.58%** |
| 1101 – General Business & Industry | 85.23% | **173.67%** | **293.92%** |
| 2210 – Info Tech Mgmt | 56.47% | **323.41%** | **670.29%** |

FY 2005 HUD MD-715 Report, at 6196, 6202, Exhibit 67.

In other words, while White males are underrepresented in seven of eight major occupations at HUD, and are employed at only 63.49% of their level in the civilian labor force. However, Black males and Black females in HUD's workforce exceed parity by approximately 200% and approximately 500%, respectively. Id.

221.    Despite these significant disparities, HUD failed to identify any potential barriers to equal opportunity to White males, and likewise, failed to undertake any analysis to

eliminate such barriers. <u>FY 2005 HUD MD-715 Report</u>, at 6162-6163, <u>Exhibit 67</u>; <u>Keith G. Dep.</u>, at 107-109, 120-122, <u>Def.'s Exh. 6</u>.

222.    Deborah M., a Human Resource Specialist, reviewed Plaintiff's PHRS application in the MSR process, and found that he did not meet the basic qualifications for the position. <u>Deborah M. Dep.</u>, at 6-7, 28-29, <u>Def.'s Exh. 10</u>; <u>Deborah M. Affidavit</u>, at 2-3, <u>Exhibit 68</u>.

223.    A Subject Matter Expert was called in to review Deborah M.'s initial determination of lack of basic qualification. <u>Deborah M. Dep.</u>, at 29, <u>Def.'s Exh. 10</u>. The Subject Matter Expert, Emmanuel Y., signed off affirming that determination. <u>Emmanuel Y. Dep.</u>, at 13, <u>Def.'s Exh. 12</u>.

224.    On or about June 25, 2000, Plaintiff was notified that his MSR application for the PHRS position had been rejected because he did "not have the required level of experience (or education) for this position and will not receive further consideration." <u>Exhibit 69</u>.

225.    On or about June 27, 2001, HUD sent Plaintiff a letter stating that Plaintiff had been deemed unqualified for the PHRS position due to a "procedural error." <u>Exhibit 70</u>.

226.    At his deposition, Emmanuel Y. expressed the view that Patoski met the basic qualifications for the PHRS position, and that the initial determination of lack of qualification was wrong. <u>Emmanuel Y. Dep.</u>, at 17-18, <u>Def.'s Exh. 12</u>.

227.    There were no procedural error in the way Plaintiff's application was considered in the MSR process. <u>Deborah M. Affidavit</u>, at 3, <u>Exhibit 68</u>.

228.    Cheryl Ann. T. understood Abbey O. to be Black from his application, which stated that he was involved in the Professional National Black M.B.A. Association. <u>Cheryl Ann. T. Dep.</u>, at 75-76, <u>Def.'s Exh. 2</u>.

229.    Only a few employees were deemed to be minimally qualified for the PHRS position, including Mary K. and Robert Y. <u>PHRS Rating Sheets</u>, <u>Exhibit 71</u>. However, none of these individuals were rated as an acceptable candidate by the MSR rating panel. <u>Id.</u>; <u>HUD Fact 31</u>.

230.    Robert Y. applied for the PHRS position through the MSR process, vacancy announcement 06-MSR-2000-0099 AZ. <u>Req. for Admission 3</u>, <u>Exhibit 72</u>. Robert Y. is a White male. <u>Req. for Admission 23</u>, <u>Exhibit 72</u>. He was well qualified for the position. <u>Robert Y. Application</u>, <u>Exhibit 73</u>.. However, the rating committee gave him a low score, such that his name was not considered by the Selecting Officer. <u>PHRS Ratings Sheets</u>, <u>Exhibit 71</u>.

231.    On or about October 13, 2000, an employee of HUD, acting within the scope of his or her employment, informed the EEO counselor by e-mail, that for vacancy

announcement 06-MSR-2000-0099AZ, there was only one application, from Robert Y., whose application was rated and scored below the cut off score necessary for referral to the Selecting Officer. Req. for Admission 21, Exhibit 72.

232.    Mary K. applied for a PHRS position through the MSR process, vacancy announcement 06-MSR-2000-0099 AZ. Exhibit 74. Mary K. is a White female. Exhibit 75. Mary K. was deemed to be ineligible by the rating panel for the PHRS position. PHRS Ratings Sheets, Exhibit 71. Nevertheless, Mary K. was deemed qualified under the DEU process, and she was actually hired as a PHRS in Los Angeles. Exhibit 76.

233.    Prior to Abbey O.'s promotion to the PHRS position, he was a Community Builder Fellow. Abbey O.'s Application, Exhibit 77.

234.    Community Builder Fellows, such as Abbey O. were hired a temporary employees, under special Schedule A hiring authority, and the expectation was that after two years, the Fellows would leave HUD and return to their communities. Admission 24, Exhibit 72; Beard Dep., at 53, 60-63, Exhibit 48.

235.    Audits conducted by the HUD Inspector General and OPM concluded that that HUD had overstepped its authority in using Schedule A authority for hiring Community Builder Fellows. Beard Dep., at 61-62, 99-100, Exhibit 48.

236.    After the Community Builder Fellows were hired, there was a backlash in Congress, and there was legislation requiring that HUD cease and desist with the external Community Builder program. Beard Dep., at 95-96, Exhibit 48. Congress passed legislation stating,

> The Secretary is prohibited from using funds under this heading or any other heading in this Act to convert any [Fellows] to career employees, and after September 1, 200 to employ any [Fellows].

Beard Dep., at 95-96, Exhibit 48; Beard Dep. Exh. 4, at 5, Exhibit 78. Despite this directive from Congress, Abbey O. was hired as a career PHRS. An audit conducted by HUD's IG concluded that HUD violated the spirit of the law, however, the audit was never issued. Beard Dep., at 96-97, 101-102, Exhibit 48.

237.    Plaintiff had submitted the same application for the PHRS position for both the MSR and DEU processes. Exhibit 51, ¶ 10.

The Plaintiff
By his attorneys,


_____/s/ Robert S. Mantell_____
Kevin G. Powers
BBO# 405020
Robert S. Mantell
BBO# 559715
Rodgers, Powers & Schwartz LLP
18 Tremont Street, Suite 500
Boston, MA  02108
(617) 742-7010, ext. 305
fax (617) 742-7225