UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RICHARD S. PATOSKI,

        Plaintiff,

v.                                    C.A. No. 05-11086 RCL

ALPHONSO JACKSON, SECRETARY,
DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT,

        Defendant.

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF HIS
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Richard S. Patoski hereby submits his reply memorandum in support of his Motion for Summary Judgment.

**Def.'s Opp.**, at 1: HUD mischaracterizes the Plaintiff's AEP claim by suggesting that Plaintiff has an issue with the dissemination of workforce "statistics." Def.'s Opp., at 2, 17-18. Rather, Plaintiff takes issue with HUD's numerical goals and objectives for increasing the hiring, promotion, and training of all women and racial groups, except for White males. See Plaintiff's Memo. In Support of Motion for Summary Judgment, at 6-20. HUD evaluated its Supervisors and Managers on a yearly basis to ensure that these numerical goals and objectives were met, and rewarded those who promoted minorities. SOF 198, 199, 205. HUD admits to altering its hiring practices, recruitment, and training practices in light of AEP goals. SOF 144.

**Def.'s Opp.**, at 3 n.1, 6, 7: HUD ignores other testimony demonstrating that Crane relied on gender in recommending female candidates, that clearly demonstrates that gender was a motivating factor, such as:

> Q.  Okay. So I'm not saying that – asking whether, but for [Linda Pellegrino's] gender, you would not have recommended her. I'm simply asking whether it is one of possibly many factors which motivated your recommendation.
>
> Mr. Grady:  Objection to form. Go ahead and answer.
>
> A.  Yes. [Resp. to HUD Fact 18; Mary Lou C. Dep., at 115, Def.'s Exh. 14].

Crane's testimony is unambiguous that she considered gender a motivating factor.

**Def.'s Opp.**, at 4-5: Count IV does not allege that Plaintiff was rejected for the CB position because of his gender. Instead, Count IV merely alleges that gender was considered when making that decision. That consideration alone is illegal under 42 U.S.C. § 2000e-2(m), even in the absence of proof that such consideration had an effect on the decision. HUD errs by implying that Plaintiff must prove that consideration of gender caused the rejection.

HUD argues that under Cariglia v. Hertz Equipment Rental Corp., 363 F.3d 77 (1st Cir. 2004), an employer is responsible for the bias of the Manager who recommended the employment decision, only if the information provided by the Manager is false. This argument fails for many reasons. Under a "motivating factor" analysis, there may be legal reasons for an employment decision, along with illegal reasons. The presence of the illegal reasons is enough to establish liability. 42 U.S.C. § 2000e-2(m). The plaintiff need not show the falsity of the legal motives to establish liability. 42 U.S.C. § 2000e-5(g)(2)(B). Thus, it is nonsensical, in a Section 2(m) claim, to require proof that one of the reasons given and relied upon by the Manager is false. The very nature of the 2(m) claim assumes the possible presence of legal, and true reasons for rejection, along with the unlawful reason. see Price Waterhouse, 109 S. Ct. at 1796 (White, J., concurring).

Since the <u>Cariglia</u> case did not construe 42 U.S.C. § 2000e-2(m), and proceeded solely on a claim that illegal motive cause the termination, it is distinguishable.[1]

Second, the <u>Cariglia</u> case is not properly read to limit the doctrine to cases in which the biased Manager lies about the employee. This doctrine has been applied even where the supervisor in question does not supply the final decisionmaker false information. In <u>Tejada-Batista v. Morales</u>, 424 F.3d 97, 102-103 (1st Cir. 2005), a supervisor recommended the termination of an employee, based on criminal conviction occurring three years before. Despite the truth of the assertion, a jury was free to find that the supervisor would not have raised this concern but for retaliatory motives. <u>Id</u>.

Third, even if Plaintiff were (erroneously) required to prove that the information Crane submitted to Cintron were false, Plaintiff can prevail on that burden. Crane told Cintron that Plaintiff had poor interpersonal skills. SOF 172. That statement was knowingly false. <u>Resp. to HUD Fact 8</u>.

The undisputed evidence is that Crane's negative recommendation, which was tainted with a discriminatory motive, caused Plaintiff's rejection. There is ample evidence that Crane was the *de facto* decisionmaker and that she considered gender.[2]

---

[1] The case cited by HUD, <u>Azimi v. Jordan's Meats, Inc.</u>, 456 F.3d 228, 248 n.14 (1st Cir. 2006) is likewise off-point, in that it is not a Section 2(m) case.

[2] Crane was a Regional Director, a very highly placed official within HUD, to whom the Boston CB's would report. SOF 158. Cintron contacted Crane to determine who he should select for the position. SOF 159. Cintron testified that Crane's recommendations were given particular weight, and that he considered Crane's determination to be "very, very important" to his selection. SOF 160. Cintron testified that the kind of information he obtained from the Regional Directors, like Crane, was "very important, I thought, in making the decisions for who would move into these positions." SOF 161. Cintron's calls to people such as Crane were, "I thought were very, very important calls to make . . . also because they would be the supervisors of these employees when the sections were made." SOF 162. To the extent that inconsistencies developed, or questions were

3

An employer is chargeable not only for the decision-makers' motive and conduct, but also for those of the other supervisory personnel whose action bore on the plaintiff's discharge. DeGrace v. Rumsfeld, 614 F.2d 796, 803 (1st Cir. 1980). See Long v. Eastfield College, 88 F.3d 300, 307 (5th Cir. 1996) (motives of supervisor binds company, where the company rubber-stamped the supervisors recommendation to reject an employee); Thomlison v. Omaha, 63 F.3d 786, 789 (8th Cir. 1995) (supervisor rubber-stamped recommendation of subordinate); Stimson v. Tuscaloosa, 186 F.3d 1328, 1331-1332 (11th Cir. 1999), cert. denied, 120 S. Ct. 1555 (2000). "If . . . the decision makes relied upon the recommendations of supervisors, the motives of the supervisors should be treated as the motives for the decision." Trustees of Forbes Library v. Labor Relations Commission, 384 Mass. 559, 570 (1981).

**Def.'s Opp.**, at 6: HUD distinguishes Hannon v. Chater, 887 F. Supp. 1303, 1308, 1316 (N.D. 1995), on the grounds that Crane recommended an action, and that the decisionmaker in that case was the direct decision maker. In actuality, the person in the Hannon case, like Crane, merely made a recommendation to hire a female. Id. at 1308 ("he recommended the female candidate"). Thus, Hannon is on-point.

**Def.'s Opp.**, at 7-8: HUD argues that a general expressions of the desirability of diversity is not illegal. That point is debatable. Title VII is color-blind, and where a

---

generated concerning a candidates qualifications, Cintron made no effort to resolve them, other than to rely on the opinion of Crane, the Regional Director. SOF 163. Cintron gave more weight to Crane's assessments of candidates than the files describing the candidates' qualifications. SOF 160. Other than speaking with Crane, Cintron did not consult with anyone else concerning his decisions regarding the Boston positions. SOF 163. Cintron did not ask Crane what experience she had working with the candidates, nor did he request the foundation for her recommendations. SOF 165. Everyone who was selected as a Community Builder in Boston was positively endorsed by Crane, and everyone she did not endorse did not get selected. SOF 164

supervisor expresses the desire to add more minorities, in the absence of the factors described in <u>Johnson v. Transportation Agency</u>, 107 S. Ct. 1442, 1451-1452 (1987), that can be evidence of a discriminatory motive to favor minorities. Title VII protects Whites as well as other racial minorities, men as well as women. <u>McDonald v. Santa Fe Trail Transp. Co.</u>, 96 S. Ct. 2574, 2579-2580 (1976) ("Title VII prohibits racial discrimination against the white petitioners in this case upon the same standards as would be applicable were they Negroes and Jackson white"). If a manager expresses a desire to hire more Whites, that would be evidence of discriminatory motive, just as would a manager expressing a desire to hire more racial minorities.

However, this is not a case involving expressions of a general interest in diversity. This is a case in which Crane, the *de facto* decision-maker, made specific hiring decisions and expressly considering gender in making those decisions. The cases cited by HUD do not address such a situation, nor do they address the application of 42 U.S.C. § 2000e-2(m). It is illegal when considerations of race and/or gender motivate any specific employment decision, even if it is not a dispositive factor. 42 U.S.C. § 2000e-2(m); <u>Hannon</u>, 887 F. Supp. at 1316.

**Def.'s Opp.**, at 8, 11 n.7, 16-18: Plaintiff's claim concerning the AEP alleges a violation of Title VII, 42 U.S.C. § 2000e-2(a)(2), not a violation of the Constitution.

**Def.'s Opp.**, at 9-10, 17 n.5: HUD claims that its AEP is justified and/or supported by MD-714. That is false, as the AEP violated MD-714, and HUD's AEP contained race

5

and gender based affirmative action that went well beyond what was required, suggested or permitted by MD-714. Resp. to HUD Fact 70A(i) – 70A(ix)(g).[3]

**Def.'s Opp.**, at 10-12. HUD's argument that Plaintiff's challenge to the AEP is moot is demonstrated to be false in Plaintiff's Opposition to HUD's Motion for Summary Judgment, at 2-5. The cases HUD cites are distinguishable in that Plaintiff is seeking retrospective relief in the form of declaratory judgment and emotional distress damages under Title VII. Cf Worth v. Jackson, 451 F.3d 854, 861 (D.C. Cir. 2006) (where plaintiff sought only prospective relief on affirmative action plan, the case is moot because the plan was rescinded). The Court is capable of providing relief to redress injury. Cf Gulf of Maine Fisherman's Alliance v. Daley, 292 F.3d 84, 88 (1st Cir. 2002) (case seeking only the injunction on enforcement of a plan is moot once the plan has been rescinded). Plaintiff is the proper party to bring the case, because he was subjected, in violation of 42 U.S.C. § 2000e-2(a)(2), to an unlawful classification based on his race. Cf Princeton University v. Schmid, 455 U.S. 100, 103 (1982) (case moot where the only appellant with a true interest in the case refused to express an opinion on the merits).

**Def.'s Opp.**, at 12-13, 18. HUD erroneously argues that the Count VII claim against the AEP is derivative of Plaintiff's non-selection claims, and that the AEP can only be found

---

[3] In particular, for the benefit of women and racial minorities, HUD established numerical objectives for increasing promotion and training, HUD set goals designed to create representation of women and racial minorities to exceed parity, HUD set goals to maintain parity after it had been created, HUD set goals to increase training of women and minorities in excess of their rate of representation in the workforce, HUD set promotion goals to increase hiring of EEO groups in excess of their representation in the candidate pool, HUD established goals for hiring or moving women and racial minorities into certain job categories, and to promote and train various EEO groups without undertaking the required investigation and inquiries, and HUD excluded White males from this program. None of this was permitted by MD 714. Resp. to HUD Fact 70A(i) – 70A(ix)(g)..

illegal if it is shown to impact on the non-selections. However, this is a stand alone claim, remaining valid despite its impact or non-impact on non-selections. According to Title VII, "It shall be an unlawful employment practice for an employer to . . . classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race . . . [or] sex . . . ." 42 U.S.C. § 2000e-2(a)(2).

As a victim of a discriminatory classification, Plaintiff need not demonstrate that the use of such classification caused him harm. Rather, such classification is illegal even where it merely "tends" to deprive an individual of employment opportunities. 42 U.S.C. § 2000e-2(a)(2); see Lorance v. AT&T Technologies, 109 S. Ct. 2261, 2266 n.3, 2269 (1989) (concrete harm when discriminatory system is adopted, even before it affects the plaintiff, and the plaintiff should sue based on the initiation of the system alone). There is nothing in Title VII limiting suits under 42 U.S.C. § 2000e-2(a)(2) only to those who were non-selected for particular positions. Thus, Plaintiff need not prove that the AEP impacted his non-selections for the CB and PHRS positions in order to recover for the illegal classifications (although it did).[4]

**Def.'s Opp.**, at 14, 18. Contrary to HUD's argument, there is sufficient evidence upon which a jury could conclude that the decisionmakers were aware of the AEP goals, and

---

[4] The cases cited by HUD do not address claims of unlawful classification under 42 U.S.C. § 2000e-2(a)(2), or 42 U.S.C. § 2000e-2(m), but rather indicate that the presence of an affirmative action plan, alone, is insufficient evidence to compel the inference that an employee was rejected because of his race or gender, in violation of 42 U.S.C. § 2000e-2(a)(1). Mlynczak v. Bodman, 442 F.3d 1050, 1058 (7th Cir. 2005); Cerrato v. San Francisco Community College Dist., 26 F.2d 968, 976 (9th Cir. 1994); Axel v. Apfel, 171 F. Supp.2d 522, 529 (D. Md. 2000)

7

that those goals played a role in the non-selections. SOF 179-180, 198-199; <u>Resp. to HUD Fact 49</u>.

**Def.'s Opp.**, 14-16. Plaintiff is not seeking to pursue a "pattern and practice" claim or a "class action" claim. Plaintiff seeks recovery for the AEP under 42 U.S.C. § 2000e-2(a)(2). Independent of that claim, Plaintiff intends to introduce the AEP, and statistical evidence of the demise of White male representation at HUD, as evidence of a corporate-wide atmosphere of discrimination to support his non-selection claims. A corporate discriminatory atmosphere need not coincide with the particular actors or timeframe to be admissible evidence. <u>Conway v. Electro Switch Corp.</u>, 825 F.2d 593, 597 (1st Cir. 1987); <u>Brennan v. GTE Government Systems</u>, 150 F.3d 21, 28 (1st Cir. 1998).

**Def.'s Opp.**, at 19-20. HUD erroneously implies that Plaintiff needs to prove that the AEP numerical goals and objective constituted "mandatory quotas." Plaintiff need not prove the existence of a mandatory quota. Plaintiff need only prove the existence of a classification that would "tend" to deprive an individual of employment opportunities based on race or gender. 42 U.S.C. § 2000e-2(a)(2).

However, insofar as the numerical goals constitute "objectives" as opposed to "quotas," that distinction does not exempt the AEP from scrutiny; it disadvantages White males in the same fundamental way a quota, guarantee, or set aside would. <u>Byrd v. Ruben</u>, 1997 U.S. Dist. Lexis 10863, at 26-27; <u>Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville</u>, 113 S. Ct. 2297, 2301 (1993).

The evidence plainly demonstrates that the classification tended to impact employment opportunities. The entire purpose of having numerical goals and objectives for increasing hiring, promotion and training of members of EEO groups is to impact

employment opportunities for the individuals in those groups. The numerical goals and objectives were given to HUD Managers to "provide direction for hiring." SOF 28.

HUD would employ a wide range of concrete strategies to comply with AEP goals and objectives, which impacted adversely on employment opportunities for White males. SOF 144. Not only were Managers provided the goals and objective, but those involved earlier in the hiring process responded to its goals and objectives.[5] SOF 144. For example, HUD would extend the closing date on vacancy announcements, to the extent that low numbers of women or racial minorities applied, which accords White males fewer employment opportunities than those in other EEO groups. SOF 144.[6]

The fact that the numerical goals and objective were distributed annually, and that Supervisors and Managers were evaluated based on their efforts to meet those goals and objectives, means that there was an expectation that the AEP would impact on employment opportunities. See Johnson v. Transportation Agency, Santa Clara County,, 107 S. Ct. 1442, 1467 (1987) (Scalia, dissenting). Managers and Supervisors were informed they were expected to review AEP reports before initiating any hiring, training or promotion, and that they would be held "accountable" for promoting AEP goals. SOF 63-64, 78, 79, 95, 96, 198, 199. To the extent that a Supervisor wished to receive the

---

[5] HUD is incorrect to the extent that it indicates that the Plaintiff's complaints about the AEP is limited only to its influence on final decisionmakers. See Def.'s Opp., at 1.

[6] The policy impairs equal opportunity as follows: say, for example, a vacancy announcement opened up for a position that a Hispanic male would be interested in, but that Hispanic male is not aware of the announcement. Due to that Hispanic male's non-application, only a small number of Hispanic males apply for the position. In such a case, the closing date would be extended so that so that all people, including the Hispanic male, would have an increased opportunity for that job. In contrast, if Plaintiff, a White male, were in the same position, and was not aware of a vacancy announcement, the closing date would not be extended, despite a dearth of White male candidates. Thus, the opportunities provided to White males were less than those provided to others.

highest evaluation scores possible, compliance with the AEP goals and objectives were "mandatory." Resp. to HUD Fact 70B. There is no evidence that Managers or Supervisors were informed that there was no need to satisfy the AEP goals. SOF 28.

HUD's apparent position, that the AEP numerical goals and objectives for hiring, promotion and training were not intended to have any effect on hiring, promotion and training decisions, is absurd on its face. Statistical analysis confirms that White males suffered enormous underrepresentation at HUD during the AEP. Pl.'s Opp. to Sum. Judg., at 13-14. If the AEP goals were to have no effect, then what would have been the harm of applying the same goals and objectives to correct White male underrepresentation? The answer is, of course the AEP was designed to, and actually did tend to impact on employment opportunities. Thus, it is an illegal classification, for which Plaintiff may seek recovery, in the form of emotional distress damages and declaratory relief. SOF 204.

**CORRECTION TO PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT**

The conclusion to Plaintiff's Opposition to HUD's Motion for Summary Judgment, at 20, requested that this Court deny summary judgment on Counts I, II, III, IV, VII & IX. The conclusion should also have requested that this Court deny summary judgment on Counts V and VI, as well. This omission was a clerical error that Plaintiff wishes to correct.

The Plaintiff
By his attorneys,


_____/s/ Robert S. Mantell_____
Kevin G. Powers
BBO# 405020
Robert S. Mantell
BBO# 559715
Rodgers, Powers & Schwartz LLP
18 Tremont Street, Suite 500
Boston, MA  02108
(617) 742-7010, ext. 305
fax (617) 742-7225

patoski summary judgment reply