UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RICHARD S. PATOSKI,  )
　　　　　　　　　　　)
　　　　Plaintiff,　　 )
　　　　　　　　　　　)
v.　　　　　　　　　　)　　C.A. No. 05-11086 RCL
　　　　　　　　　　　)
ALPHONSO JACKSON, SECRETARY, )
DEPARTMENT OF HOUSING AND　　)
URBAN DEVELOPMENT,　　　　　 )
　　　　　　　　　　　)
　　　　Defendant.　　)

**PLAINTIFF'S MOTION IN LIMINE RELATING TO HUD'S
AFFIRMATIVE EMPLOYMENT PROGRAM**

Plaintiff Richard S. Patoski, a White male, hereby submits his motion in limine relating to HUD's Affirmative Employment Program (AEP). Plaintiff requests: [1] that the jury be instructed that HUD's AEP illegally disfavored males such as Plaintiff; and [2] that HUD's stated desire for a workplace composition reflective of the nation's diversity constitutes an unlawful goal.

From FY 1993 through FY 2003, HUD implemented its AEP, which established numerical objectives and goals, for the purpose of increasing the career opportunities of women, but not White males. Mr. Patoski, as a White male, did not, and could not benefit from the AEP program. If he had been female, he would have been able to benefit from the AEP. Thus, gender was a determining factor as to whether or not Mr. Patoski could benefit from the AEP. He was the "wrong" gender, so he could not be advantaged by the program.

Evidence that Mr. Patoski was disadvantaged by his classification as a "White male" is relevant and admissible to his claim for gender discrimination under Title VII. Under the "sex-plus" theory of gender discrimination, the Title VII plaintiff does not need to allege that the employer discriminated against everyone of his or her gender, but need only show that the employer disparately treated disparately a subclass within the protected class. Phillips v. Martin Marietta Corp., 91 S. Ct. 496 (1971); Arnett v. Aspin, 846 F. Supp. 1234, 1238-41 (E.D. Pa 1994); Rosa v. Park West Bank & Trust Co., 214 F.3d 213, 215-216 (1st Cir. 2000). Thus, Mr. Patoski may produce as evidence the bias at HUD against White males, in support of his gender discrimination claim, because but for his gender, if he had been a White female, he would have been treated in a completely different fashion under the AEP. Gender was a determinative factor.

Determination of whether the AEP was lawful or unlawful is a necessary predicate before the rest of this case may be tried. Plaintiff seeks recovery for gender discrimination in his non-selection for a Community Builder position. Counts II, III & IV. As evidence of discrimination, Plaintiff intends to introduce evidence of the AEP, to demonstrate that HUD had a corporate-wide policy which disfavored White males, and which encouraged Managers and Supervisors at HUD to favor applications of women. Specifically, at the time of the non-selection, the AEP contained goals for hiring over 100 White women into the class of position into which Plaintiff sought promotion, and in fact, three White women were offered the position over Plaintiff.

As HUD has acknowledged, the AEP may be considered by the jury to determine whether Plaintiff's rejection was due in whole or in part because of his gender. Def.'s Mem. In Support of Summary Judgment, at 11; McDonnell Douglas Corp. v. Green, 93

S. Ct. 1817, 1825 (1973) (an employer's general policies and practices may be relevant to determining whether an individual plaintiff was the subject of discrimination). Plaintiff is entitled to a set of jury instructions to the effect that the AEP was an unlawful program. See DeCorte v. Jordan, 497 F.3d 433, 440 (5th Cir. 2007) (jury instructed that affirmative action plan was invalid). A jury will not fairly be able to evaluate the importance of the AEP as evidence, unless the Court instructs it that the AEP was illegal, and reflected an unlawful preference based on gender.[1] Without such an instruction, a jury may conclude that HUD's program is benign and lawful.

I.   **FACTUAL BACKGROUND**

Citations to the SOF 1-203 refer to the Plaintiff's Rule 56.1 Statement of Facts filed in Support of Plaintiff's Motion for Summary Judgment. Citations to "Resp. to HUD Fact" and SOF 204, et seq. refer to facts contained in Plaintiff's Rule 56.1 Statement filed in opposition to HUD's motion for summary judgment. Exhibits cited herein refer to the Exhibits attached to the Plaintiff's Rule 56.1 submissions.

II.   **THE AEP VIOLATED TITLE VII AND THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION**

A.   HUD'S AEP PROGRAM SUPPORTED EMPLOYMENT OPPORTUNITY FOR EVERYONE EXCEPT WHITE MALES

   1.   EEOC Management Directive 714

In 1987, the Equal Employment Opportunity Commission (EEOC) issued Management Directive 714 ("MD-714"), for the purpose of implementing an affirmative

---

[1] A **"regardless of good intentions, a governmental employer commits unlawful discrimination when it takes race into account in an employment decision and acts pursuant to an invalid affirmative action plan."** See Bass v. Bd. Of County Comm'rs, 256 F.3d 1095, 1110 (11th Cir. 2001). Likewise, before a jury considers whether Plaintiff was rejected for the Community Builder position because of his gender, it should be determined whether the AEP in place at the time was "invalid." Id. & n.6. A corporate discriminatory atmosphere need not coincide with the particular actors or timeframe to be admissible evidence. Conway v. Electro Switch Corp., 825 F.2d 593, 597 (1st Cir. 1987); Brennan v. GTE Government Systems, 150 F.3d 21, 28 (1st Cir. 1998).

3

program of equal employment opportunity in the Federal Government. SOF 11. MD-714 required Federal agencies to perform workforce composition analysis based on EEO Group,[2] and determine whether any EEO group is under-represented as compared to the Civilian Labor Force (CLF). SOF 13.

According to MD-714, each agency shall analyze the workforce by "PATCOB" category, grade groupings and major occupations. SOF 14. PATCOB is an acronym for a variety of occupational groups, including Professional, Administrative, Technical, Clerical, Other White-Collar categories and Blue-Collar occupations. SOF 14.

MD-714 permits, but does not require, a Federal agency to establish numerical objectives and goals to correct instances where an EEO group is substantially under-represented in an occupational category. SOF 15-16.

2. HUD's AEP Program

During FY1993-FY2003, HUD annually analyzed its workforce composition by EEO group, and compared its workforce to the CLF. SOF 31-143. Purporting to remedy under-representation, HUD would institute numerical goals and objectives for increasing the rates of hiring, promotion and training of members of certain EEO groups. SOF 51, 53, 55-6, 62, 68, 69, 70, 72, 80, 83-5, 87-8, 100-2, 104-5, 111, 115-7, 119. The purpose of such goals was to "provide direction for hiring." SOF 28. White males were singled out as the only EEO group for whom HUD refused to institute a hiring, promotion or training goal or objective, no matter how great their under-representation. SOF 53, 55, 57, 60, 69, 70, 73, 76, 84-5, 89, 93, 97, 102, 105, 108, 112, 115, 117, 120.

a. Promotion

---

[2] There are 10 EEO Groups, which include male and female Whites, male and female African-Americans, male and female Hispanics, male and female Asians/Pacific Islanders, and male and female Native Americans. SOF 13.

When the promotion rate for an EEO group was lower than its percentage of the workforce, HUD considered that to be an "UNDESIRED CONDITION." SOF 48, 56, 72, 88, 105. To correct such a condition, HUD would announce an objective to increase that EEO group's promotion rate. Id. For example, with regard to the FY 1998 AEP Report, when Hispanic females constituted 4.0% of the HUD workforce, but received 3.7% of the Competitive promotions, HUD announced an "objective" to increase the rate of competitive promotions for Hispanic females. SOF 56 & FY 1998 AEP Update Report, at 4053, 4056. HUD communicated the "expectation" that there would be "increased rates of promotion" for Hispanic females. Id., at 4055.

However, White males were not treated equally. From FY1992 through FY2003, White males were never promoted in numbers reaching their representation in the HUD workforce. SOF 35, 37, 42, 48, 57, 73, 89, 105, 120, 132, 142. Despite this ubiquitous under-representation, HUD never established an objective to increase the promotion rates of White males, and never imposed an "expectation" that their promotion rate would increase. Id. For example, while the FY 1998 AEP Update Report stated that White males constituted 28.1% of the entire HUD workforce in FY 1997, White males received only 15.8% of the promotions. SOF 73; 1998 AEP Update Report, at 4053 (DVI-3), Exhibit 16. However, it was not considered a "DESIRED CONDITION" that White males would be promoted at an increased rate, and no such objective for increased promotion was adopted. SOF 73.

Often, HUD would establish an objective to increase an EEO group's promotion rate, even if that group had already been promoted in numbers commensurate with its workforce composition. SOF 58, 74, 90, 106. For example, in FY 2000, White females

5

were 27.7% of the HUD workforce, and received 28.7% of the promotions. SOF 106; FY 2000 AEP Update Report, at HUD 4272, DVI-2, Exhibit 18. Despite the fact that White females were receiving their share of promotions, HUD generated an objective to increase the overall promotion rate for White females. SOF 106; FY 2000 AEP Update Report, at 4272, 4276, DVI-2, DVI-6, Exhibit 18. However, White males were not treated similarly. This was a difference of treatment that hinged directly on gender.

      b.      Numerical Goals in PATCOB Categories

On an annual basis, HUD compared its workforce composition by EEO group with that of the Civilian Labor Force (CLF). SOF 24. The comparison would be undertaken by PATCOB categories. SOF 24. The PATCOB categories include Professional, Administrative, Technical, Clerical, Other & Blue Collar. SOF 14. When an EEO group was found to be under-represented at HUD as compared to the CLF, HUD would adopt a numerical objective to add members of that EEO group. SOF 25. For example, the FY 1998 AEP Report sets forth a goal of adding 103 White females to positions in its "Administrative" category. SOF 69.[3]

However, White males were not treated similarly. From FY1992 though FY2003, White males were underrepresented in the HUD workforce in every PATCOB category. SOF 31, 37, 43, 49, 65, 81, 98, 113, 125, 135. However, HUD never established an objective to increase the numbers of White males in those categories, and HUD never generated an "expectation" that their numbers would increase. SOF 53, 55, 69,70 84-5, 97, 102, 112, 115, 117, 127.

Often, HUD established numerical goals for adding members of an EEO group,

---

[3] For example, the CB position that Plaintiff applied for in FY1998 fell within the "Administrative" PATCOB category. SOF 153.

6

even if they were already employed in excess of parity in the applicable PATCOB category. SOF 54, 71, 86, 103, 118, 130. For example, the FY 2001 AEP Report sets the goal of hiring fifty Black female Administrative workers, even though HUD already employed Black female Administrative workers at a rate exceeding the CLF of over 400%. SOF 123-124; FY 2001 AEP Update Report, at 4330, 4342, <u>Exhibit 19</u>. However, as stated above, there were no goals established to assist the career opportunities of White males. Had those White males been women, they would have been assisted by the AEP.

    c.    Trainings

HUD conducted similar analyses of those being trained in Special Employment Programs (SEPs). On an annual basis, when an EEO group at HUD was enrolled in SEPs in numbers less than its percentage in the overall HUD workforce, HUD would establish an objective to increase that EEO group's participation. SOF 59, 75, 91, 107. Sometimes, HUD established an objective for the increased participation of an EEO group, even though that group was already enrolled in SEPs at rates exceeding their workforce representation. SOF 61, 77, 92, 109. However, White males were not treated similarly. White males from FY 1992 through FY 2002 were underrepresented in their enrollment in SEPs in each year. SOF 34, 40, 46, 60, 76, 93, 108, 143. However, HUD failed to establish any objective for increasing the training of White males. <u>Id</u>.

    d.    Goals and Objectives Were Acted Upon

These objectives and goals to benefit women and minorities were communicated to Managers and Supervisors on an annual basis. SOF 23. Managers and Supervisors were evaluated based on efforts to assure "that EEO/AE/Diversity goals and objectives

are achieved," as part of HUD's yearly appraisals. SOF 19, 64, 79, 96, 110, 198. Managers and Supervisors were instructed to "achieve measurable results" in compliance with EEO/AE/Diversity goals. SOF 64, 79, 96. One performance standard included the requirement to "make decisions regarding . . . promotions . . . [and] recommendations for selection . . . that further the Departments EEO/AE programs and policies and foster diversity within the HUD workplace." SOF 179.[4] Those who were given high ratings in these evaluations could expect monetary bonuses. SOF 199.

Moreover, in light of its goals and objectives, HUD would institute concrete recruitment and manipulate the selection process to improve chances of women and minorities in terms of training, promotion and hiring. SOF 144. For example, HUD would extend the closing date on vacancy announcements, to the extent that low numbers of women or racial minorities applied, which accords White males fewer employment opportunities than those in other EEO groups. SOF 144.

Managers and Supervisors were informed they were expected to review AEP reports before initiating any hiring, training or promotion, and that they would be held "accountable" for promoting AEP goals. SOF 63-64, 78, 79, 95, 96, 198, 199. To the extent that a Supervisor wished to receive the highest evaluation scores possible, compliance with the AEP goals and objectives was mandatory. Resp. to HUD Fact 70B. There is no evidence that Managers or Supervisors were informed that there was no need to satisfy the AEP goals. SOF 28. Thus, there was an expectation that this classification system would tend to affect the career opportunities of the relevant EEO groups. The fact

---

[4] Insofar as the numerical goals constitute "objectives" as opposed to "quotas," that distinction does not exempt the AEP from scrutiny; it disadvantages White males in the same fundamental way a quota, guarantee, or set aside would. Byrd v. Ruben, 1997 U.S. Dist. Lexis 10863, at 26-27; Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville, 113 S. Ct. 2297, 2301 (1993).

8

that Managers were evaluated and rewarded to the extent they effectuated AEP goals is evidence that discriminatory motives were involved. SOF 198, 199, 205. See Johnson v. Transportation Agency, Santa Clara County, , 107 S. Ct. 1442, 1467 (1987) (Scalia, dissenting) (evaluations of supervisory personnel based on their ability to attain an affirmative action plan's objective for a diverse workforce "unmistakably communicated" that concrete numerical results in hiring were expected); Adamson v. Wyeth Pharm., 2005 U.S. Dist. Lexis 20579 (D. Mass.), at 58-59.

    e.    The AEP as Applied to Plaintiff

Plaintiff, a White male, applied for a promotion to a Community Builder position in 1997. SOF 2, 154. The CB position fell within the "Administrative" PATCOB category. SOF 153, 191. The AEP applied directly to the CB position, in that it established numerical goals for White women to fill Administrative positions. SOF 53, 55. If White males were treated similarly to other EEO groups, then during those periods, HUD would have established numerical goals to add White males into the Administrative jobs. SOF 49-51, 53, 81-84. HUD would have established objectives for increasing the promotion rate of White males, generally. SOF 56, 88. Managers and Supervisors would have been informed of these goals and objectives, and reminded that they would be evaluated based on their compliance. SOF 63-4, 95-7. However, these steps were never taken, because HUD discriminated against White males.

B.    STANDARD FOR AFFIRMATIVE ACTION BY THE FEDERAL GOVERNMENT

As will be shown, HUD's AEP, as implemented during the relevant time period, constituted unlawful discrimination on the basis of gender, under Title VII and/or the Equal Protection requirements of the Fifth Amendment of the United States Constitution.

This Court has dismissed Plaintiff's claim (Count VII) alleging that the AEP violated Title VII on the ground that it is moot, because HUD has allegedly discontinued the program. However, even if the claim is moot, that does not alter the fact that the AEP may be used as evidence of a discriminatory mindset on the part of HUD, during the time of the rejection. Thus, Plaintiff requests a determination as a matter of law that the AEP violated Title VII and/or the Fifth Amendment, so that a jury may be properly informed that HUD implemented an official, department-wide policy, that unlawfully disfavored a subset of males such as Plaintiff on the basis of gender.

Plaintiff will initially discuss the fact that the AEP violated Title VII standards. As will be shown, Title VII standards likely embrace the Fifth Amendment Constitutional standards. Thus, by the end of this section, it will be demonstrated that the AEP violated Title VII, or the Fifth Amendment, or both.

According to Title VII, "It shall be an unlawful employment practice for an employer to . . . classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(2). It would seem that this provision would bar any gender based affirmative action. However, the standard for determining whether an affirmative action program run by a Federal Agency complies with Title VII is more complicated.

There are at least three other possible standards to determine whether a voluntary affirmative action plan adopted by a Federal agency complies with Title VII. The first standard asks whether the affirmative action program is designed to remedy a conspicuous imbalance in a traditionally segregated job (the "Imbalance Standard").

Johnson v. Transportation Agency, 107 S. Ct. 1442, 1451-1452 (1987).  The second standard is whether the program satisfies Constitutional Equal Protection analysis: intermediate scrutiny for gender classifications ("Constitutional Standard").  See United States v. Virginia, 116 S. Ct. 2264, 2275 (1996).  The third standard is a combination of the first two.  As will be shown, Plaintiff prevails under any standard.

    1.    The Imbalance Standard

In a case not involving the Federal government, the Supreme Court interpreted Title VII to permit voluntary affirmation action in a State program when there is a "conspicuous imbalance in a traditionally segregated job category."  Johnson v. Transportation Agency, 107 S. Ct. 1442, 1451-1452 (1987).  In that 1987 case, the Defendant Transportation Agency adopted an affirmative action plan, setting numerical goals for hiring women and those in certain ethnic groups to reach the proportion of women and ethnic groups in the labor pool.  Id. at 1446, 1448.  After a lower scoring female was selected for a position based, in part, on consideration of "affirmative action matters," the non-selected male filed suit challenging the plan.  Id. at 1445, 1448.

The Supreme Court approved the affirmative action plan, where there was evidence at the Transportation Agency that employees of different genders were congregated into traditionally segregated jobs.  Id. at 1453.  For example, while women were well-represented in administrative jobs, only one of the 110 road maintenance workers and none of the 238 skilled craft workers were female.  Id. at 1453-1454.  Affirmative action was permitted in the face of these lop-sided groupings which tracked stereotypically genderized occupations, and where goals for hiring women were used in positions that were staffed overwhelmingly with males.  Id. at 1453-1454, 1456.

The Agency's affirmative action plan was approved because it had particular, important qualities. Gender was to be only one of a variety of factors to be taken into account in making hiring decisions. Id., at 1454, 1455, 1457. The affirmative action plan was intended to attain a balanced workforce, not to maintain one. Id., at 1455, 1456. Moreover, the Agency sought annually to develop more refined measures of the under-representation in each job category that required attention. Id. at 1453-1454.

The Supreme Court established the Imbalance Standard, knowing it to be less stringent than Constitutional standards. Id., 107 S. Ct. at 1450 n.6. The Court recognized, under the standard it announced, that an affirmative action plan may be lawful under Title VII, but could nevertheless be illegal under Equal Protection principles. Id.

2. The 1991 Amendments to Title VII – 42 U.S.C. § 2000e-2(m) and Section 116 of the 1991 Civil Rights Act

Soon after the Johnson decision, in 1991, Congress promulgated amendments to Title VII that had the effect of harmonizing Title VII with Constitutional standards. Section 107(a) of the Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071, 1075. Section 2(m) was added to prohibit consideration of sex as "a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). Consideration of gender is unlawful, even if it is only one of many factors considered, and even if it is a non-dispositive factor. Id; 42 U.S.C. § 5(g)(2)(B).

Section 2(m) profoundly changed the law and rendered certain affirmative action plans illegal. In making the amendment, several senators, led by Senator Robert Dole, in a section-by-section analysis of the 1991 Civil Right Act, stated that § 2(m) "is equally applicable to cases involving challenges to unlawful affirmative action plans, quotas, and other preferences." 137 Cong. Rec. S15,476 (daily ed. October 30, 1991).

12

While the <u>Johnson</u> court had approved an affirmative action plan under Title VII because gender was but one factor of many to be considered by the employer, Title VII was thereafter changed to expressly prohibit use of gender as any type of consideration. <u>Compare</u> <u>Johnson</u>, 107 S. Ct. at 1454, 1455, 1457, with 42 U.S.C. § 2000e-2(m). <u>Johnson</u> was thereby statutorily overruled.

The reach of Section 2(m) was limited by §116 of the 1991 Civil Rights Act. Section 116 of the 1991 Act provides that "nothing in the amendments made by this title shall be construed to affect court-ordered remedies, affirmative action, or conciliation agreements, that are in accordance with the law." Section 116 of the Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071, 1079. Thus, Section 2(m) does not invalidate otherwise legal affirmative action; this clause saves only plans that are "in accordance with the law." Necessarily, Section 116 permits Section 2(m), and the rest of Title VII, to prohibit affirmative action plans when those plans are otherwise illegal, i.e. unconstitutional. Where a plan is unconstitutional, it will also be illegal under Title VII.

3.      Constitutional Standards

In 1995, the Supreme Court recognized that the Fifth Amendment of the United States Constitution requires that agencies of the Federal Government accord parties Equal Protection, in a manner similar to what is required under the Fourteenth Amendment. <u>Adarand Constructors, Inc. v. Pena</u>, 115 S. Ct. 2097, 2105-2107 (1995). The Fifth Amendment prohibits Federal affirmative action programs that are unjustified and/or exceed narrow Constitutional limits. <u>Id</u>. The burden of production is on the governmental actor to show that a gender classification is justified under intermediate scrutiny. <u>Id</u>. at 2111 (governmental actor must "justify" race classification); <u>United</u>

13

States, 116 S. Ct. at 2275 (placing the burden on the state to justify a gender classification). As will be shown, HUD's AEP violated Title VII, regardless of whether one applies the Imbalance Standard, the Constitutional Standard, or both. This same analysis will establish that the AEP violated the Fifth Amendment, as well.

C.   HUD'S AEP DEPRIVED, OR TENDED TO DEPRIVE, WHITE MALES OF EQUAL OPPORTUNITIES IN VIOLATION OF TITLE VII.

HUD violated Title VII in that it "classified" its employees in a "way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee" based on gender. 42 U.S.C. § 2000e-2(a)(2). The AEP classified each HUD employee as a member of a single EEO Group, such as White male, Hispanic Female, Asian Male, etc. SOF 13, 24. The AEP thus classifies all HUD employees by their gender.

HUD then used its classification to establish goals and objectives to further the employment opportunities only for women, but not for certain men. Supra II(A)(2)(a), (b) & (c). Goals were set to add members of specific EEO groups into certain categories of jobs, and to increase their overall promotion and training rates. Id. HUD communicated those goals and objectives to HUD Managers and Supervisors on an annual basis, evaluated them based on their effectiveness in producing measurable results to satisfy those goals, and rewarded those who complied with positive evaluations and monetary bonuses. Supra IV(A)(2)(d); See Johnson, 107 S. Ct. 1442, 1467 (1987) (Scalia, dissenting) (evaluations of personnel based on their ability to attain an affirmative action plan's objective for diversity "unmistakably communicated" that concrete numerical results in hiring were expected). Concrete employment practices were implemented to attain the goals. SOF 144.

14

White males did not get the benefit on any of these AEP initiatives. Supra I(A)(2)(a), (b) & (c). During the time of the AEP, White male representation in the workforce declined inexorably, and White males were never promoted at levels nearing their workforce representation. SOF 200-203. As such, the AEP is in facial violation of 42 U.S.C. § 2000e-2(a)(2), because it involved a gender classification expressly treated White males differently than White females, and did so in a way that tended to affect their employment opportunities adversely. Byrd v. Ruben, 1997 U.S. Dist. Lexis 10863 (affirmative action program similar to AEP violates Title VII). The AEP also violates 42 U.S.C. § 2000e-2(m), which prohibits any consideration of gender. Id. Thus, the AEP is potent evidence of an agency-wide policy to discriminate on the basis of gender.

HUD may argue that Title VII is violated only when an adverse job action occurs, and that therefore, the AEP could not be violated because it did not cause Plaintiff's rejection. Plaintiff denies that the AEP did not cause his rejection. Crane Dep., at 74, Exhibit 28. However, even if that were so, Title VII prohibits classifications that "would deprive or tend to deprive" an employee of opportunities. 42 U.S.C. § 2000e-2(a)(2). If proof of a resulting adverse action were required for there to be a violation, then the words "tend to deprive" would be a nullity. Furthermore, use of the word "would" requires the interpretation that the violation occurs even if the harm has not yet happened, but "would" tend to happen in the future. Id. Thus, it is simply incorrect that the Plaintiff needs to establish proof of a resulting adverse employment action in order to demonstrate that the AEP was unlawful.

Of course, even if this Court finds that the AEP is lawful with respect to Title VII due to its alleged lack of connection to a specific rejection (the evidence is that it was

connected to the CB position), the Court should nevertheless find that the AEP violated Constitutional standards for Equal Protection.

D.   THE AEP VIOLATED THE IMBALANCE STANDARD

Even if the Imbalance Standard articulated by the Johnson case is applicable to affirmative action used by the Federal Government and remains good law (it is not), the AEP as implemented by HUD does not pass muster.

1.   No Finding of Traditional Segregation

HUD failed to demonstrate that its goals and objectives were designed to remedy a "conspicuous imbalance in a traditionally segregated job category." Johnson, 107 S. Ct. at 1451-1452. HUD made no inquiries as to whether its positions were "traditionally segregated," and it never reached any conclusions that some or all of its positions were traditionally segregated. SOF 149. Looking more specifically to the positions for which Plaintiff applied, HUD does not contend that the CB position was traditionally segregated. SOF 149. In fact, the CB position was new, as of 1997, and could not be traditionally segregated. SOF 152. Thus, the AEP is not justified under Title VII.

2.   No Finding of Conspicuous Imbalance

Under Johnson, another element to justifying affirmative action is the presence of a "conspicuous imbalance" between gender composition in the workforce as compared to the CLF. Johnson, 107 S. Ct. at 1451-1452. Moreover, with regard to the PATCOB categories, HUD corrected all under-representation (except for White males), and not just conspicuous imbalances. SOF 25, 27, 30. In other words, if there was a shortfall of even one member an EEO Group in a large occupational category, HUD would establish a numerical goal to correct that slight imbalance. Id. HUD's exhuberance for affirmative

16

action means that it is unjustified under Johnson.

3. No Finding of Imbalance in Specific Jobs

The affirmative action plan in Johnson was approved in part because the Agency constantly sought to develop more refined measures of the under-representation in each job category that required attention. Johnson, 107 S. Ct. at 1453-1454. Over the years, HUD has done nothing to hone its analysis, and tailor it to smaller and smaller job categories. For example, we do not know whether there is a conspicuous imbalance of an EEO group in the CB position, because HUD never did that analysis. SOF 145, 147, 150. Since the CB position was new, it could not have been the subject of imbalance. SOF 152. HUD's failure to tailor its inquiry to specific jobs prevents it from receiving the protection of the Imbalance Standard.

4. Goals to Add Women and Minorities to Exceed Parity

HUD's AEP routinely called for the adding of members of an EEO group into a PATCOB category, even though there was no under-representation of that EEO group within the category. SOF 54, 71, 86, 103, 118, 130. According to the Imbalance Standard, affirmative action may be used to fix an imbalance; it may not be used to maintain balance. Johnson, 107 S. Ct. at 1456. Furthermore, affirmative action may not be utilized to tip the balance in favor of disparity favoring minorities. See Mackin v. City of Boston, 969 F.2d 1273, 1275-6 (1st Cir. 1992). HUD's goals to add women into occupational categories with no under-representation violates the standard.

5. Objectives to Increase Promotion Rates in Excess of Parity

HUD also established goals to increase the rate of promotion and trainings for members of EEO groups (not White males), even when there was no under-

17

representation in the promotion and trainings rates of those groups. SOF 58, 74, 90, 106. These objectives to exceed parity violate the principle that affirmative action may be used only to fix an imbalance. Johnson, 107 S. Ct. at 1456.

6. Promotion Goals Were Not Tailored to Areas of Under-representation

HUD would establish general objectives to increase the promotion rate of certain EEO groups (not White males) agency-wide. SOF 48, 56, 72, 88, 105. Managers were exhorted to promote women and minorities to positions, even if there was no under-representation of that EEO group in such positions. Supra II(A)(2)(a). HUD's goals would result in an excess of parity for women in many positions.

7. Whose Ox is Being Gored?

The affirmative action found to be lawful in Johnson assisted females to the detriment of males. However, in that context, males were overwhelmingly represented in the affected jobs. Only one of the 110 Road Maintenance Workers was female and none of the 238 skilled craft workers were female. Johnson, 107 S. Ct. at 1453-1454. In that context, it was proper to give preferences to women to the detriment of males. In this case, however, White males were subjected only to the negative side of the AEP while they were already substantially underrepresented in every single PATCOB category at HUD and their numbers were constantly declining. SOF 31, 37, 43, 49, 65, 81, 98, 113, 125, 135, 200-203. There is no way that such a plan would have been countenanced by the Supreme Court. Thus, the AEP does not satisfy the Imbalance Standard.

E. THE AEP VIOLATES CONSTITUTIONAL STANDARDS

HUD'S AEP also violates Constitutional standards. With regard to gender preferences, intermediate scrutiny applies. Parties who seek to defend gender-based

government action must demonstrate an "exceedingly persuasive justification" for that action. United States, 116 S. Ct. at 2274. Gender classifications are viewed with skepticism, whether or not they deny opportunity to women or men. United States, 116 S. Ct. at 2275. The government must show that the "classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." United States, 116 S. Ct. at 2275.

In this case, HUD is not alleging that the goal of its AEP is to cure past discrimination. SOF 21. Rather, the only justification advanced by HUD is that HUD's workforce should reflect diversity contained in the civilian labor force and the nation itself. SOF 22. The urge to achieve EEO parity between the workforce, and the CLF (or the nation), is not a compelling or important state interest, and is insufficient justification for preferences based on race or gender. Grutter v. Bollinger, 123 S. Ct. 2325, 2339 (2003) ("[O]utright racial balancing . . . is patently unconstitutional); DeCorte v. Jordan, 497 F.3d 433, 440-441 (5th Cir. 2007) (employer's plan with goal of having the department reflect the racial composition of Orleans Parish was unlawful, because it constitutes "a plan to focus on race in employment decisions and an intent to achieve a desired racial balance").

HUD has failed to satisfy its burden to establish that its program was justified. Adarand, 115 S. Ct. at 2111; United States, 116 S. Ct. at 2275. Importantly, HUD is unable to present any analysis or study to demonstrate that its program withstands Constitutional scrutiny. SOF 146. The only justification advanced by HUD for its program is per se inadequate to surmount the Constitutional hurdles to affirmative action. Thus, the jury must be instructed that an intent to achieve a desired gender balance, in

19

this case, represents an illegal goal. DeCorte, 497 F.3d at 441.

Moreover, as shown in Supra Section II(D), the steps taken by HUD are not narrowly tailored to address its goals, even if it could be said that those goals were Constitutionally permissible. HUDs strategies were designed to assist women in exceeding parity, at the expense of under-represented White males, and would give employment advantages even in areas where women were not under-represented. Thus, under any standard used, HUD's AEP is unlawful. It violates Title VII, the Fifth Amendment, or a combination of both. The jury should be instructed about this fact.

**WHEREFORE**, the Plaintiff requests that this Court instruct the jury that Defendant's AEP illegally disfavored males such as Plaintiff; and that HUD's stated desire for a workplace composition reflective of the nation's diversity constitutes an unlawful justification for its conduct in implementing the AEP.

The Plaintiff
By his attorneys,


/s/ Robert S. Mantell
Kevin G. Powers BBO# 405020
Robert S. Mantell BBO# 559715
Rodgers, Powers & Schwartz LLP
18 Tremont Street, Suite 500
Boston, MA 02108
(617) 742-7010, ext. 305

RULE 7.1 CERTIFICATION

I certify that on January 17, 2008, attorneys for the parties, Robert S. Mantell and Mark Grady, Esq., met in a good faith effort to resolve the issues raised in this motion.

Patoski motion in limine                          /s/ Robert S. Mantell