**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

RICHARD S. PATOSKI,  )
                          )
        Plaintiff,  )   **C.A. No. 05-11086**
                          )
                          )
v.                         )
                          )
ALPHONSO JACKSON, SECRETARY  )
DEPARTMENT OF HOUSING AND  )
URBAN DEVELOPMENT,  )
                          )
        Defendant.  )
                          )

**Expert Report of John G. Larsen**

## Table of Contents

| | |
|---|---|
| Introduction | 1 |
| Employment History | 2 |
| Education and Training | 3 |
| Previous Testimony | 4 |
| Publications | 4 |
| Compensation | 4 |
| Examples of Experience Demonstrating Management and Program Analyst Expertise | 5-9 |
| Background in Affirmative Action And Underrepresentation | 10-16 |
| Assignment | 17 |
| Conclusions | 18 |
| Summary of Findings | 18-23 |
| Findings | 24-64 |
| Exhibits | 65-70 |

Attachments:

1.  Resume of John G. Larsen

## Introduction

I, John G. Larsen, retired from the Federal Aviation
Administration (hereafter FAA) of the U. S. Department of
Transportation in January of 2005.  Prior to my retirement, my
position title was Management Analysis Officer, FAA Southern
Region.  My position was in the Management and Program Analyst,
GS-0343, series and I was in the 'K' pay band (General Schedule
grade 15 equivalent).  My organizational title was Manager,
Management Systems Division, FAA Southern Region.  I served in
that position from January of 1980 until my retirement in
January of 2005.

My principal job responsibilities included: 1) advising senior
regional managers and the Regional Administrator on issues
affecting both FAA regional and agency-wide policies and
programs; and 2) management of the regional Information Resource
Management program.  My resume is attached to this document
(Attachment 1).

1

## Employment History

I had been employed by the FAA since October 28, 1968.  I have held Management Analyst and Program Analyst positions in FAA since 1972 as follows:

June 1972 – June 1976

 Program Analyst, Appraisal Staff, Office of the Regional Director, FAA Eastern Region.  In this position I participated in an evaluation program encompassing technical program operations, managerial continuity and effectiveness, and a variety of personnel matters including employee morale, working conditions, internal and external communications, Equal Employment Opportunity (hereafter EEO) and Civil Rights.

June 1976 – January 1980

 Management Systems Officer and Manager of the Management Systems Division, FAA Eastern Region.  My job responsibilities in this position were comparable to those of my last position before retirement.

January 1980 – January 2005

 Management Analysis Officer and Manager of the Management Systems Division, FAA Southern Region.

2

## **Education and Training**

In 1976 I earned a Master in Public Administration Degree from
the John F. Kennedy School of Government, Harvard University.
My undergraduate degrees were from Nassau Community College
(1968 Associate in Applied Science) and Dowling College (1975
Bachelor of Science).

My undergraduate course work included 24 semester hours in
Accounting.  Pertinent courses at the JFK School of Government
included a 160 hour Seminar in Quantitative Analysis for Public
Administrators (August 1975) and the following courses:

> Analysis for Decision Making,
> Law and Public Policy: Political Analysis,
> Public Management: Budgeting and Information Systems, and
> Educational Statistics.

I have completed a wide variety of management and information
technology training.  I graduated from the FAA Executive School
in 1978 and completed the FAA Executive Development Program in
1982.  In 1974 I completed a training program in Operational
Audit and Development of Operational Audit Findings conducted by
the Institute of Internal Auditors.  In 1974 I completed audit
training conducted by the U.S. General Accounting Office.

3

## Previous Testimony

I testified as an Expert Witness in Ryan v. Mineta in the United States District Court, District of New Jersey, in 2004. Additionally, I have testified in three Equal Employment Opportunity Commission (hereafter EEOC) Hearings, one (Villareal) in Dallas, TX, one (Carter) in Philadelphia, PA., and one (Boyd) via telephone. I have been scheduled to testify at other EEOC Hearings in cases that were apparently settled before my testimony was needed.

## Publications

Except for my Expert Report in Ryan v. Mineta, I have not produced any publications outside of FAA. Evaluations, Appraisals and management studies were documented with reports internal to the FAA.

## Compensation

The parties have not yet reached an agreement on compensation.

4

## Examples of Experience Demonstrating Management and Program

## Analyst Expertise

I have led, conducted or participated in the following:

1973-1979

Program appraisals of various FAA programs in the FAA
Eastern Region including: Airports Division, Flight
Standards Division, Employment Branch, and the Aviation
Medical program at the Washington Air Route Traffic Control
Center.

Studies of the Federal Aviation Regulation Part 157
program, Air Traffic Sick Leave Abuse, and use of Quality
Step Increase Awards for supervisors and managers in the
Air Traffic Division.

Study of Air Traffic Training failure rates at the New York
Air Route Traffic Control Center based on allegations of
racial disparity raised by Congressman Clay in response to
constituent complaints.

Served as the representative of the Regional Director on
the national Steering Committee for the Air Traffic
Staffing Standards project.

5

1980-2003

Evaluation of the Southern Region Personnel Management
Division performed for a new Regional Director.  This
evaluation was conducted with two FAA Headquarters
personnel and was actually assigned to me by the Regional
Director before my transfer to the Southern Region.

Analysis of the distribution of the air carrier fleet in
the U.S. by FAA region as compared to the distribution of
Aviation Safety Inspector staffing by FAA region.  This
study resulted in additional Air Carrier Inspector staffing
in the FAA Southern Region.

Analysis of Flight Standards Field Office workload by
geographic area with recommendations for optimum field
office distribution in the Southern Region.  This study was
published within FAA and was commended by the FAA
Headquarters Flight Standards organization.

Participated, on behalf of the FAA Regions, with the FAA
Administrator and other senior FAA headquarters personnel
in development of the FAA Information Resource Management
Plan.  The resulting plan was published within the FAA.

Participated in the development of a Five-Year Productivity
Improvement Program for the FAA Administrator.

Analysis and leadership in the restructuring of, the
Southern Region printing program.  This effort was
undertaken at the request of the Regional Administrator
because the regional printing program was in a deficit
spending posture.

Participated in the development of national organizational
performance indicators for the FAA Administrator, with
particular involvement in the development of productivity
and efficiency indicators for Air Traffic field facilities.

Analysis of overtime waste in the Southern Region Civil
Aviation Security Division that resulted in savings of
approximately $100,000.00 per year in the Southern Region
alone.

Represented the Southern Region in a national review of
Executive Staff grade levels across the regions.

Study of the transition from the General Schedule pay
structure to the FAA Pay Banding system implemented as part
of FAA personnel reform.  This study identified disparate

impact (based on five year salary projections) on
minorities and females because they were disproportionately
represented in the lower step levels going into the
transition.

· Various studies of Diversity and Affirmative Action
programs as discussed under Background in Affirmative
Action and Underrepresentation.

Designated to advise the Southern Region Regional
Management Team (hereafter RMT) on affirmative action and
underrepresentation matters in development of the *Southern
Region Strategic Plan to Manage Diversity*.

Designated to assist the Diversity Oversight Board for the
Executive Director for Operations in the areas of Merit
Promotion Plan (hereafter MPP) and underrepresentation.

At the request of the Regional Administrator and with
extensive input and editorial assistance from the Human
Resource Management Division Manager and the Deputy
Regional Counsel, prepared a draft Affirmative Action
directive for the FAA .  This directive was presented by
the Regional Administrator to various FAA Headquarters
officials, but it was never issued as an agency directive.

8

Analysis and periodic reporting of Air Traffic Controller Sick Leave usage, overtime abuse and liability for credit hours accrued in the FAA Southern Region.

Analysis of requirements and development of software to track FAA MPP actions (announcements, applications & selections) for all FAA regions and centers.

Analysis of requirements and development of software to support aircraft arrival and departure reservations for airports in the Atlanta area for the 1996 Olympic Games.

Analysis of requirements and development of software to convert print image files generated by the FAA's accounting system into spreadsheet files and to automatically make electronic distribution of such files to users throughout the region based on their individual needs for various standardized reports.

Analysis of optimum customer service and support ratios for all regional headquarters organizations in all regions with projections of potential staffing savings if optimum levels were achieved in all locations with reduction in the number of FAA regions.

## **Background in Affirmative Action and Underrepresentation**

In 1992 I was presented with a proposal to capture minority and gender information about MPP applicants using an Office of Management and Budget form.  This proposal was made to me by Ms. Wanda Reyna who was a manager in the FAA Headquarters Human Resource Management organization.  I advised Ms. Reyna that it would be far more efficient to capture such information using data already available to us in the Consolidated Personnel Management Information System (hereafter CPMIS) since the vast majority of all applicants for MPP announced positions were already FAA employees.  I explained how this might be done with relatively simple software.  I was then asked by Ms. Reyna to develop a software application to accomplish this purpose.  I developed the MPP Tracking system, which was ultimately deployed to, and used by, all FAA regions and centers.

Ms. Reyna had explained that the FAA needed minority and gender information on MPP applicants and selections to determine the extent to which minorities and females were eligible for and selected for MPP announced positions.  The objective was to quantify the opportunities managers had to make minority/female selections and the extent to which these opportunities were seized.

After initial development of the MPP Tracking system, it was apparent to me that the kind of information being collected by this system was highly sensitive and, since I had not been able to obtain details about how the FAA intended to use the information (e.g., reports required, etc.), I began to research the subject.  Initially, I relied on General Accounting Office reports on Equal Employment Opportunity and Affirmative Action to find the appropriate regulatory guidance.  I also relied on information available from two managers in the Southern Region Human Resource Management Division who each had considerable experience with these matters; one while serving as the Personnel Officer at the Atlanta Federal Penitentiary, and the other while working in the Department of Defense.  Additionally, I relied on the Southern Region Deputy Regional Counsel for clarification and interpretation of the regulatory guidance I was researching.

In February 1993, while participating with the Regional Management Team, which consists of the Regional Administrator and all regional division managers and staff officers, in the development of the *Southern Region Strategic Plan to Manage Diversity*, I raised my concerns about the FAA's apparent deviation from existing Office of Personnel Management (hereafter OPM) and EEOC guidance on affirmative action.

11

Specifically, we were not identifying underrepresentation or targeting affirmative action at underrepresented EEO groups. Dale Huddleston, then Manager of the Southern Region Human Resource Management Division, agreed that we were in violation of Title V and OPM/EEOC guidance and he told us that this had been reported to him at a recent meeting of all regional Human Resource Management Division Managers. Based on this discussion, the RMT agreed to adopt the "EEOC Model", meaning that we would target affirmative action at underrepresented EEO groups. I subsequently prepared briefings for managers of the larger divisions showing them how their minority/female hiring accomplishments were generally not benefiting underrepresented EEO groups and what EEO groups were actually underrepresented in their respective organizations. For these calculations I used personnel data from CPMIS and *1990 Census Availability Data by PATCOB* produced by the EEOC Office of Federal Operations.

In December 1993 I prepared a memo to the Regional Administrator raising my concerns in the area of affirmative action and underrepresentation based on then recently issued FAA and AXO (Executive Director for Operations) Diversity Plans. The AXO plan was being interpreted as calling for minority and/or female selections in at least 50% of all cases. After reviewing the memo, he asked me to take essentially the same text and change

12

it into a memo from him to the Executive Director for
Operations.

On February 15, 1994, the Acting Executive Director for
Operations sent a memorandum to the AXO Management Team
(managers and executives reporting to the Executive Director for
Operations) that appeared to be in response to the December 1993
memorandum.  The February 15, 1994, memorandum stated:

    "Recently, it has come to my attention that the targeted
    recruitment efforts set forth in the June 4, 1993, edition
    of the AXO Diversity Plan may have led to some confusion
    about our plans for affirmative action.…  Targeted
    recruitment efforts dictate that we set different targets
    for each organization.  There can be no 'across the board'
    goal, since workforce composition and available labor force
    vary by organization and geographic location."

Having established contacts with personnel in the U.S. Census
Bureau and the EEOC Office of General Counsel, I continued to
obtain data, documentation, guidance and consultation, which
enabled me to track policy changes e.g., from calculating
underrepresentation based on broad occupational categories
(Professional, Administrative, Technical, Clerical, Other and
Blue Collar) to calculations based on occupation-to-occupation

13

comparisons.  I obtained the *Census/OPM Occupation Cross-Classification Table by Census Occupation Code* referred to in the DOJ Post-*Adarand* Guidance for use in matching OPM and census occupational categories.  I also obtained the *Census of Population and Housing, 1990: Equal Opportunity File on CD-ROM* and the associated documentation from the Bureau of the Census.

The Executive Director for Operations created a Diversity Oversight Board and assigned Mr. Ted Beckloff, then Regional Administrator, a leadership role in that activity.  In turn, Mr. Beckloff tasked me to provide support to that board in underrepresentation matters.

In 1994 Mr. Ted Beckloff, who had been the Regional Administrator, retired and Ms. Carolyn Blum was appointed to that position.  Shortly after Ms. Blum's arrival, the Human Resource Management Division Manager and I briefed her on the problems we had observed with FAA's approach to Affirmative Action.  On my suggestion, she asked that I draft an FAA Order that would both contain enough information so as to educate FAA personnel on Affirmative Action regulations and provide the framework for a defensible Affirmative Action program in the FAA.  I prepared that draft with input from the Human Resource Management Division manager and with considerable editorial assistance from the Deputy Regional Counsel.

14

In 1994 FAA conducted a "Buy Out" encouraging many employees to retire in order to reduce FAA staffing.  After the "Buy Out" was completed, I prepared an underrepresentation analysis for FAA and transmitted it to the FAA Headquarters Human Resource Management organization so as to offer an updated baseline.

In 1995 I completed another analysis of Affirmative Action in FAA which examined indications that the "50-50" goal was more a quota than a goal.

In 1996 I obtained a copy of the February 29, 1996, U. S. Department of Justice Memorandum to General Counsels Re: Post-*Adarand* Guidance on Affirmative Action in Federal Employment (hereafter DOJ post-Adarand guidance)[Exhibit 1].  Initially, I received an electronic version from an FAA colleague and subsequently I obtained a signed paper copy from the Office of Diversity, Office Personnel Management.  In 1997 I completed an analysis of the seriously flawed methodology FAA employed in calculating EEO group underrepresentation for the FAA's 1997 Affirmative Employment Program, as compared to the specific guidance provided in the DOJ memo.

Both of these studies were sent to senior FAA officials in FAA Headquarters.  In neither case did I receive any feedback to

indicate that the problems I identified would be corrected.
Moreover, over the years of my involvement in these matters I
have never received any feedback taking substantive issue with
my interpretation or application of the guidance I was citing or
with my arguments and conclusions based thereon.

.

In October 2000 I prepared an underrepresentation analysis of
the Southern Region Airports Division.  I conducted this
analysis at the request of Steve Brill, then Manager of the
Southern Region Airports Division.  Mr. Brill stated that he
needed the analysis for a planned meeting of all Airports
Division Managers with Woodie Woodward, then Associate
Administrator for Airports.

In 2001 in preparation for a Work Environment Improvement
Initiative (hereafter WEII) program in the Southern Region, I
prepared an underrepresentation analysis for the entire Southern
Region examining on board staffing, promotions and cash awards
to determine whether and where any evidence of disparate impact
might exist.  My analyses were delivered to the contractor,
Roosevelt Thomas Training and Consulting, which specializes in
diversity matters and who was working on the WEII project for
FAA.  I did not receive any feedback from the contractor
indicating disagreement with either my methodology or
conclusions.

16

After the parties entered into a settlement agreement in Ryan v. Mineta, I participated extensively in the agreed upon effort to identify and revise or eliminate offending FAA policies, programs and procedures.

## Assignment

I have been asked to address the following questions:

1. Whether the U. S. Department of Housing and Urban Development (hereafter HUD) Affirmative Employment Plans and Federal Equal Opportunity Recruitment Plans since 1993 [as reflected in exhibits 10-44 and 55-57] are in or out of compliance with the standards established by the U.S. Supreme Court's decision in the *Adarand* case, as interpreted by the U. S. Department of Justice and communicated by memorandum dated February 29, 1996, to General Counsels Re: Post-*Adarand* Guidance on Affirmative Action in Federal Government [exhibit 1].

2. Whether HUD, as reflected in documents [exhibits 10-57] since 1993, actually utilized its Affirmative Employment Plans in reaching it's promotion decisions nationally, including in Massachusetts.

17

## Conclusions

1.  It is my opinion, to a reasonable degree of probability and within my expertise as a Management and Program Analyst, that the HUD's Affirmative Employment Plans since 1993 [as reflected exhibits 10-44 and 55-57] are NOT in compliance with the standards established by the U.S. Supreme Court's decision in the *Adarand* case, as interpreted by the U.S. Department of Justice [exhibit 1].

2.  It is my opinion, to a reasonable degree of probability and within my expertise as a Management and Program Analyst and based on my review of documents [exhibits 10-57], that since 1973 HUD has actually utilized its Affirmative Employment Plans in reaching its promotion decisions nationally, including in Massachusetts.

## Summary of Findings

- HUD's various affirmative action documents calling for race and gender conscious employment related decision making did not satisfy the requirements of the Department of Justice guidance in that HUD did not use the proper relevant labor pool(s) for making the necessary comparison(s), e.g., next lower grade level representation in promotion calculations.

18

- HUD's various affirmative action documents consistently
  called for increasing the promotion rates for minority and
  female EEO group(s), even when the proper comparison(s)
  would have indicated representation of the preferred EEO
  group(s) in excess of parity at the level(s) into which
  promotions were made.

- HUD's various affirmative action documents consistently
  called for goals to add members of minority and female EEO
  group(s) into categories of positions, even where HUD's own
  analysis showed such preferred EEO groups in excess of
  parity in those positions.

- HUD's various affirmative action documents established
  promotion related goals that were generally applied across
  the entire organization and throughout the grade structure
  without any evidence of tailoring to specific geographic
  areas, organizational components, occupations or grade
  levels, where underrepresentation may have occurred.

- HUD policy documents placed an emphasis on diversity from
  the highest levels in HUD.  HUD policy established
  requirements for the performance of managers and
  supervisors to be evaluated based on their accomplishment

19

of HUD's affirmative action and diversity goals.  HUD's

policy in this regard was consistent with 5 U.S.C.

§4313(5), which requires Senior Executive Service

performance appraisals to be based on, among other factors,

"meeting affirmative action goals."

- The deposition of one senior HUD executive confirms that
  the Secretary personally expressed his support for
  diversity and that this executive actually considered race
  and gender in making recommendations for career development
  promotions.

- Significant indications of race and gender consideration in
  HUD employment related decision making include the
  reduction in white male percentage representation in HUD
  grades 13-15 by 20.83% (from 42.78% to 33.87%) between
  September 27, 1997 and September 30, 2004.  During the same
  period white male percentage representation in HUD grades
  1-12 increased by 21.84% from 5.83% to 7.11%.
  Additionally, the average grade of white male HUD employees
  increased by only 2.84% during this period as compared to
  an increase of 8.48% for minority and female HUD employees.

- Indications of race and gender consideration adverse to
  white males in HUD employment related decision making over

the period FY-1993 through FY-2003, are illustrated in the following charts:



HUD White Male On Board Percentage at Beginning of Each Fiscal Year



White Male Percentage Representation in GS/GM 13-15 Grades at Beginning of Each Fiscal Year



White Male Representation in Administrative Occupational Category at Beginning of Each Fiscal Year



White Male Percentage of Promotion Parity

(Percentage of promotions/percentage representation in work force)

- HUD's various affirmative action documents ignore any statistical indication of underrepresentation of white males or of a "glass ceiling" limiting the promotion

22

potential for white males.  All of the reviewed (FY-1993 and FY-1995-2003) HUD AEP Update Reports consistently indicated that white males were underrepresented in all of the six PATCOB categories and HUD did not establish any goals to rectify these instances of underrepresentation. HUD's failure to address white male underrepresentation is consistent with guidance from EEOC.

• HUD's current and continuing intent to consider race and gender in employment related decision making is evidenced by HUD's FY-2006 Annual Performance Plan and HUD's Strategic Plan for FY-2003 – FY-2008 which include contain language indicating an objective to further diversify its workforce.

• The earliest evidence of HUD underrepresentation calculations that appear to comply with DOJ Post-Adarand guidance was a report based on September 30, 2005, data which showed white male underrepresentation in 14 of the 17 major job series in HUD.  This report also showed Black male representation substantially above parity in all 17 job series and Black female representation substantially above parity in all but one of the 17 job series.

## FINDINGS

1.  Underrepresentation is defined in the Civil Service Reform
    Act (5 U.S.C. 7201) as meaning a situation in which the
    number of members of a minority group designation within a
    category of civil service employment constitutes a lower
    percentage of the total number of employees within the
    employment category than the percentage that the minority
    group constituted within the labor force of the United
    States.

    Underrepresentation in an entire occupational category
    might be used to see if changes in recruitment from the
    outside would be appropriate.  In this case comparisons are
    made with the qualified population in the geographic area
    from which recruitment is done.

    In contrast, underrepresentation at a given grade level
    within an occupational category might be used to determine
    whether changes in the promotion process are warranted.   In
    this case the relevant labor force for comparison purposes
    is the pool (generally the next lower grade level) from
    which promotions are made.

2.   The DOJ Post-*Adarand* guidance contains the following
     [exhibit 1 – p.8-9]:

> "Whenever an agency establishes an affirmative action
> plan, based on statistical comparisons or anecdotal
> information, it is important that agencies carefully
> match the job qualifications in the jobs at issue with
> those in the relevant applicant pool as closely as
> possible.  It would not be sufficient for an agency to
> have only a general sense that its EEO profile indicated
> minority underrepresentation.  The agency must go through
> the process of comparing minority representation in the
> job category at issue to the relevant pool in the
> civilian labor force to determine whether there is a
> sufficiently substantial disparity and, therefore, a
> predicate for affirmative action.
>
> Depending on the circumstances, the relevant labor pool
> is measured either by applicant flow data or the civilian
> labor force.  An underrepresentation of minorities when
> compared to the general population or the general
> civilian labor force, however, would not be a sufficient
> predicate for the use of racial criteria in employment
> decisions when special skills or qualifications are
> required to perform the job."

25

...

"For example, if an agency or office sought to determine
whether it has an underrepresentation of African-American
engineers, it would not compare the percentage of
African-American engineers that it employed with the
percentage of African-Americans in the civilian labor
force generally, or with the percentage of African-
Americans in a 'professionals' category of which
engineers may be only a part.  Since engineers possess
unique qualifications not shared by the population or
professionals at large, the comparison should be between
the percentage of African-American engineers employed by
the agency or office and the percentage of African-
American engineers in the civilian labor force.  Where
the fit cannot be so precise, the agency should use the
qualified labor force that most closely matches the
agency's qualifications for the job at issue.  If an
agency were going to fill SES positions and wanted to
know if it had an underrepresentation of Hispanics in its
SES ranks, the agency would compare the number of its
Hispanic GS-15s, and others of similar qualifications
eligible for placement into an SES positions, (sic) to
the number of Hispanic SESers it employs.

26

This analysis should be performed at whatever level
within the agency that the employment decisions are made.
The fact that there are sufficient disparities to justify
race-based action by one component of an agency does not
mean that other components may take such action, when
employment decisions are made by individual components."

...

"It is important that the statistical evidence on which the
decisions to use racial and ethnic criteria is made be
thorough and accurate.  The use of sound statistics will
enable an agency to establish a justification for the use of
race if challenged.  The use of race in the affirmative action
context will be upheld where there is a sound basis for its
use; absent such sound support, a non-minority disadvantaged
by the use of race could successfully challenge the use of an
affirmative action plan."

3.   The U.S. Government Accountability Office (GAO) [then the U.S.
     General Accounting Office] in their March 2001 report number
     GAO-01-377 [exhibit 8 – p.6] stated:

     "EEOC also said it advises agencies, in determining whether
     underrepresentation of minorities exists in the various
     levels of the workforce, to follow the guidance contained
     in the Department of Justice's February 29, 1996,
     memorandum on affirmative action in federal employment.

27

Among other things, that memorandum gives examples of comparative labor forces that agencies can use to determine whether minority groups are underrepresented in particular jobs. For example, the memorandum states that an agency would determine whether minorities were underrepresented in its workforce by comparing minority representation in the job at issue to the relevant or qualified labor pool in the CLF, rather than to the national CLF. The memorandum also indicates that where the job at issue cannot be precisely matched to a job in the CLF, an agency should use the qualified labor force that most closely matches its qualifications for the job at issue. For example, the memorandum states that an agency would determine whether minorities were underrepresented in its SES workforce by comparing the number of minority GS-15 employees it employs, and others with similar qualifications, to the number of minority SES members it employs."

4.   EEOC Frequently Asked Questions regarding EEOC Management Directive 715 [exhibit 4] include the following references (items numbered 12 and 13) to the DOJ Post-*Adarand* guidance:
   "If a federal agency desires to develop numerical objectives or goals, the agency's General Counsel should carefully review the DoJ Memorandum before establishing any goals."
   and

"Before a federal agency uses ethnicity or race as a basis for an employment decision, the agency must satisfy strict scrutiny to ensure that the decision promotes 'compelling' governmental interests and that it is 'narrowly tailored' to serve those interests.  Again, the agency's General Counsel should carefully review the DoJ Memorandum before establishing any preferences."

5.   HUD, apparently in compliance with an October 18, 1989, EEOC memorandum from James H. Troy, then Director, Office of Program Operations, to Directors of EEO, [exhibit 7] has ignored, and continues to ignore, statistical indications of underrepresentation of white males.  This "Troy Memorandum" stated:

"Our review of the multi-year affirmative employment plans submitted in accordance with EEOC Management Directive 714 revealed that some clarification of the directive's language and intent is necessary.  Some agencies apparently concluded that the inclusion of White Males in our definition of EEO Groups was a signal requiring the development of specific objectives for that group when manifest imbalance or conspicuous absence was determined.  Therefore, these agencies' affirmative employment plans contained numerical objectives for this group in clerical and other low graded PATCO occupations.

29

Management Directive 714, while identifying white males as an EEO group, does not intend that such objectives be developed as part of the required multi-year affirmative employment plans.  Such objectives appear to be in contradiction to the intent and language of Section 717 of the Civil Rights Act, Executive Order 11478, all affirmative action guidelines, as well as legislative and executive history surrounding the development and implementation of these documents.  Clearly, the historical intent of affirmative action in the federal service is to eliminate the effects of past and present employment discrimination against minorities and females."

6.    In Fiscal Years 1993 and 1995 through 2003 the HUD AEP Update Reports consistently indicated that white males were underrepresented in all of the six PATCOB categories [exhibits 10 - p.DII-8, 11 - p.DII-10, 12 - p.DII-10, 13 - p.DII-10, 15 - p.DII-12, 17 - p.DII-18, 18 - p.DII-15, 19 - p.DII-15, 20 - p.DII-14] and HUD did not establish any goals to rectify these instances of underrepresentation.

7.    The HUD FY-1997 AEP Accomplishment Report [exhibit 14 - p.DVI-11], in Program Element VI., Promotions, included the following:

"PROBLEM/BARRIER STATEMENT: The promotion rates for some EEO groups (Black males, Hispanic males, Asian males, Asian

30

females, and Indian males) are below their representation in
the Department's work force.

OBJECTIVE: Increase the promotion rates (Combined,
Competitive, and Non-competitive) for Black males, Hispanic
males, Asian males, Asian females, and Indian males."

The same document indicated [p. DVI-2] that white males and
females constituted 28.10% and 28.45% of HUD's work force
respectively.  While identifying the above stated problem with
the promotion rates of some other groups, the report indicated
that the promotion rate for white males (9.2%) was less than
one-half of the promotion rates for both white females (19.0%)
and for all minorities and women (19.1%), but did not
acknowledge this disparity as any kind of problem or barrier to
be dealt with.

DOJ post-*Adarand* guidance requires underrepresentation at a
given grade level to be based on a comparison with the
representation of the same EEO group at the next lower level or
the population from which selections to the grade level being
studied are normally made.  HUD, instead, compared the
percentage of promotions received by an EEO group with the
percentage of that group in the entire Department.

31

Black males, Hispanic males and Indian males were all represented at greater percentages in the GS/GM 13-15 group than they are at the GS-9-12 group from which promotions to the GS/GM 13-15 level would normally be made [p.DS-16]. Additionally, these groups were also represented at greater percentages in the Senior Level than in the GS/GM 13-15 group from which promotions into the Senior Level would normally be made. Thus, HUD's broad objective to increase promotion rates for the specified EEO groups was not in conformance with the DOJ post-*Adarand* guidance.

8.    The HUD FY-1998 AEP Accomplishment Report [exhibit 16], using data as of September 30, 1998, similarly concluded (p.DVI-13) that "The promotion rates for some EEO groups (Black males, Hispanic males, Asian males, Asian females, and Indian males) are **below** their representation in the Department's workforce." HUD then stated an objective to "Increase the promotion rates (Combined, Competitive, and Non-Competitive) for Black males, Hispanic males, Asian males, Asian females and Indian males." The on-board staffing data by grade level group [p.DS-16], as in the previous year, did not support the conclusions or objectives regarding increasing the promotion rates of Black males or Hispanic males. Black males were represented at 12.0 percent of the Senior level, 10.2% at the GS/GM 13-15 level and 7.9% at the GS 9-12 level. Hispanic males were represented at 3.0% in the

Senior level, 3.1% in the GS/GM 13-15 level and 2.7% at the GS 9-2 level.

9.      The HUD FY-1999 AEP Accomplishment Report [exhibit 18], using data as of September 30, 1999, also concluded (p.DVI-11) that "The promotion rates for some EEO groups (Black males, Black females, Hispanic males, Hispanic females, Indian males, and Indian females) are **below** their representation in the Department's workforce. The across-the-board decrease in the promotion rates for White females is also a concern." HUD then stated the objective: "An increase in the percentages of: (1) Combined, Non-Competitive, and Competitive promotion rates for White females, Black males, Hispanic males, and Indian males; (2) Combined and Non-competitive rates for Hispanic females; (3) Combined and Competitive rates for Indian females; and (4) Competitive rates for Black females." A number of action items to accomplish this objective were then stated in the report.

The same document indicated [p.DVI-3] that the rate of non-competitive promotions for white males (14.7%) was less than one-half of the non-competitive promotion rates of both white females (32.3%) and Black females (33.5%), but did not acknowledge any potential problem or barrier associated with this disparity.

DOJ post-*Adarand* guidance clearly requires underrepresentation
at a given grade level to be based on a comparison with the
representation of the same EEO group at the next lower level or
the population from which selections to the grade level being
studied are normally made.  HUD compared the percentage of
promotions received by an EEO group with the percentage of that
group in the entire Department.

Black males, Hispanic males and Indian males were all
represented at greater percentages in the GS-13-15 group than
they were at the GS-9-12 group from which promotions to the GS-
13-15 level would normally be made [p.DS-17].  Black males and
Indian males were also represented at greater percentages in the
Senior Level than in the GS-13-15 group from which promotions
into the Senior Level would normally be made.  Thus, HUD's broad
objective to increase promotion rates for the specified EEO
groups was not in conformance with the DOJ post-*Adarand*
guidance.

10.  The HUD FY-2000 AEP Accomplishment Report [exhibit 20 - p.DVI-
     13] also included the Problem/Barrier Statement: "The promotion
     rates for some EEO groups (Black males, Hispanic males, Indian
     males, and Indian females) are **below** their percentages of
     representation in the Department's work force and the continued
     decreases in promotion rates for other EEO groups (White

34

females, Black females, Hispanic females, Asian males and Asian females)." This report then stated the objective as "An increase in the percentages of: (1) Combined, Non-competitive, and Competitive promotions for Black males and Asian males; (2) Combined and Competitive for White females and Hispanic females; (3) Combined and Non-competitive for Hispanic males; (4) Non-competitive for Asian females; (5) Non-competitive and Competitive for Black females; and (6) Competitive for Indian females." The report then presented various action items designed to accomplish those objectives.

These objectives were not established as called for in the DOJ post-*Adarand* guidance, which calls for the comparison of a given EEO group's representation at a given level with the representation of the same group in the relevant labor pool (normally the next lower grade) from which selections to the higher level are normally made. Black males, Hispanic males, Asian males and Indian males were all represented at the GS-13/15 group at percentages higher than their respective representation in the GS-9/12 group from which promotions to the GS-13/15 group are normally made [p. DS-16]. Black males were also represented in the Senior Level at 13.9% compared to Black male representation of 10.5% in the GS-13/15 group.

The same report [P. DVI-2-3] showed a combined (competitive and non-competitive) promotion rate for white males (17.4%) being just 77% of the corresponding promotion rate for white females (22.5%), 71% of the rate for Black females (24.5%), and 77% of the rate for all minorities and women (19.1%), but no problem or barrier was identified with this disparity.

11. The HUD FY-2002 AEP Update Report [exhibit 23 - p.DVI-5] included the following (referring to FY-2001 promotion activity):

> "**UNDESIRED CONDITION**: The percentage of promotions for some EEO groups continues to decrease in all three (3) promotion analyses. Their percentages of promotions consistently remain [sic] below their percentage representation in the workforce.
>
> **DESIRED CONDITION**:  An increase in the promotion rates for minority and female employees with percentages of promotion consistently below their percentages of representation in the workforce and those who continue to experience decreases in the percentage of promotions being granted during the fiscal year.  To be specific: **White females** under Combined and Non-Competitive promotions **Black males** under all three (3) categories (Combined, Non-Competitive, and Competitive; [sic] **Hispanic males** and **American Indian males** under Combined and Non-Competitive; **Asian American**

36

**females** under Non-Competitive; and **American Indian females** under Competitive, and Non-Competitive."

The same report [p.DVI-2] showed that during FY-2001 8.2% of the white male work force received promotions as compared to 13.7% of the white female work force and 12.4% of the Black male work force.  The fact that the white male promotion rate was less than 60% of the rate for white females and only two-thirds of the rate for Black males was not addressed.

12.  As addressed above, HUD AEP reports frequently used a comparison of the percentage representation in the work force with percentage participation in promotions as justification for goal(s) to increase promotion rates for some EEO group(s).  Such comparisons do not comply with the DOJ post-Adarand guidance. Moreover, this faulty methodology was not even consistently applied by HUD.  As documented in HUD AEP Update Reports for fiscal years 1998, and 2000 through 2002, HUD established goals to increase the promotion rates for some minority/female EEO group(s) when the percentage representation of the benefiting EEO group in the workforce was not less than the representation of the respective group in the promotion activity reported.  In the FY-1998 report HUD established a goal to increase the competitive promotion rate of Hispanic males when the same report showed Hispanic males to be 2.6% of the work force

receiving 2.7% of the promotions (exhibit 17 - p.DVI-3).  In the
FY-2000 report HUD established goals to increase the promotion
rates of white females, Black females and Hispanic females when
the same report showed each of these groups receiving combined
promotion rates in excess of their respective representation in
the work force (exhibit 21 - p.DVI-2-4).  In the FY-2001 report
HUD established goals to increase the promotion rates of white
females and Black females when the same report showed both of
these groups having promotion rates above their respective
representation percentages in the work force (exhibit 22 -p.
DVI-2-3).  In the FY-2002 report HUD established goals to
increase the promotion rates of Asian American females and
American Indian females even though the promotion rates of both
EEO groups was at or above the percentage work force
representation of the respective group (exhibit 23 -p.DVI2-5).

13.  For the period including FY-1992 through FY-2002 data presented
     in HUD AEP reports provide the following trend information:

- White male representation in the HUD work force declined consistently as indicated in the following table:

White Male Percentage On-Board:

| FY AEP Plan Update Report | Data As Of | AEP Page | HUD Page | White Male On-Board % |
|---|---|---|---|---|
| 1993 | 09/30/92 | DV-1 [1] | n/a | 29.7% |
| 1994 | 09/30/93 | DS-6 [2] | n/a | 29.6% |
| 1995 | 09/30/94 | DV-2 | n/a | 29.1% |
| 1996 | 09/30/95 | DII-8 | n/a | 29.1% |
| 1997 | 09/30/96 | DII-8 | 3884 | 28.2% |
| 1998 | 09/30/97 | DII-7 | 3987 | 28.1% |
| 1999 | 09/30/98 | DII-7 | 4096 | 28.0% |
| 2000 | 09/30/99 | DII-9 | 4207 | 27.7% |
| 2001 | 09/30/00 | DII-9 | 4319 | 27.8% |
| 2002 | 09/30/01 | DII-3 | 4418 | 27.0% |
| 2003 | 09/30/02 | DII-3 | 4525 | 26.3% |

[1] Subtracting Minority and Female Work Force Representation (70.3%) from 1

[2] FY-1994 AEP Accomplishment Report

- White male representation in grades GS/GM 13-15 declined consistently as indicated in the following table:

White Male Percentage Representation GS/GM-13-15:

| FY AEP Plan Update Report | Data As Of | AEP Page | HUD Page | White Male 13-15 % |
|---|---|---|---|---|
| 1993 | 09/30/92 | DII-9 | n/a | 50.6% |
| 1994 | 09/30/93 | DS-18 [1] | n/a | 49.6% |
| 1995 | 09/30/94 | DII-9 | n/a | 48.0% |
| 1996 | 09/30/95 | DII-8 | n/a | 46.0% |
| 1997 | 09/30/96 | DII-8 | 3884 | 44.5% |
| 1998 | 09/30/97 | DII-8 | 3988 | 42.9% |
| 1999 | 09/30/98 | DII-7/10/11 | 4096/4099/4100 | 41.0% |
| 2000 | 09/30/99 | DII-9/15 | 4207/4213 | 40.3% |
| 2001 | 09/30/00 | DII-9/15/16 | 4319/4325/4326 | 38.1% |
| 2002 | 09/30/01 | DII-3/9/10 | 4418/4425/4426 | 37.0% |
| 2003 | 09/30/02 | DII-3/9/10 | 4525/4531/4532 | 35.5% |

[1] Calculated based on FY-1994 AEP Accomplishment Report

39

- White male representation in the Administrative

  Occupational Category declined consistently as indicated in

  the following table:

White Male Percentage Representation - Administrative Occupational Category:

| FY AEP Plan Update Report | Data As Of | AEP Page | HUD Page | White Male Admin % |
|---|---|---|---|---|
| 1993 | 09/30/92 | DII-8 | n/a | 36.2% |
| 1994 | 09/30/93 | DS-7 [1] | n/a | 35.6% |
| 1995 | 09/30/94 | DII-11 | n/a | 34.4% |
| 1996 | 09/30/95 | DII-10 | n/a | 32.8% |
| 1997 | 09/30/96 | DII-10 | 3886 | 32.3% |
| 1998 | 09/30/97 | DII-10 | 3990 | 31.3% |
| 1999 | 09/30/98 | DII-8 | 4097 | 30.9% |
| 2000 | 09/30/99 | DII-11 | 4209 | 30.2% |
| 2001 | 09/30/00 | DII-11 | 4321 | 29.7% |
| 2002 | 09/30/01 | DII-4/5 | 4419/4420 | 28.9% |
| 2003 | 09/30/02 | DII-4/5 | 45264527 | 27.5% |

[1] FY-1994 AEP Accomplishment Report

- The percentage of combined (competitive and non-

  competitive) promotions awarded to white males declined

  over the period and was consistently less than the

  proportional representation of white males in the HUD work

  force as indicated in the following table:

White Male Percentage Representation Combined (Competitive and Non-Competitive) Promotions:

| FY AEP Plan Update Report | FISCAL YEAR | AEP Page | HUD Page | WM % Comb Prom | WM Prom Parity (F/E) |
|---|---|---|---|---|---|
| 1993 | 1992 | DVI-1 [1] | n/a | 20.6% | 69.4% |
| 1994 | 1993 | DVI-3 [2] | n/a | 21.3% | 72.0% |
| 1995 | 1994 | DVI-1 [1] | n/a | 19.5% | 67.0% |
| 1996 | 1995 | DVI-2 | n/a | 18.6% | 63.9% |
| 1997 | 1996 | DVI-3 | 3944 | 16.6% | 58.9% |
| 1998 | 1997 | DVI-3 | 4053 | 15.8% | 56.2% |
| 1999 | 1998 | DVI-3 | 4162 | 15.8% | 56.4% |
| 2000 | 1999 | DVI-2/3 | 4272/3 | 24.8% | 89.5% |
| 2001 | 2000 | DVI-2/3 | 4377/8 | 22.8% | 82.0% |
| 2002 | 2001 | DVI-2/3 | 4481 | 15.7% | 58.1% |
| 2003 | 2002 | DVI-2 | 4584 | 15.0% | 57.0% |

[1] White Male percentage = 1 - Minority and Female percentage
[3] Calculated based on FY-1994 AEP Accomplishment Report

14.   HUD AEP Update Reports established hiring or internal movement
      objectives to add minorities and women in the Administrative
      occupational category when HUD's own analysis showed such
      preferred EEO groups in excess of parity in those positions.
      Update Reports for the years FY-1997 through FY-2003 report each
      included objectives to add Black females, Hispanic males and
      Hispanic females in the Administrative Occupational category
      when those groups were shown to be represented in excess of
      parity in the same reports [exhibit 15 - p.DII10&DII22, exhibit
      17 - p.DII10&DII-22, exhibit 19 - p.DII19&DII-24, exhibit 21 -
      p.DII18&DII-30, exhibit 22 - p.DII20&DII-32, exhibit 23 -
      p.DII15&DII-29, exhibit 24 - p.DII14&DII-25].

15.  In October of 2003 EEOC issued Management Directive 715 (MD-
     715)[exhibit 3] which cancelled EEOC Management Directive 714
     (MD-714)[exhibit 2], which had been the regulatory basis for
     annual preparation and submission of Affirmative Employment
     Program (AEP) plans and reports.  MD-715 eliminated the
     requirement for AEP plans and reports and established a program
     based on achieving a model EEO program free of barriers to equal
     opportunity for all.  MD-715 called for the calculation and
     reporting of EEO group "Participation Rates for Major
     Occupations" and "Distribution by Race/Ethnicity and Sex" in the
     EEOC prescribed MD-715 report forms.  However, the first report
     due under MD-715 was for FY-2004; no Affirmative Employment
     report was due to EEOC for FY-2003.

     However, HUD continued to submit annual FEORP Recruitment Plan
     reports to OPM.  The HUD FY-2003 FEORP Recruitment plan [exhibit
     33] identified underrepresented groups for which HUD would
     target recruitment.  White females, for example, were identified
     as being underrepresented in the Professional, Administrative,
     Technical and Clerical occupational categories (p.1-2).

16.  HUD's FY-2004 Affirmative Programs EEO Report [exhibit 25],
     contrary to the EEOC instructions [exhibit 5], reflects the use
     of CLF factors for the entire population of the United States

for comparison with the HUD identified major occupations, including the GS-1101 series (Table A5-1).  Thus, HUD reported participation rates for these occupations based on a comparison with the entire population, including, for example, prisoners and others who were unemployed with no civilian work experience since 1995.

17.  HUD's FY-2004 Affirmative Programs EEO Report [exhibit 25] includes data on EEO group participation in the Officials and Managers category (Table A3-1)divided into Senior Level (GS-15 and above), Mid-Level (grade 13-14), and Grade 12 and below subcategories.  According to EEOC MD-715 Frequently Asked Questions (item number 25), "…use of the Officials and Managers category further divided into hierarchical subcategories, allows for the collection of data about racial and gender stratification that can help to identify the existence of a 'glass ceiling'."

The following table reflects Officials and Managers data reported in HUD's FY-2004 Affirmative Programs EEO report:

HUD FY=2004 MD-715 Report -
Officials and Managers
(EEO group participation percentage rates)

| | White Males | White Females | Black Males | Black Females | Hispanic Males | Hispanic Females | Asian Males | Asian Females | Native-Am Males | Native-Am Females |
|---|---|---|---|---|---|---|---|---|---|---|
| Senior Level, GS-15 and above: | 7.6% | 33.2% | 18.0% | 26.8% | 4.2% | 3.9% | 2.6% | 2.0% | 1.2% | 0.1% |
| Mid-Level, GS-13/14: | 36.0% | 24.5% | 10.0% | 15.8% | 4.9% | 4.0% | 1.9% | 2.0% | 0.4% | 0.3% |
| Grade 12 and below: | 47.0% | 18.8% | 10.6% | 14.1% | 1.2% | 5.9% | 1.2% | 1.2% | 0.0% | 0.0% |

As indicated in the above table, only white males are
significantly underrepresented at the Senior Level (7.6%)
as compared to their representation in the Mid-Level
(36.0%).  The representation of every other group in the
Senior Level is at least 85% of the corresponding
representation in the Mid-Level or feeder group for the
Senior Level.  Similarly, only white males and Hispanic
females are significantly underrepresented at the Mid-Level
as compared to their respective representation in the Grade
12 and below feeder category.

18.  In August of 2006 the U. S. Government Accountability
     Office, GAO, issued report number GAO-06-832, THE FEDERAL
     WORKFORCE Additional Insights Could Enhance Agency Efforts
     Related to Hispanic Representation [exhibit 9].  This
     report recounted various federal government efforts to
     eliminate the long perceived underrepresentation of
     Hispanics in the federal workforce.  These efforts included
     the 1997 OPM 9-Point Plan and, more recently, the 2000
     Executive Order No. 13171, Hispanic Employment in the
     Federal Government and the most recent data reported by
     EEOC and OPM showing that Hispanics constituted 7.4 percent
     of the permanent federal workforce while making up 12.6
     percent of the Civilian Labor Force, CLF.  Recognizing that

44

citizenship is required for most federal jobs and that

federal workforce contains a greater percentage of

occupations that require higher levels of education than

the CLF, GAO's analysis of 2000 Census data [p. 8] showed

that Hispanics had lower citizenship rates than other

racial/ethnic groups with the exception of Asians, who had

similar rates and, after citizenship, education had the

largest effect on Hispanic representation in the federal

workforce.  GAO concluded [p.8] that, among citizens,

Hispanics were 5 percent less likely to be employed in the

federal government and, after accounting for education,

Hispanic citizens were 1.16 times or 16 percent more likely

than similarly educated non-Hispanic citizens to be in the

federal workforce than the nonfederal workforce.

This report illustrates the potential for significant

change in the outcome of underrepresentation calculations

as the relevant population data is refined to more

accurately reflect qualifications.

19.  A March 6, 1997, memorandum for All HUD Employees from then

Secretary Andrew Cuomo re: Policy Statement - Equal Employment

Opportunity, Affirmative Employment, Prevention of Sexual

Harassment, Discrimination Based on Sexual Orientation,

Employment and Accommodation of Persons with Disabilities, and

45

Disabled Veterans as published in the HUD Departmentwide FY-
1997, FY-1998 and FY-1999 Affirmative Employment (AEP) Update
Reports [exhibits 11 - p.D-3 and 13 - p.D-3 and 15 - p.D-3]
contained the following statements:

- "The EEO/AE/Diversity goals and objectives of the
  Department are expressed in HUD regulations at 24 CFR Part
  7 as well as in the multi-year Affirmative Employment
  Program (AEP) Plan.  EEO/AE/Diversity is a separate
  critical element in our managerial performance appraisal
  system, which requires the Senior Executive Service (SES)
  and managers and supervisors under the Performance
  Management and Recognition System (PMRS) to achieve
  measurable results in their management of the Department."

- "I expect all managers and supervisors to be proactive in
  implementing EEO/AE/Diversity.  The following strategies
  will, I believe, set the standard for the achievement of
  that goal:

    1.  Hold subordinate managers and supervisors
        accountable for promoting EEO/AE/Diversity in every
        aspect of the Department's policies, programs, and
        practices, including learning and practicing the
        principles fo F.A.I.R. (Feedback, Assistance,

46

Inclusion and Respect) in all interactions with
employees and HUD clients.

...

4.   Make use of Special Employment Programs to correct
the underrepresentation of minorities, women, and
persons with disabilities, i.e., Part-Time
Employment, Cooperative Education, Upward Mobility,
Special Hiring Authorities, etc.

...

8.   Refer to the AEP Plan goals and objectives before
initiating any recruitment, hiring, training,
reassignment, and promotions actions.

...

9.   Periodically review AEP progress reports and make
adjustments in activities to meet goals and
objectives."

A substantially identical policy statement was issued on April
2, 2001, by then Secretary Mel Martinez and published in the HUD
Departmentwide AEP Update Reports for Fiscal Years 2001, 2002
and 2003 [exhibits 18 - p.D-3 and 19 - p.D-3 and 20 - p.D-3]

20.   An April 10, 1998, memorandum from Saul Ramirez, Acting Deputy
Secretary,(as posted on the hudweb.hud.gov web site as of
2/10/2000) re: Equal Employment Opportunity, Affirmative
Employment and Diversity Performance Appraisal Critical Elements

47

[exhibit 36] transmitted Critical Elements to "ensure that the
appropriate emphasis is being placed on matters of Equal
Employment Opportunity (EEO), Affirmative Employment (AE), and
Diversity."  The attached "MANAGER AND SUPERVISOR
EEO/AE/DIVERSITY PERFORMANCE STANDARD" included:

   "PERFORMANCE STANDARD – FULLY SUCCESSFUL:

   1.   Takes actions and makes decisions regarding hiring,
        promotions, work assignments, training, upward mobility,
        recommendations for selection, and other personnel or
        administrative matters that further the Department's
        EEO/AE programs and policies and foster diversity within
        the HUD workplace."


21.  An Office of Departmental Equal Employment Opportunity
     Reorganization Affirmative Employment Plan published on the HUD
     web site as of November 8, 2000, [exhibit 34] contained the
     following:

     •    "The goal of the Reorganization AEP Plan is to assure a
          qualified applicant pool which increases the representation
          of women, minorities and persons with disabilities at all
          levels of the Department, and to establish a system that
          incorporates a practical, common sense approach into a
          strong commitment to redress representational imbalances in

48

the workforce, especially at the supervisory and managerial levels.

To attain this end, the Department will:

1.  Designate Affirmative Employment Program Managers on the staff of EEO Officers to be responsible for the development and management of the approved AEP Plan throughout the organization, and providing advice and guidance to managers and supervisors in Headquarters and the field in  implementing their EEO/AE responsibilities.

2.  The AEP Manager will be responsible for reviewing the recruitment, hiring, reassignment and employee development and other personnel actions taken by managers and supervisors, and advising the Primary Organization Head of the impact of those actions on the achievement of the AEP Plan goals of the organization, prior to their final approval in Headquarters or the field.

    ...

    In hiring, promotion, reassignment and recruiting situations, the Department will select from the following successful methods, or utilize other creative internal and/or external methods, to achieve a representative workforce:

    ...

49

11.    Communicate to all selecting officials the
Department's intent to increase the representation of
women, minorities and persons with disabilities in
management and supervisory positions, and the
expectation that when selections are made that
attainment of this goal will be a consideration.

...

In light of continuing and future hiring restrictions,
place special emphasis on internal movements as a
means of improving the representation of EEO groups in
the work force.  To this end, the Department will:

1.    During the annual Performance Review, rating
officials should provide an articulation of the
specific actions that managers and supervisors
have taken to rectify the imbalances that exist
in the workforce under their supervision."


22.    One of the non-selections at issue in this case involved
selections for the Community Builder program.  The HUD Office of
Inspector General (OIG) issued an audit report dated September
30, 1999, (Audit Case Number 99-FW-177-0002) [exhibit 42]
addressing HUD Community Builders hiring, functions,
responsibilities and their impact on organizations within HUD.
This report included the statements:

50

"…the Secretary indicated he wanted diversity as a selection criterion.  The Office of General Counsel properly advised him that applications could not ask the race of the candidate. However, at the same meeting, one Schedule C employee noted diversity was easy to tell from the volunteer activities in the resumes, or that one could also determine it during the interview."(p.24)

and

"HUD did not properly hire the Community Builders.  As discussed in Finding One, HUD violated federal requirements and stated intentions in hiring the Community Builders.  HUD violated federal selection process and Veterans Preference, apparently did not base the pay grades on selection ratings, hired individuals who did not meet HUD pre-stated minimum scores, and determined the skills and number of peopled needed to perform the duties."(p.69)

23.  The Community Builder hiring program addressed by the OIG report occurred during the 1997-1999 period.  As indicated in the following table using data from HUD's EEOMAS Reports [exhibit 35], overall HUD white male percentage representation was reduced by only 1.45% between September 1997 and September 2000, but decreased by 10.8% in grades 13 through 15 during the same period.

Comparison of HUD Equal Employment
Opportunity Management Analysis System
EEOMAS-001 GS&GM Reports

| | 9/27/1997 | 9/23/2000 | |
|---|---|---|---|
| GRADE | WHITE MALE % | WHITE MALE % | Percent Change |
| 15 | 54.47% | 46.95% | -13.81% |
| 14 | 48.29% | 41.23% | -14.71% |
| 13 | 36.66% | 33.56% | -8.46% |
| **13-15** | **42.78%** | **38.16%** | **-10.80%** |
| HUD TOTAL | 26.86%* | 27.45% | -1.45% |

24. One of the non-selections at issue in this case involved
    selections in the HUD Public and Indian Housing organization.
    Between FY-1996 and FY-2001 the representation of white males in
    grades 13-15 decreased by 17.8% (from 42.1% to 34.6%) while the
    representation of white females increased by 26.0% (from 21.9%
    to 27.6%) [exhibit 56 -p.7-8 and exhibit 57 - p.8]

25. Between September 27, 1997, [exhibit 35 - EEOMAS-001 reports for
    GS & GM Pay Plans] and September 30, 2004, [exhibit 25 - p.61-
    62] white male percentage representation in HUD grades 13-15
    decreased by 20.83% (from 42.78% to 33.87%).  At the grade 14
    level white male representation decreased by 30.2% from 48.29%
    to 35.18%.  During the same period white male percentage
    representation in HUD grades 1-12 increased by 21.84% from 5.83%
    to 7.11%.  Additionally, the average grade of white male HUD
    employees increased by only 2.84% during this period as compared
    to an increase of 8.48% for minority and female HUD employees.

52

26.  HUD regulations at 24 CFR Part 7 (since withdrawn) [exhibit 43]
     contained the following:

     "§7.15 Responsibilities of managers and supervisors.

     All managers and supervisors of the Department are responsible
     for:

          (a)     Removing barriers to EEO and ensuring that
          affirmative employment objectives are accomplished in
          their areas of responsibility;

          (b)     Evaluating and documenting subordinate managers
          and supervisors on their performance of EEO/ADR/AE
          responsibilities"


27.  A February 15, 2002, letter from the U.S. Equal Employment
     Opportunity Commission (EEOC) to the HUD Director, Affirmative
     Employment Division, regarding a May 3-4 and June 20, 2001,
     onsite review of the HUD's operations located in St. Louis,
     Missouri, [exhibit 6] included the following statements:

     •    "Employees who were interviewed expressed concerns that the
          agency's most recent promotions were not awarded to the
          most qualified candidates and that white male employees
          appeared to be adversely affected in promotion decisions by
          the agency."

- "During the course of our review, we were presented with information from a number of white male employees who believed that their rights under Title VII of the Civil Rights Act are being abridged.  They expressed their belief that they are being denied promotions on an equitable basis because of their sex and race, and that they are not being hired on an equitable basis because of sex and race."

- "During our review, we were provided with statistical information concerning promotion and hiring that, on its face, raises questions.  We did not attempt to secure all of the related information that would be essential to concluding whether there is, in fact, reason for concern, and we make no judgment on these issues.  However, we do suggest that agency management review these concerns, and take all appropriate steps to ensure that its hiring and promotion decisions are appropriate and free from any prohibited bias."

- And, under Recommendations, "The agency should review current staffing and promotion decisions to identify and correct barriers that exist with respect to the promotion of white males into positions GS-13 and above, and new hires into positions GS-11 and below."

This letter also requested a status report on the accomplishment
of the recommendations within six months.

28. The HUD FY-1998 Federal Equal Opportunity Recruitment Program
    (FEORP) Accomplishment Report [exhibit 26 – p.5,7,&11] included
    the following:

    • For the 0301 Misc. Administrative series identified
      Targeted Groups as being white females, Hispanic females,
      Asian-American males, Asian-American females and American
      Indian males and under REPORT OF RESULTS:
      "An analysis of Fiscal Year 1998's recruitment/hiring
      activity revealed **eighteen (18)** hiring accomplishments in
      the occupational series: **HIRES: White Females (15)** - 2 at
      the GS-15, 1 at the GS-14, and 1 at the GS-13, 1 at the GS-
      11, 6 at the GS-9 and 4 at the Administratively Determined
      (AD) pay plan; **Hispanic females (2)** - both at the GS-9; and
      **Asian males (1)** – at the GS-9.  The internal
      movement/promotions activity revealed **sixty-seven (67)**
      accomplishments for the above targeted group(s): **PROMOTIONS
      (61): White females (49)** – 1 to the SES, 5 to the GS-15, 13
      to the GS-14, 6 to the GS-13, 9 to the GS-12, 9 to the GS-
      11, 3 to the GS-9, 1 to the GS-7, and 2 to the
      Administratively Determined (AD) pay plan: **Hispanic
      females: (6)** – 1 to the GS-13, 2 to the GS-12, 1 to the GS-
      11, and 2 to the GS-9; **Asian males (2)** – 1 to the GS-15 and

1 to the GS-13; **Asian females (3)**- 1 to the GS-14, 1 at the GS-12 and 1 to the GS-9; and **Indian males (1)** - to the GS-13.  There were also six **(6) REASSIGNMENTS** into this occupational series: **Hispanic females (4)** - 1 at the GS-13, 2 at the GS-12 and 1 at the GS-11; and **Asian males (2)** - at the GS-12."

- For the 0343 Management/Program Analyst series, identified Targeted Groups as being White females, Hispanic males, Hispanic females, Asian-American males, Asian-American females, American Indian males, and American Indian females and under REPORT OF RESULTS:

"An analysis of Fiscal Year 1998's recruitment/hiring activity revealed no accomplishments in this occupational series.  The internal movement/promotions analysis revealed **forty-six (46)** accomplishments for the above targeted group(s): **PROMOTIONS (36): White females (24)** - 1 to the GS-15, 7 to the GS-14, 7 to the GS-13, 3 to the GS-12, 3 to the GS-112 and 3 to the GS-9; **Hispanic males (4)** - 2 to the GS-13 and 2 to the GS-12; **Hispanic females (4)** - 1 to the GS-14, 1 to the GS-13, 1 to the GS-11, and 1 to the GS-9; **Asian males (3)** - 2 to the GS-15 and 1 to the GS-13; and **Asian females (1)** - to the GS-13.  There were also **ten (10) REASSIGNMENTS** into this occupational series: **Hispanic males (4)** - 3 at the GS-13 and 1 at the GS-12; **Asian males (3)** -

1 at the GS-14 and 2 at the GS-13; and **Asian females (3)** –
at the GS-13."

- For the 1101 General Business and Industry series
identified Targeted Groups as being White females, Asian-
American males and Asian-American females and under REPORT
OF RESULTS:

> "An analysis of Fiscal Year 1998's recruitment/hiring
> activity revealed **six (6)** hiring accomplishments in
> this occupational series: **White females (6)** – 4 at the
> GS-15 level, 1 at the GS-14, and 1 at the GS-13.   The
> internal movement/promotions analysis revealed **274**
> accomplishments for the above target group(s):
> **PROMOTIONS (252): White females (230)** – 15 to the GS-
> 15, 51 to the GS-14, 100 to the GS-13, 45 to the GS-
> 12, and 19 to the GS-11; **Asian males (13)** – 1 to the
> GS-14, 10 to the GS-13, and 1 to the 12, and 1 to the
> GS-11; and **Asian females (9)** – 4 to the GS-13, 2 to
> the GS-12, and 3 to the GS-11.   There were also
> **twenty-two (22) REASSIGNMENTS** into this occupational
> series: **White females (11)** – 2 at the GS-14, 2 at the
> GS-13, 1 at the GS-12, and 6 at the GS-11; **Asian males
> (11)** – 2 at the GS-14, 1 at the GS-13, 7 at the GS-12,
> and 1 at the GS-11. There were no other
> accomplishments."

57

The HUD FEORP Accomplishment Reports for Fiscal Years 1999, 2001
and 2002 [exhibits 28, 30 and 32] similarly took credit for
"Accomplishments" in the form of recruiting and promotions
targeted at EEO groups.  (The FY-2000 FEORP Accomplishment
Report was not available for review)

29.  The HUD FY-2000 AEP Accomplishment Report [exhibit 20 - p.DVI-5]
included the statement:

> "The analyses of the promotions revealed that the
> Department was successful in increasing the promotion rates
> for the targeted groups as follows:
>
>     ...
>
> Black males - in all three (3) targeted promotion types -
> Combined by 108 or +2.7 percent, Non-competitive by 18 or
> +0.6 percent, and Competitive by 90 or +4.5%.
> Hispanic males - in one (1) of the targeted promotion types
> - Non-competitive by 7 or +0.5 percent.  While the number
> of Combined promotions for Hispanic males increased by 21,
> their percentage rate decreased by 0.2 percent."

As previously documented, the HUD objectives of increasing the
promotion rates for Black and Hispanic males were not based on
application of the DOJ post-*Adarand* guidance, but HUD took

credit in the FY-2000 AEP Accomplishment Report for achieving these objectives.

Similarly, HUD's FY-1999 AEP Accomplishment Report [exhibit 18 – p.DVI-5] took credit for accomplishing objectives established in the HUD FY-1999 AEP Update Report [exhibit 19] to increase the promotion rates of Black and Hispanic males, which were not justified in accordance with DOJ post-*Adarand* guidance.

30. Although HUD was not required by EEOC Management Directive to prepare and submit an Affirmative Employment Plan report to EEOC for FY-2003, HUD did prepare an AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM PLAN UPDATE REPORT FOR FISCAL YEAR 2003 – DEPARTMENTWIDE [exhibit 24].  Page D-4 of that document contains the following:

> "…I expect all managers and supervisors to be proactive in implementing EEO/AE/Diversity.  They are required to:
> 1. Hold subordinate managers and supervisors accountable for promoting EEO/AE/Diversity in every aspect of the Department's policies, programs, and practices.
>    …
> 3. Make a vigorous effort to assure full and fair representation of qualified minorities, women, and persons with disabilities, including disabled veterans

> when recruiting, hiring, and providing advancement
> opportunities.
>
> 4. Use Special Employment Programs to correct the under-
>    representation of minorities, women, and persons with
>    disabilities, including disabled veterans, i.e., Part-
>    Time Employment, Cooperative Education, Special Hiring
>    Authorities, Upward Mobility, etc."

31. HUD also prepared an FY-2003 AEP Plan Update Report (exhibit 24)
    based on September 30, 2002, data and reporting on FY-2002
    promotion activity.  This report included the following [p.DVI-
    5]:

> **UNDESIRED CONDITION**:  The percentage of promotions for
> some EEO groups continue to decrease in all three (3)
> promotion analyses (Combined, Competitive and Non-
> Competitive promotions).  Their percentages of promotions
> consistently remain below their percentage of
> representation in the workforce.
>
> **DESIRED CONDITION**:  An increase in the promotion rates for
> minority and women employees with percentages of promotion
> consistently below their percentages of representation in
> the workforce and those who continue to experience
> decreases in the percentage of promotions being granted
> during the fiscal year.  To be specific:  **White females**
> under all three (3) categories (Combined, Non-Competitive

60

and Competitive); **Black males** under all three (3)
categories; **Hispanic male**s under Non-Competitive
promotions; **Asian American** males under all three (3)
categories; and **American Indian males** under all three (3)
categories."

.

The same report [p.DVI-2] showed that while 7.1% of the white
male work force received a promotion in FY-2002, 11.8% of the
white female work force was promoted during the same period.
The fact that the promotion rate of white females was 166%
higher than that of white males was not acknowledged or
addressed as a problem, barrier or undesired condition.

32.  The President's Management Agenda (PMA) [exhibit 52] established
five government-wide and nine agency-specific goals to improve
federal management.  One of the government-wide goals addresses
Strategic Management of Human Capital (p.11).  The associated
PMA Scorecard Standards for Success [exhibit 53 - p.1] under
green for success, contains the following:

"Reduced under representation, particularly in
mission-critical occupations and leadership ranks;
established processes to sustain diversity;"

The Department of Housing and Urban Development Strategic
Plan for FY 2003-FY 2008 [exhibit 44 - p. 2] and HUD's

Annual Performance Plans for FY-2002, FY-2003 and FY-2004 [exhibits 37, 38 and 39] all contain language reflecting organizational goals, objectives and output indicators designed to, for example from the FY-2002 Annual Performance Plan (p.192), "… improve the workforce to reflect the nation's diversity by increasing the representation of under-represented groups by 0.3 percentage point." The FY-2003 Annual Performance Plan repeated the above statement from the FY-2002 plan and included (p.144) "HUD's first diversity goal is to increase the share of Hispanics to 7.3 percent of employees by FY-2003. Similarly, HUD hopes to reverse the decline in the representation of white females by reaching 26.9 percent, in order to close the gap with the CLF representation of 35.5 percent." HUD's FY-2004 Annual Performance Plan (p.149) contained "EM.1.4: Monitor and report improvements in the representation of under represented groups in the Department" and "HUD has a FY-2003 goal to increase the representation of Hispanics from 7.1 percent to 7.3 percent of employees. Similarly, HUD hopes to increase the representation of White females from 26.0 percent to 26.9 percent in FY-2003 to close the gap between their CLF representation of 35.5 percent." As previously discussed, annual OPM FEORP Reports to the Congress, which calculate underrepresentation in accordance with DOJ Post-Adarand

guidance, contradict the above referenced HUD
underrepresentation assertions.

Similarly, the HUD FY-2006 Annual Performance Plan [exhibit
40 - p.134], the HUD FY-2005 Performance Accountability
Report [exhibit 41 - P.147], and the HUD Strategic Plan FY
2003 - FY 2008 [exhibit 44 - p.2] all stated an objective
to "Rebuild HUD's human capital and further diversify its
workforce."

33.  In a May 5, 2006, deposition [exhibit 54] in the matter of
     Patoski v. Jackson, Mary Lou Crane acknowledged that:

     - While employed by HUD as the Secretary's
       Representative in Boston, she made recommendations to
       the selecting official for the second round of
       selections for the Community Builder positions [p.105,
       113 and 135].

     - Diversity (race/gender) was a consideration in at
       least some of her recommendations in this and other
       instances in which she was asked for recommendations
       [p.107-108, 114-115].

     - Had Mr. Patoski (a white male) been Black or Hispanic,
       she would have considered that as a positive factor in
       his application [p.144].

     - Her performance was evaluated on the extent that she
       complied with or promoted EEO/AA/diversity goals
       [p.55] and she understood that HUD held all managers
       and supervisors accountable for using personnel action
       opportunities for meeting the department's AEP goals
       [p.74].

     - Not recalling having seen AEP plans [p.74] and having
       no understanding of HUD hiring goals with regard to
       race or gender [p.75], her underrepresentation

63

determinations were based on looking around the office
[p.67].

- She knew that then Secretary Cuomo was committed to
  diversity [p.91], and that there had been one or more
  discussions with Secretary Cuomo about the importance
  of diversity with regard to the Community Builder
  positions [p.91].

34. The earliest HUD report that appeared to reflect
    underrepresentation calculations done in accordance with
    DOJ Post-Adarand guidance [exhibit 57 - p. HUD06202] was
    based on September 30, 2005, data.  The following table
    shows the percentage of Civilian Labor Force parity for
    White males, Black males and Black females in the 7 job
    series addressed in the report.

Source: Department of Housing and Urban Development FY-2005 Affirmative Programs Report to EEOC as
of September 30, 2005

| HUD Job Series | Percentage of Parity – 2000 Census CLF | | |
| | White Male | Black Male | Black Female |
| --- | --- | --- | --- |
| 201 – Personnel Management | 34.67% | 220.54% | 656.51% |
| 301 – General Administration | 84.50% | 236.73% | 358.35% |
| 343 – Management Analyst | 34.50% | 476.15% | 1076.47% |
| 360 – Equal Employment Compliance | 34.43% | 370.87% | 544.08% |
| 511 – Auditing | 111.43% | 248.08% | 238.89% |
| 1101 – General Business & Industry | 85.23% | 173.67% | 293.92% |
| 2210 – Info Tech Mgmt | 56.47% | 323.41% | 670.29% |

As indicated in the above table, White males were
underrepresented in six of the seven job series as compared
to Black males and Black females which were represented at
levels substantially above parity in all seven job series.
However, the report did not include any barrier
identification or plan for barrier elimination to address
this disparity.

HUD also produced a report based on September 30, 2005,
data [Exhibit 59 – p. HUD 06051-06052] which showed white
male underrepresentation in 14 of the 17 major job series
in HUD.  This report also showed Black male representation
substantially above parity in all 17 job series and Black
female representation substantially above parity in all but
one of the 17 job series.

64

In light of the above, I can only conclude that HUD's
Affirmative Employment Plans were in use since 1997 and that
these plans clearly do not comply with the DOJ post-*Adarand*
guidance.

_____          _____
John G. Larsen                           March 8, 2007
                                              Date

## EXHIBITS

1.  U. S. Department of Justice February 29, 1996,Memorandum to General Counsels Re: Post-*Adarand* Guidance on Affirmative Action in Federal Government. eeoa.army.pentagon.mil/web/doc library/acf8b0b.txt

2.  U. S. Equal Employment Opportunity Commission Management Directive 714. www.doi.gov/diversity/doc/md 714/md 714 part1.htm

3.  U. S. Equal Employment Opportunity Commission Management Directive 715 www.eeoc.gov/federal/eeomd715.html

4.  U. S. Equal Employment Opportunity Commission Management Directive 715 Frequently Asked Questions www.eeoc.gov/federal/qanda-md715.html

5.  U. S. Equal Employment Opportunity Commission Management Directive 715 Instructions www.eeoc.gov/federal/715instruct/index.html

6.  U. S. Equal Employment Opportunity Commission February 15, 2002, letter from the Director, St. Louis District Office, to the Director, Affirmative Employment Division, Department of Housing and Urban Development, RE: MD 714 On-Site Review.

7.  U. S. Equal Employment Opportunity Commission October 18, 1989, Memorandum from James H. Troy, Director, Office of Program Operations,, to Directors of EEO. [HUD005096]

8.  U. S. General Accounting Office (now General Accountability Office), GAO, March 2001 report number GAO-01-377, SENIOR EXECUTIVE SERVICE, Diversity Increased in the Past Decade. www.gao.gov/new.items/d01377.pdf

9.  U. S. General Accountability Office, GAO, August 2006 report number GAO-06-832, THE FEDERAL WORKFORCE Additional Insights Could Enhance Agency Efforts Related to Hispanic Representation.  www.gao.gov/new.items/d06832.pdf

10. U. S. Department of Housing and Urban Development FY-1993 Affirmative Employment Program (AEP) Update Report to EEOC.

11. U. S. Department of Housing and Urban Development FY-1994 Affirmative Employment Program (AEP) Accomplishment Report to EEOC.

66

12. U. S. Department of Housing and Urban Development FY-1995
    Affirmative Employment Program (AEP) Update Report to EEOC.

13. U. S. Department of Housing and Urban Development FY-1996
    Affirmative Employment Program (AEP) Update Report to EEOC.

14. U. S. Department of Housing and Urban Development FY-1997
    Affirmative Employment Program (AEP) Accomplishment Report
    to EEOC.

15. U. S. Department of Housing and Urban Development FY-1997
    Affirmative Employment Program (AEP) Update Report to EEOC.
    [HUD003859]

16. U. S. Department of Housing and Urban Development FY-1998
    Affirmative Employment Program (AEP) Accomplishment Report
    to EEOC.

17. U. S. Department of Housing and Urban Development FY-1998
    Affirmative Employment Program (AEP) Update Report to EEOC.
    [HUD003962]

18. U. S. Department of Housing and Urban Development FY-1999
    Affirmative Employment Program (AEP) Accomplishment Report
    to EEOC.

19. U. S. Department of Housing and Urban Development FY-1999
    Affirmative Employment Program (AEP) Update Report to EEOC.
    [HUD 004071]

20. U. S. Department of Housing and Urban Development FY-2000
    Affirmative Employment Program (AEP) Accomplishment Report
    to EEOC.

21. U. S. Department of Housing and Urban Development FY-2000
    Affirmative Employment Program (AEP) Update Report to EEOC.
    [HUD 004181]

22. U. S. Department of Housing and Urban Development FY-2001
    Affirmative Employment Program (AEP) Update Report to EEOC.
    [HUD 004287]

23. U. S. Department of Housing and Urban Development FY-2002
    Affirmative Employment Program (AEP) Update Report to EEOC.
    [HUD 004390]

24. U. S. Department of Housing and Urban Development FY-2003
    Affirmative Employment Program (AEP) Update Report to EEOC.
    [HUD 004498]

25.  U. S. Department of Housing and Urban Development
     AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN
     ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM PLAN UPDATE REPORT
     FOR FISCAL YEAR 2003 - DEPARTMENTWIDE.

26.  U. S. Department of Housing and Urban Development FY-2004
     Affirmative Programs Report to EEOC. [HUD004601]

27.  U. S. Department of Housing and Urban Development FY-1998
     Federal Equal Opportunity Recruitment Program (FEORP)
     Accomplishment Report. [HUD004858]

28.  U. S. Department of Housing and Urban Development FY-1999
     Federal Equal Opportunity Recruitment Program (FEORP)
     Recruitment Plan. [HUD004888]

29.  U. S. Department of Housing and Urban Development FY-1999
     Federal Equal Opportunity Recruitment Program (FEORP)
     Accomplishment Report. [HUD004892]

30.  U. S. Department of Housing and Urban Development FY-2000
     Federal Equal Opportunity Recruitment Program (FEORP)
     Recruitment Plan. [HUD004895]

31.  U. S. Department of Housing and Urban Development FY-2001
     Federal Equal Opportunity Recruitment Program (FEORP)
     Accomplishment Report. [HUD004921]

32.  U. S. Department of Housing and Urban Development FY-2002
     Federal Equal Employment Opportunity Recruitment Program
     (FEORP) Departmentwide Recruitment Plan.

33.  U. S. Department of Housing and Urban Development FY-2002
     Federal Equal Opportunity Recruitment Program (FEORP)
     Accomplishment Report. [HUD004986]

34.  U. S. Department of Housing and Urban Development FY-2003
     Federal Equal Opportunity Recruitment Program (FEORP)
     Recruitment Plan. [HUD005017]

35.  U. S. Department of Housing and Urban Development,
     Departmental Office of Equal Employment Opportunity,
     Reorganization Affirmative Employment Plan.

36.  U. S. Department of Housing and Urban Development Equal
     Employment Opportunity Management Analysis System reports
     (EEOMAS - 001), Breakdown by Grade or Level Within Pay
     Plan, as of September 27, 1997, and September 23, 2000.

37.  U. S. Department of Housing and Urban Development April 10, 1998, Memorandum from Saul Ramirez, Acting Deputy Secretary, Re: Equal Employment Opportunity, Affirmative Employment and Diversity Performance Appraisal Critical Elements and the Manager and Supervisor EEO/AE/Diversity Performance Standard attached thereto.

38.  U. S. Department of Housing and Urban Development FY-2002 Annual Performance Plan. www.huduser.org/publications/polleg/fy2002app.html

39.  U. S. Department of Housing and Urban Development FY-2003 Annual Performance Plan. www.huduser.org/publications/polleg/fy2003app.html

40.  U. S. Department of Housing and Urban Development FY-2004 Annual Performance Plan. www.hud.gov/offices/cfo/pafinal.pdf

41.  U. S. Department of Housing and Urban Development FY-2006 Annual Performance Plan. www.hud.gov/offices/cfo/reports/pdfs/app2006.pdf

42.  U. S. Department of Housing and Urban Development FY-2005 Performance and Accountability Report. www.hud.gov/offices/cfo/reports/2005par.pdf

43.  U. S. Department of Housing and Urban Development, Office of Inspector General Report - Audit Case Number 9-FW-177-0002 dated September 30, 1999. www.hud.gov/oig/ig960002.pdf

44.  U. S. Department of Housing and Urban Development Regulations at 24 CFR 7.15. www.access.gpo.gov/nara/cfr/waisidx_03/24cfr7_03.html

45.  U. S. Department of Housing and Urban Development Strategic Plan FY 2003-FY 2008 www.hud.gov/offices/cfo/reports/03strategic.pdf

46.  U. S. Office of Personnel Management FY-1997 Federal Equal Opportunity Recruitment Program (FEORP) Report to Congress.

47.  U. S. Office of Personnel Management FY-1998 Federal Equal Opportunity Recruitment Program (FEORP) Report to Congress.

48.  U. S. Office of Personnel Management FY-1999 Federal Equal Opportunity Recruitment Program (FEORP) Report to Congress.

69

49.  U. S. Office of Personnel Management FY-2000 Federal Equal
     Opportunity Recruitment Program (FEORP) Report to Congress.
     www.opm.gov/feorpreports/

50.  U. S. Office of Personnel Management FY-2002 Federal Equal
     Opportunity Recruitment Program (FEORP) Report to Congress.
     www.opm.gov/feorpreports/

51.  U. S. Office of Personnel Management FY-2003 Federal Equal
     Opportunity Recruitment Program (FEORP) Report to Congress.
     www.opm.gov/feorpreports/    .

52.  U. S. Office of Personnel Management FY-2004 Federal Equal
     Opportunity Recruitment Program (FEORP) Report to Congress.
     www.opm.gov/feorpreports/

53.  The President's Management Agenda
     www.whitehouse.gov/omb/budget/fy2002/mgmt.pdf

54.  The President's Management Agenda (PMA) Standards for
     Success www.whitehouse.gov/results/agenda/standards.pdf

55.  May 5, 2006, deposition of Mary Lou Crane in the mater of
     Richard S. Patoski v. Alphonso Jackson.

56.  Department of Housing and Urban Development Assistant
     Secretary for Public and Indian Housing Affirmative
     Employment Program Accomplishment Report for FY-1997. [HUD
     002471]

57.  Department of Housing and Urban Development Assistant
     Secretary for Public and Indian Housing Affirmative
     Employment Program Accomplishment Report for FY-2002. [HUD
     002661]

58.  Department of Housing and Urban Development FY-2005
     Affirmative Programs Report to EEOC. [HUD 06131]

59.  Department of Housing and Urban Development Report VP715A1,
     Total Workforce – Distribution by Race/Ethnicity and Sex
     From September 30, 2004 to September 30, 2005. [HUD 0645]

Expert Report of John G. Larsen                                              Attachment 1 Page 1

## John G. Larsen
58 Secretariat Lane
Jefferson, Georgia 30549
Telephone (678) 947-1455          johnlarsen@mindspring.com          Fax   (706) 824-0363

### SUMMARY OF QUALIFICATIONS

Masters in Public Administration • 25 years experience and proven ability managing full range of
information systems activities in large complex organization • Strong analytical and interpersonal
skills • Demonstrated ability to perceive relationships between, and integrate the objectives of, IS
organizations and the primary missions supported • Continuous Improvement Leader

### EXPERIENCE

FEDERAL AVIATION ADMINISTRATION

| | | |
|---|---|---|
| **Manager, Management Systems Division** | Atlanta, Georgia | 1980 - 2005 |
| **Manager, Management Systems Division** | New York, N.Y. | 1976 - 1980 |
| **Program Analyst, Appraisal Staff** | New York, N.Y. | 1972 - 1976 |
| **Executive Assistant, New York Federal Executive Board** | New York, N.Y. | 1970 - 1972 |
| **Air Traffic Control Specialist** | Ronkonkoma, N.Y. | 1968 - 1970 |

ACCOMPLISHMENTS

• Responsible for Management Analysis and Information Resource Management activities for the FAA
Southern Region including management of a division of over 40 employees and support contractors
with annual operating budget of approximately $2.5 million. Functional responsibilities include
management analysis and consultation, IS facilities management, software development/maintenance,
Local Area Network administration and technical support/help desk services.

• Managed design, development and ongoing support for the first widely distributed PC/LAN based
application system in the FAA. This system supported time and attendance data collection for over
40,000 employees of the Department of Transportation in hundreds of locations throughout the United
States and in Europe.

• Over a six year period made Continuous Improvement (CI) process a reality in the division with
emphasis on measurement of both processes and customer satisfaction. The transition to a process
orientation involved extensive training of leaders and significant employee involvement in process
improvement and measurement activities. Deep budget cuts notwithstanding, this CI process enabled
the organization to continue providing a full range of services while reducing the number of
supervisors by 50% and overall staffing by over 30% (by 50% in the Information Systems Branch)
since 1994.

• Personally developed various application systems, including the Visual FoxPro system used for
aircraft arrival and departure reservations at Atlanta area airports during the 1996 Summer Olympic
Games.

• Pioneered, within FAA, use of data from legacy transaction systems to provide meaningful
management information in the PC/LAN environment. These efforts addressed the efficiency of Air

Traffic Controller scheduling practices, the identification of employee leave and overtime abuse patterns and underrepresentation/adverse impact analyses in employment matters as required by EEOC.

• Managed analytical projects for customer organizations.  Studies included one to determine optimal Flight Standards field office locations based on the geographical distribution of regulated certificate holders.  Another assessed the need for redistribution of Aviation Safety Inspectors between FAA regions based on the growth and geographic relocation of air carrier operations over the years.

• Performed extensive analysis of FAA affirmative action programs, policies and practices as contrasted with OPM and EEOC regulations and Department of Justice guidance based on the 1995 Supreme Court decision in ***Adarand*** Constructors v. Pena.

• Conceptualized and initiated a program to make federal agency IS resources available to law enforcement agencies for computer forensics support.

## EDUCATION

**Masters in Public Administration**
John F. Kennedy School of Government, Harvard University, Cambridge MA. 1976

Bachelor of Science
Dowling College, Oakdale, NY. 1975

Associate in Applied Science
Nassau Community College, Garden City, NY. 1968

## OTHER QUALIFICATIONS

**Continuous Improvement Leadership -** Certified Continuous Improvement Leader, Michael T. Midas, Jr., The Leadership Institute, America in the 1990's, Inc., 1995

**Law Enforcement -** Georgia Police Officers Standards and Training Council Peace Officer Certification , October 1983.  Computer investigations training at the Financial Fraud Institute, Federal Law Enforcement Training Center, Glynco, Georgia.

**Expert Witness (Report & Testimony), Federal District Court, District of New Jersey –**
Management and Program Analysis expert testimony in Ryan v. Mineta regarding FAA affirmative action program, policy and practices.

REFERENCES AND ADDTIONAL INFORMATION AVAILABLE ON REQUEST