UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD S. PATOSKI, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ALPHONSO JACKSON, SECRETARY, )<br>DEPARTMENT OF HOUSING AND )<br>URBAN DEVELOPMENT, )<br>)<br>Defendant. )<br> | C.A. No. 05-11086 RCL |

**PLAINTIFF'S OPPOSITION TO MOTION IN LIMINE TO EXCLUDE TESTIMONY BY OTHER INDIVIDUALS OF THEIR OPINION OF PLAINTIFF'S INTERPERSONAL SKILLS IN THE ABSENCE OF EVIDENCE THAT SUCH OPINIONS WERE COMMUNICATED TO A DECISION MAKER**

Plaintiff hereby opposes Defendant HUD's motion in limine to exclude testimony of witnesses who believe that Plaintiff exhibited positive interpersonal skills, unless those opinions were communicated to the decision makers before Plaintiff was rejected for the Community Builder (CB) position. Such a ruling would preclude evidence of Plaintiff's qualification for the CB position, and preclude evidence of what the decisionmakers would have discovered had they chosen to investigate, as opposed to summarily rejecting Plaintiff.

The evidence will show that prior to the rejection, Plaintiff was a CPD Representative. A CPD Representative is similar to a Community Builder, and is the closest position to a Community Builder, in terms of functions performed. Beard Dep., at 48-49, Exhibit 1. During his many years as a CPD Representative, Plaintiff received positive performance evaluations. The fact that he performed the functions of the CPD

Representative well means that he would have performed the functions of a CB well, too. After Plaintiff applied for the Community Builder position, he was determined to be qualified, and was evaluated by a Rating Panel. At least one member of the Rating Panel had experience supervising Plaintiff as a CPD Rep. Plaintiff was given the highest score possible by the Rating Panel, and his name was placed on the Best Qualified List.

Jose Cintron, the Selecting Officer for the CB position, was tasked to fill four CB positions in Boston from the Best Qualified List. In making his decision, Cintron contacted Mary Lou Crane, the Secretary's Representative who would be supervising the four new CBs. According to testimony that the jury need not credit, Crane recommended against hiring Plaintiff on the grounds of his interpersonal skills.

One of the ways that Plaintiff may prove discrimination is by way of an inferential order of proof, known as the McDonnell Douglas standard. Under that standard, the second burden of the prima facie case is to demonstrate that the Plaintiff is qualified. McDonnell Douglas Corp. v. Green, 93 S. Ct. 1817 (1973); Cumpiano v. Banco Santander Puerto Rico, 902 F.2d 148, 154 (1st Cir. 1990) ("plaintiff's job performance met her employer's legitimate expectations"). Indications that a plaintiff would be competent in the position is sufficient to establish qualification. Connell v. Bank of Boston, 924 F.2d 1169, 1173 (1st Cir. 1991).

Thus, Mr. Patoski should be able to introduce and explain his long record of positive evaluations, his history of doing his job competently and professionally, the fact that the Rating Panel, which included one of his supervisors, had given him the highest score possible, and the fact that he had already been performing the functions of the CB

position, prior to that position being created. As part of this showing of qualification, Mr. Patoski must be permitted to demonstrate his ability to work with others.

HUD is arguing that the decision makers in this case felt that good interpersonal skills were an important qualification for the CB position.[1] HUD's Proposed Jury Instructions, at 4 ("HUD wished its Community Builders to have exceptional interpersonal skills"). Thus, Plaintiff should be permitted to proffer evidence of his professionalism and positive interpersonal skills that he exhibited prior to the rejection, to show that he was qualified for the position.

Moreover, Plaintiff should be permitted to introduce the positive opinions of co-workers and public officials that he dealt with, so that he may show what the decision makers would have discovered had they actually contacted his supervisor or anyone else that had actually observed his interpersonal skills at the contact phone number provided in Plaintiff's application. Ms. Crane never directly supervised Plaintiff and was never in his chain of command. Yet, Plaintiff was summarily rejected based on Ms. Crane's recommendation, despite the fact that interpersonal skills were not listed in the vacancy announcement as a required skill for the position. Thus, general evidence of Plaintiff's qualification is fair game, and it applies squarely to a well-recognized element of the prima facie case. Moreover, it is certainly possible that Plaintiff's long history of positive interactions with others would filter into Ms. Crane's understanding, by way of reputation (although Ms. Crane would now deny it). It is up to the jury to examine the totality of circumstances to determine whether Ms. Crane is telling the truth.

---

[1] Plaintiff reserves the right to challenge HUD's assertion on this issue. However, this in unquestionably the theory that HUD is pursuing at trial.

3

There is, however, an important caveat. Plaintiff acknowledges that he can not submit evidence of good interpersonal skills for the period of time <u>after</u> the rejection. Such post hoc evidence could not be relevant to Crane's decision, in that there is no way that it could influence the decision makers, whether by being communicated formally to the decision makers, or informally or unconsciously by way of rumor or reputation. Thus, Plaintiff does not oppose the motion in limine to the extent it seeks to limit evidence of Plaintiff's interpersonal skills taking place after the rejection. In fact, Plaintiff intends to file a motion in limine of his own, asking the Court to prohibit evidence of poor interpersonal skills, unless there is evidence that such instance occurred before his rejection.

Thus, Plaintiff requests that Defendant's motion in limine be denied, in part, to permit Plaintiff to demonstrate evidence of good interpersonal skills occurring prior to the rejection. Plaintiff does not oppose the motion to the extent that it seeks to prohibit Plaintiff from introducing evidence of interpersonal skills occurring after the rejection.

    Respectfully submitted,

    The Plaintiff,
    By his Attorneys

    _____/s/ Robert S. Mantell_____
    Kevin G. Powers
    BBO# 405020
    Robert S. Mantell
    BBO# 559715
    Rodgers, Powers & Schwartz LLP
    18 Tremont Street
    Suite 500
    Boston, MA  02108
    (617) 742-7010

Patoski opposition limine interpersonal skills

# EXHIBIT 1

07/18/06: Patoski v U.S. DHUD: Depo: Michael Beard

PAGE 1 TO PAGE 116

NEAL R. GROSS & CO., INC.

(202) 234-4433

**CONDENSED TRANSCRIPT AND CONCORDANCE**
PREPARED BY:

*NEAL R. GROSS & CO., INC.*
*1323 RHODE ISLAND AVE., NW*
*WASHINGTON, DC   20005*
*Phone:   (202) 234-4433*

Page 45

(1) **And the list of their duties is also on** (2) **that page, serving as initial point of contact for all** (3) **elected officials, coordinate with Public Trust** (4) **Officers, prepare all community profiles and briefing** (5) **papers.**
(6) Q Would internal candidates be not allowed (7) to apply for the Fellow positions?
(8) **A No. Anybody could apply for the Fellow** (9) **positions.**
(10) Q Oh I see. All right. But only internal (11) candidates could apply for the Community Builder (12) positions that are not Fellows? Is that true?
(13) **A I don't know. I don't know — when they** (14) **advertise these — I'd have to go back and** (15) **specifically look. I think the first round it was** (16) **internal, then I believe those were internal to HUD.** (17) **Only HUD employees could apply. The second round that** (18) **was the externals, those were applied — I mean they** (19) **were advertised to anybody in the public.**
(20) Q Now, going to page 10. Do you see where (21) it says, "After receiving over 8,400 applications, HUD (22) hired 214 Fellows in its first class, between May and

Page 46

(1) October 1998?"
(2) **A Yes.**
(3) Q To your knowledge, is that accurate?
(4) **A Yes.**
(5) Q And those were the external candidates?
(6) **A Yes.**
(7) Q How many internal candidates Community (8) Builders did it hire?
(9) **A In this group here?**
(10) Q Yes.
(11) **A I don't believe there would have been any** (12) **internals?**
(13) Q Okay. Is there a part in here that lists (14) how many internal candidates were hired?
(15) (No response.)
(16) Q Oh. Okay. Let's go to page 12.
(17) **A Okay.**
(18) Q Do you see where it says, "October to (19) December 1997, hired 361 internal Community Builders?"
(20) **A Right.**
(21) Q To your knowledge, is that accurate?
(22) **A Yes.**

Page 47

(1) Q And then, underneath it says, "March 1998 (2) to October 1998, hired 214 Community Builder Fellows."
(3) **A Right.**
(4) Q Okay. Does that include the Fellow (5) Specialists?
(6) **A Yes. I think they come later. Yes.** (7) **They're down there, November 8, 1998.**
(8) Q Okay. So does it actually — oh, I see. (9) Do you see where it says, "January 1999 to May 1999, (10) hired 86 Community Builder Specialists from 4,836 (11) applications?"
(12) **A Right.**
(13) Q Is that accurate?
(14) **A Yes.**
(15) Q Okay. And it says, in that same period of (16) time, "124 Community Builder Fellows, from 2,063 (17) applicants were hired."
(18) **A Right.**
(19) Q And is that accurate?
(20) **A Yes.**
(21) Q And do you see where it says, "August 20, (22) 1998, 15 unplaced employees assigned as Community

Page 48

(1) Builders, and 14 unplaced employees assigned as (2) Community Builder Associates?" Do you see where it (3) says that?
(4) **A Yes, I do.**
(5) Q And did that actually occur?
(6) **A Yes.**
(7) Q Okay. Now, looking at the Community (8) Builders, was there a job already at — in place, at (9) HUD, that was similar, that performed similar work?
(10) **A They were — the HUD employees were doing** (11) **the work. Yes. So the concept here was to create a** (12) **position that was distinct, in that — the argument** (13) **coming from — in reorganization — HUD employees were** (14) **charged with both enforcement and helping. And the** (15) **same person would be charged with that, and that could** (16) **cause difficulties, and they wanted to separate that.** (17) **And this Community Builder bunch was going** (18) **to be the helping bunch. They were going to go out** (19) **and help people, so that the Public Trust Officers** (20) **could then come behind them and keep folks in line,** (21) **and split the function. But the functions were being** (22) **done by all the HUD employees at that time.**

Page 49

(1) Q Are you aware of the job titles of the (2) people at HUD who had been doing those functions?
(3) A I think – I think they may be in this (4) report, because we specifically talk about community (5) planning and development people, in particular, that (6) were doing this kind of function.
(7) Q You mean the CPD Reps?
(8) A The CPD Reps.
(9) Q So it's your understanding that the CPD (10) Reps were doing this job that the Community Builders (11) were tasked to do?
(12) A Yes.
(13) Q But the theory was that the Community (14) Builders could do a part of that job better if they (15) were given an isolated portion of those tasks?
(16) A Right.
(17) Q Now, in this audit report, you came to (18) certain conclusions. Is that correct?
(19) A That's correct.
(20) Q And, for example, on page 16, it says, (21) "Needed grade levels and needed skills not (22) determined." Do you see where it says that?

Page 50

(1) A That's right.
(2) Q Can you explain that conclusion?
(3) A The officials at HUD were not able to give (4) us any sort of written plan on how they arrived – how (5) many Community Builders they needed, where they needed (6) them, and at what grade levels they needed them, and (7) what skills they needed.
(8) Q Now, did you take issue with HUD's (9) qualifications statement, in terms of the Community (10) Builder position?
(11) (No response.)
(12) Q Do you know what I am referring to?
(13) A No.
(14) Q So, for example, on page 16, it says, "The (15) problems stem from HUD's broad qualification (16) statement, that included such terms..." Do you see (17) that?
(18) A Yes. I see that.
(19) Q What do you mean that the problem stem (20) from that? What's the problem?
(21) A This is discussing the fact that, when (22) they were hiring Fellows at varying pay grades, 13,

Page 51

(1) 14, and 15's, you could not tell from reading an (2) individual's resume, comparing it to the skill set (3) they had written down, why somebody got a 13, why (4) somebody got a 14, why somebody got a 15. As a matter (5) of fact, they couldn't either. We could look up the - (6) - they gave numeric scoring's to these resumes, and (7) people were getting 13's that had scored higher than (8) people getting 15's. There was no logic to this.
(9) And then what we show here in this text, (10) is some wording examples from the scoring sheets they (11) were using, like "A broad range of knowledge and a (12) solid educational background are essential." What (13) does that mean to a score? And these were scored by (14) a lot of different people.
(15) Q Is that wrong to have qualification (16) standards that are not subject to objective scores?
(17) A I don't know that it's wrong. It makes it (18) difficult to make proper hiring decisions.
(19) Q It's suboptimal?
(20) A Yes.
(21) Q Yes? What are the alternatives to that – (22) doing it that way?

Page 52

(1) A Well, you don't know what you're looking (2) for. I mean this was open to just about anybody that (3) wanted to apply. There was no specific skill set (4) being looked for, other than community activists, (5) people that were obviously involved already in housing (6) or community development projects. They were looking (7) for those kind of individuals.
(8) Q And why is it suboptimal to do it in the (9) way that HUD did it?
(10) A I think that we say right in here. What (11) they created was a round of problems within the (12) department, in the career people that were there, that (13) were seeing these higher graded people coming in with (14) skill sets that were undefinable.
(15) Problems within the Community Builders (16) themselves, when they found out that, "Hey, I got a (17) 13, but that individual got a 15. What's the (18) difference between us? I scored higher. How did that (19) happen?" This is the kind of problems it was (20) creating.
(21) Q Now –
(22) A At HUD – is the one quote from that one