UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD S. PATOSKI,<br><br>       Plaintiff,<br><br>v.<br><br>ALPHONSO JACKSON, SECRETARY,<br>DEPARTMENT OF HOUSING AND<br>URBAN DEVELOPMENT,<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)   C.A. No. 05-11086<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO
EXCLUDE EVIDENCE OF DISPARATE IMPACT ON WHITE MALES UNDER
HUD'S AFFIRMATIVE EMPLOYMENT PLAN**

Plaintiff hereby opposes Defendant's motion in limine to exclude evidence of the

effect of HUD's Affirmative Employment Plan (AEP) on White males in HUD's

workforce. As will be shown, the category of "White male" is one which HUD

developed for the purpose of conferring and withholding employment opportunities. As

a matter of formal policy, HUD treated White men worse than all other types of

individuals, for the purpose of conferring career advances. The category of White male is

relevant to Plaintiff's claims of sex discrimination, because if he had been a White

female, he would have been accorded advantages under the AEP. However, as a White

male, he received only disadvantages. Thus, gender was the determinative factor in

placing Plaintiff in a disadvantaged category.

Plaintiff has alleged, in Counts II and IV, that his gender was a motivating factor

in HUD's decision to reject his application for a Community Builder position at HUD,

and that but for his gender he would have been selected. These claims involve violations

of two separate provisions of Title VII. 42 U.S.C. § 2000e-2(a)(1) & 2(m). In support of

his claims of gender discrimination, Plaintiff relies, in part, on the existence of the AEP,

and statistical proof of adverse effect on White males. First Amended Complaint, ¶ 14

(AEP constitutes evidence of gender discrimination).

As will be shown, HUD's use of EEO categories that combine the factors of race

and gender may be used to evidence the fact that there was department-wide

discrimination based on gender, under the "sex plus" theory of discrimination.

I.     HUD's AEP ESTABLISHED GENDER PLUS RACE CATEGORIES, AND
       USED THOSE EEO CATEGORIES TO SET AFFIRMATION ACTION
       GOALS AND TO TRACK THE SUCCESS OF THOSE GOALS

As more thoroughly discussed in Plaintiff's Motion in Limine Relating to HUD's

Affirmative Employment Program (Docket No. 70), from FY 1993 through FY 2003,

HUD classified all of its employees as falling within ten EEO categories, which reflected

combinations of gender and race, such as White males, White females, African-American

males, African-American females, Asian males, etc. Docket No. 70, at 4. For each EEO

group, in each major job category, HUD compared its workforce composition to that of

the Civilian Labor Force (CLF). Docket No. 70, at 6-7. If HUD's representation for an

EEO group was lower to that in the CLF, HUD would create a numerical goal to add

more members of the underrepresented EEO group into the relevant job category. Id.

For example, if White females were 30% of the population of Administrative workers in

the CLF, but only constituted 25% of HUD's Administrative workers, then HUD would

create a goal to increase, by a specific number, the amount of White female

Administrative workers. However, White males were singled out as the only group for

whom HUD refused to generate a goal. Id. This is despite the fact that White males were underrepresented in every major occupational group, in each year, from 1993 through 2003. Id. See Exhibit 1 (AEP report from FY 1997, probably the most relevant report).

HUD also analyzed promotions by EEO group. HUD compared the percentage of each EEO group in its workforce, and with the percentage of HUD promotions given to members of that group. Docket No. 70, at 5-6. If the percentage of promotions for an EEO group was lower than that group's overall workforce percentage, then HUD generated a goal of according that group more promotions. Id. In other words, if Asian females were 2% of the HUD workforce, but received only 1% of the HUD promotions, HUD would generate a goal to increase the promotion rate of Asian females. Id. Once again, White males were singled out as the only group for whom HUD refused to generate a goal for more promotions. Id.; See Exhibit 1. White males were underrepresentated in the rate of promotion for each year from 1993 through 2003. Id.

Finally, HUD analyzed the training received by members in each EEO group. If those in an EEO group were trained at a rate less than its overall workforce representation, HUD generated a special goal to train more of those in the underrepresented EEO group. Docket No. 70, at 7. So if an EEO group was 20% of the HUD workforce, but received only 15% of the training, HUD would generate a goal to increase training for that EEO group. Again, White males were the only ones for whom HUD refused to generate goals. Id. White males were underrepresented in the provision of training for every year from 1992 through 2002. Id. HUD Supervisors and Managers were instructed on a yearly basis that they "are fully accountable for taking actions to assure that EEO/AE/Diversity goals are achieved," and they were evaluated on their

3

compliance with this directive every year. <u>Exhibit 1</u>. Thus, White males, as a matter of written, formal HUD policy, were disadvantaged as compared to other EEO groups.[1]

## II.    STATISTICAL EVIDENCE THAT WHITE MALES WERE DISFAVORED

The evidence, from HUD's own documents, shows that White male representation within the HUD workplace declined, and that they were treated worse than other EEO groups. This evidence is made all the more stark, given the fact that in all the illustrated years, White males were already underrepresented in each major occupational category at HUD, as compared with the civilian labor force.

The first chart shows an inexorable decline in White males employed at HUD at the higher grade levels relevant to the Community Builder position:



---

[1]    While HUD argues that its AEP Plan was promulgated in "fulfillment" of its obligations under EEOC Management Directive 714 (<u>Def.'s Motion</u>, at 2 n.1), in actuality Plaintiff has demonstrated as a matter of law that HUD violated MD 714 in implementing its plan. <u>Plaintiff's Motion in Limine to Preclude Argument that HUD's AEP Plan Was Justified Under MD 714 or Other Law, Docket 71</u>.

The second diagram shows a steady decline of White males in the

Administrative category, in which the Community Builder position was classified.



White males were never received equity in the number of promotions:



The overall numbers of White males at HUD declined dramatically and inexorably.  SOF 200, <u>Docket 43</u>.  There are many other ways to slice and dice the statistics to show that White males were disadvantaged at HUD.

III.    POLICIES AND PRACTICES THAT IMPACT WHITE MALES AT HUD ARE RELEVANT TO PLAINTIFF'S GENDER DISCRIMINATION CLAIM

Evidence of HUD-wide policies and practices that adversely affected White male representation and employment opportunities are relevant and admissible to assist in proving Plaintiff's gender discrimination claims.  That is because the White male designation, which HUD used as an operative category, falls within the "sex plus" theory of gender discrimination.

If an employer exhibits a preference for conferring employment benefits on a White woman, over a White man, this constitutes sex discrimination in violation of Title VII.  That is because gender is a determinative factor in the decision to discriminate, even if another factor, such as race, was also considered by the employer.  Title VII prohibits discrimination against sub-classes of men, if, but for their gender, they would not be placed within that disadvantaged class.  For that reason, evidence concerning the plight and demise of White male representation at HUD is relevant to Plaintiff's sex discrimination case.

Title VII prohibits employment discrimination based on gender.  42 U.S.C. § 2000e-2(a)(1) & (a)(2).  This prohibition against discrimination protects men as well as women.  <u>Oncale v. Sundowner Offshore Services, Inc.</u>, 118 S. Ct. 998, 1001 (1998).  Title VII requires that "persons of like qualifications be given employment opportunities irrespective of their sex."  <u>Phillips v. Martin Marietta Corp.</u>, 91 S. Ct. 496 (1971).  "Congress' intent to forbid employers to take gender into account in making employment

decisions appears on the face of [Title VII]. . . . We take these words to mean that gender must be irrelevant to employment decisions." Price Waterhouse v. Hopkins, 109 S. Ct. 1775, 1785 (1989) (plurality) (superseded by statute on other grounds).

Title VII is violated when an employer considers gender plus another factor, such as race. Under a so-called "gender plus" or "sex plus" claim, an employer discriminates, not against the class of men or women as a whole, but against a subclass of men or women so designated by their sex plus another characteristic. Gee-Thomas v. Cingular Wireless, 324 F. Supp. 2d 875, 881 (M.D. Tenn. 2004), citing Back v. Hastings on Hudson Union Free Sch. Dist., 365 F. 3d 107, 118 n.7 (2d Cir. 2004). Title VII imposes liability for sex discrimination when an employer disparately treats a subclass of men or women. See, e.g., Phillips, 91 S. Ct. at 497-498.

In the central case of Phillips v. Martin Marietta Corp., Martin Marietta Corp. was willing to hire both women and men, and did not discriminate against these broad categories, in general terms. Id. at 497. Indeed, the overall hiring statistics showed that women were hired in numbers that exceeded their representation in the applicant pool. Id. Where the employer ran into trouble was its policy of rejecting job applications from women with young children, while it was willing to consider the applications of men with young children. Id. at 497. Despite the fact that women, as a general class, were being hired at levels indicating a lack of gender-wide animus, the Supreme Court recognized a theory that allowed recovery for gender discrimination, where sex plus another factor (young children) was considered. According to Martin Marietta, men with children were eligible – women with children were not. This was not acceptable under the law.

Subsequent decisions confirmed and built upon the sex plus theory. The First

Circuit has recognized a sex-plus-clothes claim.[2] There is also a sex-plus-marriage line

of cases. In Sprogis v. United Airlines, 444 F.2d 1194, 1194-98 (7th Cir.), cert. denied,

404 U.S. 991, 30 L. Ed. 2d 543, 92 S. Ct. 536 (1971), the employer would hire married

male flight attendants, but would not hire married female flight attendants. The Sprogis

court held that this policy violated the Title VII prohibition against sex discrimination.

Id. at 1198. "**The effect of the statute is not to be diluted because discrimination**

**adversely affects only a portion of the protected class.**" Id., at 1198 (bold added); see

also Fisher v. Vassar College, 70 F.3d 1420, 1449 n.14 33-34, 1448 (2d Cir. 1995), aff'd

en banc, 114 F.3d 1332 (1997), cert. denied, 118 S. Ct. 851 (1998) ("Sex plus marriage

discrimination is simply a sub-category of sex discrimination. To discriminate on the

basis of sex plus marriage is to discriminate on the basis of sex").

Sex plus age claims were recognized in Arnett v. Aspin, 846 F. Supp. 1234, 1237-

1241 (E.D. Pa. 1994), and Hall v. Missouri Highway & Transp. Com'n, 995 F. Supp.

1001, 1005 (E.D. Mo. 1998), to protect older women.

Finally, and most importantly to this inquiry, there is a strong line of cases

recognizing gender plus race theories. In Jefferies v. Harris County Community Action

Association, 615 F.2d 1025, 1032-1033 (5th Cir. 1980), the Fifth Circuit recognized a

combination sex plus race Title VII claim. Following the holding of Phillips, the Court

---

[2] The First Circuit's decision in Rosa v. Park West Bank & Trust Co., 214 F.3d 213 (1st Cir. 2000), is
consistent with the sex plus analysis. In that case, Lucas Rosa, a biological male, was wearing women's
clothes when he sought a loan application from the defendant bank. Id. at 214. The bank refused to provide
Rosa with a loan application, allegedly because he did not come dressed in masculine attire. Id. at 214.
Rosa filed suit under the Equal Credit Opportunity Act (ECOA), 15 U.S.C. §§ 1691-1691f. The ECOA,
like Title VII, prohibits discrimination on the basis of sex. 15 U.S.C. § 1691(a). The District Court granted
the bank's motion to dismiss and Rosa appealed. The First Circuit held in Rosa's favor. When a man
wearing a particular set of clothes would be treated better if he were a woman, then gender has been shown
to be a determinative factor, and sex discrimination has been proven. Rosa, 214 F.3d at 215-216. But for
Rosa's gender, he would have received the application, and this is the dispositive allegation, even though
another factor (clothes) was also allegedly given consideration by the bank.

reasoned that an African-American woman, experiencing bias due to the confluence of race and gender, had stated a valid theory of recovery under the sex-plus rubric. Id. at 1033. "[D]iscrimination against black females [could] exist even in the absence of discrimination against black men or white women." Id. at 1032.

Other cases have reached the same conclusion. Johnson v. Dillard's Inc., 2007 U.S. Dist. Lexis 71176 (D. S.C. 2007), at 8-12 (recognizing sex plus race claim under Title VII); Graham v. Bendix Corp., 585 F. Supp. 1036, 1047 (N.D. Ind. 1984) ("The duty not to discriminate is owed each minority employee, and discrimination against one of them is not excused by a showing the employer did not discriminate against all of them, or there was one he did not abuse."), citing Furnco v. Waters, 98 S. Ct. 2943 (1978); EEOC Memorandum, Intersectional Discrimination, at 2 (recognizing a prohibition on discrimination based on gender plus race), Exhibit 2.

When an employer makes a decision based on sex, in combination with another immutable characteristic, such as race, this represents gender discrimination under Title VII. Thus, evidence relating to White males at HUD is relevant to sex bias claims.

## II.    DEFENDANT'S ARGUMENTS ARE ERRONEOUS

### A.    PLAINTIFF IS NOT LIMITED TO PRESENTING STATISTICS COMPARING THE ENTIRE CLASS OF MEN WITH THE ENTIRE CLASS OF WOMEN

Defendant argues that Plaintiff's reliance on evidence of the demise of White males at HUD is so off-point and irrelevant as to be inadmissible. Def.'s Motion, at 4. Defendant argues that the only relevant statistical analysis involves looking at employment patterns for all men, and all women at HUD. Def.'s Motion, at 4-5. Defendant ignores completely the abundant line of cases that state that Title VII protects sub-classes of people in a protected gender. Gee-Thomas, 324 F. Supp. 2d at 881. If the

victim of discrimination would not been treated better if he were a different gender, Title VII provides a remedy. Jefferies, 615 F.2d at 1032-1033 (5th Cir. 1980). Plaintiff need not prove that discriminatory animus applies to all men, or all women. Phillips, 91 S. Ct. at 497-498. Defendant provides absolutely no case law to the contrary.

In this case, White men were categorized and segregated into the only EEO group that was not conferred employment opportunities under the AEP. Only men who happened to be White were discriminated against. Other types of men, including Hispanic, African-American, and Asian men, were conferred benefits. Plaintiff was a White man. If Plaintiff had a different gender, and had been a White female, he would have also received benefits. A purely gender-wide analysis of the workforce would not touch upon the form of discrimination to which HUD subjected its White males.

It was the government that chose to combine their racial preference program with their gender preference program into a single Affirmative Employment Program (AEP) which called for preferences for every EEO group except White males. Then when challenged by a White male, the same government demands that the injured party lump his EEO group statistically among those who have been favored by the program. From a purely logical perspective, it would appear that the government should have relinquished the right to demand such granularity of evidence when it chose to so thoroughly classify their employees squarely on gender and race. A jury can easily understand the concept of a disfavored sub-class of males, and will not be confused by the dual classifications.

B.     THIS IS NOT AN ADVERSE IMPACT CASE

HUD seeks to confuse the Court by asserting that the burdens of the disparate impact claim apply in this case. Def.'s Motion, at 4. This is not a disparate impact case;

rather the disparate treatment analysis is more applicable.

In a disparate treatment case, the Plaintiff alleges that he was rejected because of his sex, based on conscious or unconscious discrimination of the employer. <u>International Bro. of Teamsters v. United States</u>, 97 S. Ct. 1843, 1854-1855 n. 15 (1977); <u>Thomas v. Eastman Kodak Co.</u>, 183 F.3d 38 (1st Cir. 1999).[3] While a disparate treatment claim involves an ultimate burden of proving that an individual was victimized by unlawful bias, that claim may be supported by evidence of company-wide statistics and formal policies that discriminate based on sex. <u>International Bro. of Teamsters</u>, 97 S. Ct. at 1857 n. 20 ("statistics showing racial or ethnic imbalance are probative in a case such as this one only because such imbalance is often a telltale sign of purposeful discrimination").

In contrast, a disparate impact case applies when a Plaintiff seeks to show that an apparently neutral employment practice disproportionately and negatively affects a protected class. <u>Id.</u>, at 1855 n.15. Proof of unlawful motive is not required under disparate impact theory. <u>Id.</u> Instead, disparate impact cases rely on a specialized and technical burden shifting analysis that is inapplicable to disparate treatment cases. 42 U.S.C. § 2000e-2(k). The disparate impact theory does not apply to this case for a number of reasons, including the fact that the AEP expressly relied on gender as a factor in conferring employment opportunities, and is, by definition, not a "neutral" practice.

In this case, Plaintiff seeks to support his claim that he was rejected because of his gender, with evidence of workforce composition, and HUD's policies. Such department-wide evidence does not, however, turn this case into a disparate impact case.

C.    THIS IS NOT A RACE DISCRIMINATION CASE

---

[3] For the purposes of Count IV, however, Plaintiff need only prove that gender was a motivating factor, as opposed to a determinative factor, in the non-selection. 42 U.S.C. § 2000e-2(m).

Defendant is correct to point out that there is no race discrimination claim left in this case. Plaintiff does not seek, at this point, to recover for race discrimination.[4] Plaintiff does not seek a jury instruction that race discrimination is illegal, nor does Plaintiff propose a jury verdict question asking whether race was a factor in the rejection.

Instead, Plaintiff seeks to recover for gender discrimination (Counts II & IV) and seeks to utilize the sex plus standard of liability. While race is a protected category under Title VII, that does not mean that race is not appropriately considered a "plus" factor for the gender discrimination claim. It would be illogical for Title VII to prohibit discrimination based on sex plus a <u>neutral</u> factor, (such as being married or having children), yet refuse to prohibit discrimination based on sex plus a prohibited criterion, such as race. <u>Jeffries</u>, 615 F.2d at 1034.

The <u>Arnett</u> decision considered the issue of whether the plus factor may include an otherwise prohibited characteristic. In that case, the plaintiff, Arnett was pursuing a sex discrimination claim arising only under Title VII. <u>Arnett</u>, 846 F. Supp. at 1240-1241. Arnett alleged that she was discriminated against because she was an older woman, and she sought to pursue a theory of sex plus age discrimination. The employer, a Federal agency, objected on the grounds that age discrimination was a protected category under the ADEA, and that that protection somehow precluded age from being a "plus" factor under a Title VII sex discrimination claim.

The Court rejected the Federal agency's objection, and sided with Arnett:

> The reasoning behind the holdings of <u>Phillips</u> and its progeny is that when an employer discriminates against members of one sex, the victims of such discrimination should have a remedy under Title VII which expressly prohibits

---

[4] Plaintiff has asserted claims for race discrimination that have either been dismissed, or he has not been permitted to amend his complaint to add them. Plaintiff does not waive the right to appeal these rulings. However, at this stage, Plaintiff does not purport to submit a claim of race discrimination to the jury.

discrimination on the basis of sex. The point behind the establishment of the sex-plus discrimination theory is to allow Title VII plaintiffs to survive summary judgment when the defendant employer does not discriminate against all members of the sex. Thus, the above-cited cases have not created a new remedy, but instead have closed a loophole through which defendant employers could escape Title VII liability. As the Court stated in <u>Jefferies</u>, an employer could discriminate against a discrete group of women -- large women, black women, women with children, married women, pregnant women, older women -- and be granted summary judgment in their favor because they had indeed filled these positions with other women not in the group. Such a result cannot be condoned. **This is true whether or not the "plus" classification is also one afforded protection on its own, such as age under the ADEA.**

<u>Arnett</u>, 846 F. Supp. at 1240 (emphasis added). Thus, even though race is a protected

characteristic, and even though Plaintiff is not here pursuing a race discrimination, race

may still be the plus factor in Plaintiff's sex plus claim.

D.    MAGISTRATE JUDGE ALEXANDER DID NOT PRECLUDE THE
      INTRODUCTION OF EVIDENCE RELATING TO WHITE MALES

        In Defendant's opposition to Plaintiff's Motion in Limine relating to the AEP,

Defendant argues that statistical evidence, and department-wide policies demonstrating

antipathy to White males is somehow precluded by the ruling of Magistrate Judge

Alexander. <u>Document 85</u>, 8-15. That is not true.

        When Plaintiff's application for the Community Builder position was rejected, he

was not aware that one of the six individuals selected was African-American. Plaintiff

knew that younger women were given preference, so he initiated a sex and age

discrimination complaint. Plaintiff later learned that an African-American was selected

for one of the Community Builder positions. He therefore sought to amend his complaint

to add a race discrimination claim based on the same non-selection for which he had filed

a timely administrative charge. Magistrate Judge Alexander denied the motion to amend,

on the grounds that there was no timely administrative complaint of race discrimination.

Patoski v. Jackson, 477 F. Supp. 2d 361 (D. Mass. 2007). However, that decision does

not purport to rule upon the relevance or admissibility of the plight of White males under

HUD policies workplace practices, with regard to the remaining gender bias claims. Id.

Introduction of evidence of HUD's formal policies, and workforce composition,

relating to White men does not "circumvent" Magistrate Judge Alexander's decision.

There is no requirement to exhaust administrative remedies for the **evidence** one wishes

to introduce at trial. Plaintiff did not need to exhaust administrative remedies for a race

claim, because Plaintiff is not seeking to impose liability for race discrimination. No

finding of race discrimination is necessary for Plaintiff to prevail under a gender plus

theory. Plaintiff need only show that his gender is a determinative factor that placed him

within a disfavored EEO category.

While HUD alleges that evidence regarding White males circumvents the

Magistrate Judge Alexander's ruling, it does not quote any applicable portion of the

decision, or identify where the alleged conflict is.[5] Therefore, the ruling on Plaintiff's

motion to amend provides no basis for excluding evidence focusing on White males.

E.   JUDGE LINDSAY'S DISMISSAL OF COUNT VII DID NOT PRECLUDE
     THE INTRODUCTION OF EVIDENCE RELATING TO WHITE MALES

Defendant's opposition to Plaintiff's Motion in Limine relating to the AEP, also

argues that the White male analysis is precluded by Judge Lindsay's dismissal of Count

VII. Docket 85. This argument is also not true. Defendant's argument is compromised

by the fact that Judge Lindsay never issued a written decision explaining the reasons for

the dismissal, and Defendant has not attached any transcript of Judge Lindsay's verbal

comments. Plaintiff has requested a transcript of the relevant hearing.

---

[5] Defendant anticipated the nature of Plaintiff's rebuttal argument, but asserts no valid argument against it.
Docket 85, at 12 n. 10.

To further demonstrate the falsity of the Defendant's argument, it is important to look at two separate provisions of Title VII. Title VII states that it shall be an unlawful practice for an employer:

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

> (2) to . . . classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1) & (2).

Section 2(a)(1) permits recovery when an employee is rejected for a job because of gender. Section 2(a)(2) applies when an employee is merely <u>classified</u> by gender in a way that "would . . . tend to limit that employee's job opportunities."

Count II alleges that Plaintiff was a discriminated against on the basis of gender when he was non-selected for the Community Builder position. Under this section 2(a)(1) claim, Plaintiff seeks damages such as lost wages and benefits stemming from the rejection. The Complaint further alleges that the existence of the AEP demonstrates evidence of gender discrimination. <u>First Amended Complaint</u>, ¶ 14. Thus, Count II seeks recovery under section 2(a)(1) based on the adverse action of non-selection.

Under Count VII, however, Plaintiff sought to recover for being the subject of an unlawful classification, in that the AEP placed him in a disfavored category based on his sex. For purposes of Count VII, Plaintiff requested declaratory judgment that he was the victim of an unlawful classification, and emotional distress damages stemming from his knowledge of the classification. This claim was brought pursuant to Section 2(a)(2). For

the purposes of this Count alone, Plaintiff proceeded under the theory that it was unnecessary that the unlawful classification actually caused or led to an adverse employment action. The fact of the unlawful classification, existing in itself, was sufficient to demonstrate a violation, in Plaintiff's view, under Section 2(a)(2).

In other words, to the extent that the AEP contributed to or caused Plaintiff's rejection, Section 2(a)(1) provides a remedy. Count II. But irrespective of whether the AEP contributed to the non-selection, Plaintiff sought recovery on the basis of the unlawful classification alone under Section 2(a)(2). Count VII.

Defendant sought summary judgment on Count VII, on the grounds that the AEP had been discontinued in 2003. In other words, the substance of the argument was, even if the AEP were illegal, there would be no recovery because program was discontinued.

We do not know exactly why Judge Lindsay dismissed Count VII. No written decision exists, and his explanation at the hearing was ambiguous. However, both parties are clear that Judge Lindsay felt the claim to be moot, because the program was discontinued, and HUD promised not to resurrect it. See Plaintiff's Motion for Certificate of Appealability, p. 2, Docket 61. Judge Lindsay apparently dismissed, out of hand, the claim for emotional distress arising from an unlawful classification, claiming that expert confirmation of such distress was required at the summary judgment stage to establish harm. Id.

Defendant writes that, "Judge Lindsay specifically rejected Plaintiff's argument that the validity of HUD's AEP was a live issue for purposes of Plaintiff's gender and age discrimination claims in Counts I-IV." Docket 85, at 5. That description is absolutely false, to Plaintiff's recollection. Instead, the Judge rejected Plaintiff's argument that the

request for declaratory judgment was a live issue that needed to be resolved for Counts I-IV. See Plaintiff's Motion for Certificate of Appealability, p. 2, Docket 61. To Plaintiff's recollection, the Judge reasoned that the AEP could be considered relevant and admissible evidence at the trial of Counts II and IV, and Plaintiff could seek a jury instruction that the AEP reflected an unlawful bias against men, even if the Court failed to enter declaratory judgment against HUD at summary judgment. Thus, the Judge dismissed Count VII, relying on the fact that the AEP may yet be determined to have evidentiary weight in the gender discrimination claim.

Plaintiff's recollection is that HUD acknowledged at the summary judgment hearing that even if Count VII were dismissed, the Plaintiff would continue to be free to argue at trial that the AEP constituted evidence of gender discrimination. In its summary judgment pleadings, Defendant argued that even if the Court were to dismiss Count VII, Plaintiff would be free to nevertheless argue that the AEP constituted evidence of discrimination for other parts of his case. Def.'s Mem. In Support of Summary Judgment, at 11, Docket 47. Defendant wrote:

> Count VII of Plaintiff's Complaint appears to seek some form of declaratory judgment with respect to HUD's AEP as it existed prior to October 2003. First Amended Complaint, ¶ 46-52. **Patoski can certainly introduce evidence of the manner in which he contends the AEP, under MD 714, demonstrated discriminatory intent with respect to his non selections,** however, as the policy has been superseded and will not return, questions with respect to the AEP as it existed under MD 714, are moot.

Id. (emphasis added). Thus, Defendant acknowledged in his summary judgment materials that it was not seeking a ruling that the AEP was inadmissible to the non-selection claims. It was seeking dismissal of the declaratory judgment claim as moot.

After the Court entered summary judgment on Count VII, Plaintiff moved to

certify the issue for interlocutory appeal. Defendant opposed the motion, on the grounds

that Counts II and IV could be tried, without immediate appellate resolution of the Count

VII issues. Part and parcel of Defendant's argument was the assertion that Plaintiff was

still free to attempt to introduce the AEP as evidence of discrimination in Counts II and

IV, despite the dismissal of Count VII. Defendant wrote:

> The Plaintiff may unquestionably proceed to trial in the absence of appellate
> review on the remaining claim, i.e., that his non-selection for the 1998
> Community Builder position was based upon age and gender discrimination.
> Further, to the extent that HUD's AEP is relevant to these claims (if at all), the
> form of **such evidence may be determined by this Court by pre trial motions
> *in limine.***

HUD's Opposition to the Request That This Court Certify an Interlocutory Appeal, at 2-

3, Docket 64 (bold added). Thus, even after summary judgment issued, Defendant

understood that the admissibility of the AEP with respect to the remaining issues, and the

AEP lawfulness, were live issues, which should be determined at a later date.

HUD now asserts that the dismissal of Count VII somehow precludes use of the

AEP as evidence of unlawful bias. Docket 85, at 5. It even asserts that Plaintiff is now

seeking to relitigate an issue which Judge Lindsay already decided. These assertions are

false, and are completely inconsistent with Defendant's statements before and during the

summary judgment hearing, and after summary judgment entered, that the evidentiary

value of the AEP remained an open issue.

Judge Lindsay never held that the AEP was lawful when implemented. In fact,

Count VII was held to be moot, given HUD's discontinuation of the policy, which was

changed as a result of clarifications of discrimination law. See MD 715, at 1.

Judge Lindsay never entered a decision to the effect that the AEP failed to play a

role in the Community Builder selection process. There was ample evidence that the

AEP did play a role in that process. See Response to HUD Fact 17, Docket 51. There

was no discussion of, or rejection of, the Plaintiff's evidence of causation.

In actuality, Judge Lindsay was making an assertion of law, indicating that he

believed that in order for there to be recovery under 42 U.S.C. § 2000e-2(a)(2), a plaintiff

must show an adverse employment action was caused by the illegal classification.

Plaintiff disagreed that an adverse action was required, as then section 2(a)(2) would be

rendered completely superfluous by section 2(a)(1), which addresses adverse actions. It

would also contradict the plain language of the statute, which prohibits a classification

which "would" merely "tend to deprive any individual of employment opportunities." 42

U.S.C. § 2000e-2(a)(2). Given Plaintiff's insistence that the AEP did contribute to the

non-selection, it is unclear to what extent Judge Lindsay's ruling depended on the

requirement of proving an adverse action.

Even if Judge Lindsay found that the AEP played no role in the selection process

(he did not), the AEP may still be admissible to demonstrate a corporate-wide

discriminatory state of mind. Conway v. Electro Switch Corp., 825 F.2d, at 597

("evidence of a corporate state of mind or a discriminatory atmosphere is not rendered

irrelevant by its failure to coincide precisely with the particular actors or timeframe

involved in the specific events that generated a claim of discriminatory treatment.").

Judge Lindsay held that the Count VII claim was moot. Plaintiff is not here

seeking to overturn or evade that ruling, either expressly or implicitly.[6] Cf Docket 85. In

arguing that the AEP was unlawful when implemented, and that it constitutes evidence of

discrimination, Plaintiff is not ignoring the prior order, in any fashion. Judge Lindsay

did not rule on the AEP's legality (including its Constitutionality), or its admissibility for

---

[6] Plaintiff reserves the right to challenge the ruling on appeal.

the trial of Counts II and IV.

Defendant argues that it has been proceeding with trial preparation on the assumption that Judge Lindsay had disposed of the issue of the AEP's admissibility. Docket 85, at 7. However, as said above, Defendant clearly wrote **after summary judgment entered**, that the AEP's admissibility and scope of use at trial, were matters to be left for the motion in limine stage.  HUD's Opposition to the Request That This Court Certify an Interlocutory Appeal, at 2-3, Docket 64 ("such evidence may be determined by this Court by pre trial motions *in limine*").  Therefore, it did not understand the issues to be resolved in the manner it now contends.

## CONCLUSION

For the foregoing reasons, Defendant's motion to exclude evidence of HUD's policies and statistical evidence with respect to White males should be denied.

The Plaintiff,

By his Attorneys

_____/s/ Robert S. Mantell_____
Kevin G. Powers
BBO# 405020
Robert S. Mantell
BBO# 559715
Rodgers, Powers & Schwartz LLP
18 Tremont Street
Suite 500
Boston, MA  02108
(617) 742-7010

Patoski opposition limine white male analysis

# EXHIBIT 1

# U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (HUD)

## DEPARTMENTWIDE

## FISCAL YEAR 1997

## AFFIRMATIVE EMPLOYMENT PROGRAM (AEP)

## UPDATE REPORT

HUD003859



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
THE SECRETARY
WASHINGTON, D.C. 20410-0001

March 6, 1997

MEMORANDUM FOR:  All HUD Employees

FROM:  Andrew Cuomo

SUBJECT:  Policy Statement - Equal Employment Opportunity, Affirmative
Employment, Prevention of Sexual Harassment, Discrimination Based
on Sexual Orientation, Employment and Accommodation of Persons
with Disabilities, and Disabled Veterans

In conformance with the policies expressed in Title VII of the Civil Rights Act of
1964, as amended; the Civil Rights Act of 1991; Executive Order 11478, as amended;
the Age Discrimination in Employment Act of 1967; the Equal Pay Act of 1962, as
amended; the Rehabilitation Act of 1973, as amended; the Vietnam Era Veteran's
Readjustment Act of 1974; the Civil Service Reform Act of 1978, and HUD regulations
at 24 CFR Part 7, it is the policy and intent of the Department of Housing and
Urban Development (HUD) to provide equality of employment opportunity for all
persons, and to prohibit discrimination because of race, color, religion, sex,
national origin, age, or disability in all facets of employment.  Additionally, sexual
harassment and discrimination based on sexual orientation are unacceptable in
the workplace and will not be condoned at HUD.  Moreover, HUD is committed to
promoting affirmative employment through the removal of barriers and by positive
actions at every management level, including the early resolution of EEO disputes.

These policies are an integral part of HUD's mission and their implementation is
a high priority of this Administration.  I am personally committed to Equal Employment
Opportunity, Affirmative Employment and Diversity (EEO/AE/Diversity) and I expect all
employees to support EEO/AE/Diversity.  In carrying out their responsibilities, all
managers and supervisors are fully accountable for taking actions to assure that
EEO/AE/Diversity goals and objectives are achieved.

The EEO/AE/Diversity goals and objectives of the Department are expressed in
HUD regulations at 24 CFR Part 7 as well as in the multi-year Affirmative Employment
Program (AEP) Plan.  EEO/AE/Diversity is a separate critical element in our managerial
performance appraisal system, which requires the Senior Executive Service (SES) and
managers and supervisors under the Performance Management and Recognition
System (PMRS) to achieve measurable results in their management of the Department.

EEOC FORM 566 (8/87)                                                                 D-3

HUD003864

## AFFIRMATIVE EMPLOYMENT PROGRAMS (AEP)

I expect all managers and supervisors to be proactive in implementing EEO/AE/Diversity. The following strategies will, I believe, set the standard for the achievement of that goal:

1.  Hold subordinate managers and supervisors accountable for promoting EEO/AE/Diversity in every aspect of the Department's policies, programs, and practices; including learning and practicing the principles of F.A.I.R. (Feedback, Assistance, Inclusion and Respect) in all interactions with employees and HUD clients.

2.  Attend EEO/AE/Diversity training sessions to ensure full understanding of and sensitivity to EEO/AE/Diversity policies, practices, and procedures.

3.  Make a vigorous effort to assure full and fair representation of qualified minorities, women, and persons with disabilities when recruiting, hiring, and providing advancement opportunities.

4.  Make use of Special Employment Programs to correct the underrepresentation of minorities, women, and persons with disabilities, i.e., Part-Time Employment, Cooperative Education, Upward Mobility, Special Hiring Authorities, etc.

5.  Attend "Valuing the HUD Employee" Training and use the F.A.I.R. concept taught on a daily basis.

6.  Learn and use Alternative Dispute Resolution (ADR) techniques to resolve problems early before they give rise to formal EEO complaints or union contract grievances.

7.  Participate in preparing the AEP Plan by analyzing all aspects of the Department's operations to determine any barriers to full equal employment, and by designing and carrying out actions to remove those barriers.

8.  Refer to the AEP Plan goals and objectives before initiating any recruitment, hiring, training, reassignment, and promotion actions.

9.  Periodically review AEP progress reports and make adjustments in activities to meet goals and objectives.

2

HUD003865

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

**FISCAL YEAR 1997**
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM PLAN UPDATE REPORT
PROGRAM ANALYSIS

DEPARTMENT

UPDATE

II. WORK FORCE - SUMMARY ANALYSIS (Cont'd)

ANALYSIS OF REPRESENTATION BY GRADE GROUPING (Cont'd)

| Race/Sex | SENIOR LEVEL | GS/GM 13-15 | GS 9-12 | GS 5-8 | GS 1-4 |
|---|---|---|---|---|---|
| Minorities and Women | 51.5 | 55.5 | 72.9 | 95.3 | 81.0 |
| Women | 30.7 | 40.2 | 59.4 | 89.9 | 77.5 |
| Minorities | 32.7 | 33.0 | 43.4 | 57.1 | 37.9 |

**ADMINISTRATIVELY DETERMINED PAY RATE SCHEDULE***

| Race/Sex | Percentage of representation |
|---|---|
| White males | 41.0% |
| White females | 36.1 |
| Black males | 3.3 |
| Black females | 13.1 |
| Hispanic females | 3.3 |
| Asian males | 3.3 |
| Minorities and Women | 59.1 |
| Women | 52.5 |
| Minorities | 23.0 |

**BLUE COLLAR***

| Race/Sex | WG 5-9 | WG 11-12 | WL 5-9 | WB 5-9 | WD 5-9 | XS 5-9 | XP 5-9 |
|---|---|---|---|---|---|---|---|
| White males | 20.0% | 0.0% | 0.0% | 100.0% | 66.7% | 0.0% | 0.0% |
| Black males | 80.0 | 0.0 | 100.0 | 0.0 | 33.3 | 0.0 | 100.0 |
| Minorities and Women | 80.0 | 0.0 | 100.0 | 0.0 | 33.3 | 0.0 | 100.0 |
| Women | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Minorities | 80.0 | 0.0 | 100.0 | 0.0 | 33.3 | 0.0 | 100.0 |

*   No other EEO groups are represented in this category.

EEOC FORM 566 (8/87)                                      DII-9

HUD003885

## AFFIRMATIVE EMPLOYMENT PROGRAM (AEP) PLAN UPDATE REPORT

### DISTRIBUTION OF EEO GROUPS AND COMPARISON BY PATCOB

FISCAL YEAR 1996 — HUD/CIVILIAN LABOR FORCE COMPARISON

| OCCUPATIONAL CATEGORY | TOTAL ALL % | WHITE MALE % | WHITE FEMALE % | BLACK MALE % | BLACK FEMALE % | HISPANIC MALE % | HISPANIC FEMALE % | ASIAN AMERICAN PACIFIC ISLANDER MALE % | ASIAN AMERICAN PACIFIC ISLANDER FEMALE % | AMERICAN INDIAN ALASKAN NATIVE MALE % | AMERICAN INDIAN ALASKAN NATIVE FEMALE % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PROFESSIONAL AGENCY (HUD) | 100.0 | 50.0 | 18.7 | 8.1 | 11.0 | 3.2 | 1.8 | 4.4 | 2.4 | 0.2 | 0.2 |
| (CAD) CIVILIAN LABOR FORCE | 100.0 | 54.7 | 30.3 | 2.4 | 3.2 | 2.1 | 1.4 | 3.5 | 1.9 | 0.2 | 0.2 |
| ADMINISTRATIVE AGENCY (HUD) | 100.0 | 32.3 | 28.4 | 9.7 | 20.1 | 3.0 | 3.2 | 1.1 | 1.2 | 0.5 | 0.5 |
| (CAD) CIVILIAN LABOR FORCE | 100.0 | 42.1 | 40.4 | 3.6 | 5.3 | 2.6 | 2.6 | 1.4 | 1.4 | 0.3 | 0.3 |
| TECHNICAL AGENCY (HUD) | 100.0 | 5.0 | 37.2 | 3.5 | 41.5 | 1.2 | 7.2 | 0.5 | 1.9 | 0.2 | 1.8 |
| (CAD) CIVILIAN LABOR FORCE | 100.0 | 36.1 | 42.9 | 3.6 | 6.6 | 3.2 | 3.4 | 1.9 | 1.6 | 0.4 | 0.4 |
| CLERICAL AGENCY (HUD) | 100.0 | 4.3 | 35.8 | 3.9 | 46.2 | 0.6 | 6.2 | 0.2 | 2.1 | 0.1 | 0.5 |
| (CAD) CIVILIAN LABOR FORCE | 100.0 | 14.0 | 63.4 | 2.8 | 9.6 | 1.7 | 5.2 | 0.8 | 1.9 | 0.1 | 0.5 |
| OTHER AGENCY (HUD) | 100.0 | 0.0 | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| (CAD) CIVILIAN LABOR FORCE | 100.0 | 67.6 | 11.2 | 9.7 | 3.2 | 4.8 | 1.0 | 1.2 | 0.3 | 0.9 | 0.2 |
| BLUE COLLAR AGENCY (HUD) | 100.0 | 30.8 | 0.0 | 69.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| (CAD) CIVILIAN LABOR FORCE | 100.0 | 65.4 | 9.8 | 9.1 | 2.2 | 8.7 | 1.5 | 1.7 | 0.5 | 0.8 | 0.2 |

EEOC FORM 568/569 (8/87)

DII-10

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM PLAN UPDATE REPORT
PROBLEM/BARRIER IDENTIFICATION

DEPARTMENT
UPDATE

PROVIDE A NARRATIVE DESCRIBING THE PROBLEMS/BARRIERS IDENTIFIED:

II.  WORK FORCE

EXPECTED RESULTS:  An increase in the diversification and
balanced representation of EEO groups, whose current
composition of the Department's work force shows manifest
imbalances and/or conspicuous absences.

FOLLOW-UP ACTION:  Continue to monitor hiring, internal
movement, and attrition statistics in order to conduct
impact analyses on selected EEO groups who are manifestly
imbalanced and/or conspicuously absent from the work force.
Develop realistic and proactive strategies to eliminate
imbalances in the work force.

Since the Department is in a full downsizing mode, all
efforts to eliminate the identified instances of manifest
imbalances and conspicuous absences will be through the use of
internal movements, including promotions and reassignments, and
employee training and development.  Internal movement objectives
have been established for all EEO groups where there are
instances of underrepresentation in the work force.  See pages
DII-21 through DII-38 for specific numerical objectives by EEO
group, occupational category (PATCOB), and major occupations.

EEOC FORM 566 (8/87)                          DII-12

HUD003887

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM PLAN UPDATE REPORT
REPORT OF OBJECTIVES AND ACTION ITEMS

DEPARTMENT
UPDATE

**PROGRAM ELEMENT:  II.  WORK FORCE**

**PROBLEM/BARRIER STATEMENT:**  Manifest imbalances and conspicuous absences of EEO groups exist in PATCOB categories and mainstream occupations as indicated below:

**OBJECTIVE:**  To reduce manifest imbalances and conspicuous absences of the affected EEO groups.

**RESPONSIBLE OFFICIAL:**  Secretary
**TARGET DATE:**  09/30/97

| ACTION ITEMS: (Cont'd) | RESPONSIBLE OFFICIAL | TARGET DATE |
|---|---|---|
| **PROFESSIONAL (PATCOB) CATEGORY (Cont'd)** | | |
| --Engineer - GS-0801<br>--FY97 Numerical Objective: 2<br>--Eight Year Numerical<br>  Objective: 41 | Assistant<br>Secretaries<br>and Principal<br>Organization<br>Heads | 09/30/97 |
| --Attorney - GS-0905<br>--FY97 Numerical Objective: 5<br>--Eight Year Numerical<br>  Objective: 54 | " | " |
| --Contracting Specialist -<br>  GS-1102<br>--FY97 Numerical Objective:  4<br>--Eight Year Numerical<br>  Objective:  19 | " | " |

EEOC FORM 566 (8/87)                                    DII-14

HUD003889

COMBINED HIRING AND INTERNAL MOVEMENT
NUMERICAL OBJECTIVES BY PATCOB
FISCAL YEAR 1997

ORGANIZATION: HUD

| OCCUPATIONAL CATEGORY | PLANNED/ACTUAL | TOTAL ALL | WHITE | | BLACK | | HISPANIC | | ASIAN AMERICAN/ PACIFIC ISLANDER | | AMERICAN INDIAN/ ALASKAN NATIVE | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | MALE | FEMALE | MALE | FEMALE | MALE | FEMALE | MALE | FEMALE | MALE | FEMALE |
| PROFESSIONAL | PLANNED | 41 | ****** | 16 | 2 | 3 | 2 | 4 | 3 | 3 | 5 | 3 |
| ADMINISTRATIVE | PLANNED | 202 | ****** | 113 | 0 | 10 | 19 | 18 | 13 | 11 | 8 | 10 |
| TECHNICAL | PLANNED | 69 | ****** | 39 | 6 | 0 | 9 | 0 | 6 | 2 | 5 | 2 |
| CLERICAL | PLANNED | 42 | ****** | 25 | 3 | 0 | 5 | 0 | 4 | 0 | 3 | 2 |
| OTHER | PLANNED | 1* | ****** | 0 | 1* | * | * | * | * | * | * | * |
| BLUE COLLAR | PLANNED | 0 | ****** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | PLANNED | 355 | ****** | 193 | 12 | 13 | 35 | 22 | 26 | 16 | 21 | 17 |

EEOC FORM 566 (8/87)

* One from either of the identified targeted groups.

DII-22

HUD003896

COMBINED HIRING AND INTERNAL MOVEMENT
NUMERICAL OBJECTIVES BY MAJOR OCCUPATIONS
FISCAL YEAR 1997

ORGANIZATION: HUD (CONT'D)

| OCCUPATIONAL CATEGORY | PLANNED/ ACTUAL | TOTAL ALL | WHITE | | BLACK | | HISPANIC | | ASIAN AMERICAN/ PACIFIC ISLANDER | | AMERICAN INDIAN/ ALASKAN NATIVE | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | MALE | FEMALE | MALE | FEMALE | MALE | FEMALE | MALE | FEMALE | MALE | FEMALE |
| GS-0828 CONST ANALYST ADMINISTRATIVE | PLANNED | 5 | ******* | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 1 |
| GS-1101 HSNG MGT SPEC. ADMINISTRATIVE | PLANNED | 44 | ******* | 40 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 0 |
| GS-1160 FIN ANAL (HSNG) ADMINISTRATIVE | PLANNED | 4 | ******* | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GS-1165 LOAN SPECIALIST ADMINISTRATIVE | PLANNED | 15 | ******* | 10 | 0 | 0 | 1 | 0 | 2 | 0 | 1 | 1 |
| GS-1170 * REALTY SPEC. ADMINISTRATIVE | PLANNED | 0 | ******* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GS-1171 APPRAISER ADMINISTRATIVE | PLANNED | 8 | ******* | 2 | 0 | 0 | 0 | 2 | 1 | 1 | 1 | 1 |
| GS-1173 HSNG MGT SPEC. ADMINISTRATIVE | PLANNED | 3 | ******* | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |

* This occupational series has less than 100 employees. No numerical objectives have been established for Fiscal Year 1997. However, the Department will continue to monitor and report on all accomplishments, if any, in this occupational series.

EEOC FORM 566 (8/87)

DII-25

HUD003899

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM PLAN UPDATE REPORT
PROGRAM ANALYSIS

DEPARTMENT

UPDATE

IV.   RECRUITMENT AND HIRING (Cont'd)

EEO GROUP ANALYSIS BY AVAILABILITY IN APPLICANT POOL (Cont'd)

| EEO Group | Applicant Pool # | % | Qual Appl Pool # | % | Candidate Appl Pool # | % | Selectees # | % |
|---|---|---|---|---|---|---|---|---|
| Unknown Race | 148 | 4.3 | 54 | 36.5 | 41 | 75.9 | 3 | 7.3 |
| Males | 59 | 1.7 | 12 | 20.3 | 10 | 83.3 | 1 | 10.0 |
| Females | 89 | 2.6 | 42 | 47.2 | 31 | 73.8 | 2 | 6.4 |
| Totals | 3,409 | 100.0 | 2,373 | 69.6 | 1,894 | 79.8 | 796 | 42.0 |
| Minorities and women | 2,491 | 73.1 | 1,666 | 66.9 | 1,347 | 80.8 | 594 | 44.1 |
| Women | 2,182 | 64.0 | 1,448 | 66.4 | 1,171 | 80.9 | 503 | 42.9 |
| Minorities | 1,455 | 42.7 | 937 | 64.4 | 777 | 82.9 | 330 | 42.5 |

EEO GROUP ANALYSIS BY REPRESENTATION IN THE APPLICANT POOL

| EEO Group | Applicant Pool # | % | Qual Appl Pool # | % | Candidate Appl Pool # | % | Selectees # | % |
|---|---|---|---|---|---|---|---|---|
| Whites | 1,806 | 53.6 | 1,382 | 58.2 | 1,086 | 57.3 | 464 | 58.3 |
| Males | 770 | 22.6 | 653 | 27.5 | 506 | 26.7 | 199 | 25.0 |
| Females | 1,036 | 30.4 | 729 | 30.7 | 580 | 30.6 | 265 | 33.3 |
| Blacks | 1,017 | 29.8 | 654 | 27.6 | 583 | 28.4 | 244 | 30.6 |
| Males | 215 | 6.3 | 145 | 6.1 | 115 | 6.1 | 63 | 7.9 |
| Females | 1,802 | 23.5 | 509 | 21.5 | 423 | 22.3 | 181 | 22.7 |
| Hispanics | 304 | 8.9 | 191 | 8.0 | 157 | 8.3 | 60 | 7.5 |
| Males | 121 | 3.5 | 74 | 3.1 | 59 | 3.1 | 20 | 2.5 |
| Females | 183 | 5.4 | 117 | 4.9 | 98 | 5.2 | 40 | 5.0 |
| Asians | 83 | 2.4 | 59 | 2.5 | 45 | 2.4 | 14 | 1.8 |
| Males | 83 | 1.1 | 26 | 1.1 | 20 | 1.1 | 6 | 0.8 |
| Females | 45 | 1.3 | 33 | 1.4 | 25 | 1.3 | 8 | 1.0 |

EEOC FORM 566 (8/87)                                    DIV-4

HUD003924

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM PLAN UPDATE REPORT
PROGRAM ANALYSIS

DEPARTMENT

UPDATE

IV.  RECRUITMENT AND HIRING (Cont'd)

EEO GROUP ANALYSIS BY REPRESENTATION IN THE APPLICANT POOL
(Cont'd)

| EEO Group | Applicant Pool | | Qual Appl Pool | | Candidate Appl Pool | | Selectees | |
|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % |
| Indians | 51 | 1.5 | 33 | 1.4 | 27 | 1.4 | 11 | 1.4 |
| Males | 24 | 0.7 | 15 | 0.6 | 13 | 0.7 | 4 | 0.5 |
| Females | 27 | 0.8 | 18 | 0.8 | 14 | 0.7 | 7 | 0.9 |
| Unknown Race | 148 | 4.3 | 54 | 2.3 | 41 | 2.2 | 3 | 0.4 |
| Males | 59 | 1.7 | 12 | 0.5 | 10 | 0.6 | 1 | 0.1 |
| Females | 89 | 2.6 | 42 | 1.8 | 31 | 1.6 | 2 | 0.3 |
| Totals | 3,409 | 100.0 | 2,373 | 100.0 | 1,894 | 100.0 | 796 | 100.0 |
| Minorities and women | 2,491 | 73.1 | 1,666 | 70.2 | 1,347 | 71.1 | 594 | 74.6 |
| Women | 2,182 | 64.0 | 1,448 | 61.0 | 1,171 | 61.8 | 503 | 63.2 |
| Minorities | 1,455 | 42.7 | 937 | 39.5 | 777 | 41.0 | 330 | 41.5 |

While no policy or procedural problems/barriers were identified, the Department's ability to conduct targeted recruitment for most positions where underrepresentation exists has been severely limited, for several years, due to the Governmentwide reinvention efforts. As a result, there are instances of under-representation (manifest imbalance and/or conspicuous absence) of some EEO groups in the Department's work force. Further, with a proposed reduction of approximately 30.5 percent of the Department's permanent ceiling over the next three (3) years, little, if any, recruitment and/or hiring is anticipated. In light of the above limitations, emphasis for Fiscal Year 1997 will again be placed on internal movements, training and career development. See pages DIV-6 through DIV-12 for Problem/Barrier Identification and Report of Objectives and Action Items. Also see Program Element II-Work Force for established numerical hiring objectives and Program Element V-Employee Development Programs for related objectives and action items.

EEOC FORM 566 (8/87)                                    DIV-5

HUD003925

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM PLAN UPDATE REPORT
PROBLEM/BARRIER IDENTIFICATION

DEPARTMENT
UPDATE

PROVIDE A NARRATIVE DESCRIBING THE PROBLEMS/BARRIERS IDENTIFIED

IV. RECRUITMENT AND HIRING (Cont'd)

The analysis identified the following problems/barriers:

**UNDESIRED CONDITION:** Governmentwide reinvention, reorganizations, and downsizing efforts have severely limited the Department's ability to conduct targeted recruitment and hiring. As a result, some EEO groups remain underrepresented (manifest imbalance and/or conspicuous absence) in twenty-two (22) major occupational series. Further, the adverse impact analysis and impact ratio analysis revealed that some EEO groups were adversely affected during the competitive selection process.

**DESIRED CONDITION:** The desired condition is to attain and retain a work force that is reflective of the nation's diversity. With little, if any, recruitment and hiring anticipated and with a mandated staff reduction of approximately 30.5 percent by the year 2000, the Department's ability to attain its desired condition is unlikely. Yet, every effort will be made to eliminate instances of underrepresentation of the identified EEO groups in the following occupational categories (PATCOB-Professional, Administrative, Technical, Clerical, Other, and Blue Collar) and major occupational series:

### PROFESSIONAL CATEGORY

0510-Accountant........................ White females

0511-Auditor........................... White females
Black males
Hispanic females
Asian males
Asian females
Indian males
Indian females

---

EEOC FORM 566 (8/87)                                    DIV-6

HUD003926

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

**FISCAL YEAR 1997**
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM UPDATE REPORT
PROGRAM ANALYSIS

DEPARTMENT

UPDATE

## V.  EMPLOYEE DEVELOPMENT PROGRAMS (Cont'd)

a group exceeded their percentages of work force representation (minorities and women +3.5 percent and women +3.1 percent). Minorities comprised 40.2 percent of training participation, an increase of 1.8 percent.  Their percentage of participation is below their percentage of work force representation by 0.8 percent.

An analysis of the number of training incidents revealed that the incidents were either met or exceeded the number of on-board employees in the following EEO groups:  White females – incidents-3,721, employees-3,137; Black males – incidents-881, employees-881; Hispanic males – incidents-368, employees-277; Hispanic females – incidents-593, employees-421; Indian males – incidents-51, employees-43; and Indian females – incidents-95, employees-70.  The percentage of training incidents for on-board Black female employees was 92.6 percent, followed by 89.8 percent for Asian females, and 89.5 percent for Asian males.

**FISCAL YEAR 1996**
ANALYSIS OF SPECIAL EMPLOYMENT PROGRAM AND TRAINING INCIDENTS

|  | Work Force # | % | Special Programs # | % | Training Incidents # | % |
|---|---|---|---|---|---|---|
| WHITES | 6180 | 57.2 | 155 | 52.7 | 6486 | 58.0 |
| Males | 3043 | 28.2 | 53 | 18.0 | 2765 | 24.7 |
| Females | 3137 | 29.0 | 102 | 34.7 | 3721 | 33.3 |
| BLACKS | 3498 | 32.4 | 97 | 33.0 | 3305 | 29.6 |
| Males | 881 | 8.2 | 15 | 5.1 | 881 | 7.9 |
| Females | 2617 | 24.2 | 82 | 27.9 | 2424 | 21.7 |
| HISPANICS | 698 | 6.5 | 28 | 9.5 | 961 | 8.6 |
| Males | 277 | 2.6 | 8 | 2.7 | 368 | 3.3 |
| Females | 421 | 3.9 | 20 | 6.8 | 593 | 5.3 |
| ASIANS | 309 | 2.8 | 9 | 3.1 | 277 | 2.5 |
| Males | 143 | 1.3 | 3 | 1.0 | 128 | 1.1 |
| Females | 166 | 1.5 | 6 | 2.1 | 149 | 1.4 |

EEOC FORM 566 (8/87)                                DV-2

HUD003935

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM UPDATE REPORT
PROGRAM ANALYSIS

DEPARTMENT

UPDATE

V.    EMPLOYEE DEVELOPMENT PROGRAMS (Cont'd)

FISCAL YEAR 1996
ANALYSIS OF SPECIAL EMPLOYMENT PROGRAM AND TRAINING INCIDENTS

|  | Work Force | | Special Programs | | Training Incidents | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| INDIANS | 113 | 1.1 | 5 | 1.7 | 146 | 1.3 |
| Males | 43 | 0.4 | 2 | 0.7 | 51 | 0.5 |
| Females | 70 | 0.7 | 3 | 1.0 | 95 | 0.8 |
| Totals | 10,798 | 100.0 | 294 | 100.0 | 11,175 | 100.0 |
| Minorities and Women | 7,755 | 71.8 | 241 | 82.0 | 8,410 | 75.3 |
| Women | 6,411 | 59.3 | 213 | 72.4 | 6,982 | 62.5 |
| Minorities | 4,618 | 42.8 | 139 | 47.3 | 4,689 | 42.0 |

With the continuing Departmentwide mandatory downsizing and restructuring, HUD remains committed to assuring that every employee is given the opportunity to increase their skills, productivity, and employability, whether in this agency or in the external labor market.  HUD will continue to focus on the training and development of its current staff.  See Fiscal Year 1996 AEP Accomplishment Report, Program Element DV - Employee Development for more detailed analyses of this program element.

EEOC FORM 566 (8/87)                               DV-3

HUD003936

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM UPDATE REPORT
PROGRAM ANALYSIS

DEPARTMENT

UPDATE

PROVIDE A NARRATIVE DESCRIBING THE PROBLEM/BARRIERS IDENTIFIED:

V.    EMPLOYEE DEVELOPMENT PROGRAMS (Cont'd)

PROBLEM/BARRIER IDENTIFICATION

The analysis identified the following problems/barriers

UNDESIRED CONDITION:    The percentages of participation for
some EEO groups (Black males, Black females, Asian males and
Asian females) in both Special Employment Program and/or
incidents of training are below their percentages of work
force representation.  Further, the percentages of parti-
cipation for White females and Indian females decreased
during Fiscal Year 1996 in both Special Employment Programs
and training.  Hispanic male participation also decreased
under Special Employment Programs.

DESIRED CONDITION:    The increased participation of
minorities and women in both Special Employment Program and
incidents of training, with emphasis on White females, Black
males, Black females, Hispanic males, Asian males, Asian
females, and Indian females.

ANALYSIS:    The analysis of HUD's Employee Development
Programs (Special Employment Programs and Incidents of
Training) revealed decreases in the percentages of parti-
cipation, in both categories, for White females (-2.1%),
Asian females (-0.1%), and Indian females (0.4%).  Decreases
also occurred for Black males (-0.5%), Hispanic males (-
0.8%), and Asian males (0.4%) under Special Employment
Programs.  Further, the percentages of participation in
employee training and development programs for Black males,
Black females, Asian males, and Asian females are below
their percentages of representation in the work force.

PROBABLE BARRIER:    Minorities and women may not be applying
for available training, educational, and employee develop-
ment opportunities for fear of non-selection.  Another
probable barrier could be that minorities and women are not
aware of the available developmental opportunities since

EEOC FORM 566 (8/87)                                    DV-4

HUD003937

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

**FISCAL YEAR 1997**
**ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM UPDATE REPORT**
**PROGRAM ANALYSIS**

DEPARTMENT

UPDATE

PROVIDE A NARRATIVE DESCRIBING THE PROBLEM/BARRIERS IDENTIFIED:

**V.   EMPLOYEE DEVELOPMENT PROGRAMS (Cont'd)**

PROBLEM/BARRIER IDENTIFICATION (Cont'd)

most training and development opportunities are announced via the Department's automated on-line information systems as required by the Paperwork Reduction Act.

**ALTERNATIVE:**   Continue to publicize all training and developmental opportunities using the following methods: Department's Internet, cc:Mail messages, focus messages, on-line staff bulletins, the HUD Training Academy's Intranet Homepage, posters and announcements, and hard copy dissemination to local union offices.  Encourage managers and supervisors to work with minority and female staff in the development of Individual Development Plans (IDP's). Promote participation in the Mentoring Program by women and minorities, both as mentors and mentees.

**EXPECTED RESULTS:**   Increased minority and women participation in all training and developmental programs and other educational opportunities.

**FOLLOW-UP ACTION:**   Continue to monitor, analyze, and report on minority participation in training and educational programs.

EEOC FORM 566 (8/87)                              DV-5

HUD003938

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM UPDATE REPORT
REPORT OF OBJECTIVES AND ACTION ITEMS

DEPARTMENT

PROGRAM ELEMENT:    V.   EMPLOYEE DEVELOPMENT

PROBLEM/BARRIER STATEMENT:  The percentages of participation for
some EEO groups, in both Special Employment Programs and
incidents of training, are below their percentages of work force
representation.

OBJECTIVE:  Increased participation of minorities and women
(White females, Black males, Black females, Hispanic males, Asian
males, Asian females, and Indian females) in all employee
development programs and educational opportunities.

RESPONSIBLE OFFICIAL:  Secretary
TARGET DATE:  09/30/97

| ACTION ITEMS: | RESPONSIBLE OFFICIAL | TARGET DATE |
|---|---|---|
| 1. Maintain existing Educational Partnerships with colleges and universities and expand the use of partnerships with other colleges and universities. | Assistant Secretary for Administration and Administrator, HUD Training Academy | Ongoing activity with annual reporting 09/30/97 |
| 2. Continue to sponsor the Department's Employee Development and Training Program including:  The Executive Development Program, the Mid-Level Development Program, the Upward Mobility Program, the Mentoring Program, etc. | " | " |

EEOC FORM 566 (8/87)                                        DV-6

HUD003939

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM PLAN UPDATE REPORT
PROGRAM ANALYSIS

DEPARTMENT

UPDATE

VI.   PROMOTIONS (Cont'd)

PROMOTION ACTIVITY ANALYSIS
Fiscal Year 1996

| EEO Group | Work Force Percentages | | PROMOTIONS Combined Percentages | | Non-Competitive Percentages | | Competitive Percentages | |
|---|---|---|---|---|---|---|---|---|
| | FY96 | FY95/96 Change | FY96 | FY95/96 Change | FY96 | FY95/96 Change | FY96 | FY95/96 Change |
| Whites | 57.2% | -0.5% | 50.6% | -3.0% | 47.8% | -6.0% | 58.2% | +5.6% |
| Males | 28.2 | 0.0 | 16.6 | -2.0 | 14.1 | -3.2 | 23.5 | -1.3 |
| Females | 29.0 | -0.5 | 34.0 | -1.0 | 33.7 | -2.8 | 34.7 | +6.9 |
| Blacks | 32.4 | +0.4 | 37.4 | +3.0 | 39.5 | +5.7 | 31.5 | -5.4 |
| Males | 8.1 | +0.1 | 6.7 | +0.2 | 6.6 | +1.1 | 6.9 | -4.2 |
| Females | 24.2 | +0.3 | 30.7 | +2.8 | 32.9 | +4.6 | 24.6 | -1.2 |
| Hispanics | 6.5 | 0.0 | 8.4 | +0.1 | 8.8 | +0.3 | 7.5 | -0.1 |
| Males | 2.6 | 0.0 | 2.1 | -0.3 | 2.0 | -0.3 | 2.4 | -0.6 |
| Females | 3.9 | 0.0 | 6.3 | +0.4 | 6.8 | +0.6 | 5.1 | +0.5 |
| Asians | 2.8 | 0.0 | 2.1 | -0.4 | 2.2 | -0.4 | 1.5 | -0.5 |
| Males | 1.3 | 0.0 | 0.7 | -0.1 | 0.7 | -0.1 | 0.7 | +0.2 |
| Females | 1.5 | 0.0 | 1.4 | -0.3 | 1.5 | -0.3 | 0.8 | -0.7 |
| Indians | 1.1 | +0.1 | 1.5 | +0.3 | 1.7 | +0.4 | 1.3 | +0.4 |
| Males | 0.4 | 0.0 | 0.3 | +0.1 | 0.4 | +0.2 | 0.3 | +0.1 |
| Females | 0.7 | +0.1 | 1.2 | +0.2 | 1.3 | +0.2 | 1.0 | +0.3 |
| Minorities and women | 71.8 | 0.0 | 83.4 | +2.0 | 85.9 | +3.2 | 76.5 | +1.3 |
| Women | 59.3 | -0.1 | 73.6 | +2.1 | 76.1 | +2.2 | 66.2 | +5.8 |
| Minorities | 42.8 | +0.5 | 49.4 | +3.0 | 52.2 | +6.0 | 41.8 | -5.6 |

EEOC FORM 566 (8/87)                                          DVI-3

HUD003944

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM PLAN UPDATE REPORT
PROBLEM/BARRIER IDENTIFICATION

DEPARTMENT
UPDATE

PROVIDE A NARRATIVE DESCRIBING THE PROBLEMS/BARRIERS IDENTIFIED:

VI.   PROMOTIONS (Cont'd)


PROBLEM/BARRIER IDENTIFICATION

The analysis identified the following problems/barriers:

UNDESIRED CONDITION:   The promotion rates for Black males,
Hispanic males, Asian males, and Asian females are below
their percentage of representation in the Department's work
force.

DESIRED CONDITION:   An increase in both Combined and Non-
competitive promotion rates for Black males, Hispanic males,
Asian males, and Asian females, and an increase in the
Competitive promotion rates for Black males, Hispanic males,
and Asian females which is comparable to their availability
in the work force.

ANALYSIS:   The analysis of the Department's Fiscal Year
1996 Combined promotion activity revealed that the percent-
ages of promotions for White females, Hispanic males, Asian
males, and Asian females decreased.  While the percentage
of promotions for White females also decreased, the per-
centage rate exceeds their work force representation.  The
percentage rate for Asian females mirrors their represen-
tation in the work force.  The rates for the other EEO
groups are below their percentages of work force represen-
tation.  The analysis of Non-competitive promotions also
revealed decreases for White females, Hispanic males, Asian
males, and Asian females.  Under Competitive promotions,
the percentages of promotion for Black males, Black females,
Hispanic males, and Asian females decreased.  The
promotion rates for Indian males and Indian females
increased in all three (3) promotion categories.


EEOC FORM 566 (8/87)                              DVI-4

HUD003945

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM PLAN UPDATE REPORT
PROBLEM/BARRIER IDENTIFICATION

DEPARTMENT

UPDATE

PROVIDE A NARRATIVE DESCRIBING THE PROBLEMS/BARRIERS IDENTIFIED:

VI.  PROMOTIONS (Cont'd)

PROBABLE BARRIER:    It appears that Black males, Hispanic males, Asian males, and Asian females may not be equitably employed in positions or occupational series which allow for promotion potential.  Further, the normal attrition rate and continuing downsizing efforts may have an adverse impact on the availability of eligible candidates from targeted EEO groups for both Non-competitive and Competitive promotions.

ALTERNATIVE:    Continue to assure that each Program Office develops and implements an AEP plan which focuses on internal movement strategies for minority males; continue utilization of the Department's Mentoring Program as a means of assisting minorities and women in breaking through the "Glass Ceiling," with special emphasis on minority males; continue to publicize internal position vacancies by electronic mail and other on-line technology; continue to utilize the Individual Development Plan (IDP) process, the various Educational Partnerships with colleges and universities, and other training and development programs to prepare minorities and women for career advancement; continue providing training on Valuing the HUD Employee utilizing the F.A.I.R. principles; and continue to monitor the promotion rates for minorities and women, and conduct quarterly impact analyses.

EXPECTED RESULTS:    Increased rates of promotion for all targeted EEO groups (Black males, Hispanic males, Asian males, and Asian females, and Indian males) whose percentages of promotions are below their percentages of work force representation.

FOLLOW-UP ACTION:    Continue to track promotion activity and report results to top management.  Results should show an improved promotion rate for the affected EEO groups.

See pages DVI-6 and DVI-7 for Fiscal Year 1997 objectives and action items.  Also see Program Element V - Employee Development Program for related objectives and action items.

EEOC FORM 566 (8/87)

DVI-5

HUD003946

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM PLAN UPDATE REPORT
REPORT OF OBJECTIVES AND ACTION ITEMS

DEPARTMENT
UPDATE

PROGRAM ELEMENT:  VI.  PROMOTIONS

PROBLEM/BARRIER STATEMENT:  The promotion rates for some EEO
groups (Black males, Hispanic males, Asian males, and Asian
females) are below their percentages of representation in the
Department's work force.

OBJECTIVE:  Increase the promotion rates (Combined, Non-
competitive, and Competitive) for Black males, Hispanic males,
Asian males, and Asian females.

RESPONSIBLE OFFICIAL:  Secretary
TARGET DATE:  09/30/97

| ACTION ITEMS: | RESPONSIBLE OFFICIAL | TARGET DATE |
|---|---|---|
| 1. Develop and implement AEP Plans that focus on internal movement strategies and training and development initiatives for each Program Office within Department. | Assistant Secretaries and Principal Organization Heads | 3/29/97 |
| 2. Develop and implement Diversity Plans for each Program Office. | Assistant Secretaries and Principal Organization Heads | 3/29/97 |
| 3. Continue Department-wide training on Managing Cultural Diversity and the Valuing the HUD Employee – F.A.I.R. principles. | Assistant Secretary for Administration, Director, ODEEO, and Administrator, HUD Training Academy | 09/30/97 |

EEOC FORM 566 (8/87)

DVI-6

HUD003046

# EXHIBIT 2



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Washington, D.C. 20507

MAR 1 9 1997

**MEMORANDUM**

TO:     District, Area, and Local Field Office Directors
        Regional Attorneys

FROM:   Ellen J. Vargyas
        Legal Counsel

        C. Gregory Stewart
        General Counsel

        Elizabeth Thornton, Director
        Office of Program Operations

SUBJECT:  Intersectional Discrimination

The Commission's National Enforcement Plan identifies intersectional discrimination as a priority issue. Specifically, it includes:

> Claims based on the intersection of two or more prohibited bases of discrimination (e.g., discrimination against women of color, older women, or minority persons with disabilities).

Based on questions which have been presented about the meaning of this category, we have prepared this memo to provide additional guidance to the field.

## I.    Definition of Intersectional Discrimination

Intersectional discrimination is discrimination based on a combination -- or "intersection" -- of two or more prohibited bases. In intersectional cases, the discrimination is targeted at, or adversely impacts, individuals who are members of two or more protected categories precisely because they are members of these particular categories. The discrimination is, therefore, based on this intersection or combination of the prohibited bases.

A leading case on intersectional discrimination succinctly explains this theory. In Lam v. University of Hawaii, 40 F.3d 1551 (9th Cir. 1994), the Ninth Circuit held that an Asian woman's claim of race and sex animus should be analyzed in terms of "whether the employer discriminates on the basis of that combination of factors, not just whether it discriminates against people of the same race or of the same sex." 40 F.3d at 1562. The court explained that an individual's identity cannot be bisected at the intersection of race and sex nor can the discrimination be reduced to distinct components, because it distorts or ignores the particular nature of an individual's experience. Asian women may be subject to stereotypes and targeted for discrimination even in the absence of discrimination against Asian men or non-Asian women. Intersectional discrimination exists, at least in part, because of stereotypes that are specific to women of color, Black men, older women, older people with disabilities, and other particular groups in which protected classifications intersect.

Lam is part of a developing jurisprudence which recognizes intersectional discrimination claims as stating a cause of action under the civil rights laws. Several courts had previously recognized Black women as a class separate and distinct from the class of women and the class of Blacks. They found that discrimination against Black women can exist even absent discrimination against Black men or White women and that the fact that Black men and White women are not subject to discrimination does not defeat an aggrieved Black woman's charge. In fact, more favorable treatment of Black men and White women can be evidence of discrimination against an aggrieved Black woman. See Jefferies v. Harris County Community Action Association, 615 F.2d 1025 (5th Cir. 1980); Judge v. Marsh, 649 F.Supp. 770, 780 (D.D.C. 1986) (adverse employment actions directed against Black women may violate Title VII). Several other courts have recognized intersectional claims by older women. See Good v. U.S. West Communications Inc., 1995 WL 67672 (D. Or. 1995) (court recognized plaintiff's intersectional claim of age and sex discrimination); Arnett v. Aspin, Secretary of Defense, 846 F.Supp. 1234, 1241 (E.D. Pa. 1994) (court found that

-2-

plaintiff is a member of a protected subgroup -- women over forty).[1]

These cases acknowledge some basic realities of the workforce. For example, employment data indicate a pattern of depressed salary levels and a lack of employment opportunities for Black women, Latino women, and older women. The Department of Labor Glass Ceiling Report, "Good for Business," reports that, at various educational levels and professions, women of color typically make less money than their male racial counterpart and White women. According to the U.S. Bureau of Labor Statistics for 1996, the average median weekly income for Black women is approximately 59% of the median weekly income for White men, 84% of the median weekly income for White women, and 84% of the median weekly income for Black men. The average median weekly income for women 55 years of age and over is approximately 65% of the median weekly income for men in the same age group and 88% of the median weekly income for women 30 to 54 years of age.

Intersectional discrimination cases are distinguishable from multiple discrimination cases. In multiple discrimination cases,

---

[1]     For additional information, there are a number of law review articles and treatises on intersectional discrimination available in the headquarters library. See e.g., Winston, *Mirror, Mirror on the Wall: Title VII, Section 1981, and the Intersection of Race and Gender in the Civil Rights Act of 1990*, 79 Calif. L. Rev. (1991); Smith, *Separate Identities: Black Women, Work, and Title VII*, 14 Harvard Women's Law Journal 21 (1991); Shoben, *Compound Discrimination: The Interaction of Race and Sex in Employment Discrimination*, 55 N.Y.U.L. Rev. 793 (1980); Scales-Trent, *Compound Discrimination -- The Intersection of Race and Gender*, in Rossein, Employment Discrimination Law and Litigation (1994); American Association of Retired Persons, *Employment Discrimination Against Midlife and Older Women* (1996). For additional information on specific stereotypes that have lead to intersectional discrimination, see e.g., Ammons, *Mules, Madonnas, Babies, Racial Imagery and Stereotypes: The African-American Woman and the Battered Woman Syndrome*, 1995 Wisconsin Law Review 1003 (1995); American Association of Retired Persons, *The Persistence of Age and Sex Stereotypes in the 1990s: The Influence of Age and Gender in Management Decisionmaking* (1995).

a Charging Party brings an independent claim of discrimination on each of two or more bases. For example, an employer has a promotion policy that disproportionately excludes both women and African-Americans. In a multiple discrimination case, a Black woman can bring a charge alleging both race and sex discrimination, each on an independent basis. This differs from an intersectional claim where the discrimination is based on the combination of bases. Some cases, however, may involve both multiple and intersectional claims.

## II. Examples of Intersectional Discrimination

**Example:** Tamara is a Black woman who alleges that she was subjected to a racially and sexually hostile work environment. Tamara's co-worker called her a "Black B****". The epithet "Black B****" contains elements of both racial and sexual animus and cannot be designated exclusively as racist or sexist. It is impossible to separate the racial and sexual hostility. Therefore, the slur "Black B****" can be used as evidence of intersectional discrimination on the combined basis of race and sex. In addition, Tamara's co-worker made several sexual comments and three racial slurs to her in a six-week period. Because of the relative infrequency of the comments, Tamara may have insufficient evidence to prove independent claims of either racial or sexual harassment. Nevertheless, if all the comments were considered together, they would be sufficient to establish a claim of harassment. Evidence of the racial and sexual comments may be aggregated to determine the pervasiveness of the harassment and to establish a hostile work environment. See Hicks v. Gates Rubber Company, 833 F.2d 1406, 1416 (10th Cir. 1987) (evidence of racial and sexual hostility may be aggregated to determine the pervasiveness of the harassment); Anthony v. County of Sacramento, 898 F.Supp. 1435, 1445-47 (E.D. Cal. 1995) (plaintiff called a "Black B****"; evidence of racial and sexual harassment must be considered together to establish a hostile work environment).

**Example:** Luis is a Hispanic male who developed polio as a child. He wears a leg brace and walks with difficulty. Luis applied for, and was denied, a position as a shipping clerk in Respondent's warehouse. However, the Respondent has hired non-Hispanics who have similar impairments and has hired Hispanics without impairments. There is no evidence of discrimination against

-4-

Hispanics without disabilities or non-Hispanics with or without disabilities. The employer may be liable for intersectional discrimination on the overlapping bases of national origin and disability. The employer cannot successfully defend its actions by the fact that it has not discriminated against all Hispanics or all individuals with disabilities.

**Example:** Leah is a forty-five year old TV news anchorwoman who was discharged and replaced by a thirty-one year-old anchorwoman. Leah's co-anchor is a fifty-five year old man. A co-worker overheard Leah's manager say that "in this business a woman needs to be youthful and sexually attractive." Leah's former male co-anchor is older than she and her replacement is a woman. Leah may have insufficient evidence to prove an independent claim of age discrimination or sex discrimination. However, Leah may be able to establish that her disparate treatment was caused by a confluence of age and sex discrimination. The Respondent will not be exonerated by the fact that it has not discriminated against all women nor all individuals in the protected age group.

**Example:** Aaron is a Black male who works for a publishing company. He is in an entry level position and sets up computers and phone lines. Aaron has requested training for over a year that would place him on the promotion certification list for a computer analyst position. Women of color, and White and Hispanic men, most with less seniority than Aaron, have received training and are on the certification list. If promoted, Aaron would often have to work after hours and be in the office alone with the female manager. The investigator discovers that this manager has made statements expressing stereotypical fears about Black men. Thus, even though Black women and non-Black men have not been discriminated against, the evidence suggests that Aaron was discriminated against because of the intersection of race and sex.

## III. Charge Processing

Be alert when two or more bases of discrimination may be involved. It may be impossible to determine at the outset of an investigation whether a claim is of intersectional or multiple discrimination. Both theories should be considered when collecting evidence to insure that valid intersectional claims are properly investigated and prosecuted.

-5-

The Commission recognizes intersectional discrimination claims as an enforcement priority. Employers should not be allowed to escape liability merely because the employer does not discriminate against all people in a protected category, but targets, or has policies which have an adverse impact on, particular individuals who belong to two or more protected groups. Moreover, if the Charging Party's case would probably be defeated if the bases are analyzed separately (e.g., the Charging Party is a Black female and the employer has hired or promoted non-Black females and Black males), then analyze the case as an intersectional discrimination claim. Claims of intersectional discrimination may be premised upon any combination of race, color, religion, sex, national origin, age, and/or disability. Accordingly, prohibited bases under Title VII, the ADEA, and/or the ADA may be combined to form the basis for intersectional claims.

The Office of Legal Counsel is interested in helping to develop and track these cases. If we can be of assistance, please contact Teresa Guerrant or Susan Murphy in the Office of Legal Counsel at (202) 663-4679. For assistance with cases in litigation, please contact Jerome Scanlan in Litigation Management Services at (202) 663-4719.