UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD S. PATOSKI, )<br><br>Plaintiff, )<br><br>v. )<br><br>ALPHONSO JACKSON, SECRETARY, )<br>DEPARTMENT OF HOUSING AND )<br>URBAN DEVELOPMENT, )<br><br>Defendant. ) | C.A. No. 05-11086 |

## OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE PLAINTIFF FROM OFFERING EXPERT TESTIMONY REGARDING DAMAGES

Plaintiff hereby opposes Defendant's motion to exclude Plaintiff from offering expert testimony regarding damages. Defendant challenges Plaintiff's calculation of lost pay and benefits as one so complicated as requiring expert testimony. Defendant's motion is erroneous for a number of reasons. First, the calculation of the difference of what Plaintiff has and will earn, as compared to what he would have earned had he been promoted to the Community Builder position, is not one requiring expert testimony. Second, Plaintiff's work-related expertise is financial analysis, and he is more than qualified to calculate lost pay, using official, publicly available OPM tables reflecting salaries. Third, Defendant's apparent assumption that Plaintiff's testimony will be the only evidence in support of damages is false. Plaintiff will call other witnesses, and will provide evidence of other employee's experiences with regard to salary. Fourth, Defendant's claim that "no explanation is provided as to how Plaintiff has reached his

damages estimates" is false. <u>Def.'s Mot.</u>, at 4.  Plaintiff explained his methodology at his

deposition, and the method is not complex.

## I.      THE CALCULATION OF LOST PAY AND BENEFITS IS NOT AN ISSUE INHERENTLY REQUIRING EXPERT TESTIMONY

Plaintiff is, and has been, an employee of HUD.  In 1997, Plaintiff applied for a

Community Builder position.  Had Plaintiff been selected, he would have received a

higher pay grade and salary level.  This case alleges that Plaintiff was rejected for the

Community Builder position because of his gender, his age, or a combination of both.

Counts I-III.  Plaintiff also alleges that gender was "a motivating factor" in his non-

selction.  Count IV.

The calculation of the difference between what Plaintiff has and will earn at

HUD, as compared to what he would have earned had he been selected, is not so

complicated as to require expert testimony.  For example, Plaintiff provided to Defendant

a chart showing his calculations of lost pay, which is attached to Defendant's motion.

<u>Def.'s Motion</u>, at 5-6.  Plaintiff further supported that calculation with print-outs of

official OPM salary schedules for the various Grades and Steps.  <u>Def.'s Motion</u>, 7-16.

Even if this Court were to find this arithmetical analysis to be complicated,

Plaintiff is well-qualified to provide informed testimony.  Plaintiff began working at

HUD in 1972.  <u>Patoski Dep.</u>, at 12, <u>Exhibit 1</u>.  Plaintiff was hired by the Boston office of

HUD in 1980 as the economic development specialist and was considered the regional

expert in financial analysis.  <u>Patoski Dep.</u>, at 9, 197-198, <u>Exhibit 1</u>.  In that capacity, he

promoted, processed, and monitored grants for the urban development action grant

program.  <u>Id.</u> at 9-10.  Plaintiff conducted the financial analysis review of the Columbia

Point project for the urban development action grant, and several years later, it was used

as the national model to create what is known as the Hope VI project. Patoski Dep., at 145, Exhibit 1. Ms. Crane acknowledged that Plaintiff was a competent economic development expert. Crane Dep., at 127-128., Exhibit 2.

Thus, Plaintiff is more than qualified to project his lost earnings than most laypersons. An economic expert, which courts do not routinely require, is certainly not required in this case. Barocco v. Ennis Inc. of Colorado, 2003 U.S. Dist. LEXIS 4080, *3-5 (E.D. La. 2003) (denying Defendants' motion in limine to exclude lay opinion testimony regarding loss of future earning capacity). If Defendant has a concern about a particular piece of Plaintiff's evidence, Defendant can address the concern at trial or through one of its witnesses. Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., 2006 U.S. Dist. LEXIS 67562, *6 (2006) (denying motion in limine to exclude all evidence of damages). Thus, there is no justification to curtail Plaintiff's testimony.

## II.    PLAINTIFF EXPLAINED HIS METHODOLOGY AT HIS DEPOSITION

Plaintiff has had 36 years of exposure to HUD's policies and practices in moving personnel through job grade levels, including his own continuing receipt of step increases. Patoski Dep., at 171-172, Exhibit 1. Accordingly, at his deposition, Plaintiff explained how he calculated the earnings he has lost by virtue of being rejected for the Community Builder position in 1998. Plaintiff applied for the CB position as a GS-14 and GS-15 levels. However, for the purpose of calculating his lost pay and benefits, Plaintiff used **the most conservative approach**, and assumed that he would have been hired on as a GS-14, Step 1. Patoski Dep., at 168, Exhibit 1.

Plaintiff testified, based on his experience at HUD, concerning automatic step increases. Patoski Dep., at 167-169, Exhibit 1. Plaintiff then projected how his salary

3

would have improved over the years. Id. at 169-170. Step increases come in regular increments. Id. Salary information comes from official OPM documents.

Plaintiff also testified that unless there was a problem with an employee, a GS-14, would be promoted to G-15, Step 1 after one year. Id. at 169-170. Other evidence supports Plaintiff's testimony that it is HUD's practice to provide a regular promotion after a year. For example, Ms. Griswold was hired as a Community Builder instead of Plaintiff. After serving in that position for a period of time, Ms. Griswold was promoted. Crane Dep., at 98, Exhibit 2. In fact, Ms. Griswold was promoted over the objections of her supervisor, demonstrating the inevitability of the promotion. Crane Dep., at 98, Exhibit 2.

While HUD may bring in witnesses to contradict Plaintiff, it can not justifiably challenge Plaintiff's experience and understanding with HUD's practices with regard to him and others.[1] With respect to lost retirement pay, Plaintiff attended a special training on calculating pension pay, and he will rely on written materials provided to him in that training. The pension calculations are straightforward, and easily calculated. See Patoski Dep., at 197, Exhibit 1.

Since this subject is not the proper basis of expert testimony, a Daubert hearing is unnecessary; and Plaintiff's testimony concerning his lost earnings does not require duplication or substitution by an economic expert. Barocco, 2003 U.S. Dist. LEXIS at *6 (rejecting argument that economic expert is required and denying defendants' motion to exclude lay opinion testimony concerning future earning capacity).

---

[1] At the time of his deposition, Plaintiff had only calculated damages to February 2006, based on the salaries he would have earned as a Community Builder, in comparison with the annual salaries he actually earned from 1998 to February 2006. Patoski Dep., at 170, Exhibit 1.

In an excess of caution, Plaintiff will be timely supplementing his Pretrial witness list to add union officials who will be able to meet any standard of testimony for lost pay and benefits.  Defendant's assumption that the only evidence of damages would be Plaintiff's testimony is erroneous.

## CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court deny Defendant's motion to exclude Plaintiff's testimony on the financial damages he has incurred as the result of his rejection for the Community Builder position.

Respectfully submitted,

The Plaintiff,
By his Attorneys


_____/s/ Robert S. Mantell_____
Kevin G. Powers, BBO #405020
Robert S. Mantell, BBO #559715
Rodgers, Powers & Schwartz LLP
18 Tremont Street
Boston, MA 02108
(617) 742-8010

Patoski opposition limine damages

# EXHIBIT 1

## Page 1

(1) 1 - 201
(2)
(3)         IN THE UNITED STATES DISTRICT COURT
(4)                        FOR THE
(5)              DISTRICT OF MASSACHUSETTS
(6)
(7) RICHARD S. PATOSKI,           )
                                  )
(8)                  Plaintiff,   )
                                  )
(9) -V-                           )  CIVIL DOCKET NO.
                                  )  05-11086-RCL
(10) Alphonso Jackson, Secretary, )
     DEPARTMENT OF HOUSING & URBAN)
(11) DEVELOPMENT,                 )
                                  )
(12)                  Defendant.  )
(13)
(14)
(15)         THE ORAL DEPOSITION OF RICHARD S. PATOSKI, held
(16) pursuant to Notice, and the applicable provisions of the
(17) Federal Rules of Civil Procedure, before MaryAnn Rossi, a
(18) Court Reporter and Notary Public, within and for the
(19) Commonwealth of Massachusetts, at the offices of the
(20) United States Attorney, 1 Courthouse Way, Suite 9200,
(21) Boston, Massachusetts, on Thursday, December 7, 2006,
(22) commencing at 10:11 a.m.
(23)
(24)
(25)

## Page 2

(1) PRESENT:
(2) On Behalf of the Plaintiff:
(3)      ROBERT S. MANTELL, ESQ.
         Rodgers, Powers & Schwartz, LLP
(4)      18 Tremont Street
         Boston, MA  02108
(5)      (617) 742-7010
(6) On Behalf of the United States:
(7)      MARK GRADY, ESQ.
         Assistant U.S. Attorney
(8)      Office of the United States Attorney
         1 Courthouse Way
(9)      Boston, MA  02210
         (617) 748-3100
(10)
         JACK BRANDWEIN, ESQ.
(11)     Associate Regional Counsel
         US Department of Housing and Urban Development
(12)     10 Causeway Street
         Boston, MA  02222
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

## Page 3

(1)                    I N D E X
     WITNESS                                        PAGE
(2)
     Richard S. Patoski
5
(3)
     EXHIBITS: DESCRIPTIO                           PAGE
(4)
(5)    1    FY97 HUD AEP Update Repor               57
(6)    2    FY99 HUD AEP Update Repor               62
(7)    3    EEOC Management Directive 7171
(8)    4    Instructions to Federal Agencies
            for EEOC MD7171
(9)    5    FY04 HUD MD715 Repor                    78
(10)   6    FY05 HUD MD715 Repor                    78
(11)   7    First Amended Complaint and Jury
            Trial Demand                            165
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

## Page 4

(1)              S T I P U L A T I O N S
(2)
(3)         IT IS HEREBY STIPULATED AND AGREED TO, by and
(4) between the parties and their respective
(5) attorneys, that all objections, except as to
(6) the form of the questions, shall be reserved
(7) until the time of trial; that the filing of
(8) the deposition be waived; and, that the
(9) witness may read and sign the deposition
(10) without any Notary Public being present.
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Page 9

(1) My job consists of primarily three types of
(2) activities. One is processing applications for grants from
(3) HUD, coming from client communities. Clients are generally
(4) cities and – and government entities. Also, they can be
(5) nonprofits for some of the grants that we – or other
(6) entities engaged in homeless program services.
(7) The second component of the job is monitoring
(8) these grantees after they are awarded grants for compliance
(9) with the appropriate program regulations that were
(10) promulgated by HUD and by other government wide agencies,
(11) such as OMB and so forth that may be applicable to that
(12) particular grant.
(13) And the third is providing technical assistance to
(14) grantees in meeting their obligations under what's called
(15) the consolidating planning process. And the key component
(16) there is helping them to identify, obtain and coordinate all
(17) available resources that would be directed towards their
(18) locally determined housing and community priorities.
(19)    Q    And how long have you had that position?
(20)    A    I've worked in the Boston office since 1980 in
(21) community planning and development division. But the job
(22) has evolved into a series of different things over time.
(23) I was initially hired to be the economic
(24) development specialist for the office without any assigned
(25) cities and working then to promote, process and monitor

Page 10

(1) grants under a specific grant program called the urban
(2) development action grant program, which is just like the
(3) Hope VI program, in fact, the predecessor to the Hope VI
(4) program.
(5) The grant program terminated in 1989, I believe,
(6) at which time, I assumed the duties and responsibilities of
(7) a normal CPD rep. Meaning, CPD meaning community planning
(8) and development representative.
(9)    Q    And those were what you just described?
(10)    A    The consolidated planning process was initiated, I
(11) believe, in 1994 or 5. And that's become the – the
(12) component of providing technical assistance to help cities
(13) obtain, identify, obtain and coordinate resources to address
(14) their locally determined housing and community development
(15) priorities, was instituted at that time under – under
(16) Secretary Cuomo.
(17) It was a personal initiative of him which later
(18) evolved into the community builder program.
(19) But, at that time, it was somewhat of a new effort
(20) in that HUD staff were viewing – viewed their position
(21) primarily as one of processing grants and monitoring for
(22) compliance. Under the new technical assistance aspect and
(23) consolidated planning process, this was happening at a time
(24) when the funding was being curtailed and the objective of
(25) the program was to help them identify other resources, not

Page 11

(1) just HUD CPD resources, but all resources that are available
(2) to coordinate, – identify them, obtain them and coordinate
(3) them, to deal with their local issues.
(4)    Q    So, let me see if I – I tried to follow that.
(5) Up until 1995, you were basically doing the first
(6) of the two things you initially described as your present
(7) duties; is that correct?
(8)    A    Well, no, that is not correct. Under the UDAG
(9) program, I was doing pretty much what you do on the
(10) consolidated plan program. Because the UDAG program had a
(11) test.
(12) There was a competitive grant program. And the
(13) test in the application process was what we called the but
(14) for test, meaning, but for these funds from HUD, this
(15) project would not proceed.
(16) That required, in reviewing those applications, an
(17) assessment of, are they accessing other available resources.
(18) So–
(19)    Q    I'm going to try to move these along, because this
(20) isn't obviously the crux of the matter.
(21) Prior – so, since basically – well, strike that.
(22) You described your present duties in three categories?
(23)    A    Yes.
(24)    Q    And you have more or less performed that job
(25) throughout your time at HUD?

Page 12

(1)    A    Yes. You know, my time in Boston.
(2)    Q    In Boston?
(3)    A    I joined HUD in 1972.
(4)    Q    Prior to that, you had had other jobs with HUD?
(5)    A    Prior to my coming to Boston–
(6)    Q    Prior to coming to Boston?
(7)    A    Yeah. Entirely different jobs for HUD.
(8)    Q    Can you tell me if you know what the HUD Hispanic
(9) employment plan is? Or what's your understanding of it?
(10)    A    My understanding is it's a program to – there's
(11) two components to all the programs aimed at minorities.
(12) The Hispanic employment program has a public
(13) relations type of aspect to it in terms of holding events
(14) like Hispanic heritage week, bringing in Hispanic –
(15) Hispanic speakers on different topics regarding Hispanics.
(16) Outreach to Hispanic colleges or students to – you know,
(17) and organizations to make them aware of what HUD does and
(18) to help in the recruiting process.
(19) But, it also includes paying for HUD staff to go
(20) to the Hispanic employment program conferences, particularly
(21) their annual conference, in which the organization's main
(22) purpose is to promote the career development of Hispanic
(23) employees and ways that that can be done in the department.
(24) So that there is actual training given to
(25) management staff on how to get Hispanics into the upper

## Page 13

(1) levels of management in HUD.

(2)      Q   Are you aware of any rule or regulation or

(3) executive order under which HUD is required to have an

(4) Hispanic employment program?

(5)      A   I believe, the Hispanic employment program is

(6) established according to an executive or presidential

(7) executive order.

(8)      Q   Can you describe for me what claims, if any, you

(9) are pursuing in this litigation with respect to the Hispanic

(10) employment plan?

(11)      A   Well, I think the Hispanic employment—

(12)      MR. MANTELL:   Objection.

(13) I'm objecting to it. Go ahead.

(14)      A   It's a program that leads to preferences for

(15) Hispanic employees in assignments, training, promotions and

(16) hiring, and ways in which that can occur.

(17)      BY MR. GRADY:

(18)      Q   Did the Hispanic employment plan play a role in

(19) you not receiving the community builder position?

(20)      A   No. It did not.

(21)      Q   Is it your contention that the Hispanic employment

(22) plan played a role in your not receiving the public housing

(23) revitalization specialist position?

(24)      MR. MANTELL:   Objection.

(25) You can answer.

## Page 14

(1)      A   No. It did not.

(2)      BY MR. GRADY:

(3)      Q   Okay. Can you describe for me how you personally

(4) were injured by HUD's Hispanic employment plan?

(5)      A   It's part of their ongoing preferences, patterns

(6) and practices that give preferences to a minority class, an

(7) EEO class, in this case, Hispanics, over white males.

(8)      Q   Is there any occasion on which you have been

(9) denied a tangible employment benefit as a result of the

(10) Hispanic employment plan?

(11)      A   Yes.

(12)      Q   What is that? Can you describe that for me?

(13)      A   The selection of an Hispanic woman for the

(14) position of CD director for the Miami field office.

(15)      Q   And how is it that the Hispanic employment plan

(16) caused that women to be selected for that position? How is

(17) it that that harmed you?

(18)      A   Well, one of the things that they did in that

(19) selection process was they – I had applied for the

(20) position. I had made the best qualified list for the

(21) position.

(22) They had established a best qualified list and

(23) rating roster.

(24) And the woman was selected, the Hispanic woman was

(25) selected at the GS-14 level from the DEU certificate of

## Page 15

(1) eligibles. That certificate of eligibles from the first

(2) vacancy announcement – well, I wasn't selected for the

(3) position is how it harmed me.

(4) But, to go on to show discrimination against white

(5) males in the process, to favor – discrimination that

(6) discriminated against white males and favored Hispanic

(7) women, is that the DEU certificate of eligibles for the

(8) GS-14, the top scoring person was a white male who was not

(9) selected.

(10) He was a veteran. And if anybody was selected,

(11) they would've had to select him, because he was the top

(12) scoring white male – a white – he was a veteran. He was

(13) the top scoring and he was a veteran.

(14) He would have had to been selected under the

(15) statutory veterans preference.

(16) HUD subsequently made no selection claiming that

(17) there were – and I have an affidavit to this effect,

(18) claiming that the selection – a selection was not made

(19) because they wanted to do expand their pool of applicants.

(20) And they issued a subsequent vacancy announcement.

(21) There was, to my knowledge, no effort to cancel

(22) the first vacancy notice, or to give any notification to

(23) anybody that was on the best qualified list for the first

(24) vacancy announcement per OPM – OPM instructions. Their

(25) instructions read should, not shall give notice to people

## Page 16

(1) when you cancel and reissue a vacancy.

(2) There was no formal cancellation. Cancel vacancy

(3) announcement that I know of. Normally, HUD would issue the

(4) USA jobs, you know, – a vacancy announcement with a

(5) notation that this vacancy announcement has been canceled

(6) and a subsequent one will be reissued.

(7) In this case, they just reissued the vacancy

(8) announcement. They did not give notice to me or to the

(9) white male that had appeared at the top of the vacancy list.

(10) And they processed the selection through a new

(11) vacancy announcement that was a duplicate of the original

(12) one for which there was an Hispanic female that applied, who

(13) had not applied on the first vacancy – in response the

(14) first vacancy announcement, the initial vacancy

(15) announcement, who was then selected.

(16) It appeared that almost – by the surnames on the

(17) list, that almost all of the Hispanics that applied under

(18) the initial vacancy announcement did apply under the

(19) subsequent reissued vacancy announcement.

(20) Now, this could very well be a process that was

(21) promoted at the – as part of the HEP program. I don't

(22) know.

(23) There was a news article about that time in which

(24) – in the Federal Times, in which Secretary Jackson talked

(25) about how HUD needed to hire more Hispanics and we needed

to

Page 145

(1)   Q   So, what is it that you contend rendered someone
(2) ineligible for a GS-15 under the DEU?
(3)   A   Not having enough experience. I believe the rule
(4) reads that you need to have one year of experience equal to,
(5) or equivalent to one year of experience at the next lower
(6) level with the federal service or something like that.
(7) But, you don't automatically have to have it.
(8) In other words, I demonstrated, since I had worked
(9) back when -- in the '80s, for the prototype Hope VI project,
(10) Columbia Point was the prototype just to give you an idea
(11) since you are from the area. You know about Columbia Point,
(12) the three levels, former residents, blah, blah, blah.
(13) I did the review for that project for the urban
(14) development action grant, which was the grant given to them.
(15) Subsequent to that project, several years after that
(16) project, they made it -- used that as the national model to
(17) create this Hope VI project.
(18) You've seen the success at Columbia Point. It's
(19) terrific. So, they did this thing.
(20) And they put it -- it's public housing. They put
(21) it -- instead of the CBD division, they put it in the public
(22) housing division. Okay.
(23) So, I had lots of experience to cite doing that.
(24) The same financial analysis.
(25)   Q   So that's why you qualified at 15 but maybe Kevin

Page 146

(1) Gallagher didn't?
(2)   A   Kevin Gallagher probably didn't -- I don't know.
(3) His experience was in syndication.
(4) Just -- you have to -- what syndication does is,
(5) you have to -- it sells the tax credits, but you don't--
(6)   Q   Okay. We want to move this along.
(7)   A   So, Kevin applies. He gets found eligible for the
(8) 13 and 14. Ineligible for the 15.
(9) There is an eligibility determination sheet done
(10) for each level.
(11) Somehow, by mistake, HUD claims, his name got put
(12) on the rating sheets for the 15 level.
(13)   Q   Okay.
(14)   A   With Abbey and the rest -- and I was on
(15) that level, too. Okay.
(16) But now they have to pick -- you have to be rated
(17) and ranked and get to the top three. Okay.
(18) So, Kevin Gallagher, a white male, gets rated and
(19) ranked and gets the highest score. He gets the highest
(20) score when he was determined not even to be eligible. Okay.
(21) Now, that's pretty odd. Right.
(22) So, if he wasn't on there, I would have been
(23) fourth on the list. I was fifth on the list. Okay.
(24) Now, there was another guy named Knighton, I
(25) think?

Page 147

(1)   Q   Knighton.
(2)   A   Knighton. Okay. Who applied under the MSR
(3) application process. But, he wasn't a status candidate,
(4) because he was a temporary community builder fellow and not
(5) a civil service status candidate.
(6) He was determined, rightly so, to be ineligible
(7) for consideration under the MSR process.
(8)   Q   He didn't have federal civil service--
(9)   A   He didn't have federal civil service. He
(10) submitted to the application under the -- he responded to
(11) the wrong vacancy announcement.
(12) HUD unilaterally took his application and moved it
(13) over to the DEU processing. He hadn't applied under the DEU
(14) in response to the DEU application.
(15) So, he gets rated and ranked and appears number
(16) four on the list.
(17)   Q   On the GS-15 list?
(18)   A   On the GS-15 certificate of eligibles.
(19)   Q   Certificate of eligibles.
(20)   A   But, on the rating and ranking. The certificate
(21) of eligibles only contains the top three. Okay.
(22) So, if he had not been moved over, I would have
(23) been number three. If Knighton hadn't been
(24) mistakenly put on the rating, if Knighton hadn't been moved,
(25) I would be number three.

Page 148

(1) I would've been on the list.
(2)   Q   Okay.
(3)   A   Okay. Now, HUD claims they moved Knighton: "Oh,
(4) that was just a routine thing." We have asked in discovery:
(5) "Okay. Who else have you ever moved?"
(6) And you guys claim you don't have that
(7) information. So, I think it's bogus. All right.
(8)   Q   It's improper for them to have taken this guy's
(9) application--
(10)   A   It says should not. If you read to the OPM
(11) directions, it says, applications received in response to --
(12) when there are two different announcements issued,
(13) applications received in response to those announcements,
(14) should, not shall, be processed under the -- in the process
(15) for that announcement.
(16)   Q   Okay. So, in essence, they shouldn't have sent
(17) him over to the DEU. And if they didn't, you would have
(18) been up one higher?
(19)   A   And I would've been on the certificate of
(20) eligibles.
(21) So, where was I damaged? I was damaged in not
(22) being considered for the thing.
(23) Now, I'll go even one step further. Okay. If
(24) they hadn't put Kevin Gallagher's name mistakenly on that,
(25) and still they transferred Knighton and so forth, but DE --

## Page 149

(1)  the certificate of eligibles for the DEU process would have
(2)  contained – from which the selection is made, would have
(3)  contained the names of the only three blacks to apply for
(4)  the job. Very odd indeed.
(5)  Q      Okay. Now, go back even further, back to the MSR
(6)  A      Okay. Now, go back even further, back to the MSR
(7)  application process. Guess what? Nobody made a best
(8)  qualified list.
(9)  They were all rated scores of like 24, when 25 was
(10) necessary to make the best qualified list. So, there was no
(11) best qualified list for the MSR application.
(12) Q      Well, I mean, are you contending somehow that–
(13) A      The standards were extremely skewed.
(14) Q      Okay.
(15) A      So that the people that would make a best
(16) qualified – there were none for status candidates. They
(17) didn't want to hire any status candidates. They wanted to
(18) fill these jobs with the majority of women and minorities
(19) that were already temporary community builder fellows.
(20) Less standards to move people up there, especially
(21) if you are a fellow. And the people rating and ranking the
(22) applications, with no crediting plan, could pick and rate
(23) whatever they wanted, put those people at least – all they
(24) had to do was get them into the top three list. That's it.
(25) Then, the selecting official took care of the

## Page 150

(1)  rest.
(2)  Q      Okay. What evidence is there, or on what basis do
(3)  you contend that those two officials that were doing the
(4)  rankings used race or gender as a factor in their decision?
(5)  A      Because they had performance standards of meeting
(6)  the goal of meeting the AEP goals.
(7)  Q      Okay. Besides the AEP goals, was there any – is
(8)  there any other basis that those people used race or gender
(9)  as a factor in their rating?
(10) A      Yes. For the GS-15 level management position.
(11) These were managements. These were the directors of public
(12) housing division and other offices. I think one was for
(13) Newark and one was for New York or something like that.
(14) To a large degree, there's a little bit of a
(15) political process going on in there. You have to be
(16) considered – not political in terms of having a sponsor or
(17) a patron. But, you have to be considered in what – HUD
(18) uses this term all the time, a team player.
(19) Well, a team player is like Mary Lou Crane. You
(20) have to support the secretary's initiative.
(21) That's how these people get the jobs and how they
(22) keep their jobs. And I'll give you an example of that.
(23) There is – there was one male, Robert–
(24) Q      Don't give me examples of people getting the job.
(25) Come back to, besides the AEP, what evidence is there that

## Page 151

(1)  you contend in this case, supports the claim that those two
(2)  people who did the rating and ranking used race or gender as
(3)  a factor in their ratings?
(4)  A      The patterns and practices of who gets the jobs
(5)  that they have. In other words, that they would be team
(6)  players, supportive of Cuomo's initiatives, that's one. The
(7)  more important one is probably the performance standard and
(8)  their EPES, of meeting and making anything – any decisions
(9)  regarding hiring. Not just the hiring decision. Any
(10) decision in the process that they are making them in
(11) consideration of the AEP goals.
(12) And that's all I can think of right now, but I'm
(13) sure there are more.
(14) Q      Do you know who those two people are?
(15) A      Carmine and DelRosa. I don't remember their names
(16) precisely. But one is the director. One was a white male,
(17) one was an Hispanic female.
(18) Q      So, it's your contention that white males
(19) discriminated against other white males in HUD in order to
(20) advance under this AEP?
(21) A      All the time.
(22) Q      Okay.
(23) A      If you are going to be promoted.
(24) Q      Can you explain to me how you are prejudiced by
(25) HUD forwarding ineligible applications from the MSR to the

## Page 152

(1)  DEU process?
(2)  A      Because by doing that, I was not placed on the
(3)  certificate of eligibles and for the DEU position.
(4)  Q      Because that individual was found to be higher
(5)  rated than you?
(6)  A      Higher than me, using a rating system without a
(7)  crediting – not based on a crediting plan and placed on the
(8)  roster.
(9)  Q      But under that crediting plan, a white guy
(10) actually scored the highest; correct?
(11) A      Yes. And under the selection process, he was not
(12) selected. A white male that was found ineligible.
(13) Q      But, with respect to the rating process, that you
(14) critiqued, it actually found a white male was given a higher
(15) score under that process; correct?
(16) MR. MANTELL:      Objection.
(17) A      It is my contention that that was done on purpose
(18) so that it wouldn't look so obvious that they had developed
(19) a certificate of eligibles that had only the three black
(20) males that applied for the position on it.
(21) BY MR. GRADY:
(22) Q      Well, it doesn't seem like HUD could have ever
(23) done anything right. Because if they put a white guy at the
(24) top, it was only part of their conspiracy. And if they
(25) didn't put a white guy at the top, it's because they were

## Page 161

(1) they issued that letter. They must have a list of all the
(2) letters that they have sent out.
(3) They are sent out by one person, Jeff Lammers.
(4)     BY MR. GRADY:
(5)     Q   What I'm trying to sort of get at is, you were
(6) considered for the position under the DEU announcement;
(7) right?
(8)     A   Yes.
(9)     Q   If you were considered for the same position under
(10) the DEU announcement, why does it matter that you weren't
(11) qualified for the MSR? Does that make it more clear?
(12)     A   Because I wasn't considered for the position for
(13) the MSR.
(14)     Q   Why would it be different if, say they had found
(15) ineligible under the MSR --
(16)     A   Yes.
(17)     Q   -- for GS-14 --
(18)     A   Yes.
(19)     Q   And what would have --
(20)     A   It would be high enough to make the qualified
(21) list.
(22)     Q   -- what would have happened then?
(23)     A   I would've been rated and ranked and put on, I
(24) hope, the best qualified list.
(25)     Q   And if you were put on the best qualified list

## Page 162

(1) under the MSR, would you automatically have gotten the
(2) position?
(3)     A   No.
(4)     Q   What would've happened?
(5)     A   They would have given that list, along with the
(6) DEU best qualified list or called certificate of eligibles
(7) for each level of the position, same for the MSR.
(8) So, there would be six lists that they would give
(9) to the selecting official, who would then decide who it was
(10) going to select from any one of those six lists.
(11)     Q   Okay. So, you would -- there would be a best
(12) qualified list from the MSR at the GS-14 -- In a perfect
(13) world, there would be Richard Patoski, best qualified, MSR
(14) announcement GS-14 would've gone along with the DEU
(15) certificate of eligibles, the three people considered with
(16) -- under the DEU announcement; is that correct?
(17)     A   Yes.
(18)     Q   Okay. And they would -- so you lost an
(19) opportunity to be considered at the GS-14 level because of
(20) the erroneous finding that you were ineligible?
(21)     A   Right. And that's the result of the
(22) discrimination. The result of the discrimination is not the
(23) non-selection. Please understand that.
(24) It's the not being considered for the position
(25) because of the discrimination, and not being put on either

## Page 163

(1) list.
(2) I didn't make an MSR list. I didn't make a DEU
(3) list.
(4) If they hadn't moved Gallagher over their
(5) incorrectly, if they hadn't put Gallagher on there
(6) incorrectly, if they hadn't moved Knighton over, I'd be on
(7) that list.
(8)     Q   So, you didn't -- you would've gotten
(9) consideration for the position if things were done properly
(10) under at least the MSR GS-13 level; correct?
(11)     A   I would have gotten consideration if things were
(12) done properly under both processes.
(13)     Q   Okay. Now, in order for you to have made that
(14) best qualified list under the MSR, there still would've been
(15) an intervening ranking; correct?
(16)     A   Yes.
(17)     Q   And so, you would still have had to have been
(18) ranked to make the best qualified list under the MSR?
(19)     A   Yes. And that was at the 14 level.
(20) And since I ranked pretty high for the GS-15
(21) position on the DEU, one would assume that, if they are
(22) using the same grading standards, which in this case, I
(23) contend that, that I would have made it on the 14,
(24) would've made at least the cut off.
(25)     Q   But, since they erroneously kept you off the MSR,

## Page 164

(1) you were denied that opportunity for consideration that you
(2) would have gotten?
(3)     A   I strongly object to the word erroneously. I
(4) think it was deliberate.
(5)     Q   Okay.
(6)     A   And it was because of discrimination.
(7)     Q   Because of what you contend was a deliberate error
(8) in the MSR process, you were denied the opportunity to be
(9) considered for the GS-14 level under the MSR?
(10)     A   Deliberate discriminatory process in the
(11) processing of the MSR application.
(12)     Q   Okay. Was any minority candidate considered under
(13) the MSR announcement for the PHRS position?
(14)     A   None of them made the best qualified list. Were
(15) there minorities in the pool? I really don't know at the
(16) time.
(17) It's clear in the ROI, but I just don't remember.
(18)     Q   So, there were no minorities that made the best
(19) qualified list for the -- under the MSR announcement;
(20) correct?
(21)     A   No one made the best qualified list, because there
(22) was none. That I can recall.
(23) There was something about Yablonskie. And I can't
(24) remember whether he made the list --
(25)     Q   But, without suggesting anything, I think you said

Page 165

(1) that he got a 24 and the cut off was 25?

(2)    A    I believe he did. I mean, which was strange

(3) because he is the public housing revitalization specialist,

(4) or was at that time. Not a Hope VI specialist, but a public

(5) housing revitalization specialist.

(6)    Q    Who is George Bridgeman? Do you know?

(7)    A    I do not know – recognize the name.

(8)    Q    Do you know who Philip Holmes is?

(9)    A    Don't recognize the name.

(10)    Q    William Howell?

(11)    A    Don't recognize the name.

(12)    Q    Ernest Nichols?

(13)    A    Don't recognize the name.

(14)    Q    Jeffrey Twerago?

(15)    A    Don't recognize the name.

(16)    Q    Alexander Villardo?

(17)    A    Don't recognize the name.

(18)    Q    Do you know if those people have any relevance to

(19) this lawsuit?

(20)    A    I don't know. Are they the list of the candidates

(21) from the MSR? I don't know.

(22)    MR. GRADY:    I'm just going to have this marked as

(23) the next exhibit.

(24)    (Patoski Exhibit Number 7 marked

(25)    for identification.)

Page 167

(1)    A    In 2004.

(2)    MR. MANTELL:    Objection.

(3)    BY MR. GRADY:

(4)    Q    What are the damages you are seeking in this

(5) action?

(6)    MR. MANTELL:    Objection.

(7)    A    I believe it's in here. Compensation for any lost

(8) wages and benefits incurred as a result of the rejection,

(9) including before or after judgment, back pay and front pay.

(10) My back pay now is occurring at about 2000 a

(11) month. It's probably about 180,000 by now.

(12)    Q    Starting with back pay, –

(13)    A    1998.

(14)    Q    Okay. So, first to starting from 1998, it's your

(15) contention that it is $2000 a month?

(16)    A    The differential between my current pay and back

(17) pay is about 2000 a month.

(18)    Q    And what's the basis for that calculation?

(19)    A    My calculation using the pay scale.

(20)    Q    And how – explain to me how you went about it?

(21) Getting the $2000?

(22)    A    Taking the grade level position I was at the time

(23) and what I've been promoted to since. And the pay level of

(24) the position that I would have gotten as a community

(25) builder, and with the automatic promotions that go with

Page 166

(1)    BY MR. GRADY:

(2)    Q    Could you please tell me if you could identify

(3) what has been marked as deposition Exhibit 7?

(4)    A    It's identified as the first amended complaint and

(5) jury trial demand.

(6)    Q    You don't recognize that document?

(7)    A    Yes, I do. It's my first amended complaint and

(8) jury trial demand.

(9)    Q    Can you tell me if, in there there's any reference

(10) to your denial of the 2003 position?

(11)    A    No. There's no reference.

(12)    MR. MANTELL:    Objection.

(13)    A    There is an indirect reference and that is part of

(14) the patterns and practices that are alleged in, I believe,

(15) Count 9, item 59.

(16)    BY MR. GRADY:

(17)    Q    With respect to–

(18)    A    And there is a reference here at some – "He

(19) continues to apply for positions and continues to be

(20) rejected in favor of certain racial or ethnic groups. That

(21) has happened on three occasions."

(22)    Q    This was filed in June 2006; correct?

(23)    A    Yes.

(24)    Q    And the denial for the position you applied for in

(25) 2004 was when?

Page 168

(1) that, relatively automatic step increases.

(2)    Q    Well, just – just to be sure that we are all on

(3) the same page, when you say you are calculating from – from

(4) what you made at the time in 1998, you knew that. That's a

(5) pretty fixed number; correct?

(6)    A    Um-hmm.

(7)    Q    You also know the amounts that you have made since

(8) 1998; correct?

(9)    A    Um-hmm. And I was promoted.

(10)    Q    That's a yes?

(11)    A    Yes.

(12)    Q    You said um-hmm. We don't have video.

(13)    A    Sorry.

(14)    Q    No. Don't apologize for it that's a perfectly

(15) natural thing. That's why this is such an unnatural

(16) experience.

(17)    A    I don't find it unnatural.

(18)    Q    Now, when you say, I calculated from the GS – you

(19) know, the salary of the position I would've gotten, what

(20) number are you using? Where are you getting it from? What

(21) level have you decided or are you presuming you would have

(22) gotten–

(23)    A    Well, I applied for the job at the GS-14.

(24)    Q    Okay.

(25)    A    So, I used GS-14 step one. There is an automatic

## Page 169

(1) increase when you go to – well, I assumed that I would have
(2) been promoted to the GS-15 level.
(3)    Q    When?
(4)    A    After one year at the GS-14 level.
(5)    Q    What's the basis for that assumption?
(6)    A    You are generally promoted unless there is some
(7) problem. And as we learned in Mary Lou's deposition, she
(8) tried to hold back the promotion of Deborah Griswold based
(9) on the fact that she didn't have people skills. And she was
(10) unable to do that.
(11)    Q    Okay.
(12)    A    So, even your supervisor can't hold back your
(13) promotion.
(14)    Q    So, the presumption is that, in one year, you
(15) would have gone up to GS-15?
(16)    A    Yes.
(17)    Q    Okay.
(18)    A    Let's put it this way. Deborah Griswold got the
(19) job at a 14. She's the only one that got it at a 14.
(20) And so, I calculated it at where she was at during
(21) various times, what grade steps she was at.
(22)    Q    Oh, okay. Well, I mean again, you've got to walk
(23) me through it. I mean, you know what you did. I don't know
(24) what you did.
(25)    A    You start with year one as a GS-15 – 14, step

## Page 170

(1) one. Year two as a GS-15 step one. Year three as a GS-15
(2) step two. Year three as a GS-15 – year four as a GS-15
(3) step three.
(4) And then, I think, I'm still calculating in step
(5) three. I don't know if it's three years until you get to a
(6) step four.
(7)    Q    Okay. And you–
(8)    A    That's without any quality in grade increases.
(9) They're based on your performance. I didn't put those in.
(10)    Q    So, what's your total as of today for back pay?
(11)    A    I gave the total in one of my documents. At the
(12) time, and I think it was, as of February of this year, like
(13) 160. And it's accruing at about 2000 a month. That's the
(14) current difference.
(15)    Q    What's front pay? When you say "front pay", what
(16) do you mean?
(17)    MR. MANTELL:    Objection.
(18)    A    That's from the date of the decision 'til when the
(19) jury determines the compensation. Is that what it is?
(20)    BY MR. GRADY:
(21)    Q    Well, I mean, I just wanted to–
(22)    A    I'm not clear on the understanding of that term,
(23) but it's – I know the compensatory damage has to be done by
(24) the jury.
(25)    Q    Did you work at HUD continuously since you were

## Page 171

(1) denied the CB position?
(2)    A    Yes, I have.
(3)    Q    Now, with respect to the public housing
(4) revitalization specialist position, have you calculated what
(5) your lost wages are for that?
(6)    A    No. I haven't, but it melds in with the community
(7) builder. It would be included, the figure for the community
(8) builder job.
(9)    Q    You've assumed that you're going to win?
(10)    A    I know I'm going to win.
(11)    Q    All right. But, assuming you didn't win, how
(12) would I calculate public housing revitalization specialist–
(13)    A    I did the same thing. I looked at – I calculated
(14) from a GS-14 step one.
(15)    Q    And progressed the same way you–
(16)    A    Progressed the same way.
(17)    Q    And let me – just very generally speaking, how
(18) much did you make this year?
(19)    A    What is my current salary?
(20)    Q    Yes. What is your current salary?
(21)    A    I think it's 97,000.
(22)    Q    Last year?
(23)    A    95. I don't know. I've only been getting
(24) cost-of-living raises.
(25)    Q    I hate that too.

## Page 172

(1)    A    I get a step increase this year.
(2)    Q    Okay. And the year before last? I mean, do you
(3) know your salaries from '98 on?
(4)    A    I – I can calculate them. I don't know them
(5) right now at this time.
(6)    Q    Could we get that information? If you are making
(7) a claim of lost wages?
(8)    A    Sure.
(9)    MR. GRADY:    Do have a problem with that, Rob?
(10)    MR. MANTELL:    You can issue a request for it if
(11) you'd like. Where you are late, I just – I'm just kind of
(12) taken aback, because you have – you know what his salary
(13) is. You have–
(14)    THE WITNESS:    HUD certainly knows.
(15)    MR. MANTELL:    So, I'm just stunned again.
(16)    THE WITNESS:    HUD has all the SS52's, that would
(17) have the salary information on it.
(18)    BY MR. GRADY:
(19)    Q    Any other – any other explanation of what the
(20) front pay is that you are seeking?
(21)    A    Not at this time.
(22)    MR. MANTELL:    Objection.
(23)    BY MR. GRADY:
(24)    Q    You are seeking an amount of money that will
(25) compensate you for emotional and physical pain, suffering,

**Page 173**

(1) inconvenience, mental anguish and loss of enjoyment of life.
(2) Can you describe for me what emotional and
(3) physical pain you have suffered in relationship to this?
(4)    MR. MANTELL:    Objection.
(5)    A    Emotional and physical. I don't know what stress
(6) would fall under, emotional or physical.
(7) BY MR. GRADY:
(8)    Q    Well, have you—
(9)    A    Are you asking me just to describe it or to tell
(10) you?
(11)    Q    Sure. Just what is – what would you contend
(12) comprises your damages in this regard?
(13)    A    I'm – what it says. Emotional and physical pain,
(14) suffering inconvenience and loss of enjoyment. All
(15) of those.
(16)    Q    And how is—
(17)    A    Describe those things?
(18)    Q    Yes. What emotional and physical pain have you
(19) had?
(20)    A    The stress has caused me – the stress from not
(21) being accepted and continually watching the – or being
(22) damaged by the practices and – patterns and practices that
(23) resulted in my non-selection for the community builder and
(24) the public housing revitalization specialist position,
(25) non-selection for the community builder position, and not

**Page 174**

(1) being considered for the public housing revitalization
(2) specialist position caused an extreme amount of stress that
(3) resulted in me seeking counseling from HUD's employment
(4) assistance program.
(5)    MR. MANTELL:    Can we take a short break?
(6)    MR. GRADY:    Sure.
(7)    (Off the record from 3:15 p.m. to 3:18 p.m.)
(8) BY MR. GRADY:
(9)    Q    So, you were describing the emotional and physical
(10) pain that you have undergone as a result of non-selection.
(11)    A    Well, I'd like to probably also get into
(12) everything, the mental anguish, damaged reputation, I mean,
(13) the diminished earning capacity, etcetera, etcetera.
(14)    Q    Sure. I asked you what emotional pain and
(15) physical pain you have undergone as a result of the
(16) non-selection.
(17)    A    Okay. Well, it all started with the non-selection
(18) for the community builder position. Particularly, when I
(19) was given notice that Linda Pellegrino was selected over me.
(20) Remember Linda Pellegrino was the 28-year-old
(21) female who had very limited experience in HUD and in fact,
(22) experience in only one program. And she was selected over
(23) me, which I considered a personal affront, took that very
(24) personally.
(25) I felt it was discrimination from the moment it

**Page 175**

(1) happened. Especially with the secretary's emphasis on
(2) bringing in younger blood and blah, blah, blah. And I
(3) really kind of went into a funk, you could call it
(4) depression.
(5)    Q    Well, hold on a second. You can call it that.
(6) Were you diagnosed with depression at any point?
(7)    A    I'll get into the diagnosis in a minute.
(8)    Q    Okay.
(9)    A    Okay. A lot of stress. I sought counseling from
(10) the employees assistance program. She thought my reactions
(11) and feelings were fairly normal, but she suggested that I
(12) see a psychiatrist about it, which I did.
(13)    Q    And who was that?
(14)    A    Dr.Robert Abernathy. He is at Mass General. He
(15) is listed on our witness list. He is a specialist in anger
(16) management.
(17) Because the stress was boiling up and I would get
(18) very angry about the situation, about what I saw around me.
(19) Particularly, one instance was when Mary Lou asked
(20) me to represent HUD at the national meeting in Providence,
(21) Rhode Island right after they all had been selected and
(22) supposedly were going to, you know, a month long training
(23) session. And – she actually made the request through my
(24) director, Robert Paquin.
(25) And he came to me and said: "You know, gee, I

**Page 176**

(1) really hate to, you know, spring this on you, but Mary Lou
(2) really wants you to sit on a panel." And the panel was with
(3) the regional director of EDA and the regional SBA director.
(4) And, you know, normally, I'd be flattered to be
(5) put on a level with these people. But I said: "Absolutely
(6) not."
(7) You know, and then, Paquin had a long talk with me
(8) about how it would be in my best interest to still do it,
(9) blah, blah, blah, you know, etcetera, etcetera. That just
(10) caused much more stress, you know, doing this.
(11) I personally – my job for me is personally not a
(12) vocation is an avocation. And I really enjoy my job.
(13) And I was really good at it. And I got accolades
(14) for it and everything else.
(15) And to not be selected for a job that was
(16) basically a continuation, at least of a component of what I
(17) was doing, and had received all these awards from –
(18) including from Cuomo who had set up the program and
(19) everything, was just an overwhelming personal affront which
(20) resulted in the stress from coming to work almost every day.
(21) It took a long time in counseling with Mr.– with
(22) Dr.Abernathy. He attributed it to my problem to – since
(23) he's an anger management specialist to the stress
(24) triggering, affecting my levels of serotonin in my brain in
(25) the synapse and so forth.

Page 193

(1) integration of the office of the department of EEO. And the
(2) fact that 24 out of 25 people in that office are minorities
(3) is outrageous. Women and minorities.
(4)     Q    Did you miss any work as a result of this denial
(5) of the—
(6)     A    I missed simply for the stress. There were lots
(7) of days where I would just call in and not go in.
(8)     Q    How many days did you miss specifically?
(9)     A    I would have to go back and calculate that. I
(10) would probably say a dozen at least.
(11)     Q    12 days since 1998?
(12)     A    Probably more. And because there are days I get
(13) up and I just can't – I just can't go to work. And that's
(14) why I've been pushing for a three day telecommuting
(15) schedule. But HUD keeps denying it.
(16) Plus, you know, time when I have to come to all
(17) this stuff. When I – you know, when there's a deposition,
(18) I have to take time off to come to one. Not this one, but
(19) other depositions.
(20) Time spent on my case when I'm at home. You know,
(21) with respect to my enjoyment of life, vacation schedules,
(22) the whole works.
(23)     Q    Well, what specifically are you claiming in regard
(24) to those things?
(25)     A    That I've had to put in an extreme – an extreme

Page 194

(1) amount of hours working on this case, reviewing material,
(2) talking to people.
(3)     Q    Do you think you should be recompensed for your
(4) time putting in on this case?
(5)     A    I should be recompensed for the time I have taken
(6) off from work to do that. I should be – I think I should
(7) be compensated for the time I've put into it.
(8)     Q    Okay.
(9)     A    Travel to Washington for the depositions, that
(10) type of stuff.
(11)     Q    I want to go back to – Dr. Abernathy; is it?
(12)     A    Yes.
(13)     Q    You began treating with him in 1998; is that
(14) correct?
(15)     A    Yes.
(16)     Q    And it's your contention you began treating with
(17) him because of the stress caused by the denial of the
(18) community builder position? Is that correct?
(19)     A    Yes. It precisely was the only reason I went to
(20) him. He was recommended, referred to me, and I was able to
(21) get in to see him. He's very hard to schedule with.
(22) Because he's the expert.
(23)     Q    What did you tell him about the denial
(24) in the first interview?
(25)     MR. MANTELL:    Objection. Patient/therapist

Page 195

(1) privilege.
(2) I instruct you not to answer.
(3)     A    I won't answer.
(4)     BY MR. GRADY:
(5)     Q    What did you tell him about the denial at any of
(6) the times that you have seen him?
(7)     MR. MANTELL:    The same objection. And the same
(8) instruction.
(9)     A    I won't respond. On the advice of attorney, I
(10) won't respond to that question.
(11)     BY MR. GRADY:
(12)     Q    What did – and again, you are seeking to recover
(13) for emotional distress damages; correct?
(14)     A    Yes. I believe it will all be presented when the
(15) jury determines damages.
(16)     Q    You intend to tell the jury that you were treating
(17) with a psychiatrist, a psychologist?
(18)     MR. MANTELL:    Objection.
(19) You can answer.
(20)     A    Yes. I will tell them that. I will probably
(21) bring him in to testify.
(22)     BY MR. GRADY:
(23)     Q    And you intend to bring him in to testify with
(24) regard to his diagnosis in this matter; is that correct?
(25)     A    I haven't talked to him about it. Actually, I may

Page 196

(1) have. He said probably – it would probably be no problem.
(2) I would have to discuss with him, you know, what
(3) he is going to disclose and not disclose.
(4)     MR. GRADY:    I'm going to suspend the deposition on
(5) that issue.
(6)     (Off the record from 3:45 p.m. to 3:50 p.m.)
(7)     MR. GRADY:    Counsel, you intend to object and
(8) instruct your witness not to answer with respect to further
(9) questions directed to communications between he and his
(10) psychiatrist?
(11)     MR. MANTELL:    The questions given so far, that's
(12) right.
(13)     MR. GRADY:    If there were further questions
(14) regarding what the specific communications were between your
(15) client and the psychiatrist, you would object and instruct
(16) the witness not to answer?
(17)     MR. MANTELL:    Right. I believe, you're entitled
(18) to the medication, the diagnosis. And I think, you've
(19) already gotten those.
(20) So, other than that, I think privilege applies.
(21)     MR. GRADY:    Okay. Thank you.
(22) I have nothing further today. Thank you very
(23) much, Mr.Patoski. We will suspend.
(24)     MR. MANTELL:    I have – I have a few questions.
(25)     MR. GRADY:    Oh, no, no. That's fine. On the

Page 197

(1) issue with privilege.
(2) EXAMINATION
(3)     BY MR. MANTELL:
(4)     Q.   In the complaint, Exhibit 7 talks about
(5) compensation for any loss of wages and/or benefits.
(6) Are there any other losses – you've described the
(7) loss of wages.
(8) Are there any other losses that you should be
(9) compensated for as a result of the rejection?
(10)     A    Yes. The calculation of my annuity payment
(11) depends on my high three years. So, I need to be reinstated
(12) for that.
(13) And one of the main reasons I am seeking promotion
(14) is because of the impact on my retirement annuity, which is
(15) substantial, over 1000 a month.
(16)     Q.   Now, you discussed your emotional distress with
(17) regard to the rejection for the community builder position.
(18) Did you experience any emotional distress with
(19) regard to the rejection for the PHRS position?
(20)     A    Yes, I did. The same type of distress that I
(21) experienced with the community builder position.
(22) Particularly, because, when I was the economic
(23) development specialist for the office from 1980 through
(24) 1990, and probably slightly beyond, doing the financial
(25) analysis of applications for urban development action

Page 198

(1) grants, I was considered the regional expert on that.
(2) So, to not get the Hope VI position, which would
(3) be a natural flow from that, I – you know, reputation
(4) again.
(5) And part of it is incredibly the selection
(6) official was not from the Hope VI program. But almost all
(7) the staff of the Hope VI program in Washington, which I know
(8) and communicate with and so forth, are former UDAG staff
(9) members.
(10) We used to use a separate office for the UDAG
(11) program because of the skills required in that program. And
(12) those people, when the program was eliminated, and they
(13) started the Hope VI, they moved those people over to run the
(14) Hope VI program.
(15) So, as I talked to Hugh Allen and a number of
(16) other people that are – you know, I just – diminished ego,
(17) humiliation, stature. You know, it's: "Rick, how come
(18) you're not the Hope VI specialist in Boston? What
(19) happened?"
(20) And all I can say is: "I applied for the job and
(21) didn't get it."
(22)     MR. MANTELL:    I have no further questions.
(23)     MR. GRADY:    Nothing on the cross.
(24)     (Whereupon, at 3:55 p.m., the deposition was
(25) suspended.)

Page 199

(1)     C E R T I F I C A T E
(2) COMMONWEALTH OF MASSACHUSETTS )
     ) SS.
(3) COUNTY OF SUFFOLK )
(4) I, MaryAnn Rossi, a Court Reporter and Notary
(5) Public, within and for the Commonwealth of Massachusetts, do
(6) hereby certify that there came before me on this 7th day of
(7) December, 2006, the person hereinbefore named, who was by me
(8) duly sworn to tell the truth, the whole truth, and nothing
(9) but the truth, concerning and touching the matter in
(10) controversy in this cause; that he was thereupon examined
(11) upon his oath, and his examination reduced to typewriting,
(12) under my direction, and that this deposition transcript is a
(13) true and accurate record of the testimony given by the
(14) witness.
(15) I further certify that I am not related to any of
(16) the parties hereto or their counsel, and that I am in no way
(17) interested in the outcome of said cause.
(18) Dated at Boston, Massachusetts, this 29th day of
(19) December, 2006.
(20)
(21)
     MaryAnn Rossi
(22) NOTARY PUBLIC
     My Commission Expires:
(23) September 12, 2008
(24)
(25)

Page 200

(1) CORRECTION SHEET
(2) DEPOSITION OF RICHARD S. PATOSKI
(3) PAGE NO. LINE NO. SUGGESTED CORRECTION
(4)
(5)
(6)
(7)
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

# EXHIBIT 2

# In The Matter Of:

## *Richard S. Patoski   v.*
## *Alphonso Jackson*

---

## *Mary Lou Crane*
## *Vol. 1, May 5, 2006*

---

## *Doris O. Wong Associates, Inc.*
## *Professional Court Reporters*
## *50 Franklin Street*
## *Boston, MA  02110*
## *(617) 426-2432*

*Original File CRANE.V1, 163 Pages*
*Min-U-Script® File ID: 3799344055*

# Word Index included with this Min-U-Script®

Page 94

[1] So there were a number of rounds for hiring
[2] community builders. Is that correct?
[3]   A: I remember there were at least two.
[4]   Q: Okay. And Mr. Nee was in the second round?
[5]   A: I believe so.
[6]   Q: Okay.
[7]   A: Or I know he came to me in the second
[8] round. I don't know if he was also in the first
[9] round.
[10] Is Mr. Nee handicapped in any way?
[11]   A: No.
[12]   Q: What is his sexual orientation?
[13]   A: I think he's a heterosexual.
[14]   Q: Okay. How old is he? Or how old —
[15]   A: He was in his early 40s at the time.
[16]   Q: Was he a veteran?
[17]   A: No. Depends upon what wars you're talking
[18] about. But, no.
[19]   Q: Okay. Any — did you make any other
[20] recommendations relating to the second round of
[21] hiring for community builders?
[22]   A: Not before the fact.
[23]   Q: You mean —
[24]   A: Not before there was a pool of candidates.

Page 95

[1] I mean, Marty was — when I knew Marty was a
[2] candidate, I wanted Marty. I got people I didn't
[3] know, of course, but — in — in this — I don't
[4] remember how this worked. There were internal
[5] candidates as well, and I did make a recommendation
[6] on a white female.
[7]   Q: Okay. And who was that?
[8]   A: Who was it?
[9]   Q: Yes.
[10]   A: A Debra —
[11]   Q: — Griswold?
[12]   A: Yes.
[13]   Q: Okay.
[14]   A: Which was, in retrospect, a bad
[15] recommendation. But ...
[16]   Q: And why was that?
[17]   A: Because she turned out to be a difficult
[18] employee.
[19]   Q: She had bad interpersonal skills?
[20]   A: Yes.
[21]   Q: How long did it take to discern that?
[22]   A: I don't know but it — I did notice early
[23] on that she was sending late-night memos down to
[24] Washington. I mean, she was difficult.

Page 96

[1]   Q: And —
[2]   A: Not what I expected when I recommended her.
[3]   Q: Did you know of her work?
[4]   A: Not intimately.
[5]   Q: No.
[6] So prior to the time that you recommended
[7] her, you did not really know much about her work
[8] habits or her job performance and things like that?
[9]   A: I thought her job performance was good,
[10] but, you know, in retrospect, maybe I learned a lot
[11] of that from her. So maybe she was blowing her own
[12] horn. But my impression of her was that she was a
[13] bright woman with depth of knowledge. She was
[14] pleasant. She'd been given some top assignments.
[15] And that's the kind of person I wanted in the
[16] position.
[17]   Q: Okay. Well, let's back up a little.
[18] What was Debra Griswold's position prior to
[19] becoming a community builder?
[20]   A: She was a community planning and
[21] development representative.
[22]   Q: And how had you come to know of her work
[23] performance?
[24]   A: A lot of it was through meetings in the

Page 97

[1] city of Boston, because she was assigned to handle
[2] things in the city of Boston.
[3]   Q: And you interacted with her personally?
[4]   A: Yeah, I did.
[5]   Q: Some or —
[6]   A: Within the office, outside the office, yes.
[7] It wasn't a huge office.
[8]   Q: Okay. And from those interactions, you
[9] never discerned that she had a problem with
[10] interpersonal relationships?
[11]   A: No.
[12]   Q: No. And it was only later that these
[13] problems came up?
[14]   A: Well, she didn't like me because she
[15] thought I only liked the men on the staff. So we
[16] started to have a problem.
[17]   Q: And you say she's a white female?
[18]   A: Yes.
[19]   Q: How old was she when she became a community
[20] builder?
[21]   A: You know, I don't know. She was probably
[22] in her late 30s, early 40s.
[23]   Q: When you recommended her, did you regard it
[24] as a positive factor that she was a female?

Page 98

[1] A: Yes.
[2] Q: When you — at some point, Ms. Griswold was
[3] promoted, is that correct, to a GS-15?
[4] A: Not by me.
[5] Q: Not by you?
[6] A: In fact, I fought her promotion.
[7] Q: For what reason did you fight her
[8] promotion?
[9] A: Because I didn't think she merited it.
[10] Q: Why?
[11] A: Because of her job performance. I was
[12] doing her evaluation at that time. She thought she
[13] was automatically entitled to it.
[14] Q: Was her poor interpersonal skills part of
[15] the reason why you did not think she merited —
[16] A: Yes.
[17] Q: — a promotion?
[18] A: Yes. And I also didn't think it was an
[19] automatic.
[20] Q: So, going to the first round of hiring for
[21] community builder positions — excuse me a second.
[22] (Pause)
[23] Q: Could you hold on for one minute.
[24] MR. MANTELL: Let's take a short break.

Page 100

[1] MR. MANTELL: Yeah.
[2] It's about 12:20. Why don't we go for
[3] lunch. I will make a copy of this and have it
[4] marked when we come back.
[5] MR. GRADY: It's not — you don't need to
[6] do it right now. You can do it at the end.
[7] MR. MANTELL: Why don't we take lunch.
[8] (Luncheon recess taken
[9] at 12:15 p.m.)

Page 99

[1] (Recess taken)
[2] BY MR. MANTELL:
[3] Q: I'm going to give you a document that
[4] purports to be a selection roster for the community
[5] builder position, and I'm just going to have you
[6] look at it.
[7] A: (Perusing documents)
[8] I haven't seen this.
[9] Q: Okay. I understand. I understand. Okay.
[10] I was just trying to refresh your recollection as to
[11] whether you received a written list from which to
[12] make recommendations for the community builder
[13] position.
[14] A: I don't know if I did. I can't remember if
[15] I did.
[16] Q: But it was — if you did, it wasn't this
[17] document that you saw?
[18] A: I never saw a document like that.
[19] MR. GRADY: Can we mark the document you
[20] showed the witness, counsel?
[21] MR. MANTELL: Sure.
[22] MR. GRADY: I just don't ever want to be in
[23] a situation where there's some question about what
[24] was shown.

Page 101

[1] AFTERNOON SESSION
[2] MR. MANTELL: Would you mark this.
[3] (Document marked as Crane
[4] Exhibit 7 for identification)
[5] BY MR. MANTELL:
[6] Q: Why don't we start. We'll go back on.
[7] A: Didn't you already show me these?
[8] Q: I did.
[9] Could you review Crane Exhibit 7. Do you
[10] recognize ever seeing that document before?
[11] A: I do not.
[12] Q: And that was the document that you
[13] previously testified that you had not seen before.
[14] A: I even forgot some of these people were
[15] candidates, and just looking at this, it makes me
[16] laugh.
[17] Q: Now, we're going back to the first round of
[18] candidates for the community builder position, and
[19] you were testifying about your role in that round of
[20] hiring for the Boston office.
[21] (Fire drill interruption)
[22] BY MR. MANTELL:
[23] Q: Okay.
[24] A: Back on the first round.

Page 126

[1] a turnoff to a political person. The mayor of
[2] Gloucester used to send me e-mails complaining about
[3] him all the time.
[4]     I shouldn't say all the time. I had
[5] several e-mails of complaint.
[6]     Q: Can you recall, other than the mayor of
[7] Gloucester, who complained about Mr. Patoski?
[8]     A: You know, it was either Lawrence or
[9] Lowell's city manager. I can't — Lowell is the one
[10] with the city manager. Must have been Lowell's city
[11] manager because Lawrence has an elected mayor.
[12]     Q: So you think it was Lawrence — Lawrence's
[13] city manager?
[14]     A: No. Lowell. Lowell had the city manager
[15] form of government.
[16]     Q: Okay. So the only two people you can
[17] recall complaining about Mr. Patoski is Lowell's
[18] city manager and the mayor of Gloucester. Is that
[19] correct?
[20]     A: Yes.
[21]     Q: To your knowledge, did either one of them
[22] complain prior to your recommendation —
[23]     A: Yes.
[24]     Q: — not to hire Mr. Patoski?

Page 127

[1]     A: They didn't — they did not have anything
[2] to do with the community builder situation. But
[3] they had complained prior to his being a candidate
[4] for community builder, yes.
[5]     Q: Were these the only reasons why you did not
[6] recommend Mr. Patoski?
[7]     A: Yes. Because I knew Mr. Patoski and I knew
[8] him to be an intelligent person. I sought his
[9] advice on things.
[10]     Q: Okay. So, technically, did you think he
[11] did his job well?
[12]     A: His assigned job? Yes.
[13]     Q: Do you think he was professional and
[14] competent?
[15]     A: Yes.
[16]     Q: Did he deal with you in a professional and
[17] competent manner?
[18]     A: Yes.
[19]     Q: To your knowledge, did he — did you ever
[20] witness Mr. Patoski interact with others in the
[21] workplace?
[22]     A: Prior to selection or subsequent to?
[23]     Q: Yes. Prior to his nonselection as a
[24] community builder.

Page 128

[1]     A: I probably saw him giving advice to his
[2] colleagues.
[3]     Q: To your understanding, prior to his
[4] selection, did Mr. Patoski interact with his
[5] coworkers in a competent and professional manner?
[6]     A: I would guess so. I mean, I don't think he
[7] would have had the special assignments that he had
[8] as economic development expert did he not. Because
[9] everybody had to then rely on his guidance and
[10] advice, so he must have.
[11]     Q: So he wouldn't have been in that position,
[12] you're saying, unless he had certain skills for
[13] interactive — for interacting?
[14]     MR. GRADY: Objection to form. Go ahead.
[15]     A: I think that he was in that position more
[16] based on his knowledge. He was very knowledgeable
[17] of that subject area.
[18]     Q: Had any of Mr. Patoski's coworkers ever
[19] complained to you about his interactive skills?
[20]     A: No, but that wouldn't have been
[21] appropriate. I wouldn't have been the person they'd
[22] complain to.
[23]     Q: Can you recall specifically what the mayor
[24] of Gloucester said to you about Mr. Patoski prior to

Page 129

[1] his nonselection as community builder?
[2]     A: I cannot.
[3]     Q: Can you recall with any specificity what
[4] the Lowell city manager said to you —
[5]     A: No.
[6]     Q: — prior to Mr. Patoski's nonselection?
[7]     A: I can't.
[8]     Q: Did you review any documents prior to —
[9] well, did you tell Mr. Cintron the reason why you
[10] were not recommending Mr. Patoski?
[11]     A: I may have had a conversation about his
[12] personality being brusque. He — Mr. Patoski was
[13] kind of a straight-arrow kind of economic person,
[14] did his job very well in that area, but didn't have
[15] ancillary skills that I felt the community builders
[16] needed to have, which had to do with the whole
[17] interpersonal thing.
[18]     Q: Did you review any documents before making
[19] these recommendations to Mr. Cintron?
[20]     A: Not that I remember. He —
[21]     Q: Did Mr. — go ahead. I don't want to
[22] interrupt you.
[23]     A: No. No. My lawyer has advised me not to
[24] say anything like that.