UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RICHARD S. PATOSKI,                          )
                                             )
              Plaintiff,                      )
                                             )
v.                                           )        C.A. No. 05-11086
                                             )
ALPHONSO JACKSON, SECRETARY,                 )
DEPARTMENT OF HOUSING AND                     )
URBAN DEVELOPMENT,                           )
                                             )
              Defendant.                      )

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITIONS TO MOTIONS IN
LIMINE REGARDING THE AEP, DOCKET NUMBERS 85 AND 86 –
LEAVE TO FILE GRANTED ON APRIL 24, 2008**

        Plaintiff Richard S. Patoski hereby submits his Reply Memorandum in response

to Oppositions to Plaintiff's Motions in Limine regarding the legality of HUD's

Affirmative Employment Program (AEP).  Plaintiff's original motions are at Docket 70

and 71 and the Oppositions to which Plaintiff replies are at Docket 85 and 86.  The

arguments contained in Defendant's oppositions should be rejected because [1] the AEP

reflects a specific and mandatory demand that HUD managers confer benefits on

particular people based on gender categories, and does not constitute a vague, generalized

preference for workforce diversity; [2] there is no need to exhaust administrative

remedies as a prerequisite to introducing **evidence** of gender discrimination; and [3] prior

rulings by Magistrate Judge Alexander and Judge Lindsay do not preclude Plaintiff from

submitting evidence of a bias against White males to demonstrate gender discrimination.

I.    CASES APPROVING OF AN EMPLOYER'S GENERAL DESIRE FOR A
      DIVERSE WORKFORCE ARE DISTINGUISHABLE

HUD argues that its AEP represents an "an aspiration goal" that its workforce

reflect the diversity of the civilian workforce, and that such a goal is not illegal.  Docket

85, at 13.  HUD seeks to dilute the significance of its institutionalized bias against White

males with citation to cases that stand for the proposition that expression of general

concern for workforce diversity does not indicate unlawful bias.  Id.

HUD fails to respond to the various cases cited by Plaintiff for the proposition

that a governmental goal of diversity to reflect the nation's workforce is illegal.  The

cases cited by HUD are distinguishable because in those situations, the employers [1]

merely expressed a desire to obtain a diverse candidate pool, (Silver v. CUNY, 947 F.2d

102, 1022 (2nd Cir. 1991) (employer sought a diverse candidate pool, but did not indicate

that selection decisions should be based on diversity)); [2] expressed a concern for

diversity, and there is no link between that concern and the job action at issue, (Blanke v.

Rochester Tel. Corp., 36 F. Supp.2d 589, 597-598 (W.D.N.Y. 1999) (employer's general

desire for diversity was not linked to the decision to terminate the plaintiff); Brown v.

Time, Inc., 1997 WL 231143 * 4 (S.D.N.Y. 1997) (generalized desire for diversity did

not express a policy of discrimination); or [3] expressed generalized concerns about the

lack of diversity in the context of an overabundance of White male employees (Lutes v.

Goldin, 62 F. Supp. 2d 118, 131-132 (D.D.C. 1999); Ltizer v. Roanoke, Virginia, 2003

WL 1456514, *4 (W.D.Va 2003) (statements deploring lack of diversity).  These cases

are inapt because here considerations of diversity were linked with specific selection

decisions, in the context where White males were already dramatically underrepresented

2

in the HUD workplace.[1]

By way of distinguishing the instant case from the various cases cited by Defndant, Plaintiff will examine a typical AEP report. Exhibit 1 contains the FY1997 AEP Report, which was in effect when HUD refused to promote Plaintiff to the Community Builder position in December 1997. It is the most relevant report.

The Community Builder position was in the "Administrative" category of jobs. The AEP Report for FY 1997 imposed a goal of adding 113 White females into the Administrative category. Exhibit 1, at 3896. Despite the fact that White males were underrepresented in the Administrative category (and in every other major occupational category, as well), no numerical goal was adopted to benefit White males. Exhibit 1, at 3886, 3869.

The Community Builder was also categorized as a "GS-1101" position within the Administrative category. The FY1997 AEP Report adopted the goal of adding 40 White women into GS-1101 jobs. Exhibit 1, at 3899. No such goals were adopted for White men.

While White males were 28.2% of the HUD workforce, they only received 18% of the training in Special Programs. Exhibit 1, at 3935. White females were 29% of the workforce, but they received 34.7% of the training in Special Programs. Id. HUD

---

[1] The case of Payne v. Norwest Corp., 911 F. Supp. 1299, 1305-1306 (D. Mont. 1995), aff'd in part and rev'd in part on other grounds, 113 F.3d 1079 (9th Cir. 1997), is distinguishable. In that case, a White male was terminated and was replaced by another White male. There was a complete absence of evidence of race discrimination, except for an internal memorandum recommending increasing the number of women and minorities in certain positions and some diversity goals maintained by the defendant. The instant case is different in many ways. Plaintiff was rejected and the position was offered to two much younger, much less qualified women. Moreover, in this case, there is a plethora of other circumstantial and direct evidence of gender discrimination, including admissions from a key participant of the decision making process to the effect that she considered female gender a "positive factor" in her recommendations for the Community Builder positions, while male status was only a neutral factor in her eyes. See Docket No. 50, at 5-14. Further, the Payne decision is from another jurisdiction and it has absolutely no persuasive value, in that it contains no discussion, and relies on no supporting authority, for the proposition that maintaining diversity goals does not support an inference of race discrimination.

adopted goals to increase training for those EEO groups that were underrepresented in their rate of training, including various categories of females. Exhibit 1, at 3937. For those EEO groups assisted by a goal, the "expected result" was an increase in training opportunities. Exhibit 1 at 3938. However, despite the under-representation of White males, HUD would not adopt such goals to help them. Id., at 3937.

The FY1997 AEP Report demonstrates that while White males were 28.2% of the HUD workforce, they received only 16.6% of the promotions. Exhibit 1, at 3944. White females were 29% of the workforce, and they received 34% of the promotions. Id. When non-White male EEO groups were under-represented in the rate of promotion, a special objective was generated to increase such group's promotion rate. Id., at 3946. However, despite White male under-representation in the rate of promotion, they did not benefit from a similar objective. Id.

The FY 1997 AEP Report contains a memorandum from the Secretary of HUD, Andrew Cuomo, dated March 6, 1997 and addressed to all HUD employees, stating, "In carrying out their responsibilities, all managers and supervisors are fully accountable for taking actions to assure that EEO/AE/Diversity goals and objectives are achieved." Exhibit 1, at 3864. The memorandum further states that EEO/AE/Diversity is a critical element on the performance evaluations, and that managers and supervisors would be evaluated every year to make sure they achieve "measurable results." Exhibit 1, at 3864.

The head of HUD further instructed managers and supervisors to be "proactive" in implementing Diversity strategies, and that they should

8.    Refer to the AEP Plan goals and objectives before initiating any recruitment, hiring, training, reassignment, and promotion actions.

9.    Periodically review AEP progress reports and make adjustments in

4

activities to meet goals and objectives.

Exhibit 1, at 3865.

Thus, the AEP does not reflect an "aspirational" and generalized desire for workforce diversity, and it does far more than simply seek broaden applicant pools. Rather, the AEP imposes specific numerical goals for hiring and internal movements in specific job categories, for specific EEO groups. It imposes objectives to increase career opportunities in the provision of tangible job actions – promotions and training – to categories of people so long as they were not White males. Supervisors and managers are instructed to consult the AEP goals before undertaking any personnel action, including hiring and promotion, and they were evaluated on a yearly basis to determine whether they had obtained "measurable results" with regard to AEP goals.

An examination of the AEP does not corroborate Defendant's spin that the AEP represents a benign, general aspirational goal. Consequently, the cases cited by Defendant do not touch upon the instant case.

II.    HUD GOALS RELATING TO TRAINING AND PROMOTIONS PROVIDE
       IMPORTANT EVIDENCE, AND WERE IN EFFECT AT THE TIME OF THE
       NON-SELECTION IN DECEMBER 1997

Defendant argues that AEP goals with regard to training are irrelevant to Plaintiff's non-selection claims. Docket 86, at 6. However, HUD policies with regard to trainings are relevant to this case, in that it helps to demonstrate HUD's general attitude toward limiting employment opportunities for males like Plaintiff. McDonnell Douglas Corp. v. Green, 93 S. Ct. 1817, 1825 (1973) (evidence relevant to proving discrimination may include an employer's "general policy and practice with respect to minority employment"). However, it should also be pointed out that Plaintiff has a history of

applying for, and being denied, training at HUD.

Defendant further argues that AEP goals with regard to encouraging promotion are inapplicable to this case. Docket 86, at 6. However, these goals are relevant and applicable, since Plaintiff's selection as a Community Builder would have constituted a promotion for him. Moreover, HUD's biased provision of goals regarding promotion likewise expresses an overall policy of discrimination in the provision of career opportunities that a jury may consider. McDonnell Douglas Corp., 93 S. Ct. at 1825.

Defendant challenges consideration of goals relating to training and promotion, because the examples that Plaintiff cited in his motions in limine are from AEP reports relating to FY1999 and FY2001. Docket 86, at 6. However, as shown above, HUD's policy of adopting goals with regard to training and promotion, in a manner that disadvantages White males, was alive and in force in the FY1997 AEP Report, that was effective at the time of Plaintiff's non-selection. Exhibit 1, 3935, 3937, 3938, 3944, 3946.

III.   MAGISTRATE JUDGE ALEXANDER DID NOT PRECLUDE THE
       INTRODUCTION OF EVIDENCE RELATING TO WHITE MALES

In Defendant's opposition to Plaintiff's Motion in Limine relating to the AEP, Defendant argues that statistical evidence, and department-wide policies demonstrating antipathy to White males is somehow precluded by the ruling of Magistrate Judge Alexander. Document 85, 8-15. That is not true.

When Plaintiff's application for the Community Builder position was rejected, he was not aware that one of the six individuals selected was African-American. Plaintiff knew that younger women were given preference, so he initiated a sex and age discrimination complaint. Plaintiff later learned that an African-American was selected

6

for one of the Community Builder positions. He therefore sought to amend his complaint to add a race discrimination claim based on the same non-selection for which he had filed a timely administrative charge. Magistrate Judge Alexander denied the motion to amend, on the grounds that there was no timely administrative complaint mentioning race. Patoski v. Jackson, 477 F. Supp. 2d 361 (D. Mass. 2007). However, that decision does not purport to rule upon the relevance or admissibility of the plight of White males under HUD policies and workplace practices, with respect to the gender claims. Id.

Introduction of evidence of HUD's formal policies, and workforce composition, relating to White men does not "circumvent" Magistrate Judge Alexander's decision. There is no requirement to exhaust administrative remedies for the **evidence** one wishes to introduce at trial. Plaintiff did not need to exhaust administrative remedies for a race claim, because Plaintiff is not seeking to impose liability for race discrimination. No finding of race discrimination is necessary for Plaintiff to prevail under a gender plus theory. Plaintiff need only show that his gender is a determinative factor that placed him within a disfavored EEO category.

While HUD alleges that evidence regarding White males circumvents the Magistrate Judge Alexander's ruling, it does not quote any applicable portion of the decision, or identify where the alleged conflict is.[2] Therefore, the ruling on Plaintiff's motion to amend provides no basis for excluding evidence focusing on White males.

IV.    JUDGE LINDSAY'S DISMISSAL OF COUNT VII DID NOT PRECLUDE THE INTRODUCTION OF EVIDENCE RELATING TO WHITE MALES

Defendant's opposition to Plaintiff's Motion in Limine relating to the AEP, argues that the White male analysis is precluded by Judge Lindsay's dismissal of Count

---

[2] Defendant anticipated the nature of Plaintiff's rebuttal argument, but asserts no valid argument against it. Docket 85, at 12 n. 10.

VII. <u>Docket 85</u>. This argument also fails. Defendant's argument is compromised by the fact that Judge Lindsay never issued a written decision explaining the reasons for the dismissal, and Defendant has not attached any transcript of Judge Lindsay's verbal comments. Plaintiff has requested a transcript of the relevant hearing.

To further demonstrate the falsity of the Defendant's argument, it is important to look at two separate provisions of Title VII. Title VII states that it shall be an unlawful practice for an employer:

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

> (2) to . . . classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1) & (2).

Section 2(a)(1) permits recovery when an employee is rejected for a job because of gender. Section 2(a)(2) applies when an employee is merely <u>classified</u> by gender in a way that "would . . . tend to limit that employee's job opportunities."

Count II alleges that Plaintiff was a discriminated against on the basis of gender when he was non-selected for the Community Builder position. Under this section 2(a)(1) claim, Plaintiff seeks damages such as lost wages and benefits stemming from the rejection. The Complaint further alleges that the AEP is evidence of gender discrimination. <u>First Amended Complaint</u>, ¶ 14. Thus, Count II seeks recovery under section 2(a)(1) based on the adverse action of non-selection.

Under Count VII, however, Plaintiff sought to recover for being the subject of an

unlawful classification, in that the AEP placed him in a disfavored category based on his sex. For purposes of Count VII, Plaintiff requested declaratory judgment that he was the victim of an unlawful classification, and emotional distress damages stemming from his knowledge of the classification. This claim was brought pursuant to Section 2(a)(2). For the purposes of this Count alone, Plaintiff proceeded under the theory that it was unnecessary to prove that the unlawful classification actually caused or led to an adverse employment action. The fact of the unlawful classification, existing in itself, was sufficient to demonstrate a violation, in Plaintiff's view, under Section 2(a)(2).

In other words, to the extent that the AEP contributed to or caused Plaintiff's rejection, Section 2(a)(1) provides a remedy. Count II. But irrespective of whether the AEP contributed to the non-selection, Plaintiff sought recovery on the basis of the unlawful classification alone under Section 2(a)(2). Count VII.

Defendant sought summary judgment on Count VII, on the grounds that the AEP had been discontinued in 2003. In other words, the substance of the argument was, even if the AEP were illegal, there would be no recovery because program was discontinued.

We do not know exactly why Judge Lindsay dismissed Count VII. No written decision exists, and his explanation at the hearing was ambiguous. However, both parties are clear that Judge Lindsay felt the claim to be moot, because the program was discontinued, and HUD promised not to resurrect it. See Plaintiff's Motion for Certificate of Appealability, p. 2, Docket 61. Judge Lindsay apparently dismissed, out of hand, the claim for emotional distress arising from an unlawful classification, claiming that expert confirmation of such distress was required at the summary judgment stage to establish harm. Id.

Defendant writes that, "Judge Lindsay specifically rejected Plaintiff's argument that the validity of HUD's AEP was a live issue for purposes of Plaintiff's gender and age discrimination claims in Counts I-IV." Docket 85, at 5; see Docket 86, at 3. That description is absolutely false, to Plaintiff's recollection. Instead, the Judge rejected Plaintiff's argument that the request for declaratory judgment was a live issue that needed to be resolved before the trial of Counts I-IV. See Plaintiff's Motion for Certificate of Appealability, p. 2, Docket 61. To Plaintiff's recollection, the Judge reasoned that the AEP could be considered relevant and admissible evidence at the trial of Counts II - IV, and Plaintiff could still argue in favor of a jury instruction that the AEP reflected an unlawful bias against men, even if the Court dismissed Count VII. Thus, the Judge dismissed Count VII, relying on the fact that the AEP may yet be determined to have evidentiary weight in the gender discrimination claim.[3]

Plaintiff's recollection is that HUD acknowledged at the summary judgment hearing that even if Count VII were dismissed, the Plaintiff would continue to be free to argue at trial that the AEP constituted evidence of gender discrimination. In its summary judgment pleadings, Defendant argued that even if the Court were to dismiss Count VII, Plaintiff would be free to nevertheless argue that the AEP constituted evidence of discrimination for other parts of his case. Def.'s Mem. In Support of Summary Judgment, at 11, Docket 47. Defendant wrote:

> Count VII of Plaintiff's Complaint appears to seek some form of declaratory judgment with respect to HUD's AEP as it existed prior to October 2003. First Amended Complaint, ¶ 46-52. **Patoski can certainly introduce evidence of the**

---

[3] HUD correctly asserts that Plaintiff's argument in his motion in limine is identical to the arguments raised in his motion for summary judgment. However, Judge Lindsay never addressed these arguments on the merits. Judge Lindsay found that this Count was moot. As a moot claim, there would be no reason to consider the merits of the claim. Thus, it is false to argue that Plaintiff is seeking to re-litigate an issue that has already been decided. There is no written order supporting HUD's argument.

> **manner in which he contends the AEP, under MD 714, demonstrated
> discriminatory intent with respect to his non selections,** however, as the policy
> has been superseded and will not return, questions with respect to the AEP as it
> existed under MD 714, are moot.

Id. (emphasis added). Thus, Defendant acknowledged in its summary judgment materials

that it was not seeking a ruling that the AEP was inadmissible to the non-selection claims.

It was seeking dismissal of the declaratory judgment claim as moot.

After the Court entered summary judgment on Count VII, Plaintiff moved to

certify the issue for interlocutory appeal. Defendant opposed the motion, on the grounds

that Counts II and IV could be tried, without immediate appellate resolution of the Count

VII issues. Part and parcel of Defendant's argument was the assertion that Plaintiff was

still free to attempt to introduce the AEP as evidence of discrimination in Counts II and

IV, despite the dismissal of Count VII. Defendant wrote:

> The Plaintiff may unquestionably proceed to trial in the absence of appellate
> review on the remaining claim, i.e., that his non-selection for the 1998
> Community Builder position was based upon age and gender discrimination.
> Further, **to the extent that HUD's AEP is relevant to these claims (if at all),
> the form of such evidence may be determined by this Court by pre trial
> motions** *in limine*.

HUD's Opposition to the Request That This Court Certify an Interlocutory Appeal, at 2-

3, Docket 64 (bold added). Even after summary judgment issued, Defendant understood

that the admissibility of the AEP with respect to the remaining issues, and the AEP's

lawfulness, were live issues, which should be determined at a later date.

HUD now asserts that the dismissal of Count VII somehow precludes use of the

AEP as evidence of unlawful bias. Docket 85, at 5. It even asserts that Plaintiff is now

seeking to relitigate an issue which Judge Lindsay already decided. These assertions are

false, and are completely inconsistent with Defendant's statements before and during the

summary judgment hearing, and after summary judgment entered, that the evidentiary

value of the AEP remained an open issue.

Judge Lindsay never held that the AEP was lawful and Constitutional when

implemented. In fact, Count VII was held to moot, given HUD's discontinuation of the

policy, which was changed as a result of clarifications of discrimination law. See MD

715, at 1. As a moot issue, Judge Lindsay did not need to rule on the merits at the

summary judgment stage, and if he did so (he did not), such a ruling would be dictum.

Judge Lindsay never entered a decision to the effect that the AEP failed to play a

role in the Community Builder selection process. Defendant states that "it was clearly

established at the summary judgment proceedings that the decision makers at issue had

no knowledge of the AEP's goals, and did not reach any decision with respect to the

Community Builder position on these 'goals.'" Docket 86, at 7. Plaintiff absolutely

disputes this characterization of what Judge Lindsay ruled.

There was ample evidence that the AEP did play a role in the process. See

Response to HUD Fact 17, Docket 51. The objectives and goals to benefit women and

racial minorities were communicated to Managers and Supervisors on an annual basis.

SOF 23.[4] Managers and Supervisors were annually evaluated on whether they worked to

assure "that EEO/AE/Diversity goals and objectives are achieved." SOF 19, 64, 79, 96,

110, 198. Mary Lou C., one of the relevant decision makers, testified that she was

evaluated by a standard that measured her efforts to further AEP goals, and that each

year, she was given positive ratings in that category. SOF 179-180. AEP goals and

objectives were placed on-line and were available to HUD employees. Pl.'s SOF, Exhibit

---

[4] SOF refers to Plaintiff's Statements of Facts filed with respect to the summary judgment motions.
Statements in the SOF were supported by sworn materials.

51. Mary Lou C. testified that when she made recommendations to hire and promote

certain individuals, and considered their (non-White male) gender and race to be a

positive factor in that recommendation, she felt that she was acting in a manner consistent

with HUD policy.  SOF 185.  Thus, there was ample evidence that the AEP and related

policies contributed to the non-selection.  Plaintiff does not recall Judge Lindsay ruling

that there was an absence a genuine dispute of material fact on this point.  In fact,

Plaintiff does not recall any specific discussion of, or rejection of, the Plaintiff's evidence

of causation.

In actuality, Judge Lindsay was making an assertion of law, indicating that he

believed that in order for there to be recovery under 42 U.S.C. § 2000e-2(a)(2), a plaintiff

must show an adverse employment action was caused by the illegal classification.

Plaintiff disagreed that an adverse action was required, as then section 2(a)(2) would be

rendered completely superfluous by section 2(a)(1) (which addresses adverse actions).

The requirement to prove adverse action would also contradict the plain language of the

section 2(a)(2), which prohibits a classification which "would" merely "tend to deprive

any individual of employment opportunities."  42 U.S.C. § 2000e-2(a)(2).  Given

Plaintiff's insistence that the AEP did contribute to the non-selection, it is unclear to what

extent Judge Lindsay's ruling depended on the requirement of proving an adverse action.

Even if Judge Lindsay found that the AEP played no role in the selection process

(he did not), the AEP may still be admissible to demonstrate a corporate-wide

discriminatory state of mind.  Conway v. Electro Switch Corp., 825 F.2d, at 597

("evidence of a corporate state of mind or a discriminatory atmosphere is not rendered

irrelevant by its failure to coincide precisely with the particular actors or timeframe

13

involved in the specific events that generated a claim of discriminatory treatment.").

Judge Lindsay held that the Count VII claim was moot. Plaintiff is not here seeking to overturn or evade that ruling, either expressly or implicitly.[5]  Cf Docket 85. In arguing that the AEP was unlawful when implemented, and that it constitutes evidence of discrimination, Plaintiff is not ignoring the prior order, in any fashion. Judge Lindsay did not rule on the AEP's legality, its Constitutionality, or its admissibility for the trial of Counts II - IV.

Defendant argues that it has been proceeding with trial preparation on the assumption that Judge Lindsay had disposed of the issue of the AEP's admissibility. Docket 85, at 7. However, as said above, Defendant clearly wrote **after summary judgment entered**, that the AEP's admissibility and scope of use at trial, were matters to be left for the motion in limine stage. HUD's Opposition to the Request That This Court Certify an Interlocutory Appeal, at 2-3, Docket 64 ("such evidence may be determined by this Court by pre trial motions *in limine*"). This would be a poor justification to exclude highly relevant evidence.

V.   MD 714 DOES NOT JUSTIFY THE AEP

Defendant correctly asserts that it was required, by MD 714, to file AEP reports, and that MD 714 said that it may adopt goals and objectives. Docket 86, at 4, 6. However, Defendant absolutely fails to address Plaintiff's argument that HUD failed to undertake the inquiries required by MD 714 to support goals and objectives. MD-714 states,

> Numerical objectives (goals) shall be used in accordance with the following guidance.

---

[5]  Plaintiff reserves the right to challenge the ruling on appeal.

(1) Agencies should review the Supreme Court decision, Johnson v. Transportation Agency, Santa Clara County, 107 S. Ct. 1442 (1987).

(2) The agency must conduct an appropriate work force analysis. . . .

MD 714, section 7(d), Exhibit 2.

The Johnson case permitted a voluntary affirmative action program to remedy a "conspicuous imbalance in a traditionally segregated job." Johnson v. Transportation Agency, 107 S. Ct. 1442, 1451-1452 (1987)). HUD implemented goals and objectives without complying with this standard. First, HUD failed to identify which, if any of its jobs were "traditionally segregated." SOF 149. Second, HUD failed to tailor its goals and objectives to positions that were "traditionally segregated." SOF 21-150. Given that the Community Builder was a new position, there was no way to establish that there was a conspicuous imbalance in a traditionally segregated job. HUD absolutely fails to rebut these facts that it adopted goals without first engaging in the appropriate analysis. Moreover, MD 714 says nothing to permit Federal agencies to adopt goals and objectives to increase trainings and promotions for EEO groups. Thus, HUD can not possibly use MD 714 to legitimize the goals and objective that it adopted.

Furthermore, even if it could be said that the AEP was supported by MD 714 (it was not), the EEOC Management Directive could not possibly provide cover for HUD to violate the provisions of Title VII and the Fifth Amendment of the United States Constitution. Under both Title VII and the Constitution, preferential treatment based on gender is permitted only if the governmental employer undertakes a sufficient analysis of workplace circumstances, to demonstrate that its goals are acceptable. Johnson, 107 S. Ct. at 1451-1452; United States v. Virginia, 116 S. Ct. 2264, 2275 (1996). Therefore, HUD's AEP continues to demonstrate unlawful bias, even if it could be said that the

EEOC's management directive somehow authorized the AEP as implemented by HUD.

HUD should not be permitted to argue that it could impose goals under MD 714 even if

its actions otherwise violated Title VII and the Constitution.

## VI.    STATISTICS OF HUD PRACTICES OVER TIME ARE ADMISSIBLE

Defendant argues that Plaintiff's statistical evidence of the plight of White men at

HUD covers an overly broad swath of time. Docket 86, at 7-8. Plaintiff was rejected in

December 1997. Plaintiff's statistical evidence covers FY 1993 though 2003, which is a

range of five years before, and five years after the rejection. Statistical evidence of an

employer's practices must necessarily span a length of time. It is submitted that the

analysis proposed by Plaintiff is reasonable. Defendant does not offer any caselaw

stating that a statistical analysis of a five year span from the date of rejection is

overbroad.

Respectfully submitted,

The Plaintiff,
By his Attorneys


_____/s/ Robert S. Mantell_____
Kevin G. Powers
BBO# 405020
Robert S. Mantell
BBO# 559715
Rodgers, Powers & Schwartz LLP
18 Tremont Street
Suite 500
Boston, MA  02108
(617) 742-7010

Patoski motion in limine reply

# EXHIBIT 1

# U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (HUD)

## DEPARTMENTWIDE

## FISCAL YEAR 1997

## AFFIRMATIVE EMPLOYMENT PROGRAM (AEP)

## UPDATE REPORT

HUD003859



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
THE SECRETARY
WASHINGTON, D.C. 20410-0001

March 6, 1997

MEMORANDUM FOR:  All HUD Employees

FROM:  Andrew Cuomo

SUBJECT:  Policy Statement - Equal Employment Opportunity, Affirmative
Employment, Prevention of Sexual Harassment, Discrimination Based
on Sexual Orientation, Employment and Accommodation of Persons
with Disabilities, and Disabled Veterans

In conformance with the policies expressed in Title VII of the Civil Rights Act of
1964, as amended; the Civil Rights Act of 1991; Executive Order 11478, as amended;
the Age Discrimination in Employment Act of 1967; the Equal Pay Act of 1962, as
amended; the Rehabilitation Act of 1973, as amended; the Vietnam Era Veteran's
Readjustment Act of 1974; the Civil Service Reform Act of 1978, and HUD regulations
at 24 CFR Part 7, it is the policy and intent of the Department of Housing and
Urban Development (HUD) to provide equality of employment opportunity for all
persons, and to prohibit discrimination because of race, color, religion, sex,
national origin, age, or disability in all facets of employment. Additionally, sexual
harassment and discrimination based on sexual orientation are unacceptable in
the workplace and will not be condoned at HUD. Moreover, HUD is committed to
promoting affirmative employment through the removal of barriers and by positive
actions at every management level, including the early resolution of EEO disputes.

These policies are an integral part of HUD's mission and their implementation is
a high priority of this Administration. I am personally committed to Equal Employment
Opportunity, Affirmative Employment and Diversity (EEO/AE/Diversity) and I expect all
employees to support EEO/AE/Diversity. In carrying out their responsibilities, all
managers and supervisors are fully accountable for taking actions to assure that
EEO/AE/Diversity goals and objectives are achieved.

The EEO/AE/Diversity goals and objectives of the Department are expressed in
HUD regulations at 24 CFR Part 7 as well as in the multi-year Affirmative Employment
Program (AEP) Plan. EEO/AE/Diversity is a separate critical element in our managerial
performance appraisal system, which requires the Senior Executive Service (SES) and
managers and supervisors under the Performance Management and Recognition
System (PMRS) to achieve measurable results in their management of the Department.

EEOC FORM 566 (8/87)                                                    D-3

HUD003864

## AFFIRMATIVE EMPLOYMENT PROGRAMS (AEP)

I expect all managers and supervisors to be proactive in implementing EEO/AE/Diversity. The following strategies will, I believe, set the standard for the achievement of that goal:

1. Hold subordinate managers and supervisors accountable for promoting EEO/AE/Diversity in every aspect of the Department's policies, programs, and practices, including learning and practicing the principles of F.A.I.R. (Feedback, Assistance, Inclusion and Respect) in all interactions with employees and HUD clients.

2. Attend EEO/AE/Diversity training sessions to ensure full understanding of and sensitivity to EEO/AE/Diversity policies, practices, and procedures.

3. Make a vigorous effort to assure full and fair representation of qualified minorities, women, and persons with disabilities when recruiting, hiring, and providing advancement opportunities.

4. Make use of Special Employment Programs to correct the underrepresentation of minorities, women, and persons with disabilities, i.e., Part-Time Employment, Cooperative Education, Upward Mobility, Special Hiring Authorities, etc.

5. Attend "Valuing the HUD Employee" Training and use the F.A.I.R. concept taught on a daily basis.

6. Learn and use Alternative Dispute Resolution (ADR) techniques to resolve problems early before they give rise to formal EEO complaints or union contract grievances.

7. Participate in preparing the AEP Plan by analyzing all aspects of the Department's operations to determine any barriers to full equal employment, and by designing and carrying out actions to remove those barriers.

8. Refer to the AEP Plan goals and objectives before initiating any recruitment, hiring, training, reassignment, and promotion actions.

9. Periodically review AEP progress reports and make adjustments in activities to meet goals and objectives.

2

HUD003865

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

## FISCAL YEAR 1997
### ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM PLAN UPDATE REPORT
### PROGRAM ANALYSIS

DEPARTMENT

UPDATE

II.  WORK FORCE - SUMMARY ANALYSIS (Cont'd)

ANALYSIS OF REPRESENTATION BY GRADE GROUPING (Cont'd)

| Race/Sex | SENIOR LEVEL | GS/GM 13-15 | GS 9-12 | GS 5-8 | GS 1-4 |
|---|---|---|---|---|---|
| Minorities and Women | 51.5 | 55.5 | 72.9 | 95.3 | 81.0 |
| Women | 30.7 | 40.2 | 59.4 | 89.9 | 77.5 |
| Minorities | 32.7 | 33.0 | 43.4 | 57.1 | 37.9 |

### ADMINISTRATIVELY DETERMINED PAY RATE SCHEDULE*

| Race/Sex | Percentage of representation |
|---|---|
| White males | 41.0% |
| White females | 36.1 |
| Black males | 3.3 |
| Black females | 13.1 |
| Hispanic females | 3.3 |
| Asian males | 3.3 |
| Minorities and Women | 59.1 |
| Women | 52.5 |
| Minorities | 23.0 |

### BLUE COLLAR*

| Race/Sex | WG 5-9 | WG 11-12 | WL 5-9 | WB 5-9 | WD 5-9 | XS 5-9 | XP 5-9 |
|---|---|---|---|---|---|---|---|
| White males | 20.0% | 0.0% | 0.0% | 100.0% | 66.7% | 0.0% | 0.0% |
| Black males | 80.0 | 0.0 | 100.0 | 0.0 | 33.3 | 0.0 | 100.0 |
| Minorities and Women | 80.0 | 0.0 | 100.0 | 0.0 | 33.3 | 0.0 | 100.0 |
| Women | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Minorities | 80.0 | 0.0 | 100.0 | 0.0 | 33.3 | 0.0 | 100.0 |

*   No other EEO groups are represented in this category.

EEOC FORM 566 (8/87)                                    DII-9

HUD003885

## AFFIRMATIVE EMPLOYMENT PROGRAM (AEP) PLAN UPDATE REPORT

### DISTRIBUTION OF EEO GROUPS AND COMPARISON BY PATCOB

### FISCAL YEAR 1996 — HUD/CIVILIAN LABOR FORCE COMPARISON

| OCCUPATIONAL CATEGORY | TOTAL ALL % | WHITE MALE % | WHITE FEMALE % | BLACK MALE % | BLACK FEMALE % | HISPANIC MALE % | HISPANIC FEMALE % | ASIAN AMERICAN PACIFIC ISLANDER MALE % | ASIAN AMERICAN PACIFIC ISLANDER FEMALE % | AMERICAN INDIAN ALASKAN NATIVE MALE % | AMERICAN INDIAN ALASKAN NATIVE FEMALE % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PROFESSIONAL AGENCY (HUD) (CAD) | 100.0 | 50.0 | 18.7 | 8.1 | 11.0 | 3.2 | 1.8 | 4.4 | 2.4 | 0.2 | 0.2 |
| CIVILIAN LABOR FORCE | 100.0 | 54.7 | 30.3 | 2.4 | 3.2 | 2.1 | 1.4 | 3.5 | 1.9 | 0.2 | 0.2 |
| ADMINISTRATIVE AGENCY (HUD) (CAD) | 100.0 | 32.3 | 28.4 | 9.7 | 20.1 | 3.0 | 3.2 | 1.1 | 1.2 | 0.5 | 0.5 |
| CIVILIAN LABOR FORCE | 100.0 | 42.1 | 40.4 | 3.6 | 5.3 | 2.6 | 2.6 | 1.4 | 1.4 | 0.3 | 0.3 |
| TECHNICAL AGENCY (HUD) (CAD) | 100.0 | 5.0 | 37.2 | 3.5 | 41.5 | 1.2 | 7.2 | 0.5 | 1.9 | 0.2 | 1.8 |
| CIVILIAN LABOR FORCE | 100.0 | 36.1 | 42.9 | 3.6 | 6.6 | 3.2 | 3.4 | 1.9 | 1.6 | 0.4 | 0.4 |
| CLERICAL AGENCY (HUD) (CAD) | 100.0 | 4.3 | 35.8 | 3.9 | 46.2 | 0.6 | 6.2 | 0.2 | 2.1 | 0.1 | 0.5 |
| CIVILIAN LABOR FORCE | 100.0 | 14.0 | 63.4 | 2.8 | 9.6 | 1.7 | 5.2 | 0.8 | 1.9 | 0.1 | 0.5 |
| OTHER AGENCY (HUD) (CAD) | 100.0 | 0.0 | 100.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| CIVILIAN LABOR FORCE | 100.0 | 67.6 | 11.2 | 9.7 | 3.2 | 4.8 | 1.0 | 1.2 | 0.3 | 0.9 | 0.2 |
| BLUE COLLAR AGENCY (HUD) (CAD) | 100.0 | 30.8 | 0.0 | 69.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| CIVILIAN LABOR FORCE | 100.0 | 65.4 | 9.8 | 9.1 | 2.2 | 8.7 | 1.5 | 1.7 | 0.5 | 0.8 | 0.2 |

EEOC FORM 568/569 (8/87)

DII-10

HUD003886

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM PLAN UPDATE REPORT
PROBLEM/BARRIER IDENTIFICATION

DEPARTMENT
UPDATE

PROVIDE A NARRATIVE DESCRIBING THE PROBLEMS/BARRIERS IDENTIFIED:

II.  WORK FORCE

EXPECTED RESULTS:  An increase in the diversification and
balanced representation of EEO groups, whose current
composition of the Department's work force shows manifest
imbalances and/or conspicuous absences.

FOLLOW-UP ACTION:  Continue to monitor hiring, internal
movement, and attrition statistics in order to conduct
impact analyses on selected EEO groups who are manifestly
imbalanced and/or conspicuously absent from the work force.
Develop realistic and proactive strategies to eliminate
imbalances in the work force.

Since the Department is in a full downsizing mode, all
efforts to eliminate the identified instances of manifest
imbalances and conspicuous absences will be through the use of
internal movements, including promotions and reassignments, and
employee training and development.  Internal movement objectives
have been established for all EEO groups where there are
instances of underrepresentation in the work force.  See pages
DII-21 through DII-38 for specific numerical objectives by EEO
group, occupational category (PATCOB), and major occupations.

HUD003887

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM PLAN UPDATE REPORT
REPORT OF OBJECTIVES AND ACTION ITEMS

DEPARTMENT

UPDATE

**PROGRAM ELEMENT:  II.  WORK FORCE**

**PROBLEM/BARRIER STATEMENT:**  Manifest imbalances and conspicuous absences of EEO groups exist in PATCOB categories and mainstream occupations as indicated below:

**OBJECTIVE:**  To reduce manifest imbalances and conspicuous absences of the affected EEO groups.

**RESPONSIBLE OFFICIAL:**  Secretary
**TARGET DATE:**  09/30/97

| ACTION ITEMS: (Cont'd) | RESPONSIBLE OFFICIAL | TARGET DATE |
|---|---|---|
| **PROFESSIONAL (PATCOB) CATEGORY (Cont'd)** | | |
| --Engineer - GS-0801<br>--FY97 Numerical Objective: 2<br>--Eight Year Numerical<br>   Objective: 41 | Assistant<br>Secretaries<br>and Principal<br>Organization<br>Heads | 09/30/97 |
| --Attorney - GS-0905<br>--FY97 Numerical Objective: 5<br>--Eight Year Numerical<br>   Objective: 54 | " | " |
| --Contracting Specialist -<br>   GS-1102<br>--FY97 Numerical Objective:  4<br>--Eight Year Numerical<br>   Objective:  19 | " | " |

EEOC FORM 566 (8/87)                                              DII-14

HUD003889

COMBINED HIRING AND INTERNAL MOVEMENT
NUMERICAL OBJECTIVES BY PATCOB
FISCAL YEAR 1997

ORGANIZATION: HUD

| OCCUPATIONAL CATEGORY | PLANNED/ACTUAL | TOTAL ALL | WHITE | | BLACK | | HISPANIC | | ASIAN AMERICAN/ PACIFIC ISLANDER | | AMERICAN INDIAN/ ALASKAN NATIVE | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | MALE | FEMALE | MALE | FEMALE | MALE | FEMALE | MALE | FEMALE | MALE | FEMALE |
| PROFESSIONAL | PLANNED | 41 | ****** | 16 | 2 | 3 | 2 | 4 | 3 | 3 | 5 | 3 |
| ADMINISTRATIVE | PLANNED | 202 | ****** | 113 | 0 | 10 | 19 | 18 | 13 | 11 | 8 | 10 |
| TECHNICAL | PLANNED | 69 | ****** | 39 | 6 | 0 | 9 | 0 | 6 | 2 | 5 | 2 |
| CLERICAL | PLANNED | 42 | ****** | 25 | 3 | 0 | 5 | 0 | 4 | 0 | 3 | 2 |
| OTHER | PLANNED | 1* | ****** | 0 | 1* | * | * | * | * | * | * | * |
| BLUE COLLAR | PLANNED | 0 | ****** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | PLANNED | 355 | ****** | 193 | 12 | 13 | 35 | 22 | 26 | 16 | 21 | 17 |

* one from either of the identified targeted groups.

EEOC FORM 566 (8/87)

DII-22

HUD003896

COMBINED HIRING AND INTERNAL MOVEMENT
NUMERICAL OBJECTIVES BY MAJOR OCCUPATIONS
FISCAL YEAR 1997

ORGANIZATION: HUD (CONT'D)

| OCCUPATIONAL CATEGORY | PLANNED/ACTUAL | TOTAL ALL | WHITE | | BLACK | | HISPANIC | | ASIAN AMERICAN/ PACIFIC ISLANDER | | AMERICAN INDIAN/ ALASKAN NATIVE | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | MALE | FEMALE | MALE | FEMALE | MALE | FEMALE | MALE | FEMALE | MALE | FEMALE |
| GS-0828 CONST ANALYST ADMINISTRATIVE | PLANNED | 5 | ******** | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 1 |
| GS-1101 HSNG MGT SPEC. ADMINISTRATIVE | PLANNED | 44 | ******** | 40 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 0 |
| GS-1160 * FIN ANAL (HSNG) ADMINISTRATIVE | PLANNED | 4 | ******** | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GS-1165 LOAN SPECIALIST ADMINISTRATIVE | PLANNED | 15 | ******** | 10 | 0 | 0 | 1 | 0 | 2 | 0 | 1 | 1 |
| GS-1170 * REALTY SPEC. ADMINISTRATIVE | PLANNED | 0 | ******** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GS-1171 APPRAISER ADMINISTRATIVE | PLANNED | 8 | ******** | 2 | 0 | 0 | 0 | 2 | 1 | 1 | 1 | 1 |
| GS-1173 HSNG MGT SPEC. ADMINISTRATIVE | PLANNED | 3 | ******** | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |

\* This occupational series has less than 100 employees. No numerical objectives have been established for Fiscal Year 1997. However, the Department will continue to monitor and report on all accomplishments, if any, in this occupational series.

EEOC FORM 566 (8/87)

DII-25

HUD003899

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM PLAN UPDATE REPORT
PROGRAM ANALYSIS

DEPARTMENT

UPDATE

IV.   RECRUITMENT AND HIRING (Cont'd)

EEO GROUP ANALYSIS BY AVAILABILITY IN APPLICANT POOL (Cont'd)

| EEO Group | Applicant Pool # | % | Qual Appl Pool # | % | Candidate Appl Pool # | % | Selectees # | % |
|---|---|---|---|---|---|---|---|---|
| **Unknown** | | | | | | | | |
| Race | 148 | 4.3 | 54 | 36.5 | 41 | 75.9 | 3 | 7.3 |
| Males | 59 | 1.7 | 12 | 20.3 | 10 | 83.3 | 1 | 10.0 |
| Females | 89 | 2.6 | 42 | 47.2 | 31 | 73.8 | 2 | 6.4 |
| Totals | 3,409 | 100.0 | 2,373 | 69.6 | 1,894 | 79.8 | 796 | 42.0 |
| **Minorities** | | | | | | | | |
| and women | 2,491 | 73.1 | 1,666 | 66.9 | 1,347 | 80.8 | 594 | 44.1 |
| Women | 2,182 | 64.0 | 1,448 | 66.4 | 1,171 | 80.9 | 503 | 42.9 |
| Minorities | 1,455 | 42.7 | 937 | 64.4 | 777 | 82.9 | 330 | 42.5 |

EEO GROUP ANALYSIS BY REPRESENTATION IN THE APPLICANT POOL

| EEO Group | Applicant Pool # | % | Qual Appl Pool # | % | Candidate Appl Pool # | % | Selectees # | % |
|---|---|---|---|---|---|---|---|---|
| **Whites** | 1,806 | 53.6 | 1,382 | 58.2 | 1,086 | 57.3 | 464 | 58.3 |
| Males | 770 | 22.6 | 653 | 27.5 | 506 | 26.7 | 199 | 25.0 |
| Females | 1,036 | 30.4 | 729 | 30.7 | 580 | 30.6 | 265 | 33.3 |
| **Blacks** | 1,017 | 29.8 | 654 | 27.6 | 583 | 28.4 | 244 | 30.6 |
| Males | 215 | 6.3 | 145 | 6.1 | 115 | 6.1 | 63 | 7.9 |
| Females | 1,802 | 23.5 | 509 | 21.5 | 423 | 22.3 | 181 | 22.7 |
| **Hispanics** | 304 | 8.9 | 191 | 8.0 | 157 | 8.3 | 60 | 7.5 |
| Males | 121 | 3.5 | 74 | 3.1 | 59 | 3.1 | 20 | 2.5 |
| Females | 183 | 5.4 | 117 | 4.9 | 98 | 5.2 | 40 | 5.0 |
| **Asians** | 83 | 2.4 | 59 | 2.5 | 45 | 2.4 | 14 | 1.8 |
| Males | 83 | 1.1 | 26 | 1.1 | 20 | 1.1 | 6 | 0.8 |
| Females | 45 | 1.3 | 33 | 1.4 | 25 | 1.3 | 8 | 1.0 |

EEOC FORM 566 (8/87)                                           DIV-4

HUD003924

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM PLAN UPDATE REPORT
PROGRAM ANALYSIS

DEPARTMENT

UPDATE

IV.  RECRUITMENT AND HIRING (Cont'd)

EEO GROUP ANALYSIS BY REPRESENTATION IN THE APPLICANT POOL
(Cont'd)

| EEO Group | Applicant Pool | | Qual Appl Pool | | Candidate Appl Pool | | Selectees | |
|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % |
| Indians | 51 | 1.5 | 33 | 1.4 | 27 | 1.4 | 11 | 1.4 |
| Males | 24 | 0.7 | 15 | 0.6 | 13 | 0.7 | 4 | 0.5 |
| Females | 27 | 0.8 | 18 | 0.8 | 14 | 0.7 | 7 | 0.9 |
| Unknown Race | 148 | 4.3 | 54 | 2.3 | 41 | 2.2 | 3 | 0.4 |
| Males | 59 | 1.7 | 12 | 0.5 | 10 | 0.6 | 1 | 0.1 |
| Females | 89 | 2.6 | 42 | 1.8 | 31 | 1.6 | 2 | 0.3 |
| Totals | 3,409 | 100.0 | 2,373 | 100.0 | 1,894 | 100.0 | 796 | 100.0 |
| Minorities and women | 2,491 | 73.1 | 1,666 | 70.2 | 1,347 | 71.1 | 594 | 74.6 |
| Women | 2,182 | 64.0 | 1,448 | 61.0 | 1,171 | 61.8 | 503 | 63.2 |
| Minorities | 1,455 | 42.7 | 937 | 39.5 | 777 | 41.0 | 330 | 41.5 |

While no policy or procedural problems/barriers were
identified, the Department's ability to conduct targeted recruit-
ment for most positions where underrepresentation exists has been
severely limited, for several years, due to the Governmentwide
reinvention efforts. As a result, there are instances of under-
representation (manifest imbalance and/or conspicuous absence) of
some EEO groups in the Department's work force. Further, with a
proposed reduction of approximately 30.5 percent of the Depart-
ment's permanent ceiling over the next three (3) years, little,
if any, recruitment and/or hiring is anticipated. In light of
the above limitations, emphasis for Fiscal Year 1997 will again
be placed on internal movements, training and career development.
See pages DIV-6 through DIV-12 for Problem/Barrier Identification
and Report of Objectives and Action Items. Also see Program
Element II-Work Force for established numerical hiring objectives
and Program Element V-Employee Development Programs for related
objectives and action items.

EEOC FORM 566 (8/87)                                    DIV-5

HUD003925

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM PLAN UPDATE REPORT
PROBLEM/BARRIER IDENTIFICATION

DEPARTMENT
UPDATE

PROVIDE A NARRATIVE DESCRIBING THE PROBLEMS/BARRIERS IDENTIFIED

IV. RECRUITMENT AND HIRING (Cont'd)

The analysis identified the following problems/barriers:

UNDESIRED CONDITION: Governmentwide reinvention, reorgani-
zations, and downsizing efforts have severely limited the
Department's ability to conduct targeted recruitment and
hiring. As a result, some EEO groups remain underrepre-
sented (manifest imbalance and/or conspicuous absence) in
twenty-two (22) major occupational series. Further, the
adverse impact analysis and impact ratio analysis revealed
that some EEO groups were adversely affected during the
competitive selection process.

DESIRED CONDITION: The desired condition is to attain and
retain a work force that is reflective of the nation's
diversity. With little, if any, recruitment and hiring
anticipated and with a mandated staff reduction of approxi-
mately 30.5 percent by the year 2000, the Department's
ability to attain its desired condition is unlikely. Yet,
every effort will be made to eliminate instances of under-
representation of the identified EEO groups in the following
occupational categories (PATCOB-Professional, Administra-
tive, Technical, Clerical, Other, and Blue Collar) and major
occupational series:

PROFESSIONAL CATEGORY

0510-Accountant........................ White females

0511-Auditor........................... White females
                                        Black males
                                        Hispanic females
                                        Asian males
                                        Asian females
                                        Indian males
                                        Indian females

EEOC FORM 566 (8/87)                                    DIV-6

HUD003926

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

**FISCAL YEAR 1997**
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM UPDATE REPORT
PROGRAM ANALYSIS

**DEPARTMENT**

UPDATE

## V.  EMPLOYEE DEVELOPMENT PROGRAMS (Cont'd)

a group exceeded their percentages of work force representation (minorities and women +3.5 percent and women +3.1 percent). Minorities comprised 40.2 percent of training participation, an increase of 1.8 percent.  Their percentage of participation is below their percentage of work force representation by 0.8 percent.

An analysis of the number of training incidents revealed that the incidents were either met or exceeded the number of on-board employees in the following EEO groups:  White females – incidents-3,721, employees-3,137; Black males – incidents-881, employees-881; Hispanic males – incidents-368, employees-277; Hispanic females – incidents-593, employees-421; Indian males – incidents-51, employees-43; and Indian females – incidents-95, employees-70.  The percentage of training incidents for on-board Black female employees was 92.6 percent, followed by 89.8 percent for Asian females, and 89.5 percent for Asian males.

**FISCAL YEAR 1996**
ANALYSIS OF SPECIAL EMPLOYMENT PROGRAM AND TRAINING INCIDENTS

|  | Work Force # | Work Force % | Special Programs # | Special Programs % | Training Incidents # | Training Incidents % |
|---|---|---|---|---|---|---|
| **WHITES** | 6180 | 57.2 | 155 | 52.7 | 6486 | 58.0 |
| Males | 3043 | 28.2 | 53 | 18.0 | 2765 | 24.7 |
| Females | 3137 | 29.0 | 102 | 34.7 | 3721 | 33.3 |
| **BLACKS** | 3498 | 32.4 | 97 | 33.0 | 3305 | 29.6 |
| Males | 881 | 8.2 | 15 | 5.1 | 881 | 7.9 |
| Females | 2617 | 24.2 | 82 | 27.9 | 2424 | 21.7 |
| **HISPANICS** | 698 | 6.5 | 28 | 9.5 | 961 | 8.6 |
| Males | 277 | 2.6 | 8 | 2.7 | 368 | 3.3 |
| Females | 421 | 3.9 | 20 | 6.8 | 593 | 5.3 |
| **ASIANS** | 309 | 2.8 | 9 | 3.1 | 277 | 2.5 |
| Males | 143 | 1.3 | 3 | 1.0 | 128 | 1.1 |
| Females | 166 | 1.5 | 6 | 2.1 | 149 | 1.4 |

EEOC FORM 566 (8/87)                                    DV-2

HUD003935

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM UPDATE REPORT
PROGRAM ANALYSIS

DEPARTMENT
                                                        UPDATE

V.   EMPLOYEE DEVELOPMENT PROGRAMS (Cont'd)

FISCAL YEAR 1996
ANALYSIS OF SPECIAL EMPLOYMENT PROGRAM AND TRAINING INCIDENTS

|  | Work Force # | % | Special Programs # | % | Training Incidents # | % |
|---|---|---|---|---|---|---|
| INDIANS | 113 | 1.1 | 5 | 1.7 | 146 | 1.3 |
| Males | 43 | 0.4 | 2 | 0.7 | 51 | 0.5 |
| Females | 70 | 0.7 | 3 | 1.0 | 95 | 0.8 |
| Totals | 10,798 | 100.0 | 294 | 100.0 | 11,175 | 100.0 |
| Minorities and Women | 7,755 | 71.8 | 241 | 82.0 | 8,410 | 75.3 |
| Women | 6,411 | 59.3 | 213 | 72.4 | 6,982 | 62.5 |
| Minorities | 4,618 | 42.8 | 139 | 47.3 | 4,689 | 42.0 |

With the continuing Departmentwide mandatory downsizing and restructuring, HUD remains committed to assuring that every employee is given the opportunity to increase their skills, productivity, and employability, whether in this agency or in the external labor market.  HUD will continue to focus on the training and development of its current staff.  See Fiscal Year 1996 AEP Accomplishment Report, Program Element DV – Employee Development for more detailed analyses of this program element.

EEOC FORM 566 (8/87)                        DV-3

HUD003936

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM UPDATE REPORT
PROGRAM ANALYSIS

DEPARTMENT
UPDATE

PROVIDE A NARRATIVE DESCRIBING THE PROBLEM/BARRERS IDENTIFIED:

V.   EMPLOYEE DEVELOPMENT PROGRAMS (Cont'd)

PROBLEM/BARRIER IDENTIFICATION

The analysis identified the following problems/barriers

**UNDESIRED CONDITION:**   The percentages of participation for some EEO groups (Black males, Black females, Asian males and Asian females) in both Special Employment Program and/or incidents of training are below their percentages of work force representation.  Further, the percentages of participation for White females and Indian females decreased during Fiscal Year 1996 in both Special Employment Programs and training.  Hispanic male participation also decreased under Special Employment Programs.

**DESIRED CONDITION:**   The increased participation of minorities and women in both Special Employment Program and incidents of training, with emphasis on White females, Black males, Black females, Hispanic males, Asian males, Asian females, and Indian females.

**ANALYSIS:**   The analysis of HUD's Employee Development Programs (Special Employment Programs and Incidents of Training) revealed decreases in the percentages of participation, in both categories, for White females (-2.1%), Asian females (-0.1%), and Indian females (0.4%).  Decreases also occurred for Black males (-0.5%), Hispanic males (-0.8%), and Asian males (0.4%) under Special Employment Programs.  Further, the percentages of participation in employee training and development programs for Black males, Black females, Asian males, and Asian females are below their percentages of representation in the work force.

**PROBABLE BARRIER:**   Minorities and women may not be applying for available training, educational, and employee development opportunities for fear of non-selection.  Another probable barrier could be that minorities and women are not aware of the available developmental opportunities since

EEOC FORM 566 (8/87)                                    DV-4

HUD003937

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM UPDATE REPORT
PROGRAM ANALYSIS

DEPARTMENT
                                                                    UPDATE
PROVIDE A NARRATIVE DESCRIBING THE PROBLEM/BARRIERS IDENTIFIED:

V.   EMPLOYEE DEVELOPMENT PROGRAMS (Cont'd)

PROBLEM/BARRIER IDENTIFICATION (Cont'd)

most training and development opportunities are announced
via the Department's automated on-line information systems
as required by the Paperwork Reduction Act.

ALTERNATIVE:   Continue to publicize all training and
developmental opportunities using the following methods:
Department's Internet, cc:Mail messages, focus messages,
on-line staff bulletins, the HUD Training Academy's Intranet
Homepage, posters and announcements, and hard copy dissemi-
nation to local union offices.  Encourage managers and
supervisors to work with minority and female staff in the
development of Individual Development Plans (IDP's).
Promote participation in the Mentoring Program by women and
minorities, both as mentors and mentees.

EXPECTED RESULTS:   Increased minority and women partici-
pation in all training and developmental programs and other
educational opportunities.

FOLLOW-UP ACTION:   Continue to monitor, analyze, and report
on minority participation in training and educational
programs.

EEOC FORM 566 (8/87)                              DV-5

HUD003938

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM UPDATE REPORT
REPORT OF OBJECTIVES AND ACTION ITEMS

DEPARTMENT

**PROGRAM ELEMENT:    V.    EMPLOYEE DEVELOPMENT**

**PROBLEM/BARRIER STATEMENT:**  The percentages of participation for some EEO groups, in both Special Employment Programs and incidents of training, are below their percentages of work force representation.

**OBJECTIVE:**  Increased participation of minorities and women (White females, Black males, Black females, Hispanic males, Asian males, Asian females, and Indian females) in all employee development programs and educational opportunities.

**RESPONSIBLE OFFICIAL:**  Secretary
**TARGET DATE:**  09/30/97

| ACTION ITEMS: | RESPONSIBLE OFFICIAL | TARGET DATE |
|---|---|---|
| 1.  Maintain existing Educational Partnerships with colleges and universities and expand the use of partnerships with other colleges and universities. | Assistant Secretary for Administration and Administrator, HUD Training Academy | Ongoing activity with annual reporting 09/30/97 |
| 2.  Continue to sponsor the Department's Employee Development and Training Program including:  The Executive Development Program, the Mid-Level Development Program, the Upward Mobility Program, the Mentoring Program, etc. | " | " |

EEOC FORM 566 (8/87)                                    DV-6

HUD003939

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM PLAN UPDATE REPORT
PROGRAM ANALYSIS

DEPARTMENT

UPDATE

VI.   PROMOTIONS (Cont'd)

PROMOTION ACTIVITY ANALYSIS
Fiscal Year 1996

| EEO Group | Work Force Percentages FY96 | FY95/96 Change | PROMOTIONS Combined Percentages FY96 | FY95/96 Change | Non-Competitive Percentages FY96 | FY95/96 Change | Competitive Percentages FY96 | FY95/96 Change |
|---|---|---|---|---|---|---|---|---|
| Whites | 57.2% | -0.5% | 50.6% | -3.0% | 47.8% | -6.0% | 58.2% | +5.6% |
| Males | 28.2 | 0.0 | 16.6 | -2.0 | 14.1 | -3.2 | 23.5 | -1.3 |
| Females | 29.0 | -0.5 | 34.0 | -1.0 | 33.7 | -2.8 | 34.7 | +6.9 |
| Blacks | 32.4 | +0.4 | 37.4 | +3.0 | 39.5 | +5.7 | 31.5 | -5.4 |
| Males | 8.1 | +0.1 | 6.7 | +0.2 | 6.6 | +1.1 | 6.9 | -4.2 |
| Females | 24.2 | +0.3 | 30.7 | +2.8 | 32.9 | +4.6 | 24.6 | -1.2 |
| Hispanics | 6.5 | 0.0 | 8.4 | +0.1 | 8.8 | +0.3 | 7.5 | -0.1 |
| Males | 2.6 | 0.0 | 2.1 | -0.3 | 2.0 | -0.3 | 2.4 | -0.6 |
| Females | 3.9 | 0.0 | 6.3 | +0.4 | 6.8 | +0.6 | 5.1 | +0.5 |
| Asians | 2.8 | 0.0 | 2.1 | -0.4 | 2.2 | -0.4 | 1.5 | -0.5 |
| Males | 1.3 | 0.0 | 0.7 | -0.1 | 0.7 | -0.1 | 0.7 | +0.2 |
| Females | 1.5 | 0.0 | 1.4 | -0.3 | 1.5 | -0.3 | 0.8 | -0.7 |
| Indians | 1.1 | +0.1 | 1.5 | +0.3 | 1.7 | +0.4 | 1.3 | +0.4 |
| Males | 0.4 | 0.0 | 0.3 | +0.1 | 0.4 | +0.2 | 0.3 | +0.1 |
| Females | 0.7 | +0.1 | 1.2 | +0.2 | 1.3 | +0.2 | 1.0 | +0.3 |
| Minorities and women | 71.8 | 0.0 | 83.4 | +2.0 | 85.9 | +3.2 | 76.5 | +1.3 |
| Women | 59.3 | -0.1 | 73.6 | +2.1 | 76.1 | +2.2 | 66.2 | +5.8 |
| Minorities | 42.8 | +0.5 | 49.4 | +3.0 | 52.2 | +6.0 | 41.8 | -5.6 |

EEOC FORM 566 (8/87)                                          DVI-3

HUD003944

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM PLAN UPDATE REPORT
PROBLEM/BARRIER IDENTIFICATION

DEPARTMENT
UPDATE

PROVIDE A NARRATIVE DESCRIBING THE PROBLEMS/BARRIERS IDENTIFIED:

VI.   PROMOTIONS (Cont'd)

PROBLEM/BARRIER IDENTIFICATION

The analysis identified the following problems/barriers:

**UNDESIRED CONDITION:**   The promotion rates for Black males, Hispanic males, Asian males, and Asian females are below their percentage of representation in the Department's work force.

**DESIRED CONDITION:**   An increase in both Combined and Non-competitive promotion rates for Black males, Hispanic males, Asian males, and Asian females, and an increase in the Competitive promotion rates for Black males, Hispanic males, and Asian females which is comparable to their availability in the work force.

**ANALYSIS:**   The analysis of the Department's Fiscal Year 1996 **Combined** promotion activity revealed that the percentages of promotions for White females, Hispanic males, Asian males, and Asian females **decreased.**  While the percentage of promotions for White females also **decreased,** the percentage rate **exceeds** their work force representation.  The percentage rate for Asian females **mirrors** their representation in the work force.  The rates for the other EEO groups are **below** their percentages of work force representation.  The analysis of **Non-competitive** promotions also revealed **decreases** for White females, Hispanic males, Asian males, and Asian females.  Under **Competitive** promotions, the percentages of promotion for Black males, Black females, Hispanic males, and Asian females **decreased.**   The promotion rates for Indian males and Indian females **increased** in all three (3) promotion categories.

EEOC FORM 566 (8/87)                                    DVI-4

HUD003945

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM PLAN UPDATE REPORT
PROBLEM/BARRIER IDENTIFICATION

DEPARTMENT

UPDATE

PROVIDE A NARRATIVE DESCRIBING THE PROBLEMS/BARRIERS IDENTIFIED:

VI.  PROMOTIONS (Cont'd)

**PROBABLE BARRIER:**  It appears that Black males, Hispanic males, Asian males, and Asian females may not be equitably employed in positions or occupational series which allow for promotion potential.  Further, the normal attrition rate and continuing downsizing efforts may have an adverse impact on the availability of eligible candidates from targeted EEO groups for both Non-competitive and Competitive promotions.

**ALTERNATIVE:**  Continue to assure that each Program Office develops and implements an AEP plan which focuses on internal movement strategies for minority males; continue utilization of the Department's Mentoring Program as a means of assisting minorities and women in breaking through the "Glass Ceiling," with special emphasis on minority males; continue to publicize internal position vacancies by electronic mail and other on-line technology; continue to utilize the Individual Development Plan (IDP) process, the various Educational Partnerships with colleges and universities, and other training and development programs to prepare minorities and women for career advancement; continue providing training on Valuing the HUD Employee utilizing the F.A.I.R. principles; and continue to monitor the promotion rates for minorities and women, and conduct quarterly impact analyses.

**EXPECTED RESULTS:**  Increased rates of promotion for all targeted EEO groups (Black males, Hispanic males, Asian males, and Asian females, and Indian males) whose percentages of promotions are **below** their percentages of work force representation.

**FOLLOW-UP ACTION:**  Continue to track promotion activity and report results to top management.  Results should show an improved promotion rate for the affected EEO groups.

See pages DVI-6 and DVI-7 for Fiscal Year 1997 objectives and action items.  Also see Program Element V - Employee Development Program for related objectives and action items.

EEOC FORM 566 (8/87)                                                 DVI-5

HUD003946

AFFIRMATIVE EMPLOYMENT PROGRAM FOR MINORITIES AND WOMEN

FISCAL YEAR 1997
ANNUAL AFFIRMATIVE EMPLOYMENT PROGRAM PLAN UPDATE REPORT
REPORT OF OBJECTIVES AND ACTION ITEMS

DEPARTMENT

UPDATE

PROGRAM ELEMENT:  VI.  PROMOTIONS

PROBLEM/BARRIER STATEMENT:  The promotion rates for some EEO groups (Black males, Hispanic males, Asian males, and Asian females) are below their percentages of representation in the Department's work force.

OBJECTIVE:  Increase the promotion rates (Combined, Non-competitive, and Competitive) for Black males, Hispanic males, Asian males, and Asian females.

RESPONSIBLE OFFICIAL:  Secretary
TARGET DATE:  09/30/97

| ACTION ITEMS: | RESPONSIBLE OFFICIAL | TARGET DATE |
|---|---|---|
| 1.  Develop and implement AEP Plans that focus on internal movement strategies and training and development initiatives for each Program Office within Department. | Assistant Secretaries and Principal Organization Heads | 3/29/97 |
| 2.  Develop and implement Diversity Plans for each Program Office. | Assistant Secretaries and Principal Organization Heads | 3/29/97 |
| 3.  Continue Department-wide training on Managing Cultural Diversity and the Valuing the HUD Employee - F.A.I.R. principles. | Assistant Secretary for Administration, Director, ODEEO, and Administrator, HUD Training Academy | 09/30/97 |

EEOC FORM 566 (8/87)                                    DVI-6

# EXHIBIT 2

(Part 1 of 4)

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

EQUAL EMPLOYMENT OPPORTUNITY

MANAGEMENT DIRECTIVE

EEO-MD-714

DATE OCTOBER 6, 1967

TO THE HEADS OF FEDERAL AGENCIES:

1.    SUBJECT. Instructions for the Development and Submission of Federal Affirmative Employment Multi-Year Program Plans, Annual Accomplishment Reports, and Annual Plan Updates for FY 1988 through FY 1992.

2.    PURPOSE. To prescribe to Federal agencies instructions, policies, procedures, guidance, and formats for the development and submission of:

    a.    Multi-year affirmative employment program plans,
    b.    Annual affirmative employment program accomplishment reports, and
    c.    Annual affirmative employment program plan updates.

3.    EFFECTIVE DATE.  October 1, 1987.

4.    ORIGINATOR.  Federal Sector Programs, Office of Program Operations, Equal Employment Opportunity Commission (EEOC).

5.    OBSOLETE DATA.  EEO-MD-707 and EEO-MD-707A are canceled as of January 1, 1988.

6.    AUTHORITY.  These instructions are prepared pursuant to EEOC's authority under Section 717 of the Civil Rights Act of 1964, as; amended, 42 USC 20OOe-16; Reorganization Plan No.1 of 1978, issued pursuant to 5 USC 901 et seq.; Executive Order 11748 (3 CFR, 1966-70 Comp., p. 803) as amended by Executive Order 12106 (3 CFR 1978 Comp., p. 263); and 29 CFR Part 1613. specific sources of authority and guidance are further explained in Appendix E of this document.

7.    POLICY INTENT.  The intent of the Commission in issuing this Directive is to develop a systematic multifaceted methodology for affirmative employment programs which require:

    o    Strong commitment by the Head of the Agency through a clear delegation of authority to Senior Managers;

    o    Management accountability systems for holding Senior Managers responsible for achieving Agency EEO objectives;

    o    Identification and removal of barriers at all levels of the work force;

(3)  Agencies shall select problems and barriers affecting PATCOB categories and major occupations and identify specific actions to eliminate each problem and barrier.

c.  Report of Objectives and Action Items.  The next step in the development of a multi-year affirmative employment  program is the preparation of a report containing the following:

(1)  A clear statement of specific and measurable objectives and supporting action items which will resolve problems identified.

(2)  Assignment of a responsible official for each objective and action item listed.

(3)  A target date for completion of each objective and action item.

See Exhibit 1 for a sample. (EEOC Form 566, p.10).

After, review of an agency's Report of Objectives and Action Items, the EEOC may direct, after discussion with the agency, the development of additional objectives and action items.

d.  Numerical Objectives (Goals).  Agencies may establish numerical objectives (goals) for each job category or major occupation where there is a manifest imbalance or conspicuous absence of EEO Group(s) in the work force.  Numerical objectives (goals) shall be used in accordance with the following guidance.

(1)  Agencies should review the Supreme Court decision, Johnson v. Transportation Agency, Santa Clara County, 107 S. Ct. 1442 (1987).

(2)  The agency must conduct an appropriate work force analysis.  Where the work force representation of EEO Groups is below their corresponding civilian labor force (CLF) representation so that a conspicuous absence or manifest imbalance exists, the agency may develop reasonable numerical objective (goals) to address the absence or imbalance.

(3)  Agencies should use Appendix B of EEO-MD-707 for Civilian Labor Force (CLF) data comparisons.  Any deviation from this data base must be approved by  EEOC, Federal Sector Programs, Washington, D.C.

(4)  Numerical objectives (goals) must be reasonable.  They must have a reasonable relation to the extent of manifest imbalance or conspicuous absence, the availability of candidates and the number of vacancies.  The availability of candidates is dependent on effective community outreach, agency, recruitment, applicant flow, relevant qualifications, training, and promotions.

(5)  Agencies should consult with their personnel and budget officers for assistance with their vacancy projections.

(6)  Numerical objectives (goals) do not require or mandate the selection of unqualified persons or preferential treatment based on race, national origin or sex.  The purpose of numerical measures is to attain, rather than maintain a balanced work force.

(7)  Agencies should use the form in Exhibit 3 (EEOC Form 568,