UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD S. PATOSKI, )<br><br>Plaintiff, )<br><br>v. )<br><br>ALPHONSO JACKSON, SECRETARY, )<br>DEPARTMENT OF HOUSING AND )<br>URBAN DEVELOPMENT, )<br><br>Defendant. ) | C.A. No. 05-11086 |

**OPPOSITION TO DEFENDANT'S MOTION IN LIMINE
TO EXCLUDE PLAINTIFF'S EXPERT TESTIMONY
AND REQUEST FOR A _DAUBERT_ HEARING**

Plaintiff hereby opposes Defendant's motion to exclude Plaintiff's the testimony

of Plaintiff's expert witness. The expert witness in question, John Larsen, who for 20

years conducted management research and analyses for the Federal government,

including analyses of the EEOC affirmative action model that Defendant HUD adopted,

is eminently qualified to testify on numerical evidence that White males were

discriminated against in the provision of career opportunities, and about HUD's

implementation of an affirmative action program that relied upon procedures that

disadvantaged White males, while other, less discriminatory options were available. Mr.

Larsen can explain HUD's non-compliance with Department of Justice guidelines on

affirmative action, and the resultant under-representation of White males in job categories

for which Patoski was eligible. Mr. Larsen's analysis employs the very EEO "gender

plus" groups, such as White females and Asian males, which HUD relied upon in

implementing its Affirmative Employment Plan (AEP).

Mr. Larsen's detailed, seventy-five page expert report is included as <u>Docket No. 80</u>. Defendant's motion relies in great part upon its argument that evidence of bias against White males is irrelevant to Plaintiff's claim of discrimination on the basis of gender. Plaintiff's counterargument is that Title VII prohibits discrimination against <u>sub-categories</u> of men, just as it prohibits discrimination against men in general. Discrimination against Plaintiff (or others) as White men constitutes gender discrimination, because, but for their gender, they would not be in this disfavored category. To avoid a lengthy, duplicative discussion of the "White male" issue, Plaintiff suggests that this Court, before ruling on the instant motion, review <u>Docket 92</u>, which is Plaintiff's Opposition to <u>Defendant's Motion in Limine to Exclude Testimony Purporting to Demonstrate the Disparate Impact of HUD's Affirmative Employment Plan on White Males in this Claim Involving Solely Claims of Gender Discrimination</u>, pages 2 – 10.

## I.    LEGAL PRINCIPLES GOVERNING EXPERT TESTIMONY

Expert testimony is admissible when three conditions are met. First, the proposed expert witness is qualified to testify as an expert by "knowledge, skill, experience, training, or education." <u>Fed. R. Evid. 702</u>; <u>United States v. Paiva</u>, 892 F.2d 148, 160 (1st Cir. 1989) ("a witness may qualify as an expert on any one of [Rule 702's] five listed grounds"). Second, the expert's testimony must concern "scientific, technical or other specialized knowledge." <u>Fed. R. Evid. 702</u>. Finally, the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." <u>Fed. R. Evid. 702</u>; <u>United States v. Shay</u>, 57 F.3d 126, 132 (1st Cir. 1995).

The fundamental issue in determining if the testimony will assist the trier of fact is "'whether the untrained layman would be qualified to determine intelligently and to the

2

best degree, the particular issue without enlightenment from those having a specialized understanding of the subject matter involved.'" United States v. Montas, 41 F.3d 775, 783 (1st Cir. 1994) (citations omitted).

The test of the reliability of expert testimony is "flexible," United States v. Diaz, 300 F.3d 66, 73 (1st Cir. 2002), and statistical analyses have been held admissible in disparate treatment discrimination cases, "unless they are 'so incomplete as to be inadmissible as irrelevant.'" McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals,, 140 F.3d 288, 303 (1st Cir. 1998) (quoting Bazemore v. Friday, 478 U.S. 385, 400 n.10 (1986).

## II.     MR. LARSEN'S REPORT, WHICH INVESTIGATES AND REPORTS ON HUD'S TREATMENT OF WHITE MALES, IS RELEVANT AND ADMISSIBLE WITH RESPECT TO PLAINTIFF'S GENDER DISCRIMINATION CLAIMS

Defendant argues here, as it does elsewhere, that evidence that HUD disadvantaged White male is irrelevant and inadmissible with regard to Plaintiff's gender discrimination claims. Def.'s Motion, at 3-4. Plaintiff responds to Defendant's argument thoroughly in Docket 92, which is Plaintiff Opposition to Defendant's Motion in Limine to Exclude Testimony Purporting to Demonstrate the Disparate Impact of HUD's Affirmative Employment Plan on White Males in this Claim Involving Solely Claims of Gender Discrimination. Plaintiff expressly incorporates pages 2-10 of Docket 92, herein.

Plaintiff's response is that consideration of White males is permissible under the "sex plus" theory of gender discrimination. Under that theory, unlawful gender bias has occurred where consideration of gender, along with another factor, has led to an adverse employment action. In other words, discrimination against a sub-class of males constitutes gender discrimination, if there is no such bias against an analogous sub-class

of females) <u>Phillips v. Martin Marietta Corp.</u>, 91 S. Ct. 496 (1971) (disparately treating women with young children constitutes gender discrimination, if an employer treats men with young children in a better fashion).  Here, HUD's adverse treatment of White males constitutes gender discrimination involving a sub-class of men, since there is evidence that HUD gave preferential treatment to White women.  Thus, gender is the determinative factor in Plaintiff's placement in a disadvantaged category.

"The effect of [Title VII] is not to be diluted because discrimination adversely affects only a portion of the protected class." <u>Sprogis v. United Air Lines, Inc.</u>, 444 F.2d 1194, 1198 (7th Cir.), <u>cert. denied</u>, 404 U.S. 991 (1971) (discrimination against married women constitutes gender discrimination).  Consequently, it constitutes gender discrimination if an employer makes decisions based on a combination consideration of gender and another factor, such as race.  <u>Jefferies v. Harris County Community Action Association</u>, 615 F.2d 1025, 1032-1033 (5th Cir. 1980); <u>Johnson v. Dillard's Inc.</u>, 2007 U.S. Dist. LEXIS 71176, *10 (D.S.C. 2007) (Title VII sex plus race).

Mr. Larsen's analyses track and rely on the **very same EEO categories** that HUD relied on in setting affirmative action goals and in tracking workforce composition and promotions. <u>Docket 80</u>, at 43.  These EEO categories, which are based on gender, with the "plus" factor of race, include White males, Black males, Hispanic males, Asian males, and Native-American males and White, Black, Hispanic, Asian and Native-American females.  <u>Id.</u>

HUD's use of these "sex plus" groups reflects the fact that courts and the EEOC recognize that unlawful discrimination can exist when an employer discriminates against a subclass of women or men, <u>e.g.</u>, sex plus another characteristic, such as marriage,

caregiving, or race. Consequently, it is perfectly appropriate for Mr. Larsen to track

HUD's actions with respect to White men, to determine whether gender discrimination

has occurred.

There is no indication that discrimination against a subclass of males is an idea

beyond the comprehension of the jury, or that exposure to such evidence would confuse

the jury. Defendant cites cases in which it is determined, for example, that evidence of

race discrimination is excluded from cases involving sex discrimination "given the lack

of correlation between the two kinds of discrimination." Def.'s Motion, at 5. However,

it was the government that generated the dual factor, gender-based categories, and it

acted on those categories by treating members of the White male category different than

all the others. Thus, the government should not be heard to complain about a lack of

correlation between the race and gender factors, when it generated and relied on the

relationship between the two factors to govern its policies and actions.

## III.    MAGISTRATE JUDGE ALEXANDER'S PRIOR DECISION DOES NOT FORECLOSE EVIDENCE REGARDING WHITE MALES

Defendant argues that Magistrate Judge Alexander's prior decision in this case

somehow precludes evidence involving White males. Def.'s Motion, at 4 n.6; Patoski v.

Jackson, 477 F. Supp. 2d 361 (D. Mass. 2007). Plaintiff provides an expansive refutation

of this assertion in Docket 92, at 12-14, and he encourages this Court to review those

pages. In short, Magistrate Judge Alexander ruled that Plaintiff may not amend his

Complaint to add a Count seeking recovery for race discrimination, because Plaintiff

failed to exhaust administrative remedies for such a claim.

Introduction of evidence of HUD's formal policies, and workforce composition,

relating to White men, in support of a gender discrimination claim, does not

5

"circumvent" Magistrate Judge Alexander's decision.  There is no requirement to exhaust administrative remedies for the **evidence** one wishes to introduce at the trial of a gender discrimination claim.  Plaintiff did not need to exhaust administrative remedies for a race claim, because Plaintiff is not, at this stage, seeking to impose liability for race discrimination.  No finding of race discrimination is necessary for Plaintiff to prevail under a gender plus theory.

Thus, Magistrate Judge Alexander's decision, which does not address the admissibility of evidence for Plaintiff's gender discrimination claim, does not preclude Mr. Larsen's analysis of HUD's practices with respect to White males.

## IV.    MR. LARSEN HAS KNOWLEDGE AND EXPERIENCE INVOLVING PROGRAM ANALYSIS THAT WOULD ASSIST THE JURY

Defendant's questioning of Mr. Larsen's qualifications is without merit.  Def.'s Motion, at 5-6.  Mr. Larsen, is highly qualified to testify about HUD's (1) out-of-compliance Affirmative Employment Plans ("AEP") in making hires and promotions, (2) selection of the wrong comparator group in determining which EEO subgroups were underrepresented and should be targeted for promotion; and (3) numerical evidence that White males were subjected to disfavor and bias at HUD.  Docket 80, at 1-17, 20.

In 1976, Mr. Larsen earned a Master in Public Administration Degree from the John F. Kennedy School of Government, Harvard University.  Docket 80, at 3.  He has taken various classes involving quantitative analysis, including Accounting, Quantitative Analysis for Public Administrators, analysis for Decision Making, Public Management: Budgeting and Information Systems, and Educational Statistics, Law and Public Policy: Political Analysis.  Docket 80, at 3.  Mr. Larsen also completed a wide variety of management and information and technology training, including audit training.  Docket

6

80, at 3. He has acquired more than 20 years of management analysis experience with the Federal Aviation Agency ("FAA"). Docket 80, at 5-17.

Mr. Larsen has substantial experience in projects relating to Affirmative Action and Under-representation analysis. Docket 80, at 10-17. His prior research and consultations have addressed such matters as the disparate consequences of the FAA's transition to a pay banding system on females and minorities and the FAA's non-compliance with Department of Justice guidelines in calculating EEO group underrepresentation(s) for the FAA affirmative action plan. Docket 80, at 7-8, 15. In addition, Mr. Larsen has reviewed HUD Affirmative Employment Plans (AEPs), EEOC Recruitment Plans, the U.S. Department of Justice's memorandum to General Counsels Re: Post-Adarand Guidance on Affirmative Action in Federal Government; and HUD's AEP Accomplishment Reports, among many other documents. Larsen Report, at 66-70.

Mr. Larsen has testified as an expert witness, in Ryan v. Mineta (D.N.J. 2004), and as an expert witness in EEOC hearings in Dallas, (Villareal), Philadelphia (Carter), and via telephone (Boyd). Docket 80, at 4 & Attachment 1, at 2.

A.    John Larsen's Expert Testimony on HUD's Hiring and Promotion Practices Is Reliable, Relevant, and Will Assist the Jury in Determining and Understanding the Issues at Trial

Mr. Larsen examined undisputed data from HUD's own reports, regarding workforce composition, and rates of promotion, to determine whether there are indications that White males were treated worse than others. Such evidence may assist a jury in determining whether HUD was biased in its decision making during relevant years. Docket 80, at 20-21, 39-41. The trends of White male under-representation is well documented in Mr. Larsen's report. Docket 80, at 43.

The following charts illustrate some of what Mr. Larsen found from the data. The first chart shows an inexorable decline in White males employed at HUD at the higher grade levels relevant to the Community Builder position:



The second diagram shows a steady decline of White males in the Administrative category, in which the Community Builder position was classified.



The third chart shows that White males never received equity in the their

rate of promotion:



Here, Mr. Larsen's methodology and analysis of the workforce, which describe changes in the percentages of EEO subgroups at HUD who occupied job grades relevant to this case, and obtain the benefit of tangible career opportunities, such as promotion, do not involve complex multivariate statistical analysis. They may be properly considered in context, once explained by this experienced and qualified witness. Currier v. United Techs. Corp., 393 F.3d 246, 253 (1st Cir. 2004) (affirming district court's decision to admit former employee's statistics and allow the jury to assess their significance). These charts do nothing more than plot undisputed data points from the reports on tables reflecting the passage of time. No computer is needed to generate these charts and analyses. Thus, Mr. Larsen's extensive experience in auditing and program management, and education render him capable of explaining the evidence of workforce practices with respect to White males. Cf Def.'s Motion, at 7.

Multiple courts have allowed expert testimony similar to that offered by Mr. Larsen. See, e.g., Nieves-Villanueva v. Soto-Rivera, 133 F.3d 91, 92 (1st Cir. 1997) (stating that testimony concerning actual personnel practices was unobjectionable and ruling that the expert "was competent to testify that the plaintiff's appointments were irregular in the sense that they did not conform to normal personnel practice... ."); Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568 (8th Cir. 1996) (allowing expert testimony as to the adequacy of defendant's "Open Door" policy, store training, and response to complaints); Snider v. Consolidated Coal Co., 973 F.2d 555 (7th Cir. 1992) (allowing testimony of expert who consulted and advised companies on problems of sexual harassment in the work place and finding that such testimony was relevant and outweighed the risk of prejudice); Crenshaw v. Bozeman Deaconess Hosp., 693 P.2d 487

(Mont. 1984) (recognizing a new legion of experts in the complex domain of labor

relations).

The fact that Mr. Larsen holds no degree in statistics is irrelevant (although he has

received education on the subject). The complexity of the figures he has assembled are

not solely within the province of the scientist. Mr. Larsen does, however, of a graduate

level degree in Public Administration, and has enormous experience in program

management and analysis. He has been able to review the reports to obtain the relevant

numbers, and to assemble them in a comprehensible way. He will be able to clearly

describe HUD's AEP to the jury, describe the less discriminatory alternatives to the AEP

that HUD refused to implement, and describe the pattern of diminished career

opportunities of White males at HUD.

> B.     Mr. Larsen May Testify About HUD's Failure to Comply with a
> Department of Justice Directive to the Federal Agencies and/or HUD's
> Decisions to Pursue an AEP Analysis that Unnecessarily and Unfairly
> Disadvantaged White Males

On February 29, 1996, in the year before Plaintiff's rejection, the U.S.

Department of Justice issued a memorandum to General Counsels Re: Post Adarand

Guidance on Affirmative Action in Federal Government. That memorandum contained

guidelines for agencies to follow with respect to employment based affirmative action.

While those guidelines did, in fact, rely on caselaw, Mr. Larsen's analysis of HUD's

compliance with the memorandum focuses on directives contained in the memorandum,

as opposed to directives contained in the caselaw. Thus, Mr. Larsen, in this portion of his

testimony, would be testifying how HUD diverged from the Federal government's

internal directives, as opposed to the law.

11

Even if this Court were to hold that HUD's divergence from the Department of Justice Guidelines improperly intrudes upon questions of law, Mr. Larsen's testimony should nevertheless be considered admissible with respect to his description of how the AEP worked, and how the goals and objectives were adopted, as compared to alternative available to HUD.  For example, Mr. Larsen would testify about the following features of the AEP:

      *      That HUD, in analyzing promotion practices, failed to consider the composition of the applicant pool – i.e., whether the an EEO group's composition in a particular position was greater or less than its composition in the lower grade level from which applicants were promoted.  Thus, HUD was encouraging promotions for EEO groups to higher levels, in instances in which the representation of such EEO groups in those higher positions exceeded the rate of representation of that EEO group in the lower positions that constituted the applicant pool.  Docket 80, at 18.  Compliance with such objectives would compromise the ability of White males to have equal access to positions.

      *      HUD issued blanket objectives for greater promotions for EEO groups, even for instances in which compliance with the objective would encourage promotion of a member of such a group into a position for which there was no under-representation.  Docket 80, at 19.  Again, compliance with such objectives would compromise the ability of White males to have equal access to jobs.

      *      HUD issued objectives to add EEO groups, including female EEO groups, into positions for which there was no under-representation for such female EEO groups.

Docket 80, at 19. Compliance with such goals would undermine the presence of career opportunities for White males, who were never the subject of such preferential treatment.

     \*     HUD created a blind spot in terms of examining or remedying White male under-representation, and/or the failure to treat White males equally. HUD simply refused to consider adverse treatment or under-representation of White males to be a problem to be remedied. Docket 80, at 22-23.

Thus, without opining about the legality of the AEP, or whether the AEP complied with MD 714 or the DoJ memorandum, Mr. Larsen could testify concerning the features of the AEP, and compare those features to alternatives that HUD could have opted for in fashioning its AEP. Thus, the jury would be able to evaluate HUD's conduct in crafting its AEP to show where HUD made selections that disadvantaged White males and favored others. Then it would be up to the jurors (or the Judge for questions of law), to determine whether those decisions, constituting the framework and structure of the AEP, indicate a bias against men such as Plaintiff.

Thus, even if Mr. Larsen does not comment on the lawfulness of the AEP, or its conformity with the Federal Government's own guidelines, Mr. Larsen may still comment on the combination of choices that HUD made that led to the disproportionate, and one-sided impairment of White males' career opportunities. Then, it will be up to the Court to instruct the jury as to whether HUD's AEP violated the law as a matter of policy.

     C.     Mr. Larsen Has Revealed His Methodology

Mr. Larsen's opinions in this case are based on his expertise in the "EEOC Model," affirmative action methodology, and quantitative analysis. Docket 80, at 1-17 &

Attachment 1. Defendant's criticisms regarding Mr. Larsen's methodologies constitute a mere re-hashing of the argument that inquiries regarding "White males" are irrelevant to a claim involving gender discrimination. As shown above, examination of the plight of White males, as a sub-class of men in general, is certainly relevant to the gender discrimination claim.

Patoski testified repeatedly throughout his deposition that the employee group discriminated against at HUD was comprised of "white males." Patoski Dep., at 15-17, 24, 26, 40, 50-51, 73-74, 76, 80-81, 86, 91, 98, 140, 152-155, 160, 192, Exhibit 1. Plaintiff identified the AEP's different and worse treatment of White men as evidence of discrimination in his Complaint. First Amended Complaint, ¶ 14. Therefore, he may introduce this evidence under the "sex plus" theory of gender discrimination.

## V.   FIFTH AMENDMENT EQUAL PROTECTION PRINCIPLES APPLY TO THE EMPLOYMENT DECISIONS OF THE FEDERAL GOVERNMENT

In 1995, the Supreme Court recognized that the Fifth Amendment of the United States Constitution requires that the Federal Government accord citizens equal protection of laws, in a manner similar to what is required under the Fourteenth Amendment. Adarand Constructors, Inc. v. Pena, 115 S. Ct. 2097, 2105-2107 (1995). In other words, the government may not favor some people over others, based on characteristics such as gender and race, unless such consideration survives constitutional scrutiny. The Adarand case applied strict scrutiny to the use of race-based criteria in the award of federal highway contracts. Id. Thus, the Federal government's reliance on race or sex-based criteria are unquestionably subject to constitutional scrutiny under the Fifth Amendment.

Defendant now questions the applicability of Fifth Amendment protections to the Federal government's employment practices. Def.'s Motion, at 2 n.3. Under HUD's

14

Constitutional theory, the Federal government may not be permitted to discriminate against contractors on the basis of gender, but it could engage in sex discrimination in matters involving employment. Defendant does not suggest the legal or factual basis for this distinction. It provides no reasoned support for its position that the Constitution permits unjustified sex-based discrimination against Federal employees.

Defendant supports its argument only with an out-of-context quote from the D.C. Circuit, that it is "our view that neither Northeastern Florida nor Adarand extends much beyond their particular facts." Worth v. Jackson, 451 F.3d 854, 861 (D.C. Cir. 2006). However, the Worth case was discussing limitations on Supreme Court rulings of the doctrine of standing and ripeness. Worth, 451 F.3d at 858-859, 861. The Worth case does nothing to throw into doubt that the Fifth Amendment equal protection principles apply to the Federal government's conduct with regard to its employees. Nor does any other case that Plaintiff knows of.

## VI.    A *DAUBERT* HEARING IS NOT REQUIRED

Courts, in their gatekeeping role of regulating the admissibility of expert testimony under Fed. R. Evid. 702, evaluate both the reliability and relevance of the testimony. Fed. R. Evid. 702; Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 591-595 (1993). As stated above, Mr. Larsen's testimony is directly relevant to the claims and defenses in this case. The review for reliability assesses "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-593. Voir dire of an expert in the presence of the jury is permissible under Daubert, and the trial court, as gatekeeper, has discretion not to hold a pretrial evidentiary

15

reliability. <u>United States v. Alatorre</u>, 222 F.3d 1098, 1102 (9th Cir. 2000) (a separate,

pretrial hearing outside the presence of the jury is not required); <u>United States v. Nichols</u>,

169 F.3d 1255. 1262-1264 (10th Cir. 1999) (court has discretion not to hold pretrial

evidentiary reliability hearing in carrying out its gatekeeping function).

Clearly, Mr. Larsen's analysis of *data created and relied on by HUD*; and

description of HUD's methodologies to encourage career opportunities for certain EEO

groups, may properly "be applied to the facts in issue." <u>Daubert</u>, 509 U.S. at 592-593.

Given the obvious reliability of the data, a <u>Daubert</u> hearing on the reliability of Mr.

Larsen's methodology is not required. <u>United States v. Diaz</u>, 300 F.3d 66, 73-74 (1st Cir.

2002) (no pretrial evidentiary hearing on reliability is required).

### CONCLUSION

For the above reasons, Plaintiff respectfully requests that the Court deny

Defendant's motion to exclude Mr. Larsen's expert testimony and request for a <u>Daubert</u>

hearing, in its entirety.

Respectfully submitted,

The Plaintiff,
By his Attorneys


_____/s/ Robert S. Mantell_____
Kevin G. Powers
BBO# 405020
Robert S. Mantell
BBO# 559715
Rodgers, Powers & Schwartz LLP
18 Tremont Street
Suite 500
Boston, MA  02108
(617) 742-7010

Patoski opposition limine larsen

**DEPO-Richard S. Patoski, 12/7/2006**

**APEX Reporting**

**Page 1 to Page 201**

CONDENSED TRANSCRIPT AND CONCORDANCE

*APEX REPORTING*
*327 Summer Street*
*First Floor, Rear*
*Boston, MA    02210*
*Phone:   617-426-3077*
*FAX:   617-426-6844*

**Page 1**

( 1)  1 - 201
( 2)
( 3)              IN THE UNITED STATES DISTRICT COURT
( 4)                          FOR THE
( 5)                  DISTRICT OF MASSACHUSETTS
( 6)
( 7)  RICHARD S. PATOSKI.            )
                                     )
( 8)                  Plaintiff. )
                                     )
( 9)  -V-                           )  CIVIL DOCKET NO.
                                     )  05-11086-RCL
(10)  Alphonso Jackson. Secretary.  )
      DEPARTMENT OF HOUSING & URBAN )
(11)  DEVELOPMENT.                  )
                                     )
(12)                  Defendant. )
(13)
(14)
(15)          THE ORAL DEPOSITION OF RICHARD S. PATOSKI. held
(16)  pursuant to Notice. and the applicable provisions of the
(17)  Federal Rules of Civil Procedure. before MaryAnn Rossi. a
(18)  Court Reporter and Notary Public. within and for the
(19)  Commonwealth of Massachusetts. at the offices of the
(20)  United States Attorney. 1 Courthouse Way. Suite 9200.
(21)  Boston. Massachusetts. on Thursday. December 7, 2006.
(22)  commencing at 10:11 a.m.
(23)
(24)
(25)

**Page 3**

( 1)                     I N D E X
      WITNESS                                           PAGE
( 2)
      Richard S. Patoski
   5
( 3)
      EXHIBITS: DESCRIPTIO                              PAGE
( 4)
      1    FY97 HUD AEP Update Repor                    57
( 5)
      2    FY99 HUD AEP Update Repor                    62
( 6)
      3    EEOC Management Directive 7171
( 7)
      4    Instructions to Federal Agencies
( 8)       for EEOC MD7171
( 9)  5    FY04 HUD MD715 Repor                         78
(10)  6    FY05 HUD MD715 Repor                         78
(11)  7    First Amended Complaint and Jury
           Trial Demand                                 165
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

**Page 2**

( 1)  PRESENT:
( 2)  On Behalf of the Plaintiff:
( 3)      ROBERT S. MANTELL. ESQ.
          Rodgers. Powers & Schwartz. LLP
( 4)      18 Tremont Street
          Boston. MA  02108
( 5)      (617) 742-7010
( 6)  On Behalf of the United States:
( 7)      MARK GRADY. ESQ.
          Assistant U.S. Attorney
( 8)      Office of the United States Attorney
          1 Courthouse Way
( 9)      Boston. MA  02210
          (617) 748-3100
(10)
          JACK BRANDWEIN. ESQ.
(11)      Associate Regional Counsel
          US Department of Housing and Urban Development
(12)      10 Causeway Street
          Boston. MA  02222
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

**Page 4**

( 1)                 S T I P U L A T I O N S
( 2)
( 3)          IT IS HEREBY STIPULATED AND AGREED TO. by and
( 4)  between the parties and their respective
( 5)  attorneys. that all objections. except as to
( 6)  the form of the questions. shall be reserved
( 7)  until the time of trial: that the filing of
( 8)  the deposition be waived: and. that the
( 9)  witness may read and sign the deposition
(10)  without any Notary Public being present.
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Page 13

(1) levels of management in HUD.

(2) Q   Are you aware of any rule or regulation or
(3) executive order under which HUD is required to have an
(4) Hispanic employment program?

(5) A   I believe, the Hispanic employment program is
(6) established according to an executive or presidential
(7) executive order.

(8) Q   Can you describe for me what claims, if any, you
(9) are pursuing in this litigation with respect to the Hispanic
(10) employment plan?

(11) A   Well, I think the Hispanic employment–

(12) MR. MANTELL:   Objection.

(13) I'm objecting to it. Go ahead.

(14) A   It's a program that leads to preferences for
(15) Hispanic employees in assignments, training, promotions and
(16) hiring, and ways in which that can occur.

(17) BY MR. GRADY:

(18) Q   Did the Hispanic employment plan play a role in
(19) you not receiving the community builder position?

(20) A   No. It did not.

(21) Q   Is it your contention that the Hispanic employment
(22) plan played a role in your not receiving the public housing
(23) revitalization specialist position?

(24) MR. MANTELL:   Objection.

(25) You can answer.

Page 15

(1) eligibles. That certificate of eligibles from the first
(2) vacancy announcement – well, I wasn't selected for the
(3) position is how it harmed me.

(4) But, to go on to show discrimination against white
(5) males in the process, to favor – discrimination that
(6) discriminated against white males and favored Hispanic
(7) women, is that the DEU certificate of eligibles for the
(8) GS-14, the top scoring person was a white male who was not
(9) selected.

(10) He was a veteran. And if anybody was selected,
(11) they would've had to select him, because he was the top
(12) scoring white male – a white – he was a veteran. He was
(13) the top scoring and he was a veteran.

(14) He would have had to been selected under the
(15) statutory veterans preference.

(16) HUD subsequently made no selection claiming that
(17) there were – and I have an affidavit to this effect,
(18) claiming that the selection – a selection was not made
(19) because they wanted to do expand their pool of applicants.
(20) And they issued a subsequent vacancy announcement.

(21) There was, to my knowledge, no effort to cancel
(22) the first vacancy notice, or to give any notification to
(23) anybody that was on the best qualified list for the first
(24) vacancy announcement per OPM – OPM instructions. Their
(25) instructions read should, not shall give notice to people

Page 14

(1) A   No. It did not.

(2) BY MR. GRADY:

(3) Q   Okay. Can you describe for me how you personally
(4) were injured by HUD's Hispanic employment plan?

(5) A   It's part of their ongoing preferences, patterns
(6) and practices that give preferences to a minority class, an
(7) EEO class, in this case, Hispanics, over white males.

(8) Q   Is there any occasion on which you have been
(9) denied a tangible employment benefit as a result of the
(10) Hispanic employment plan?

(11) A   Yes.

(12) Q   What is that? Can you describe that for me?

(13) A   The selection of an Hispanic woman for the
(14) position of CD director for the Miami field office.

(15) Q   And how is it that the Hispanic employment plan
(16) caused that women to be selected for that position? How is
(17) it that that harmed you?

(18) A   Well, one of the things that they did in that
(19) selection process was they – I had applied for the
(20) position. I had made the best qualified list for the
(21) position.

(22) They had established a best qualified list and
(23) rating roster.

(24) And the woman was selected, the Hispanic woman was
(25) selected at the GS-14 level from the DEU certificate of

Page 16

(1) when you cancel and reissue a vacancy.

(2) There was no formal cancellation. Cancel vacancy
(3) announcement that I know of. Normally, HUD would issue the
(4) USA jobs, you know, – a vacancy announcement with a
(5) notation that this vacancy announcement has been canceled
(6) and a subsequent one will be reissued.

(7) In this case, they just reissued the vacancy
(8) announcement. They did not give notice to me or to the
(9) white male that had appeared at the top of the vacancy list.

(10) And they processed the selection through a new
(11) vacancy announcement that was a duplicate of the original
(12) one for which there was an Hispanic female that applied, who
(13) had not applied on the first vacancy – in response the
(14) first vacancy announcement, the initial vacancy
(15) announcement, who was then selected.

(16) It appeared that almost – by the surnames on the
(17) list, that almost all of the Hispanics that applied under
(18) the initial vacancy announcement did apply under the
(19) subsequent reissued vacancy announcement.

(20) Now, this could very well be a process that was
(21) promoted at the – as part of the HEP program. I don't
(22) know.

(23) There was a news article about that time in which
(24) – in the Federal Times, in which Secretary Jackson talked
(25) about how HUD needed to hire more Hispanics and we needed
to

Page 17

(1) focus on that, etcetera, etcetera. And it was very clear to

(2) me, in my opinion, that that's what occurred in that

(3) process.

(4) Q  So, in this specific instance, you applied for a

(5) position; correct?

(6) A  Yes.

(7) Q  And you didn't get the position; correct?

(8) A  I was – yes. I did not get the position. But,

(9) no one got the position in the – under the application that

(10) I applied to.

(11) Q  And then, did you apply to that second

(12) announcement as well?

(13) A  I was not aware of the second announcement.

(14) Q  So there is a situation in which you applied for a

(15) position which was withdrawn; is that correct?

(16) MR. MANTELL:    Objection.

(17) A  There is no evidence–

(18) BY MR. GRADY:

(19) Q  Well, strike – well, let me rephrase the

(20) question.

(21) You applied for a position vacancy in which HUD

(22) made no selection whatsoever?

(23) A  Right.

(24) Q  And they subsequently reissued a vacancy

(25) announcement for that position that was the same position;

Page 18

(1) correct?

(2) A  Correct. And I would like to just add that they

(3) reissued the vacancy announcement under the representation

(4) they needed to expand the applicant pool. The applicant

(5) pool, under the reissued vacancy, was about half of the

(6) original vacancy – for the original vacancy announcement.

(7) Q  So, the pool for the original announcement was

(8) larger or smaller than the pool for the second?

(9) A  Almost double the pool for the second

(10) announcement. And they made no attempt to make sure that

(11) the people from the first announcement were either carried

(12) over without application to the second – the pool of the

(13) second announcement, or that they were made aware of the

(14) fact that they were reissuing a second announcement.

(15) In other words, someone had to either tell you, or

(16) you had to be diligent enough to be watching the

(17) announcements to know that a second vacancy announcement had

(18) been issued.

(19) Q  For the same position?

(20) A  Right.

(21) Q  Is it your contention that they didn't publish the

(22) second announcement?

(23) A  No. They did publish it.

(24) Q  You've also contended that there was a white male

(25) group who was at the top of the best qualified list under

Page 19

(1) the first vacancy announcement; correct?

(2) A  On the roster, the DEU certificate of eligibles

(3) for the position at the GS-14 level, which is where they

(4) made the selection from in the second announcement. They

(5) were free to use whatever roster. He was at the top of the

(6) list on the 14. I just use that as an example. I believe

(7) he was also on the 15 level and the 13 level.

(8) BY MR. GRADY:

(9) Q  But, he may not have been first?

(10) A  I really don't recall.

(11) There was another strange feature in that process

(12) in that, there were several positions in the initial

(13) issuance of vacancy announcements. I believe, there were

(14) seven positions being filled at the same time, all CPD

(15) directors. This was a major position in various offices

(16) around.

(17) They also lowered the standards for that. And he

(18) – looking at the ratings for the other positions, there was

(19) inconsistent rating.

(20) I mean, this guy got one score for the position in

(21) Miami and got an entirely different score for the same

(22) position in another city. Very strange. If they were using

(23) a crediting plan.

(24) Q  With respect to the first announcement where no

(25) one was hired.–

Page 20

(1) A  Yes.

(2) Q  – I take it, if no one was hired – strike that.

(3) Is it your contention you were improperly denied

(4) an opportunity at the position?

(5) A  Yes. That is my contention.

(6) Q  And do you believe that that particular claim

(7) would be actionable under Title VII?

(8) MR. MANTELL:    Objection.

(9) You can answer.

(10) A  It's part of actually my claim right now. It's a

(11) Constitutional claim as well as a Title VII claim that this

(12) is part of the pattern and practice.

(13) This is an example of a pattern and practice – an

(14) ongoing pattern and practice.

(15) It occurred at the time of the community – the

(16) type of pattern and practice was occurring at the time of

(17) the community building selection process. It was occurring

(18) at the time of the public housing evaluation specialist.

(19) And it occurred at this time, which was in 2004.

(20) BY MR. GRADY:

(21) Q  Have you pursued a Title VII action with respect

(22) to–

(23) A  I made an EEO complaint on this position and

(24) several others. But, at a particular point in time, I felt

(25) that the–

Page 21

(1)     MR. MANTELL:   Objection.

(2)   You answered his question.

(3)     THE WITNESS:   Thank you.

(4)   BY MR. GRADY:

(5)     Q   So, you did initially pursue an administrative

(6)   claim under Title VII with respect--

(7)     A   Yes, I did.

(8)     Q   One of the things we've got to remember here,

(9)   you're smart enough to know where all of my questions are

(10)   going. You have to let me finish them first, because she

(11)   has to go back and write them down.

(12)   So, I recognize that, but I have to ask you to be

(13)   patient and let me finish.

(14)     A   I thought you were finished.

(15)     Q   You undertook to file an administrative claim

(16)   under Title VII with respect to denial of the position

(17)   you've just described; correct?

(18)     A   It was not just a Title VII claim. It was also a

(19)   Constitutional claim. Yes, I did file.

(20)     Q   And where is that claim in the administrative

(21)   process?

(22)     A   It's closed.

(23)     Q   How -- what part about its closure?

(24)     A   The agency submitted a discovery request that I

(25)   felt was past the deadline. And I did not respond to it.

Page 22

(1)   The agency made a motion for dismissal. And the

(2)   EEO judge granted it.

(3)   I objected at the -- it was clear to me that the

(4)   regulatory time frame in the EEOC regulations for the

(5)   discovery request had expired and the EEOC Judge did not

(6)   have the authority to extend it.

(7)   And I just didn't respond.

(8)     Q   What happened when you didn't respond?

(9)     A   They made a motion for dismissal which the EEOC

(10)   Judge granted it.

(11)     Q   Have you taken any action to seek review of the

(12)   Administrative Judge's decision?

(13)     A   No. I have -- I have found -- no.

(14)     Q   Have you fully described the claims that you're

(15)   making in this action with respect to the Hispanic

(16)   employment plan?

(17)     MR. MANTELL:   Objection.

(18)     A   It's not a -- it's not an Hispanic employment

(19)   plan. It's an ongoing pattern and practice claim.

(20)   BY MR. GRADY:

(21)     Q   Well, have you fully described the patterns and

(22)   practices you contend HUD was using under the Hispanic

(23)   employment plan -- strike that. Let me rephrase the

(24)   question.

(25)     A   Please do.

Page 23

(1)   BY MR. GRADY:

(2)     Q   Is there any other manner in which you contend the

(3)   Hispanic employment plan discriminates against you? Other

(4)   than what you've just described?

(5)     A   Well, there are patterns and practices that would

(6)   benefit Hispanics. I don't know if they are pursuant to the

(7)   Hispanic employment plan or not.

(8)     Q   Okay. And what are those?

(9)     A   God, there's a whole list of them.

(10)     Q   Well, if you're making a contention in this

(11)   litigation that those patterns and practices are part of

(12)   your claim, I think we need to know what they are.

(13)     A   One is soliciting people to apply for jobs and not

(14)   soliciting white males. Two, finding white males ineligible

(15)   for positions when it's clear they are clearly eligible.

(16)   Case in point is the public housing revitalization

(17)   specialist job in which Deborah Medvic, an experienced human

(18)   resource specialist, found me ineligible for the position

(19)   when the basic qualifications for me to be eligible was

(20)   simply one year experience at the next lower grade to the

(21)   grade position.

(22)   This is a real basic, basic OPM standard that she

(23)   claimed -- well, I think there is conflicting explanations

(24)   from her in her affidavit and deposition.

(25)     Q   Don't get too too far down that road. We'll talk

Page 24

(1)   about that later.

(2)     A   Okay.

(3)     Q   Just with respect to Hispanic employment, I'm just

(4)   trying to narrow, you know, for the Hispanic employment

(5)   plan, I wanted to know what were the claims that you think

(6)   relate to the Hispanic employment plan?

(7)     A   Well, this ongoing pattern and practice. I think

(8)   that there are probably patterns that may have occurred in

(9)   the position that I was talking about from Miami, where

(10)   white males were not found eligible.

(11)   I don't -- I don't know that. Okay.

(12)     Q   Is that a component in your -- or is it your

(13)   contention that's a component of the Hispanic employment

(14)   plan or that that is a separate pattern and practice?

(15)     A   It's a pattern and practice that may be a

(16)   component of the employment -- Hispanic employment program,

(17)   or -- I don't know the details of the Hispanic employment

(18)   program.

(19)   I don't know if they tell them at those

(20)   conferences.

(21)     Q   Well, is there -- is it your contention in this

(22)   litigation that HUD has a published Hispanic employment plan

(23)   that includes descriptions of the practice and procedure you

(24)   described here? That they should cancel--

(25)     A   No.

Page 25

(1) Q. Okay. And that, in fact, -- well, is it your
(2) contention that whatever patterns and practices HUD employs,
(3) they're not going to be formally written down?
(4) MR. MANTELL: Objection.
(5) A. They're not going to be formally written down
(6) except that HUD has issued a policy statement which says, do
(7) whatever you have to do to meet the goals of the AEP.
(8) BY MR. GRADY:
(9) Q. But that was when the AEP was in effect?
(10) A. When the AEP was in effect.
(11) Q. Okay. Can you describe for me what your
(12) understanding is of the FEORP? What that is?
(13) A. That's an annual report to -- is it OPM? I guess,
(14) it's OPM, on basically your efforts to recruit minorities.
(15) Q. And are you aware of any rule, regulation, law,
(16) executive order or other provision that requires HUD to have
(17) an FEORP?
(18) A. I'm sure it's subject to an executive order --
(19) it's pursuant to an executive order. I'm not sure, I
(20) believe it's pursuant to an executive order.
(21) Q. Can you describe for me the claims that you are
(22) pursuing in this litigation with respect to the FEORP?
(23) MR. MANTELL: Objection.
(24) BY MR. GRADY:
(25) Q. If any?

Page 27

(1) at this time.
(2) BY MR. GRADY:
(3) Q. You're not aware of any claim?
(4) A. I cannot say for sure at this time.
(5) Q. Do you know of any at this time?
(6) A. I cannot be sure at this time.
(7) Q. Can you testify right now as to any claim that you
(8) are pursuing in this action with respect to the FEORP?
(9) A. I cannot testify at this time. That does not mean
(10) that there isn't any.
(11) Q. Can you describe for me what is your understanding
(12) of the upward mobility program?
(13) A. The upward mobility program is a program that
(14) takes lower graded HUD employees and -- well, it doesn't
(15) take -- it creates opportunity for lower graded HUD
(16) employees to move up in their GS status. Move up.
(17) Q. What is your understanding as to how it
(18) accomplishes that?
(19) A. It's accomplished by formally adopting positions
(20) that are identified as upward mobility positions. And in
(21) recruiting for people at the next lower grade to fill those
(22) positions.
(23) Rather than competing say open to the general
(24) public.
(25) Q. So, positions pursuant to the upward mobility

Page 26

(1) A. Well, the claims aren't directly related to it.
(2) It is part of the -- it's part of my claim that, the records
(3) clearly show that white males were under represented
(4) compared to the relevant civil labor force in that, at the
(5) time that HUD was claiming women and minorities were under
(6) represented, it showed that women and minorities were over
(7) represented.
(8) In fact, the only EEO group that has consistently
(9) been under represented compared to the labor -- the civilian
(10) labor force in HUD has been white males, I believe.
(11) Q. And I'm just going to try to clarify this.
(12) So, with respect to the FEORP, it's relevant to
(13) your claim that the AEP is discriminatory?
(14) A. Yes. Because the AEP makes a claim that
(15) minorities and women are under represented. And the data
(16) that HUD is supplying to OPM in the FR--
(17) Q. FEORP?
(18) A. -- FEORP shows that they were not under
(19) represented.
(20) Q. Okay. But, there's nothing -- there's no claim
(21) here with respect to the FEORP directly discriminating
(22) against you or directly resulting in discrimination against
(23) you?
(24) MR. MANTELL: Objection.
(25) A. I don't believe there is. I cannot say for sure

Page 28

(1) program are not filled through the ordinary process?
(2) A. The ordinary process. I don't know what you mean
(3) by "ordinary process".
(4) Q. Well, can you describe for me what claims you are
(5) pursuing in this litigation with respect to the upward
(6) mobility program?
(7) MR. MANTELL: Objection.
(8) A. Well, the upward mobility program gives
(9) preferences to women and minorities. As part of a policy
(10) statement as to ways -- There was policy statement on the
(11) AEP and ways to affect meeting the goals of the AEP.
(12) And one of the identified ways was the upward
(13) mobility program.
(14) Q. Have you ever applied to the upward mobility
(15) program?
(16) A. I have never been eligible for the upward mobility
(17) program.
(18) Q. Can you describe for me how you were personally
(19) injured by the upward mobility program?
(20) A. Again, it's part of a pattern and practice to set
(21) aside positions that are -- for which preference is given to
(22) women and minorities to fill them.
(23) Q. And that's to the exclusion of white males?
(24) A. Absolutely.
(25) Q. But, I take it, it's not to the exclusion of white

**Page 37**

(1) African Americans to these trainings you've described?

(2) A   I have an objection to HUD using HUD funds to send

(3) only African Americans to this training.

(4) Q   Do you know if any members of other races applied

(5) or asked to go to that training?

(6) A   I do not know that for – to be certain. But, if

(7) one looks at the mission statement for the Blacks In

(8) Government, it's very clear, it's not geared to anybody but

(9) blacks.

(10) Q   Okay. Do you know if any of the selectees in the

(11) any public housing revitalized – strike that.

(12) To your knowledge, was the selectee for the public

(13) housing revitalized station specialist position for which

(14) you applied a participant in the special emphasis program?

(15) A   I do not know that for a fact. However, most

(16) likely – he most likely was. It appears that he most

(17) likely was.

(18) Q   Can you describe for me what your understanding is

(19) of HUD's corrective action plan?

(20) A   I don't know what you are referring to. HUD has

(21) multiple correction action plans.

(22) It would have to be a correction action plan

(23) regarding – normally, that's regarding an audit finding or

(24) a finding, for example, OPM did audit – OPM did audit HUD's

(25) process for giving veterans preferences and found that they

**Page 39**

(1) Q   Can you tell me what your understanding is of

(2) HUD's accelerate promotion policy?

(3) A   Not at this time.

(4) Q   Are you making any claim in this litigation with

(5) respect to the accelerated promotion policy?

(6) MR. MANTELL:   Objection.

(7) A   I cannot answer that question at this time.

(8) BY MR. GRADY:

(9) Q   What is your understanding, or do you understand

(10) that HUD has a diversity improvement plan?

(11) A   Yes.

(12) Q   What is your understanding of what is termed the

(13) diversity recruitment plan?

(14) A   Making the distinction between diversity

(15) recruitment and diversity hiring?

(16) Q   Well, it's a term that I have retrieved from some

(17) of the discovery requests you have made from HUD.

(18) What is your understanding of what that term

(19) means?

(20) A   Which term?

(21) Q   Diversity recruitment plan.

(22) A   That is a plan to recruit women and minorities.

(23) Q   And what claims are you making in this litigation

(24) with respect to the diversity recruitment plan?

(25) And I'll be clear. And if there is another aspect

**Page 38**

(1) had violated the statutory requirements of hiring – not

(2) hiring veterans that have preference.

(3) And it had developed a sort of corrective action

(4) plan of what are you going to do. I think, it required them

(5) to offer jobs to five other people, things of that nature.

(6) So, that's what a correction action plan is.

(7) Q   Are you pursuing any claims in this litigation

(8) with respect to any particular corrective action plan?

(9) A   I cannot recall at this time.

(10) Q   Can you describe for me how any corrective action

(11) plan may have played a role in your not receiving the

(12) community builder position?

(13) A   I cannot tell you that at this time.

(14) Q   Can you describe for me whether any corrective

(15) action plan played a role in your not receiving the public

(16) housing revitalization specialist position?

(17) A   I cannot tell you at this time.

(18) Q   Can you describe for me what your understanding is

(19) with regard to the proud to be program?

(20) A   Not at this time.

(21) Q   Are you making any claim in this litigation with

(22) respect to the proud to be program?

(23) A   Not in – I can't say at this time. Depositions

(24) regarding discovery regarding those items has not been

(25) completed.

**Page 40**

(1) of it, we'll get to that.

(2) A   Well, again, it's a preferential program for

(3) certain EEO groups from which white males are excluded.

(4) Q   Okay. And how are those groups favored and what

(5) groups are favored under this plan?

(6) A   Well, for example, blacks. All right. HUD has a

(7) – a component of the plan is to go to historically black

(8) colleges to recruit graduates to the HUD programs to

(9) participate in the programs, apply to HUD. That's – that's

(10) an example.

(11) Q   Can you describe for me how you were personally

(12) harmed by this program?

(13) MR. MANTELL:   Objection.

(14) A   I was harmed by that program. HUD used –

(15) recruited Abbey Ogunbola to be a community builder fellow in

(16) the position as a temporary employee. So, he could receive

(17) on-the-job training and then apply and receive a permanent

(18) position.

(19) Q   And Abbey Ogunbola was the individual who received

(20) the public housing revitalization position?

(21) A   Yes.

(22) Q   So, it's your contention that, this recruitment

(23) plan that recruited minorities, led to Mr. Ogunbola being

(24) granted a community builder fellow position?

(25) A   Yes.

(1) rumors that he wanted to be Al Gore's running mate when he
(2) subsequently ran for president, etcetera, etcetera.
(3) So, he was going to make this. If anybody was
(4) going to be diverse, it was going to be HUD.
(5) And he conveyed this, I believe, in the senior
(6) management staff meetings that were – minutes of which were
(7) always posted it on the HUD website, issuing policy
(8) directives. The policy directive I said that – which was
(9) posted on the web for everybody to see and which stated
(10) that, these are ways you can achieve your goals, you know,
(11) using the upward mobility program, using Schedule A hiring
(12) authority, using blah, blah, blah.
(13) And it had the other statement in there using
(14) every internal and external means possible. Something to
(15) that effect.
(16) So, there was a real cultural change at HUD, a big
(17) push to this. And everybody knew it.
(18) And the AEP was the official thing. Managers were
(19) held accountable under performance standards, meeting the
(20) goals. And that's how the AEP discriminated against white
(21) males.
(22) The AEP itself, under MD714, did not require them
(23) to focus on achieving the goal of – focus on correcting the
(24) under representation of any EEO group compared to the
(25) relevant civilian labor force. It just focused on women and

(1) as a percent went down, 20 percent. And women and
(2) minorities went up 20 percent.
(3) Now, this is a phenomenal turnaround. And it –
(4) in my estimation, it could only be achieved with
(5) discrimination. There is no – there has been nothing
(6) presented from HUD that shows that HUD would be capable of
(7) doing that without discrimination.
(8) And, in fact, if you look at any comparable
(9) civilian organization, no one – no one has achieved those
(10) results, you know, without discrimination.
(11) Q   Can you describe specifically how the AEP played a
(12) role in your not receiving the community building position
(13) in 1997?
(14) A   Well, it set the – it's not just the AEP. It's
(15) the – the AEP was a document. And then, there were
(16) policies and procedures and patterns and practices
(17) established pursuant to the AEP.
(18) And like the instructions or policy statement that
(19) was posted on the web, of, you know, using the upper
(20) mobility program, using the Schedule A hiring authority,
(21) assigning, putting women and minorities in positions
(22) temporarily, you know, all of that.
(23) It even talked about making sure the selection
(24) panel, the rating panel – you know, usually there is a
(25) rating panel for applications. And they usually consist of

---

Page 50

(1) minorities. And exclusively excluded white males.
(2) It was the only EEO group that was excluded.
(3) Meanwhile, on the reports that they published, the
(4) statistical data that they showed, showed that, of all of
(5) the EEO groups in HUD, white males was the most under
(6) represented, having what they – what they called a manifest
(7) imbalance.
(8) HUD interpreted a manifest imbalance, and this is
(9) Cockrell's deposition, to mean, if you were even one
(10) employee below the level of the – what it should be
(11) following the statistics from the civilian labor force, and
(12) under MD714, they were also required to identify and remove
(13) barriers and so forth.
(14) And what HUD basically did is, they just went
(15) overboard. The pendulum really swung to the fact that the
(16) statistical analysis between 1992, when the process began,
(17) and what we have been supplied by HUD in 2000, show that,
(18) for the level that I am applying for, the GS-14, there was,
(19) during that period, the number of white males at that level
(20) in the HUD work force actually decreased by a nominal
(21) amount, about seven or eight white males at the GS-14 level.
(22) While for women, it went up – women and
(23) minorities, it went up – I don't know – 180 percent.
(24) And if you look at it as the percent of the work
(25) force at the GS-14 level, white males in the HUD work force,

Page 52

(1) five people.
(2) They were making sure that – the instructions
(3) were making sure the majority of the rating panel were women
(4) and minorities.
(5) I mean, it's a whole – it's incredible to me that
(6) someone giving the civil service reform act and merit
(7) staffing principles and so forth would come out with this.
(8) Now, to my knowledge, other agencies didn't do
(9) this. This was HUD doing it better than anyone else.
(10) Okay. And there were new stories that Andrew
(11) Jackson – oh, Andrew Jackson – Alphonso Jackson, taking
(12) credit for HUD is the – was the cabinet level agency with
(13) the highest percentage of women and minorities at the upper
(14) levels and taking credit for this and talking about how we
(15) are doing real great.
(16) The only area where we are weak right now is
(17) Hispanics. And we're going to focus on that and get them –
(18) get them into HUD. And blah, blah, blah.
(19) I mean, they were very – they were all very proud
(20) of what they did. It was in the performance appraisals. It
(21) was in their evaluations.
(22) Everybody was proud of their achievements. But,
(23) it was discrimination against white males. And it
(24) established basically a glass ceiling for white males.
(25) Because it didn't happen at every grade level. It

---

**Page 73**

(1)    Q.    Okay. On Page 59?

(2)    A.    Right. The compulsory snapshots are the data of

(3)    its work force compared to civilian labor work force.

(4)    Takes additional snapshots where needed. I don't

(5)    believe HUD did any of that. I don't believe, if – that's

(6)    all they did, was just complete the compulsory snapshots of

(7)    Step 1.

(8)    So, they didn't even complete Step 1, much less go

(9)    through the required process to Step 4.

(10)    Q.    Okay. Can you describe for me how it is that

(11)    their failure to go through the complete Step 1, Step 2,

(12)    Step 3, or Step 4, has harmed you in the past, presently

(13)    harms you or will harm you in the future?

(14)    A.    Well, I should say that, barrier analysis was part

(15)    of the AEP under 714 also. But –and so, this relates to

(16)    this.

(17)    In comparing the federal – the HUD work force to

(18)    the civilian labor force, the most under represented group

(19)    by far are white males.

(20)    We had some statistics that came from this report

(21)    at the deposition for–

(22)    Q.    Mr.Gaiter?

(23)    A.    – Mr.Gaiter, showing that white males were,

(24)    compared to the relevant civilian labor force, white males

(25)    in the HUD work force were less than 50 percent of the level

**Page 75**

(1)    of barrier section of the report, they talk about the

(2)    barriers not being – not having an adequate data, which is

(3)    not a barrier. And why would that even be – and EEOC gives you

(4)    the data. Okay. Why would it not having an adequate data

(5)    system be a reason for not identifying barriers.

(6)    Q.    Is there any other way that MD715 has harmed you

(7)    in the past individually, presently, or will harm you in the

(8)    future?

(9)    A.    I can't answer that at this time.

(10)    I should add, it will harm me in the future if HUD

(11)    fails to identify barriers and eliminate them.

(12)    Q.    So, it's your contention that HUD has harmed you

(13)    individually by failing to identify barriers to the

(14)    employment – or strike that – failing to analyze the data

(15)    in both its 2004, the 2005 MD715 appropriately, to reach a

(16)    conclusion that there were barriers to the employment of

(17)    white males?

(18)    A.    Yes. And I would add to that, it's just its

(19)    failure to identify what those barriers are. And that it

(20)    continues to damage me by not doing that.

(21)    Q.    Now, you mentioned – has MD715 – strike that.

(22)    What is it that you think HUD should be doing

(23)    here?

(24)    A.    They should be – first of all, how did the – how

(25)    did the HUD work force – how did the participation of white

**Page 74**

(1)    in the relevant civilian labor force. Whereas, black males

(2)    and black females, were – the females were like 500 percent

(3)    of what it would have been.

(4)    So, there is not just a gap here. There is a huge

(5)    disparity.

(6)    Now, these numbers didn't just pop up in FY '05.

(7)    They popped up even using – even though HUD is not using

(8)    the correct numbers, I don't know, deciding the numbers, I

(9)    should say. Prior to MD715 – I should say, 715 now

(10)    supplies the numbers. Okay.

(11)    Prior to 715, HUD would report the correct numbers

(12)    to – in the federal FEROP report.

(13)    Q.    I'm just referring to, for purpose of this

(14)    question, MD715.

(15)    A.    Okay. So, 715. So, this shows clearly that –

(16)    that anybody, if they did any analysis at all of the data,

(17)    they would clearly see that white males are – there is a

(18)    gross disparity in representation of white males compared to

(19)    black males and black females, for example.

(20)    This gets to the Constitutional challenge, the

(21)    racial challenge.

(22)    The – And HUD's just not even acknowledging it.

(23)    They're not – they're not attempting to identify barriers.

(24)    They're not attempting to eliminate barriers, because, first

(25)    of all, they're identifying. In fact, in the identification

**Page 76**

(1)    males in the HUD work force reach such a low level compared

(2)    to the relevant civilian labor force.

(3)    And how did the employment of black males and

(4)    black females in particular reach such a disproportionate –

(5)    and we're not talking, you know, 110 percent. We're talking

(6)    500 percent and so forth. Grossly disproportionate

(7)    representation compared to the civil labor force.

(8)    How did that happen? That's the barriers.

(9)    Q.    Well, what would you contend that HUD should do in

(10)    response to the data in the MD715s from 2004 and 2005?

(11)    A.    It should analyze its data more closely, look at

(12)    its employment practices, look at its employment procedures,

(13)    and correct them.

(14)    And I could give you a couple of examples of

(15)    procedures that are actual in this case.

(16)    Q.    What steps should HUD take to fix its imbalance of

(17)    white males?

(18)    MR. MANTELL:    Objection.

(19)    A.    Give preference to white males until the past

(20)    discrimination is corrected. Which is what it was doing

(21)    under the AEP.

(22)    They claim that there had been past discrimination

(23)    that resulted in under representation of women and

(24)    minorities. And it had preference programs to bring them up

(25)    to the relevant the civilian labor force.

Page 77

(1) So, why not do the same thing now for the white
(2) males? The pendulum needs to swing back.
(3)     Q    Do you intend to apply for positions at HUD in
(4) the future that will be subject to MD715?
(5)     A    Yes, I do.
(6)     Q    Do you intend to apply for positions announced
(7) under MSR announcements that will be subject to MD715?
(8)     A    Well, MSR is not people – that is a code that
(9) usually appears, but the merit staffing status only counted
(10) is – but it's not the only code used.
(11) So, I will be applying for – responding to
(12) applications for status only candidates.
(13)     Q    Would you apply to positions announced under the
(14) DEU procedures that would be subject to MD715?
(15)     A    DEU stands for data - delegated examining unit
(16) processing of applications. And I would be applying for
(17) those also.
(18)     Q    And if a position in the future were announced
(19) under both, would you apply to one or the other? Or would
(20) you apply to both?
(21)     A    I am probably one of the few employees that has is
(22) actually known that it's best to apply for both. And I will
(23) do that in the future.
(24) One of the patterns and practices that I allude to
(25) was that human resource personnel would always tell people

Page 79

(1)     MR. MANTELL:    Objection.
(2)     A    No. It does not.
(3)     BY MR. GRADY:
(4)     Q    How is it, if it doesn't direct that HUD those
(5) categories, race, gender, that you contend that HUD MD715 is
(6) in violation of Title VII of the Constitution?
(7)     MR. MANTELL:    Objection.
(8) (Witness scans document.)
(9)     A    Somewhere in the instructions, I cannot locate it
(10) immediately, but somewhere in the instructions for the MD715
(11) report, there is a statement that the goal of the MD715 is
(12) the elimination of barriers for equal employment opportunity
(13) for any EEO group. Not just the compiling of the
(14) statistical data that is reported in the report, which is
(15) actually already compiled by EEOC.
(16) I'm going to read this statement from Page 5909.
(17) It says: "Agents, they should be mindful that good
(18) intentions will not be sufficient to avoid liability for
(19) unlawful discrimination where a selection procedure is found
(20) to be unnecessarily burden members of an EEO group."
(21) "An agency is required to examine any procedure
(22) that operates to disproportionately burden identified
(23) groups. The agency must determine whether such procedures
(24) is job related and consistent with business necessity,"
(25) blah, blah, blah. Okay.

Page 78

(1) there was no need to apply under the DEU process.
(2)     MR. GRADY:    Okay. If we could just mark this as
(3) the next exhibit, please?
(4) (Patoski Exhibit Number 5 marked
(5) for identification.)
(6)     BY MR. GRADY:
(7)     Q    I'm just going to show you what has been marked as
(8) Exhibit 5.
(9) Can you tell me if you can recognize it? What is
(10) it?
(11)     A    It's titled fiscal year 2004 management directive
(12) 715, affirmative programs of EEO report.
(13)     Q    Are you familiar with the 2004 MD715 report?
(14)     A    I don't think I've seen the 2004 report before.
(15)     Q    How about the 2005?
(16)     A    I've read the 2005.
(17) (Patoski Exhibit Number 6 marked
(18) for identification.)
(19)     BY MR. GRADY:
(20)     Q    I show you what has been marked as Exhibit 6.
(21) Do you recognize that document?
(22)     A    Yes. This is a fiscal year 2005 management
(23) directive 715, affirmative program of EEO report.
(24)     Q    Thanks. Is it your contention that MD715 directs
(25) HUD to make decisions based on race, gender, sex?

Page 80

(1) Without complying with this report, HUD is
(2) damaging me currently and damaging me going forward, by not
(3) identifying the procedures that have resulted in striking
(4) disparities in white male representation in the HUD work
(5) force compared to the relevant civilian work force, versus
(6) the strikingly over representation of black males and
(7) females in the HUD work force. And that that is a violation
(8) of my Constitutional right to equal protection.
(9) Does that answer your question?
(10)     Q    That is your answer.
(11) And how does – if you so contend, how is it that
(12) MD715 violates Title VII?
(13)     MR. MANTELL:    Objection.
(14)     A    It's not MD715 itself that violates Title VII.
(15) It's HUD's failure to comply with the MD715 requirements.
(16)     BY MR. GRADY:
(17)     Q    In HUD's failing to comply with MD715's
(18) requirements, have you been denied a position? Or any other
(19) tangible employment position – benefit, excuse me.
(20) Tangible–
(21)     A    I have been damaged in that I am not able to
(22) complete – compete on a level playing field with women and
(23) minorities for training, promotion, job assignments.
(24)     Q    Because of MD715?
(25)     A    Because of HUD's failure to comply with MD715.

Page 81

(1) They have not identified and they have not removed
(2) the barriers to equal employment opportunities for white
(3) males as reflected in the statistical analysis that white
(4) males are grossly under represented compared to the relevant
(5) civilian labor force, compared to black males and black
(6) females.
(7)   MR. MANTELL:    Could we take a short break? Or
(8) would you want to take a long break?
(9)   MR. GRADY:    Absolutely. It's up to you. Do you
(10) want to take lunch now?
(11)   MR. MANTELL:    Is this a good point?
(12)   MR. GRADY:    Yes.
(13)   (Off the record from 12:10 p.m. to 1:00 p.m.)
(14)   Q.   Okay. You mentioned earlier that HUD had a
(15) practice of placing individuals into temporary positions,
(16) specifically women and minorities; is that correct?
(17)   A.   Yes.
(18)   Q.   What claims are you making in this lawsuit with
(19) respect to HUD's practice in this regard?
(20)   A.   Well, in the case of a public housing
(21) revitalization specialist position, the selectee Abbey
(22) Ogunbola was first selected as a temporary community builder
(23) fellow in a competition that was closed to HUD employees.
(24) I could not apply for it. It was only open to
(25) outside employees.

Page 82

(1)   Q.   What type of position--
(2)   A.   And--
(3)   Q.   I'm sorry. Go ahead. I didn't know you weren't
(4) finished. I apologize.
(5)   A.   The creation of those positions and hiring them as
(6) fellows was determined by OPM to be a violation of the
(7) Schedule A hiring authority.
(8) So, not only was it discrimination within -- it
(9) was discriminatory, because it was done -- it was designed,
(10) in my estimation to place him in that position temporarily,
(11) so that at a later point in time, they could be converted to
(12) full-time positions and they would have the experience
(13) necessary to be selected to the position full-time.
(14) And that they not only did this, they violated OPM
(15) regulations in doing that.
(16) So they carried out a prohibitive personnel policy
(17) action to place him there.
(18)   Q.   Okay. So, first HUD violated the OPM regulations
(19) in hiring the community builder fellows; is that correct?
(20)   A.   That's correct.
(21)   Q.   Can you describe briefly, what is the community
(22) builder fellow program to your understanding?
(23)   A.   Well, it was advertised that it would be a two
(24) year fellowship program, possibly, depending upon commercial
(25) appropriations renewed for another two years, in which

Page 83

(1) people from outside HUD, primarily our clients, would --
(2) meaning that professionals that worked with HUD, from city
(3) governments or housing development corporations or the
(4) private sector, would come in and spend time at HUD
(5) participating as a community builder in the community
(6) builder program, but also learning what HUD does and trying
(7) to cross pollinate HUD into what the concerns and issues are
(8) for the clients.
(9) And that they would definitely leave and go back
(10) to their former positions at the end of the fellowship,
(11) which I don't know of any fellows that actually left HUD.
(12)   Q.   Now, you also said that -- well, first you said
(13) they violated OPM regulations in making the hires; is that
(14) correct?
(15)   A.   Yes.
(16)   Q.   Second--
(17)   A.   It's not my -- it's not my determination. That
(18) was OPM's determination.
(19)   Q.   And second, that they're hiring was discriminatory
(20) when they hired the community builder fellows?
(21)   A.   Yes.
(22)   Q.   What's the basis for the claim that the hiring of
(23) the community builder fellows was discriminatory?
(24)   A.   The amount of community builder fellows that were
(25) women and minorities, the fact that it was closed to HUD

Page 84

(1) employees, the fact that they didn't follow their own
(2) selection criteria as disclosed in the HUD Inspector
(3) General's audit.
(4) You know, they have a cutoff score. And they
(5) hired more -- more people.
(6) And just my general observation of the quality of
(7) the people that they brought in.
(8)   Q.   Okay. Now, you said it was closed to HUD
(9) employees; is that correct?
(10)   A.   Yes.
(11)   Q.   And why was it -- how was it closed to HUD
(12) employees?
(13)   A.   Because it was a temporary fellowship position and
(14) HUD employees could not apply for it.
(15)   Q.   You couldn't apply for a temporary position?
(16)   A.   I suppose; if I resigned my permanent position, I
(17) could apply for it. But, you would lose your civil service
(18) status, and benefits, etcetera, etcetera.
(19)   Q.   Okay. So, did HUD prohibit you from applying for
(20) this position? Or did you choose not to because you would
(21) lose your civil service benefits?
(22)   A.   All the material that was presented to the HUD
(23) employees made it clear that HUD employees would not be
(24) selected or should not apply for the job.
(25)   Q.   Did anyone -- did you apply?

Page 85

(1) A No. I did not. I did not know any HUD employee

(2) who applied.

(3) Q And your contention is today that you didn't apply

(4) because you were told you couldn't?

(5) A Yes.

(6) Q But you were telling – you could have resigned

(7) your position at HUD and you could have applied for this

(8) position?

(9) A I'm not clear that that would have been the case,

(10) but I – if I had resigned from HUD, then I wouldn't have

(11) been a HUD employee.

(12) And my representation is that no HUD employee

(13) could apply for the position.

(14) Q Okay. And you didn't attempt to do so?

(15) A No. I did not attempt to do so.

(16) Q Now, I take it that white non-HUD employees could

(17) apply for the position?

(18) A Could?

(19) Q Could.

(20) A Say that again?

(21) Q Sure. That's quite non-employees of HUD–

(22) A Yes.

(23) Q – could apply for the community builder

(24) fellowships?

(25) A They could. They could. But I believe – well,

Page 86

(1) they could.

(2) Q And if, in fact, HUD discriminated against those

(3) – well, strike that.

(4) Do you know if any white individuals applied for

(5) the community builder fellow program?

(6) A Yes. They did apply. And yes, they were

(7) selected.

(8) Q And if there were white applicants who weren't

(9) selected on the grounds – or strike that.

(10) If HUD had discriminated against white males or –

(11) well, we'll take white males. If HUD had discriminated

(12) against white males in the community builder hiring

(13) process and there were white male applicants that didn't get

(14) the job, I take it that those individuals could pursue a

(15) Title VII action against HUD for discrimination; couldn't

(16) they?

(17) A Yes, they could.

(18) Q And how would the community builder fellow

(19) position have compared to your position at HUD that you had

(20) at that time? Would it have been more money? Less money?

(21) MR. MANTELL: Objection.

(22) A It was the same grade structure as the regular

(23) community builder staff positions. Meaning, it was a 13,

(24) 14, 15 position. So, they could have hired you at any

(25) level.

Page 87

(1) So, I would have applied, as I had applied, for

(2) the CB position as a 14 and that would have been a financial

(3) enhancement.

(4) BY MR. GRADY:

(5) Q Okay. Now, coming back to, you mentioned the

(6) public housing revitalization specialist position was given

(7) to an individual named Abbey Ogunbola; correct?

(8) A Yes.

(9) Q And this is an individual who had participated in

(10) the community builder fellow program; correct?

(11) A Yes.

(12) Q And it's your contention that he had an unfair up.

(13) Why is it that Abbey Ogunbola's participation in

(14) the community builder fellow program harmed you?

(15) A It harmed me, because it was actually part of the

(16) policy statement of what people could do or should do to

(17) promote the – to meet the AEP goals.

(18) And as I said, one of those policies suggested –

(19) listed ways of doing this. And one was to put people, women

(20) and minority in temporary positions.

(21) This was exactly what had occurred. They put him

(22) in a temporary position which gave him a heads up for the

(23) permanent position, because he was trained during that year

(24) to actually do the job.

(25) Q Well, is a public housing revitalization

Page 88

(1) specialist a community builder?

(2) A It was a position that replaced the temporary

(3) community builder fellow specialist.

(4) He was a temporary community builder fellows

(5) specialist Hope VI program specialist. The public housing

(6) revitalization specialist was a Hope VI specialist also. It

(7) was the same job.

(8) Q So, Mr.Ogunbola got experience in Hope VI in the

(9) community builder fellow program?

(10) A Hope VI from the HUD perspective. And, yes, the

(11) temporary fellow program.

(12) Q You, in your job as a community planning and

(13) development employee, didn't get experience in Hope VI?

(14) A Not in the public housing program called Hope VI.

(15) I had a similar – experience similar to the Hope VI program

(16) in its predecessor program.

(17) Q To your knowledge, was Abbey Ogunbola complicit

(18) somehow in HUD's discrimination in hiring him for the

(19) community builder fellow position?

(20) MR. MANTELL: Objection.

(21) A Yes.

(22) BY MR. GRADY:

(23) Q How so?

(24) A By disclosing in his application that he was a

(25) black male.

(1) Q For the community builder fellow position?
(2) A Yes.
(3) Q And so, an individual that identifies themselves
(4) as a black male is complicit in HUD's discrimination that
(5) you allege in this case?
(6) MR. MANTELL: Objection.
(7) A I believe so. I believe it's a way that is
(8) probably promulgated at Blacks in Government and even HUD
(9) people talk about using it.
(10) I think, we gave you at one point minutes of a
(11) management agenda saying where Secretary Cuomo said he
(12) wanted minorities selected for these positions. He wanted
(13) diversity to be a factor in the selections.
(14) And legal counsel correctly told him that you
(15) couldn't ask for race or that information. And the human
(16) resources person said, oh, no problem. We can tell from
(17) what activities they list on their thing.
(18) So, Mr. Ogunbola, at least on the permanent
(19) position, listed that he had been in the Black MBA program
(20) or something of that nature.
(21) BY MR. GRADY:
(22) Q With respect to–
(23) A That seems to be very common from the minority
(24) applications that I have reviewed regarding my – regarding
(25) the process here.

(1) They all seem to somehow put that in as like a
(2) professional association or whatever. So it's a flag.
(3) Q It's your contention that black applicants are
(4) complicit in HUD's discrimination by preparing their
(5) applications in such a way that identifies them as being of
(6) a minority?
(7) MR. MANTELL: Objection.
(8) A I believe that is so. I believe the word is out
(9) on the street, through Blacks In Government and other
(10) organizations, that there is a preference for minorities and
(11) women. And if you can show that you are one of those
(12) preference groups in your application, terrific. All the
(13) better. It gives you a heads up.
(14) BY MR. GRADY:
(15) Q Is there any other instance where HUD's use of the
(16) practice, as you have described it, of placing minorities in
(17) acting positions or temporary positions to gain experience
(18) harmed you? Personally?
(19) MR. MANTELL: Objection.
(20) A I can not think of any at this time.
(21) BY MR. GRADY:
(22) Q Now, I just want to be clear.
(23) Is placing individuals into a temporary position
(24) in an acting capacity different than the claim with respect
(25) to Mr. Ogunbola? Or is it the same?

(1) A Repeat the question?
(2) Q Is there any – sure.
(3) When you say placing – okay. That's – I
(4) apologize. Withdrawn.
(5) Can you describe for me what, if any, allegations
(6) you make with respect to HUD's practices and procedures
(7) regarding issuing and canceling vacancy announcements?
(8) A Yes. HUD does that for the purpose of not
(9) selecting – not being forced to select white males. As in
(10) the case pointed out for the community planning and
(11) development director of Miami, where they had selected
(12) someone from that roster, with a – that had a veterans
(13) preference in the scoring, they would've had to select a
(14) white male. So, they didn't select him.
(15) Made the representation that we are issuing – we
(16) issued, HUD issued, management issued, program office. It
(17) wasn't a personnel decision. It was the program – program
(18) office.
(19) That the program office made a decision that they
(20) needed a broader applicant pool and reissued the vacancy
(21) announcement.
(22) And when they reissued it, they got less of an
(23) applicant pool and ended up hiring an Hispanic female with a
(24) substantially less rating than the white male that they
(25) could've hired in the first round.

(1) So, they hired a less qualified person and got
(2) less of an applicant pool.
(3) Now, HUD has represented they can't tell us how
(4) many times they canceled and reissued vacancies. But, the
(5) EEOMAS program description says that data is right in the
(6) EEOMAS – in the database.
(7) So, I find that – I question the veracity of that
(8) claim.
(9) Q So, what position have you personally been denied
(10) as a result of this process?
(11) MR. MANTELL: Objection.
(12) A Well, I believe the public housing revitalization
(13) specialist position.
(14) If Abbey had not had the one year – well, it was
(15) less than one year – the one year in-house training in the
(16) program, he probably would have scored less and I would have
(17) been on the selection roster. And I would've been selected.
(18) BY MR. GRADY:
(19) Q Other than with regard to the cancellation and
(20) reissuance of the vacancy announcement, is that something
(21) that came up in the PHRS position?
(22) A No. But it did come up in the community planning
(23) and development position. And I was on the best qualified
(24) list for that position.
(25) One of the best qualified lists which they could